JUDGE PAULEY

12 CIV 6837

Athanasios Basdekis (AB2574)
Brian A. Glasser (*Pro Hac Vice* forthcoming)
James B. Perrine (*Pro Hac Vice* forthcoming)
**BAILEY & GLASSER, LLP**
209 Capitol Street
Charleston, WV 25301
(304) 345-6555 (main)
(304) 342-1110 (facsimile)
*Counsel for Plaintiff Thomas W. Charron Jr.,
Individually and as Trustee of the Thomas W.
Charron Jr. Grantor Retained Annuity Trust
Dated July 8, 2010*



**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| THOMAS W. CHARRON JR., Individually and as Trustee of the THOMAS W. CHARRON JR. GRANTOR RETAINED ANNUITY TRUST DATED JULY 8, 2010,<br><br>Plaintiff,<br><br>v.<br><br>SALLYPORT GLOBAL HOLDINGS, INC.; JPD PRIVATE TRUST COMPANY, LTD, as Trustee of THE GPD CHARITABLE TRUST; GIAN PAUL DEBLASIO (aka John P. DeBlasio), as Trustee of THE JOHN DEBLASIO CHARITABLE TRUST FOR WORLD PEACE AND DEVELOPMENT; and JOHN DOE, as Trustee of THE JOHN DEBLASIO CHARITABLE TRUST FOR WORLD PEACE AND DEVELOPMENT,<br><br>Defendants. | Civ. No. _____<br><br><br>**COMPLAINT** |

## COMPLAINT

Plaintiff Thomas W. Charron Jr. ("Charron"), Individually and as Trustee of the Thomas

W. Charron Jr. Grantor Retained Annuity Trust Dated July 8, 2010 (the "Charron Trust"), brings

this action against Defendants Sallyport Global Holdings, Inc. ("Sallyport" or the "Company"), the JPD Private Trust Company, LTD ("JPD Trust Company"), as Trustee of The GPD Charitable Trust (the "GPD Trust"), Gian Paul DeBlasio (aka John P. DeBlasio) ("DeBlasio"),[1] as Trustee of The John DeBlasio Charitable Trust for World Peace and Development ("DeBlasio World Peace Trust"), and John Doe, as Trustee of the DeBlasio World Peace Trust (collectively, "Defendants"), and states as follows, based on information and belief, with such information and belief being based on the investigation of Plaintiff and his counsel and a review of, among other things:

a.    that certain Stock Purchase Agreement dated December 7, 2010 (the "Agreement"), among Sallyport Global Holdings, Inc. and Plaintiff, attached hereto as **Exhibit A**;

b.    that certain Securities Purchase Agreement dated May 6, 2011 (the "SPA") by and among Sallyport, Sallyport Holdings, LLC, Kaseman LLC, Sallyport Global Inc., John P. DeBlasio, and the Stockholders of Sallyport and of Sallyport Global Inc., attached hereto as **Exhibit B**.   This SPA describes the "Kaseman Acquisition."   The SPA attached to this Complaint, which does not include the Schedules that are part of the full SPA, is the same SPA attached as Exhibit D to the Complaint in the case of *JPD Private Trust Company, Ltd., as Trustee of The GPD Charitable Trust, Plaintiff, versus KS International, LLC, and Sallyport Global Holdings Inc., Defendants*, Civil Action No.: 1:12CV572-AJT/JFA in the United States

---

[1] DeBlasio is not an individual defendant in this litigation; he is being sued solely in his capacity as a Trustee.  Plaintiff's claims against DeBlasio in his individual capacity are being brought in a parallel proceeding in the Circuit Court for Fairfax County, Virginia ("Fairfax County Litigation"). The same is true for the other non-defendant entities and non-defendant individuals referenced in this Complaint.  Each defendant in the Fairfax County Litigation is a "Conspirator," and collectively all Defendants in the Fairfax County Litigation are referred to

District Court for the Eastern District of Virginia, Alexandria Division (the "EDVA Litigation"). The EDVA Litigation includes as an exhibit to the Complaint an Independent Auditor's Report prepared for the "Acquiring Conspirators" (defined below) by McGladrey & Pullen, LLP (the "McGladrey Audit"). The McGladrey Audit provided, *inter alia*, an audit of the "consolidated and combined balance sheet of Kaseman Holdings, LLC and Subsidiaries and Sallyport Holdings, LLC and Subsidiaries . . . as of June 30, 2011. . . ." Note 2 of the McGladrey Audit analyzed the Kaseman Acquisition and concluded that the total purchase price for the shares of Sallyport acquired on June 29, 2011, was Eighty-Two Million Eight Hundred Forty-One Thousand Dollars ($82,841,000.00). The McGladrey Audit number is higher than the Defendants' reported enterprise value in connection with the Kaseman Acquisition, but is still inconsistent with at least four Indications of Interest that Sallyport had received from on or about July 13, 2010, to on or about August 6, 2010, which Indications of Interest each placed the value of Sallyport between Ninety Million Dollars ($90,000,000.00) and One Hundred Ten Million Dollars ($110,000,000.00). The publically disclosed information in the EDVA Litigation raises the question of what happened to millions of dollars of Enterprise Value in connection with the Kaseman Acquisition? Plaintiff has a good faith belief that this money was transferred away from Sallyport to the offshore trusts disclosed in the EDVA Litigation;

      c.     Amendment No. 1 to the SPA, dated June 2011, and attached hereto as **Exhibit C**, a document publicly filed in the EDVA Litigation;

      d.     The Complaint from the EDVA Litigation and accompanying exhibits, which are attached hereto as **Exhibit D**;

---

herein as the "Non-Defendant Conspirators," and with the Defendants herein, collectively the "Conspirators." See *infra*.

e.      that certain letter dated September 20, 2011, from David J. Kalson, Cohen &

Grigsby, P.C., ("Kalson") to Michael F. O'Connor, Williams & Connolly LLP, ("O'Connor")

wherein Kalson states that Defendant DeBlasio had authorized him to disclose on behalf of

Sallyport that "a transaction involving the sale of greater than 20% by voting power of

Sallyport's equity was consummated on June 29, 2011 for a price that reflected an enterprise

value of Sallyport and related entities of $64.5 million," attached hereto as **Exhibit E**;

f.      that certain letter dated October 6, 2011, from O'Connor to Kalson requesting, on

behalf of Plaintiff Charron, "a copy of the purchase agreement and any related documents" to

"verify the transaction value," attached hereto as **Exhibit F**;

g.      that certain email dated July 14, 2012, sent by Defendant DeBlasio to Plaintiff

Charron in response to Plaintiff Charron's request to receive a copy of the purchase agreement

and related documents which could be used to verify the transaction value of Sallyport, attached

hereto as **Exhibit G**;

h.      All of the allegations made in this Complaint are made on the basis of documents

that are publicly filed and publicly available. Plaintiff notes that as a result of a demand, in April

2012, he received, from DeBlasio, a copy of the full SPA and all related Schedules. DeBlasio

refused to produce the schedules until a Confidentiality Agreement dated March 3, 2012, was

executed between DeBlasio and Plaintiff. This was a further attempt by DeBlasio to mislead

Plaintiff because he never produced the McGladrey Audit discussed above. In any event, the

Schedules included in that full version of the SPA further evidence the breach of the Agreement

and scheme to defraud Plaintiff, as alleged herein. At present, Plaintiff does not have a waiver

from DeBlasio to use those confidentially disclosed documents in this litigation. Plaintiff

therefore has not included the Schedules in this Complaint. Plaintiff intends to seek early

discovery of the full SPA, with all Schedules attached, in this litigation, and will amend his Complaint accordingly thereafter; and

i.    Further important information associated with the Kaseman Acquisition structuring described below, like the specific bank accounts used for the transfers, the dates, times and amounts associated with each transfer, the specific entities involved in each transfer, and the email traffic associated with structuring the Kaseman Acquisition in association with these transfers is all presently solely and exclusively in the possession of the Defendants and Conspirators.  Once this information is obtained through discovery, Plaintiff will include the specific transfers, the parties involved, the dates of the transfers and the accounts involved, in his amended Complaint.

## STATEMENT OF THE CASE

1.    This action arises from the Defendants' breach of contract and concomitant scheme to defraud the Plaintiff out of millions of dollars.  This illicit scheme included the use of shell companies and shadowy offshore trusts to achieve its conspiratorial and fraudulent aims.

2.    On December 7, 2010, Plaintiff, as an individual, and as Trustee of the Charron Trust, entered into the Agreement with Sallyport which was consummated on December 8, 2010, the same day that Plaintiff Charron resigned his position as an officer, director, and employee of Sallyport.  Pursuant to the Agreement, Sallyport purchased all of the shares that Thomas Charron and the Charron Trust held in Sallyport.

