other Person has notified any member of the Company Group, either in writing or, to the Sellers' Knowledge, orally, that such member of the Company Group has breached or violated any Law, Order, certification, representation, clause, provision, specification or requirement pertaining to such Government Contract; (v) no material cost incurred by any member of the Company Group pertaining to such Government Contract has been formally questioned or challenged or, to the Sellers' Knowledge, is the subject of any investigation or has been disallowed by the U.S. Government; (vi) no money due to any member of the Company Group pertaining to such Government Contract has been withheld or offset nor has any claim been made in writing or, to the Sellers' Knowledge, orally to withhold or offset money, and each member of the Company Group is entitled to all progress payments received with respect thereto; and (vii) no member of the Company Group has terminated any such Government Contract nor has any member of the Company Group been notified in writing or, to the Sellers' Knowledge, orally by the U.S. Government, any prime contractor, subcontractor or any other Person that any such Government Contract has been terminated for any reason and no cure notice, show cause, deficiency, default or similar notice is currently in effect pertaining to any such Government Contract.

(b)     (i) Neither any member of the Company Group nor, to the Sellers' Knowledge, any of its directors, managers, officers or cleared employees is (or during the last three years has been) under administrative, civil or criminal investigation, indictment or information by any Governmental Authority, or been subject to any audit or investigation with respect to any alleged irregularity, misstatement or omission arising under or relating to any Government Contract; (ii) during the last six years, no member of the Company Group has conducted or initiated any internal investigation or made a voluntary disclosure to the U.S. Government with respect to any alleged irregularity, misstatement or omission arising under or relating to a Government Contract. To the Sellers' Knowledge, there exists no irregularity, misstatement or omission arising under or relating to any Government Contract that has resulted in (x) any of the consequences set forth in clause (i) or (ii) of the immediately preceding sentence or (y) any other Material Adverse Effect; and (iii) no member of the Company Group has made any mandatory disclosure under FAR Subpart 3.10 to any Governmental Authority with respect to credible evidence of a violation of federal criminal law involving fraud, conflict of interest, bribery or gratuity violations found in Title 18 of the United States Code or a violation of the civil False Claims Act with respect to any Government Contract, as a result of the three (3) year "look back" required by FAR 3.10.

(c)     There are (i) no outstanding material disputes between any member of the Company Group, and either the U.S. Government or any prime contractor, subcontractor, vendor or other third party, arising under or relating to any Government Contract; and (ii) no material claims or requests for equitable adjustment between any member of the Company Group and the U.S. Government or between any member of the Company Group and any prime contractor, subcontractor or vendor arising under or relating to any Government Contract.

(d)     Each member of the Company Group's accounting system meets in all material respects the requirements of the Federal Acquisition Regulations ("FAR") and Federal Cost Accounting Standards, as applicable. To the Sellers' Knowledge, there are no reports resulting from any audits or other investigations by the Defense Contract Audit Agency or other United States Governmental Authority officials of any of the Government Contracts (past or

-44-

present) that conclude that any member of the Company Group engaged in overcharging or other defective pricing practices or in other practices in violation of the FAR. To the Sellers' Knowledge, there are no audits or other investigations by United States Governmental Authority officials of any Government Contracts (past or present), which are either on-going or have been completed but the report of which has not yet been issued (and is expected to be issued) and which are expected to recommend fines, penalties or other sanctions.

(e) No member of the Company Group delivers Products to a Governmental Authority, or performs Services for a Governmental Authority, other than pursuant to written Government Contracts.

(f) No member of the Company Group has been awarded any Government Contract under any set-aside or preference for small businesses or under any other set-aside or preference program.

(g) To the Sellers' Knowledge, no member of the Company Group has made payments in violation of law to any official of any governmental entity in violation of any law, including but not limited to, bribes, gratuities, kickbacks, lobbying expenditures, political contributions or contingent fee payments.

(h) To the Sellers' Knowledge, no facts exist which could reasonably be expected to give rise to liability under a claim for fraud (as such concept is defined under the state or federal laws of the United States) in connection with any Government Contract under the United State civil or criminal False Claims Act, the United States Procurement Integrity Act or other Laws adopted by any other Governmental Authority, as applicable.

(i) No member of the Company Group has received any adverse or negative past performance evaluation or rating in connection with any Government Contract within the past three (3) years and, to the Sellers' Knowledge, no facts exist that could result in any adverse or negative past performance evaluation or rating by any Governmental Authority or could adversely affect the evaluation of any member of the Company Group, or its successor's, bids or proposals for future Government Contracts.

(j) To the Sellers' knowledge, there is no work or future business opportunities from which any member of the Company Group is currently limited, prohibited or otherwise restricted from performing or bidding, due to express organizational conflicts of interest (as defined by Subpart 9.5 of the FAR), Contract terms or provisions, or organizational conflicts of interest mitigation plans submitted by any member of the Company Group in connection with any Government Contract.

(k) To the Sellers' Knowledge, no member of the Company Group is using any intellectual property developed under any Government Contract for purposes outside the scope of that Government Contract without having obtained the necessary prior permission of the applicable Governmental Authority.

(l) Except as set forth on Schedule 6.28(k), no member of the Company Group has made any assignments of the Government Contracts or of any interests in the

-45-

outstanding Government Contracts. No member of the Company Group has entered into any financing arrangements with respect to any outstanding Government Contract.

Section 6.29    Clearances.

Except to the extent disclosure is prohibited by the Industrial Security Manual, or any manual relating to clearances that may not be disclosed, Schedule 6.29 sets forth listings (including an indication of the type of clearance) of all facility security clearances held by each member of the Company Group and all personnel security clearances held by any officer, director, manager, employee, consultant or agent of the Company Group. The Company Group holds all facility security clearances and the employees of the Company Group hold all personnel security clearances required under applicable Law that are required for the operation of the Business. All material facility security clearances held by each member of the Company Group are currently in full force and effect. No termination for default, notice of rescission, notice of revocation, notice of wrongdoing, notice of breach, cure notice or show cause notice from Defense Security Service or any other Governmental Authority has been issued and remains unresolved with respect to any such facility security clearances.

Section 6.30    Export Control Matters.

Each member of the Company Group is in compliance with all U.S. federal export control Laws applicable to it including, without limitation, the Arms Export Control Act, as amended (22 U.S.C. Section 2751 *et seq.*) and as implemented through executive order and the International Traffic in Arms Regulations (22 CFR 120-130), the Export Administration Act of 1979, as amended (50 U.S.C. App. 2401-2420) and as implemented through Executive Order, the Export Administration Regulations (15 CFR 730774) and the Laws implemented by the Office of Foreign Assets Control, U.S. Department of the Treasury (31 CFR 500 *et. seq.)* (collectively, the "**International Trade Laws**"). No member of the Company Group has received written notice that it is the subject of any enforcement actions or threats of enforcement actions that could affect the evaluation of the ability of any member of the Company Group (or its successors) to obtain approval for future export activity. No Governmental Authority has notified any Seller or any member of the Company Group in writing of any actual or alleged violation or breach of any International Trade Laws. Neither any Seller nor any member of the Company Group has received any notice of any pending audit, review, inspection, investigation, survey or examination of records by any Governmental Authority relating to the export activity of any member of the Company Group. No member of the Company Group has been and is not now (i) under any criminal indictment involving alleged false statements, false claims or other improprieties relating to the export activity of any member of the Company Group, (ii) under, to Sellers' Knowledge, any administrative, civil or criminal investigation involving alleged false statements, false claims or other improprieties relating to the export activity of any member of the Company Group, or (iii) party to any administrative or civil litigation involving alleged false statements, false claims or other improprieties relating to the export activity of any member of the Company Group; and to the Sellers' Knowledge there is no basis for any such indictment, investigation or litigation. To Sellers' Knowledge, all of the Products and technical data (as defined in the Export Administration Regulations ("**EAR**")) that the Company Group makes, sells or otherwise distributes that are subject to the EAR and have a Export Control

-46-

Classification Number ("**ECCN**") other than EAR99 are listed (along with their respective ECCNs) in Schedule 6.30.