3.    In Section 2.04 of the Agreement, Sallyport agreed to provide "Windfall Protection" to Plaintiff in the event Sallyport, DeBlasio, or any of their affiliates or any other direct or indirect equity holders, on or prior to the first anniversary date of the Agreement, sold or agreed to sell shares of Sallyport's capital stock (or equity of an intervening Person or assets

of Sallyport or any Sallyport subsidiary) constituting 20% or more by voting power or economic value of Sallyport's assets or equity to a third party in one or a series of related transactions for a price that reflected an enterprise value of Sallyport equal to or greater than Sixty-Five Million Dollars ($65,000,000.00) (a "Windfall Sale").   The occurrence of a Windfall Sale entitled Plaintiff to a payment of twenty percent (20%) of the proceeds from such transaction or transactions within three Business Days following the closing of such Windfall Sale, with such payment to be made by Sallyport or Defendant DeBlasio or such other selling stockholder. [2]

4.       Defendants, along with the Non-Defendant Conspirators, conspired and aided and abetted one another to breach the Agreement and illicitly structure the sale of the shares in Sallyport by the DeBlasio World Peace Trust to Sallyport Holdings LLC on June 29, 2011, (the "Kaseman Acquisition") so as not to pay Plaintiff millions of dollars.

5.       Non-Defendant Conspirators Thomas J. Campbell ("Campbell"), DC Capital Partners, LLC ("DC Capital Partners"), DC Capital Partners Investments, L.L.C. ("DC Capital Partners Investments"), Kaseman LLC ("Kaseman"), and Sallyport Holdings, LLC ("Sallyport Holdings") (collectively, the "Acquiring Conspirators") profited from this scheme and conspiracy by being able to acquire Sallyport at a price they deemed favorable, as a result of not paying Plaintiff millions of dollars.

---

[2] Section 2.04 reads as follows: "Windfall Protection. As additional consideration for the Shares, the Company agrees to make an additional payment to Sellers, on the basis and subject to the limitations provided in this Section 2.04. If, on or prior to the first anniversary of the date hereof, John DeBlasio or any of his affiliates of any other direct or indirect equity holder sells or agrees to sell shares of the Company's capital stock (or equity of an intervening Person or assets of the Company or any Company subsidiary) constituting 20% or more by voting power or economic value of the Company's assets or equity to a third party in one or a series of related transactions for a price that reflects an enterprise value of the Company equal to or greater than $65,000,000 (a "Windfall Sale"), within three Business Days following the closing of such Windfall Sale, the Company or such stockholder shall pay Sellers an amount equal to 20% of the proceeds received from the Windfall Sale, such payment to be made to Sellers pro rata in accordance with the percentages set forth on Schedule I."

6.     Non-Defendant Conspirator KS International, LLC ("KS International") is the successor in interest to Kaseman.

7.     Acquiring Conspirators Campbell, DC Capital Partners, and DC Capital Partners Investments made their investment in the other Acquiring Conspirators more lucrative through their active participation in a purposefully complex and illegitimate scheme to evade Defendants' obligations to Plaintiff.

8.     Non-Defendant Conspirators Sallyport Global, LLC ("Sallyport Global") and Sallyport Global Services, Ltd. ("Sallyport Global Services") (collectively, the "Conduit Conspirators"), participated as unlawful conduits for funds moving away from Sallyport to conceal the true enterprise value of Sallyport in the Kaseman Acquisition.

9.     DeBlasio, the JPD Trust Company, as Trustee of the offshore GPD Trust, previously known as the offshore DeBlasio World Peace Trust, Pasquale DeBlasio, individually and as Trustee of the  John P. DeBlasio Trust ("DeBlasio Trust"), The DeBlasio Group, DeBlasio and DeBlasio Associates, and Franco DeBlasio (collectively, the "Seller Group Conspirators") profited from the scheme and conspiracy by being able to sell Sallyport at a price they deemed more favorable by concealing the true enterprise value of Sallyport in the Kaseman Acquisition.  The members of the Seller Group Conspirators who were actual shareholders of Sallyport profited directly by selling the company for a higher price than would otherwise have been possible in the absence of the scheme to breach the contract and defraud Plaintiff.  The members of the Seller Group Conspirators who were not direct shareholders of Sallyport were paid cash for their participation in the fraudulent scheme, or received other pecuniary or non-pecuniary benefits important to them.

10.     A key element of the improper scheme to cheat Plaintiff was reporting the alleged enterprise value of Sallyport for purposes of the Kaseman Acquisition to Plaintiff at the contrived sum of Sixty-Four Million Five Hundred Thousand Dollars ($64,500,000.00) — a sum conveniently stated to appear to rest just under the Sixty Five Million Dollar ($65,000,000.00) enterprise value threshold which triggered payment obligations to Plaintiff.

11.     Defendants so reported this false enterprise value despite knowing that the Conduit Conspirators, under the direction of the Seller Group Conspirators and with the full knowledge and participation of the Acquiring Conspirators, near the time of the transaction, transferred away millions of dollars, to the newly created DeBlasio World Peace Trust, an offshore shell Bermuda trust controlled by Defendant DeBlasio.

12.     As mentioned above, Plaintiff was aware that from on or about July 13, 2010, to on or about August 6, 2010, Sallyport had received at least four responses of Indication of Interest which placed the value of Sallyport between Ninety Million Dollars ($90,000,000.00) and One Hundred Ten Million Dollars ($110,000,000.00).

13.     The McGladrey Audit accomplished as part of the Kaseman Acquisition transaction provided, *inter alia*, an audit of the "consolidated and combined balance sheet of Kaseman Holdings, LLC and Subsidiaries and Sallyport Holdings, LLC and Subsidiaries . . . as of June 30, 2011. . . ." Note 2 of the McGladrey Audit analyzed the Kaseman Acquisition and concluded that the total purchase price for the shares of Sallyport acquired on June 29, 2011, was Eighty-Two Million Eight Hundred Forty-One Thousand Dollars ($82,841,000.00).

14.     Thus millions of dollars moved out of Sallyport as part of the Kaseman Acquisition transaction. The exact time(s) of the transfer(s), the parties involved, the receiving account(s), and other such related information, is known to, and in the exclusive control of, the Defendants. Plaintiff has a good faith belief, and is confident, that such transfer(s) occurred. Plaintiff plans to seek this detailed information immediately in discovery, and will file an amended Complaint upon the receipt of such information.

15.     All of the Defendants conspired and acted to so report this false value despite knowing that the true enterprise value of Sallyport for the Kaseman Acquisition was at least Eighty Two Million Eight Hundred Forty One Thousand Dollars ($82,841,000.00) (the "Enterprise Value").

16.     Plaintiff was entitled to twenty percent of proceeds received by DeBlasio and his affiliates, which is no less than, and is in fact more than, Sixteen Million Five Hundred Sixty

Eight Thousand Two Hundred Dollars ($16,568,200.00), at the time of the closing of the Kaseman Acquisition on June 29, 2011.

17.     Defendants' actions in planning, structuring and effectuating the Kaseman Acquisition so as to breach the Agreement and defraud and cheat Plaintiff were deliberate, intentional, and unlawful, and they entitle Plaintiff to compensatory and punitive damages.

18.     Plaintiff brings this action to recover all amounts to which he is entitled in law and equity as a direct and proximate cause of Defendants tortious and fraudulent actions, and their breach of contract and breach of the covenants of good faith and fair dealing. These amounts include at least Sixteen Million Five Hundred Sixty Eight Thousand Two Hundred Dollars ($16,568,200.00) in compensatory damages, and punitive damages up to the amount permitted by law and in equity, as set forth below.

## JURISDICTION AND VENUE

19.     This Court has jurisdiction over the subject matter of this action pursuant to diversity jurisdiction under 28 U.S.C. § 1332(a)(1) since complete diversity of citizenship exists between the parties.  Plaintiff individually is a citizen of the State of Florida as Thomas Charron is a citizen of the State of Florida and Plaintiff as trustee of the Charron Trust is a citizen of the State of Florida as the Charron Trust is a trust organized under the laws of Florida.  Defendant Sallyport is a citizen of the State of Delaware since it is a Delaware corporation and is a citizen of the State of Virginia since its principal place of business is at 1600 Tysons Boulevard, Suite 1400, McLean, Virginia 22102.  Defendant JPD Trust Company is a Bermuda company with a principal place of business located at Mintflower Place, 8 Par-la-Ville Road, Hamilton, HM08, Bermuda, and is the Trustee of the GPD Trust, formerly known as the DeBlasio World Peace Trust.  All of these parties are Bermuda citizens. Defendant DeBlasio is a citizen of the State of Illinois, and at all relevant times, he served as either the Trustee, and/or the President of the Trustee, of the DeBlasio World Peace Trust, a trust organized under the laws of Bermuda and a

citizen of Bermuda, which is now the GPD Trust, a trust organized under the laws of Bermuda and a citizen of same. Upon information and belief, John Doe is or was the Trustee of the DeBlasio World Peace Trust, and is not a citizen of the State of Florida but is believed to be a citizen of Bermuda, the same citizenship as the DeBlasio World Peace Trust over which John Doe sits as Trustee, such that complete diversity of citizenship exists.