Section 6.31    Accounts Payable.

All of the accounts payable reflected on the July 31, 2010 Balance Sheet and all accounts payable that have arisen since July 31, 2010 arose from bona fide purchases of goods and services of the Company Group in the ordinary course of business.

Section 6.32    Customers.

No material customer of the Company Group has decreased materially or, to the Sellers' Knowledge, overtly threatened or expressed an intention to decrease materially its purchases of Services or Products from the Company Group since July 31, 2010. Except as set forth on Schedule 6.32, since July 31, 2010, to the Sellers' Knowledge, there has been no termination, cancellation, or limitation of, or any material modification or change in, the business relationship of the Company Group with any material customer.

Section 6.33    Absence of Undisclosed Changes.

Since July 31, 2010, other than as set forth on Schedule 6.33 or in the Existing Financial Statements, and other than the transactions contemplated by this Agreement or as approved by Purchaser pursuant to Section 4.3 hereof, there has not been any entry by any member of the Company Group into any commitment or transaction material to the Company Group taken other than in the ordinary course of the Business. In addition, since July 31, 2010, other than as set forth on Schedule 6.33 or in the Existing Financial Statements, and other than the transactions contemplated by this Agreement or as approved by Purchaser pursuant to Section 4.3 hereof, there has not been (a) any change by any member of the Company Group in its accounting methods, principles and practices, (b) any reevaluation by any member of the Company Group of any assets (including, without limitation, any write down of inventory or write-off of accounts receivable) other than as required by GAAP, or (c) any action or event of the type prohibited by Section 4.3 hereof.

Section 6.34    Bank Accounts.

(a)    Schedule 6.34 lists the names and location of all banks and other financial institutions with which any member of the Company Group maintains an account (or at which an account is maintained to which any member of the Company Group has access as to which deposits are made on behalf of any member of the Company Group), in each case listing the type of account, the account number therefor, and the names of all persons authorized to draw thereupon or having access thereto and lists the locations of all safe deposit boxes used by the Company Group.

## ARTICLE 7
## REPRESENTATIONS AND WARRANTIES OF PURCHASER

Purchaser hereby represents, warrants and agrees for the benefit of the Sellers as follows:

-47-

Section 7.1    Organization and Standing of Purchaser.

Purchaser is a limited liability company duly organized, validly existing and in good standing under the laws of the State of Delaware.

Section 7.2    Authorization and Binding Obligation of Purchaser.

Purchaser has the requisite limited liability company power and authority to enter into and perform this Agreement and all other Transaction Documents. All limited liability company action on the part of Purchaser and the managers and officers of Purchaser necessary for the authorization, execution and delivery of this Agreement and all other Transaction Documents and for the performance of all of their respective obligations hereunder and thereunder, as the case may be, have been taken or will have been taken as of the Closing Date, and each of this Agreement and each of the other Transaction Documents, when executed and delivered, shall constitute valid and legally binding obligations of Purchaser, enforceable in accordance with their respective terms, except as may be limited by (i) bankruptcy, insolvency, or other similar laws affecting the enforcement of creditors' rights generally and (ii) general principles of equity (whether enforcement is sought at law or in equity).

Section 7.3    Ability to Perform Obligations.

Purchaser is not a party to, subject to, or bound by any agreement, Law or Order of any Governmental Authority that could prevent or materially impair (i) the performance of its obligations under this Agreement, or (ii) the purchase and receipt of, or the right to purchase or receive any Purchased Stock or SGI Stock.

Section 7.4    Non-Contravention.

(a)    Neither the execution and delivery by Purchaser of this Agreement or the other Transaction Documents, the performance by Purchaser of its obligations hereunder or thereunder, nor the performance or consummation by Purchaser of the transactions contemplated hereby or thereby will (i) violate or conflict with any provision of the certificate of formation, Purchaser LLC Agreement or other organizational documents of Purchaser, (ii) violate or conflict with any Law or Order to which Purchaser is subject or bound, (iii) require the approval of, notice to, or a filing or registration with any Governmental Authority, (iv) whether after notice or lapse of time or both, violate, breach or conflict with any provision of, result in the loss of a material benefit under, or permit the termination or acceleration of any Contract to which Purchaser is a party, (v) require any authorization, consent or approval of, exemption or other action by, or notice to, any party to any Contract to which Purchaser is a party or (vi) result in the creation or imposition of any Encumbrance (other than Permitted Encumbrances) upon any of the Membership Interests.

Section 7.5    Brokers, Finders.

Neither this Agreement nor the sale and purchase of the Stock and the SGI Stock or any other transaction contemplated by this Agreement was induced by or procured through or otherwise involved in any way any Person acting on behalf of or representing Purchaser as broker, finder, investment banker, financial advisor or in any similar capacity.

-48-

Section 7.6    No Legal Proceedings.

There is no action, suit, claim, proceeding or investigation pending or threatened against, relating to or affecting Purchaser or its assets and properties in a matter that would adversely affect its ability to perform its obligations under this Agreement or any Transaction Document to which it is a party.

Section 7.7    Securities Act of 1933.

The Purchased Stock and the SGI Stock are being acquired for investment only and not with a view to any public distribution thereof, and Purchaser will not offer to sell or otherwise dispose of the Purchased Stock or the SGI Stock so acquired by it in violation of the Securities Act of 1933, as amended, and the rules and regulations promulgated thereunder or the applicable state securities laws of any state.

Section 7.8    No Other Representations.

Purchaser hereby acknowledges and agrees that neither the Sellers nor either Company are making any representation, warranty or covenant whatsoever, express or implied, except those representations, warranties and covenants expressly set forth in this Agreement, any other Transaction Document or in the Disclosure Schedule or in any certificate contemplated hereby and delivered in connection herewith. In any event, except as expressly set forth in this Agreement, none of Sellers, neither Company or any of its officers, directors, partners, employees, affiliates or representatives, as the case may be, has made or is making any representation, warranty or covenant express or implied, as to any warranty of merchantability, suitability or fitness for a particular purpose or quality, with respect to any of the tangible assets being so acquired, or as to the condition or workmanship thereof, or as to the absence of any defects therein, whether latent or patent.

Section 7.9    Solvency.

Immediately after giving effect to the transactions contemplated by this Agreement or any of the other Transaction Documents, including the closing of any Debt Financing, each of Purchaser and each Company shall (i) be able to pay its debts as they become due, and (ii) shall have adequate capital to carry on its business; provided, that neither Purchaser nor either Company shall have any liability to the Sellers for breach of this Section 7.9 to the extent such breach is attributable to any matter that results in a breach of the Sellers representations and warranties set forth in Article 6. No transfer of property is being made and no obligation is being incurred in connection with the transactions contemplated by this Agreement or any of the other Transaction Documents, including the closing of any financing to be obtained by Purchaser or any of its Affiliates in order to effect the transactions contemplated hereby, with the intent to hinder, delay or defraud either present or future creditors of Purchaser or any member of the Company Group.

### ARTICLE 8
### TERMINATION

Section 8.1    Termination of Agreement.