20.    Venue is proper in this District pursuant to Section 6.05 of the Agreement and 28 U.S.C. § 1391. Section 6.05 of the Agreement states in relevant part as follows: "Governing Law; Choice of Forum.  This Agreement shall be governed by and construed in accordance with the laws of the State of New York.  The parties agree that the exclusive place of jurisdiction for any action, suit or proceeding relating to this Agreement shall be in the courts of the United States of America sitting in the Borough of Manhattan in the City of New York or, if such courts shall not have jurisdiction over the subject matter thereof, in the courts of the State of New York sitting therein, and each such party hereby irrevocably and agrees to submit to the jurisdiction of such courts for purposes of any such action, suit or proceeding.  Each party irrevocably waives any objection it may have to the venue of any action, suit or proceeding brought in such courts or to the convenience of the forum.  Each party hereto consents to service of process in any such proceeding in any manner permitted by New York law, and agrees that service of process by registered or certified mail, return receipt requested, at such party's address set forth in Section 6.04 is reasonably calculated to give actual notice.  Final judgment in any such action, suit or proceeding shall be conclusive and may be enforced in other jurisdictions by suit on the judgment, a certified or true copy of which shall be conclusive evidence of the fact and the amount of any indebtedness or liability of any party herein."

21.    Defendants are all parties to the Agreement by being either signatories to the Agreement and/or obligors of payments due to Plaintiff pursuant to Section 2.04 of the Agreement, of which they were aware at the time they succeeded to their interests as shareholders and which reads in relevant part that "the Company or such stockholder shall pay Seller [Charron and the Charron Trust] an amount equal to 20% of the proceeds received from

the Windfall Sale, such payment to be made to Sellers *pro rata* in accordance with the percentages set forth on Schedule I."

## PARTIES

1.      Plaintiff individually is a citizen of the State of Florida and over the age of eighteen. Plaintiff is also the Trustee of the Charron Trust, a trust organized under the laws of Florida, which has a principal address of 14250 Royal Harbour Court 1017, Fort Myers, Florida 33908..

2.      Defendant Sallyport is a Delaware corporation with a principal place of business located at 1600 Tysons Boulevard, Suite 1400, McLean, Virginia 22102.

3.      Defendant JPD Trust Company is a Bermuda company with a principal place of business located at Mintflower Place, 8 Par-la-Ville Road, Hamilton, HM08, Bermuda, and is the Trustee of the GPD Trust, formerly known as the DeBlasio World Peace Trust.

4.      Defendant DeBlasio (also known as John P. DeBlasio) is a citizen of the State of Illinois over the age of eighteen. He is sued solely in a representative capacity, not individually. DeBlasio is or was either the Trustee, and/or the President of the Trustee, of the DeBlasio World Peace Trust, a charitable trust organized under the laws of Bermuda, which is now the GPD Trust, a charitable trust organized under the laws of Bermuda.

5.      Upon information and belief, Defendant John Doe is or was the Trustee of the DeBlasio World Peace Trust, and is not a citizen of the State of Florida, but is a citizen of one of the 49 other states or a citizen of a foreign country, likely Bermuda, the same citizenship as the DeBlasio World Peace Trust.

6.     Non-Defendant Conspirator DC Capital Partners is a Virginia limited liability company with a principal place of business located at 11 Canal Center Plaza, Suite 350, Alexandria, Virginia, 22314.

7.     Non-Defendant Conspirator DC Capital Partners Investments is a Virginia limited liability company with a principal place of business located at 1600 Tysons Boulevard, Suite 900, McLean, Virginia, 22101.

8.     Non-Defendant Conspirator KS International is a Delaware limited liability company with a principal place of business located at 1600 Tysons Boulevard, Suite 1400, McLean, Virginia 22102.  Defendant KS International is a portfolio company of DC Capital Partners.  Upon information and belief, Defendant KS International is a subsidiary of, affiliate of, or is managed, controlled or owned in whole or in part by, DC Capital Partners.

9.     Non-Defendant Conspirator Kaseman is a Virginia limited liability company with a principal place of business located at 1600 Tysons Boulevard, Suite 1400, McLean, Virginia 22102.  Defendant Kaseman is a subsidiary of Defendant KS International.  Upon information and belief, Defendant Kaseman is a subsidiary of, affiliate of, or is managed, controlled or owned in whole or in part by, KS International and/or DC Capital Partners.

10.    Non-Defendant Conspirator Sallyport Holdings is a Delaware limited liability company with a principal place of business at 1600 Tysons Boulevard, Suite 1400, McLean, Virginia 22102.  Defendant Sallyport Holdings is (or was) a portfolio company of DC Capital Partners.  Upon information and belief, Defendant Sallyport Holdings is (or was) a subsidiary of, affiliate of, or is (or was) managed, controlled or owned in whole or in part by, KS International and/or DC Capital Partners.

11.    Non-Defendant Conspirator Sallyport Global is a Florida limited liability company with a principal place of business at 27200 Riverview Center Boulevard, Suite 309, Bonita Springs, Florida 34134, and is the successor-in-interest to Non-Defendant Conspirator Sallyport Global, Inc.

12.     Non-Defendant Conspirator Sallyport Global Services, Ltd. is a Bermuda company with a principal place of business located at 2 Church Street, Hamilton, HM11, Bermuda.

13.     Non-Defendant Conspirator Pasquale DeBlasio is a citizen of the Commonwealth of Pennsylvania over the age of eighteen and is the Trustee of the DeBlasio Trust, a business trust organized under the laws of the State of Florida. He is an owner of the DeBlasio Group, which is under contract with Sallyport, and he also acting in the conflicted position as Trustee of the DeBlasio Trust.

14.     Non-Defendant Conspirator DeBlasio Group is a Pennsylvania business trust with a principal place of business located at 445 Washington Avenue, Bridgeville, Pennsylvania 15107.

15.     Non-Defendant Conspirator DeBlasio and DeBlasio Associates is a Pennsylvania corporation with a principal place of business located at 447 Washington Avenue, Bridgeville, Pennsylvania 15107.

16.     Non-Defendant Conspirator Franco DeBlasio is a citizen of the Commonwealth of Pennsylvania over the age of eighteen and an owner and/or manager of Non-Defendant Conspirators DeBlasio Group and DeBlasio and DeBlasio Associates.

17.     Non-Defendant Conspirator Thomas J. Campbell is a citizen of Virginia over the age of eighteen and is the President and Founder of Defendant DC Capital Partners.

## FACTUAL BACKGROUND

**A.     The Efforts Before December 8, 2010 of Plaintiff Charron and DeBlasio to Sell Sallyport and the Forging of the Relationship between DeBlasio and DC Capital Partners, DC Capital Partners Investments, KS International, Kaseman, Sallyport Holdings, and Campbell.**

18.     In August 2009, Plaintiff Charron and DeBlasio, each a fifty percent (50%) owner of Sallyport, started to search for purchasers of the Company.

19.    On or about August 16, 2009, DeBlasio hired Glenn Corliss on behalf of Sallyport to locate potential purchasers of the Company.

20.    On or about September 15, 2009, Sallyport entered into an agency agreement with Trans Equity Advisors under which Trans Equity Advisors would identify purchasers for, and assist in, the sale of Sallyport.  The agreement with Trans Equity Advisors was effective from September 15, 2009, until January 31, 2010.

21.    In late October 2009, Trans Equity Advisors introduced Plaintiff Charron and DeBlasio to DC Capital Partners and Mr. Campbell, who expressed interest in buying Sallyport, but decided not to pursue an acquisition at that particular time.

22.    On or about February 2, 2010, Sallyport terminated its agreement with Trans Equity Advisors.

23.    On or about February 25, 2010, Sallyport entered into an agreement with Sagent Advisors, Inc. ("Sagent"), under which Sagent would serve as Sallyport's exclusive financial advisor with respect to any sale, merger, consolidation or other similar transaction.

24.    On or about April 13, 2010, DeBlasio in a letter to Plaintiff Charron expressed that he would be working with Torch Hill Investment Partners to execute a Management Buyout of Charron's interest in Sallyport for Forty Million Dollars ($40,000,000.00).

25.    On or about June 22, 2010, Sagent sent out a preliminary interest letter to numerous possible acquirers for the acquisition of Sallyport.

26.    From on or about July 13, 2010, to on or about August 6, 2010, Sagent received at least four responses of Indication of Interest which placed the value of Sallyport between Ninety Million Dollars ($90,000,000.00) and One Hundred Ten Million Dollars ($110,000,000.00).

27.    DeBlasio and the rest of the Seller Group Conspirators were each aware of these indications of value.

28.    On or about August 11, 2010, Chris Oliver, Managing Director of Sagent, and DeBlasio met with Mr. Campbell to discuss a potential acquisition of Sallyport by DC Capital Partners.  In particular, the discussions centered on a transaction where DC Capital Partners

would acquire Sallyport and merge it with an existing portfolio company, Kaseman.  They also discussed the potential synergies between Sallyport and Kaseman.  Plaintiff Charron, at the behest of Sagent and DeBlasio, did not have any conversations with any representative of DC Capital Partners, including Mr. Campbell, about the sale of Sallyport.

29.     On or about August 12, 2010, Sagent received an Indication of Interest from DC Capital Partners to acquire Sallyport.  Later that day, Mr. Campbell requested that DeBlasio meet with Tony Grimes, the Chief Executive Officer of Kaseman, to explain the business of Sallyport.

30.     Thereafter, Sagent provided DC Capital Partners with access to a virtual data room and other financial, operating and legal information for DC Capital Partners' due diligence investigation leading to a formal proposal to acquire Sallyport.

31.     From on or about August 19, 2010 to on or about September 30, 2010, representatives of Sagent and Sallyport regularly conferred with representatives of DC Capital Partners and Kaseman to discuss the details of a merger of Sallyport and Kaseman.