The parties hereto may terminate this Agreement as provided below:

(a)    Purchaser, the Sellers and either Company may terminate this Agreement by mutual written consent at any time prior to the Closing.

(b)    Purchaser may terminate this Agreement by giving written notice to the Sellers and the Companies at any time prior to the Closing in the event:

(i)    any Seller or either Company is in material breach of any covenant contained in this Agreement and such material breach is not cured within thirty (30) days after written notice from Purchaser of such breach; or

(ii)    the representations and warranties of the Sellers and the Companies contained in this Agreement shall have been untrue in any material respect on the date when made (or in the case of any representations or warranties that are made as of a different date or period, as of such different date or period), in any case only to the extent that such material breach or inaccuracy of a representation or warranty is not cured within thirty (30) days after the date of the applicable notice.

(c)    The Sellers and the Companies may terminate this Agreement by giving written notice to Purchaser at any time prior to the Closing in the event:

(i)    Purchaser is in material breach of any covenant contained in this Agreement and such material breach is not cured within thirty (30) days after written notice from the Sellers and the Companies of such breach; or

(ii)    the representations and warranties of Purchaser contained in this Agreement shall have been untrue in any material respect on the date when made (or in the case of any representations or warranties that are made as of a different date or period, as of such different date or period), in any case only to the extent that such material breach or inaccuracy of a representation or warranty is not cured within thirty (30) days after the date of the applicable notice.

(d)    Purchaser may terminate this Agreement by giving written notice to the Sellers and the Companies at any time prior to the Closing if the Closing has not occurred on or before July 31, 2011, by reason of the failure to occur of any closing condition under Article 9 (unless the failure results primarily from Purchaser breaching any representation, warranty or covenant contained in this Agreement).

(e)    The Sellers and the Companies may terminate this Agreement by giving written notice to Purchaser at any time prior to the Closing if the Closing has not occurred on or before July 31, 2011, by reason of the failure to occur of any closing condition under Article 10 (unless the failure results primarily from any Seller or the Companies breaching any representation, warranty or covenant contained in this Agreement).

Section 8.2    Effect of Termination.

-50-

If any party terminates this Agreement pursuant to Section 8.1, all obligations of the parties hereunder will terminate without liability of any party to the other party; provided, that the provisions of this Section 8.2, Section 8.3 and Article 13 will survive termination and remain in full force and effect; and provided, further, that no such termination shall release any party of liability to any other party for damages or otherwise by reason of the breach of any of the provisions of this Agreement.

Section 8.3    Termination Fee.

(a)    In the event of the termination of this Agreement by Sellers pursuant to Section 8.1(e), Purchaser and Sponsor Affiliate shall pay to each Seller its Pro Rata Share of a termination fee in an aggregate amount of $1,000,000, due and payable in immediately available funds within ten (10) business days after the demand therefor, which demand may only be made following the occurrence of the termination event giving rise to the payment obligation described in this Section 8.3.

(b)    In the event that Sellers shall receive full payment pursuant to this Section of the amounts due hereunder, the receipt of such payment shall be deemed to be liquidated damages for any and all losses or damages suffered or incurred by Sellers or any other person in connection with this Agreement (and the termination of this Agreement), the transactions contemplated this Agreement (and the abandonment thereof) or any matter forming the basis for such termination, and neither Sellers nor any other Person shall be entitled to bring or maintain any other claim, action or proceeding against Purchaser, Sponsor Affiliate or any of their Affiliates arising out of this Agreement, any of the transactions contemplated by this Agreement or any matters forming the basis for such termination.

(c)    The parties acknowledge that the agreements contained in this Section are an integral part of the transactions contemplated by this Agreement and that, without these agreements, the parties would not enter into this Agreement. Except as provided in this Section 8.3, payment of the fees and expenses described in this Section 8.3 shall constitute the sole and exclusive remedy of the Sellers in connection with any such termination of this Agreement pursuant to Section 8.1(e).

## ARTICLE 9
## CLOSING CONDITIONS OF PURCHASER

The obligations of Purchaser to consummate the transactions contemplated by this Agreement are subject to the satisfaction at or prior to the Closing Date of each of the following conditions, any one or more of which may be waived (but only in writing) by Purchaser (provided that no such waiver shall be deemed to have cured any breach of any representation, warranty or covenant made in this Agreement):

Section 9.1    Representations, Warranties and Covenants of the Sellers and the Companies.

(i) All of the representations and warranties made by the Sellers and the Companies, or any one of them, in this Agreement shall be true and correct, in the case of any representation or warranty that is qualified as to materiality or words of similar import, in all respects, and in the

-51-

case of any representation or warranty that is not so qualified, in all material respects, in each case as of the date hereof and as of the Closing Date as though made at and as of the Closing Date (except to the extent such representations and warranties speak as of an earlier date, which shall be true and correct (as applicable, in all material respects) as of such date); (ii) the Companies and the Sellers shall have performed and complied with all agreements and covenants required by this Agreement to be performed or complied with by them on or prior to the Closing Date; and (iii) with respect to clauses (i) and (ii), at the Closing there shall be delivered to Purchaser a certificate signed by the Sellers and a duly authorized officer of the Companies to the foregoing effect.

Section 9.2     Deliveries to Be Made by the Companies and the Sellers at the Closing.

At the Closing, the Companies and the Sellers, as applicable, shall deliver or cause to be delivered to Purchaser the following in form and substance reasonably satisfactory to Purchaser:

(a)     original certificates representing all of the Purchased Stock and SGI Stock, which certificates shall be either duly endorsed for transfer or accompanied by stock powers executed in blank;

(b)     copies of resolutions of the stockholders and/or directors of the Companies authorizing and approving the execution and delivery of this Agreement and the other Transaction Documents and the performance by the Companies of their respective obligations hereunder and thereunder, certified by an authorized officer of each Company;

(c)     an incumbency certificate dated the Closing Date for each Company executed by an authorized office of each Company which shall identify the name and title and bear the signature of the officer of each Company individually authorized to execute and deliver this Agreement and the other Transaction Documents;

(d)     a good standing certificate, or similar document, for each member of the Company Group, dated as of a date within 30 days of the Closing Date, from the jurisdiction of its organization or formation and each other jurisdiction in which it is required to be qualified to do business;

(e)     copies of the organizational documents of each member of the Company Group certified by a duly authorized officer of each such member of the Company Group;

(f)     resignations, effective as of the Closing Date, of all directors and managers of each member of the Company Group and the resignations of those officers of the members of the Company Group requested by Purchaser prior to the Closing;

(g)     a statement prepared by each Company in accordance with Treasury Regulation Section 1.1445-2(c)(3) certifying that neither the Stock nor the SGI Stock is a "U.S. real property interest"; and

(h)     all other documents, assurances and other matters provided in this Agreement to be delivered to Purchaser at or before the Closing and not delivered to Purchaser

before the Closing, including, but not limited to, the duly executed Employment Agreements, Purchaser LLC Agreement and Contribution Agreement.

Section 9.3    Third Party Consents.

All consents and approvals identified on Schedule 6.3 required in order for the Sellers to perform their obligations under this Agreement shall have been obtained by the Sellers.

Section 9.4    Orders; Illegality.

There shall not be in effect any Law or Order which enjoins, prohibits, makes illegal or materially restricts or otherwise prevents the consummation of the transactions contemplated hereby.

Section 9.5    Absence of Investigations and Proceedings.

There shall be no investigation or proceeding before or by any Governmental Authority pending or threatened to which any member of the Company Group or any Seller is or may be a party that would reasonably be expected to have a Material Adverse Effect. No proceeding or formal investigation by any Governmental Authority shall be pending or threatened, with the object of challenging or preventing consummation of the transactions contemplated by this Agreement and no other proceedings shall be pending with such object or to collect damages from Purchaser (that if successful, would have a Material Adverse Effect).