32.     On or about September 28, 2010, DC Capital Partners proposed an acquisition of Sallyport.  On that day, Chris Oliver of Sagent called DeBlasio to discuss this proposal and strategy going forward.  DeBlasio told Chris Oliver that DC Capital Partners' offer was lower than he anticipated.  Later that day, DeBlasio told representatives of Sagent that DC Capital Partners was allegedly interested in another acquisition instead of acquiring Sallyport.

33.     On or about December 8, 2010, Sallyport purchased the shares of Plaintiff in Sallyport pursuant to the Agreement.  At the same time, Plaintiff Charron resigned from his offices as a director and officer and as an employee of Sallyport effectively immediately.

**B.     DeBlasio's History of Acting to the Detriment of Plaintiff Charron.**

34.     While a co-owner, Chairman of the Board of Directors, and Chief Executive Officer of Sallyport, Plaintiff Charron uncovered numerous instances where DeBlasio, aided and abetted by his brothers, Pasquale DeBlasio and Franco DeBlasio, and The DeBlasio Group and DeBlasio and DeBlasio Associates (collectively, the "DeBlasio Parties") and others, acted

outside of proper authority to the detriment of Plaintiff Charron and Sallyport.  Further, the DeBlasio Parties purposefully and intentionally withheld material facts, including financial and operational data, from Plaintiff Charron to frustrate his financial share in Sallyport.  These events show a pattern and practice of the DeBlasio Parties conspiring with and aiding and abetting one another to harm Plaintiff Charron.

35.     The DeBlasio Group performed bookkeeping, payroll, and tax services for Sallyport and in connection with the Kaseman Acquisition.  Defendant Pasquale DeBlasio was the principal liaison between Sallyport and The DeBlasio Group and DeBlasio and DeBlasio Associates.

36.     On more than one occasion in 2010, The DeBlasio Group initiated unauthorized debits from Sallyport's payroll accounts.  Certain of these unauthorized debits left Sallyport's account overdrawn.

37.     In or about June 2010, The DeBlasio Group had, for its own benefit, backdated approximately Four Hundred Ninety Thousand Dollars ($490,000.00) of invoices on Sallyport's books without the knowledge of Plaintiff Charron.

38.     Also in June 2010, Pasquale DeBlasio, without authority to do so, caused Sallyport Global Services to wire Four Million Eight Hundred Thousand Dollars ($4,800,000.00) from its bank account in Bermuda to The DeBlasio Group.  To accomplish this unauthorized wire transfer, Pasquale DeBlasio had to circumvent Sallyport's two-step authorization process, which required either DeBlasio or Plaintiff Charron to initiate the wire transfer and then the other owner to approve the wire transfer.  On this occurrence, Pasquale DeBlasio circumvented the second step of the authorization procedure by falsifying a Telegraphic Transfer Request Form, using an antiquated signature of DeBlasio and impersonating DeBlasio on the phone with the representative of the bank who consummated the wire transfer.  Pasquale DeBlasio took all of these actions without the knowledge or approval of Plaintiff Charron.

39.     In or about July 2010, The DeBlasio Group, acting under the direction of Pasquale DeBlasio, gave DeBlasio a bonus of One Million Seven Hundred Thousand Dollars

($1,700,000.00) that was not approved by the directors or officers of Sallyport. DeBlasio used this unauthorized bonus to help finance his purchase of a property in the Georgetown area of the District of Columbia, which was held by a trust, the trustee of which was The DeBlasio Group.

40.    Plaintiff Charron thereafter concluded that he and DeBlasio could no longer operate the company as joint and equal owners, and therefore proceeded with the Agreement, including the Windfall Protection feature.

**C.    The Stock Purchase Agreement Between Sallyport and Plaintiff**

41.    On December 7, 2010, Plaintiff, as an individual, and as Trustee of the Charron Trust, entered into the Agreement with Sallyport which was consummated on December 8, 2010, the same day that Plaintiff Charron resigned his position as an officer, director, and employee of Sallyport. Pursuant to the Agreement, Sallyport purchased all of the shares that Thomas Charron and the Charron Trust held in Sallyport.

42.    In Section 2.04 of the Agreement, Sallyport agreed to provide "Windfall Protection" to Plaintiff in the event Defendant DeBlasio or any of his affiliates or any other direct or indirect equity holder, on or prior to the first anniversary date of the Agreement, sold or agreed to sell shares of Sallyport's capital stock (or equity of an intervening Person or assets of Sallyport or any Sallyport subsidiary) constituting 20% or more by voting power or economic value of Sallyport's assets or equity to a third party in one or a series of related transactions for a price that reflected an enterprise value of Sallyport equal to or greater than Sixty-Five Million Dollars ($65,000,000.00) (a "Windfall Sale"). The occurrence of a Windfall Sale entitled Plaintiff to a payment of twenty percent (20%) of the proceeds from such transaction or transactions within three Business Days following the closing of such Windfall Sale with such payment to be made by Sallyport or Defendant DeBlasio or such other selling stockholder.

**D.**   **The Conspiracy and Scheme to Breach the Agreement and Defraud Plaintiff as Part of The Kaseman Acquisition.**

43.     On June 29, 2011, Sallyport Holdings, as "Purchaser," and Kaseman, as "Sponsor Affiliate," entered into the SPA with Sallyport, Sallyport Global Inc. (now Sallyport Global LLC), DeBlasio, the DeBlasio World Peace Trust (now the GPD Trust), and the DeBlasio Trust. Under the SPA, Sallyport Holdings purchased the outstanding shares of Sallyport held by the DeBlasio World Peace Trust and the outstanding shares of Sallyport Global, Inc. held by the DeBlasio Trust. This was the Kaseman Acquisition.

44.     Elements of the SPA show evidence of a plan to breach the Agreement and conspiracy and scheme to defraud and steal from Plaintiff by Defendants and the Non-Defendant Conspirators, as follows.

45.     Though the SPA reports a purchase price of Sixty-Four Million Five Hundred Thousand Dollars ($64,500,000.00), the Enterprise Value of Defendant Sallyport for the Kaseman Acquisition was at least Eighty Two Million Eight Hundred Forty One Thousand Dollars ($82,841,000.00).

46.     The Enterprise Value of the Company for the Kaseman Acquisition is established *inter alia* by reference to Exhibit D to the Complaint from the EDVA Litigation, namely an Independent Auditor's Report prepared for the Acquiring Conspirators by McGladrey & Pullen, LLP (the "McGladrey Audit").   The McGladrey Audit provided, *inter alia*, an audit of the "consolidated and combined balance sheet of Kaseman Holdings, LLC and Subsidiaries and Sallyport Holdings, LLC and Subsidiaries . . . as of June 30, 2011. . . ."   Note 2 of the McGladrey Audit analyzed the Kaseman Acquisition and concluded that the total purchase price for the shares of Sallyport acquired on June 29, 2011, was Eighty-Two Million Eight Hundred Forty-One Thousand Dollars ($82,841,000.00). However, the McGladrey Audit does not disclose the millions of dollars that, as stated above, had been transferred out of Sallyport in connection with Kaseman Acquisition, with the awareness and approval of the Acquiring Conspirators.

47.   The Enterprise Value is higher than $82,841,000.00 because the Defendants engaged in transaction and/or series of transactions as referenced in the Windfall Protection provision of the Agreement, whereby DeBlasio caused Sallyport to transfer away millions of dollars via the Conduit Conspirators to the offshore DeBlasio World Peace Trust, or others, near the closing of the Kaseman Acquisition.

48.   The total purchase price for Sallyport as reported in the McGladrey Audit establishes that true Enterprise Value for the Company was known to all Defendants and Conspirators to be at least Eighty-Two Million Eight Hundred Forty-One Thousand Dollars ($82,841,000.00).

49.   Plaintiff has not received the money due to Plaintiff, both individually and as Trustee, under the Windfall Protection provision, namely, twenty percent (20%) of the proceeds from the Kaseman Acquisition.

50.   Instead of causing Sallyport and the responsible stockholders to pay Plaintiff as required, Defendants and the Non-Defendant Conspirators have together conspired and schemed to breach the Agreement and defraud Plaintiff of money rightfully due, and kept it for themselves to Plaintiff's detriment.

**E.    DeBlasio Leads the Conspiracy and Scheme to Breach the Agreement and Defraud Plaintiff and Cheat Plaintiff Out of the Windfall Protection.**

**1.    DeBlasio Hatches the Scheme to Defraud Plaintiff of the Windfall Protection.**

51.   By at least 2010, Plaintiff Charron and DeBlasio decided that they could no longer co-exist as equal owners of Sallyport and, in addition to exploring a sale of Sallyport to an outside purchaser, considered an internal buyout of one shareholder.  These buyout discussions between Plaintiff Charron and DeBlasio were occurring at least as early as April 2010 and continued up until December 8, 2010, the effective date of the Agreement.

52.   In October and November 2010, DeBlasio, aided and abetted by the DeBlasio Parties and others, continually sought to purchase Plaintiff Charron's shares in Sallyport for a

sum well below the enterprise value of the Company as measured by, among other things, the Indications of Interest secured by Sagent.