Section 9.6    Owned Real Property.

All Real Property owned by any member of the Company Group shall have been sold, assigned, transferred or otherwise conveyed such that, as of the Closing, no member of the Company Group owns any Real Property.

Section 9.7    Absence of Certain Changes.

Between the date of this Agreement and the Closing Date, there shall have been no events, occurrences or conditions that have had or could reasonably be expected to have a Material Adverse Effect.

Section 9.8    Closing Date Indebtedness; Release of Encumbrances.

The Closing Date Indebtedness shall have been repaid in full by disbursement of a portion of the Redemption Purchase Price as provided in Section 2.4(c), and the Sellers shall have delivered to Purchaser evidence, reasonably satisfactory to Purchaser, showing that the Closing Date Indebtedness has been paid in full and that all Encumbrances in respect of the Closing Date Indebtedness affecting any Assets of the Company Group or equity of any member of the Company Group have been released.

Section 9.9    Transaction Expenses.

-53-

All Transaction Expenses incurred by the Sellers or the Company on behalf of the Sellers or itself in connection with the transactions contemplated under this Agreement shall have been paid in full by disbursement of a portion of the Redemption Purchase Price as provided in Section 2.4(c).

Section 9.10   Key Employees.

The Company or Purchaser shall have entered into non-competition and non-solicitation agreements with each of the Key Employees, on such terms as may be reasonably satisfactory to Purchaser.

Section 9.11   Delivery of Stock Certificates for Redeemed Stock.

At the Closing, the Company Stockholder shall deliver or cause to be delivered to the Company original certificates representing all of the Redeemed Stock which certificates shall be either duly endorsed for transfer or accompanied by stock powers executed in blank.

Section 9.12   Minimum Cash Amount.  The Company Group shall have Cash on hand that is at least equal to the Minimum Cash Amount.  For purposes of this Section 9.12 it is agreed between the parties that prior to Closing the Company Group may make distributions of Cash to the Sellers (including, without limitation, salary, bonuses, commissions and tax distributions), as long as such distributions will not cause the Cash on hand at the Company Group to be less than the Minimum Cash Amount.

Section 9.13   The Company Stockholder.

Sallyport Global Services, Ltd., a Subsidiary of the Company, shall have been replaced as trustee of the Company Stockholder with a trustee reasonably acceptable to Purchaser.

Section 9.14   Trust Account Amount.

Prior to the Closing, the Sellers and Purchaser shall have mutually agreed upon an additional amount of the Redemption Purchase Price to be placed into the Trust Account, if any, which amount shall be added to the Trust Account Amount.

## ARTICLE 10
## CLOSING CONDITIONS OF THE SELLERS

The obligations of the Sellers and the Companies to consummate the transactions contemplated by this Agreement are subject to the satisfaction at or prior to the Closing Date of each of the following conditions, any one or more of which may be waived (but only in writing) by the Sellers and the Companies (provided that no such waiver shall be deemed to have cured any breach of any representation, warranty or covenant made in this Agreement):

Section 10.1   Representations, Warranties and Covenants of Purchaser.

(i) All of the representations and warranties made by Purchaser in this Agreement shall be true and correct, in the case of any representation or warranty that is qualified as to

materiality or words of similar import, in all respects, and in the case of any representation or warranty that is not so qualified, in all material respects, as of the date hereof and as of the Closing Date as though made at and as of the Closing Date (except to the extent such representations and warranties speak as of an earlier date, which shall be true and correct (as applicable, in all material respects) as of such date); (ii) Purchaser shall have performed and complied with all agreements and covenants required by this Agreement to be performed by it on or prior to the Closing Date; and (iii) with respect to clauses (i) and (ii), at the Closing there shall be delivered to the Sellers a certificate signed by a duly authorized officer of Purchaser to the foregoing effect.

Section 10.2    Deliveries to be Made by Purchaser at the Closing.

At the Closing, Purchaser shall deliver or cause to be delivered to the Sellers the following:

(a)    the portion of the Total Purchase Price due at Closing, as provided in Section 2.4;

(b)    a copy of the resolutions of the board of managers of Purchaser authorizing the execution and delivery of this Agreement and the other Transaction Documents and the performance by Purchaser of its obligations hereunder and thereunder, certified by a duly authorized officer of Purchaser;

(c)    an incumbency certificate dated the Closing Date for Purchaser executed by a duly authorized officer of Purchaser which shall identify the name and title and bear the signature of each officer of Purchaser individually authorized to execute and deliver this Agreement and the other Transaction Documents;

(d)    a duly executed copy of the Purchaser LLC Agreement having schedules reflecting the Membership Interests issued to the Company Stockholder in connection with the contribution of the Rollover Stock; and

(e)    all other documents, assurances and other matters provided in this Agreement to be delivered to the Sellers at or before the Closing and not delivered to the Sellers before the Closing including, but not limited to, the duly executed Employment Agreements and the Contribution Agreement.

Section 10.3    Third Party Consents.

All consents and approvals required to be obtained by Purchaser in order to consummate the transactions contemplated by this Agreement shall have been obtained by Purchaser.

Section 10.4    Orders; Illegality.

There shall not be in effect any Law or Order which enjoins, prohibits, makes illegal or materially restricts or otherwise prevents the consummation of the transactions contemplated hereby.

Section 10.5   Absence of Investigations and Proceedings.

There shall be no investigation or proceeding before or by any Governmental Authority pending or threatened to which Purchaser is or may be a party that would reasonably be expected to have a Material Adverse Effect. No proceeding or formal investigation by any Governmental Authority shall be pending or threatened, with the object of challenging or preventing consummation of the transactions contemplated by this Agreement and no other proceedings shall be pending with such object or to collect damages from any member of the Company Group or any Seller (that if successful, would have a Material Adverse Effect).

ARTICLE 11
INDEMNIFICATION; SURVIVAL OF REPRESENTATIONS
AND WARRANTIES

Section 11.1   Indemnification by the Sellers.

Subject to the terms and conditions of this Article 11, each of the Sellers and (only prior to the Closing) the Companies, jointly and severally, agree to indemnify and hold harmless Purchaser, the Purchaser's Affiliates and their respective members, shareholders, managers, directors, officers, employees, agents, successors in interest, assigns and representatives (collectively, the "Purchaser Indemnified Parties") from and against any and all Losses which may be incurred or suffered by any such party and which arise out of or result from:

(a)   any inaccuracy in or breach of any of the representations and warranties made by any Seller or the Company under Article 6 of this Agreement (it being agreed and understood that for purposes of determining whether there is an inaccuracy or breach of any representation or warranty in Section 6.18, no disclosure on Schedule 6.18 shall be deemed to qualify the representations and warranties in Section 6.18);

(b)   any breach or nonperformance of any of the covenants or agreements made by any Seller or, prior to the Closing, the Company in or pursuant to this Agreement;

(c)   any Transaction Expenses or Closing Date Indebtedness that remains unpaid following the Closing that did not result in a reduction of the Redemption Purchase Price (or other purchase price component payable hereunder) pursuant to Section 2.4(c);

(d)   sponsoring, maintaining or terminating the DB Plan, including but not limited to (i) any administrative expenses related thereto (including but not limited to actuarial, legal, record-keeping and third party administration expenses), and (ii) any requirement to fund or make premium or other payments or contributions in respect of the DB Plan in connection with its termination; and

(e)   any demand, claim, suit, action, cause of action, proceeding or assessment brought by any former stockholder of the Company.