53.   On December 1, 2010, DeBlasio, as President of the Company, and Plaintiff executed a "Letter of Intent" setting forth the terms of the proposed acquisition by which the Company would purchase Plaintiff's fifty percent (50%) interest in Sallyport.  The Letter of Intent included the Windfall Protection which was later made a part of the Agreement, as discussed above.

54.   Plaintiff Charron required the inclusion of the Windfall Protection in the Letter of Intent, and ultimately the Agreement, as part of the basis of the bargain in case of a subsequent sale. Plaintiff Charron reasonably believed and understood that Defendants would pay the amounts owed under the Windfall Protection Clause of the Agreement, and that Defendants would not engage in misconduct designed to artificially and improperly manipulate and lower the Enterprise Value of the Company so as to destroy or injure the right of Plaintiff to receive the fruits of the Agreement.

55.   On or about December 8, 2010, Plaintiff and Sallyport, represented by DeBlasio, consummated the Agreement, which included the Windfall Protection provision.

**2.   Conspirators Execute the Scheme to Breach the Agreement and Defraud Plaintiff of the Windfall Protection.**

56.   Within several months of executing the Agreement and providing the assurances of the Windfall Protection to Plaintiff, DeBlasio, conspiring with and aided and abetted by all the other Conspirators, planned, structured, and consummated the Kaseman Acquisition in a manner designed to circumvent the Windfall Protection and divide the benefit of avoiding having to pay Plaintiff twenty percent (20%) of the proceeds from the Kaseman Acquisition transaction.

57.   To achieve the purposes of the conspiracy and scheme to defraud, DeBlasio, aided and abetted by the DeBlasio Parties, created multiple new entities, including Sallyport Global, Inc., the DeBlasio World Peace Trust, and the DeBlasio Trust, to participate in the Kaseman

Acquisition. All the Conspirators then used these new entities, including the DeBlasio World Peace Trust, and the DeBlasio Trust, to disguise and conceal material facts about the Kaseman Acquisition and to effectuate transactions that sought to lower the reported enterprise value of Sallyport for purposes of the Kaseman Acquisition and avoid the strictures of the Windfall Protection.

58.     Between December 8, 2010, and June 28, 2011, DeBlasio, aided and abetted by the DeBlasio Parties and others, caused Sallyport Global Services to transfer away millions of dollars from Sallyport to the DeBlasio World Peace Trust, a shell trust located in Bermuda, or others as yet unknown, as explained above. The purpose of the transfer(s) of this money was to lower the enterprise value of the Company for purposes of the Kaseman Acquisition and avoid having to pay Plaintiff under the Windfall Protection provision. The Acquiring Conspirators all knew and approved of and consented to do the deal in conjunction with these transfers designed to defraud Plaintiff.

59.     Prior to the closing of the Kaseman Acquisition, all of the Defendants and Conspirators knew of the existence of the Windfall Protection provision designed to protect and benefit Plaintiff.

60.     All of the Defendants and Conspirators knew they were working together to cheat Plaintiff out of money due and owing to Plaintiff.

61.     At least by January 18, 2011, DeBlasio, aided and abetted by the DeBlasio Parties and others, caused the creation of the John P. DeBlasio Trust, a business trust organized under the laws of the State of Florida.

62.     On or about January 18, 2011, DeBlasio, aided and abetted by the DeBlasio Parties and others, caused the creation of Sallyport Global, Inc. ("SGI") (now Defendant Sallyport Global), a corporation organized under the laws of the State of Florida. The President of SGI was the John P. DeBlasio Trust.

63.     On or about March 15, 2011, Defendant Sallyport, through its agent DeBlasio, terminated the Letter Agreement with Sagent so that Sagent and its representatives would not be privy to the conspiracy and scheme to defraud Plaintiff via the Kaseman Acquisition.

64.     On or about March 17, 2011, Campbell, aided and abetted by the Acquiring Conspirators and others, caused the creation of Sallyport Holdings, a Delaware limited liability company.

65.     On or about June 8, 2011, the Defendants and Conspirators caused the creation of Sallyport Global, a limited liability company organized under the laws of the State of Florida. The Manager of Sallyport Global was and is KS International.

66.     The newly formed entities played a significant role in the structuring and execution of the tortious and fraudulent aspects of the Kaseman Acquisition to detriment of Plaintiff.

67.     Sallyport Holdings was the Purchaser in the Kaseman Acquisition and acquired one hundred percent (100%) of the shares of Sallyport and SGI, which were then held solely by the DeBlasio World Peace Trust, and the DeBlasio Trust, respectively.

68.     Pasquale DeBlasio, as President of the Trustee of the DeBlasio Trust, represented the DeBlasio Trust in the Kaseman Acquisition.

69.     Prior to the closing of the Kaseman Acquisition, all of the Conspirators knew about the transfer(s) of millions of dollars away from Sallyport to the DeBlasio World Peace Trust or others.  The Conspirators, therefore, knew about the conspiracy and scheme to defraud Plaintiff by misrepresenting the enterprise value of the Company for purposes of the Kaseman Acquisition so as to avoid paying Plaintiff pursuant to the Windfall Protection provision.

70.     Prior to the closing of the Kaseman Acquisition, all of the Conspirators knew that they had purposefully structured and orchestrated the transaction to avoid paying Plaintiff under the Windfall Protection provision. Sections 11.1(e) and 13.17 of the SPA make that painfully clear. In those Sections, DeBlasio, the DeBlasio World Peace Trust, and the DeBlasio Trust agreed to indemnify the Acquiring Conspirators and the Conduit Conspirators "from any

demand, claim, suit, action, cause of action, proceeding or assessment brought by any former stockholder of the Company."

71.    Plaintiff, individually and as Trustee, was the **only** former stockholder of the Company.  All the Conspirators therefore knew Sallyport was not going to pay Plaintiff at the closing of the Kaseman Acquisition and planned to look to DeBlasio and his related trusts for financial protection in the event Plaintiff ever discovered the breach of the Agreement and conspiracy and scheme to defraud.

72.    This explicit provision for financial protection of the Acquiring Conspirators and the Conduit Conspirators in the event of discovery shows consciousness of guilt on the part of all Conspirators.

73.    On or about June 29, 2011, upon closing of the Kaseman Acquisition, the Conspirators acted together and executed the scheme to cheat Plaintiff out of the funds due to Plaintiff pursuant to the Windfall Protection provision.

74.    No closing statement ever included payments to Plaintiff, and Plaintiff was in fact never paid.

**3.    The Conspirators Cover Up the Breach of Contract and the Conspiracy and Scheme to Defraud Plaintiff of the Windfall Protection.**

75.    Upon conclusion of the Kaseman Acquisition, all of the Conspirators acted to cover up their scheme to breach the Agreement and defraud Plaintiff of money due to Plaintiff under the Windfall Protection provision.

76.    On or about June 24, 2011, DeBlasio, aided and abetted by the DeBlasio Parties and others, caused the formation in Bermuda of The GPD Charitable Trust (the "GPD Trust"), the successor-in-interest to the DeBlasio World Peace Trust, and the JPD Trust Company, the Trustee of the GPD Trust.  DeBlasio and the DeBlasio Parties caused the formation of the GPD Trust and the JPD Trust Company to help disguise and conceal material facts about the Kaseman

Acquisition from Plaintiff and make it more difficult for Plaintiff to learn about, and trace the flow of money from the Kaseman Acquisition.

77.     On or about July 29, 2011, the Acquiring Conspirators caused Kaseman Holdings, LLC and Sallyport Holdings to be merged into KS International.  This merger helped disguise and conceal material facts about the Kaseman Acquisition and made it more difficult for Plaintiff to learn about, and trace the flow of money from the Kaseman Acquisition.

78.     Upon learning of the Kaseman Acquisition, Plaintiff, through counsel, made repeated requests to Defendant Sallyport, Defendant DeBlasio, and the Acquiring Conspirators for a copy of the deal documents so that Plaintiff could verify the purported enterprise value of Sixty-Four Million Five Hundred Thousand Dollars ($64,500,000.00).   On each occasion, Defendant Sallyport, Defendant DeBlasio and the Acquiring Defendants refused to provide the deal documents and told Plaintiff to trust them about the legitimacy of the purported enterprise value of Sallyport for the Kaseman Acquisition.

79.     On or about September 20, 2011, DeBlasio, with full knowledge of all the other Conspirators, instructed a lawyer for Cohen & Grigsby to misinform counsel for Plaintiff, in writing, that the enterprise value of the Company for the Kaseman Acquisition was Sixty-Four Million Five Hundred Thousand Dollars ($64,500,000.00).  See attached **Exhibit E**.  This false representation was an attempt to disguise and conceal material facts about the Kaseman Acquisition from Plaintiff and make it more difficult for Plaintiff to learn about and trace the flow of money from the Kaseman Acquisition.

80.     On or about October 6, 2011, counsel for Plaintiff requested from the lawyer from Cohen & Grigsby a copy of the purchase agreement and any related documents from the Kaseman Acquisition so that Plaintiff could verify the asserted transaction value of Sixty-Four Million Five Hundred Thousand Dollars ($64,500,000.00).