Section 11.2   Indemnification by Purchaser and the Company.

-56-

Each of the Purchaser and (only prior to the Closing) the Sponsor Affiliate and (only after the Closing) the Companies, jointly and severally, agree to indemnify and hold harmless each of the Sellers, the Sellers' Affiliates and their respective members, shareholders, managers, directors, officers, employees, agents, successors in interest, heirs, assigns and representatives from and against any and all Losses which may be incurred or suffered by any such party and which arise out of or result from:

     (a)     any inaccuracy in or breach of any of the representations and warranties made by Purchaser under Article 7 of this Agreement; and

     (b)     any breach or nonperformance of any of the covenants or agreements made by Purchaser in or pursuant to this Agreement.

Section 11.3  Cooperation.

The parties shall cooperate in the defense of all third party claims which may give rise to Indemnifiable Claims hereunder. In connection with the defense of any claim, each party shall make available to the party controlling such defense any books, records or other documents within its control and access to employees that are reasonably requested in the course of such defense.

Section 11.4  Limitations on Indemnification.

     (a)     Except as set forth in Section 11.4(c), the Sellers shall not be required to indemnify any other Person under Section 11.1(a) unless and until the aggregate of all amounts for which indemnity would otherwise be payable by the Sellers under this Article 11 exceeds $200,000 (the "Basket"); thereafter, the Sellers shall only be responsible for all such amounts in excess of the Basket. Except as set forth in Section 11.4(c), Purchaser and (only after the Closing) the Companies shall not be required to indemnify any other Person under Section 11.2(a) unless the aggregate of all amounts for which indemnity would otherwise be payable by Purchaser and the Company exceeds the Basket; thereafter, Purchaser and the Companies shall only be responsible for all such amounts in excess of the Basket.

     (b)     Except as set forth in Section 11.4(c): (i) the Sellers' indemnity obligations for Losses under Sections 11.1(a) and 11.1(d) shall be limited, in the aggregate, to $4,000,000 (the "Cap"); and (ii) Purchaser's and (only after the Closing) the Company's indemnity obligations for Losses under Section 11.2(a) shall be limited, in the aggregate, to the Cap.

     (c)     Notwithstanding any provision contained in this Agreement to the contrary, the limitations contained in Section 11.4(a) shall not apply with respect to any Losses relating to or arising from any inaccuracy in or breach of any of the representations and warranties contained in Section 6.21 hereof to the extent related to the DB Plan. Notwithstanding any provision contained in this Agreement to the contrary, the limitations contained in Sections 11.4(a) and 11.4(b) shall not apply with respect to any Losses relating to or arising from (i) willful misrepresentation or fraud and (ii) any inaccuracy in or breach of any of the representations and warranties contained in (A) with respect to the Sellers, Sections 6.2, 6.4, 6.5, 6.18 and 6.25 hereof; and (B) with respect to Purchaser, Sections 7.2, 7.5 and 7.9

-57-

hereof (collectively, the "Excluded Representations and Warranties"). The Sellers' indemnification obligations, on the one hand, and the Purchaser's and the Companies' indemnification obligations, on the other hand, under this Article 11 with respect to any Losses relating to or arising from any inaccuracies or breaches of their Excluded Representations and Warranties shall be limited, in the aggregate, to an amount equal to the aggregate Base Purchase Price and Redemption Purchase Price actually paid to the Sellers (including the Initial Holdback Amount and the Trust Account Amount). It is the Sellers' obligation to pay all Taxes constituting a Seller Tax Liability under Section 5.2, including foreign Taxes. Notwithstanding the immediately preceding sentence, and notwithstanding any provision contained in this Agreement to the contrary, the Sellers' indemnification obligations resulting from the Sellers' failure to pay foreign Taxes shall be limited, in the aggregate, to $4,000,000 solely in respect of those foreign Taxes that are ultimately owed by any member of the Company Group but that the Company, as of the Closing, did not know, and could not have known after reasonable inquiry, that it would have an obligation to pay.

(d)     As between the Sellers only (and without prejudice to the joint and several nature of the Sellers' indemnification obligations under Section 11.1), to the extent that a particular Seller is required hereunder to pay more than such Seller's Pro Rata Share of Losses hereunder (the "Excess Seller") and the other Seller pays less then such Seller's Pro Rata Share of such Losses hereunder (the "Shortfall Seller"), the Shortfall Seller hereby agrees to indemnify and reimburse the Excess Seller with respect to such difference, such amount due and payable promptly upon demand with any unpaid amounts bearing interest at the annual rate of 10% until paid. Notwithstanding the foregoing, as between the Sellers only, any indemnification obligations that result from the transaction pursuant to which the Company Stockholder acquired the Stock held by it or the preceding events and transactions relating thereto shall be the sole obligation of the Company Stockholder.

(e)     Any payment made by the Companies or the Sellers pursuant to this Article 11 in respect of any claim for Losses will be net of any insurance proceeds realized by and paid to the indemnified party or its Affiliates in respect of such claim.

(f)     No Person entitled to indemnification hereunder will be entitled to recover from the indemnifying party any Losses in excess of the actual damages suffered by such Person, and the parties waive any right to recover consequential, special, punitive or exemplary damages arising in connection with or with respect to the indemnification provisions hereof; provided, that such waiver shall not apply to any such Losses that are incurred by an Indemnified Party to the extent such damages are claimed by a third party in a claim, lawsuit or arbitration against an Indemnified Party.

(g)     Each party entitled to indemnification hereunder will take all reasonable steps to mitigate all Losses after becoming aware of any event which could reasonably be expected to give rise to any Losses that are indemnifiable or recoverable hereunder.

(h)     Except for specific performance (as provided in Section 13.13) or other equitable remedies that may be available to enforce the agreements, covenants or obligations under this Agreement, and except in the case of fraud or willful misrepresentation, the indemnification obligations under this Article 11 are the parties' sole and exclusive remedies,

-58-

each against the other, with respect to matters arising under this Agreement, of any kind or nature. The parties hereby waive and release any other rights, remedies, causes of action or claims arising under this Agreement, of any kind or nature.

(i)    Any indemnification payments under this Article 11 will be treated, for Tax purposes, as adjustments to the Base Purchase Price and the Redemption Purchase Price.

(j)    Seller Indemnification Obligations shall first be satisfied by a reduction of the Initial Holdback Amount, and thereafter shall be paid in cash by the Sellers, to the extent not otherwise limited pursuant to this Article 11; provided, however, that with respect to any Seller Indemnification Obligations for which recovery may be available from the Trust Account pursuant Section 2.3(b), the Purchaser Indemnified Parties shall first seek recourse against the Trust Account, in accordance with the terms and conditions of the Trust Account Agreement.

Section 11.5    Notice to Indemnifying Party.

If any party (the "Indemnified Party") receives notice of any claim or other commencement of any action or proceeding with respect to which any other party (or parties) (the "Indemnifying Party") is obligated to provide indemnification pursuant to Sections 11.1 or 11.2 or pursuant to any other specific indemnification covenant contained in this Agreement, the Indemnified Party shall promptly give the Indemnifying Party written notice thereof together with a copy of such notice of claim or commencement of a proceeding. The failure of a party to give notice under this Section 11.5 shall not relieve any party from liability, unless and to the extent the other party has been materially prejudiced thereby. Subject to the terms and conditions of the Trust Account Agreement, the Indemnified Party shall not settle or compromise any claim by a third party for which it is entitled to indemnification hereunder, without the prior written consent of the Indemnifying Party (which shall not be unreasonably withheld or delayed), unless a suit shall have been instituted against it and the Indemnifying Party shall not have undertaken the defense of such suit after notification thereof as provided in Section 11.6.