81.     On or about December 2, 2011, the lawyer from Cohen & Grigsby, at the instruction of DeBlasio, and with the knowledge of all the other Conspirators, told counsel for Plaintiff that the Kaseman Acquisition had resulted in a "pre-structuring" value of Sallyport of

Sixty Million Seven Hundred Thousand Dollars ($60,700,000.00) and an overall enterprise value of Sixty-Four Million Five Hundred Thousand Dollars ($64,500,000.00). The Conspirators caused this false representation to be made to Plaintiff's counsel to disguise and conceal material facts about the Kaseman Acquisition from Plaintiff and make it more difficult for Plaintiff to learn about and trace the flow of money from the Kaseman Acquisition.

82.      On or about July 13, 2012, counsel for Plaintiff requested by letter that DeBlasio provide information to permit Plaintiff to verify Sallyport's compliance with the Windfall Protection provision. Again, Defendant DeBlasio, with the knowledge of all the other Defendants and Conspirators, refused to answer the questions.

83.      On or about March 8, 2012, Sagent, as plaintiff, filed a complaint against Sallyport in the Supreme Court of the State of New York, County of New York (the "Sagent Litigation"). In this lawsuit, Sagent claims that Sallyport breached their agreement by not paying Sagent's fee associated with the Kaseman Acquisition. The filings in the Sagent Litigation revealed to Plaintiff that the Conspirators purposefully did not disclose the Kaseman Acquisition to Sagent or Plaintiff prior to its consummation. The secrecy by which the Conspirators conducted the Kaseman Acquisition evidences their fraudulent intent to conceal the material facts of the deal from Plaintiff since Plaintiff is entitled to additional money from Sallyport and its stockholders depending on the Enterprise Value of the Company for the acquisition.

84.      Further, shortly after the initiation of the Sagent Litigation, DeBlasio contacted Plaintiff Charron and asked for his assistance in trying to resolve that lawsuit. As a precondition of getting involved in any settlement efforts, Plaintiff Charron requested that DeBlasio and the Acquiring Conspirators provide a copy of the deal documents for the Kaseman Acquisition, for which Plaintiff had already made several requests to no avail. On or about April 6, 2012, a lawyer for Cohen & Grigsby, acting at the instruction of DeBlasio and the Acquiring Conspirators, provided selective deal documents to counsel for Plaintiff Charron. Included in these documents was the SPA and all schedules related thereto. Noticeably absent from the documents provided to Plaintiff was the McGladrey Audit, completed on March 30, 2012, which

showed a total purchase price of Eighty-Two Million Eight Hundred Forty-One Thousand Dollars ($82,841,000.00) for Sallyport in the Kaseman Acquisition.

85.     DeBlasio & DeBlasio Associates and The DeBlasio Group at 447 Washington Ave., Bridgeville, Pennsylvania provided accounting, financial, and tax services in connection with the fraudulent aspects of the Kaseman Acquisition as relates to Plaintiff's rights. These parties were thus intimately involved in the Kaseman Acquisition for these reasons, in addition to the other reasons set forth in this Complaint.

86.     On or about May 25, 2012, the JPD Private Trust Company, as Trustee of The GPD Charitable Trust, filed a Complaint against KS International and Sallyport in the United States District Court for the Eastern District of Virginia, Civil Action No. 1:12CV572-AJT/JFA, as defined earlier, the EDVA Litigation.  As discussed *supra*, attached as Exhibit D to the Complaint was the McGladrey Audit showing the total purchase price for the shares of Sallyport acquired on June 29, 2011, was Eighty-Two Million Eight Hundred Forty-One Thousand Dollars ($82,841,000.00).

87.     Plaintiff had no knowledge of the EDVA Litigation and the McGladrey Audit until on or about July 19, 2012, when counsel for Plaintiff was informed about it by a lawyer for Cohen & Grigsby who represented DeBlasio and the Acquiring Conspirators.

88.     Thus, Plaintiff did not know material facts about the Kaseman Acquisition and how they had been cheated by the Conspirators until the filing of, and their learning about, the Sagent and EDVA Litigation.  After learning of these material facts and realizing how he and the Charron Trust had been defrauded and cheated, Plaintiff on August 30, 2012, demanded full payment within seven days from Defendant Sallyport, DeBlasio or the Conspirators herein either pursuant to the Windfall Provision of the Agreement or because they control Sallyport and can cause it to pay what it owes.  Defendants and Conspirators have not made Plaintiff whole, leaving Plaintiff no alternative but to seek redress in court.

## CLAIMS FOR RELIEF

### COUNT I
### (Breach of Contract)
### (Against All Defendants)

89.     Plaintiff repeats and realleges the allegations set forth in all preceding paragraphs of this Complaint as if set forth fully herein.

90.     The essential elements of a breach of contract action are: (1) the existence of a contract; (2) the plaintiff's performance pursuant to that contract; (3) the defendant's breach of its obligations pursuant to the contract; and (4) damages resulting from that breach.

91.     In this case, Plaintiff and Defendants entered into the Agreement on or about December 7, 2010.  The Agreement is a contract that was in existence at all relevant times herein.

92.     Plaintiff at all times performed his obligations pursuant to the Agreement.

93.     Defendants at all relevant times had obligations under the Agreement, which obligations were breached by Defendants.  These obligations and related breaches include but are not limited to Defendants' failure to pay the Amount Owed to Plaintiff.

94.     As a direct and proximate result of Defendants' acts and omissions, and breaches of the Agreement, Plaintiff has suffered compensatory damage in an amount to be proven at trial, but which in any event exceeds Sixteen Million Five Hundred Sixty Eight Thousand Two Hundred Dollars ($16,568,200.00).

### COUNT II
### (Breach of Implied Covenant of Good Faith and Fair Dealing)
### (Against All Defendants)

95.     Plaintiff repeats and realleges the allegations set forth in all preceding paragraphs of this Complaint as if set forth fully herein.

96.    Under New York law, all contracts imply a covenant of good faith and fair dealing in the course of performance.  This covenant embraces a pledge that neither party shall do anything which will have the effect of destroying or injuring the right of the other party to receive the fruits of the contract.  The duties of good faith and fair dealing imply obligations which encompass any promises which a reasonable person in the position of the promisee would be justified in understanding were included.

97.    In this case, Defendants failed to exercise good faith and deal fairly in fulfilling the terms and promises contemplated by the Agreement entered into on or about December 7, 2010.

98.    Plaintiff at all times performed his obligations pursuant to the Agreement. Plaintiff also reasonably understood and was promised by Defendants that Defendants would pay the amounts owed under the Windfall Protection Clause of the Agreement, and that Defendants would not engage in misconduct designed to artificially and improperly manipulate and lower the Enterprise Value of the Company so as to destroy or injure the right of the Plaintiff to receive the fruits of the contract.

99.    Defendants at all relevant times had obligations under the Agreement, which obligations were breached by Defendants.  These obligations and related breaches include but are not limited to Defendants' failure to pay the Amount Owed to Plaintiff, Defendants' transferring millions of dollars to the DeBlasio World Peace Trust, or others, in an effort to lower the reported enterprise value of Defendant Sallyport and avoid the strictures of the Windfall Protection provision, and other misconduct described above.

100.    As a direct and proximate result of Defendants' acts and omissions, and breaches of the Agreement and their implied duties of good faith and fair dealing, Plaintiff has suffered

compensatory damage in an amount to be proven at trial, but which in any event exceeds Sixteen Million Five Hundred Sixty Eight Thousand Two Hundred Dollars ($16,568,200.00).

### COUNT III
### (Tortious Interference with Contractual Relations)
### (An Alternative Claim Against All Defendants, except Sallyport)

101.    Plaintiff repeats and realleges the allegations set forth in all preceding paragraphs of this Complaint as if set forth fully herein.

102.    A plaintiff states a claim for tortious interference with contractual relations where he alleges: (1) the existence of a contract between the plaintiff and a third party; (2) the defendant's knowledge of the contract; (3) the defendant's intentional inducement of the third party to breach or otherwise render performance impossible; and (4) damages to the plaintiff.

103.    In this case, Plaintiff and Sallyport entered into the Agreement on or about December 7, 2010.  The Agreement is a contract that was in existence at all relevant times herein.

104.    Sallyport at all relevant times had obligations under the Agreement, which obligations were breached by Sallyport. These obligations and related breaches include but are not limited to Sallyport's failure to pay Plaintiff twenty percent (20%) of the proceeds from the Kaseman Acquisition, which equals at least Sixteen Million Five Hundred Sixty Eight Thousand Two Hundred Dollars ($16,568,200.00).

105.    Defendants and the Conspirators knew of the above valid contractual relationship in the Agreement and Sallyport's obligation to pay Plaintiff under the Windfall Protection provision.

106.    Defendants and Conspirators intentionally interfered with the above valid contractual relationship, thereby inducing or causing a breach or termination of said relationship, by, among other things, causing Sallyport's failure to pay Plaintiff twenty percent (20%) of the proceeds from the Kaseman Acquisition, which equals at least Sixteen Million Five Hundred Sixty Eight Thousand Two Hundred Dollars ($16,568,200.00).

107.   The interference of Defendants and the Conspirators was the proximate cause of damage to Plaintiff because they planned, structured, orchestrated, executed, and covered up material facts about the Kaseman Acquisition to avoid Sallyport paying to Plaintiff money rightfully due to Plaintiff under the Windfall Protection provision.