Section 11.6    Defense by Indemnifying Party.

In connection with any claim giving rise to indemnity hereunder resulting from or arising out of any claim or legal proceeding by a person who is not a party to this Agreement, after receiving written notice of such claim from the Indemnified Party, the Indemnifying Party at its sole cost and expense may, upon written notice to the Indemnified Party, assume the defense of any such claim or legal proceeding using counsel of its choice, if it acknowledges to the Indemnified Party in writing its obligations to indemnify the Indemnified Party with respect to all elements of such claim. The Indemnified Party shall be entitled to participate in (but not control) the defense of any such action, with its counsel and at its own expense; provided, however, that if the Indemnified Party, in its reasonable discretion, determines that there exists a conflict of interest between the Indemnifying Party (or any constituent party thereof) and the Indemnified Party, the Indemnified Party (or such constituent party thereof) shall have the right to engage separate counsel, the reasonable costs and expenses of which shall be paid by the Indemnifying Party, but in no event shall the Indemnifying Party be liable to pay for the costs and expenses of more than one separate firm of attorneys (in addition to any local counsel). If the Indemnifying Party does not assume the defense of any such claim or litigation resulting

therefrom, subject to the terms and conditions of the Trust Account Agreement, the Indemnified Party may settle (with the prior written consent of the Indemnifying Party, which consent shall not be unreasonably withheld, delayed or conditioned) or defend against such claim or litigation, after giving notice of the same to the Indemnifying Party, on such terms as the Indemnified Party may deem appropriate, and the Indemnifying Party shall be entitled to participate in (but not control) the defense of such action, with its counsel and at its own expense. If the Indemnifying Party thereafter seeks to question the manner in which the Indemnified Party defended such third-party claim, the Indemnifying Party shall have the burden to prove by a preponderance of the evidence that the Indemnified Party did not defend such third-party claim in a reasonably prudent manner. Notwithstanding the foregoing, however, Purchaser shall in all cases be entitled to control of the defense of any such action if it can demonstrate that such action (i) may result in injunctions or other equitable remedies in respect of Purchaser, the Company Group or the Business; (ii) may result in liabilities which (when taken with other then-existing claims by Purchaser under this Article 11 and the effect of any limitations on liability hereunder) would not be fully indemnified hereunder; or (iii) may have a Material Adverse Effect. In the event of any conflict between this Section 11.6 and Section 5.2(e)(iii), subject to the terms and conditions of the Trust Account Agreement, Section 5.2(e)(iii) shall control to the extent consistent with the parties' intention that the Sellers shall control the defense and response to any audit or administrative or judicial or other proceeding that relates to any Seller Tax Liability.

Section 11.7   Right of Contribution.

The Sellers shall not have any right of contribution against the Companies with respect to any breach by any Seller of any of the Sellers' representations, warranties, covenants or agreements set forth in this Agreement.

Section 11.8   Survival of Representations and Warranties of the Company and the Sellers.

The representations and warranties of the Company and the Sellers contained in Sections 6.18 and 6.21 hereof (and any indemnification obligation with respect to breach thereof) shall terminate and expire 30 days after the expiration of the statute of limitations applicable to claims by third parties against Purchaser and the Company Group in respect of the matter or matters which are the subject of said representations and warranties, unless on or prior to such date Purchaser has delivered to the Sellers a written notice of a claim for indemnification under Section 11.1(a) with respect to any breach of such representation or warranty in which case such representation or warranty shall survive until, but only for purposes of, the resolution of such matter covered by such written notice, at which point they shall expire. All other representations and warranties contained in Article 6 hereof (other than those contained in Sections 6.2, 6.4, 6.5 and 6.25 hereof, which shall survive the execution and delivery of this Agreement and the Closing and any investigation at any time made by or on behalf of Purchaser indefinitely) (and any indemnification obligation with respect to breach thereof) shall terminate and expire on the Release Date, unless on or prior to such date Purchaser has delivered to the Sellers a written notice of a claim for indemnification under Section 11.1(a) with respect to any breach of such representation or warranty in which case such representation or warranty shall survive until, but only for purposes of, the resolution of such matter covered by such written notice, at which point they shall expire.

-60-

Section 11.9    Survival of Representations and Warranties of Purchaser.

Each representation and warranty of Purchaser contained in Article 7 hereof shall survive the execution and delivery of this Agreement and the Closing and shall (together with any indemnification obligation with respect to breach thereof) thereafter terminate and expire on the Release Date (other than those contained in Sections 7.2, 7.5 and 7.9 hereof, each of which shall survive the execution and delivery of this Agreement and the Closing and any investigation at any time made by or on behalf of the Sellers indefinitely), unless, on or before such date, the Sellers have delivered to Purchaser a written notice of claim for indemnification under Section 11.2(a) with respect to any breach of such representation, warranty, covenant or agreement in which case such representation or warranty shall survive until, but only for purposes of, the resolution of such matter covered by such written notice, at which point they shall expire.

## ARTICLE 12
## CONFIDENTIALITY; RELEASE

Section 12.1    Confidentiality of the Sellers.

Unless this Agreement shall have been terminated pursuant to Article 8, the Sellers agree to, and agree to use their respective Best Efforts to cause their respective agents, representatives, Affiliates, employees, officers, managers and directors to: (i) treat and hold as confidential (and not make use of, disclose or provide access to any Person) all Company IP and information relating to product development, price, distributors, Customer Lists, pricing and marketing plans, policies and strategies, details of client and consultant contracts, operations methods, product development techniques, business acquisition plans, new personnel acquisition plans and all other confidential information with respect to the Company Group or the Business, except for such information as may be required by applicable Law, in which event the Sellers agree to, and agree to use their respective Best Efforts to cause their respective agents, representatives, Affiliates, employees, officers and directors to, furnish only that portion of such confidential information which they reasonably believe is legally required to be provided and exercise their reasonable efforts to obtain assurances that confidential treatment will be afforded such information, and (ii) in the event that the Sellers or any of their respective agents, representatives, Affiliates, employees, officers, managers or directors becomes legally compelled to disclose any such information, provide Purchaser with prompt written notice of such requirement (to the extent permissible) so that Purchaser may, at the expense of Purchaser, seek a protective order or other remedy. This Section 12.1 shall not apply to any information that, at the time of disclosure, is known to the receiving party before disclosure thereof, is independently developed by the receiving party, is or becomes publicly available through no fault of the receiving party, is obtained by the receiving party from a third party not known by the receiving party to be under any obligation not to disclose such information and which the receiving party has no reason to believe is not otherwise publicly available or is reasonably necessary in order for any Seller to litigate any claim against Purchaser pursuant to this Agreement. Each Seller agrees and acknowledges that remedies at law for any breach of its obligations under this Section 12.1 are inadequate and that in addition thereto Purchaser shall be entitled to seek equitable relief, including injunction and specific performance, in the event of any such breach. Notwithstanding the foregoing, each Seller, with the consent of Purchaser (which consent shall not be unreasonably withheld), may make such disclosures in connection with defending any

-61-

claim brought against such Seller or any of its Affiliates or Associates by any third person as may be reasonably necessary in order for such Seller to conduct its defense thereof; provided, however, that each Seller agrees to, and agrees to cause their respective agents, representatives, Affiliates, employees, officers and directors to, exercise their respective Best Efforts to obtain assurances that confidential treatment will be afforded such information and to seek a protective order or other remedy to preserve the confidentiality of such information.

Section 12.2  Release.