108.   Defendants and the Conspirators effectively divided this ill-gotten gain among themselves in the Kaseman Acquisition, as it was structured to cheat Plaintiff for the mutual financial benefit of all Defendants and Conspirators.

109.   Wherefore, as a direct and proximate result of Defendants' acts and omissions, and breaches of the Agreement, Plaintiff has suffered compensatory damage in an amount to be proven at trial, but which in any event exceeds Sixteen Million Five Hundred Sixty Eight Thousand Two Hundred Dollars ($16,568,200.00).

110.   Punitive damages, which are something in addition to full compensation, can be awarded as a punishment to Defendants and as a warning and example to deter them and others from committing like wrongs.  If Plaintiff alleges, as here, that Defendants acted wantonly, oppressively, or with such recklessness or negligence as evidenced a conscious disregard for the rights of others, or with such malice as implied a spirit or mischief, or criminal indifference to civil obligations, then an award of punitive damages is appropriate as are called for by the circumstances of the case.

111.   In this case, Plaintiff is entitled to punitive damages because Defendants willfully and maliciously injured Plaintiff in business by conspiring and participating in a scheme and artifice to defraud Plaintiff by planning, structuring, orchestrating, executing, and covering up material facts about the Kaseman Acquisition to avoid paying to Plaintiff money rightfully due to Plaintiff under the Windfall Protection provision of the Agreement.  By taking these actions, Defendants acted wantonly, oppressively, or with such recklessness or negligence as evidenced a conscious disregard for the rights of Plaintiff and others, or with such malice as implied a spirit or mischief, or criminal indifference to civil obligations, that an award of punitive damages is appropriate as are called for by the circumstances of this case.

112. As a direct and proximate result of the acts and omissions of Defendants, Plaintiff has suffered compensatory and punitive damages in an amount to be proven at trial, but which in any event exceeds Sixteen Million Five Hundred Sixty Eight Thousand Two Hundred Dollars ($16,568,200.00) in compensatory damages.  Punitive damages up to the limit permitted by law and in equity should also be awarded against these Defendants for their intentional and tortious conduct as described herein.

**COUNT IV**
**(Fraud)**
**(An Alternative Claim Against All Defendants, except Sallyport)**

113. Plaintiff repeats and realleges the allegations set forth in all preceding paragraphs of this Complaint as if set forth fully herein.

114. Whether labeled fraud, misrepresentation or deceit, the elements of these actions, which must be proved by clear and convincing evidence, are as follows: (1) a false representation; (2) made by the defendant with knowledge or belief (scienter) that the representation is false or that he or she did not have a sufficient basis of information with which to make it; (3) defendant's intent to induce the plaintiff to act or to refrain from action in reliance upon the misrepresentation; (4) the plaintiff's justifiable reliance upon the representation in taking action or refraining from it; and (5) damage to the plaintiff resulting from such reliance. To constitute actual or positive fraud, there must be an intentional deception; in other words, active and positive fraud includes cases of the intentional and successful employment of any cunning, deception, or artifice to circumvent, cheat, or deceive another.

115. In this case, Defendants were the masterminds behind the conspiracy and fraudulent scheme alleged herein, controlling and directing every aspect of the conspiracy and fraud.

116. In this case, Defendants made the following fraudulent statements and/or omissions of material fact, among others, to Plaintiff, including but not limited to: (i) Defendants

affirmatively stated to Plaintiff that, prior to December 8, 2010, DC Capital Partners had no interest in conducting the Kaseman Acquisition, or any such similar acquisition, which was a false statement that Plaintiff relied upon in closing his transaction on December 8, 2010; (ii) Defendants did not disclose to Plaintiff upon execution and closing of the Agreement that, within one year of the Agreement, Defendants intended to have the Company enter into a transaction for the shares of Sallyport where the enterprise value of the Company exceeded Sixty-Five Million Dollars ($65,000,000.00); (iii) Defendants represented that they would provide Windfall Protection to Plaintiff as stated in the Agreement, when in truth and fact they had no intention of providing Windfall Protection to Plaintiff when the Agreement was executed or thereafter; and (iv) after the transaction, Defendants caused their lawyers to misrepresent, at least twice, in writing, the actual Enterprise Value of Sallyport at sale. These statements and/or omissions of material fact constituted false representations of material facts, they were made intentionally by these Defendants, and they were made with the intention of causing Plaintiff to act on those representations.

117.    Plaintiff did in fact act on those representations when he executed the Agreement and sold his shares in Sallyport on or about December 8, 2010 and when he did not immediately demand payment in full following the Kaseman Acquisition.

118.    Plaintiff's reliance on the representations and omissions of material fact caused damage to Plaintiff because he executed the Agreement and caused himself and the Charron Trust to sell their shares in Sallyport in reliance upon the Windfall Protection provision of the Agreement and because he has not been paid money he and the Charron Trust are lawfully owed.

119.    The representations and omissions of material fact of Defendants were the proximate cause of damage to Plaintiff because Plaintiff executed the Agreement and caused himself and the Charron Trust to sell their shares in Sallyport in reliance upon the Windfall Protection of the Agreement and they did not receive the money they were owed thereafter.

120.    In this case, Plaintiff is entitled to punitive damages because Defendants willfully and maliciously injured Plaintiff in business by conspiring and participating in a scheme and

artifice to defraud Plaintiff by planning, structuring, orchestrating, executing, and covering up material facts about the Kaseman Acquisition to avoid paying Plaintiff money rightfully due under the Windfall Protection provision of the Agreement. By taking these actions, Defendants acted wantonly, oppressively, or with such recklessness or negligence as evidenced a conscious disregard for the rights of Plaintiff and others, or with such malice as implied a spirit or mischief, or criminal indifference to civil obligations, that an award of punitive damages is appropriate as are called for by the circumstances of this case.

121.    As a direct and proximate result of the acts and omissions of Defendants, Plaintiff has suffered compensatory and punitive damages in an amount to be proven at trial, but which in any event exceeds Sixteen Million Five Hundred Sixty Eight Thousand Two Hundred Dollars ($16,568,200.00) in compensatory damages. Punitive damages up to the limit permitted by law and in equity should also be awarded against these Defendants for their intentional and tortious conduct as described herein.

## COUNT V
### (Constructive Fraud)
### (An Alternative Claim Against All Defendants, Except Sallyport)

122.    Plaintiff repeats and realleges the allegations set forth in all preceding paragraphs of this Complaint as if set forth fully herein.

123.    Constructive, or "legal," fraud consists of an act done or omitted that is tantamount to positive fraud, or is construed as a fraud by the court, because of its detrimental effect on public interests and public or private confidence although the act is not done or omitted with any actual design to perpetrate positive fraud or injury on other persons. Similarly, constructive fraud may be defined as the breach of a duty which, irrespective of moral guilt and intent, the law declares fraudulent because of its tendency to deceive, to violate a confidence, or to injure public or private interests that the law deems worthy of special protection. Constructive fraud occurs when one party has superior knowledge over the other.

124.    In this case, Defendants had superior knowledge and made the following fraudulent statements and/or omissions of material fact, among others, to Plaintiff, including but not limited to: (i) Defendants affirmatively stated to Plaintiff that, prior to December 8, 2010, DC Capital Partners had no interest in conducting the Kaseman Acquisition, or any such similar acquisition, which was a false statement that Plaintiff relied upon in closing his transaction on December 8, 2010; (ii) Defendants did not disclose to Plaintiff upon execution and closing of the Agreement that, within one year of the Agreement, Defendants intended to have the Company enter into a transaction for the shares of Sallyport where the enterprise value of the Company exceeded Sixty-Five Million Dollars ($65,000,000.00); (iii) Defendants represented that they would provide Windfall Protection to Plaintiff as stated in the Agreement, when in truth and fact they had no intention of providing Windfall Protection to Plaintiff when the Agreement was executed or thereafter; and (iv) after the transaction, Defendants caused their lawyers to misrepresent, at least twice, in writing, the actual Enterprise Value of Sallyport at sale. These statements and/or omissions of material fact constituted false representations of material facts, they were made innocently or negligently by these Defendants, and they were made with the intention of causing Plaintiff to act on those representations.

125.    Plaintiff did in fact act on those representations when he executed the Agreement and caused himself and the Charron Trust to sell their shares in Sallyport on or about December 8, 2010 and when he did not immediately demand payment in full following the Kaseman Acquisition.

126.    Plaintiff's reliance on the representations and omissions of material fact caused damage to Plaintiff because he executed the Agreement and caused himself and the Charron Trust to sell their shares in Sallyport in reliance upon the Windfall Protection provision of the Agreement and because he has not been paid money he is lawfully owed.

127.    The representations and omissions of material fact of Defendants were the proximate cause of damage to Plaintiff because Plaintiff executed the Agreement and caused

himself and the Charron Trust to sell their shares in Sallyport in reliance upon the Windfall Protection of the Agreement and did not receive the money he was owed thereafter.

128.   Wherefore, as a direct and proximate result of Defendants' acts and omissions, and breaches of the Agreement, Plaintiff has suffered monetary damage in an amount to be proven at trial, but which in any event exceeds Sixteen Million Five Hundred Sixty Eight Thousand Two Hundred Dollars ($16,568,200.00).