(a)  The consideration allocated to the Sellers pursuant to Article 2 of this Agreement represents the only payment or consideration to be received by the Sellers in exchange for the Stock and the SGI Stock owned by the Sellers, and conditioned upon full receipt of that portion of the consideration contemplated by Article 2, each Seller, for such Seller and such Seller's heirs, successors and assigns (collectively, the "Releasors"), hereby forever fully and irrevocably releases and discharges the Companies and their respective predecessors, successors, subsidiaries and Affiliates, managers, directors, officers, employees, agents, and representatives (collectively, the "Released Parties") from any and all actions, suits, claims, demands, debts, sums of money, accounts, reckonings, bonds, bills, covenants, Contracts, controversies, promises, judgments, Liabilities and Costs or obligations of any kind whatsoever in law or equity, or otherwise (including claims for damages, costs, expenses, and attorneys', brokers' and accountants' fees and expenses) for additional payment or consideration in connection with the transactions contemplated by this Agreement, as well as all other events, facts, conditions or circumstances, existing or arising prior to the Closing Date, which the Releasors can, shall or may have against the Released Parties, and that now exist or may hereafter accrue (collectively, the "Released Claims"), provided that Released Claims shall not include claims (i) pertaining to or arising under this Agreement or any of the other Transaction Documents, whether for indemnification or otherwise, (ii) any future claims pertaining to or arising under any employment or other relationship by any Seller with the Company Group after the Closing, (iii) claims for accrued salary and vested benefits under any Plans existing as of the Closing Date, or (iv) pertaining to or arising under any rights of a Seller to indemnification or reimbursement from a member of the Company Group under its organizational documents or otherwise as contemplated in Section 5.3 for third party claims arising out of or in connection with acts or omissions of such Seller while acting in his capacity as officer or director of any member of the Company Group prior to or as of the Closing Date. The Releasors shall refrain from asserting any claim or demand or commencing (or causing to be commenced) any proceeding, in any court or before any tribunal, against any Released Party based upon any Released Claim.

ARTICLE 13
MISCELLANEOUS

Section 13.1  Expenses.

The Sellers and Purchaser shall pay their own expenses incident to the negotiation, preparation and performance of this Agreement and the transactions contemplated hereby, including, without limitation, expenses and disbursements of their respective financial advisors, accountants and counsel.

-62-

Section 13.2  Notices.

All notices, requests, demands, and other communications under this Agreement shall be in writing and delivered in person or sent by facsimile or sent by certified mail, postage prepaid, or by nationally recognized courier service and properly addressed as follows:

to Purchaser and to the Companies (after the Closing):

c/o DC Capital Partners, LLC
975 F Street NW
Suite 1050
Washington, DC 20004-1454
Attention:  Thomas J. Campbell
Fax: (202) 737-5225

with a copy to:

Arnold & Porter LLP
555 12th Street, NW
Washington, DC 20004
Attention:  Kevin Lavin, Esq.
Fax:  (202) 942-5999

to the Sellers and to the Companies (prior to the Closing):

The DeBlasio Group
447 Washington Avenue
Bridgeville, PA 15017
Attention: Pasquale B DeBlasio
Fax: 412-221-7306

with a copy to:

Cohen & Grigsby, P.C.
625 Liberty Avenue
Pittsburgh, Pennsylvania 15222-3152
Attention: Andrew T. Flowers
Fax: (412) 209-1945

to John DeBlasio:

310 N. Belmont Avenue
Arlington Heights, IL 60004
Fax: (847) 231-3021

-63-

with a copy to:

Cohen & Grigsby, P.C.
625 Liberty Avenue
Pittsburgh, Pennsylvania 15222-3152
Attention: Andrew T. Flowers
Fax: (412) 209-1945

Any party hereto may from time to time change its address for the purpose of notices to that party by a similar notice specifying a new address, but no such change shall be deemed to have been given until it is actually received by the party sought to be charged with its contents. All notices and other communications required or permitted under this Agreement which are addressed as provided in this Section 13.2 if delivered personally, by facsimile or by nationally recognized courier service, shall be effective upon delivery; and, if delivered by mail, shall be effective three days following deposit in the United States mail, postage prepaid.

Section 13.3   Counterparts.

This Agreement may be executed in two or more counterparts, each of which will be deemed an original with the same effect as if the signatures hereto and thereto were upon the same instrument. If any signature is delivered by facsimile transmission or by PDF, such signature shall create a valid and binding obligation of the party executing (or on whose behalf the signature is executed) with the same force and effect as if such facsimile or PDF signature were an original thereof. This Agreement and each of the other Transaction Documents shall become effective when each party hereto or thereto, as the case may be, shall have received a counterpart thereof signed by the other parties hereto or thereto, as the case may be.

Section 13.4   Integration.

This Agreement and the other Transaction Documents supersede all prior negotiations, agreements and understandings among the parties hereto with respect to the subject matter of this Agreement and constitute the entire agreement among the parties hereto.

Section 13.5   Assignability.

Neither this Agreement nor any right or obligation hereunder is assignable in whole or in part, whether by operation of Law or otherwise, by any party without the express written consent of the other parties hereto and any such attempted assignment shall be void and unenforceable; provided, however, that Purchaser may transfer or assign this Agreement or any right or obligation hereunder to any lender or other financing source, and any Affiliate at any time prior to or after the Closing, provided that Purchaser, jointly and severally with its assignee, remains primarily liable for the full and timely performance of all of Purchaser's obligations under this Agreement. This Agreement and the rights and obligations hereunder shall be binding upon, and shall inure to the benefit of, the parties hereto and their respective successors or assignees, and no other person shall acquire or have any rights under or by virtue of this Agreement.

Section 13.6    No Waiver of Rights.

All waivers hereunder must be made in writing, and failure of any party at any time to require another party's performance of any obligation under this Agreement shall not affect the right subsequently to require performance of that obligation. Any waiver of any breach of any provision of this Agreement shall not be construed as a waiver of any continuing or succeeding breach of such provision or a waiver or modification of any other provision.

Section 13.7    Subject Headings.

The subject headings of the Articles and Sections of this Agreement are included for the purposes of convenience only, and shall not affect the construction or interpretation of any of the provisions of this Agreement.

Section 13.8    Further Assurances.

At all times before and after the Closing, the parties hereto shall each perform such acts, execute and deliver such instruments and documents and do all such other things consistent with the terms of this Agreement as may be reasonably necessary to accomplish the transactions contemplated in this Agreement or to otherwise carry out the purpose of this Agreement.

Section 13.9    Schedules and Exhibits.

All Schedules and Exhibits referred to in and attached to this Agreement are incorporated herein by such reference as if fully set forth in the text hereof.

Section 13.10    Severability.

Whenever possible, each provision of this Agreement shall be interpreted in such manner as to be effective and valid under applicable Law, but if any provision of this Agreement should be prohibited or invalid under applicable Law, such provision shall be ineffective to the extent of such prohibition or invalidity without invalidating the remainder of such provision or the remaining provisions of this Agreement.

Section 13.11    Publicity and Reports.

The Companies, the Sellers and Purchaser shall coordinate all publicity relating to the transactions contemplated by this Agreement and, except to the extent required by Law or applicable stock exchange rules, no party shall issue any press release, publicity statement or other public notice relating to this Agreement, or the transactions contemplated by this Agreement, without obtaining the prior consent of the other parties hereto. Purchaser and the Sellers shall consult with each other with respect to the form and content of any application, report, notice or request for consent made to any Governmental Authority or third party which relates to this Agreement or the transactions contemplated hereby.

Section 13.12    Parties in Interest.