129.   In this case, Plaintiff is entitled to punitive damages because Defendants willfully and maliciously injured Plaintiff in business by conspiring and participating in a scheme and artifice to defraud Plaintiff by planning, structuring, orchestrating, executing, and covering up material facts about the Kaseman Acquisition to avoid paying Plaintiff money rightfully due under the Windfall Protection provision of the Agreement.  By taking these actions, Defendants acted wantonly, oppressively, or with such recklessness or negligence as evidenced a conscious disregard for the rights of Plaintiff and others, or with such malice as implied a spirit or mischief, or criminal indifference to civil obligations, that an award of punitive damages is appropriate as are called for by the circumstances of this case.

130.   As a direct and proximate result of the acts and omissions of Defendants, Plaintiff has suffered compensatory and punitive damages in an amount to be proven at trial, but which in any event exceeds Sixteen Million Five Hundred Sixty Eight Thousand Two Hundred Dollars ($16,568,200.00) in compensatory damages.  Punitive damages up to the limit permitted by law and in equity should also be awarded against these Defendants for their intentional and tortious conduct as described herein.

**COUNT VI**
**(Conversion)**
**(Against All Defendants)**

131.   Plaintiff repeats and realleges the allegations set forth in all preceding paragraphs of this Complaint as if set forth fully herein.

132.    Conversion is an unauthorized exercise of dominion and control over personal property which interferes with a superior possessory right of another.  Interference with rightful possession is the essence of converting property to one's own wrongful use.  The elements of a cause of action for conversion are: (1) the plaintiff's right to possession; (2) intent of the defendant; and (3) defendants' interference with the plaintiff's property rights to the exclusion of the plaintiff's rights.

133.    In this case, Defendants divided between themselves money that they cheated out of Plaintiff by designing, structuring, orchestrating, executing, and disguising the Kaseman Acquisition so as to avoid paying Plaintiff money owed to Plaintiff under the Windfall Protection provision of the Agreement. These actions constituted the wrongful exercise or assumption of authority over Plaintiff's money, and they deprived Plaintiff of his possession, or constituted an act of dominion wrongfully exerted over property in denial of, or inconsistent with, Plaintiff's rights.

134.    As a direct and proximate result of the acts and omissions of Defendants, Plaintiff has suffered monetary damage in an amount to be proven at trial, but which in any event exceeds Sixteen Million Five Hundred Sixty Eight Thousand Two Hundred Dollars ($16,568,200.00). Punitive damages up to the limit permitted by law and in equity should also be awarded against these Defendants for their intentional and tortious conduct as described herein.

## COUNT VII
### (Unjust Enrichment)
### (Against All Defendants)

135.    Plaintiff repeats and realleges the allegations set forth in all preceding paragraphs of this Complaint as if set forth fully herein.

136.    Unjust enrichment arises when: (1) one person has obtained money or property from another; (2) under such circumstances that in good conscience it should not be retained, and (3) the law imposes a duty to repay or return it.

- 36 -

137.   Defendants have obtained and divided among themselves at least Sixteen Million Five Hundred Sixty Eight Thousand Two Hundred Dollars ($16,568,200.00) which belongs to Plaintiff and obtained this money by conspiring and scheming to defraud Plaintiff through their unlawful design, structure, execution, and concealment of the Kaseman Acquisition. Defendants are not entitled to Plaintiff's money and the law requires Defendants to repay and/or return this money to Plaintiff.

138.   As a direct and proximate result of the acts and omissions of Defendants, Plaintiff has suffered monetary damage in an amount to be proven at trial, but which in any event exceeds Sixteen Million Five Hundred Sixty Eight Thousand Two Hundred Dollars ($16,568,200.00). Punitive damages up to the limit permitted by law and in equity should also be awarded against these Defendants for their intentional and tortious conduct as described herein.

## COUNT VIII
### (Quantum Meruit)
### (Against All Defendants)

139.   Plaintiff repeats and realleges the allegations set forth in all preceding paragraphs of this Complaint as if set forth fully herein.

140.   The term quantum meruit means (1) that there is a contract implied in fact to pay the reasonable value of services, or (2) that, to prevent unjust enrichment, the claimant may recover on a quasi-contract (an "as if" contract) for that reasonable value. To make out a claim in quantum meruit, a claimant must establish: (1) the performance of the services in good faith; (2) the acceptance of the services by the person to whom they are rendered; (3) an expectation of compensation therefor; and (4) the reasonable value of the services.

141.   The preceding allegations made by Plaintiff, incorporated herein, satisfy all the elements of a claim for quantum merit.  The damages exceed Sixteen Million Five Hundred Sixty Eight Thousand Two Hundred Dollars ($16,568,200.00).  Punitive damages up to the limit

permitted by law and in equity should also be awarded against these Defendants for their intentional and tortious conduct as described herein, and under the doctrine of quantum meruit.

**COUNT IX**
**(Civil Conspiracy)**
**(Against All Defendants)**

142.   Plaintiff repeats and realleges the allegations set forth in all preceding paragraphs of this Complaint as if set forth fully herein.

143.   To plead a cause of action to recover damages for civil conspiracy, the plaintiff must allege a cognizable tort, coupled with an agreement between the conspirators regarding the tort, and an overt action in furtherance of the agreement.

144.   In this case, Plaintiff and Sallyport entered into the Agreement on or about December 7, 2010.  The Agreement is a contract that was in existence at all relevant times herein.  The cognizable torts by Defendants are asserted above and incorporated herein.  The overt acts by Defendants include their intentional and deceptive participation in a scheme to transfer away from Sallyport millions of dollars to the DeBlasio World Peace Trust, or others, in an attempt to lower the alleged enterprise value of Sallyport for purposes of the Kaseman Acquisition, their lying about the actual and true amount of the Enterprise Value they received, and their misrepresentations and cover up of their fraud, and their benefitting financially and otherwise from fraudulently avoiding having to pay Plaintiff pursuant to the Windfall Protection provision of the Agreement.

145.   Sallyport at all relevant times had obligations under the Agreement, which obligations were breached by Sallyport, with the knowledge and active participation of Defendants. These obligations and related breaches include but are not limited to Sallyport's failure to pay Plaintiff twenty percent (20%) of the proceeds from the Kaseman Acquisition, which equals at least Sixteen Million Five Hundred Sixty Eight Thousand Two Hundred Dollars ($16,568,200.00).

146.   Defendants at all relevant times combined, associated, agreed, mutually undertook or acted in concert together for the purpose of willfully and maliciously injuring Plaintiff by conspiring and participating in a scheme and artifice to defraud Plaintiff by planning, structuring, orchestrating, executing, and covering up material facts about the Kaseman Acquisition to avoid or aid and abet the avoidance by others of paying Plaintiff money rightfully due under the Windfall Protection provision.  In so doing, Defendants acted with legal malice: that this, they acted intentionally, purposely, and without legal justification.

147.   Moreover, and/or in the alternative, Defendants attempted to procure the participation, cooperation, agreement or other assistance of any one or more person to enter into any combination, association, agreement, mutual understanding or concert. They did so by planning, structuring, orchestrating, executing, and covering up material facts about the Kaseman Acquisition to avoid or aid and abet the avoidance by others of paying to Plaintiff money rightfully due under the Windfall Protection provision.

148.   Wherefore, as a direct and proximate result of Defendants' acts and omissions, and conscious, illegal, interference with the Agreement, Plaintiff has suffered compensatory damage in an amount to be proven at trial, but which in any event exceeds Sixteen Million Five Hundred Sixty Eight Thousand Two Hundred Dollars ($16,568,200.00). Punitive damages up to the limit permitted by law and in equity should also be awarded against these Defendants for their intentional and tortious conduct as described herein.

## DEMAND CLAUSE

WHEREFORE, as to the foregoing claims, Plaintiff Thomas W. Charron Jr., Individually and as Trustee of the Thomas W. Charron Jr. Grantor Retained Annuity Trust Dated July 8, 2010, prays for a judgment in his favor and against Defendants, for the actual damages sustained, to be determined at trial, but which in any event exceed Sixteen Million Five Hundred Sixty Eight Thousand Two Hundred Dollars ($16,568,200.00) together with punitive damages up to the limit

permitted by law and in equity, attorneys' fees, related expenses, and pre- and post-judgment interest, and such other relief as this Court may deem just and appropriate.

## JURY TRIAL DEMAND

Plaintiff demands a trial by jury on all counts and causes of action so triable.

**DATED**, this 7th day of September, 2012.

Respectfully submitted,

THOMAS W. CHARRON JR.,
Individually and as Trustee of the
THOMAS W. CHARRON JR.
GRANTOR RETAINED ANNUITY
TRUST DATED JULY 8, 2010

By:

Athanasios Basdekis (AB2574)
Brian A. Glasser *(Pro Hac Vice* forthcoming)
James B. Perrine *(Pro Hac Vice* forthcoming)
**BAILEY & GLASSER, LLP**
209 Capitol Street
Charleston, WV 25301
(304) 345-6555 (main)
(304) 342-1110 (facsimile)

*Counsel for Plaintiff Thomas W. Charron Jr.,*
*Individually and as Trustee of the Thomas W.*
*Charron Jr. Grantor Retained Annuity Trust*
*Dated July 8, 2010*