This Agreement shall be binding upon and inure to the benefit of each party, and nothing in this Agreement, express or implied, is intended to confer upon any other Person any rights or remedies of any nature whatsoever under or by reason of this Agreement except for the provisions of Section 5.3 and Article 11 (which are intended to be for the benefit of the Persons provided for therein and may be enforced by such Persons). Nothing in this Agreement is intended to relieve or discharge the obligation of any third Person to (or to confer any right of subrogation or action over against) any party to this Agreement.

Section 13.13    Specific Performance.

Sellers acknowledge that, in view of the uniqueness of the Business and the transactions contemplated by this Agreement, Purchaser would not have an adequate remedy at law for money damages in the event that this Agreement has not been performed in accordance with its terms, and therefore agrees that Purchaser shall be entitled to specific enforcement of the terms hereof in addition to any other remedy to which it may be entitled, at law or in equity.

Section 13.14    Governing Law.

This Agreement will be governed by and construed and enforced in accordance with the internal laws of the State of Delaware without reference to its choice of law rules.

Section 13.15    Consent to Jurisdiction, Etc.

Each of the parties hereto hereby irrevocably consents and agrees that any action, suit or proceeding arising in connection with any disagreement, dispute, controversy or claim arising out of or relating to this Agreement or any other Transaction Document (a "Legal Dispute") shall be brought only to the exclusive jurisdiction of the courts of the Commonwealth of Virginia located in the City of Alexandria or the federal courts located in the United States District Court for the Eastern District of Virginia (Alexandria Division). The parties hereto agree that, after a Legal Dispute is before a court as specified in this Section 13.15 and during the pendency of such Legal Dispute before such court, all actions, suits or proceedings with respect to such Legal Dispute or any other Legal Dispute, including, without limitation, any counterclaim, cross-claim or interpleader, shall be subject to the exclusive jurisdiction of such court. Each of the parties hereto hereby waives, and agrees not to assert, as a defense in any Legal Dispute, that such action, suit or proceeding may not be brought or is not maintainable in such court, that the action, suit or proceeding is brought in an inconvenient forum or that the venue of the action, suit or proceeding is improper. Each party hereto agrees that a final judgment in any action, suit or proceeding described in this Section 13.15 after the expiration of any period permitted for appeal and subject to any stay during appeal shall be conclusive and may be enforced in other jurisdictions by suit on the judgment or in any other manner provided by Law.

Section 13.16    Waiver of Jury Trial.

EACH OF THE PARTIES TO THIS AGREEMENT HEREBY AGREES TO WAIVE ITS RESPECTIVE RIGHTS TO A JURY TRIAL OF ANY CLAIM OR CAUSE OF ACTION BASED UPON OR ARISING OUT OF THIS AGREEMENT. The scope of this waiver is intended to be all-encompassing of all Legal Disputes (as defined in Section 13.15) that may be filed in any court and that relate to the subject matter of the transactions contemplated by this

-66-

Agreement, including contract claims, tort claims, breach of duty claims and all other common law and statutory claims. Each party hereto hereby acknowledges that this waiver is a material inducement to enter into a business relationship, that each has already relied on this waiver in entering into this Agreement. Each party hereto further warrants and represents that it has reviewed this waiver with its legal counsel and that it knowingly and voluntarily waives its jury trial rights following consultation with legal counsel. THIS WAIVER IS IRREVOCABLE, MEANING THAT IT MAY NOT BE MODIFIED EITHER ORALLY OR IN WRITING (OTHER THAN BY A MUTUAL WRITTEN WAIVER SPECIFICALLY REFERRING TO THIS SECTION 13.16 AND EXECUTED BY EACH OF THE PARTIES), AND THIS WAIVER SHALL APPLY TO ANY SUBSEQUENT AMENDMENTS, RENEWALS, SUPPLEMENTS OR MODIFICATIONS TO THIS AGREEMENT OR TO ANY OTHER DOCUMENTS OR AGREEMENTS RELATING TO THE TRANSACTIONS CONTEMPLATED BY THIS AGREEMENT. In the event of litigation, this Agreement may be filed as a written consent to a trial by the court.

Section 13.17 <u>John DeBlasio Guarantee</u>.

John DeBlasio hereby agrees that he, along with the Sellers, shall be jointly and severally liable for the full and timely performance of all of the Sellers' obligations under this Agreement, including those obligations that survive the Closing. In addition, John DeBlasio agrees that he shall be subject to the terms and conditions of Sections 5.1, 12.1 and 12.2 hereof as if he was a "Seller" for purposes of such sections. For the avoidance of doubt, but subject to Section 11.4(j), the parties hereto agree that Purchaser shall not be required to institute suit or exhaust its remedies against Sellers with respect to any Seller Indemnification Obligations prior to enforcing its rights and remedies against John DeBlasio with respect to any Seller Indemnification Obligations pursuant to this <u>Section 13.17</u>. In addition, if for any reason the Company Stockholder does not own, beneficially and of record, and have good and marketable title to, the Stock, and therefore John DeBlasio is deemed the beneficial and record owner of the Stock, John DeBlasio agrees that he shall be deemed to be the "Company Stockholder" for all purposes of this Agreement and he hereby agrees to be bound by all of the terms and conditions of this Agreement as the Company Stockholder.

[Signature Page Follows]

IN WITNESS WHEREOF, the parties hereto have executed, or have caused to be executed by their respective duly authorized officers, this Agreement as of the date first written above.

COMPANY:

SALLYPORT GLOBAL HOLDINGS INC.

By:
Name:     John DeBlasio
Title:    President / CEO

SGI:

SALLYPORT GLOBAL INC.

By:
Name:
Title:

SELLERS:

THE JOHN DEBLASIO CHARITABLE TRUST FOR WORLD PEACE AND DEVELOPMENT

By:
Name:     John DeBlasio
Title:    President of Trustee

JOHN P. DEBLASIO TRUST

By:
Name:
Title:

[Signature Page to Securities Purchase Agreement]

IN WITNESS WHEREOF, the parties hereto have executed, or have caused to be executed by their respective duly authorized officers, this Agreement as of the date first written above.

**COMPANY:**

**SALLYPORT GLOBAL HOLDINGS INC.**

By: _____
Name: _____
Title: _____

**SGI:**

**SALLYPORT GLOBAL INC.**

By: _____
Name: *PASQUALE B. DEBLASI.*
Title: *Trustee, JOHN P. DeBRe ω Trust, President*

**SELLERS:**

**THE JOHN DEBLASIO CHARITABLE TRUST FOR WORLD PEACE AND DEVELOPMENT**

By: _____
Name: _____
Title: _____

**JOHN P. DEBLASIO TRUST**

By: _____
Name: *PASQUALE B. DeBLASI.*
Title: *TRUSTEE*

**PURCHASER:**

**SALLYPORT HOLDINGS LLC**

By: _____
Name:    Thomas J. Campbell
Title:    Managing Member

**SPONSOR AFFILIATE** (solely with respect to Sections 8.3 and 11.2):

**KASEMAN, LLC**

By: _____
Name:    Thomas J. Campbell
Title:    Chairman

**JOHN DEBLASIO** (solely with respect to Section 13.17):

_____

John DeBlasio

[Signature Page to Securities Purchase Agreement]

PURCHASER:

SALLYPORT HOLDINGS LLC

By:    _____
Name:  _____
Title: _____

SPONSOR AFFILIATE (solely with respect to Sections 8.3 and 11.2):

KASEMAN, LLC

By:    _____
Name:  _____
Title: _____

JOHN DEBLASIO (solely with respect to Section 13.17):

_____
John DeBlasio

[Signature Page to Securities Purchase Agreement]