# EXHIBIT

# D

FILED

**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA**
(Alexandria Division)

2012 MAY 25  P 1:42

JPD PRIVATE TRUST COMPANY, LTD as       )
Trustee of THE GPD CHARITABLE TRUST,    )
                                        )
       Plaintiff,                        )
                                        )
       v.                                )
                                        )
KS INTERNATIONAL LLC,                   )
1600 Tysons Boulevard                   )
McLean, VA 22102                        )
                                        )
       and                               )
                                        )
SALLYPORT GLOBAL HOLDINGS INC.,         )
1600 Tysons Boulevard                   )
McLean, VA 22102                        )
                                        )
       Defendants.                       )

CLERK US DISTRICT COURT
ALEXANDRIA, VIRGINIA

Civil Action No. *1:12CV572-AJT/JFA*

## COMPLAINT

    Plaintiff JPD Private Trust Company, LTD as Trustee of The GPD Charitable Trust

alleges the following for its Complaint against Defendants Sallyport Global Holdings Inc. and

KS International LLC:

      1.    This dispute arises from the sale of the Sallyport Companies to Defendants via a

Securities Purchase Agreement ("SPA"). Defendants have breached their obligations under the

SPA by refusing to pay to Plaintiff certain deferred sales proceeds on the grounds that such

proceeds are being held back to cover purported indemnification claims. Although Defendants

have attempted to manufacture indemnifiable claims by alleging that sufficient Working Capital

was not left in the Company, they failed to follow mandatory contractual procedures for

resolving Working Capital Disputes, choosing instead to unilaterally and improperly seize the

deferred sales proceeds for themselves. Furthermore, Defendants have failed to demonstrate that

sufficient Working Capital was not left in the Company. Plaintiff seeks a judgment for the substantial damages resulting from Defendants' actions.

## I. PARTIES

2.      Plaintiff JPD Private Trust Company, LTD (the "Trustee") is trustee of The GPD Charitable Trust, which was previously known as The John DeBlasio Charitable Trust for World Peace and Development (the "Charitable Trust"). The Charitable Trust was the former Company Stockholder of Defendant Sallyport Global Holdings Inc. and a Seller under the SPA. The Charitable Trust is a charitable trust organized under the laws of Bermuda. The Trustee is a Bermuda Limited Company, a company limited by shares, with a principal place of business at 8 Par-la-Ville Road, Hamilton, Bermuda.

3.      Defendant KS International LLC ("KS International") is a Delaware limited liability company with its principal place of business at 1600 Tysons Boulevard., McLean, Virginia 22102. Upon information and belief, each member of KS International is a citizen of one or more U.S. States and no member of KS International is a citizen of a foreign state. KS International was formerly known as Kaseman Holdings LLC, which was the successor to Sallyport Holdings LLC, which was the Purchaser under the SPA.

4.      Defendant Sallyport Global Holdings Inc. ("Sallyport Global Holdings" or the "Company") is a Delaware corporation with its principal place of business at 1600 Tysons Boulevard., McLean, Virginia 22102. Pursuant to the SPA, Sallyport Global Holdings is a subsidiary of KS International.

## II. JURISDICTION

5.      This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332(a)(2) because the amount in controversy exceeds $75,000, exclusive of interest and costs, and it is between citizens of a U.S. State and citizens or subjects of a foreign state.

6.      Venue is appropriate in this District pursuant to 28 U.S.C. § 1391(a) and (c) because the SPA provides that "any action, suit or proceeding arising in connection with any disagreement dispute, controversy or claim arising out of or relating to [the SPA] shall be brought only to... [the U.S. District Court for the Eastern District of Virginia Alexandria Division]." (SPA § 13.15.)

### III.  FACTUAL BACKGROUND

7.      Sallyport Global LLC. formerly known as Sallyport Global Inc. ("SGI"). and Sallyport Global Holdings (the "Companies") are engaged in the business of providing base-operations support to United States government initiatives worldwide, offering services in a variety of areas such as operations and maintenance, security, fire and emergency, food and hospitality, logistics and procurement, training, and design and construction.

8.      On May 6, 2011, the Securities Purchase Agreement ("SPA") was executed whereby Sallyport Holdings LLC (the "Purchaser") would acquire the interests of the John DeBlasio Charitable Trust for World Peace and Development and the John P. DeBlasio Trust (the "Business Trust") in the Companies.  The SPA defined the Charitable Trust and the Business Trust as the "Sellers."  A true and correct copy of the SPA is attached hereto as Exhibit A.

9.      Amendment No. 1 to the SPA. executed on June 29, 2011. modifies certain terms of the original SPA.  When read together. the SPA and Amendment No. 1 to the SPA constitute the agreement between the parties and are referred to herein collectively as "the SPA."  A true and correct copy of Amendment No. 1 is attached hereto as Exhibit B.

10.      Pursuant to the SPA, Sallyport Holdings LLC acquired stock in Sallyport Global Holdings held by the Charitable Trust as the Company Stockholder and caused Sallyport Global

Holdings to redeem the Charitable Trust's remaining shares.  Additionally, the Business Trust contributed its interests in SGI in exchange for rollover securities in Sallyport Holdings LLC. Upon completion of the sales transaction, Sallyport Global Holdings and SGI became the wholly-owned subsidiaries of Sallyport Holdings LLC.

11.     Sallyport Holdings LLC subsequently merged into Kaseman Holdings LLC, which later changed its name to KS International LLC.

## A.     The Initial Holdback Amount Provision

12.     Pursuant to the SPA, Sallyport Global Holdings withheld $4,000,000 of the sales proceeds paid to redeem the shares of the Charitable Trust (described as "the Company Stockholder") in Sallyport Global Holdings (the "Initial Holdback Amount") on the Closing Date ("Closing Date") to be used, if necessary, for purposes of the Sellers' indemnification obligations.

13.     The SPA defined the Initial Holdback Amount as follows:

> "Initial Holdback Amount" shall mean $4,000,000, which shall be held back by the Company on the Closing Date pursuant to Section 2.3 as security and a source for effecting the payment and discharge of any indemnification obligations of the Sellers set forth in Article 11 hereof.

(SPA at 6.)

14.     The SPA also detailed the permissible uses for the Initial Holdback Amount:

> In the event there are any Seller Indemnification Obligations remaining unsatisfied on the Release Date, the Company shall be entitled to retain from the Initial Holdback Amount, on behalf of the Purchaser Indemnified Parties, an amount equal to such unsatisfied Seller Indemnification Obligations until they are finally resolved pursuant to the terms of Article 11 at which point such retained amounts shall either be paid by the Company to the Company Stockholder or permanently retained by the Company on behalf of the Purchaser Indemnified Parties in such amounts as may be determined upon such resolution.

(Id. § 2.3(a).)

15.     The SPA established the timeframe for the return of the Initial Holdback Amount

to the Company:

> [O]n the first business day immediately following the Release
> Date, the Company shall pay to the Company Stockholder, by wire
> transfer of immediately available funds to such accounts as the
> Company Stockholder may direct, an amount equal to the balance
> of the Initial Holdback Amount, <u>minus</u> any amounts the Company
> is entitled to retain in accordance with Section 2.3.

(<u>Id.</u> § 2.5(e).)

16.     The Release Date ("Release Date") was set as "the date that is thirty (30) days

following the day that the Company receives the audited consolidated financial statements of the

Company Group as of December 31, 2011." (<u>Id.</u> at 9.)

17.     Upon the Release Date, the Company, on behalf of any Purchaser with

indemnifiable claims, would be entitled to retain the Initial Holdback Amount in an amount

equal to any unsatisfied Seller Indemnification Obligation pending resolution of the

indemnification amounts pursuant to Article 11.  (<u>Id.</u> § 2.3(a).)

18.     Indemnification by the Sellers was to be limited to those items delineated in

§ 11.1(a)-(e), which include an inaccuracy in or breach of any of the representations or

warranties made by any Seller under Article 6 or a breach or nonperformance of Sellers'

covenants or agreements.

19.     On the day after the Release Date, the Charitable Trust as the Company

Stockholder was to be paid the amounts of the Initial Holdback Amount not being retained for

any unsatisfied Seller Indemnification Obligations.  (<u>Id.</u> § 2.5(e).)

**B.      The SPA Provisions for Resolving Working Capital Disputes**

20.     Importantly, indemnification obligations under the SPA do not apply to disputes

related to the Company's Working Capital Requirements.

21.     The SPA addressed Working Capital ("Working Capital") in Section 2.5,

providing for the resolution of Working Capital disputes through channels different from

Indemnification.  Specifically, before the Closing, the Sellers were to prepare a statement of

Estimated Working Capital setting forth a good faith and reasonably itemized calculation of

Working Capital expected as of the close of business on the Closing Date based on then-

available financial information.

22.     The Estimated Working Capital was to be calculated in accordance with prior

historical accounting practices and comply with United States generally accepted accounting

principles ("GAAP").  (See id. at 5; id. § 2.5(a).)

23.     The Purchase Price was to be adjusted depending on the difference between

Target Working Capital amounts set by the SPA and the Estimated Working Capital.  If the

Estimated Working Capital exceeded the Target Maximum Working Capital, the Purchase Price

was to be increased dollar-for-dollar by the amount of the excess.  Conversely, if the Estimated

Working Capital was less than the Target Minimum Working Capital, the Purchase Price to be

paid at Closing was to be decreased dollar-for-dollar by the amount of such deficiency.  (Id.

§ 2.5(a).)

24.     Within 60 days after the Closing Date, the Purchaser was required to prepare and

deliver an Actual Working Capital Statement.  (Id. § 2.5(b).)  The Actual Working Capital

Statement was to:

> [S]et forth an itemized calculation of the actual Working Capital as
> of the close of business on the Closing Date ("Final Working
> Capital").  The Actual Closing Working Capital Statement shall be
> consistent with the July 31, 2010 Balance Sheet.

(Id.)

25. Section 2.5(b) also delineates the actions to be taken to resolve any dispute over Working Capital ("Working Capital Dispute"). After receiving the Actual Working Capital Statement, the Sellers were to have 30 days in which to review the statement (the "Review Period"), during which time they were to also have access to the Company's work papers, the preparers of the Actual Working Capital Statement, and the books and records on which the Actual Closing Working Capital Statement was based. (Id.)

26. The SPA then requires the Sellers, within the Review Period, to notify the Purchaser of any disagreement with the calculation of the Final Working Capital. (Id.)

27. Following notification by the Sellers of a disagreement with the calculation of the Final Working Capital, the SPA obligates the Sellers and the Purchaser to use commercially reasonable efforts to resolve the disagreements, after which any remaining disputes would be referred to an accounting firm for final, binding resolution. (Id.)

**C.**    **Purchaser Fails to Deliver the Actual Working Capital Statement after the SPA Closes**

28. The SPA transaction closed on June 29, 2011.

29. Pursuant to Section 2.5(b), Sallyport Holdings LLC had 60 days after that Closing Date in which to prepare and deliver the Actual Working Capital Statement. (Id.)

30. Sallyport Holdings LLC sought a 30-day extension of that 60-day period, which the Sellers granted, extending the time in which to prepare and deliver the Actual Working Capital Statement to September 27, 2011.

31. Sallyport Holdings LLC did not deliver the Actual Working Capital Statement on or before the extended September 27, 2011 cut-off date.

**D.**     **Defendants Wrongfully Retain the Initial Holdback Amount**

32.     In a February 23, 2012 letter (the "February 23 Letter"), KS International, as successor in interest to Sallyport Holdings LLC, informed the Sellers that it would retain the *entire* Initial Holdback Amount "in partial satisfaction" of its alleged claims for "Working Capital adjustment and/or indemnification."  A true and correct copy of the February 23 Letter is attached hereto as Exhibit C.

33.     KS International's February 23 Letter enclosed a purported Actual Working Capital Statement (the "Delivered AWC Statement") indicating that the Sellers failed to deliver the Target Minimum Working Capital upon the Closing Date.

34.     Although the February 23 Letter describes purported shortcomings in the Working Capital Amount, Sallyport Holdings LLC, KS International, and Sallyport Global Holdings did not comply with Section 2.5 of the SPA, which provides the *exclusive* mechanism for dealing with working capital matters.

35.     Further, the SPA does not permit the Initial Holdback Amount to be applied against any Working Capital shortfall in any event because it is not an indemnifiable claim under the SPA.

36.     Notwithstanding the September 27, 2011 deadline for delivery of the Actual Working Capital Statement, KS International did not deliver the statement until nearly *five months after* the cut-off date established by the SPA.

37.     KS International and Sallyport Global Holdings failed to comply with the SPA's provisions for a resolution of any disputes of the Estimated Working Capital Statement and are not entitled to retain any of the Initial Holdback Amount for the improper claims.

38.     Instead, the Initial Holdback Amount should have been paid to the Charitable Trust as the Company Stockholder on the day following the Release Date, i.e., 30 days after the Company received audited financial statements.  (See SPA § 2.5(e); id. at 9.)

39.     KS International's February 23 Letter indicated that KS International had received the audited financial results by *no later than* the date of that letter, making the Release Date no later than March 23, 2012.  Under the SPA, the payment of the Initial Holdback Amount was thus due on March 24, 2012.

40.     Moreover, Sallyport Global Holdings and KS International failed to prepare the Delivered AWC Statement in a manner consistent with the July 31, 2010 Balance Sheet and GAAP, as required by the SPA.  (See id. § 2.5(b).)

41.     The Delivered AWC Statement included adjustments based on arbitrary changes in accounting policies that were inconsistent with those GAAP compliant accounting policies used by the Company in the preparation of the July 31, 2010 Balance Sheet as audited by Ernst & Young, LLP.

42.     In addition, the Delivered AWC Statement contained a number of mathematical errors, further rendering it useless and not in conformance with the SPA's requirements.

43.     After these errors were corrected, the Final Working Capital amount was greater than the Target Minimum Working Capital amount set in the SPA.

44.     Furthermore, even if the Final Working Capital amount had been below the Target Minimum Working Capital amount, KS International and Sallyport Global Holdings waived their right to seek an adjustment to the Purchase Price by failing to raise this issue within the SPA's time limits and cannot use the Initial Holdback Amount to unilaterally correct their own errors.

**E.      Defendants Improperly Attempted to Contort Their Working Capital Allegations Into Indemnification Claims**

45.      In the February 23 Letter, KS International also asserted that there were indemnifiable claims that entitled the Company to retain the Initial Holdback Amount for benefit of "Purchaser Indemnified Parties," including Sallyport Global Holdings and KS International. The letter asserted that the working capital forecast given by the Sellers on March 14, 2011, was much higher than the Actual Working Capital and the Minimum Cash Amount on the Closing Date. It also asserted that the Sellers improperly withdrew cash from the Company and manipulated collection of accounts receivable and payment of accounts payable before the Closing Date.

46.      The assertions in the February 23 Letter do not justify the refusal to pay. First, the working capital forecast of March 14, 2011 was merely a projection prepared in good faith based on information known at that time. KS International or its predecessor Sallyport Holdings LLC received a more current forecast from the Sellers before the Closing Date.

47.      In accordance with § 2.5(a) of the SPA, the Sellers delivered a final Estimated Working Capital statement based on updated information before the negotiation and execution of the amendment to the SPA and the Closing. The final Estimated Working Capital statement provided an estimate that was sufficiently and substantially close to the Actual Working Capital amount.

48.      Second, there were no improper cash distributions before the Closing Date. The SPA required the Company Group, which consisted of the Companies and certain defined subsidiaries and joint ventures, to have cash on hand at least equal to the Minimum Cash Amount. (SPA § 9.12.) However, in contrast to the claim that the Sellers improperly withdrew cash from the Company, the SPA explicitly provides that, "it is agreed between the parties that

prior to Closing the Company Group shall make distributions of Cash to the Sellers (including, without limitation, salary, bonuses, commissions and tax distributions), as long as such distributions will not cause the Cash on hand to the Company Group to be less than the Minimum Cash Amount." (Id.)  Accordingly, the Sellers were within their rights to receive cash distributions before the Closing Date.

49.     Furthermore, there is no evidence that Sellers manipulated the collections of accounts receivable before the Closing Date.  In fact, large cash payments to Sallyport Global Holdings, such as a $3.1 million ACH payment initiated before the Closing Date but not posted until the day after the Closing Date, greatly exceeded the Minimum Cash Amount required at Closing.

50.     The allegations by Sallyport Holdings LLC and KS International are baseless and misconstrue the SPA.  There are no current indemnifiable claims.

51.     The failure of KS International and Sallyport Global Holdings to comply with the SPA constitutes a breach of the SPA.

52.     The refusal to pay the Initial Holdback Amount is unjustified and breaches the SPA.

53.     In fact, KS International obtained an audit from the firm of McGladrey & Pullen, LLP, (the "McGladrey Audit"), which concluded that even with the purported Working Capital claims and Minimum Cash claims, the Initial Holdback Amount due and owing to Plaintiff was $2.888 million.  A copy of the McGladrey Audit is attached hereto as Exhibit D.

54.     The $2.888 million figure was less than the $4 million Initial Holdback Amount actually due because Sallyport Global Holdings and KS International failed to prepare the Delivered AWC Statement in a manner consistent with the July 31, 2010 Balance Sheet and

GAAP, as required by the SPA. (SPA § 2.5(b).)  The McGladrey Audit deviated from the proper

accounting methods used in the July 31, 2010 financial statement audited by Ernst & Young,

LLP.  Nonetheless, the McGladrey Audit confirmed that there is no dispute as to nearly 75

percent of the Initial Holdback Amount.  Defendants cannot deny that Plaintiff is entitled to, at a

minimum, $2.888 million.

**F.**     **The SPA's Indemnification Provision**

55.     The SPA provides that Sallyport Global Holdings would indemnify the Sellers for

"any and all Losses which may be incurred or suffered by any such party and which arise out of

or result from… any breach or nonperformance of any of the covenants or agreements made by

Purchaser in or pursuant to [the SPA]." (<u>Id.</u> §§ 11.2, 11.2(b).)  Losses are defined by the SPA to

include "all reasonable attorneys' fees incurred in connection" with any claim, lawsuit, or

arbitration. (<u>Id.</u> at 7.)

**COUNT I – BREACH OF CONTRACT**

56.     Plaintiff incorporates by reference Paragraph Nos. 1-55 of this Complaint as if

fully set forth herein.

57.     The SPA established conditions under which the Initial Holdback Amount would

become due to the Charitable Trust.

58.     Specifically, Section 2.5(e) of the SPA provides:

> [O]n the first business day immediately following the Release
> Date, the Company shall pay to the Company Stockholder, by wire
> transfer of immediately available funds to such accounts as the
> Company Stockholder may direct, an amount equal to the balance
> of the Initial Holdback Amount, <u>minus</u> any amounts the Company
> is entitled to retain in accordance with Section 2.3.

59.     As set forth more fully above, the Charitable Trust is now entitled to the payment

of the entire Initial Holdback Amount, which became due in full on March 24, 2012.

60.     The Charitable Trust has performed all conditions precedent required for enforcement of the SPA.

61.     Sallyport Global Holdings and KS International materially breached the SPA by failing to pay the Initial Holdback Amount to the Charitable Trust on the day after the Release Date.

62.     Sallyport Global Holdings and KS International materially breached the SPA by wrongfully refusing to pay the Initial Holdback Amount.

63.     Under the SPA, Sallyport Global Holdings and KS International owe to Plaintiff a duty of good faith and fair dealing to act with honesty in fact and to refrain from arbitrary or unreasonable conduct that would prevent Plaintiff from receiving the benefits of its bargain.

64.     Sallyport Global Holdings and KS International breached the duty of good faith and fair dealing through the following actions and inaction, among others:

- Withholding or causing to be withheld due and owing payment of the Initial Holdback Amount;

- Seizing the Initial Holdback Amount to satisfy an alleged deficiency in the Company's Actual Working Capital in violation of the SPA;

- Failing to calculate the Working Capital in a manner consistent with the July 31, 2010 Balance Sheet, historical accounting practices, and GAAP;

- Failing to address and correct computational errors in their Delivered Working Capital statement, thereby improperly inflating the amount in dispute; and

- Withholding or causing to be withheld the $2.888 million portion of the Initial Holdback Amount recognized as due and owing in the McGladrey Audit.

65. These actions by Sallyport Global Holdings and KS International were dishonest, arbitrary, capricious, and/or unreasonable and have denied Plaintiff of the benefit of the contract.

66. These breaches of the SPA have caused the Charitable Trust to suffer damages in excess of $75,000, exclusive of interest and costs.

67. The SPA provides for the recovery of any and all losses, including attorneys' fees, arising out of or resulting from any breach of an agreement made in or pursuant to the SPA.

## COUNT II – DECLARATORY JUDGMENT

68. Plaintiff incorporates by reference Paragraph Nos. 1-55 of this Complaint as if fully set forth herein.

69. As described above, Plaintiff entered into the SPA, a legally enforceable agreement, with Sallyport Global Holdings and KS International.

70. An actual and justiciable controversy exists between Plaintiff and Defendants as to the parties' respective rights, duties, and liabilities under the SPA regarding:

(i) whether Defendants waived the right to seek an adjustment based on Working Capital due to their failure to comply with the SPA's terms for resolution of a Working Capital Dispute;

(ii) whether the SPA requires the Purchaser to calculate Actual Working Capital in accordance with prior historical accounting practices and GAAP;

(iii) whether the calculations in the Actual Working Capital Statement do not comport with prior historical accounting practices, GAAP, and the SPA's requirements;

(iv) whether Defendants have Indemnifiable Claims under the SPA; and

(v) whether Plaintiff is entitled to receive the Initial Holdback Amount from Defendants.

71.     Declaratory Relief will terminate this controversy.

72.     The SPA provides for the recovery of any and all losses, including attorneys' fees, arising out of or resulting from any breach of an agreement made in or pursuant to the SPA.

73.     As a result and pursuant to 28 U.S.C. § 2201 et seq. and the common law, Plaintiff is entitled to declaratory relief.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff JPD Private Trust Company, LTD as Trustee for The GPD Charitable Trust, respectfully requests that this Court order the following relief:

1.     The entry of judgment in Plaintiff's favor and against Defendants, jointly and severally, awarding compensatory and consequential damages to Plaintiff, in excess of $75,000, plus interest and costs, against Defendants;

2.     The entry of a declaratory judgment that:

   a.  Defendants have waived the right to seek an adjustment based on Working Capital due to their failure to comply with the SPA's terms for resolution of a Working Capital Dispute;

   b.  the SPA requires the Purchaser to calculate Actual Working Capital in accordance with prior historical accounting practices and GAAP;

   c.  Defendants' calculations in the Actual Working Capital Statement do not comport with prior historical accounting practices, GAAP, mathematical logic, and the SPA's requirements;

   d.  Defendants have no Indemnifiable Claims under the SPA; and

    e.  Plaintiff is entitled to receive the entire Initial Holdback Amount from Defendants.

3.    The entry of a pre-judgment seizure of the Company's funds in the amount of the Initial Holdback Amount to secure these amounts against dissipation;

4.    An award of attorneys' fees and costs of suit; and

5.    Such other and further legal, equitable, and declaratory relief that this Court deems appropriate.

**DATED** this 25th day of May 2012.

Respectfully Submitted,

Brian P. Waagner (VSB 37202)
Matthew J. Gaziano (VSB 78507)
Husch Blackwell LLP
750 17th Street NW, Suite 900
Washington, D.C. 20006
Phone 202.378.2300
brian.waagner@huschblackwell.com

*Of Counsel*

Morgan Hanson, Esq.
Cohen & Grigsby, P.C.
625 Liberty Avenue
Pittsburgh, PA 15222-3152
Phone 412.297.4996
mhanson@cohenlaw.com

*Attorneys for Plaintiff*

# Exhibit A



EXECUTION VERSION

SECURITIES PURCHASE AGREEMENT

by and among

SALLYPORT HOLDINGS LLC,

KASEMAN, LLC (solely with respect to Sections 8.3 and 11.2),

SALLYPORT GLOBAL HOLDINGS INC.,

SALLYPORT GLOBAL INC.,

JOHN DEBLASIO (solely with respect to Section 13.17)

AND

THE STOCKHOLDERS OF SALLYPORT GLOBAL HOLDINGS, INC. AND
SALLYPORT GLOBAL INC.

Dated as of May 6, 2011

EAST: 52389629v5

TABLE OF CONTENTS

Page

ARTICLE 1 DEFINITIONS ...................................................................................................1

ARTICLE 2 PURCHASE PRICE AND PAYMENT TERMS ...............................................11

Section 2.1   Sale and Redemption of the Stock and SGI Stock. ..............................11
Section 2.2   Purchase and Redemption of the Stock and SGI Stock. ......................12
Section 2.3   Initial Holdback Amount and Trust Account Amount. .........................13
Section 2.4   Payment of Total Purchase Price and Redemption Purchase Price. ......13
Section 2.5   Working Capital. ...............................................................................14
Section 2.6   Issuance of Profits Interest. ...............................................................17

ARTICLE 3 THE CLOSING .................................................................................................17

Section 3.1   Closing. ...........................................................................................17
Section 3.2   Closing Date. ...................................................................................17
Section 3.3   Closing Date Deliveries. ...................................................................17

ARTICLE 4 CERTAIN COVENANTS .................................................................................17

Section 4.1   Access to Books and Records and Personnel. .....................................17
Section 4.2   Notice of Certain Events. ..................................................................18
Section 4.3   Conduct of Business by the Company Group. .....................................19
Section 4.4   Regulatory Matters. ..........................................................................19
Section 4.5   Transaction Proposals. .......................................................................19
Section 4.6   Customers and Suppliers. ...................................................................20
Section 4.7   Arrangements with Employees; DB Plan. ............................................20
Section 4.8   Third Party Consents. ........................................................................20
Section 4.9   Updated Disclosure Schedules. ..........................................................21
Section 4.10  Financing. ........................................................................................21
Section 4.11  Minimum Cash Amount. ....................................................................21

ARTICLE 5 ADDITIONAL CONTINUING COVENANTS .................................................22

Section 5.1   Noncompetition. ...............................................................................22
Section 5.2   Tax Matters. .....................................................................................23
Section 5.3   Directors and Officers Indemnification. ..............................................26

ARTICLE 6 REPRESENTATIONS AND WARRANTIES OF THE COMPANIES AND THE
SELLERS .............................................................................................................27

Section 6.1   Organization and Standing of the Companies. .....................................27
Section 6.2   Authorization and Binding Obligation of the Sellers and the Companies. .27
Section 6.3   Non-Contravention. ...........................................................................27
Section 6.4   Capitalization. ...................................................................................28
Section 6.5   Title to Stock. ...................................................................................29
Section 6.6   Ability to Perform Obligations. ..........................................................29
Section 6.7   Minute Books. ...................................................................................29
Section 6.8   Amendments, Dividends and Other Distributions. ................................30
Section 6.9   Absence of Undisclosed Liabilities. ....................................................30

i

Page

Section 6.10  No Material Adverse Changes.................................................30
Section 6.11  Financial Statements.............................................................30
Section 6.12  Accounts Receivable.............................................................31
Section 6.13  Accounting Records; Internal Controls.................................31
Section 6.14  Company IP............................................................................31
Section 6.15  Real Property.........................................................................31
Section 6.16  Tangible Personal Property....................................................32
Section 6.17  Insurance................................................................................32
Section 6.18  Tax Matters............................................................................33
Section 6.19  Litigation................................................................................36
Section 6.20  Labor Relations......................................................................36
Section 6.21  Employee Benefits.................................................................37
Section 6.22  Intercompany Transactions....................................................40
Section 6.23  Governmental Approvals; Compliance with Laws.................40
Section 6.24  Environmental Matters...........................................................41
Section 6.25  Brokers, Finders.....................................................................41
Section 6.26  Material Contracts..................................................................42
Section 6.27  FCPA......................................................................................43
Section 6.28  Government Contracts............................................................43
Section 6.29  Clearances..............................................................................46
Section 6.30  Export Control Matters..........................................................46
Section 6.31  Accounts Payable...................................................................47
Section 6.32  Customers...............................................................................47
Section 6.33  Absence of Undisclosed Changes..........................................47
Section 6.34  Bank Accounts........................................................................47

ARTICLE 7 REPRESENTATIONS AND WARRANTIES OF PURCHASER..........................47

Section 7.1   Organization and Standing of Purchaser.................................48
Section 7.2   Authorization and Binding Obligation of Purchaser...............48
Section 7.3   Ability to Perform Obligations...............................................48
Section 7.4   Non-Contravention..................................................................48
Section 7.5   Brokers, Finders......................................................................48
Section 7.6   No Legal Proceedings.............................................................49
Section 7.7   Securities Act of 1933............................................................49
Section 7.8   No Other Representations.......................................................49
Section 7.9   Solvency..................................................................................49

ARTICLE 8 TERMINATION.............................................................................49

Section 8.1   Termination of Agreement......................................................49
Section 8.2   Effect of Termination..............................................................50
Section 8.3   Termination Fee......................................................................51

ARTICLE 9 CLOSING CONDITIONS OF PURCHASER....................................51

Section 9.1   Representations, Warranties and Covenants of the Sellers and the
             Companies..............................................................................51
Section 9.2   Deliveries to Be Made by the Companies and the Sellers at the Closing. ..52
Section 9.3   Third Party Consents...............................................................53

ii

                                                                                    Page

Section 9.4    Orders; Illegality. ..................................................................53
Section 9.5    Absence of Investigations and Proceedings. ..............................53
Section 9.6    Owned Real Property. ...............................................................53
Section 9.7    Absence of Certain Changes. .....................................................53
Section 9.8    Closing Date Indebtedness; Release of Encumbrances. ..............53
Section 9.9    Transaction Expenses. ...............................................................53
Section 9.10   Key Employees. .........................................................................54
Section 9.11   Delivery of Stock Certificates for Redeemed Stock. ...................54
Section 9.12   Minimum Cash Amount.  ............................................................54
Section 9.13   The Company Stockholder. ........................................................54
Section 9.14   Trust Account Amount. ..............................................................54

ARTICLE 10 CLOSING CONDITIONS OF THE SELLERS .............................54

Section 10.1   Representations, Warranties and Covenants of Purchaser. ..........54
Section 10.2   Deliveries to be Made by Purchaser at the Closing. ...................55
Section 10.3   Third Party Consents. ................................................................55
Section 10.4   Orders; Illegality. ......................................................................55
Section 10.5   Absence of Investigations and Proceedings. ..............................56

ARTICLE 11 INDEMNIFICATION; SURVIVAL OF REPRESENTATIONS AND
           WARRANTIES ................................................................................56

Section 11.1   Indemnification by the Sellers. ...................................................56
Section 11.2   Indemnification by Purchaser and the Company. ........................56
Section 11.3   Cooperation. ..............................................................................57
Section 11.4   Limitations on Indemnification. .................................................57
Section 11.5   Notice to Indemnifying Party. ....................................................59
Section 11.6   Defense by Indemnifying Party. .................................................59
Section 11.7   Right of Contribution. ................................................................60
Section 11.8   Survival of Representations and Warranties of the Company and the
           Sellers.60
Section 11.9   Survival of Representations and Warranties of Purchaser. ..........61

ARTICLE 12 CONFIDENTIALITY; RELEASE .................................................61

Section 12.1   Confidentiality of the Sellers. ....................................................61
Section 12.2   Release. ......................................................................................62

ARTICLE 13 MISCELLANEOUS .......................................................................62

Section 13.1   Expenses. ...................................................................................62
Section 13.2   Notices. ......................................................................................63
Section 13.3   Counterparts. ..............................................................................64
Section 13.4   Integration. .................................................................................64
Section 13.5   Assignability. .............................................................................64
Section 13.6   No Waiver of Rights. ..................................................................65
Section 13.7   Subject Headings. .......................................................................65
Section 13.8   Further Assurances. .....................................................................65
Section 13.9   Schedules and Exhibits. ..............................................................65
Section 13.10  Severability. ...............................................................................65

iii

|  | Page |
|---|---|
| Section 13.11 Publicity and Reports | 65 |
| Section 13.12 Parties in Interest | 65 |
| Section 13.13 Specific Performance | 66 |
| Section 13.14 Governing Law | 66 |
| Section 13.15 Consent to Jurisdiction, Etc. | 66 |
| Section 13.16 Waiver of Jury Trial | 66 |
| Section 13.17 John DeBlasio Guarantee | 67 |

## SCHEDULES AND EXHIBITS

Schedule 1.......................................Permitted Indebtedness
Schedule 2.4....................................Payment Allocations
Schedule 2.6....................................Profits Interests Allocation
Schedule 6.3....................................Non-Contravention
Schedule 6.4....................................Capitalization
Schedule 6.6....................................Ability to Perform Obligations
Schedule 6.7....................................Minute Books
Schedule 6.8....................................Amendments, Dividends and Other Distributions
Schedule 6.9....................................Absence of Undisclosed Liabilities
Schedule 6.12...................................Accounts Receivable
Schedule 6.14...................................Company IP
Schedule 6.15...................................Real Property
Schedule 6.16...................................Tangible Personal Property
Schedule 6.17...................................Insurance
Schedule 6.18...................................Tax Matters
Schedule 6.19...................................Litigation
Schedule 6.20...................................Labor Relations
Schedule 6.21...................................Plans
Schedule 6.22...................................Intercompany Transactions
Schedule 6.23...................................Governmental Approvals
Schedule 6.24...................................Environmental Matters
Schedule 6.26...................................Material Contracts
Schedule 6.27...................................Consents and Governmental Approvals
Schedule 6.28...................................Government Contracts
Schedule 6.29...................................Clearances
Schedule 6.30...................................Export Control Matters
Schedule 6.32...................................Customers
Schedule 6.33...................................Absence of Undisclosed Changes
Schedule 6.34...................................Bank Accounts

Exhibit A                    Form of Contribution Agreement

Exhibit B                    Form of Trust Account Agreement

## SECURITIES PURCHASE AGREEMENT

THIS SECURITIES PURCHASE AGREEMENT (the "Agreement") is made as of this 6th day of May, 2011, by and among SALLYPORT HOLDINGS LLC, a Delaware limited liability company ("Purchaser"), KASEMAN, LLC, a Virginia limited liability company ("Sponsor Affiliate") (solely with respect to sections 8.3 and 11.2), SALLYPORT GLOBAL HOLDINGS INC., a Delaware corporation (the "Company"), SALLYPORT GLOBAL INC., a Florida corporation ("SGI," and together with the Company, the "Companies"), JOHN DEBLASIO (solely with respect to Section 13.17), THE JOHN DEBLASIO CHARITABLE TRUST FOR WORLD PEACE AND DEVELOPMENT, a charitable trust organized under the laws of Bermuda (the "Company Stockholder") and the JOHN P. DEBLASIO TRUST, a business trust organized under the laws of the State of Florida (the "SGI Stockholder," and together with the Company Stockholder, each a "Seller" and collectively the "Sellers").

### RECITALS

1.     The Company Group is engaged in the business of providing base operations support services supporting U.S. government initiatives worldwide, including provision of operations and maintenance, security, fire and emergency services, food and hospitality, logistics and procurement, training and design and construction services (collectively, the "Business").

2.     The Company Stockholder owns 100% of the issued and outstanding capital stock of the Company (the "Stock") and the SGI Stockholder owns 100% of the issued and outstanding capital stock of SGI (the "SGI Stock").

3.     The Company Stockholder desires to sell to Purchaser, and Purchaser desires to purchase from the Company Stockholder, 1,488.4 shares of Stock (the "Purchased Stock"), a portion of which will be purchased directly by Purchaser from the Company Stockholder for cash pursuant to the terms hereof and a portion of which the Company Stockholder has contributed or will contribute to Purchaser in exchange for Membership Interests in Purchaser pursuant to the terms contained in the Contribution Agreement. The SGI Stockholder desires to sell to Purchaser, and Purchaser desires to purchase from the SGI Stockholder, the SGI Stock.

4.     The Company desires to redeem from the Company Stockholder, and the Company Stockholder desires to transfer and surrender to the Company, 8511.6 shares of Stock (the "Redeemed Stock").

NOW, THEREFORE, in consideration of and subject to the mutual undertakings and agreements hereinafter set forth, Purchaser, the Company and the Sellers agree as follows:

### ARTICLE 1
### DEFINITIONS

"Actual Closing Working Capital Statement" shall have the meaning set forth in Section 2.5(b).

"Affiliate" shall mean, with respect to any Person, any other Person directly or indirectly controlling, directly or indirectly controlled by, or under direct or indirect common control with, such Person; or if such Person is a partnership, any general partner of such Person or a Person controlling any such general partner. For purposes of this definition, "control" (including "controlled by" and "under common control with") shall mean the power, directly or indirectly, to direct or cause the direction of the management and policies of such Person whether through the ownership of voting securities, by contract or otherwise.

"Agreement" shall have the meaning set forth in the Preamble hereto.

"Assets" shall mean all of the right, title and interest of each member of the Company Group in and to the goodwill, assets, properties and rights of every nature, kind and description, whether tangible or intangible, real, personal or mixed, wherever located and whether or not carried or reflected on the books and records of the members of the Company Group, which are used or useful in the operation of the Business including, without limitation, the Receivables, Leased Real Property, Owned Real Property, Tangible Personal Property, Company IP, Licenses and Permits, Governmental Approvals, Customer Lists, Customer Contracts, Government Contracts and other Contracts.

"Associate" of a Person shall mean (i) a corporation or organization (other than the Company or a party to this Agreement) of which such Person is an officer or general partner or is, directly or indirectly, the beneficial owner of 10% or more of any class of equity securities; (ii) any trust or other estate in which such Person has a substantial beneficial interest or as to which such Person serves as trustee or in a similar capacity; and (iii) the spouse, parents, siblings and direct descendants of such Person or any Person controlled by any spouse, parents, siblings or direct descendants of such Person.

"Audited Financial Statements" shall have the meaning set forth in Section 6.11(b).

"Auditor" shall have the meaning set forth in Section 2.5(c).

"Base Purchase Price" shall have the meaning set forth in Section 2.2(a).

"Basket" shall have the meaning set forth in Section 11.4(a).

"Best Efforts" shall mean the commercially reasonable best efforts that a Person desirous of achieving a result would use in similar circumstances to insure that such result is achieved as reasonably expeditiously as possible; provided, that "Best Efforts" shall not mean efforts that require the performing party to do any act that is commercially unreasonable under the circumstances or to expend any material funds or incur any material liabilities.

"Business" shall have the meaning set forth in the Recitals hereto.

"Cap" shall have the meaning set forth in Section 11.4(b).

"Cash" shall mean, as of a specific date, the difference of (a) the aggregate amount of cash and cash equivalents held as of 10:00 a.m. (Eastern Time) in the bank accounts,

-2-

including money market accounts, of the members of the Company Group, minus (b) the aggregate balance of all outstanding checks, money orders or similar instruments written against such accounts.

"Closing" shall have the meaning set forth in Section 3.1.

"Closing Date" shall have the meaning set forth in Section 3.2.

"Closing Date Indebtedness" shall mean all Indebtedness of the Company Group as of the Closing other than that Indebtedness listed on Schedule 1.

"Code" shall mean the Internal Revenue Code of 1986, as amended, and the rules and regulations promulgated thereunder.

"Company" shall have the meaning set forth in the Preamble hereto.

"Company Group" shall mean the Company, SGI and each of the Companies' direct and indirect Subsidiaries, as well as each of the Joint Ventures.

"Company IP" shall mean all intellectual property used by a member of the Company Group in the conduct of the Business as currently conducted, together with any other intellectual property owned by any member of the Company Group (regardless of whether such intellectual property was used in the Business), including all trademarks, service marks, service names, patent rights, trade secrets, copyrights, domain names and other proprietary rights.

"Company Stockholder" shall have the meaning set forth in the Preamble hereto.

"Competitive Business" shall have the meaning set forth in Section 5.1(b).

"Contracts" shall mean all contracts, agreements, commitments and understandings to which any member of the Company Group is a party or has an interest, whether oral or written, including, but not limited to, purchase, sale or other commitments, Customer Contracts, distributorship, franchise or similar agreements, patent or trademark licensing agreements (either as licensor or licensee), lease or sublease agreements (either as lessor or lessee), equipment or vehicle leases, employment agreements (including, but not limited to, agreements entered into by employees of any member of the Company Group relating to the transfer and/or safeguarding of intellectual property rights), consulting agreements, union or collective bargaining agreements, guarantees, loan agreements, non-competition agreements, severance agreements, letters of credit, joint venture, limited liability company or partnership agreements, and supply or requirements contracts.

"Contributed Stock Value" shall have the meaning set forth in Section 2.2(a).

"Contribution Agreement" shall mean the Equity Contribution Agreement between the Company Stockholder and the Purchaser to be dated as of the Closing Date, substantially in the form attached hereto as **Exhibit A**, pursuant to which the Company Stockholder shall contribute the Rollover Stock to Purchaser in exchange for Membership Interests in Purchaser.

"Customer Contracts" shall mean all outstanding agreements, service contracts, purchase orders, sales confirmations or similar commitments entered into by any member of the Company Group, which provide for obligations to deliver Services and/or Products, the rights to be paid for those Services and/or Products and the obligations and rights that are ancillary to those obligations and rights.

"Customer Lists" shall mean all lists (including name, and to the extent known to the Seller, current address and telephone number), to the extent such lists exist, of Persons which have purchased Services and/or Products from any member of the Company Group during the preceding two (2) year period prior to the Closing Date.

"DB Plan" shall mean the Sallyport Global Holdings Inc. 412i Defined Benefit Pension Plan.

"Deferred Amount" shall mean $2,000,000.

"Dollars" or "$" shall mean United States dollars.

"Employment Agreements" shall mean the Employment Agreement between the Company and/or Purchaser and John DeBlasio and the Employment Agreement between the Company and/or Purchaser and Nicholas Gross, each in a form reasonably acceptable to the parties.

"Encumbrance" in respect of any property or assets, shall mean any encumbrance or title defect of whatever kind or nature, regardless of form, whether or not registered or registrable and whether or not consensual or arising by Law, including, but not limited to, any lien, mortgage, charge, pledge, security interest, assignment, lease, option, easement, servitude, right-of-way, conditional sales contract, encroachment, restrictive covenant, right of first refusal, right of use or any other right or claim of any kind or nature whatsoever (or any agreement to grant or furnish any of the foregoing) which affects ownership or possession of, or title to, or any interest in, or the right to use or occupy such property or assets.

"Environmental Law" shall mean any federal, state, local or foreign law, rule, regulation, order, treaty, statute or permit of or issued by any Governmental Authority, as amended from time to time, relating to public health and safety, the protection of the environment, natural resources and wildlife, including, but not limited to, those relating to (i) the protection or use of surface water, groundwater, rivers and other bodies of water; (ii) the protection of ambient and indoor air quality; (iii) the management, manufacture, possession, presence, use, generation, transportation, distribution, treatment, storage, disposal, release, threatened release, abatement, removal, remediation of, or exposure to, any Hazardous Substance; or (iv) the prevention, mitigation, or remediation of environmental pollution in any form.

"EPCRS" shall have the meaning set forth in Section 6.21(h).

"ERISA" means the Employee Retirement Income Security Act of 1974, as amended, and the rules and regulations promulgated thereunder.

-4-

"ERISA Affiliate" shall mean any trade or business, whether or not incorporated, that together with any member of the Company Group would be deemed a "single employer" under Section 414 of the Code.

"Estimated Working Capital" shall have the meaning set forth in Section 2.5(a).

"Excluded Representations and Warranties" shall have the meaning set forth in Section 11.4(c).

"Existing Financial Statements" shall have the meaning set forth in Section 6.11(b).

"FAR" shall have the meaning set forth in Section 6.28(d).

"Final Working Capital" shall have the meaning set forth in Section 2.5(b).

"Foreign Plan" means any Plan subject to any Law other than U.S. federal, state or local Law.

"GAAP" shall mean United States generally accepted accounting principles.

"Government Bid" shall have the meaning set forth in Section 6.28(a).

"Government Contract" shall mean any prime contract, subcontract, basic ordering agreement, letter contract, purchase order, delivery order, Government Bid, change order, or other contractual commitment of any kind to which any member of the Company Group and any of the following are a party (i) any Governmental Authority, (ii) any prime contractor of any Governmental Authority, or (iii) any subcontractor with respect to any Contract described in clauses (i) or (ii) above.

"Governmental Approval" shall mean any authorization, certificate, consent, approval, waiver, exception, variance, franchise, permission, permit, exception, filing, publication, declaration, notice, license, right or other form of required permission from, of, to or with any Governmental Authority, and shall include, without limitation, each environmental and operating permit and license that is required for the ownership, use and operation of any facility owned or leased by any member of the Company Group, or the conduct by the Company Group of the Business.

"Governmental Authority" shall mean any federal, state, regional, municipal, or local government, or other political subdivision thereof, U.S. or foreign, or any entity, authority, agency, court, representative or Person exercising executive, legislative, judicial, regulatory or administrative functions on behalf of such governmental entity or political subdivision.

"Hazardous Substance" shall mean all substances, wastes, pollutants, contaminants and materials regulated, or defined or designated as hazardous, dangerous, or toxic, pursuant to any Environmental Law or any other Law, including, without limitation, all hazardous substances, oils, pollutants or contaminants as such terms are defined in the National Oil and Hazardous Substances Pollution Contingency Plan, 40 C.F.R. § 300.5.

-5-

"Indebtedness" shall mean, with respect to any Person, any obligations (including, without limitation, principal, accrued interest, reimbursement or indemnity obligations, prepayment penalties and fees) with respect to indebtedness of such Person, whether or not contingent, in respect of borrowed money or evidenced by bonds, notes, debentures or similar instruments or non-cash collateralized letters of credit (or reimbursement agreements in respect thereof) or representing capital lease obligations or the balance deferred and unpaid of the purchase price of any property, except such balance that constitutes a trade payable, if and to the extent any of the foregoing indebtedness (other than letters of credit) would appear as a liability upon a balance sheet of such Person prepared in accordance with GAAP, together with any guarantee of any item that would constitute Indebtedness under the foregoing provision. The amount of any Indebtedness outstanding as of any date shall be the principal amount or accrued value thereof, plus accrued interest and other obligations, as of such date.

"Indemnifiable Claim" shall mean any Loss for or against which any party is entitled to indemnification under this Agreement.

"Indemnified Party" shall have the meaning set forth in Section 11.5.

"Indemnifying Party" shall have the meaning set forth in Section 11.5.

"Initial Holdback Amount" shall mean $4,000,000, which shall be held back by the Company on the Closing Date pursuant to Section 2.3 as security and a source for effecting the payment and discharge of any indemnification obligations of the Sellers set forth in Article 11 hereof.

"IRS" shall mean the U.S. Internal Revenue Service.

"Joint Venture" shall mean each of Arkel Sallyport-Sudan Ltd., Arkel Sallyport Global Ltd. and Torres International LLC.

"July 31, 2010 Balance Sheet" shall have the meaning set forth in Section 6.11(b).

"Key Employees" shall mean each of John DeBlasio, Nicholas Gross and Steve Hartsuff.

"Law" or "Laws" shall mean all constitutions, treaties, laws, statutes, codes, regulations, rules, ordinances or other binding actions or requirements of any Governmental Authority, whether domestic, foreign or international.

"Legal Dispute" shall have the meaning set forth in Section 13.15.

"Liabilities and Costs" shall mean all indebtedness, claims, liabilities, obligations, losses, damages, judgments, punitive damages, economic damages, treble damages, costs and expenses, fines, penalties and monetary sanctions, and interest, whether accrued, absolute or contingent, and whether or not of a kind required by GAAP to be set forth on a financial statement or in notes thereto.

-6-

"Licenses and Permits" shall mean all of the rights of the members of the Company Group to the licenses, permits, approvals, clearances and authorizations required to conduct the Business.

"Loss" or "Losses" shall mean all damages, awards, judgments, payments and other Liabilities and Costs, including all costs and expenses of investigating any claim, lawsuit or arbitration and any appeal therefrom, all reasonable attorneys' fees incurred in connection therewith, and all amounts paid incident to any compromise or settlement of any such claim, lawsuit or arbitration (to the extent permitted under Article 11). The amount of any such Losses for the purposes of indemnification hereunder shall be limited to the actual, direct and reasonably foreseeable damages sustained by a Person entitled to indemnification hereunder as determined net of amounts that are actually recovered by such Person (or its Affiliates) under insurance policies with respect to such Loss, and shall not include any actual or alleged diminution in value, lost profits, lost opportunities or other consequential, incidental, special or punitive damages, except to the extent such damages are claimed by a third party in a claim, lawsuit or arbitration against an Indemnified Party.

"Material Adverse Effect" shall mean any change in or effect that, either individually or in the aggregate with all other changes or effects, (i) is or is reasonably likely to be materially adverse to the Assets, Business, results of operations, or condition (financial or otherwise) of the Company Group, taken as a whole, or (ii) would materially impair the ability of the Company, SGI or the Sellers to consummate the transactions contemplated by this Agreement; provided, however, that the following shall not be deemed to constitute, and shall not be taken into account in determining whether there has been a "Material Adverse Effect": (A) any adverse change, event or effect arising from or relating to general business, political or economic conditions or the financial, credit or securities markets, including without limitation any change, event or effect relating to any war, acts of terrorism or similar events, unless any of the foregoing disproportionately affects the Company Group relative to its competitors, (B) changes in Law of any Governmental Authority or interpretations thereof by any Governmental Authority or changes in accounting rules applicable to the Company Group, and/or (C) any adverse change, event or effect resulting from the announcement or pendency of the transactions contemplated hereby.

"Material Contract" shall have the meaning set forth in Section 6.26.

"Maximum Working Capital Adjustment" means $5,000,000.

"Membership Interests" shall mean Class A Interests in Purchaser having the rights, preferences and privileges as set forth in the Purchaser LLC Agreement.

"Minimum Cash Amount" shall mean an amount of Cash equal to the amount of (a) all liabilities outstanding as of the Closing Date that relate to activity 60 or more days prior to the Closing Date including fringe benefits accrued but not paid by the Company Group through the Closing Date for all of its employees, where "fringe benefits" means all non-wage compensation provided to employees, including but not limited to insurance, health, vision, and dental benefits and vacation, holiday, sick, paid-time off and other leave, and all bonuses (including performance, signing and referral bonuses), profit sharing, education reimbursement,

travel assistance benefits and severance, less (b) other current assets which are items that have been prepaid but for which the benefit has not been received prior to Closing.

"Non-Compete Period" shall have the meaning set forth in Section 5.1(b).

"Order" shall mean any decree, order, judgment, writ, award, injunction, rule or consent of or by a Governmental Authority.

"Permitted Encumbrances" shall mean Encumbrances (a) for Taxes, assessments or other governmental charges or levies that are not yet due or payable or that are being contested in good faith by appropriate proceedings, (b) imposed by Law, such as carrier's, warehousemen's and mechanic's liens and other similar liens, which arise in the ordinary course of business with respect to obligations not yet due or being diligently contested in good faith by appropriate proceedings, or (c) created or caused by, at the request of or with the prior written consent of Purchaser.

"Person" shall mean any individual, corporation, partnership, limited liability company, joint venture, trust, bank, unincorporated organization or government or any department, agency or political subdivision thereof, or other legal entity.

"Plan" shall mean each bonus, deferred compensation, incentive compensation, stock purchase, stock option, employment or consulting, severance pay or benefit, retention, change in control, savings, medical, life or other insurance, vacation, welfare benefit, fringe benefit, cafeteria, profit-sharing or pension benefit plan, program, agreement or arrangement, and each other employee benefit or compensation plan, program, agreement or arrangement, sponsored, maintained or contributed to or required to be contributed to by any member of the Company Group or any ERISA Affiliate, or as to which any member of the Company Group or any ERISA Affiliate has, or may have, any liability or obligation, contingent or otherwise, whether written or oral and whether legally binding or not.

"Pro Rata Share" means, with respect to the Company Stockholder, 95.35%, and with respect to the SGI Stockholder, 4.65%.

"Products" shall mean products, technology and services manufactured, sold, licensed, under development or otherwise exploited or provided by the Company Group, or proposed in the Company Group's business plans or projections.

"Profits Interests" shall mean the Class B Interests of Purchaser having the rights, preferences and privileges as set forth in the Purchaser LLC Agreement.

"Purchased Stock" shall have the meaning set forth in the Recitals hereto.

"Purchaser" shall have the meaning set forth in the Preamble hereto.

"Purchaser Indemnified Parties" shall have the meaning set forth in Section 11.1.

"Purchaser LLC Agreement" shall mean the Limited Liability Company Operating Agreement of Purchaser, as amended from time to time.

-8-

"RAP Cycle" shall have the meaning set forth in Section 6.21(h).

"Receivables" shall mean all accounts, notes, accounts receivable, contract rights, drafts and other forms of claims, demands, instruments, receivables and rights to the payment of money or other forms of consideration, whether for Products sold or leased, Services performed or to be performed, or otherwise, owned by any member of the Company Group or in which any member of the Company Group has any interest, together with all guarantees, security agreements and rights and interests securing the same.

"Redeemed Stock" shall have the meaning set forth in the Recitals hereto.

"Redemption Purchase Price" shall have the meaning set forth in Section 2.2(b).

"Release Date" shall mean the date that is thirty (30) days following the day that the Company receives the audited consolidated financial statements of the Company Group as of December 31, 2011.

"Released Claims" shall have the meaning set forth in Section 12.2.

"Released Parties" shall have the meaning set forth in Section 12.2.

"Releasors" shall have the meaning set forth in Section 12.2.

"Review Period" shall have the meaning set forth in Section 2.5(b).

"Rollover Stock" shall mean that portion of the Stock identified on Schedule 2.4 as Rollover Stock, having an aggregate value equal to the Contributed Stock Value, and which has been or shall be contributed to Purchaser in exchange for Membership Interests pursuant to the Contribution Agreement.

"Seller" and "Sellers" shall have the meanings set forth in the Preamble hereto.

"Seller Indemnification Obligations" shall mean the unsatisfied indemnification obligations of the Sellers pursuant to Article 11.

"Seller Tax Liabilities" shall have the meaning set forth in Section 5.2(a).

"Sellers' Knowledge" shall mean the actual knowledge, after due inquiry (including inquiry of the Company's senior management team) of each of John DeBlasio and Nicholas Gross.

"Sellers' Objections" shall have the meaning set forth in Section 2.5(c).

"Services" shall mean services performed by any member of the Company Group in the operation of the Business.

"SGI" shall have the meaning set forth in the Recitals hereto.

"SGI Stock" shall have the meaning set forth in the Recitals hereto.

-9-

"SGI Stockholder" shall have the meanings set forth in the Preamble hereto.

"Stock" shall have the meaning set forth in the Recitals.

"Straddle Period" shall mean any taxable period beginning on or before and ending after the Closing Date.

"Subsidiary" of any Person means any other Person (i) more than 50% of whose outstanding shares or securities representing the right to vote for the election of directors, managers or other managing authority of such other Person are owned or controlled, directly or indirectly, by such first Person, but such other Person shall be deemed to be a Subsidiary only so long as such ownership or control exists, or (ii) which does not have outstanding shares or securities with such right to vote, as may be the case in a partnership, joint venture or unincorporated association, but more than 50% of whose ownership interest representing the right to make the decisions for such other Person is owned or controlled, directly or indirectly, by such first Person, but such other Person shall be deemed to be a Subsidiary only so long as such ownership or control exists.

"Tangible Personal Property" means all furniture, fixtures, equipment, machinery, trucks, automobiles, tools, supplies, spare parts, computer hardware, construction in progress and other tangible assets used or useful in the operation of the Business and in which any member of the Company Group has an interest, including, without limitation, any equipment or other tangible assets subject to a lease between any member of the Company Group and any Seller.

"Target Maximum Working Capital" means $34,000,000.

"Target Minimum Working Capital" means $22,000,000.

"Tax" or "Taxes" means any and all taxes imposed by any U.S. federal, state, or local, or any non-U.S. taxing authority, including, without limitation, all income, gross receipts, sales, capital gains, windfall profits, severance, stamp, use, personal property, occupancy, business occupation, mercantile, ad valorem, value added, customs duties, transfer, registration, license, withholding, payroll, employment, unemployment, social security (or similar), disability, excise, real property, environmental (including taxes under Section 59A of the Code), capital stock, franchise, alternative or add-on minimum, estimated or other tax or customs duty of any kind whatsoever (including any interest, penalties and other additions thereto, whether disputed or not and including any obligations to indemnify or otherwise assume or succeed to the Tax liability of any other Person).

"Tax Obligations" shall have the meaning set forth in Section 2.3(b).

"Tax Return" means any return, declaration, report, claim for refund, or information return or statement relating to Taxes, including any schedule or attachment thereto, and including any amendment thereof.

"Taxes Survival Period" shall have the meaning set forth in Section 2.3(b).

"Total Purchase Price" shall have the meaning set forth in Section 2.2(a).

"Transaction Documents" shall mean this Agreement, the Purchaser LLC Agreement, the Contribution Agreement, the Trust Account Agreement, and any other certificate, agreement, document or other instrument to be executed and delivered in connection with the transaction contemplated by this Agreement.

"Transaction Expenses" shall mean all fees and expenses incurred by the Sellers or any member of the Company Group, or any of them on behalf of the other, in connection with the transactions contemplated hereby which remain unpaid as of the Closing Date, which shall (i) include all fees and expenses payable to Cohen & Grigsby, P.C. and any other legal and financial advisors retained by any Seller or any member of the Company Group in connection with the transactions contemplated under this Agreement, and all change of control or bonus payments payable as a result of the transactions contemplated by this Agreement and (ii) exclude any Tax payments or obligations in connection with or resulting from the transactions contemplated hereby.

"Transaction Proposal" shall have the meaning set forth in Section 4.5.

"Trust Account" shall have the meaning set forth in Section 2.3(b).

"Trust Account Agreement" shall have the meaning set forth in Section 2.3(b).

"Trust Account Amount" shall have the meaning set forth in Section 2.3(b).

"Trust Agent" shall have the meaning set forth in Section 2.3(b).

"Unaudited Financial Statements" shall have the meaning set forth in Section 6.11(a).

"US Plan" shall mean any Plan subject to any U.S. federal, state or local Law.

"Working Capital" means the difference (whether positive or negative) of (a) the current assets of the Company Group (excluding the Joint Ventures) as of a specific date minus (b) the current liabilities of the Company Group (excluding the Joint Ventures) as of such date, in each case determined, in accordance with GAAP, in a manner consistent with the preparation of the July 31, 2010 Balance Sheet. For purposes of this Agreement, the determination of Working Capital shall not include (a) in current assets or current liabilities, any amounts included in the calculation of the Minimum Cash Amount, (b) in current assets, any Cash or any Tax assets relating to Seller Tax Liabilities, or (c) in current liabilities, any Seller Tax Liabilities, whether or not accrued on the Existing Financial Statements, any Transaction Expenses, or any Closing Date Indebtedness.

## ARTICLE 2
## PURCHASE PRICE AND PAYMENT TERMS

Section 2.1    Sale and Redemption of the Stock and SGI Stock.

(a)    Subject to the terms and conditions of this Agreement, the Company Stockholder agrees to sell, assign, transfer and deliver to Purchaser all of the Purchased Stock

(other than the Rollover Stock) and the SGI Stockholder agrees to sell, assign, transfer and deliver to Purchaser all of the SGI Stock at the Closing, free and clear of all Encumbrances, with Purchaser to purchase and acquire from each Seller the amount of Purchased Stock and SGI Stock specified on Schedule 2.4 hereto. Each of the Company and SGI, as applicable, shall take such action as is reasonably necessary to reflect the sale, assignment, transfer and delivery of the Purchased Stock (other than the Rollover Stock) and the SGI Stock on the books and records of the Company and SGI at the Closing and to provide to Purchaser such evidence of the same as Purchaser shall reasonably request.

(b)     Pursuant to the Contribution Agreement, at the Closing, the Company Stockholder shall contribute to Purchaser all of its rights, title and interest in and to the Rollover Stock.  Purchaser and the Company Stockholder hereby acknowledge and agree that the transfer of the Rollover Stock for the Membership Interests of Purchaser identified in the Contribution Agreement, by reason of being part of an overall integrated transaction, is intended to qualify as an exchange under Section 721 of the Code, and the parties hereto shall file all Tax Returns or other reports, as required, consistent with such position, and shall take no contrary position, unless required to do so by applicable Law.  Purchaser shall take such action as is reasonably necessary to reflect the contribution of the Rollover Stock on the books and records of Purchaser at the Closing and to provide to the Company Stockholder such evidence of the same as the Company Stockholder shall reasonably request.

(c)     Subject to the terms and conditions of this Agreement, the Company Stockholder agrees to sell, assign, transfer and deliver to the Company all of the Redeemed Stock at the Closing, free and clear of all Encumbrances, with the Company to purchase, redeem and acquire from the Company Stockholder all of the Redeemed Stock and with such redemption to become automatically effective at the Closing upon the Company Stockholder's receipt of the Redemption Purchase Price and the Company's receipt of the certificates contemplated by Section 9.11 hereof.  The Company shall take such action as is reasonably necessary to reflect the sale, assignment, transfer and delivery of the Redeemed Stock on the books and records of the Company at the Closing and to provide to Purchaser such evidence of the same as Purchaser shall reasonably request.

Section 2.2     Purchase and Redemption of the Stock and SGI Stock.

(a)     Subject to the terms and conditions of this Agreement, Purchaser agrees to purchase the Purchased Stock and SGI Stock from the Sellers at the Closing and to collectively pay the Sellers the Total Purchase Price, with Purchaser to pay each Seller the portion of the Total Purchase Price specified on Schedule 2.4 hereto.  The "Total Purchase Price" shall consist of the sum of (A) $5,500,000 (the "Base Purchase Price"), and (B) Membership Interests of Purchaser delivered to the Company Stockholder in accordance with Section 2.1(b) having an aggregate fair market value equal to $4,100,000 (which $4,100,000 shall be referred to as the "Contributed Stock Value").

(b)     Subject to the terms and conditions of this Agreement, the Company agrees to purchase and redeem the Redeemed Stock from the Company Stockholder at the Closing and to pay the Company Stockholder the Redemption Purchase Price as provided in Section 2.4.  The "Redemption Purchase Price" shall equal $54,900,000, plus or minus any

-12-

adjustment to the Redemption Purchase Price with respect to the Working Capital pursuant to Section 2.5.

Section 2.3    Initial Holdback Amount and Trust Account Amount.

(a)    Subject to the terms and conditions of Article 11, the Company shall be entitled to retain the Initial Holdback Amount from the Redemption Purchase Price, which shall be paid to the Company Stockholder as provided in Section 2.4. In the event there are any Seller Indemnification Obligations remaining unsatisfied on the Release Date, the Company shall be entitled to retain from the Initial Holdback Amount, on behalf of the Purchaser Indemnified Parties, an amount equal to such unsatisfied Seller Indemnification Obligations until such time that they are finally resolved pursuant to the terms of Article 11 at which point such retained amounts shall either be paid by the Company to the Company Stockholder or permanently retained by the Company on behalf of the Purchaser Indemnified Parties in such amounts as may be determined upon such resolution.

(b)    On the Closing Date, subject to Section 9.14, the Company shall deposit $10,000,000 (the "Trust Account Amount") of the Redemption Purchase Price that is otherwise payable to the Company Stockholder into a trust account with JPMorgan Chase Bank, National Association (the "Trust Agent") pursuant to the terms of a trust account agreement in the form attached hereto as Exhibit B (the "Trust Account Agreement"), and such trust account (the "Trust Account") shall provide security for the payment by the Sellers of any Seller Indemnification Obligations arising with respect to a breach of Section 6.18 or a Seller Tax Liability under Section 5.2 (the "Tax Obligations"). Upon the earlier to occur of (i) three years following the latest filing of the Tax Returns for the Company Group for the fiscal year ended July 31, 2011, to the extent no claim, audit, litigation, investigation or other administrative or judicial proceeding has been assessed or commenced with respect to such Tax Returns, or (ii) the expiration of the statute of limitations, as the same may be extended, with respect to any Tax Obligations (the "Taxes Survival Period"), the amounts in the Trust Account that have not been released to the Company for payment of any amounts due with respect to any Tax Obligations, and that are in excess of the amount of any pending indemnification claims related thereto, shall be released to the Company Stockholder. Any amounts in the Trust Account that are subject to a pending indemnification claim(s) related to Tax Obligations as of the end of the Taxes Survival Period shall be released, to the Company Stockholder or the Company, as applicable, when such claim is resolved.

Section 2.4    Payment of Total Purchase Price and Redemption Purchase Price.

Purchaser and the Company shall pay the Total Purchase Price and Redemption Purchase Price for the Purchased Stock, Redeemed Stock and SGI Stock as follows, all in accordance with the allocations set forth on Schedule 2.4:

(a)    At the Closing, Purchaser shall pay to the Sellers, by wire transfer of immediately available funds to such accounts as the Sellers may direct, an amount equal to the Base Purchase Price;

-13-

(b)     at the Closing, Purchaser shall deliver, or cause to be delivered, to the Company Stockholder the Membership Interests received in connection with the contributions described in Section 2.2(a) above, as evidenced by a fully executed copy of the Purchaser LLC Agreement having a schedule reflecting the Membership Interests issued to the Company Stockholder in connection with the contribution of the Rollover Stock, together with any certificates evidencing such Membership Interests, to the extent that they are to be certificated;

(c)     at the Closing, the Company shall pay to the Company Stockholder, by wire transfer of immediately available funds to such accounts as the Company Stockholder may direct, an amount equal to (i) the Redemption Purchase Price, minus (ii) the Closing Date Indebtedness not already paid off by the Company, the amounts and recipients of which shall be designated by the Sellers not later than one (1) business day prior to the Closing Date, minus (iii) the Transaction Expenses, the amounts and recipients of which shall be designated by the Sellers not later than one (1) business day prior to the Closing Date, minus (iv) the Initial Holdback Amount, minus (v) the Trust Account Amount, minus (vi) the Deferred Amount, (vii)(A) plus the amount, if any, by which Estimated Working Capital exceeds the Target Maximum Working Capital, or (B) minus the amount, if any, by which Estimated Working Capital is less than Target Minimum Working Capital, each as determined in accordance with Section 2.5(a), provided that no such adjustment pursuant to the preceding clause (vii)(A) or (B) shall exceed the Maximum Working Capital Adjustment;

(d)     six months following the Closing Date, the Company shall pay to the Company Stockholder, by wire transfer of immediately available funds to such account as such Seller may direct, an amount equal to the Deferred Amount; and

(e)     on the first business day immediately following the Release Date, the Company shall pay to the Company Stockholder, by wire transfer of immediately available funds to such accounts as the Company Stockholder may direct, an amount equal to the balance of the Initial Holdback Amount, minus any amounts the Company is entitled to retain in accordance with Section 2.3.

The Sellers shall deliver Schedule 2.4 to Purchaser no later than one (1) business day prior to the Closing.

Section 2.5     Working Capital.

(a)     No more than three (3) business days prior to the Closing Date, the Sellers shall prepare, or cause to be prepared, a statement which shall set forth a good faith and reasonably itemized calculation of the estimated Working Capital expected as of the close of business on the Closing Date based on the Company Group's then available financial information, in accordance with GAAP and in a manner consistent with the July 31, 2010 Balance Sheet (the "Estimated Working Capital"). If the Estimated Working Capital exceeds the Target Maximum Working Capital, the Redemption Purchase Price to be paid at Closing shall be increased dollar-for-dollar by the amount of such excess, and if the Estimated Working Capital is less than the Target Minimum Working Capital, the Redemption Purchase Price to be paid at Closing shall be decreased dollar-for-dollar by the amount of such deficiency; provided that no such adjustment pursuant to this Section 2.5(a) shall exceed the Maximum Working

Capital Adjustment. If the Estimated Working Capital is equal to or less than the Target Maximum Working Capital and equal to or greater than the Target Minimum Working Capital, no adjustment to the Redemption Purchase Price shall be made.

(b)      Within sixty (60) days after the Closing Date, Purchaser shall prepare, or cause to be prepared, and deliver to the Sellers a statement (the "Actual Closing Working Capital Statement") which shall set forth an itemized calculation of the actual Working Capital as of the close of business on the Closing Date ("Final Working Capital"). The Actual Closing Working Capital Statement shall be prepared in conformity with GAAP and in a manner consistent with the July 31, 2010 Balance Sheet. The Sellers will have a period of 30 days after their receipt of the Actual Closing Working Capital Statement (the "Review Period") to review the same and Purchaser's calculation of the Final Working Capital. As part of such review, the Sellers and their advisors shall have reasonable access during normal business hours to Purchaser's and the Company's work papers and to the preparers of the Actual Closing Working Capital Statement and to the books and records on which the Actual Closing Working Capital Statement is based.

(c)      If the Sellers disagree with the calculation of Final Working Capital, they shall notify Purchaser in writing of such disagreement prior to the expiration of the Review Period, setting forth a specific description of the basis of the disagreement and a statement reflecting the adjustments to the amount of the Final Working Capital which the Sellers believe should be made ("Sellers' Objections"). If the Sellers do not provide a notice of the Sellers' Objections within the Review Period, the Sellers shall be deemed to have accepted the Actual Closing Working Capital Statement and the calculation of the Final Working Capital delivered by Purchaser, which shall be final, binding and conclusive for all purposes hereunder. If the Sellers do provide timely notice of the Sellers' Objections, Purchaser and the Sellers shall use commercially reasonable efforts for a period of thirty (30) days (or such longer period as they may mutually agree in writing) to resolve any disagreements with respect to the calculation of the Final Working Capital. In reviewing the Sellers' Objections, Purchaser and its advisors shall have reasonable access during normal business hours to the work papers of the Sellers and their accountants that relate to such Sellers' Objections. If Purchaser and the Sellers are unable to resolve the Sellers' Objections within such 30-day period, then an independent accounting firm of recognized national or regional standing as may be mutually selected by Purchaser and the Sellers or, if they cannot agree, a Big Four accounting firm chosen by lot (after elimination of those Big Four accounting firms having relationships with the Sellers or Purchaser) (the "Auditor") shall be selected to resolve any remaining unresolved Sellers' Objections. The Sellers and Purchaser agree to execute, if requested by the Auditor, a reasonable engagement letter. Purchaser and the Sellers will cooperate with the Auditor during its engagement. The Auditor will consider only those items and amounts disputed on the Sellers' Objections that Purchaser and the Sellers have not been able to resolve. The Auditor shall resolve such disagreements as promptly as practicable, but in any event within forty-five (45) days of the date on which such dispute is referred to the Auditor, and determine whether and to what extent (if any) the Final Working Capital (as determined pursuant to the foregoing requirements) requires adjustment. Such determination shall be set forth in a written statement delivered to the Sellers and Purchaser. In making its determination, the Auditor shall (i) be bound by the terms and conditions of this Agreement, including without limitation, the definition of Working Capital and the terms of this Section 2.5, and (ii) not assign any value with respect to a disputed

-15-

amount that is greater than the highest value for such amount claimed by either Purchaser or the Sellers or that is less than the lowest value for such amount claimed by either Purchaser or the Sellers. The fees and expenses of the Auditor shall be paid one-half by Purchaser, on the one hand, and one-half by the Sellers, on the other hand. The determination of the Auditor shall be final, conclusive and binding on the Sellers and Purchaser, absent manifest error. Purchaser, the Company and the Sellers shall make available to the Auditor all relevant work papers, books and records relating to the calculations submitted and all other information reasonably requested by the Auditor. Each of Purchaser and the Sellers will be afforded the opportunity to present to the Auditor any materials and position papers related to the determination and to discuss the determination with the Auditor; provided, that no party shall initiate discussions with the Auditor without the other Party being given an opportunity to participate in such discussion and each party shall provide the other party with copies of any such materials provided to the Auditor.

(d)    If the Final Working Capital, as finally determined pursuant to this Section 2.5, is greater than the Target Maximum Working Capital, the Redemption Purchase Price (as adjusted pursuant to Section 2.5(a)) shall be increased dollar-for-dollar by the amount that the Final Working Capital exceeds the Target Maximum Working Capital, less any positive adjustment made to the Redemption Purchase Price pursuant to Section 2.5(a) or plus any negative adjustment made to the Redemption Purchase Price pursuant to Section 2.5(a), as the case may be (it being understood that if the deduction for any positive adjustment made to the Redemption Purchase Price pursuant to Section 2.5(a) would result in a negative amount, such amount shall result in a dollar-for-dollar decrease in the Redemption Purchase Price). If the Final Working Capital, as finally determined pursuant to this Section 2.5, is less than the Target Minimum Working Capital, the Redemption Purchase Price (as adjusted pursuant to Section 2.5(a)) shall be decreased dollar-for-dollar by the amount that the Target Minimum Working Capital exceeds the Final Working Capital, less any negative adjustment made to the Redemption Purchase Price pursuant to Section 2.5(a) or plus any positive adjustment made to the Redemption Purchase Price pursuant to Section 2.5(a), as the case may be (it being understood that if the deduction for any negative adjustment made to the Redemption Purchase Price pursuant to Section 2.5(a) would result in a negative amount, such amount shall result in a dollar-for-dollar increase in the Redemption Purchase Price). If the Final Working Capital is equal to or less than the Target Maximum Working Capital and equal to or greater than the Target Minimum Working Capital, no adjustment to the Redemption Purchase Price shall be made, unless the Redemption Purchase Price was adjusted pursuant to Section 2.5(a), in which case the Redemption Purchase Price shall either be increased by the amount of the decrease that was made pursuant to Section 2.5(a) or decreased by the amount of the increase that was made pursuant to Section 2.5(a). The Company Stockholder shall pay to the Company the amount of any decrease to the Redemption Purchase Price (as adjusted pursuant to Section 2.5(a)), pursuant to this Section 2.5(d). The Company shall pay to the Company Stockholder the amount of any increase to the Redemption Purchase Price (as adjusted pursuant to Section 2.5(a)), pursuant to this Section 2.5(d). All payments under this subsection (d) will be made within five (5) business days after Final Working Capital has been finally determined, and will bear interest from the Closing Date through the date of payment at a rate per annum (based on a 365 day year) equal to the prime interest rate as published in The Wall Street Journal on the Closing Date. Notwithstanding anything to the contrary provided herein, in no event shall the

collective, net adjustment to the Redemption Purchase Price pursuant to Section 2.5(a) and this Section 2.5(d) exceed the Maximum Working Capital Adjustment.

Section 2.6   Issuance of Profits Interest.  At the Closing, Purchaser shall issue Profits Interests representing no more than 5% of the outstanding Percentage Interests (as such term is defined in the Purchaser LLC Agreement) of Purchaser to certain members of the senior management of the Company Group, with such Profits Interests to be allocated to such individuals and in such amounts as shall be determined by the mutual agreement of the Purchaser and the Sellers prior to the Closing and set forth on Schedule 2.6 hereto.  The Sellers and Purchaser shall complete Schedule 2.6 no later than one (1) business day prior to the Closing.

ARTICLE 3
THE CLOSING

Section 3.1   Closing.

Subject to fulfillment or waiver of the conditions precedent set forth in Articles 9 and 10 hereof, the closing of the transactions contemplated by this Agreement (the "Closing") shall take place on the Closing Date at the offices of Arnold & Porter LLP at 555 12th Street, NW, Washington, DC 20004 at 10:00 a.m., local time, or at such other time and place on the Closing Date.

Section 3.2   Closing Date.

The Closing shall occur within three (3) days after the fulfillment or waiver of the conditions precedent set forth in Articles 9 and 10 hereof, unless Purchaser or the Sellers request Closing to occur on a later date on or before July 31, 2011, or on such other date as mutually agreed upon by the parties hereto (the actual date of the Closing being herein called the "Closing Date").

Section 3.3   Closing Date Deliveries.

At the Closing, Purchaser and the Sellers shall deliver or cause to be delivered to each other the deliveries required by Articles 9 and 10 hereof.

ARTICLE 4
CERTAIN COVENANTS

Section 4.1   Access to Books and Records and Personnel.

On or prior to the Closing Date, upon reasonable prior notice, the Company shall at all times during business hours and in a manner so as not to interfere with the normal business operations of the members of the Company Group, make the books, accounts, inventory, equipment, records (financial and other), technical information, Contracts and such other documents and information regarding the Company Group and the Business available for examination, audit and inspection by Purchaser and its officers, employees, financial advisors, financing sources, consultants, accountants, attorneys and authorized representatives.  The

-17-

Company shall furnish Purchaser as promptly as practicable with such documents or copies thereof, and other information concerning the Business, including, without limitation, any financial and operating data or other periodic financial information, as Purchaser shall, from time to time, reasonably request. No investigation by Purchaser shall, however, diminish or obviate in any way, or affect Purchaser's right to rely upon, any of the representations, warranties, covenants or agreements of the Companies or the Sellers contained in this Agreement or any other Transaction Documents.

Section 4.2   Notice of Certain Events.

On or prior to the Closing Date, the Company or either Seller shall promptly notify Purchaser in writing upon the occurrence, to Sellers' Knowledge, of any of the following:

(a)     the commencement by or against any member of the Company Group of any audit, investigation, proceeding or litigation at law or in equity or before any Governmental Authority, including any voluntary or directed disclosure to any Governmental Authority;

(b)     any violation by any member of the Company Group (or notice of potential material violation) of any Environmental Law or other Law that would be reasonably likely to have a Material Adverse Effect or that could impair the ability of Purchaser or any Seller to consummate the transactions contemplated by this Agreement;

(c)     the commencement or overt threat of any actions, suits, claims, investigations or proceedings against, relating to or involving or otherwise affecting any member of the Company Group involving at least $100,000;

(d)     any fact or circumstance which would make any representation or warranty set forth in Article 6 hereof untrue or inaccurate in any material respect as of the Closing Date or as of the date of this Agreement;

(e)     any event or circumstance that would make the timely satisfaction of any condition set forth in this Agreement impossible as of the Closing Date;

(f)     the receipt of any Transaction Proposal;

(g)     damage to any of the Assets in an amount in excess of $250,000;

(h)     any notice or other communication from any Person to any member of the Company Group alleging that the consent of such Person is or may be required in connection with the transactions contemplated by this Agreement;

(i)     any occurrence, event or circumstance materially affecting or relating to the Business that is outside the ordinary course of business of the Company Group and involves at least $250,000; or

(j)     any event which has had or would reasonably be expected to have a Material Adverse Effect or which if known as of the date hereof would have been required to be disclosed by any Seller or the Companies to Purchaser on the disclosure schedules hereto;

provided, however, that, subject to Section 4.9 below, no such notification shall affect the representations and warranties of any party or the conditions to any party's obligations hereunder.

Section 4.3   Conduct of Business by the Company Group.

Between the date of this Agreement and the Closing Date, the Sellers and the Company will cause the Company Group to, and the Company will, use its Best Efforts to (a) preserve intact the Business and the business organization of each member of the Company Group, (b) maintain in effect all material Licenses and Permits and all Governmental Approvals which are necessary for the conduct of the Business, (c) keep available the services of the Company Group's present management and workforce, and (d) maintain good business relationships with suppliers, customers and distributors and others having business dealings with any member of the Company Group. Between the date of this Agreement and the Closing Date, (a) the Companies will not, and the Sellers and the Company will cause each member of the Company Group not to, take any action that would be outside of the ordinary course of business for similarly situated companies operating in the federal services and/or government contracting industry without receiving the prior consent of Purchaser (such consent not to be unreasonably withheld, conditioned or delayed), and (b) representatives of the Company Group and Purchaser shall speak at least once a week to discuss any such actions to be taken by any member of the Company Group.

Section 4.4   Regulatory Matters.

The Sellers and the Companies, on the one hand, and Purchaser, on the other hand, will (i) take all commercially reasonable steps necessary or desirable, and proceed diligently and in good faith and use all commercially reasonable efforts, as promptly as practicable to obtain all consents, approvals or actions of, to make all filings with and to give all notices to Governmental Authorities required of such parties to consummate the transactions contemplated by the Transaction Documents, (ii) provide such other information and communications to such Governmental Authorities as such parties or such Governmental Authorities may reasonably request in connection therewith and (iii) cooperate with each other as promptly as practicable in connection with the foregoing. Each party will provide prompt notification to the other parties when any such consent, approval, action, filing or notice referred to in clause (i) above is obtained, taken, made or given, as applicable, and will advise each other party of any communications (and, unless precluded by Law, provide copies to each other party of any such communications that are in writing) with any Governmental Authority regarding any of the transactions contemplated by the Transaction Documents.

Section 4.5   Transaction Proposals.

From the date hereof until the earlier of the Closing Date or the date that this Agreement is terminated, neither any Seller nor either Company shall authorize or permit any member of the Company Group or any of their respective officers, managers, directors, consultants, employees, equity holders, Affiliates, investment bankers, attorneys, advisors, auditors, representatives or agents to, directly or indirectly, (i) solicit, initiate or encourage the submission of inquiries, proposals or offers from any third party Person or group of Persons relating to any acquisition or

-19-

purchase of any Assets of, or any equity interest in, any member of the Company Group or any Seller, or any tender or exchange offer, merger, consolidation, business combination, recapitalization, restructuring, spin-off, liquidation, dissolution or similar transaction involving, directly or indirectly, any member of the Company Group or any Seller (each a "Transaction Proposal"), (ii) participate in any discussions or negotiations regarding any Transaction Proposal or furnish information about the Company Group to any Person in connection with any Transaction Proposal except to (x) lenders and other parties to agreements with any member of the Company Group (for the specific purpose set forth in such agreements, which in no event shall include a Transaction Proposal) and (y) Purchaser or its Affiliates and representatives and proposed lenders, (iii) otherwise cooperate in any way with, or assist or participate in, facilitate or encourage, any effort or attempt by any other Person to make or enter into a Transaction Proposal, or (iv) accept, approve or authorize, or enter into any agreement concerning any Transaction Proposal or dispose of any equity interest in any member of the Company Group. The Company and the Sellers shall, as applicable, use their respective Best Efforts to cause each member of the Company Group and each of their respective equity holders, Affiliates, agents, officers, managers, directors, investment bankers, advisors, representatives and Affiliates to abide by the terms of this Section 4.5. In the event that either Company or any Seller receives any Transaction Proposal, it shall promptly notify Purchaser in writing of such communication and keep Purchaser informed of any subsequent developments in connection therewith.

Section 4.6    Customers and Suppliers.

The Company shall, and the Sellers shall cause the Company to, promptly following the request thereof by Purchaser, seek and use its Best Efforts to arrange such meetings and telephone conferences with all material customers and suppliers of the Company Group as may be necessary and appropriate for Purchaser to conduct a comprehensive review of the Company Group's relations with its customers and suppliers. Notwithstanding anything to the contrary in the foregoing sentence, no such meetings shall occur and Purchaser and its representatives shall not contact any customers and/or suppliers of the Company Group without the prior consent of the Sellers, which shall not be unreasonably withheld or delayed, provided Purchaser and any of its representatives are able to satisfy any security requirements deemed reasonably necessary by the Sellers (including providing the Sellers with any required paperwork documenting security clearances of Purchaser representatives that would be contacting such customers or suppliers), prior to any such contact by Purchaser or its representatives.

Section 4.7    Arrangements with Employees; DB Plan.

From the date hereof until the Closing Date, the Sellers and the Companies shall use their respective Best Efforts to retain the employees of the Company Group. The Company shall, prior to the Closing, use its commercially reasonable efforts to (i) obtain PBGC approval to terminate the DB Plan and distribute all assets in the DB Plan, and (ii) distribute all assets of the DB Plan to plan participants and beneficiaries.

Section 4.8    Third Party Consents.

To the extent that any consent, approval or waiver of a third party with respect to any Contract is required in connection with the transactions contemplated by this Agreement, the

parties shall use their respective Best Efforts to obtain such consent, approval or waiver prior to the Closing Date and in the event that any such consent, approval or waiver is not obtained (but without limitation on Purchaser's rights under Section 9.3), the Sellers shall cooperate with Purchaser to ensure that Purchaser obtains the economic and other benefits of each such Contract.

Section 4.9   Updated Disclosure Schedules.

After the date of this Agreement, the Sellers may update the disclosure schedules prior to the Closing to reflect any matter hereafter arising which would cause the closing condition in Section 9.1 to not be met and which, if existing on the date hereof, would have been required to be set forth or described in the disclosure schedules; provided, that no such update shall be deemed to cure any breach which exists as of the date of this Agreement. Purchaser will have three (3) business days from receipt of the updated disclosure schedule to determine, in Purchaser's sole discretion, whether to accept such updated disclosure schedule and proceed with the Closing or to reject such updated disclosure schedule and terminate this Agreement. If Purchaser terminates this Agreement as a result of the delivery of an updated disclosure schedule, no Seller or member of the Company Group shall have any further obligations or liabilities to Purchaser as a result of or following such termination.

Section 4.10   Financing.

Purchaser and Sponsor Affiliate each acknowledge that it shall be fully responsible for obtaining any required financing for the transactions contemplated hereunder (the "Debt Financing") and shall use its Best Efforts to obtain the Debt Financing. Sponsor Affiliate or Purchaser shall keep Sellers informed with respect to all material activity concerning the Debt Financing and shall give Sellers prompt notice of any material adverse change with respect to the Debt Financing. Each Seller agrees to, and shall cause the Companies and their Subsidiaries to, provide Sponsor Affiliate and Purchaser with such cooperation in connection with obtaining the Debt Financing as may be reasonably requested by Sponsor Affiliate or Purchaser, including providing true and accurate documents and financial information (which financial information shall be materially consistent with the financial information provided to Purchaser in connection with the negotiation of this Agreement) to any proposed lenders that may be providing the Debt Financing as reasonably requested by Sponsor Affiliate or Purchaser, provided that (i) such requested cooperation does not unreasonably interfere with the ongoing operations of the Companies and their Subsidiaries and (ii) none of the Sellers, nor prior to the Closing the Companies or any of their Subsidiaries, shall be required to pay any commitment or other similar fee or incur any other liability in connection with obtaining the Debt Financing.

Section 4.11   Minimum Cash Amount.

The Companies shall prepare and deliver to Purchaser prior to the Closing Date a statement setting forth the Minimum Cash Amount, which shall be accompanied by account statements or other documents reasonably acceptable to Purchaser, in each case, as of the Closing Date evidencing such amount. The statement shall accurately present in all respects the Minimum Cash Amount and the Companies shall provide Purchaser with a certificate dated as of the Closing Date and signed by an authorized officer of the Company Group to such effect.

-21-

ARTICLE 5
ADDITIONAL CONTINUING COVENANTS

Section 5.1     Noncompetition.

(a)     Each Seller hereby represents and warrants to Purchaser that such Seller has agreed to be bound by the provisions of this Section 5.1 to induce Purchaser to consummate the transactions contemplated by this Agreement and with the intention of causing the effective preservation of the goodwill of the Business unimpaired. Without limiting the generality of the foregoing or any other provision of this Agreement, it is the intention of the parties hereto that the covenants set forth in this Section 5.1 shall be enforceable and enforced to the fullest extent permissible under applicable Law.

(b)     Each Seller hereby covenants and agrees with Purchaser that such Seller will not do the following, directly or indirectly, acting alone or as a member of a partnership or other business entity or as a holder of any security of any class (provided, however, that nothing herein shall prohibit such Seller from holding an interest in Purchaser or less than 1% of the outstanding amount of any publicly traded security):

(i)     during the Non-Compete Period (as defined below), engage in any Competitive Business (as defined below) within the United States of America, Iraq, Afghanistan or any other foreign country or province or political subdivision thereof in which the Company Group carries on the Business as of the Closing Date, but only as long as the Company Group continues to engage in the Business after the Closing Date in such country, province or political subdivision thereof;

(ii)     during the Non-Solicit Period (as defined below), request, induce or attempt to influence any Person who is a customer or client of any member of the Company Group as of the Closing Date to limit, curtail or cancel its business with the Company Group or any successor thereto; or

(iii)     during the Non-Solicit Period, request, induce or attempt to influence any current or future officer, manager, director, employee, consultant, agent or representative of the Company Group to (i) terminate his, her or its employment or business relationship with any member of the Company Group or (ii) commit any act that, if committed by any Seller, would constitute a breach of any provision of this Section 5.1.

For the purposes of this Section 5.1, the "Non-Compete Period" means the period commencing on the Closing Date and ending on the fifth anniversary of the Closing Date and the "Non-Solicit Period" means the period commencing on the Closing Date and ending on the third anniversary of the Closing Date; provided, however, that either of such periods will be extended in each case by and for the duration of any period of time during which any Seller is in violation of the corresponding provision of this Section 5.1.

The provisions of clauses (i) through (iii) above are separate and distinct commitments independent of each of the other such clauses. For the purposes of this Section 5.1, "Competitive Business" means providing base operations support services in the

-22-

areas of operations and maintenance, security, fire and emergency services, food and hospitality, and logistics and procurement, training and design and construction services to Governmental Authorities as well as to other third parties that provide similar goods and services to Governmental Authorities, similar in nature to those provided by the Company Group from time to time prior to the Closing Date.

(c)     Each Seller agrees that Purchaser would suffer irreparable harm as a result of the violation of any provision of this Section 5.1 by any Seller and that Purchaser has no adequate remedy at Law for any breach or threatened or attempted breach by it of the covenants and agreements set forth in this Section 5.1 hereof and, accordingly, each Seller also agrees that Purchaser may, in addition to the other remedies that may be available to it under this Agreement or at Law, commence proceedings in equity for an injunction temporarily or permanently enjoining each Seller from breaching or threatening or attempting any such breach of such covenants and agreements, seeking specific performance, or seeking any other remedy available in equity.  The prevailing party or parties in any proceeding in equity or at law commenced in respect of this Section 5.1 shall be entitled to recover from the other party or parties to such proceeding all reasonable fees, costs and expenses (including reasonable fees and disbursements of counsel) incurred in connection with such proceeding and any appeals therefrom.

(d)     All of the parties hereto agree that the scope and duration of the covenants set forth in this Section 5.1 are reasonable.  Notwithstanding the foregoing, each Seller agrees that if the scope of the covenant set forth in this Section 5.1 is deemed by any court to be overly broad, the court may reduce the scope thereof to that which it deems reasonable under the circumstances; provided, however, that as set forth above, it is the intention of the parties that such covenant be enforced and enforceable to the fullest extent permissible under applicable Law.  If any one or more provisions of this Section 5.1 shall, for any reason, be held to be invalid, illegal or unenforceable in any respect, then to the maximum extent permitted by Law, such invalidity, illegality or unenforceability shall not affect any other provision of this Section 5.1.

(e)     Each Seller agrees that the covenants and agreements of such Seller set forth in this Section 5.1 are independent of all other covenants, representations, warranties and agreements of the parties set forth in this Agreement, and no default, breach or failure to perform by any party to the Agreement shall constitute an excuse or other justification for such Seller to fail to observe fully its covenants and agreements under this Section 5.1.  No course of dealing between Purchaser, on the one hand, and any Seller, on the other hand, and no delay by Purchaser in exercising any right, power or remedy under this Section 5.1, in equity or at law, shall constitute a waiver of, or otherwise prejudice, any such right, power or remedy.

Section 5.2     Tax Matters.

(a)     Liability for Taxes.  Except as set forth otherwise herein, the Sellers shall be liable for and pay any and all Taxes of and with respect to all the members of the Company Group that are attributable or allocable (each a "Seller Tax Liability") to (i) any taxable period that ends on or before the Closing Date, including, for the avoidance of doubt, the taxable year of SGI terminating and ending at the end of the day before the Closing Date as described in

-23-

Section 5.2(c) (each, a "Pre-Closing Tax Period"), or (ii) the portion of any Straddle Period ending on the Closing Date. The Purchaser or the Companies, as applicable, shall be liable for and pay any and all Taxes of and with respect to all the members of the Company Group that are attributable or allocable to (x) any taxable period that begins after the Closing Date (a "Post-Closing Tax Period"), or (y) the portion of any Straddle Period beginning after the Closing Date (each a "Post-Closing Tax Liability"). Notwithstanding the foregoing, any liabilities for Taxes relating to a Joint Venture shall be limited to the applicable member of the Company Group's proportionate share of such liability.

(b)     Tax Returns Filed After the Closing Date. The Sellers shall prepare or cause to be prepared and file or cause to be filed in a timely manner any Tax Returns of the members of the Company Group for any Pre-Closing Tax Period that are filed after the Closing Date and any Tax Returns of the members of the Company Group for any Straddle Period that are filed after the Closing Date. Sellers shall permit the Purchaser to review and comment on each such Tax Return described in the preceding sentence at least thirty (30) days prior to filing and shall make such revisions to such Tax Returns as are reasonably requested by the Purchaser, if and only if the Sellers determine reasonably and in good faith that such revisions are required to comply with applicable Law. The Sellers shall make or cause to be made all payments of Taxes required with respect to any such Tax Return, and Purchaser shall pay to the Sellers, on the date such Taxes are due and payable or within five (5) business days after the Sellers give Purchaser notice of same, whichever is later, an amount equal to the portion of such Taxes attributable to Post-Closing Tax Liability.

(c)     Allocation of Straddle Period Taxes. Whenever it is necessary to allocate the liability for income Taxes for a Straddle Period, such allocation will be determined on a "closing of the books" basis by assuming that the taxable year of the applicable member of the Company Group ends at the close of business on the Closing Date and that such member of the Company Group files a Tax Return for that period. For purposes of computing the income Taxes attributable to the two portions of a Straddle Period, the amount of any item that is taken into account only once for a taxable period (e.g., the benefit of graduated tax rates, exemption amounts, etc.) shall be allocated between the two portions of the Straddle Period in proportion to the number of days in each portion. Without limiting the foregoing, any Tax benefits relating to payment of Transaction Expenses, repayment of Closing Date Indebtedness or payment of bonuses paid to employees of the Company Group on or prior to the Closing Date shall be applied solely to offset Tax liabilities for the portion of the Straddle Period ending on the Closing Date. For any other Tax liability (e.g., property Tax) for a Straddle Period, such Tax shall be allocated on a per diem basis. Notwithstanding the foregoing and for the avoidance of doubt, the Sellers and the Purchaser agree that the taxable year of SGI shall terminate and end at the end of the day before the Closing Date for federal income Tax purposes and, to the extent applicable, for state and local Tax purposes.

(d)     Covenants. Purchaser and the Sellers shall not take, nor shall Purchaser cause or permit any member of the Company Group to take, any action or omit to take any action which could increase the liability of the other party or parties in connection with any Taxes under this Agreement. Neither Purchaser nor any member of the Company Group shall amend, refile or otherwise modify, or cause or permit any member of the Company Group to amend, refile or otherwise modify, any Tax election or Tax Return with respect to any Pre-

-24-

Closing Tax Period or Straddle Period without the prior written consent of the Sellers, which consent shall not be unreasonably withheld, conditioned or delayed if such amendment, refiling or modification is required to comply with applicable Law.

       (e)   Cooperation; Contests.

        (i)   The Purchaser, Sellers and each member of the Company Group shall cooperate, as and to the extent reasonably requested by the other party, in connection with the filing of Tax Returns pursuant to this Section 5.2 and any claim for refund, audit, litigation or other proceeding with respect to Taxes. Purchaser shall preserve and cause to be preserved all information, returns, books, records and documents relating to any liabilities for Taxes of any member of the Company Group with respect to a taxable period until the later of the expiration of all applicable statutes of limitation and extensions thereof or the conclusion of all litigation with respect to Taxes for such period.

        (ii)   Purchaser shall notify the Sellers in writing within five (5) business days of any proposed assessment or claim or the commencement of any audit or administrative or judicial or other proceeding involving Taxes which, if determined adversely, could result in a liability to the Sellers under this Agreement or which could cause an adjustment in the Tax liability of the Sellers; provided, however, that the failure to give such notice shall not affect the indemnification provided for in Article 11, unless and to the extent Sellers have been materially prejudiced thereby. Such notice shall contain factual information to the extent known describing the asserted Tax liability in reasonable detail and shall include copies of any notice or other document received from any Tax authority in respect of any such asserted Tax liability.

        (iii)   In the case of an audit or administrative or judicial or other proceeding that relates to any Seller Tax Liability, subject to the terms and conditions of the Trust Account Agreement, the Sellers shall have the right to control the conduct of such audit or proceeding, including settling or compromising the issue or matter, provided that Sellers acknowledge in writing that such audit or administrative or judicial or other proceeding relates to a Seller Tax Liability for which Sellers are responsible under Section 5.2(a), and the Sellers shall pay all expenses related thereto. If the Sellers elect to direct such audit or proceeding, the Sellers shall, within thirty (30) days after receiving written notice of such audit or proceeding, notify Purchaser of their intent to do so, and Purchaser shall cooperate and shall cause the Company Group to fully cooperate in each phase of the audit or proceeding. If the Sellers elect not to direct such audit or proceeding, Purchaser may assume, or cause the Company to assume, control of such audit or proceeding; provided, however, in such case, Purchaser shall provide the Sellers with a timely and reasonably detailed account of each phase of the audit or proceeding, and, subject to the terms and conditions of the Trust Account Agreement, neither Purchaser nor any member of the Company Group may settle or compromise any asserted liability without the prior written consent of the Sellers, which consent shall not be unreasonably withheld, conditioned or delayed. The Sellers may participate, at the Sellers' expense, in any audit or proceeding related to any Pre-Closing Tax Period or portion of any Straddle Period ending on the Closing Date.

       (f)   Refunds. All Tax refunds of any member of the Company Group and amounts credited against Tax of any member of the Company Group for any Pre-Closing Tax Period shall be for the accounts and benefit of the Sellers, and Purchaser shall deliver such

refunds to the Sellers as promptly as possible upon receipt. The Sellers shall be entitled to their respective Pro Rata Share of all Tax refunds of any member of the Company Group and amounts credited against Tax of any member of the Company Group for any Straddle Period, and Purchaser shall deliver such refunds to the Sellers as promptly as possible upon receipt.

(g)     Transfer Taxes. All transfer, documentary, sales, use, stamp, registration and other similar Taxes and other governmental charges (including, without limitation, charges for or in connection with the recording of any instrument or document as provided in this Agreement payable in connection with the transfer of the Stock and SGI Stock as contemplated by this Agreement), and any fees incurred in connection with the preparation and filing of any Tax Returns and other documentation with respect to all such Taxes, shall be paid one-half by the Sellers and one-half by Purchaser, and the Sellers shall be responsible for preparing and filing all necessary Tax Returns and other documentation with respect to all such Taxes, fees and charges, and, if required by applicable Law, the Purchaser shall, and shall cause its Affiliates to, join in the execution of any such Tax Returns and other documentation.

Section 5.3     Directors and Officers Indemnification.

(a)     Purchaser will cause the Company to indemnify, defend and hold harmless the past and existing directors and officers of the Company, and other persons entitled to indemnification under the General Corporation Law of the State of Delaware (as amended, the "GCL") and the Certificate of Incorporation and Bylaws of the Company as in effect immediately prior to the Closing Date, to the same extent that such persons are entitled to indemnification under the GCL and the Certificate of Incorporation and Bylaws of the Company as in effect immediately prior to the Closing Date. Purchaser will cause the Company and each member of the Company Group to maintain in effect in organizational documents of each member of the Company Group provisions regarding limitation of liability and indemnification of directors, officers and other persons which are at least as favorable to such persons as those contained in the such documents on the Closing Date.

(b)     If the Company or any of its successors or assigns (i) shall consolidate with or merge into any other Person and shall not be the continuing or surviving corporation or entity of such consolidation or merger or (ii) shall transfer all or substantially all of its assets to any Person, then and in each such case, proper provisions shall be made so that the successors and assigns of the Company shall assume all of the obligations set forth in this Section 5.3.

(c)     Purchaser shall cause the Company to maintain in effect for six (6) years from the Closing Date directors' and officers' liability insurance covering those persons who are currently covered by the Company's directors' and officers' liability insurance policy on terms not less favorable than those of such existing insurance coverage; provided, that in the event that any claim is brought under any such policy prior to the six (6) year anniversary of the Closing Date, such directors' and officers' liability insurance policy shall be maintained until final disposition thereof.

(d)     The provisions of this Section are intended to be for the benefit of, and will be enforceable by, each Person described in this Section and his, her or its heirs, representatives, successors and assigns.

-26-

ARTICLE 6
## REPRESENTATIONS AND WARRANTIES OF THE COMPANIES AND THE SELLERS

The Sellers and the Companies, jointly and severally, hereby represent, warrant and agree for the benefit of Purchaser as follows; provided, however, that with respect to any representation or warranty in this Article 6 that relates to any member of the Company Group that is a Joint Venture, such representation or warranty, as it relates to such Joint Venture, is qualified in all respects to the Sellers' Knowledge:

Section 6.1    Organization and Standing of the Companies.

The Company is a corporation duly incorporated, validly existing and in good standing under the laws of the State of Delaware and has all necessary corporate power and authority to own its properties and assets and to carry on the Business as the same has been and is currently being conducted. SGI is a corporation duly incorporated, validly existing and in good standing under the laws of the State of Florida and has all necessary corporate power and authority to own its properties and assets and to carry on the Business as the same has been and is currently being conducted. Each other member of the Company Group (a) is duly organized, validly existing and in good standing under the laws of the jurisdiction of its organization and (b) has all necessary organizational power and authority to own its properties and assets and to carry on the Business as the same has been and is currently being conducted. Each member of the Company Group is duly qualified to transact business in all jurisdictions where the nature of its business or the ownership or leasing of its property requires such qualification, except to the extent the failure to be so qualified would not reasonably be expected to have a Material Adverse Effect. Each member of the Company Group has the power and authority to hold all material rights, privileges, franchises, immunities, Licenses and Permits (governmental and otherwise) and Governmental Approvals necessary to carry on and conduct the Business as the same has been and is currently conducted.

Section 6.2    Authorization and Binding Obligation of the Sellers and the Companies.

Each Seller has the legal capacity or requisite power and authority, and each Company has all requisite corporate power and authority, to enter into and perform this Agreement and each of the other Transaction Documents. All corporate or other action on the part of each Seller and each Company (as applicable) and the managers, directors, trustees and officers of each Seller and each Company (as applicable) necessary for the authorization, execution and delivery of this Agreement and the other Transaction Documents and for the performance of their respective obligations hereunder and thereunder, as the case may be, have been taken or will have been taken as of the Closing Date. This Agreement constitutes and each of the other Transaction Documents, when executed and delivered, shall constitute a valid and legally binding obligation of each Company and each Seller, enforceable against each Company and each Seller in accordance with its respective terms, except as may be limited by (i) bankruptcy, insolvency, or other similar laws affecting the enforcement of creditors' rights generally and (ii) general principles of equity (whether enforcement is sought at law or in equity).

Section 6.3    Non-Contravention.

-27-

Except as set forth on Schedule 6.3, neither the execution and delivery by the Companies and the Sellers of this Agreement or the other Transaction Documents, the performance by the Companies and the Sellers of their respective obligations hereunder or thereunder, nor the performance or consummation by the Companies and the Sellers of the transactions contemplated hereby or thereby will (i) violate or conflict with any provision of the articles or certificate of incorporation, bylaws, or other organizational documents of any Seller or either Company (as applicable), (ii) violate or conflict with any Law or Order to which any Seller, either Company, or the Business is subject or bound, (iii) require the approval of, notice to, or a filing or registration with any Governmental Authority, (iv) whether after notice or lapse of time or both, violate, breach or conflict with any provision of, result in the loss of a material benefit under, or permit the termination or acceleration of any Material Contract, (v) require any authorization, consent or approval of, exemption or other action by, or notice to, any party to any Material Contract or (vi) result in the creation or imposition of any Encumbrance (other than Permitted Encumbrances) upon any shares of Stock or the SGI Stock or the Assets.

Section 6.4    Capitalization.

(a)    The existing capitalization and ownership of the Companies is accurately described in Schedule 6.4(a).  The Stock constitutes all of the issued and outstanding equity securities in the Company.  The SGI Stock constitutes all of the issued and outstanding equity securities in SGI.  None of the outstanding shares of Stock or SGI Stock are subject to, nor were they issued in violation of, any purchase option, call option, right of first refusal, first offer, co-sale or participation, preemptive right, subscription right or any similar right.  Except for the Stock, no securities of the Company are issued, reserved for issuance or outstanding and there are no outstanding subscriptions, options, warrants, convertible securities, commitments, rights, agreements, arrangements or demands of any character, preemptive or otherwise, other than this Agreement, relating to any of the issued or unissued shares of Stock or other securities of the Company.  Except for the SGI Stock, no securities of SGI are issued, reserved for issuance or outstanding and there are no outstanding subscriptions, options, warrants, convertible securities, commitments, rights, agreements, arrangements or demands of any character, preemptive or otherwise, other than this Agreement, relating to any of the issued or unissued shares of SGI Stock or other securities of SGI.

(b)    Schedule 6.4(b) sets forth for each member of the Company Group (a) its name and jurisdiction of organization, (b) its form of organization and (e) the capital stock, membership interests or other securities held by the Sellers or the Company, directly or indirectly, in such member of the Company Group.  Except as set forth on Schedule 6.4(b), the Company is the sole direct or indirect beneficial and record owner of all the outstanding shares of capital stock or other interests or units in each member of the Company Group other than the Company and SGI, and the Sellers are the sole direct or indirect beneficial and record owners of all the outstanding shares of capital stock or other interests or units in the Company and SGI, free and clear of all Encumbrances, except (i) as may be set forth in the certificate of formation, limited liability company agreement, certificate of incorporation or bylaws, or similar governing documents of such member, (ii) for any restrictions on sales of securities under applicable securities Laws, and (iii) for Permitted Encumbrances.  All of the outstanding shares of the capital stock or other interests or units in each member of the Company Group have been duly authorized and validly issued and are fully paid and nonassessable.  Except as set forth on

-28-

Schedule 6.4(b), none of the outstanding shares of capital stock or other interests or units in any member of the Company Group are subject to, nor were they issued in violation of, any purchase option, call option, right of first refusal, first offer, co-sale or participation, preemptive right, subscription right or any similar right.  Except as set forth on Schedule 6.4(b), there are no other corporations, partnerships, joint ventures, or other entities in which any member of the Company Group owns, of record or beneficially, any direct or indirect equity or other interest or any right to acquire the same.

(c)     There are not any options, warrants, rights, "phantom" equity rights, stock appreciation rights, performance interests, commitments, agreements, arrangements or undertakings of any kind to which any member of the Company Group is a party or by which any of them is bound (i) obligating any member of the Company Group to issue, deliver or sell, or cause to be issued, delivered or sold, additional equity securities in, or any security or interest convertible or exercisable for or exchangeable into any equity security in, any member of the Company Group, (ii) obligating any member of the Company Group to issue, grant, extend or enter into any such option, warrant, right, security, interest, commitment, agreement, arrangement or undertaking or (iii) that give any Person the right to receive any economic benefit or right similar to or derived from the economic benefits and rights occurring to holders of the Stock or SGI Stock.  As of the date of this Agreement, there are not any outstanding contractual obligations of any member of the Company Group to repurchase, redeem or otherwise acquire any equity of any member of the Company Group, except as contemplated in this Agreement.

Section 6.5     Title to Stock.

Each of the Sellers owns, beneficially and of record, and has good and marketable title to, the Stock and the SGI Stock, as applicable.  All of the shares of Stock and SGI Stock are free and clear of all Encumbrances, and are validly issued, fully paid and nonassessable, and there are no voting trust agreements or other contracts, agreements or arrangements restricting voting or dividend rights or transferability with respect to the Stock or the SGI Stock.  The delivery to Purchaser of the Purchased Stock and the SGI Stock pursuant to the terms of this Agreement, together with the redemption by the Company of the Redeemed Stock pursuant to the terms of this Agreement, will cause Purchaser to own good and valid title to all of the outstanding equity securities of the Company and SGI, free and clear of all Encumbrances.

Section 6.6     Ability to Perform Obligations.

Except as set forth on Schedule 6.6, neither either Company nor any Seller is a party to, subject to, or bound by any Contract, Law or Order that would reasonably be expected to prevent or materially impair (i) the performance of any party's obligations under this Agreement, or (ii) the sale, conveyance, transfer and delivery of, or the right to sell, convey, transfer and deliver, any shares of Stock or SGI Stock.

Section 6.7     Minute Books.

Except as set forth on Schedule 6.7, the minute books of the members of the Company Group accurately reflect all formal actions and proceedings taken to date by their stockholders,

members, directors and managers, as applicable, and such minute books contain true and complete copies of the organizational documents of each member of the Company Group and all related amendments. True and complete copies of the minute books have been made available to Purchaser. The stock transfer books of the Companies reflect accurately all transfers, issuances and other dispositions of all of the Stock and SGI Stock, as applicable.

      Section 6.8    Amendments, Dividends and Other Distributions.

Since July 31, 2010, except as set forth in Schedule 6.8, no member of the Company Group has (i) amended its organizational documents to alter its capital structure, including the rights and obligations associated with the Stock or the SGI Stock, (ii) declared, set aside, made or paid any dividend or other distribution of assets or securities whether consisting of money, property or any other thing of value, or (iii) purchased or redeemed any of its equity securities.

      Section 6.9    Absence of Undisclosed Liabilities.

Except to the extent reflected or reserved for on the July 31, 2010 Balance Sheet, there are no Liabilities and Costs of the Company Group except for (i) Liabilities and Costs incurred in the ordinary course of business consistent with past practice since July 31, 2010, (ii) Liabilities and Costs disclosed on Schedule 6.9, and (iii) Liabilities and Costs that have not had or resulted in, and would not reasonably be expected to have or result in, a Material Adverse Effect.

      Section 6.10    No Material Adverse Changes.

Since July 31, 2010, whether or not in the ordinary course of business, there has not been, occurred or arisen: (i) any change in or event affecting the Company Group that has had or would reasonably be expected to have a Material Adverse Effect; (ii) any strike or other labor dispute affecting the Company Group; or (iii) any casualty, loss, damage or destruction (whether or not covered by insurance) of any material Asset.

      Section 6.11    Financial Statements.

      (a)    The Sellers have delivered to Purchaser copies of the unaudited consolidated financial statements of the Company Group for the six months ended January 31, 2011, consisting of the consolidated balance sheet as of March 31, 2011 and the related consolidated statements of income and retained earnings and cash flow for the eight months ended March 31, 2011, (the "Unaudited Financial Statements").

      (b)    The Sellers have also delivered to Purchaser a copy of the audited consolidated financial statements of the Company Group as of July 31, 2009 and July 31, 2010 (the "Audited Financial Statements," and collectively with the Unaudited Financial Statements, the "Existing Financial Statements"), consisting of the balance sheet as of July 31, 2009 and July 31, 2010 (the "July 31, 2010 Balance Sheet") and the related statements of income and retained earnings and cash flow for the years then ended.

      (c)    The Audited Financial Statements were prepared in accordance with GAAP and present fairly, in all material respects, the consolidated financial position, results of operations and cash flows of the Company Group as of the respective dates thereof and for the

respective periods covered thereby.  The Unaudited Financial Statements were prepared in accordance with GAAP (except for the absence of footnotes) and present fairly, in all material respects, subject to normal year-end adjustments, the consolidated financial position, results of operations and cash flows of the Company Group as of the respective dates thereof and for the respective periods covered thereby.

Section 6.12    Accounts Receivable.

Except as set forth on Schedule 6.12, all Receivables accrued on the July 31, 2010 Balance Sheet and all Receivables that have arisen since July 31, 2010 (i) resulted from valid sales in the ordinary course of business of the Company Group and represent bona fide transactions that require no further act on the part of any member of the Company Group to make such Receivables payable by the account debtors; (ii) to the Sellers' Knowledge, were not, and are not, subject to any claim, counterclaim, offset or deduction; (iii) represent valid obligations owing to the Company Group by account debtors that are not Affiliates of any member of the Company Group, which are enforceable in accordance with their respective terms; (iv) are not currently more than 90 days' past due; and (v) are owned by a member of the Company Group free and clear of all Encumbrances other than Permitted Encumbrances.

Section 6.13    Accounting Records; Internal Controls.

The accounting records of the Company Group accurately and validly reflect, in all material respects, the operations and financial position of the Company Group for the periods covered thereby and have been maintained in accordance with sound business practices.

Section 6.14    Company IP.

Schedule 6.14 identifies all agreements pursuant to which any member of the Company Group out-licenses or in-licenses any Company IP, except for in-licensed commercially available "off-the-shelf" software.  Schedule 6.14 also sets forth a list of all registered intellectual property used by any member of the Company Group in the conduct of the Business, including all pending or issued trademarks, patents, copyrights and domain names, and Schedule 6.14 identifies the owner or licensee of such intellectual property and whether such asset is owned or licensed.  A member of the Company Group owns or has a valid license to all Company IP.  To Seller's Knowledge, no member of the Company Group has been alleged to infringe any intellectual property right of any other Person and there is no claim or action pending or, to the Sellers' Knowledge, threatened orally or in writing, alleging any such infringement.  To the Sellers' Knowledge, the operation of the Business as presently conducted by the Company Group does not infringe any third-party intellectual property right.  To the Sellers' Knowledge, no other Person is infringing, misappropriating or violating the intellectual property rights of any member of the Company Group, and there are no contracts, licenses or agreements between any member of the Company Group and any other Person with respect to Company IP under which there is any dispute regarding the scope of such agreement, or performance thereunder, including with respect to any payments to be made or received by any member of the Company Group thereunder.

Section 6.15    Real Property.

(a)     Schedule 6.15(a) lists all real property that is owned, leased or used by any member of the Company Group (the "Real Property"), identifying which member of the Company Group owns, leases or uses such Real property and whether such Real Property is owned, leased or used and any lease agreement related thereto, and whether such member of the Company Group has subleased or granted any rights to any third parties for the use of such Real Property. Except as set forth on Schedule 6.15(a), the member of the Company Group identified as having an interest in the Real Property on Schedule 6.15(a) has (a) a valid leasehold interest in such Real Property, to the extent it is leased by a member of the Company Group, free and clear of any Encumbrances other than Permitted Encumbrances and (b) good, valid and marketable fee simple title to the Real Property, to the extent it is owned by a member of the Company Group, free and clear of all Encumbrances, other than Permitted Encumbrances and there are no outstanding options, rights of first offer or rights of first refusal to purchase such owned Real Property. Except as otherwise listed on Schedule 6.15(a), no member of the Company Group has owned any real property within the past seven (7) years.

(b)     There are no proceedings or claims, disputes, condemnations or special assessments affecting any of the Real Property that would interfere with the Company Group's use of such Real Property after the Closing Date in any material respect. No member of the Company Group has received notice from any Governmental Authority alleging a violation of any Law affecting the Real Property that has not been corrected. All of the current uses of the Real Property are permitted under applicable zoning, land use and other applicable Laws. No member of the Company Group has received notice of any claims, causes of action, lawsuits or legal proceedings pending or, to Seller's Knowledge, threatened regarding the ownership, use or possession of the Real Property.

Section 6.16   Tangible Personal Property.

Except as disclosed on Schedule 6.16, (i) the applicable member of the Company Group has good and marketable title to, or a valid leasehold interest (which is enforceable in accordance with its terms subject to laws of general application relating to bankruptcy, insolvency, the relief of debtors and rules of law governing injunctive relief and other equitable remedies) in, each item of Tangible Personal Property, free and clear of all Encumbrances other than Permitted Encumbrances, (ii) each item of Tangible Personal Property is in good operating condition and repair (subject to normal wear and tear), and is usable in the ordinary course of business, taking into account the circumstances, intended use and environment in which such Tangible Personal Property is deployed, and (iii) no item of Tangible Personal Property has been furnished to any member of the Company Group by a customer or other Person other than in connection with a bona fide sale or lease transaction.

Section 6.17   Insurance.

Each member of the Company Group is and at all times during the past two years has been, insured in amounts and against such risks as the Company reasonably believed to be appropriate based on the Company Group's business during such times, and all of the insurance policies and bonds maintained by it are in full force and effect.  Schedule 6.17 lists all insurance policies and bonds of the Company Group as in effect on the date hereof. No member of the Company Group is in default under any such policy or bond and no member of the Company

Group has received notice of any material increase in the premium under, cancellation or non-renewal of or disallowance of any claim under any such policy. The Company Group has timely filed claims with insurers with respect to all material matters and occurrences for which it has coverage. Each member of the Company Group has complied with and implemented in all material respects all outstanding (i) requirements of any insurance company that has issued a policy with respect to any of the material properties and assets of the Company Group and (ii) requirements of any Governmental Authority with respect to any such insurance policy.

Section 6.18    Tax Matters.

For the purposes of this Section 6.18, each member of the Company Group shall be deemed to include any predecessor of such member of the Company Group or any Person from which that member of the Company Group incurs a liability for Taxes as a result of transferee liability. Except as stated in Schedule 6.18:

(a)    Each member of the Company Group has duly and timely filed (or prior to the Closing Date will duly and timely file) all Tax Returns due on or prior to the Closing in all jurisdictions (whether federal, state, local or foreign) in which any such Tax Returns were due. All such Tax Returns were prepared in substantial compliance with applicable Law and were true, complete and correct in all material respects. All Taxes of or with respect to any member of the Company Group, whether or not shown on any Tax Return, have been paid on or prior to the due date thereof, and there is no current liability for any Taxes due and payable in connection with any such Tax Returns. There are no existing Encumbrances for Taxes, other than Permitted Encumbrances, upon any Assets of the Company Group. All applicable sales Taxes, to the extent due, were paid by the applicable member of the Company Group when the Assets were acquired by such member.

(b)    Each member of the Company Group has (i) withheld all required amounts from its employees, agents, contractors and other Persons and remitted such amounts to the proper agencies; (ii) paid all employer contributions and premiums and (iii) filed all federal, state, local and foreign Tax Returns with respect to employee income tax withholding, and social security and unemployment taxes and premiums, all in compliance with the withholding tax provisions of the Code and other applicable Laws;

(c)    To the Sellers' Knowledge, neither Company presently has (nor did it previously have) any permanent establishment in any foreign country, and neither Company presently engages (nor did it previously engage) in a trade or business within the meaning of the Code relating to the creation of a permanent establishment in any foreign country;

(d)    There is no Tax sharing, Tax allocation or other Tax-related agreement in effect among or between any member of the Company Group and any other Person, except as contemplated by this Agreement and no member of the Company Group is subject to any partnership, joint venture or other arrangement which is treated as a partnership for federal or state income Tax purposes;

(e)    No member of the Company Group has ever been a member of any consolidated, combined or unitary group for federal, state, local or foreign Tax purposes;

-33-

(f)     No member of the Company Group has executed or filed with any taxing authority (whether federal, state, local or foreign) any agreement or other document extending or waiving, or having the effect of extending or waiving, the period for assessment, reassessment or collection of any Taxes, and no power of attorney has been granted by any member of the Company Group with respect to any matter relating to Taxes that could affect a member of the Company Group in any taxable period ending after the Closing Date;

(g)     No federal, state, local or foreign Tax audits or other administrative proceedings, discussions or judicial proceedings are presently pending or being conducted with regard to any member of the Company Group and, to the Sellers' Knowledge, no additional issues are being asserted against any member of the Company Group in connection with any existing audit of any such member of the Company Group;

(h)     No member of the Company Group has received from any federal, state, local or foreign taxing authority (including jurisdictions where no member of the Company Group has filed Tax Returns) any (i) notice indicating an intent to open an audit or other review, (ii) request for information related to Tax matters, or (iii) notice of deficiency or proposed adjustment for any amount of Tax proposed, asserted, or assessed by any taxing authority against any member of the Company Group;

(i)     Schedule 6.18 lists all federal, state, local and foreign income Tax Returns filed with respect to any member of the Company Group other than the Joint Ventures for the three (3) preceding taxable years, indicates those Tax Returns that have been audited, and indicates those Tax Returns that currently are the subject of audit;

(j)     Sellers have delivered to Purchaser correct and complete copies of all income and franchise Tax Returns, examination reports, and statements of deficiencies assessed against or agreed to by any member of the Company Group other than the Joint Ventures filed or received in the preceding three (3) taxable years;

(k)     Within two years prior to the date of the Agreement, no member of the Company Group has distributed stock of another Person, or has had its stock distributed by another Person, in a transaction that was purported or intended to be governed in whole or in part by Section 355 or Section 361 of the Code;

(l)     No member of the Company Group will be required to include any item of income in, or exclude any item of deduction from, taxable income for any taxable period (or portion thereof) ending after the Closing Date attributable to income of any member of the Company Group that accrued in taxable period (or portion thereof) ending on or before the Closing Date for any reason, including as a result of (i) a "closing agreement," as described in Section 7121 of the Code (or any corresponding provision of state, local or foreign income Tax Law having similar effect), (ii) the installment method or open transaction method of accounting for any transaction entered into on or prior to the Closing Date, (iii) any prepaid amount received on or prior to the Closing Date, (iv) the long-term contract method of accounting, (v) an election under Section 108(i) of the Code or (vi) change in method of accounting for a taxable period ending on or prior to the Closing Date;

-34-

(m)   Each member of the Company Group has disclosed on its income Tax Returns all positions taken therein that, if not disclosed, could give rise to a material amount of penalties under Section 6662 of the Code or a similar provision of state, local or foreign Tax Law;

(n)   No member of the Company Group is or has been a party to any "reportable transaction," as defined in Section 6707A(c)(1) of the Code and Treasury Regulation Section 1.6011-4(b);

(o)   No member of the Company Group is or has been a "United States real property holding corporation," as defined in Section 897(c)(2) of the Code, during the applicable period specified in Section 897(c)(1)(A)(ii) of the Code;

(p)   Each member of the Company Group which is a foreign corporation for U.S. federal income Tax purposes has been a "controlled foreign corporation," within the meaning of Section 957 of the Code, at all times during the holding period (for U.S. federal income Tax purposes) of the Company and the Company has been a "United States shareholder," within the meaning of Section 951(b) of the Code, with respect to each such foreign member of the Company Group during that holding period;

(q)   No member of the Company Group is or has ever been a "passive foreign investment company" under the Code;

(r)   Each of the transactions and agreements set forth on Schedule 6.22 was entered into on an arm's-length basis and each such member of the Company Group is in compliance with all material transfer pricing requirements in all jurisdictions in which such member conducts business;

(s)   Each member of the Company Group has maintained, in all material respects, proper intercompany agreements and/or concurrent and supporting documentation as required under all applicable Tax Laws, such that, to the Sellers' Knowledge, no transfer pricing amounts will be denied as deductions in any jurisdiction by reason of a lack of proper agreements or supporting documentation;

(t)   Each member of the Company Group has complied in all material respects with applicable withholding and information reporting requirements; and

(u)   No member of the Company Group is the subject of any private letter ruling of the IRS or comparable ruling of any other Governmental Authority.

(v)   SGI has, at all times since its formation, been and will, up to and including the day before the Closing Date, be a "small business corporation" within the meaning of Section 1361(b) of the Code and has had and will have in effect at all times from and after its formation and up to and including the day before the Closing Date, a valid election under Section 1362(a) of the Code, and validly has been and will be treated during such period in a similar manner for purposes of the income Tax Laws of all state and local jurisdictions in which it has been subject to taxation where such treatment is legally available.

(w)    At all times since its formation and up to and including the day before the Closing Date, (i) SGI has had only one class of stock outstanding (treating for this purpose all classes of stock having identical rights to current and liquidating distributions as a single class, regardless of differences in voting power), (ii) SGI does not and has not had any outstanding options, contracts, indebtedness or other instruments or obligations which could constitute a second class of stock within the meaning of Section 1361(b)(1)(D) of the Code and Treasury Regulations Section 1.1361-1(l), (iii) there have been no binding agreements among SGI and its shareholders or other "governing provisions" within the meaning of Treasury Regulations Section 1.1361-1(l)(2)(i) that caused any of the outstanding capital stock of SGI to have different per share rights to distribution or liquidation proceeds from any other share of then outstanding capital stock, and (iv) all distributions by SGI with respect to its stock described in Section 1368(a) of the Code have been proportional to the ownership of the capital stock of SGI outstanding at the time of each such distribution. No Seller has taken or omitted or caused to be taken or omitted to be taken any actions which would cause SGI to cease to be treated prior to the completion of the Closing as a "small business corporation" within the meaning of Section 1361(b) of the Code for federal and applicable state and local income Tax purposes.

(x)    SGI has properly reported and paid any applicable Taxes with respect to any "net unrealized built-in gain" within the meaning of Section 1374(d) of the Code subject to taxation pursuant to Section 1374 of the Code (or comparable provisions of state and local Law).

Section 6.19   Litigation.

Except as set forth on Schedule 6.19, there is no claim, action, suit or judicial, administrative or regulatory proceeding or investigation pending or, to the knowledge of Sellers, threatened in writing against any member of the Company Group before any Governmental Authority, or before any arbitrator of any kind. No member of the Company Group is in default with respect to any Order by which it is bound or to which its property or any Assets is subject and there exists no Order enjoining or requiring any member of the Company Group to take any action of any kind. Neither any Seller nor any member of the Company Group, nor to the Sellers' Knowledge any other officer, director, manager or key employee of the Company Group, has been permanently or temporarily enjoined by any Order from engaging in or continuing any conduct or practice in connection with the operation or the management of the Company Group or the Business.

Section 6.20   Labor Relations.

(a)    Except to the extent such disclosure is prohibited by Law, set forth on Schedule 6.20(a) is a list of the names of the Company Group's management level employees as of the date hereof, together with the following information: job title; current compensation paid or payable and any change in compensation since July 31, 2010; vacation accrued; and service credited for purposes of vesting and eligibility to participate under any of the Company Group's pension, retirement, thrift-savings, cash bonus, severance pay, insurance, medical, welfare or vacation plan.   Unless otherwise indicated on Schedule 6.20(a), as of the date of this Agreement, no member of the Company Group has received written notice that any such employee intends to terminate his or her relationship with the Company Group.

(b)     No member of the Company Group is a party to or is subject to any collective bargaining agreement, and there are no strikes or other labor disputes against any member of the Company Group pending or, to the Sellers' Knowledge, threatened in writing against any member of the Company Group.  Each member of the Company Group has complied in all material respects with all Laws relating to the employment of labor, including those related to wages, hours, collective bargaining and occupational safety, and no member of the Company Group has received any notice alleging a failure to comply in any material respect with any Law or Order relating to the employment of labor.  No material controversies, disputes or proceedings are pending or, to the Sellers' Knowledge, threatened against any member of the Company Group with respect to its employees.  As of the date hereof, to the Sellers' Knowledge, there are no activities or proceedings of any labor union to organize non-unionized employees.  All payments due from any member of the Company Group for which any claim may be made against such member of the Company Group on account of wages and employee health and welfare insurance and other benefits have been paid or accrued as a liability on the financial statements of the Company Group, except as disclosed on Schedule 6.20(b).  To Sellers' Knowledge, no present or former employee, officer, consultant, director or manager of the Company Group or Purchaser will have as of the Closing Date any claim against any member of the Company Group or Purchaser for (i) any violation of any Law relating to minimum wages or maximum hours, or (ii) injuries or other damages which are not fully covered by the insurance policies of the Company Group.

Section 6.21     Employee Benefits.

(a)     Schedule 6.21(a) contains a complete list of all Plans.  Schedule 6.21(a) also (i) identifies, with respect to each Plan, each entity whose current or former employees, directors or other service providers are covered by or entitled to benefits under such Plan, (ii) identifies each Foreign Plan, and (iii) identifies each Plan that covers one or more Persons who are neither U.S. citizens nor U.S. residents and provides, with respect to each such Plan, a description of the Persons who are covered by such Plan.  Neither any member of the Company Group nor any ERISA Affiliate has any formal plan or commitment, whether legally binding or not, to create any additional plan or modify or change any existing Plan that would affect any current or former employee, director or other service provider of or to any member of the Company Group or any ERISA Affiliate.

(b)     With respect to each of the Plans, the Company has made available to Purchaser true and complete copies, to the extent applicable, of each of the following documents: (i) the Plan, the related trust agreement (if any), and all amendments to such Plan; (ii) the three most recent annual reports, actuarial reports, and financial statements, if any; (iii) the most recent summary plan description, together with each summary of material modifications, required under ERISA with respect to such Plan, and all material employee communications relating to such Plan, if any; (iv) the most recent determination letter or opinion letter received from the IRS with respect to each Plan that is intended to be qualified under the Code; and (v) all material communications to or from the IRS or any other governmental or regulatory authority relating to each Plan.

(c)     Except as disclosed on Schedule 6.21(c), no Plan is subject to Section 412, 430, 431 or 432 of the Code or Title IV or Section 302, 303, 304 or 305 of ERISA.  No liability

-37-

under Title IV of ERISA has been incurred by any member of the Company Group or any ERISA Affiliate that has not been satisfied in full, and no condition exists that presents a material risk to any member of the Company Group or any ERISA Affiliate of incurring a liability under such Title. No Plan subject to Section 412, 430, 431 or 432 of the Code or Section 302, 303, 304 or 305 of ERISA (i) has incurred an accumulated funding deficiency, whether or not waived, or (ii) has been, is, or would be (if the provisions of Section 430 applied to such Plan) in "at-risk status." None of the assets of any member of the Company Group or any ERISA Affiliate are subject to any lien arising under ERISA or Subchapter D of Chapter 1 of the Code, and no condition exists that presents a material risk of any such lien arising.

(d)     The Company's Board has approved termination of the DB Plan, and the Company has submitted a Form 500 notice to the PBGC in respect thereof. Upon its termination, the DB Plan was qualified under Section 401(a) of the Code and was in compliance with the requirements of ERISA and other applicable law in all material respects. Other than the distribution of DB Plan assets to plan participants and beneficiaries, the Company Group has no remaining liability or obligation (actual, contingent, or otherwise) with respect to the DB Plan.

(e)     Neither any member of the Company Group, nor any ERISA Affiliate, nor any of the US Plans, nor any trust created thereunder, nor any trustee or administrator thereof has engaged in a transaction in connection with which any member of the Company Group, any ERISA Affiliate, any of the US Plans or any such trust could, directly or indirectly, be subject to any civil liability or penalty pursuant to Title I of ERISA, a tax imposed pursuant to Chapter 43 of the Code, or any other liability.

(f)     All contributions required to have been made under the terms of any Plan or pursuant to ERISA and the Code have been timely made and all obligations in respect of each Plan have been properly accrued and reflected in the Existing Financial Statements.

(g)     Except as set forth on Schedule 6.21(g), none of the US Plans is, and neither any member of the Company Group nor any ERISA Affiliate has ever contributed to or had an obligation to contribute to or incurred any liability in respect of, a "multiemployer plan" (as defined in Section 3(37) of ERISA), a "multiple employer welfare arrangement" (as defined in Section 3(40) of ERISA), or a single employer plan that has two or more contributing sponsors, at least two of whom are not under common control, within the meaning of Section 4063(a) of ERISA.

(h)     Each US Plan that is intended to be "qualified" within the meaning of Section 401(a) of the Code is so qualified (and each corresponding trust is exempt under Section 501 of the Code) and has received or is the subject of a favorable determination letter, opinion letter, or advisory letter from the IRS relating to the most recently completed IRS remedial amendment period cycle ("RAP Cycle") applicable thereto covering all of the applicable provisions on the IRS cumulative list of covered qualification requirements for such RAP cycle, and nothing has occurred that would reasonably be expected to adversely affect the qualified status of any US Plan (or the exempt status of any related trust) or require the filing of a submission under the IRS's employee plans compliance resolution system ("EPCRS") or the taking of other corrective action pursuant to EPCRS in order to maintain such qualified (or exempt) status. No US Plan is the subject of any pending correction or application under

-38-

EPCRS. Each of the US Plans that is intended to satisfy the requirements of Section 125, 423 or 501(c)(9) of the Code satisfies such requirements. Each of the Plans has been operated and administered in all material respects in accordance with its terms and applicable Laws, including but not limited to ERISA and the Code.

(i)     No payment or benefit paid or provided, or to be paid or provided, to current or former employees, directors or other service providers of or to any member of the Company Group (including as a result of the transactions contemplated by this Agreement) will fail to be deductible for federal income tax purposes under Section 280G of the Code.

(j)     No member of the Company Group has classified any individual as an independent contractor, consultant, or non-employee, who, according to a Plan or applicable Law, should have been classified as an employee. No member of the Company Group has incurred, and no condition exists that presents a material risk of any member of the Company Group incurring, any liability under Section 3121(z)(3) of the Code.

(k)     There are no claims pending, or, to the Sellers' Knowledge, threatened or anticipated (other than routine claims for benefits) against or involving any Plan, the assets of any Plans or against any member of the Company Group or any ERISA Affiliate with respect to any Plan. There is no judgment, decree, injunction, rule or order of any Governmental Authority or arbitrator outstanding against or in favor of any Plan or any fiduciary thereof (other than rules of general applicability). There are no pending or threatened audits or investigations by any Governmental Authority involving any Plan.

(l)     No Plan provides benefits, including without limitation death or medical benefits (whether or not insured), with respect to current or former employees, directors or other service providers after retirement or other termination of service other than (i) coverage mandated by applicable Law, (ii) death benefits or retirement benefits under any "employee pension benefit plan" (as defined in Section 3(2) of ERISA), or (iii) deferred compensation benefits accrued as liabilities in the Existing Financial Statements. Except as set forth on Schedule 6.21(l), no US Plan is funded through a "welfare benefit fund" as defined in Section 419 of the Code.

(m)     Each Plan may be amended or terminated without liability to any member of the Company Group, other than liability for accrued benefits through the date of the amendment or termination and administrative costs of amending or terminating the Plan. Except as set forth in Schedule 6.21(m), neither the execution of this Agreement or any other Transaction Document, nor the consummation of the transactions contemplated hereby or thereby, will (either alone or together with any other event) result in or is a precondition to (i) any current or former employee, director or other service provider of or to any member of the Company Group becoming entitled to severance pay or any similar payment, (ii) the acceleration of the time of payment or vesting of, or an increase in the amount of, any compensation due to any current or former employee, director or other service provider of or to any member of the Company Group, or (iii) the renewal or extension of the term of any agreement regarding the compensation of any current or former employee, director or other service provider of or to any member of the Company Group.

(n)     Each Plan that provides deferred compensation subject to Section 409A of the Code complies with Section 409A of the Code (and has so complied for the entire period during which Section 409A of the Code has applied to such Plan), except as disclosed on Schedule 6.21(n). None of the transactions contemplated by this Agreement will constitute or result in a violation of Section 409A of the Code.

(o)     No Plan subject to Section 105(h) of the Code, Section 2716 of the Public Health Service Act, or (to the extent it incorporates Section 2716 of the Public Health Service Act) Section 9815 of the Code or Section 715 of ERISA, has failed to comply with the requirements thereof. Except as disclosed on Schedule 6.21(o), each Plan that provides group health plan or group or individual health insurance coverage, and in which an individual was enrolled on March 23, 2010, is a grandfathered health plan for purposes of 45 C.F.R. s. 147.140, 26 C.F.R. s. 54.9815-125IT and 29 C.F.R. s. 2590.715-1251, to the extent any such Plan is subject to such Laws.

(p)     No US Plan subject to Title 1 of ERISA holds any "employer security" or "employer real property" (each as defined in Section 407(d) of ERISA).

(q)     Except as disclosed on Schedule 6.21(q), all workers' compensation benefits paid or payable to any current or former employee, director or other service provider of or to any member of the Company Group are fully insured by a third party insurance carrier.

(r)     No member of the Company Group is a party (or has never been a party) to any Contract with a professional employer organization.

(s)     As of the Closing Date, the then fair market value of the assets held under each Plan that is subject to Title IV of ERISA will be sufficient so as to permit a "standard termination" of each such Plan under Section 4041(b) of ERISA without the need to make any additional contributions to such Plans. No reportable event under Section 4043 of ERISA has occurred or will occur with respect to any Plan on or before the Closing Date other than any reportable event occurring by reason of the transactions contemplated by this Agreement.

Section 6.22   Intercompany Transactions.

Except as set forth on Schedule 6.22, no member of the Company Group is currently engaged in a transaction with any other member of the Company Group, any Seller or any Affiliate or Associate of any Seller. No member of the Company Group has any liabilities or obligations to any Affiliate, any Seller or any Affiliate or Associate of any Seller and neither any Seller nor such Affiliates or Associates has any obligations to any member of the Company Group. Except as provided in this Agreement, the consummation of the transactions contemplated hereby will not (either alone, or upon the occurrence of any act or event, or with the lapse of time, or both) result in any payment arising or becoming due from any member of the Company Group or any of its successors or assigns to any Affiliate, any Seller or any Affiliate or Associate of any Seller.

Section 6.23   Governmental Approvals; Compliance with Laws.

Each member of the Company Group possesses all Governmental Approvals necessary to operate the Business. All such Governmental Approvals are in full force and effect, each member of the Company Group is in compliance in all material respects with their requirements, as applicable, and no proceeding is pending or, to the Sellers' Knowledge, overtly threatened to revoke or amend any of them.  Schedule 6.23 hereto contains a complete list of all such Governmental Approvals. The operations of the Company Group and the Business comply in all material respects with all applicable Laws and no member of the Company Group has received any written notice of any failure to comply with any applicable Laws which remains unresolved. No member of the Company Group is subject to any investigation, judicial or administrative proceeding, including voluntary or directed disclosure, or Order of or by a Governmental Authority.

Section 6.24    Environmental Matters.

Except as disclosed on Schedule 6.24:

(a)    Each member of the Company Group and the operation of the Business are, and since the formation of each such member of the Company Group have been, in compliance with all applicable Environmental Laws, all past non-compliance has been resolved without any pending, ongoing or future obligation, cost or liability and no member of the Company Group has received a written notice, demand, letter, claim or request for information indicating that such member of the Company Group may be, or at any point since its formation has been, in violation of or liable under any Environmental Law;

(b)    There is no civil, criminal, or administrative action, suit, demand, claim, notice of violation, investigation, or proceeding pending against any member of the Company Group or, to the Sellers' Knowledge, threatened against any member of the Company Group relating in any way to Environmental Laws;

(c)    No member of the Company Group has received a written notice or other communication from any Governmental Authority or other Person seeking information in connection with, or advising it that it is responsible for, or potentially responsible for, costs with respect to a release, a threatened release or a clean-up of Hazardous Substances generated, stored, treated, disposed of or transported by or for such member of the Company Group; and

(d)    The Company has provided Purchaser copies of all environmental reports, studies, assessments, and sampling data within their possession that have been issued within the past six years by or for any member of the Company Group, or by any Governmental Authority, relating to the property or operations of the Company Group.

Section 6.25    Brokers, Finders.

Other than Sagent Advisors (whose fees will be paid as part of the Transaction Expenses), neither this Agreement nor the sale, purchase and redemption of the Stock and the SGI Stock nor any other transactions contemplated by this Agreement was induced by or procured through or otherwise involved in any way any Person acting on behalf of or representing the Company Group or the Sellers as broker, finder, investment banker, financial advisor or in any similar capacity.

-41-

Section 6.26   Material Contracts.

Schedule 6.26 lists each Contract to which any member of the Company Group is a party or to which any member of the Company Group is subject or bound that (a) is a Customer Contract that provides for payments to or performance by the Company in an amount equal to or in excess of $25,000 per annum in the aggregate, (b) represents a Contract upon which any member of the Company Group is substantially dependent to conduct its Business as currently conducted or the absence of which would be reasonably expected to have a Material Adverse Effect, (c) is a supplier, vendor or other Contract that provides for payments by any member of the Company Group in excess of $25,000 per annum and which cannot be terminated by the applicable member of the Company Group after the Closing in accordance with its terms upon not more than 30 days' notice without penalty or cost, (d) limits or restricts the ability of any member of the Company Group to compete or otherwise to conduct its Business in any manner or place, (e) except for Contracts otherwise disclosed under other subsections on Schedule 6.26, provides for a guaranty or indemnity by any member of the Company Group in an amount in excess of $25,000, (f) grants a power of attorney, agency or similar authority to another Person, (g) except for Contracts otherwise disclosed under other subsections on Schedule 6.26, has an unexpired term as of the date hereof in excess of two years and which cannot be terminated by the applicable member of the Company Group after the Closing in accordance with its terms upon not more than 30 days' notice without penalty or cost, (h) provides for the sale of Assets or provision of Services outside the ordinary course of business of the Company Group, (i) grants any preferential right to purchase any Assets, (j) relates to a joint venture, partnership or teaming agreement involving any member of the Company Group or the Business, (k) represents a Contract for the employment of any director, manager, officer, consultant or employee or a Contract, program or policy providing for benefits or compensation to any director, manager, officer, consultant or employee, including the Company Group's standard form of employee nondisclosure and noncompete agreement entered with employees of the Company Group in the ordinary course of business, (l) is a Contract to which any Affiliate of any member of the Company Group or any Seller or any officer, director or manager of any member of the Company Group or any Seller, or any Associate of any such Person, is directly or indirectly a party, (m) is a lease or sublease related to any Real Property, or (n) is a Government Contract which provides for payments to any member of the Company Group equal to or in excess of $25,000 per annum (each of the Contracts described under clauses (a) through (m) being a "Material Contract"). True copies of each Material Contract, including all amendments and supplements thereto, have been made available to Purchaser. Except as set forth on Schedule 6.26, each Material Contract is valid and subsisting; the applicable member of the Company Group has duly performed in all material respects all of its obligations thereunder to the extent that such obligations to perform have accrued; and no breach or default, alleged breach or default, or event which would (with the passage of time, notice or both) constitute a material breach or default thereunder by the applicable member of the Company Group or, to the Sellers' Knowledge, any other party or obligor with respect thereto, has occurred or as a result of this Agreement or the performance hereof will occur. The sale and redemption of the Stock and the SGI Stock as contemplated by this Agreement will not (and will not give any Person a right to) terminate or modify any rights of, or accelerate any obligation of, any member of the Company Group under any Material Contract. With respect to each Material Contract, (x) the applicable member of the Company Group is in compliance, in all material respects, with all requirements of all agreements pertaining to such Material Contract and the applicable member of the

-42-

Company Group has received no written notice to the contrary, and (y) no material cost incurred by any member of the Company Group pertaining to such Material Contract has been formally questioned or challenged or, is the subject of any investigation. Except as set forth on Schedule 6.26, no material amount due to any member of the Company Group pertaining to such Material Contract has been withheld or offset nor has any claim been made to withhold or offset money. There exist no material disputes between any member of the Company Group and any party with whom the applicable member of the Company Group has contracted, any prime contractor, subcontractor or vendor arising under or relating to any Material Contract.

Section 6.27   FCPA.

(a)   To the Sellers' Knowledge, no member of the Company Group or any director, officer, agent, employee, partner of any member of the Company Group, has taken any action, directly or indirectly, that would result in: (i) a violation by such persons of the Foreign Corrupt Practices Act of 1977, as amended, 15 U.S.C. § 78dd-2, and the rules and regulations thereunder (the "FCPA"), including making use of the mails or any means or instrumentality of interstate commerce corruptly in furtherance of an offer, payment, promise to pay or authorization of the payment of any money, or other property, gift, promise to give, or authorization of the giving of anything of value to any "foreign official" (as such term is defined in the FCPA) or any foreign political party or official thereof or any candidate for foreign political office, in contravention of the FCPA; or (ii) a violation by such persons of any other applicable Laws relating to bribery or corruption (the "Anti-Corruption Laws").

(b)   Each member of the Company Group has conducted its business in compliance in all material respects with the FCPA and the Anti-Corruption Laws and has retained accurate books and records and instituted and maintained policies and procedures designed to ensure, and which are reasonably expected to continue to ensure, continued compliance therewith.

Section 6.28   Government Contracts.

(a)   In addition to the representations and warranties in Section 6.26 hereof, with respect to each and every Government Contract referred to in Section 6.26, as well as each bid made by a member of the Company Group on or prior to the date hereof with respect to Government Contract that has yet to be awarded, which, if accepted, would result in a Government Contract (a "Government Bid"), except as set forth on Schedule 6.26 or 6.28: (i) each member of the Company Group has complied with all material terms and conditions of such Government Contract; (ii) all representations, certifications and disclosures executed, acknowledged or set forth in or pertaining to such Government Contract were correct, accurate and complete in all material respects as of the dates they were made (or deemed made), and each member of the Company Group has complied in all material respects with all such representations, certifications and disclosure requirements; (iii) all Cost or Pricing Data (as defined in FAR § 15.401) and other information submitted by any member of the Company Group or any such member's subcontractors in support of the negotiation of Government Contracts, or modifications thereto, or in support of requests for payments thereunder, was, as of the date of price agreement or payment submission current, accurate and complete in all material respects; (iv) neither the U.S. Government nor any prime contractor, subcontractor or

-43-

other Person has notified any member of the Company Group, either in writing or, to the Sellers' Knowledge, orally, that such member of the Company Group has breached or violated any Law, Order, certification, representation, clause, provision, specification or requirement pertaining to such Government Contract; (v) no material cost incurred by any member of the Company Group pertaining to such Government Contract has been formally questioned or challenged or, to the Sellers' Knowledge, is the subject of any investigation or has been disallowed by the U.S. Government; (vi) no money due to any member of the Company Group pertaining to such Government Contract has been withheld or offset nor has any claim been made in writing or, to the Sellers' Knowledge, orally to withhold or offset money, and each member of the Company Group is entitled to all progress payments received with respect thereto; and (vii) no member of the Company Group has terminated any such Government Contract nor has any member of the Company Group been notified in writing or, to the Sellers' Knowledge, orally by the U.S. Government, any prime contractor, subcontractor or any other Person that any such Government Contract has been terminated for any reason and no cure notice, show cause, deficiency, default or similar notice is currently in effect pertaining to any such Government Contract.

(b)     (i) Neither any member of the Company Group nor, to the Sellers' Knowledge, any of its directors, managers, officers or cleared employees is (or during the last three years has been) under administrative, civil or criminal investigation, indictment or information by any Governmental Authority, or been subject to any audit or investigation with respect to any alleged irregularity, misstatement or omission arising under or relating to any Government Contract; (ii) during the last six years, no member of the Company Group has conducted or initiated any internal investigation or made a voluntary disclosure to the U.S. Government with respect to any alleged irregularity, misstatement or omission arising under or relating to a Government Contract.  To the Sellers' Knowledge, there exists no irregularity, misstatement or omission arising under or relating to any Government Contract that has resulted in (x) any of the consequences set forth in clause (i) or (ii) of the immediately preceding sentence or (y) any other Material Adverse Effect; and (iii) no member of the Company Group has made any mandatory disclosure under FAR Subpart 3.10 to any Governmental Authority with respect to credible evidence of a violation of federal criminal law involving fraud, conflict of interest, bribery or gratuity violations found in Title 18 of the United States Code or a violation of the civil False Claims Act with respect to any Government Contract, as a result of the three (3) year "look back" required by FAR 3.10.

(c)     There are (i) no outstanding material disputes between any member of the Company Group, and either the U.S. Government or any prime contractor, subcontractor, vendor or other third party, arising under or relating to any Government Contract; and (ii) no material claims or requests for equitable adjustment between any member of the Company Group and the U.S. Government or between any member of the Company Group and any prime contractor, subcontractor or vendor arising under or relating to any Government Contract.

(d)     Each member of the Company Group's accounting system meets in all material respects the requirements of the Federal Acquisition Regulations ("FAR") and Federal Cost Accounting Standards, as applicable.  To the Sellers' Knowledge, there are no reports resulting from any audits or other investigations by the Defense Contract Audit Agency or other United States Governmental Authority officials of any of the Government Contracts (past or

-44-

present) that conclude that any member of the Company Group engaged in overcharging or other defective pricing practices or in other practices in violation of the FAR.  To the Sellers' Knowledge, there are no audits or other investigations by United States Governmental Authority officials of any Government Contracts (past or present), which are either on-going or have been completed but the report of which has not yet been issued (and is expected to be issued) and which are expected to recommend fines, penalties or other sanctions.

(e)  No member of the Company Group delivers Products to a Governmental Authority, or performs Services for a Governmental Authority, other than pursuant to written Government Contracts.

(f)  No member of the Company Group has been awarded any Government Contract under any set-aside or preference for small businesses or under any other set-aside or preference program.

(g)  To the Sellers' Knowledge, no member of the Company Group has made payments in violation of law to any official of any governmental entity in violation of any law, including but not limited to, bribes, gratuities, kickbacks, lobbying expenditures, political contributions or contingent fee payments.

(h)  To the Sellers' Knowledge, no facts exist which could reasonably be expected to give rise to liability under a claim for fraud (as such concept is defined under the state or federal laws of the United States) in connection with any Government Contract under the United State civil or criminal False Claims Act, the United States Procurement Integrity Act or other Laws adopted by any other Governmental Authority, as applicable.

(i)  No member of the Company Group has received any adverse or negative past performance evaluation or rating in connection with any Government Contract within the past three (3) years and, to the Sellers' Knowledge, no facts exist that could result in any adverse or negative past performance evaluation or rating by any Governmental Authority or could adversely affect the evaluation of any member of the Company Group, or its successor's, bids or proposals for future Government Contracts.

(j)  To the Sellers' knowledge, there is no work or future business opportunities from which any member of the Company Group is currently limited, prohibited or otherwise restricted from performing or bidding, due to express organizational conflicts of interest (as defined by Subpart 9.5 of the FAR), Contract terms or provisions, or organizational conflicts of interest mitigation plans submitted by any member of the Company Group in connection with any Government Contract.

(k)  To the Sellers' Knowledge, no member of the Company Group is using any intellectual property developed under any Government Contract for purposes outside the scope of that Government Contract without having obtained the necessary prior permission of the applicable Governmental Authority.

(l)  Except as set forth on Schedule 6.28(k), no member of the Company Group has made any assignments of the Government Contracts or of any interests in the

-45-

outstanding Government Contracts.  No member of the Company Group has entered into any financing arrangements with respect to any outstanding Government Contract.

Section 6.29   Clearances.

Except to the extent disclosure is prohibited by the Industrial Security Manual, or any manual relating to clearances that may not be disclosed, Schedule 6.29 sets forth listings (including an indication of the type of clearance) of all facility security clearances held by each member of the Company Group and all personnel security clearances held by any officer, director, manager, employee, consultant or agent of the Company Group.  The Company Group holds all facility security clearances and the employees of the Company Group hold all personnel security clearances required under applicable Law that are required for the operation of the Business.  All material facility security clearances held by each member of the Company Group are currently in full force and effect.  No termination for default, notice of rescission, notice of revocation, notice of wrongdoing, notice of breach, cure notice or show cause notice from Defense Security Service or any other Governmental Authority has been issued and remains unresolved with respect to any such facility security clearances.

Section 6.30   Export Control Matters.

Each member of the Company Group is in compliance with all U.S. federal export control Laws applicable to it including, without limitation, the Arms Export Control Act, as amended (22 U.S.C. Section 2751 *et seq.*) and as implemented through executive order and the International Traffic in Arms Regulations (22 CFR 120-130), the Export Administration Act of 1979, as amended (50 U.S.C. App. 2401-2420) and as implemented through Executive Order, the Export Administration Regulations (15 CFR 730774) and the Laws implemented by the Office of Foreign Assets Control, U.S. Department of the Treasury (31 CFR 500 *et. seq.)* (collectively, the "**International Trade Laws**").  No member of the Company Group has received written notice that it is the subject of any enforcement actions or threats of enforcement actions that could affect the evaluation of the ability of any member of the Company Group (or its successors) to obtain approval for future export activity.  No Governmental Authority has notified any Seller or any member of the Company Group in writing of any actual or alleged violation or breach of any International Trade Laws.  Neither any Seller nor any member of the Company Group has received any notice of any pending audit, review, inspection, investigation, survey or examination of records by any Governmental Authority relating to the export activity of any member of the Company Group.  No member of the Company Group has been and is not now (i) under any criminal indictment involving alleged false statements, false claims or other improprieties relating to the export activity of any member of the Company Group, (ii) under, to Sellers' Knowledge, any administrative, civil or criminal investigation involving alleged false statements, false claims or other improprieties relating to the export activity of any member of the Company Group, or (iii) party to any administrative or civil litigation involving alleged false statements, false claims or other improprieties relating to the export activity of any member of the Company Group; and to the Sellers' Knowledge there is no basis for any such indictment, investigation or litigation.  To Sellers' Knowledge, all of the Products and technical data (as defined in the Export Administration Regulations ("EAR")) that the Company Group makes, sells or otherwise distributes that are subject to the EAR and have a Export Control

-46-

Classification Number ("ECCN") other than EAR99 are listed (along with their respective ECCNs) in Schedule 6.30.

Section 6.31   Accounts Payable.

All of the accounts payable reflected on the July 31, 2010 Balance Sheet and all accounts payable that have arisen since July 31, 2010 arose from bona fide purchases of goods and services of the Company Group in the ordinary course of business.

Section 6.32   Customers.

No material customer of the Company Group has decreased materially or, to the Sellers' Knowledge, overtly threatened or expressed an intention to decrease materially its purchases of Services or Products from the Company Group since July 31, 2010.   Except as set forth on Schedule 6.32, since July 31, 2010, to the Sellers' Knowledge, there has been no termination, cancellation, or limitation of, or any material modification or change in, the business relationship of the Company Group with any material customer.

Section 6.33   Absence of Undisclosed Changes.

Since July 31, 2010, other than as set forth on Schedule 6.33 or in the Existing Financial Statements, and other than the transactions contemplated by this Agreement or as approved by Purchaser pursuant to Section 4.3 hereof, there has not been any entry by any member of the Company Group into any commitment or transaction material to the Company Group taken other than in the ordinary course of the Business. In addition, since July 31, 2010, other than as set forth on Schedule 6.33 or in the Existing Financial Statements, and other than the transactions contemplated by this Agreement or as approved by Purchaser pursuant to Section 4.3 hereof, there has not been (a) any change by any member of the Company Group in its accounting methods, principles and practices, (b) any reevaluation by any member of the Company Group of any assets (including, without limitation, any write down of inventory or write-off of accounts receivable) other than as required by GAAP, or (c) any action or event of the type prohibited by Section 4.3 hereof.

Section 6.34   Bank Accounts.

(a)   Schedule 6.34 lists the names and location of all banks and other financial institutions with which any member of the Company Group maintains an account (or at which an account is maintained to which any member of the Company Group has access as to which deposits are made on behalf of any member of the Company Group), in each case listing the type of account, the account number therefor, and the names of all persons authorized to draw thereupon or having access thereto and lists the locations of all safe deposit boxes used by the Company Group.

ARTICLE 7
REPRESENTATIONS AND WARRANTIES OF PURCHASER

Purchaser hereby represents, warrants and agrees for the benefit of the Sellers as follows:

-47-

Section 7.1    Organization and Standing of Purchaser.

Purchaser is a limited liability company duly organized, validly existing and in good standing under the laws of the State of Delaware.

Section 7.2    Authorization and Binding Obligation of Purchaser.

Purchaser has the requisite limited liability company power and authority to enter into and perform this Agreement and all other Transaction Documents. All limited liability company action on the part of Purchaser and the managers and officers of Purchaser necessary for the authorization, execution and delivery of this Agreement and all other Transaction Documents and for the performance of all of their respective obligations hereunder and thereunder, as the case may be, have been taken or will have been taken as of the Closing Date, and each of this Agreement and each of the other Transaction Documents, when executed and delivered, shall constitute valid and legally binding obligations of Purchaser, enforceable in accordance with their respective terms, except as may be limited by (i) bankruptcy, insolvency, or other similar laws affecting the enforcement of creditors' rights generally and (ii) general principles of equity (whether enforcement is sought at law or in equity).

Section 7.3    Ability to Perform Obligations.

Purchaser is not a party to, subject to, or bound by any agreement, Law or Order of any Governmental Authority that could prevent or materially impair (i) the performance of its obligations under this Agreement, or (ii) the purchase and receipt of, or the right to purchase or receive any Purchased Stock or SGI Stock.

Section 7.4    Non-Contravention.

(a)    Neither the execution and delivery by Purchaser of this Agreement or the other Transaction Documents, the performance by Purchaser of its obligations hereunder or thereunder, nor the performance or consummation by Purchaser of the transactions contemplated hereby or thereby will (i) violate or conflict with any provision of the certificate of formation, Purchaser LLC Agreement or other organizational documents of Purchaser, (ii) violate or conflict with any Law or Order to which Purchaser is subject or bound, (iii) require the approval of, notice to, or a filing or registration with any Governmental Authority, (iv) whether after notice or lapse of time or both, violate, breach or conflict with any provision of, result in the loss of a material benefit under, or permit the termination or acceleration of any Contract to which Purchaser is a party, (v) require any authorization, consent or approval of, exemption or other action by, or notice to, any party to any Contract to which Purchaser is a party or (vi) result in the creation or imposition of any Encumbrance (other than Permitted Encumbrances) upon any of the Membership Interests.

Section 7.5    Brokers, Finders.

Neither this Agreement nor the sale and purchase of the Stock and the SGI Stock or any other transaction contemplated by this Agreement was induced by or procured through or otherwise involved in any way any Person acting on behalf of or representing Purchaser as broker, finder, investment banker, financial advisor or in any similar capacity.

Section 7.6     No Legal Proceedings.

There is no action, suit, claim, proceeding or investigation pending or threatened against, relating to or affecting Purchaser or its assets and properties in a matter that would adversely affect its ability to perform its obligations under this Agreement or any Transaction Document to which it is a party.

Section 7.7     Securities Act of 1933.

The Purchased Stock and the SGI Stock are being acquired for investment only and not with a view to any public distribution thereof, and Purchaser will not offer to sell or otherwise dispose of the Purchased Stock or the SGI Stock so acquired by it in violation of the Securities Act of 1933, as amended, and the rules and regulations promulgated thereunder or the applicable state securities laws of any state.

Section 7.8     No Other Representations.

Purchaser hereby acknowledges and agrees that neither the Sellers nor either Company are making any representation, warranty or covenant whatsoever, express or implied, except those representations, warranties and covenants expressly set forth in this Agreement, any other Transaction Document or in the Disclosure Schedule or in any certificate contemplated hereby and delivered in connection herewith.  In any event, except as expressly set forth in this Agreement, none of Sellers, neither Company or any of its officers, directors, partners, employees, affiliates or representatives, as the case may be, has made or is making any representation, warranty or covenant express or implied, as to any warranty of merchantability, suitability or fitness for a particular purpose or quality, with respect to any of the tangible assets being so acquired, or as to the condition or workmanship thereof, or as to the absence of any defects therein, whether latent or patent.

Section 7.9     Solvency.

Immediately after giving effect to the transactions contemplated by this Agreement or any of the other Transaction Documents, including the closing of any Debt Financing, each of Purchaser and each Company shall (i) be able to pay its debts as they become due, and (ii) shall have adequate capital to carry on its business; provided, that neither Purchaser nor either Company shall have any liability to the Sellers for breach of this Section 7.9 to the extent such breach is attributable to any matter that results in a breach of the Sellers representations and warranties set forth in Article 6.  No transfer of property is being made and no obligation is being incurred in connection with the transactions contemplated by this Agreement or any of the other Transaction Documents, including the closing of any financing to be obtained by Purchaser or any of its Affiliates in order to effect the transactions contemplated hereby, with the intent to hinder, delay or defraud either present or future creditors of Purchaser or any member of the Company Group.

ARTICLE 8
TERMINATION

Section 8.1     Termination of Agreement.

-49-

The parties hereto may terminate this Agreement as provided below:

(a)    Purchaser, the Sellers and either Company may terminate this Agreement by mutual written consent at any time prior to the Closing.

(b)    Purchaser may terminate this Agreement by giving written notice to the Sellers and the Companies at any time prior to the Closing in the event:

(i)    any Seller or either Company is in material breach of any covenant contained in this Agreement and such material breach is not cured within thirty (30) days after written notice from Purchaser of such breach; or

(ii)    the representations and warranties of the Sellers and the Companies contained in this Agreement shall have been untrue in any material respect on the date when made (or in the case of any representations or warranties that are made as of a different date or period, as of such different date or period), in any case only to the extent that such material breach or inaccuracy of a representation or warranty is not cured within thirty (30) days after the date of the applicable notice.

(c)    The Sellers and the Companies may terminate this Agreement by giving written notice to Purchaser at any time prior to the Closing in the event:

(i)    Purchaser is in material breach of any covenant contained in this Agreement and such material breach is not cured within thirty (30) days after written notice from the Sellers and the Companies of such breach; or

(ii)    the representations and warranties of Purchaser contained in this Agreement shall have been untrue in any material respect on the date when made (or in the case of any representations or warranties that are made as of a different date or period, as of such different date or period), in any case only to the extent that such material breach or inaccuracy of a representation or warranty is not cured within thirty (30) days after the date of the applicable notice.

(d)    Purchaser may terminate this Agreement by giving written notice to the Sellers and the Companies at any time prior to the Closing if the Closing has not occurred on or before July 31, 2011, by reason of the failure to occur of any closing condition under Article 9 (unless the failure results primarily from Purchaser breaching any representation, warranty or covenant contained in this Agreement).

(e)    The Sellers and the Companies may terminate this Agreement by giving written notice to Purchaser at any time prior to the Closing if the Closing has not occurred on or before July 31, 2011, by reason of the failure to occur of any closing condition under Article 10 (unless the failure results primarily from any Seller or the Companies breaching any representation, warranty or covenant contained in this Agreement).

Section 8.2    Effect of Termination.

-50-

If any party terminates this Agreement pursuant to Section 8.1, all obligations of the parties hereunder will terminate without liability of any party to the other party; provided, that the provisions of this Section 8.2, Section 8.3 and Article 13 will survive termination and remain in full force and effect; and provided, further, that no such termination shall release any party of liability to any other party for damages or otherwise by reason of the breach of any of the provisions of this Agreement.

Section 8.3   Termination Fee.

(a)   In the event of the termination of this Agreement by Sellers pursuant to Section 8.1(e), Purchaser and Sponsor Affiliate shall pay to each Seller its Pro Rata Share of a termination fee in an aggregate amount of $1,000,000, due and payable in immediately available funds within ten (10) business days after the demand therefor, which demand may only be made following the occurrence of the termination event giving rise to the payment obligation described in this Section 8.3.

(b)   In the event that Sellers shall receive full payment pursuant to this Section of the amounts due hereunder, the receipt of such payment shall be deemed to be liquidated damages for any and all losses or damages suffered or incurred by Sellers or any other person in connection with this Agreement (and the termination of this Agreement), the transactions contemplated this Agreement (and the abandonment thereof) or any matter forming the basis for such termination, and neither Sellers nor any other Person shall be entitled to bring or maintain any other claim, action or proceeding against Purchaser, Sponsor Affiliate or any of their Affiliates arising out of this Agreement, any of the transactions contemplated by this Agreement or any matters forming the basis for such termination.

(c)   The parties acknowledge that the agreements contained in this Section are an integral part of the transactions contemplated by this Agreement and that, without these agreements, the parties would not enter into this Agreement. Except as provided in this Section 8.3, payment of the fees and expenses described in this Section 8.3 shall constitute the sole and exclusive remedy of the Sellers in connection with any such termination of this Agreement pursuant to Section 8.1(e).

ARTICLE 9
CLOSING CONDITIONS OF PURCHASER

The obligations of Purchaser to consummate the transactions contemplated by this Agreement are subject to the satisfaction at or prior to the Closing Date of each of the following conditions, any one or more of which may be waived (but only in writing) by Purchaser (provided that no such waiver shall be deemed to have cured any breach of any representation, warranty or covenant made in this Agreement):

Section 9.1   Representations, Warranties and Covenants of the Sellers and the Companies.

(i)   All of the representations and warranties made by the Sellers and the Companies, or any one of them, in this Agreement shall be true and correct, in the case of any representation or warranty that is qualified as to materiality or words of similar import, in all respects, and in the

-51-

case of any representation or warranty that is not so qualified, in all material respects, in each case as of the date hereof and as of the Closing Date as though made at and as of the Closing Date (except to the extent such representations and warranties speak as of an earlier date, which shall be true and correct (as applicable, in all material respects) as of such date); (ii) the Companies and the Sellers shall have performed and complied with all agreements and covenants required by this Agreement to be performed or complied with by them on or prior to the Closing Date; and (iii) with respect to clauses (i) and (ii), at the Closing there shall be delivered to Purchaser a certificate signed by the Sellers and a duly authorized officer of the Companies to the foregoing effect.

Section 9.2    Deliveries to Be Made by the Companies and the Sellers at the Closing.

At the Closing, the Companies and the Sellers, as applicable, shall deliver or cause to be delivered to Purchaser the following in form and substance reasonably satisfactory to Purchaser:

(a)    original certificates representing all of the Purchased Stock and SGI Stock, which certificates shall be either duly endorsed for transfer or accompanied by stock powers executed in blank;

(b)    copies of resolutions of the stockholders and/or directors of the Companies authorizing and approving the execution and delivery of this Agreement and the other Transaction Documents and the performance by the Companies of their respective obligations hereunder and thereunder, certified by an authorized officer of each Company;

(c)    an incumbency certificate dated the Closing Date for each Company executed by an authorized office of each Company which shall identify the name and title and bear the signature of the officer of each Company individually authorized to execute and deliver this Agreement and the other Transaction Documents;

(d)    a good standing certificate, or similar document, for each member of the Company Group, dated as of a date within 30 days of the Closing Date, from the jurisdiction of its organization or formation and each other jurisdiction in which it is required to be qualified to do business;

(e)    copies of the organizational documents of each member of the Company Group certified by a duly authorized officer of each such member of the Company Group;

(f)    resignations, effective as of the Closing Date, of all directors and managers of each member of the Company Group and the resignations of those officers of the members of the Company Group requested by Purchaser prior to the Closing;

(g)    a statement prepared by each Company in accordance with Treasury Regulation Section 1.1445-2(c)(3) certifying that neither the Stock nor the SGI Stock is a "U.S. real property interest"; and

(h)    all other documents, assurances and other matters provided in this Agreement to be delivered to Purchaser at or before the Closing and not delivered to Purchaser

before the Closing, including, but not limited to, the duly executed Employment Agreements, Purchaser LLC Agreement and Contribution Agreement.

Section 9.3    Third Party Consents.

All consents and approvals identified on Schedule 6.3 required in order for the Sellers to perform their obligations under this Agreement shall have been obtained by the Sellers.

Section 9.4    Orders; Illegality.

There shall not be in effect any Law or Order which enjoins, prohibits, makes illegal or materially restricts or otherwise prevents the consummation of the transactions contemplated hereby.

Section 9.5    Absence of Investigations and Proceedings.

There shall be no investigation or proceeding before or by any Governmental Authority pending or threatened to which any member of the Company Group or any Seller is or may be a party that would reasonably be expected to have a Material Adverse Effect. No proceeding or formal investigation by any Governmental Authority shall be pending or threatened, with the object of challenging or preventing consummation of the transactions contemplated by this Agreement and no other proceedings shall be pending with such object or to collect damages from Purchaser (that if successful, would have a Material Adverse Effect).

Section 9.6    Owned Real Property.

All Real Property owned by any member of the Company Group shall have been sold, assigned, transferred or otherwise conveyed such that, as of the Closing, no member of the Company Group owns any Real Property.

Section 9.7    Absence of Certain Changes.

Between the date of this Agreement and the Closing Date, there shall have been no events, occurrences or conditions that have had or could reasonably be expected to have a Material Adverse Effect.

Section 9.8    Closing Date Indebtedness; Release of Encumbrances.

The Closing Date Indebtedness shall have been repaid in full by disbursement of a portion of the Redemption Purchase Price as provided in Section 2.4(c), and the Sellers shall have delivered to Purchaser evidence, reasonably satisfactory to Purchaser, showing that the Closing Date Indebtedness has been paid in full and that all Encumbrances in respect of the Closing Date Indebtedness affecting any Assets of the Company Group or equity of any member of the Company Group have been released.

Section 9.9    Transaction Expenses.

All Transaction Expenses incurred by the Sellers or the Company on behalf of the Sellers or itself in connection with the transactions contemplated under this Agreement shall have been paid in full by disbursement of a portion of the Redemption Purchase Price as provided in Section 2.4(c).

Section 9.10   Key Employees.

The Company or Purchaser shall have entered into non-competition and non-solicitation agreements with each of the Key Employees, on such terms as may be reasonably satisfactory to Purchaser.

Section 9.11   Delivery of Stock Certificates for Redeemed Stock.

At the Closing, the Company Stockholder shall deliver or cause to be delivered to the Company original certificates representing all of the Redeemed Stock which certificates shall be either duly endorsed for transfer or accompanied by stock powers executed in blank.

Section 9.12   Minimum Cash Amount.  The Company Group shall have Cash on hand that is at least equal to the Minimum Cash Amount.  For purposes of this Section 9.12 it is agreed between the parties that prior to Closing the Company Group may make distributions of Cash to the Sellers (including, without limitation, salary, bonuses, commissions and tax distributions), as long as such distributions will not cause the Cash on hand at the Company Group to be less than the Minimum Cash Amount.

Section 9.13   The Company Stockholder.

Sallyport Global Services, Ltd., a Subsidiary of the Company, shall have been replaced as trustee of the Company Stockholder with a trustee reasonably acceptable to Purchaser.

Section 9.14   Trust Account Amount.

Prior to the Closing, the Sellers and Purchaser shall have mutually agreed upon an additional amount of the Redemption Purchase Price to be placed into the Trust Account, if any, which amount shall be added to the Trust Account Amount.

ARTICLE 10
CLOSING CONDITIONS OF THE SELLERS

The obligations of the Sellers and the Companies to consummate the transactions contemplated by this Agreement are subject to the satisfaction at or prior to the Closing Date of each of the following conditions, any one or more of which may be waived (but only in writing) by the Sellers and the Companies (provided that no such waiver shall be deemed to have cured any breach of any representation, warranty or covenant made in this Agreement):

Section 10.1   Representations, Warranties and Covenants of Purchaser.

(i) All of the representations and warranties made by Purchaser in this Agreement shall be true and correct, in the case of any representation or warranty that is qualified as to

-54-

materiality or words of similar import, in all respects, and in the case of any representation or warranty that is not so qualified, in all material respects, as of the date hereof and as of the Closing Date as though made at and as of the Closing Date (except to the extent such representations and warranties speak as of an earlier date, which shall be true and correct (as applicable, in all material respects) as of such date); (ii) Purchaser shall have performed and complied with all agreements and covenants required by this Agreement to be performed by it on or prior to the Closing Date; and (iii) with respect to clauses (i) and (ii), at the Closing there shall be delivered to the Sellers a certificate signed by a duly authorized officer of Purchaser to the foregoing effect.

Section 10.2   Deliveries to be Made by Purchaser at the Closing.

At the Closing, Purchaser shall deliver or cause to be delivered to the Sellers the following:

(a)   the portion of the Total Purchase Price due at Closing, as provided in Section 2.4;

(b)   a copy of the resolutions of the board of managers of Purchaser authorizing the execution and delivery of this Agreement and the other Transaction Documents and the performance by Purchaser of its obligations hereunder and thereunder, certified by a duly authorized officer of Purchaser;

(c)   an incumbency certificate dated the Closing Date for Purchaser executed by a duly authorized officer of Purchaser which shall identify the name and title and bear the signature of each officer of Purchaser individually authorized to execute and deliver this Agreement and the other Transaction Documents;

(d)   a duly executed copy of the Purchaser LLC Agreement having schedules reflecting the Membership Interests issued to the Company Stockholder in connection with the contribution of the Rollover Stock; and

(e)   all other documents, assurances and other matters provided in this Agreement to be delivered to the Sellers at or before the Closing and not delivered to the Sellers before the Closing including, but not limited to, the duly executed Employment Agreements and the Contribution Agreement.

Section 10.3   Third Party Consents.

All consents and approvals required to be obtained by Purchaser in order to consummate the transactions contemplated by this Agreement shall have been obtained by Purchaser.

Section 10.4   Orders; Illegality.

There shall not be in effect any Law or Order which enjoins, prohibits, makes illegal or materially restricts or otherwise prevents the consummation of the transactions contemplated hereby.

Section 10.5   Absence of Investigations and Proceedings.

There shall be no investigation or proceeding before or by any Governmental Authority pending or threatened to which Purchaser is or may be a party that would reasonably be expected to have a Material Adverse Effect. No proceeding or formal investigation by any Governmental Authority shall be pending or threatened, with the object of challenging or preventing consummation of the transactions contemplated by this Agreement and no other proceedings shall be pending with such object or to collect damages from any member of the Company Group or any Seller (that if successful, would have a Material Adverse Effect).

## ARTICLE 11
## INDEMNIFICATION; SURVIVAL OF REPRESENTATIONS AND WARRANTIES

Section 11.1   Indemnification by the Sellers.

Subject to the terms and conditions of this Article 11, each of the Sellers and (only prior to the Closing) the Companies, jointly and severally, agree to indemnify and hold harmless Purchaser, the Purchaser's Affiliates and their respective members, shareholders, managers, directors, officers, employees, agents, successors in interest, assigns and representatives (collectively, the "Purchaser Indemnified Parties") from and against any and all Losses which may be incurred or suffered by any such party and which arise out of or result from:

(a)   any inaccuracy in or breach of any of the representations and warranties made by any Seller or the Company under Article 6 of this Agreement (it being agreed and understood that for purposes of determining whether there is an inaccuracy or breach of any representation or warranty in Section 6.18, no disclosure on Schedule 6.18 shall be deemed to qualify the representations and warranties in Section 6.18);

(b)   any breach or nonperformance of any of the covenants or agreements made by any Seller or, prior to the Closing, the Company in or pursuant to this Agreement;

(c)   any Transaction Expenses or Closing Date Indebtedness that remains unpaid following the Closing that did not result in a reduction of the Redemption Purchase Price (or other purchase price component payable hereunder) pursuant to Section 2.4(c);

(d)   sponsoring, maintaining or terminating the DB Plan, including but not limited to (i) any administrative expenses related thereto (including but not limited to actuarial, legal, record-keeping and third party administration expenses), and (ii) any requirement to fund or make premium or other payments or contributions in respect of the DB Plan in connection with its termination; and

(e)   any demand, claim, suit, action, cause of action, proceeding or assessment brought by any former stockholder of the Company.

Section 11.2   Indemnification by Purchaser and the Company.

Each of the Purchaser and (only prior to the Closing) the Sponsor Affiliate and (only after the Closing) the Companies, jointly and severally, agree to indemnify and hold harmless each of the Sellers, the Sellers' Affiliates and their respective members, shareholders, managers, directors, officers, employees, agents, successors in interest, heirs, assigns and representatives from and against any and all Losses which may be incurred or suffered by any such party and which arise out of or result from:

      (a)    any inaccuracy in or breach of any of the representations and warranties made by Purchaser under Article 7 of this Agreement; and

      (b)    any breach or nonperformance of any of the covenants or agreements made by Purchaser in or pursuant to this Agreement.

Section 11.3  <u>Cooperation</u>.

The parties shall cooperate in the defense of all third party claims which may give rise to Indemnifiable Claims hereunder. In connection with the defense of any claim, each party shall make available to the party controlling such defense any books, records or other documents within its control and access to employees that are reasonably requested in the course of such defense.

Section 11.4  <u>Limitations on Indemnification</u>.

      (a)    Except as set forth in Section 11.4(c), the Sellers shall not be required to indemnify any other Person under Section 11.1(a) unless and until the aggregate of all amounts for which indemnity would otherwise be payable by the Sellers under this Article 11 exceeds $200,000 (the "<u>Basket</u>"); thereafter, the Sellers shall only be responsible for all such amounts in excess of the Basket. Except as set forth in Section 11.4(c), Purchaser and (only after the Closing) the Companies shall not be required to indemnify any other Person under Section 11.2(a) unless the aggregate of all amounts for which indemnity would otherwise be payable by Purchaser and the Company exceeds the Basket; thereafter, Purchaser and the Companies shall only be responsible for all such amounts in excess of the Basket.

      (b)    Except as set forth in Section 11.4(c): (i) the Sellers' indemnity obligations for Losses under Sections 11.1(a) and 11.1(d) shall be limited, in the aggregate, to $4,000,000 (the "<u>Cap</u>"); and (ii) Purchaser's and (only after the Closing) the Company's indemnity obligations for Losses under Section 11.2(a) shall be limited, in the aggregate, to the Cap.

      (c)    Notwithstanding any provision contained in this Agreement to the contrary, the limitations contained in Section 11.4(a) shall not apply with respect to any Losses relating to or arising from any inaccuracy in or breach of any of the representations and warranties contained in Section 6.21 hereof to the extent related to the DB Plan. Notwithstanding any provision contained in this Agreement to the contrary, the limitations contained in Sections 11.4(a) and 11.4(b) shall not apply with respect to any Losses relating to or arising from (i) willful misrepresentation or fraud and (ii) any inaccuracy in or breach of any of the representations and warranties contained in (A) with respect to the Sellers, Sections 6.2, 6.4, 6.5, 6.18 and 6.25 hereof; and (B) with respect to Purchaser, Sections 7.2, 7.5 and 7.9

hereof (collectively, the "Excluded Representations and Warranties"). The Sellers' indemnification obligations, on the one hand, and the Purchaser's and the Companies' indemnification obligations, on the other hand, under this Article 11 with respect to any Losses relating to or arising from any inaccuracies or breaches of their Excluded Representations and Warranties shall be limited, in the aggregate, to an amount equal to the aggregate Base Purchase Price and Redemption Purchase Price actually paid to the Sellers (including the Initial Holdback Amount and the Trust Account Amount). It is the Sellers' obligation to pay all Taxes constituting a Seller Tax Liability under Section 5.2, including foreign Taxes. Notwithstanding the immediately preceding sentence, and notwithstanding any provision contained in this Agreement to the contrary, the Sellers' indemnification obligations resulting from the Sellers' failure to pay foreign Taxes shall be limited, in the aggregate, to $4,000,000 solely in respect of those foreign Taxes that are ultimately owed by any member of the Company Group but that the Company, as of the Closing, did not know, and could not have known after reasonable inquiry, that it would have an obligation to pay.

(d)     As between the Sellers only (and without prejudice to the joint and several nature of the Sellers' indemnification obligations under Section 11.1), to the extent that a particular Seller is required hereunder to pay more than such Seller's Pro Rata Share of Losses hereunder (the "Excess Seller") and the other Seller pays less then such Seller's Pro Rata Share of such Losses hereunder (the "Shortfall Seller"), the Shortfall Seller hereby agrees to indemnify and reimburse the Excess Seller with respect to such difference, such amount due and payable promptly upon demand with any unpaid amounts bearing interest at the annual rate of 10% until paid. Notwithstanding the foregoing, as between the Sellers only, any indemnification obligations that result from the transaction pursuant to which the Company Stockholder acquired the Stock held by it or the preceding events and transactions relating thereto shall be the sole obligation of the Company Stockholder.

(e)     Any payment made by the Companies or the Sellers pursuant to this Article 11 in respect of any claim for Losses will be net of any insurance proceeds realized by and paid to the indemnified party or its Affiliates in respect of such claim.

(f)     No Person entitled to indemnification hereunder will be entitled to recover from the indemnifying party any Losses in excess of the actual damages suffered by such Person, and the parties waive any right to recover consequential, special, punitive or exemplary damages arising in connection with or with respect to the indemnification provisions hereof; provided, that such waiver shall not apply to any such Losses that are incurred by an Indemnified Party to the extent such damages are claimed by a third party in a claim, lawsuit or arbitration against an Indemnified Party.

(g)     Each party entitled to indemnification hereunder will take all reasonable steps to mitigate all Losses after becoming aware of any event which could reasonably be expected to give rise to any Losses that are indemnifiable or recoverable hereunder.

(h)     Except for specific performance (as provided in Section 13.13) or other equitable remedies that may be available to enforce the agreements, covenants or obligations under this Agreement, and except in the case of fraud or willful misrepresentation, the indemnification obligations under this Article 11 are the parties' sole and exclusive remedies,

-58-

each against the other, with respect to matters arising under this Agreement, of any kind or nature. The parties hereby waive and release any other rights, remedies, causes of action or claims arising under this Agreement, of any kind or nature.

(i)     Any indemnification payments under this Article 11 will be treated, for Tax purposes, as adjustments to the Base Purchase Price and the Redemption Purchase Price.

(j)     Seller Indemnification Obligations shall first be satisfied by a reduction of the Initial Holdback Amount, and thereafter shall be paid in cash by the Sellers, to the extent not otherwise limited pursuant to this Article 11; provided, however, that with respect to any Seller Indemnification Obligations for which recovery may be available from the Trust Account pursuant Section 2.3(b), the Purchaser Indemnified Parties shall first seek recourse against the Trust Account, in accordance with the terms and conditions of the Trust Account Agreement.

Section 11.5   Notice to Indemnifying Party.

If any party (the "Indemnified Party") receives notice of any claim or other commencement of any action or proceeding with respect to which any other party (or parties) (the "Indemnifying Party") is obligated to provide indemnification pursuant to Sections 11.1 or 11.2 or pursuant to any other specific indemnification covenant contained in this Agreement, the Indemnified Party shall promptly give the Indemnifying Party written notice thereof together with a copy of such notice of claim or commencement of a proceeding. The failure of a party to give notice under this Section 11.5 shall not relieve any party from liability, unless and to the extent the other party has been materially prejudiced thereby. Subject to the terms and conditions of the Trust Account Agreement, the Indemnified Party shall not settle or compromise any claim by a third party for which it is entitled to indemnification hereunder, without the prior written consent of the Indemnifying Party (which shall not be unreasonably withheld or delayed), unless a suit shall have been instituted against it and the Indemnifying Party shall not have undertaken the defense of such suit after notification thereof as provided in Section 11.6.

Section 11.6   Defense by Indemnifying Party.

In connection with any claim giving rise to indemnity hereunder resulting from or arising out of any claim or legal proceeding by a person who is not a party to this Agreement, after receiving written notice of such claim from the Indemnified Party, the Indemnifying Party at its sole cost and expense may, upon written notice to the Indemnified Party, assume the defense of any such claim or legal proceeding using counsel of its choice, if it acknowledges to the Indemnified Party in writing its obligations to indemnify the Indemnified Party with respect to all elements of such claim. The Indemnified Party shall be entitled to participate in (but not control) the defense of any such action, with its counsel and at its own expense; provided, however, that if the Indemnified Party, in its reasonable discretion, determines that there exists a conflict of interest between the Indemnifying Party (or any constituent party thereof) and the Indemnified Party, the Indemnified Party (or such constituent party thereof) shall have the right to engage separate counsel, the reasonable costs and expenses of which shall be paid by the Indemnifying Party, but in no event shall the Indemnifying Party be liable to pay for the costs and expenses of more than one separate firm of attorneys (in addition to any local counsel). If the Indemnifying Party does not assume the defense of any such claim or litigation resulting

therefrom, subject to the terms and conditions of the Trust Account Agreement, the Indemnified Party may settle (with the prior written consent of the Indemnifying Party, which consent shall not be unreasonably withheld, delayed or conditioned) or defend against such claim or litigation, after giving notice of the same to the Indemnifying Party, on such terms as the Indemnified Party may deem appropriate, and the Indemnifying Party shall be entitled to participate in (but not control) the defense of such action, with its counsel and at its own expense. If the Indemnifying Party thereafter seeks to question the manner in which the Indemnified Party defended such third-party claim, the Indemnifying Party shall have the burden to prove by a preponderance of the evidence that the Indemnified Party did not defend such third-party claim in a reasonably prudent manner. Notwithstanding the foregoing, however, Purchaser shall in all cases be entitled to control of the defense of any such action if it can demonstrate that such action (i) may result in injunctions or other equitable remedies in respect of Purchaser, the Company Group or the Business; (ii) may result in liabilities which (when taken with other then-existing claims by Purchaser under this Article 11 and the effect of any limitations on liability hereunder) would not be fully indemnified hereunder; or (iii) may have a Material Adverse Effect. In the event of any conflict between this Section 11.6 and Section 5.2(e)(iii), subject to the terms and conditions of the Trust Account Agreement, Section 5.2(e)(iii) shall control to the extent consistent with the parties' intention that the Sellers shall control the defense and response to any audit or administrative or judicial or other proceeding that relates to any Seller Tax Liability.

Section 11.7    Right of Contribution.

The Sellers shall not have any right of contribution against the Companies with respect to any breach by any Seller of any of the Sellers' representations, warranties, covenants or agreements set forth in this Agreement.

Section 11.8    Survival of Representations and Warranties of the Company and the Sellers.

The representations and warranties of the Company and the Sellers contained in Sections 6.18 and 6.21 hereof (and any indemnification obligation with respect to breach thereof) shall terminate and expire 30 days after the expiration of the statute of limitations applicable to claims by third parties against Purchaser and the Company Group in respect of the matter or matters which are the subject of said representations and warranties, unless on or prior to such date Purchaser has delivered to the Sellers a written notice of a claim for indemnification under Section 11.1(a) with respect to any breach of such representation or warranty in which case such representation or warranty shall survive until, but only for purposes of, the resolution of such matter covered by such written notice, at which point they shall expire. All other representations and warranties contained in Article 6 hereof (other than those contained in Sections 6.2, 6.4, 6.5 and 6.25 hereof, which shall survive the execution and delivery of this Agreement and the Closing and any investigation at any time made by or on behalf of Purchaser indefinitely) (and any indemnification obligation with respect to breach thereof) shall terminate and expire on the Release Date, unless on or prior to such date Purchaser has delivered to the Sellers a written notice of a claim for indemnification under Section 11.1(a) with respect to any breach of such representation or warranty in which case such representation or warranty shall survive until, but only for purposes of, the resolution of such matter covered by such written notice, at which point they shall expire.

-60-

Section 11.9    Survival of Representations and Warranties of Purchaser.

Each representation and warranty of Purchaser contained in Article 7 hereof shall survive the execution and delivery of this Agreement and the Closing and shall (together with any indemnification obligation with respect to breach thereof) thereafter terminate and expire on the Release Date (other than those contained in Sections 7.2, 7.5 and 7.9 hereof, each of which shall survive the execution and delivery of this Agreement and the Closing and any investigation at any time made by or on behalf of the Sellers indefinitely), unless, on or before such date, the Sellers have delivered to Purchaser a written notice of claim for indemnification under Section 11.2(a) with respect to any breach of such representation, warranty, covenant or agreement in which case such representation or warranty shall survive until, but only for purposes of, the resolution of such matter covered by such written notice, at which point they shall expire.

ARTICLE 12
CONFIDENTIALITY; RELEASE

Section 12.1    Confidentiality of the Sellers.

Unless this Agreement shall have been terminated pursuant to Article 8, the Sellers agree to, and agree to use their respective Best Efforts to cause their respective agents, representatives, Affiliates, employees, officers, managers and directors to:  (i) treat and hold as confidential (and not make use of, disclose or provide access to any Person) all Company IP and information relating to product development, price, distributors, Customer Lists, pricing and marketing plans, policies and strategies, details of client and consultant contracts, operations methods, product development techniques, business acquisition plans, new personnel acquisition plans and all other confidential information with respect to the Company Group or the Business, except for such information as may be required by applicable Law, in which event the Sellers agree to, and agree to use their respective Best Efforts to cause their respective agents, representatives, Affiliates, employees, officers and directors to, furnish only that portion of such confidential information which they reasonably believe is legally required to be provided and exercise their reasonable efforts to obtain assurances that confidential treatment will be afforded such information, and (ii) in the event that the Sellers or any of their respective agents, representatives, Affiliates, employees, officers, managers or directors becomes legally compelled to disclose any such information, provide Purchaser with prompt written notice of such requirement (to the extent permissible) so that Purchaser may, at the expense of Purchaser, seek a protective order or other remedy.  This Section 12.1 shall not apply to any information that, at the time of disclosure, is known to the receiving party before disclosure thereof, is independently developed by the receiving party, is or becomes publicly available through no fault of the receiving party, is obtained by the receiving party from a third party not known by the receiving party to be under any obligation not to disclose such information and which the receiving party has no reason to believe is not otherwise publicly available or is reasonably necessary in order for any Seller to litigate any claim against Purchaser pursuant to this Agreement.  Each Seller agrees and acknowledges that remedies at law for any breach of its obligations under this Section 12.1 are inadequate and that in addition thereto Purchaser shall be entitled to seek equitable relief, including injunction and specific performance, in the event of any such breach. Notwithstanding the foregoing, each Seller, with the consent of Purchaser (which consent shall not be unreasonably withheld), may make such disclosures in connection with defending any

-61-

claim brought against such Seller or any of its Affiliates or Associates by any third person as may be reasonably necessary in order for such Seller to conduct its defense thereof; provided, however, that each Seller agrees to, and agrees to cause their respective agents, representatives, Affiliates, employees, officers and directors to, exercise their respective Best Efforts to obtain assurances that confidential treatment will be afforded such information and to seek a protective order or other remedy to preserve the confidentiality of such information.

Section 12.2    Release.

(a)    The consideration allocated to the Sellers pursuant to Article 2 of this Agreement represents the only payment or consideration to be received by the Sellers in exchange for the Stock and the SGI Stock owned by the Sellers, and conditioned upon full receipt of that portion of the consideration contemplated by Article 2, each Seller, for such Seller and such Seller's heirs, successors and assigns (collectively, the "Releasors"), hereby forever fully and irrevocably releases and discharges the Companies and their respective predecessors, successors, subsidiaries and Affiliates, managers, directors, officers, employees, agents, and representatives (collectively, the "Released Parties") from any and all actions, suits, claims, demands, debts, sums of money, accounts, reckonings, bonds, bills, covenants, Contracts, controversies, promises, judgments, Liabilities and Costs or obligations of any kind whatsoever in law or equity, or otherwise (including claims for damages, costs, expenses, and attorneys', brokers' and accountants' fees and expenses) for additional payment or consideration in connection with the transactions contemplated by this Agreement, as well as all other events, facts, conditions or circumstances, existing or arising prior to the Closing Date, which the Releasors can, shall or may have against the Released Parties, and that now exist or may hereafter accrue (collectively, the "Released Claims"), provided that Released Claims shall not include claims (i) pertaining to or arising under this Agreement or any of the other Transaction Documents, whether for indemnification or otherwise, (ii) any future claims pertaining to or arising under any employment or other relationship by any Seller with the Company Group after the Closing, (iii) claims for accrued salary and vested benefits under any Plans existing as of the Closing Date, or (iv) pertaining to or arising under any rights of a Seller to indemnification or reimbursement from a member of the Company Group under its organizational documents or otherwise as contemplated in Section 5.3 for third party claims arising out of or in connection with acts or omissions of such Seller while acting in his capacity as officer or director of any member of the Company Group prior to or as of the Closing Date. The Releasors shall refrain from asserting any claim or demand or commencing (or causing to be commenced) any proceeding, in any court or before any tribunal, against any Released Party based upon any Released Claim.

ARTICLE 13
MISCELLANEOUS

Section 13.1    Expenses.

The Sellers and Purchaser shall pay their own expenses incident to the negotiation, preparation and performance of this Agreement and the transactions contemplated hereby, including, without limitation, expenses and disbursements of their respective financial advisors, accountants and counsel.

Section 13.2   Notices.

All notices, requests, demands, and other communications under this Agreement shall be in writing and delivered in person or sent by facsimile or sent by certified mail, postage prepaid, or by nationally recognized courier service and properly addressed as follows:

to Purchaser and to the Companies (after the Closing):

c/o DC Capital Partners, LLC
975 F Street NW
Suite 1050
Washington, DC 20004-1454
Attention:  Thomas J. Campbell
Fax: (202) 737-5225

with a copy to:

Arnold & Porter LLP
555 12th Street, NW
Washington, DC 20004
Attention:  Kevin Lavin, Esq.
Fax:  (202) 942-5999

to the Sellers and to the Companies (prior to the Closing):

The DeBlasio Group
447 Washington Avenue
Bridgeville, PA 15017
Attention: Pasquale B DeBlasio
Fax: 412-221-7306

with a copy to:

Cohen & Grigsby, P.C.
625 Liberty Avenue
Pittsburgh, Pennsylvania 15222-3152
Attention: Andrew T. Flowers
Fax: (412) 209-1945

to John DeBlasio:

310 N. Belmont Avenue
Arlington Heights, IL 60004
Fax: (847) 231-3021

-63-

with a copy to:

Cohen & Grigsby, P.C.
625 Liberty Avenue
Pittsburgh, Pennsylvania 15222-3152
Attention: Andrew T. Flowers
Fax: (412) 209-1945

Any party hereto may from time to time change its address for the purpose of notices to that party by a similar notice specifying a new address, but no such change shall be deemed to have been given until it is actually received by the party sought to be charged with its contents. All notices and other communications required or permitted under this Agreement which are addressed as provided in this Section 13.2 if delivered personally, by facsimile or by nationally recognized courier service, shall be effective upon delivery; and, if delivered by mail, shall be effective three days following deposit in the United States mail, postage prepaid.

Section 13.3   Counterparts.

This Agreement may be executed in two or more counterparts, each of which will be deemed an original with the same effect as if the signatures hereto and thereto were upon the same instrument.  If any signature is delivered by facsimile transmission or by PDF, such signature shall create a valid and binding obligation of the party executing (or on whose behalf the signature is executed) with the same force and effect as if such facsimile or PDF signature were an original thereof.  This Agreement and each of the other Transaction Documents shall become effective when each party hereto or thereto, as the case may be, shall have received a counterpart thereof signed by the other parties hereto or thereto, as the case may be.

Section 13.4   Integration.

This Agreement and the other Transaction Documents supersede all prior negotiations, agreements and understandings among the parties hereto with respect to the subject matter of this Agreement and constitute the entire agreement among the parties hereto.

Section 13.5   Assignability.

Neither this Agreement nor any right or obligation hereunder is assignable in whole or in part, whether by operation of Law or otherwise, by any party without the express written consent of the other parties hereto and any such attempted assignment shall be void and unenforceable; provided, however, that Purchaser may transfer or assign this Agreement or any right or obligation hereunder to any lender or other financing source, and any Affiliate at any time prior to or after the Closing, provided that Purchaser, jointly and severally with its assignee, remains primarily liable for the full and timely performance of all of Purchaser's obligations under this Agreement. This Agreement and the rights and obligations hereunder shall be binding upon, and shall inure to the benefit of, the parties hereto and their respective successors or assignees, and no other person shall acquire or have any rights under or by virtue of this Agreement.

-64-

Section 13.6     No Waiver of Rights.

All waivers hereunder must be made in writing, and failure of any party at any time to require another party's performance of any obligation under this Agreement shall not affect the right subsequently to require performance of that obligation. Any waiver of any breach of any provision of this Agreement shall not be construed as a waiver of any continuing or succeeding breach of such provision or a waiver or modification of any other provision.

Section 13.7     Subject Headings.

The subject headings of the Articles and Sections of this Agreement are included for the purposes of convenience only, and shall not affect the construction or interpretation of any of the provisions of this Agreement.

Section 13.8     Further Assurances.

At all times before and after the Closing, the parties hereto shall each perform such acts, execute and deliver such instruments and documents and do all such other things consistent with the terms of this Agreement as may be reasonably necessary to accomplish the transactions contemplated in this Agreement or to otherwise carry out the purpose of this Agreement.

Section 13.9     Schedules and Exhibits.

All Schedules and Exhibits referred to in and attached to this Agreement are incorporated herein by such reference as if fully set forth in the text hereof.

Section 13.10    Severability.

Whenever possible, each provision of this Agreement shall be interpreted in such manner as to be effective and valid under applicable Law, but if any provision of this Agreement should be prohibited or invalid under applicable Law, such provision shall be ineffective to the extent of such prohibition or invalidity without invalidating the remainder of such provision or the remaining provisions of this Agreement.

Section 13.11    Publicity and Reports.

The Companies, the Sellers and Purchaser shall coordinate all publicity relating to the transactions contemplated by this Agreement and, except to the extent required by Law or applicable stock exchange rules, no party shall issue any press release, publicity statement or other public notice relating to this Agreement, or the transactions contemplated by this Agreement, without obtaining the prior consent of the other parties hereto. Purchaser and the Sellers shall consult with each other with respect to the form and content of any application, report, notice or request for consent made to any Governmental Authority or third party which relates to this Agreement or the transactions contemplated hereby.

Section 13.12    Parties in Interest.

This Agreement shall be binding upon and inure to the benefit of each party, and nothing in this Agreement, express or implied, is intended to confer upon any other Person any rights or remedies of any nature whatsoever under or by reason of this Agreement except for the provisions of Section 5.3 and Article 11 (which are intended to be for the benefit of the Persons provided for therein and may be enforced by such Persons). Nothing in this Agreement is intended to relieve or discharge the obligation of any third Person to (or to confer any right of subrogation or action over against) any party to this Agreement.

Section 13.13    Specific Performance.

Sellers acknowledge that, in view of the uniqueness of the Business and the transactions contemplated by this Agreement, Purchaser would not have an adequate remedy at law for money damages in the event that this Agreement has not been performed in accordance with its terms, and therefore agrees that Purchaser shall be entitled to specific enforcement of the terms hereof in addition to any other remedy to which it may be entitled, at law or in equity.

Section 13.14    Governing Law.

This Agreement will be governed by and construed and enforced in accordance with the internal laws of the State of Delaware without reference to its choice of law rules.

Section 13.15    Consent to Jurisdiction, Etc.

Each of the parties hereto hereby irrevocably consents and agrees that any action, suit or proceeding arising in connection with any disagreement, dispute, controversy or claim arising out of or relating to this Agreement or any other Transaction Document (a "Legal Dispute") shall be brought only to the exclusive jurisdiction of the courts of the Commonwealth of Virginia located in the City of Alexandria or the federal courts located in the United States District Court for the Eastern District of Virginia (Alexandria Division). The parties hereto agree that, after a Legal Dispute is before a court as specified in this Section 13.15 and during the pendency of such Legal Dispute before such court, all actions, suits or proceedings with respect to such Legal Dispute or any other Legal Dispute, including, without limitation, any counterclaim, cross-claim or interpleader, shall be subject to the exclusive jurisdiction of such court. Each of the parties hereto hereby waives, and agrees not to assert, as a defense in any Legal Dispute, that such action, suit or proceeding may not be brought or is not maintainable in such court, that the action, suit or proceeding is brought in an inconvenient forum or that the venue of the action, suit or proceeding is improper. Each party hereto agrees that a final judgment in any action, suit or proceeding described in this Section 13.15 after the expiration of any period permitted for appeal and subject to any stay during appeal shall be conclusive and may be enforced in other jurisdictions by suit on the judgment or in any other manner provided by Law.

Section 13.16    Waiver of Jury Trial.

EACH OF THE PARTIES TO THIS AGREEMENT HEREBY AGREES TO WAIVE ITS RESPECTIVE RIGHTS TO A JURY TRIAL OF ANY CLAIM OR CAUSE OF ACTION BASED UPON OR ARISING OUT OF THIS AGREEMENT. The scope of this waiver is intended to be all-encompassing of all Legal Disputes (as defined in Section 13.15) that may be filed in any court and that relate to the subject matter of the transactions contemplated by this

Agreement, including contract claims, tort claims, breach of duty claims and all other common law and statutory claims. Each party hereto hereby acknowledges that this waiver is a material inducement to enter into a business relationship, that each has already relied on this waiver in entering into this Agreement. Each party hereto further warrants and represents that it has reviewed this waiver with its legal counsel and that it knowingly and voluntarily waives its jury trial rights following consultation with legal counsel. THIS WAIVER IS IRREVOCABLE, MEANING THAT IT MAY NOT BE MODIFIED EITHER ORALLY OR IN WRITING (OTHER THAN BY A MUTUAL WRITTEN WAIVER SPECIFICALLY REFERRING TO THIS SECTION 13.16 AND EXECUTED BY EACH OF THE PARTIES), AND THIS WAIVER SHALL APPLY TO ANY SUBSEQUENT AMENDMENTS, RENEWALS, SUPPLEMENTS OR MODIFICATIONS TO THIS AGREEMENT OR TO ANY OTHER DOCUMENTS OR AGREEMENTS RELATING TO THE TRANSACTIONS CONTEMPLATED BY THIS AGREEMENT. In the event of litigation, this Agreement may be filed as a written consent to a trial by the court.

Section 13.17  John DeBlasio Guarantee.

John DeBlasio hereby agrees that he, along with the Sellers, shall be jointly and severally liable for the full and timely performance of all of the Sellers' obligations under this Agreement, including those obligations that survive the Closing. In addition, John DeBlasio agrees that he shall be subject to the terms and conditions of Sections 5.1, 12.1 and 12.2 hereof as if he was a "Seller" for purposes of such sections. For the avoidance of doubt, but subject to Section 11.4(j), the parties hereto agree that Purchaser shall not be required to institute suit or exhaust its remedies against Sellers with respect to any Seller Indemnification Obligations prior to enforcing its rights and remedies against John DeBlasio with respect to any Seller Indemnification Obligations pursuant to this Section 13.17. In addition, if for any reason the Company Stockholder does not own, beneficially and of record, and have good and marketable title to, the Stock, and therefore John DeBlasio is deemed the beneficial and record owner of the Stock, John DeBlasio agrees that he shall be deemed to be the "Company Stockholder" for all purposes of this Agreement and he hereby agrees to be bound by all of the terms and conditions of this Agreement as the Company Stockholder.

[Signature Page Follows]

-67-

May 05 11 03:50p   DeBlasio                     +1-847-231-3021          p.1

IN WITNESS WHEREOF, the parties hereto have executed, or have caused to be executed by their respective duly authorized officers, this Agreement as of the date first written above.

COMPANY:

SALLYPORT GLOBAL HOLDINGS INC.

By:
Name:   John DeBlasio
Title:   President / CEO

SGI:

SALLYPORT GLOBAL INC.

By:
Name:
Title:

SELLERS:

THE JOHN DEBLASIO CHARITABLE TRUST FOR WORLD PEACE AND DEVELOPMENT

By:
Name:   John DeBlasio
Title:   President of Trustee

JOHN P. DEBLASIO TRUST

By:
Name:
Title:

[Signature Page to Securities Purchase Agreement]

IN WITNESS WHEREOF, the parties hereto have executed, or have caused to be executed by their respective duly authorized officers, this Agreement as of the date first written above.

**COMPANY:**

SALLYPORT GLOBAL HOLDINGS INC.

By: _____
Name: _____
Title: _____

**SGI:**

SALLYPORT GLOBAL INC.

By: _____
Name: *Pasquale B. DeBlasi.*
Title: *Trustee, John P. DeBlasio Trust, President*

**SELLERS:**

THE JOHN DEBLASIO CHARITABLE TRUST
FOR WORLD PEACE AND DEVELOPMENT

By: _____
Name: _____
Title: _____

JOHN P. DEBLASIO TRUST

By: _____
Name: *Pasquale B. DeBlasi.*
Title: *Trustee*

[Signature Page to Securities Purchase Agreement]

**PURCHASER:**

**SALLYPORT HOLDINGS LLC**

By: _____
Name: ___Thomas J. Campbell___
Title: ___Managing Member___

**SPONSOR AFFILIATE** (solely with respect to
Sections 8.3 and 11.2):

**KASEMAN, LLC**

By: _____
Name: ___Thomas J. Campbell___
Title: ___Chairman___

**JOHN DEBLASIO** (solely with respect to Section
13.17):

_____
John DeBlasio

[Signature Page to Securities Purchase Agreement]

May 05 11 03:50p     DeBlasio                              +1-847-231-3021          p.2

PURCHASER:

SALLYPORT HOLDINGS LLC

By: _____
Name: _____
Title: _____

SPONSOR AFFILIATE (solely with respect to
Sections 8.3 and 11.2):

KASEMAN, LLC

By: _____
Name: _____
Title: _____

JOHN DEBLASIO (solely with respect to Section
13.17):

_____
John DeBlasio

[Signature Page to Securities Purchase Agreement]

# Exhibit B



AMENDMENT NO. 1 TO

SECURITIES PURCHASE AGREEMENT

THIS AMENDMENT NO. 1 TO SECURITIES PURCHASE AGREEMENT ("Amendment"), is made as of this __ day of June, 2011, by and among Sallyport Holdings LLC, a Delaware limited liability company ("Purchaser"), Sallyport Global Holdings Inc., a Delaware corporation (the "Company"), Sallyport Global LLC, a Florida limited liability company and being known as Sallyport Global Inc. prior to its conversion to a limited liability company ("SGI," and together with the Company, the "Companies"), John P. DeBlasio ("John DeBlasio"), Kaseman LLC, a Virginia limited liability company ("Kaseman"), D.C. Capital Partners Investments, L.L.C., a Virginia limited liability company ("DCCPI"), The John Deblasio Charitable Trust for World Peace and Development, a charitable trust organized under the laws of Bermuda (the "Company Stockholder") and the John P. DeBlasio Trust, a business trust organized under the laws of the State of Florida (the "SGI Stockholder," and together with the Company Stockholder, each a "Seller" and collectively the "Sellers"). Capitalized terms used in this Amendment but not otherwise defined shall have the meanings set forth in that certain Securities Purchase Agreement, dated as of May 6, 2011 (the "Purchase Agreement"); by and among Purchaser, the Companies, the Sellers, Kaseman LLC (solely with respect to Sections 8.3 and 11.2 thereof) and John DeBlasio (solely with respect to Section 13.17 thereof).

RECITALS

WHEREAS, the parties desire to amend the Purchase Agreement according to the terms set forth in this Amendment.

NOW, THEREFORE, in consideration of and subject to the mutual undertakings and agreements hereinafter set forth, the parties hereby agree as follows:

1.      Amendment.  The parties hereby ratify and affirm the Purchase Agreement and the relative rights and obligations of the parties as set forth in the Purchase Agreement, all of which shall remain in full force and effect except as otherwise expressly amended as set forth herein. After the date hereof, any reference to the Purchase Agreement shall mean the Purchase Agreement as amended or modified hereby

2.      Amendment to Third Recital.  Recital 3 of the Purchase Agreement is hereby amended and restated in its entirety to state the following:

"The Company Stockholder desires to sell to Purchaser, and Purchaser desires to purchase from the Company Stockholder, 1,550 shares of Stock (the "Purchased Stock"). The SGI Stockholder desires to sell to Purchaser, and Purchaser desires to purchase from the SGI Stockholder, the SGI Stock, all of which the SGI Stockholder has contributed or will contribute to Purchaser in exchange for Membership Interests in Purchaser pursuant to the terms contained in the Contribution Agreement."

3.      Amendment to Fourth Recital. Recital 4 of the Purchase Agreement is hereby amended to replace the clause "8511.6 shares of Stock" in its entirety with the clause "8,450 shares of Stock".

4.      Amendment to Definitions.  The definition of "Allocation" is hereby added to the Purchase Agreement, which provides as follows:

"Allocation" shall have the meaning set forth in Section 5.2(h).

5.      Amendment to Definitions.  The definition of "Contribution Agreement" is hereby amended and restated in its entirety to state the following:

"Contribution Agreement" shall mean the Equity Contribution Agreement between the SGI Stockholder and the Purchaser to be dated as of the Closing Date, substantially in the form attached hereto as Exhibit A, pursuant to which the SGI Stockholder shall contribute the Rollover Stock to Purchaser in exchange for Membership Interests in Purchaser."

6.      Amendment to Definitions.  The definition of "Joint Venture" is hereby amended and restated in its entirety to state the following:

"Joint Venture" shall mean each of Arkel Sallyport-Sudan Ltd. and Arkel Sallyport Global Ltd."

7.      Amendment to Definitions.  The definition of "Rollover Stock" is hereby amended and restated in its entirety to state the following:

"Rollover Stock" shall mean all of the SGI Stock, having an aggregate value equal to the Contributed Stock Value, and which has been or shall be contributed to Purchaser in exchange for Membership Interests pursuant to the Contribution Agreement."

8.      Amendment to Sections 2.1(a) and (b).  Sections 2.1(a) and (b) of the Purchase Agreement are hereby amended and restated in their entirety to state the following:

"(a)    Subject to the terms and conditions of this Agreement, the Company Stockholder agrees to sell, assign, transfer and deliver to Purchaser all of the Purchased Stock at the Closing, free and clear of all Encumbrances, with Purchaser to purchase and acquire from the Company Stockholder the Purchased Stock. The Company shall take such action as is reasonably necessary to reflect the sale, assignment, transfer and delivery of the Purchased Stock on the books and records of the Company at the Closing and to provide to Purchaser such evidence of the same as Purchaser shall reasonably request.

(b)     Pursuant to the Contribution Agreement, at the Closing, the SGI Stockholder shall contribute to Purchaser all of its rights, title and interest in and to the Rollover Stock. Purchaser and the SGI Stockholder hereby acknowledge and agree that the transfer of the Rollover Stock for the Membership Interests of Purchaser identified in the Contribution

2

Agreement, by reason of being part of an overall integrated transaction, is intended to qualify as an exchange under Section 721 of the Code, and the parties hereto shall file all Tax Returns or other reports, as required, consistent with such position, and shall take no contrary position, unless required to do so by applicable Law. SGI shall take such action as is reasonably necessary to reflect the contribution of the Rollover Stock on the books and records of SGI at the Closing and to provide to Purchaser such evidence of the same as Purchaser shall reasonably request. Purchaser shall take such action as is reasonably necessary to reflect the Contribution of the Rollover Stock on the books and records of Purchaser at the Closing and to provide the SGI Stockholder such evidence of the same as the SGI Stockholder shall reasonably request."

9.     Amendment to Section 2.2(a). Section 2.2(a) of the Purchase Agreement is hereby amended to replace the sentence "The "Total Purchase Price" shall consist of the sum of (A) $5,500,000 (the "Base Purchase Price"), and (B) Membership Interests of Purchaser delivered to the Company Stockholder in accordance with Section 2.1(b) having an aggregate fair market value equal to $4,100,000 (which $4,100,000 shall be referred to as the "Contributed Stock Value")" in its entirety with the sentence "The "Total Purchase Price" shall consist of the sum of (A) $6,200,000 (the "Base Purchase Price"), and (B) Membership Interests of Purchaser delivered to the Company Stockholder in accordance with Section 2.1(b) having an aggregate fair market value equal to $3,800,000 (which $3,800,000 shall be referred to as the "Contributed Stock Value")".

10.     Amendment to Section 2.2(b). Section 2.2(b) of the Purchase Agreement is hereby amended to replace the sentence "The "Redemption Purchase Price" shall equal $54,900,000, plus or minus any adjustment to the Redemption Purchase Price with respect to the Working Capital pursuant to Section 2.5" in its entirety with the sentence "The "Redemption Purchase Price" shall equal $54,500,000, plus or minus any adjustment to the Redemption Purchase Price with respect to the Working Capital pursuant to Section 2.5".

11.     Amendment to Section 2.3(b). The first sentence of Section 2.3(b) of the Purchase Agreement is hereby amended and restated in its entirety to state the following, and a new second sentence is hereby added to Section 2.3(b) of the Purchase Agreement as follows:

"(b)     On the Closing Date, the Company shall deposit $5,000,000 (the "Trust Account Amount") of the Redemption Purchase Price that is otherwise payable to the Company Stockholder into a bank account controlled by DCCPI, and as soon as reasonably practicable thereafter, DCCPI shall transfer the Trust Account Amount, plus any interest earned on such amount while held by DCCPI, to a trust or escrow account with JPMorgan Chase Bank, National Association, or such other banking institution as shall be mutually acceptable to Purchaser and the Sellers (the "Trust Agent") pursuant to the terms of a trust account agreement in the form attached hereto as Exhibit B, or such other trust or escrow agreement as is substantially similar to the form attached hereto as Exhibit B (the "Trust Account Agreement"), and such trust or escrow account (the "Trust Account"), or the cash in the amount of the Trust Account Amount to the extent not yet deposited into the Trust Account pursuant to the terms of this Section 2.3(b), shall provide security for the payment by the Sellers of any Seller Indemnification Obligations arising with respect to a breach of Section 6.18 or a Seller Tax Liability under Section 5.2 (the

3

"Tax Obligations"); provided, however, that DCCPI shall only release the Trust Account Amount, plus any interest earned on such amount while held by DCCPI, either to the Trust Agent in accordance with this sentence or in accordance with the terms and conditions contained in Section 4 of the form of Trust Account Agreement attached hereto as **Exhibit B** as if DCCPI were "the Agent" (as such term is used in such Section). At the Company Stockholder's request, Purchaser shall reasonably cooperate and not unreasonably withhold, delay or condition consent to transfer the Trust Account to a successor trust or escrow agent, provided that the terms and conditions governing the deposit of the Trust Account with such successor trust or escrow agent are substantially similar to those provided in the Trust Account Agreement."

12.     New Section 2.3(c).   A new Section 2.3(c) is hereby added to the Purchase Agreement, which provides as follows:

"(c)     On the Closing Date, the Company shall issue the Company Stockholder a note in the principal amount of $5,000,000 (the "Mezzanine Note") pursuant to the terms and conditions of that certain Note Purchase Agreement dated as of the Closing Date by and among BNY Mezzanine Partners, L.P., certain other "Investors," Kaseman Holdings LLC and Purchaser. The Mezzanine Note shall be issued in lieu of $5,000,000 of Redemption Purchase Price that is otherwise payable to the Company Stockholder. The Mezzanine Note shall provide security for the payment by the Sellers of any Tax Obligations. If, at any time, and from time to time, during the Taxes Survival Period, but only to the extent that the Trust Account Amount has been reduced to zero, (i) (A) Purchaser or any Purchaser Indemnified Party receives from any taxing authority of competent jurisdiction any decree, order, notice of lien or levy, notice of intent to lien or levy, notice of intent to seize property or rights to property, or other statement of collection activity that, if not satisfied, would result in monetary or other detriment to any of Purchaser or any applicable Purchaser Indemnified Party (which, for the avoidance of doubt, shall include the Company, SGI, and their respective Affiliates and Subsidiaries) ("Demand"), or (B) Purchaser or any Purchaser Indemnified Party makes a payment to any taxing authority of competent jurisdiction that relates to a Seller Tax Liability in compliance with the terms of this Agreement, whether as a result of a settlement agreed to by the Sellers or otherwise (a "Tax Payment") and (ii) Purchaser or any Purchaser Indemnified Party makes or has previously made an indemnification claim pursuant to Section 5.2 or Section 11.5 hereof relating to Taxes that are the subject of such Demand or Tax Payment (a "Claim") on behalf of itself, or a Purchaser Indemnified Party, the Company Stockholder shall, immediately upon request, in consideration for satisfaction of the applicable Seller Indemnification Obligations, assign to the Company a portion of the Mezzanine Note in a principal amount equal to the Losses associated with such Claim. Upon such assignment, the Company Stockholder shall return the Mezzanine Note marked cancelled and the Company shall issue (i) a new note to the order of the Company in a principal amount equal to such Losses (the "Company Note") and (ii) a replacement note to the Company Stockholder in a principal amount equal to the difference of (A) the principal amount of the returned Mezzanine Note and (B) the principal amount of the Company Note (such replacement note being thereafter deemed to be the Mezzanine Note and subject to this Section 2.3(c)), in each case, under and pursuant to the terms of the Note Purchase Agreement; provided, however, that Sellers shall not be deemed to have waived any rights they may have to dispute the Claim under this Agreement or with respect to any defense otherwise available to Sellers to contest the Demand in any other forum. To the extent the Company Stockholder does not

4

immediately make assignment of and surrender the Mezzanine Note to the Company when and as required by this Section 2.3(c), such Mezzanine Note shall automatically be deemed cancelled and replaced by the replacement Mezzanine Note and the Company Note issued by the Company in accordance with this Section 2.3(c)."

13.    Amendment to Section 2.4(b).  Section 2.4(b) of the Purchase Agreement is hereby amended to replace the two references to "Company Stockholder" with references to "SGI Stockholder".

14.    Amendment to Section 2.4(c).  Section 2.4(c) of the Purchase Agreement is hereby amended to replace the phrase "minus (v) the Trust Account Amount," with the phrase "minus (v) the Trust Account Amount and the amount of the Mezzanine Note,".

15.    Amendment to Schedule 2.4.  Schedule 2.4 to the Purchase Agreement is hereby amended and restated in its entirety in the form attached hereto as Exhibit A.

16.    Amendment to Section 2.6.  Section 2.6 of the Purchase Agreement is hereby amended and restated in its entirety to state the following:

"Section 2.6    Issuance of Profits Interests.  Following the Closing, Purchaser shall issue Profits Interests representing no more than 5.5% of the outstanding Percentage Interests (as such term is defined in the Purchaser LLC Agreement) of Purchaser to certain members of the senior management of the Company Group, with such Profits Interests to be allocated to such individuals and in such amounts as shall be mutually agreed upon by Thomas J. Campbell and John P. DeBlasio; provided, however, that at least 1% of the outstanding Percentage Interests shall be allocated to Nicholas Gross."

17.    Deletion of Schedule 2.6.  Schedule 2.6 of the Purchase Agreement is hereby deleted in its entirety.

18.    New Section 4.12.  A new Section 4.12 is hereby added to the Purchase Agreement, which provides as follows:

"4.12    Conversion of SGI to a Limited Liability Company.  Prior to the Closing, the Sellers shall cause SGI to convert from a corporation to a limited liability company, in accordance with the laws of the State of Florida and to the reasonable satisfaction of Purchaser, and shall provide Purchaser with written evidence thereof, including certified copies of all documents filed with the State of Florida in connection therewith.  All references in this Agreement to SGI on or after the effective time of such conversion shall thereafter be deemed to refer to the limited liability company surviving such conversion ("SGI LLC"); all references to the "SGI Stockholder" on or after the effective time of such conversion shall thereafter be deemed to refer to the member of SGI LLC; and all references to the "SGI Stock" on or after the effective time of such conversion shall thereafter be deemed to refer to the membership units in SGI LLC (the "SGI Units")."

19.    New Section 4.13.  A new Section 4.13 is hereby added to the Purchase Agreement, which provides as follows:

"4.13  Merger with Kaseman. The Sellers, the Companies, John DeBlasio, Kaseman and Purchaser acknowledge and agree that as soon as reasonably practicable following the Closing, Purchaser will be merged with and into the parent company of Kaseman, Kaseman Holdings, LLC, and that all such parties to this Agreement shall support, and shall cause all of their Affiliates to support, any such merger, provided that the valuation of the Company Group in such consolidated entity with Kaseman (excluding International Development Solutions LLC) represents at least 51% of the combined post-merger valuation of such consolidated entity."

20.    New Section 4.14.  A new Section 4.14 is hereby added to the Purchase Agreement, which provides as follows:

"4.14  Post-Closing Cooperation. The Company covenants and agrees to reasonably cooperate with the Company Stockholder, at the Company Stockholder's sole cost and expense, to enforce the Company's rights under the Stock Purchase Agreement dated as of December 7, 2010 among the Company and the other parties signatory thereto (the "Redemption Agreement") against the other parties signatory thereto for purposes of enforcing the Company's rights under Section 6.01(b) of the Redemption Agreement and any other provisions of the Redemption Agreement in connection therewith. The Company hereby covenants that any money recovered from the other parties signatory thereto in connection with the Company's enforcement of such rights under the Redemption Agreement shall be paid by the Company promptly upon receipt to the Company Stockholder, subject to the Company's rights under Article 11 as a Purchaser Indemnified Party."

21.    Amendment to Section 5.2(a).  The first sentence of Section 5.2(a) of the Purchase Agreement is hereby amended and restated in its entirety to state the following:

"(a)  Liability for Taxes.  Except as set forth otherwise herein, the Sellers shall be liable for and pay any and all Taxes of and with respect to all the members of the Company Group that are attributable or allocable (each a "Seller Tax Liability") to (i) any taxable period that ends on or before the Closing Date, including, for the avoidance of doubt, the taxable year of SGI terminating and ending at the end of the day immediately prior to the date of the conversion described in Section 4.12 (each, a "Pre-Closing Tax Period"), or (ii) the portion of any Straddle Period ending on the Closing Date."

22.    Amendment to Section 5.2(c).  The last sentence of Section 5.2(c) of the Purchase Agreement, which read "Notwithstanding the foregoing and for the avoidance of doubt, the Sellers and the Purchaser agree that the taxable year of SGI shall terminate and end at the end of the day before the Closing Date for federal income Tax purposes and, to the extent applicable, for state and local Tax purposes." is hereby deleted in its entirety.

23.    Amendment to Section 5.2(e)(iii).  Section 5.2(e)(iii) of the Purchase Agreement is hereby amended to replace the two references to "the Trust Account Agreement" with references to "Section 2.3 and the Trust Account Agreement".

6

24. <u>New Section 5.2(h)</u>. New <u>Section 5.2(h)</u> is hereby added to the Purchase Agreement, which provides as follows:

"(h) <u>Allocation of Contributed Stock Value</u>. The Purchaser and the SGI Stockholder agree to allocate the Contributed Stock Value (and all other capitalized costs) among the assets of SGI in accordance with the allocation reasonably determined by the Purchaser under Section 1060 of the Code and the Treasury Regulations issued thereunder ("**Allocation**"). The Purchaser and the SGI Stockholder shall report and file all Tax Returns (including any amended Tax Returns and claims for refund) consistent with the Allocation, and neither the Purchaser nor the SGI Stockholder shall take a position contrary thereto or inconsistent therewith (including, without limitation, in any audits or examinations by any Governmental Authority or any other proceedings), except to the extent required to comply with applicable Law. The Purchaser and the SGI Stockholder shall cooperate in the filing of any forms (including IRS Form 8594 to the extent required) with respect to the Allocation, including any amendments to such forms required with respect to any adjustment to the Contributed Stock Value, pursuant to this Agreement. Notwithstanding anything in this Agreement to the contrary, the foregoing covenant shall survive the Closing."

25. <u>Amendment to Section 6.18(a)</u>. The following sentence is hereby added to the end of Section 6.18(a) of the Purchase Agreement:

"(a) SGI LLC has, at all times since its creation, had a good and marketable title to, or a valid leasehold interest in, the Assets held or used by it, located on its premises or acquired by it at any time since its inception, free and clear of all Encumbrances or restrictions on transfer, except for Permitted Encumbrances."

26. <u>Amendment to Sections 6.18(t), (u), (v), (w) and (x)</u>. Section 6.18(t) of the Purchase Agreement is hereby amended by deleting the word "and" at the end of such Section. Sections 6.18(u) and (x) of the Purchase Agreement are hereby amended by replacing the period at the end of each such Section with a semicolon. Sections 6.18(v) and (w) of the Purchase Agreement are hereby amended and restated in their entirety to state the following:

"(v) SGI has, at all times since its formation, been and will, up to and including the day immediately prior to the date of its conversion described in Section 4.12, be a "small business corporation" within the meaning of Section 1361(b) of the Code and has had and will have in effect at all times from and after its formation and up to and including the day immediately prior to the date of its conversion described in Section 4.12, a valid election under Section 1362(a) of the Code, and validly has been and will be treated during such period in a similar manner for purposes of the income Tax Laws of all state and local jurisdictions in which it has been subject to taxation where such treatment is legally available;

(w) At all times since its formation and up to and including the day immediately prior to the date of its conversion described in Section 4.12, (i) SGI has had only one class of stock outstanding (treating for this purpose all classes of stock having identical rights to current and liquidating distributions as a single class, regardless of differences in voting power), (ii) SGI does not and has not had any outstanding options, contracts, indebtedness or other instruments or

obligations which could constitute a second class of stock within the meaning of Section 1361(b)(1)(D) of the Code and Treasury Regulations Section 1.1361-1(l), (iii) there have been no binding agreements among SGI and its shareholders or other "governing provisions" within the meaning of Treasury Regulations Section 1.1361-1(l)(2)(i) that caused any of the outstanding capital stock of SGI to have different per share rights to distribution or liquidation proceeds from any other share of then outstanding capital stock, and (iv) all distributions by SGI with respect to its stock described in Section 1368(a) of the Code have been proportional to the ownership of the capital stock of SGI outstanding at the time of each such distribution.  No Seller has taken or omitted or caused to be taken or omitted to be taken any actions which would cause SGI to cease to be treated prior to the date of its conversion described in Section 4.12 as a "small business corporation" within the meaning of Section 1361(b) of the Code for federal and applicable state and local income Tax purposes."

27.    Amendment to Section 6.18.  The following is hereby added to the end of Section 6.18 of the Purchase Agreement:

"(y)    SGI has, since its conversion described in Section 4.12, been and will, up to and including the Closing Date, be a single-member limited liability company; and

(z)    SGI has not made, at any time since its conversion described in Section 4.12, and will not make, at any time up to and including the Closing Date, any entity classification elections under Treasury Regulation Section 301.7701-3 and has, since its conversion described in Section 4.12, been and will, at all times up to and including the Closing Date, be treated as disregarded as an entity separate from its owner within the meaning of Treasury Regulation Section 301.7701-3."

28.    Amendment to Section 9.2(a).  Section 9.2(a) of the Purchase Agreement is hereby amended and restated in its entirety to state the following:

"(a)    original certificates representing all of the Purchased Stock and SGI Stock, if any, which certificates shall be either duly endorsed for transfer, accompanied by stock powers executed in blank or accompanied by a limited liability company unit assignment agreement, as applicable;"

29.    Amendment to Section 10.2(d).  Section 10.2(d) of the Purchase Agreement is hereby amended to replace the reference to "Company Stockholder" with a reference to "SGI Stockholder".

30.    Amendment to Sections 11.1(d) and (e) and Addition of New Section 11.1(f).  Section 11.1(d) of the Purchase Agreement is hereby amended by deleting the word "and" at the end of such Section.  Section 11.1(e) of the Purchase Agreement is hereby amended by deleting the period at the end of such Section and adding at the end the following "; and".  New Section 11.1(f) is hereby added immediately after Section 11.1(e) of the Purchase Agreement, as follows:

"(f)    any representation, certification or claim made by the Company to any Governmental Authority with respect to its ownership of Torres International LLC and/or Torres International Services LLC, the lawsuit filed by Torres Advanced Enterprise Solutions LLC

8

against the Company and disclosed on <u>Schedule 6.19</u> and the termination of Contract W52P1J-11-D-0044 as disclosed on <u>Schedule 6.28(a)(4)</u>."

31.    <u>Amendment to Section 11.4(c)</u>. Section 11.4(c) of the Purchase Agreement is hereby amended to replace the phrase "(including the Initial Holdback Amount and the Trust Account Amount)" with the phrase "(including the Initial Holdback Amount, the Trust Account Amount and the amount of the Mezzanine Note)". In addition, the following is hereby added to the end of Section 11.4(c) of the Purchase Agreement:

"The Sellers shall not be required to indemnify any other Person under Section 11.1(f) for any costs and expenses unless and until the aggregate amount of all costs and expenses for which indemnity would otherwise be payable by the Sellers under Section 11.1(f) exceeds $500,000; thereafter, the Sellers shall be responsible for all such amounts in excess of $500,000 (the "<u>Torres Expenses Indemnity</u>"). The Sellers shall not be required to indemnify any other Person under Section 11.1(f) for any Losses other than costs and expenses unless and until the aggregate amount of all such Losses other than costs and expenses for which indemnity would otherwise be payable by the Sellers under Section 11.1(f) exceeds $2,000,000; thereafter, the Sellers shall be responsible for all such amounts in excess of $2,000,000 (the "<u>Torres Indemnity</u>"). In no event shall the Sellers obligations with respect to the Torres Expenses Indemnity and Torres Indemnity exceed, in the aggregate, an amount equal to the aggregate Base Purchase Price and Redemption Purchase Price actually paid to the Sellers (including the Initial Holdback Amount, the Trust Account Amount and the amount of the Mezzanine Note)."

32.    <u>Amendment to Section 11.4(j)</u>. Section 11.4(j) of the Purchase Agreement is hereby amended to replace the phrase "provided, however, that with respect to any Seller Indemnification Obligations for which recovery may be available from the Trust Account pursuant Section 2.3(b), the Purchaser Indemnified Parties shall first seek recourse against the Trust Account, in accordance with the terms and conditions of the Trust Account Agreement" with the phrase "provided, however, that with respect to any Seller Indemnification Obligations for which recovery may be available from the Trust Account or the Mezzanine Note pursuant Section 2.3, the Purchaser Indemnified Parties shall first seek recourse against the Trust Account and the Mezzanine Note, in accordance with the terms and conditions of the Trust Account Agreement and Section 2.3".

33.    <u>Amendment to Section 11.5</u>. Section 11.5 of the Purchase Agreement is hereby amended to replace the reference to "the Trust Account Agreement" with a reference to "Section 2.3 and the Trust Account Agreement".

34.    <u>Amendment to Section 11.6</u>. Section 11.6 of the Purchase Agreement is hereby amended to replace the two references to "the Trust Account Agreement" with references to "Section 2.3 and the Trust Account Agreement".

35.    This Amendment may be executed in any number of counterparts, each of which shall constitute an original instrument, but all of which when taken together shall constitute but one Amendment.

36.     This Amendment shall be governed in all respects by the Laws of the State of Delaware without regard to the principles of conflicts of Law thereunder.

*[signatures follow on the next page]*

10

IN WITNESS WHEREOF, the parties hereto have executed this Amendment as of the date first written above.

**COMPANY:**

**SALLYPORT GLOBAL HOLDINGS INC.**

By: _____

Name: Thomas J. Campbell

Title: Chairman

**SGI:**

**SALLYPORT GLOBAL LLC**

By: _____

Name: Thomas J. Campbell

Title: Chairman

**SELLERS:**

**THE JOHN DEBLASIO CHARITABLE TRUST FOR WORLD PEACE AND DEVELOPMENT**

By: _____

Name: _____

Title: _____

**JOHN P. DEBLASIO TRUST**

By: _____

Name: _____

Title: _____

IN WITNESS WHEREOF, the parties hereto have executed this Amendment as of the date first written above.

COMPANY:

SALLYPORT GLOBAL HOLDINGS INC.

By: _____
Name: _____
Title: _____

SGI:

SALLYPORT GLOBAL LLC

By: _____
Name: _____
Title: _____

SELLERS:

THE JOHN DEBLASIO CHARITABLE TRUST
FOR WORLD PEACE AND DEVELOPMENT

By: _____
Name: _____
Title: _____

JOHN P. DEBLASIO TRUST

By: _____
Name: Pasquale DeBlasio
Title: Trustee

Signature Page to Amendment No. 1 to Purchase Agreement

**PURCHASER:**

SALLYPORT HOLDINGS LLC

By: _____

Name:   Thomas J. Campbell

Title:   Chairman

KASEMAN, LLC

By: _____

Name:   Thomas J. Campbell

Title:   Chairman

_____

John P. DeBlasio

D.C. CAPITAL PARTNERS INVESTMENTS, L.L.C.

By: _____

Name: Thomas V. Campbell

Title: Managing Member

Signature Page to Amendment No. 1 to Purchase Agreement

Exhibit A

Schedule 2.4

Capitalized terms used on this Schedule 2.4 and not otherwise defined shall have the respective meanings provided in the Agreement.

| | | The John Deblasio Charitable Trust for World Peace and Development | John P. Deblasio Trust |
|---|---|---|---|
| Stock | | 10,000 shares | n/a |
| Redeemed Stock | | 8,450 | n/a |
| Purchased Stock | | 1,550 | n/a |
| Rollover Stock / SGI Stock | | N/A | 10,000 membership units |
| | Total | | |
| Base Purchase Price | $6,200,000 | $6,200,000 | |
| Redemption Purchase Price | $54,500,000 | $54,500,000 | |
| Contributed Stock Value | $3,800,000 | | $3,800,000 |
| *Membership Interests Issued* | *38%* | | *38%* |
| Subtotal: | $64,500,000 | $60,700,000 | $3,800,000 |
| *Less* Closing Date Indebtedness | $0 | | |
| *Less* Transaction Expenses | $114,738 | $114,738 | |
| *Less* Initial Holdback Amount | $4,000,000 | $4,000,000 | |
| *Less* Trust Account Amount | $5,000,000 | $5,000,000 | |
| *Less* Mezzanine Note Amount | $5,000,000 | $5,000,000 | |
| *Less* Deferred Amount | $2,000,000 | $2,000,000 | |
| Total at Closing: | $48,385,262 | $44,585,262 | $3,800,000 |

Exhibit C



February 23, 2012

*Via Facsimile and Express Courier*

The DeBlasio Group
447 Washington Avenue
Bridgeville, PA 15017
Attention: Pasquale B DeBlasio
Fax: 412-221-7306

John DeBlasio
310 N. Belmont Avenue
Arlington Heights, IL 60004
Fax: (847) 231-3021

     Re:   Notice of Indemnification Claims

Dear Pat and John:

     Reference is hereby made to that certain Securities Purchase Agreement, by and among Sallyport Holdings LLC, Kaseman, LLC, Sallyport Global Holdings Inc., Sallyport Global Inc., John DeBlasio, The John DeBlasio Charitable Trust for World Peace and Development and the John P. DeBlasio Trust, dated as of May 6, 2011 (as the same has been amended from time to time, the "Purchase Agreement"). Capitalized terms used but not defined in this notice have the respective meanings ascribed thereto in the Purchase Agreement.

     Enclosed with this letter as <u>Annex A</u> is the Actual Closing Working Capital Statement based on the audited financial results for the Business, which sets forth an itemized calculation of the Final Working Capital. As noted in the attached Actual Closing Working Capital Statement, the Final Working Capital was $18,984,969, which represents a shortfall of $3,015,031 from the Target Minimum Working Capital.

     More importantly, this represents a material deviation (roughly $7.5M) from the working capital forecast prepared by the Sellers as part of the negotiations leading up to the execution of the Purchase Agreement (see, attached as <u>Annex B</u>, the email and related forecast delivered by Franco DeBlasio on March 14, 2011, which projected working capital of roughly $26.5M as of June 2011). The forecast, which Purchaser and its Affiliates were led to believe was prepared in good faith, served as the basis for what Purchaser expected were good faith negotiations regarding the Working Capital and Minimum Cash components of the Purchase Agreement. In reliance on the Working Capital forecast provided by Sellers, and Purchaser's expectation of good faith from Sellers, the Working Capital and Minimum Cash targets were agreed to in the Purchase Agreement.

     It is now clear that Sellers were not negotiating, or acting, in good faith with respect to Working Capital and Minimum Cash. Based on the email correspondence and conversations

detailed below, it is abundantly clear that Sellers misrepresented the Working Capital forecast for the Business and thereafter willfully manipulated the Working Capital and Cash of the Business prior to Closing by not continuing to operate in the ordinary course of business in a purposeful attempt to drive the Working Capital and Cash of the Business as low as possible. Among the actions taken by Sellers are the following:

- In conversations with representatives of D.C. Capital Partners, John DeBlasio openly acknowledged and admitted that leading up to Closing, the Company purposefully worked to accelerate accounts receivable collections (specifically with respect to KBR receivables), with the Company electing to receive accelerated payments at a discount on certain receivables outstanding. The obvious intent of these actions was to pull as much Cash out of the Business prior to Closing as possible, while simultaneously delivering as little Working Capital at Closing as possible. The result of these actions is further evidenced by the glaring disparity between the actual accounts receivable balance at Closing versus the accounts receivable balance that Sellers represented would be available at Closing as part of the Estimated Working Capital (see Annex A).

- The Company purposefully and willfully failed to pay various suppliers and vendors to the Business in the ordinary course of business consistent with past practice. As the email (attached hereto as Annex C) dated July 2, 2011 from Tauqeer Khalid clearly indicates, although the Company normally paid vendors and suppliers on the 10th and 25th of every month, no payments were made in the month of June. The purposeful intent of withholding these payments until after the Closing was to pull as much Cash out of the Business prior to Closing as possible, and to increase the payables of the Business, thereby increasing the financial benefits to Sellers at Closing and forcing Purchaser to incur the cost of paying these pre-Closing expenses post-Closing.

- The Company purposefully and willfully neglected to pay its insurance premiums on various insurance policies that were due and payable as of no later than June 15, 2011. Rather than pay these premiums in the ordinary course of business, which amounted, at a minimum, to $482,888, the Company willfully delayed payment until after the Closing in a purposeful attempt to pull as much Cash out of the Business prior to Closing as possible, and to increase the payables of the Business, thereby increasing the financial benefits to Sellers at Closing and forcing Purchaser to incur the cost of paying this pre-Closing expense post-Closing. The email (attached hereto as Annex D) dated June 24, 2011 from John DeBlasio clearly details these actions.

- The Sellers removed all Cash from all accounts of the Company Group as of the Closing without notifying Purchaser, such that as of the Closing there was no Cash on hand (notwithstanding the requirement, as evidenced by the statement of Cash delivered by Sellers at Closing, to leave $313,859). In addition, the Cash statement listed a bonus payable to Nick Gross of $578,784. However, the bonus actually paid to Nick Gross post-Closing for pre-Closing periods was $684,000.

In addition, a bonus was paid to Win Scheel for pre-Closing periods in the amount of $50,000, which was not included on the Cash Statement.

All of the actions detailed above led to a significant shortfall of Working Capital and Cash being delivered to Purchaser at Closing, for which Purchaser is entitled to recovery pursuant to Section 2.5 of the Purchase Agreement. Moreover, all of these actions constitute breaches of various covenants contained in the Purchase Agreement, including Section 4.2 (requirement for Sellers to notify Purchaser of (a) any fact which would make any representation or warranty untrue or inaccurate in any material respect as of the Closing Date, or (b) any event or circumstance that would make the timely satisfaction of any Closing condition, including Section 9.12, impossible as of the Closing Date), Section 4.3 (covenant not to take any action outside of the ordinary course of business between signing and Closing) and Section 4.11 (requirement that the Cash Statement accurately present in all respects the Minimum Cash Amount). As such, pursuant to Section 11.1(b) of the Purchase Agreement, KS International LLC ("KSI," as successor in interest to Purchaser) is entitled to indemnification for the full amount of all Losses arising out of such actions.

In addition, as evidenced by the email (attached hereto as <u>Annex E</u>) dated July 1, 2011 from John DeBlasio, Purchaser paid $43,237.95 to Bank of America on behalf of the Sellers, with the understanding that this expense would be reimbursed by Sellers following collection of this amount from Tom Charron. It is Purchaser's understanding that no effort has been made to collect such amount by Sellers. As such, pursuant to Section 11.1(c) of the Purchase Agreement, KSI is entitled to indemnification for the full amount of such Transaction Expense.

In light of the foregoing, Purchaser is hereby notifying Sellers that it is entitled to a Working Capital adjustment and/or indemnification well in excess of $4,000,000. As such, Purchaser will retain the Initial Holdback Amount in partial satisfaction of these claims and retains all other rights and remedies that may be available pursuant to the terms of the Purchase Agreement. Nothing in this letter waives or limits any other rights or claims of Purchaser relating to the aforementioned matters.

If you have any questions about the foregoing, please do not hesitate to contact the undersigned.

Sincerely,

KS International LLC (as successor in interest to Sallyport Holdings LLC)

By:_____
Name: Thomas J. Campbell
Title: Chairman

cc:   Cohen & Grigsby, P.C.
      625 Liberty Avenue
      Pittsburgh, Pennsylvania 15222-3152
      Attention: Andrew T. Flowers
      Fax: (412) 209-1945

ANNEX A

ACTUAL CLOSING WORKING CAPITAL STATEMENT

## Working Capital Calculation

| | Balance Sheet Provided by DeBlasio's at Close | | | McGladrey Audited Balance Sheet | | | |
|---|---|---|---|---|---|---|---|
| | June 30, 2011 | Working Capital June 30, 2011 | Minimum Cash June 30, 2011 | June 30, 2011 | Working Capital June 30, 2011 | | Minimum Cash June 30, 2011 |
| **Assets** | | | | | | | |
| **Current Assets:** | | | | | | | |
| Cash and cash equivalents | $ 1,006,840 | $ | $ | $ 32,807,508 | $ 32,807,508 | | $ |
| Accounts receivable, net of allowance | 33,501,659 | 33,501,650 | 325,000 | | (1,402,780) | Prepaid Leases | 325,000 |
| Unbilled receivables | 1,080,105 | 565,325 | 1,076,780 | | 1,205,524 | AFCAP Demob | 1,076,780 |
| Prepaid expenses and other | 635,932 | 455,550 | 182,276 | 1,497,900 | | Prepaid Ins | 182,276 |
| Inventories | 137,201 | 137,201 | | | | | |
| Total Current Assets | 37,311,035 | 34,659,651 | 1,586,056 | 34,305,408 | 32,709,352 | AR Shortfall (2,683,456) | 1,585,056 |
| Property and Equipment | 1,970,270 | | | 1,198,863 | | | |
| Less: Accumulated Depreciation and Amortization | (621,826) | | | | | | |
| Other Assets | 1,046,441 | | | 1,168,593 | | | |
| | 634,722 | | | 836,282 | | | |
| Total Assets | $ 35,694,706 | $ 34,659,651 | $ 1,586,056 | $ 36,339,273 | 32,709,352 | | $ 1,585,056 |
| **Liabilities and Shareholders' Equity** | | | | | | | |
| **Current Liabilities:** | | | | | | | |
| Current maturities of long-term debt | $ 3,850,586 | $ 3,750,586 | $ 100,000 | $ 3,233,567 | 3,133,567 | Old Towne | $ 100,000 |
| Accounts payable, trade | 6,014,560 | 7,014,560 | 1,221,131 | 12,390,011 | 10,590,996 | EOC Bonus | 1,221,131 |
| Accrued expenses and other payables | | | 678,784 | | | Nick Gross Bonus | 678,784 |
| Accrued income tax | 2,771 | | | | | Win School Bonus | |
| Total Current Liabilities | 10,765,155 | 10,765,155 | 1,999,915 | 16,624,298 | 13,724,352 | CL Surplus 2,819,230 | 1,999,915 |
| | | | | | | W/C Shortfall (4,806,601) | |
| Total Liabilities | 12,497,635 | 12,657,635 | | 18,834,689 | | | |
| Total | $ 23,893,476 | $ (213,859.00) | | $ (213,859.00) | x=22,000,000 $ (10,416,651) | | |

Target Minimum W/C Shortfall

ANNEX B

WORKING CAPITAL FORECAST

Owens, J. Matthew

**Subject:** FW: Working Capital Analysis_v1DC.xls
**Attachments:** Working Capital Analysis_v1DC.xls

**From:** Franco DeBlasio [mailto:franco@deblasiogroup.com]
**Sent:** Monday, March 14, 2011 7:28 PM
**To:** Doug Lake
**Cc:** pbd@deblasiogroup.com; John DeBlasio
**Subject:** Working Capital Analysis_v1DC.xls

Doug,

I added the monthly information and a bit more analyses, give me a call if you have any questions.

Franco

1

## Project Mustang
### Working Capital

| Description | | FY 2009 | | | | FY 2010 | | | |
|---|---|---|---|---|---|---|---|---|---|
| Accounts Receivable and Unbilled Revenue | | 11,761,094 | 13,864,052 | 17,281,325 | 17,557,889 | 18,527,003 | 17,324,235 | 16,450,192 | 21,505,679 |
| Inventory | | 180,422 | 436,920 | 401,639 | 359,328 | 551,925 | 414,868 | 276,730 | 32,036 |
| Prepaid Expenses | | | | | | | | | 602,435 |
| Total | | 11,951,516 | 14,300,972 | 17,683,264 | 17,917,197 | 19,078,928 | 17,739,083 | 16,726,822 | 22,140,150 |
| | | | | | | | | | |
| Accounts Payable | | 2,218,620 | 4,577,161 | 4,616,401 | 3,328,221 | 2,866,800 | 2,908,927 | 3,064,744 | 3,243,103 |
| Accrued Liabilities | | 2,359,400 | 2,629,446 | 2,616,886 | 4,093,887 | 5,091,214 | 5,469,140 | 5,637,981 | 4,541,400 |
| Total | | 4,577,980 | 7,206,597 | 7,232,287 | 7,422,108 | 8,538,020 | 8,378,067 | 8,702,725 | 7,784,054 |
| | | | | | | | | | |
| Net Working Capital | | 7,373,536 | 7,094,375 | 10,450,977 | 10,495,089 | 10,540,908 | 9,361,028 | 8,026,197 | 14,355,490 |
| | | | | | | | | | |
| LTM Average - Net Working Capital | | 7,373,536 | 7,233,956 | 8,306,290 | 8,853,494 | 9,645,337 | 10,212,000 | 9,605,805 | 10,670,007 |
| | | | | | | | | | |
| Change in Net Working Capital (Cash (Increase) Decrease) | | | (279,161) | 3,356,602 | 44,112 | 45,819 | (1,179,802) | (1,334,828) | 6,329,299 |
| | | | | | | | | | |
| Cash accumulation stating from 0 | | | | | | | | | |
| | | | | | | | | | |
| Revenue | | $14,618,078 | $20,511,523 | $20,778,070 | $24,585,204 | $23,046,239 | $23,876,698 | $25,105,927 | $26,457,733 |
| Cost of Revenue | | 11,351,580 | 16,807,526 | 16,249,507 | 18,805,936 | 15,989,428 | 18,860,239 | 19,182,047 | 24,540,380 |
| | | | | | | | | | |
| LTM Revenue | | 14,918,878 | 35,430,501 | 58,200,471 | 80,794,875 | 88,823,036 | 82,282,011 | 93,618,866 | 98,491,497 |
| LTM Cost of Revenue | | 11,351,580 | 28,159,106 | 44,408,613 | 63,214,540 | 67,862,395 | 89,705,108 | 71,638,446 | 77,380,072 |
| | | | | | | | | | |
| LTM Average Net Working Capital (% of LTM Net Revenue) | | 49.4% | 20.4% | 14.6% | 11.0% | 10.8% | 11.1% | 8.9% | 10.7% |
| Net Working Capital (% of LTM Net Revenue) | | 49.4% | 20.0% | 18.8% | 13.0% | 11.9% | 10.1% | 8.3% | 14.6% |
| | | | | | | | | | |
| A/R Days | | 284 | 141 | 111 | 78 | 75 | 60 | 61 | 70 |
| A/P Days | | (70) | (59) | (37) | (19) | (15) | (15) | (15) | (15) |
| | | | | | | | | | |
| Monthly Revenue | 0.35 | $1,748,813 | $2,401,628 | $2,432,940 | $2,878,800 | $2,986,841 | $2,785,083 | $2,939,689 | $3,097,848 |
| Liabilities less prepaid at end of Quarter | | 4,577,980 | 7,206,597 | 7,232,287 | 7,422,108 | 8,538,020 | 8,378,067 | 8,702,725 | 7,182,219 |
| Simplified Working Capital (Monthly Revenue-Liab) | | $6,324,793 | $9,608,223 | $9,666,227 | $10,300,708 | $11,226,661 | $11,174,050 | $11,642,284 | $10,280,066 |
| | | | | | | | | | |
| Difference Between Simplified method and Traditional Method (Traditional - Simplified) | | 1,048,743 | (2,513,848) | 785,750 | 194,381 | (695,753) | (1,813,024) | (3,616,097) | 4,075,429 |
| | | | | | | | | | |
| Cash accumulation stating from 0 | | | | | | | | | |

Case 1:12-cv-00572-AJT-JFA   Document 1-5   Filed 05/25/12   Page 10 of 20 PageID# 120

|  | FY 2011 Actual | | | | FY 2011 Estimated | | | | |
|---|---|---|---|---|---|---|---|---|---|
| 20,113,005 | 18,449,671 | 35,201,300 | 33,405,800 | 35,611,025 | 37,583,138 | 36,160,782 | 37,613,198 | 36,986,622 |
| 159,888 | 159,860 | 251,185 | 251,185 | 251,105 | 251,185 | 251,185 | 251,185 | 251,185 |
| 1,287,224 | 4,193,445 | 2,696,688 | 2,696,688 | 2,696,688 | 1,348,344 | 1,348,344 | 1,348,344 | 1,348,344 |
| 30,539,157 | 22,801,684 | 38,149,181 | 36,353,773 | 38,456,798 | 39,162,667 | 37,750,311 | 38,412,717 | 37,237,707 |
| 3,641,871 | 3,203,719 | 4,598,586 | 4,335,570 | 4,608,899 | 4,877,711 | 4,691,613 | 4,807,598 | 4,800,270 |
| 6,110,638 | 4,993,840 | 7,462,506 | 7,081,888 | 7,528,355 | 7,967,442 | 7,663,790 | 8,016,212 | 7,840,963 |
| 9,752,509 | 8,197,558 | 12,031,092 | 11,417,458 | 12,137,255 | 12,845,153 | 12,355,603 | 12,923,780 | 12,641,242 |
| 20,786,648 | 14,604,326 | 26,118,089 | 24,936,315 | 26,322,544 | 26,337,514 | 25,394,708 | 26,488,838 | 24,696,465 |
| 13,132,342 | 14,443,167 | 18,415,847 | 16,598,053 | 18,710,243 | 21,005,157 | 20,146,616 | 21,004,890 | 23,018,987 |
| 6,431,162 | (8,182,322) | 11,513,763 | (1,181,774) | 1,366,220 | 14,970 | (942,800) | 1,084,230 | (1,892,473) |
|  | - |  |  |  |  | 4,051,804 | 7,125,335 | 12,749,509 |
| $33,337,140 | $16,035,989 | 16,329,028 | $14,548,237 | $15,403,283 | $16,395,176 | $15,741,468 | $16,465,343 | $16,105,380 |
| 20,900,203 | 13,409,939 | 11,854,031 | 11,246,428 | 11,658,031 | 12,656,112 | 12,173,760 | 12,733,581 | 12,455,201 |
| 109,780,404 | 101,638,795 | 133,500,812 | 171,026,647 | 103,510,332 | 154,766,575 | 106,616,958 | 188,970,384 | 176,824,031 |
| 88,291,649 | 83,041,349 | 109,305,318 | 138,214,985 | 131,513,376 | 125,966,842 | 158,343,255 | 150,883,989 | 138,800,831 |
| 12.1% | 14.2% | 12.3% | 8.7% | 11.4% | 13.6% | 10.3% | 11.6% | 13.0% |
| 13.1% | 14.4% | 19.6% | 14.5% | 16.1% | 17.0% | 13.6% | 14.2% | 13.9% |
| 69 | 65 | 98 | 70 | 76 | 87 | 87 | 73 | 75 |
| (15) | (14) | (16) | (11) | (13) | (14) | (11) | (12) | (12) |
| $3,803,335 | $5,843,557 | $5,384,123 | $5,109,511 | $5,431,633 | $5,748,430 | $5,520,347 | $5,763,616 | $5,657,176 |
| 8,405,285 | 4,004,113 | 9,334,404 | 8,720,770 | 9,440,567 | 11,496,809 | 11,017,259 | 11,575,436 | 12,641,242 |
| $12,398,620 | $9,847,670 | $14,718,527 | $13,830,281 | $14,872,200 | $17,245,239 | $16,536,606 | $17,369,052 | $18,298,418 |
| 6,398,028 | 4,756,656 | 11,398,562 | 11,106,034 | 11,450,344 | 9,092,275 | 8,658,102 | 9,128,886 | 6,298,047 |
|  |  |  |  |  |  | $25 | $5,113,161 | $9,563,260 |

Working Capital Analysis_v1DC / 2/22/2012 / 11:47 AM

ANNEX C

JULY 2, 2011 TAUQEER KHALID EMAIL

**Owens, J. Matthew**

| | |
|---|---|
| **From:** | Tauqeer Khalid [tkhalid@sallyportglobal.com] |
| **Sent:** | Saturday, July 02, 2011 9:01 AM |
| **To:** | John DeBlasio; franco@deblasiogroup.com; Brian Arsenault |
| **Cc:** | Pat DeBlasio; Doug Lake; Win Scheel |
| **Subject:** | Request for Payments to Vendors/ Suppliers as of 30 June' 2011 |
| **Attachments:** | AIEE- SOA[1].xls; Al_Mahara SoA[1].xls; Al-Neel Travel Agent - SoA.xls; AL-Rasool- SOA.xls; Al_Sajiya_SoA.xls; Anele Trading International - SOA.xls; Anwar Al Aaref Company.xlsx; B & B ( Al-Bahar & Bardawil) - SOA.xls; Genesis Universal Trading ltd.xls; Global Logistic Services Co.- SoA.xls; K-9- SOA.xls; Medicorp-SoA_SGS.xls; Mesopotamia Lion Security.xls; Paratus-SoA.xls; Track24- SoA.xls; TRC Ltd. - SOA.xls; Summary of Accounts Payable as on 30 June 2011[3].xlsx; Zurk Co - SoA[1].xls |

Franco/ Brian,

Please find attached the latest summary of accounts payables as of 30 June 2011 with related SoA's for all the vendors/ suppliers which should be paid ASAP as we didn't make any payments to them from one month.

Normally we pay them every 10th and 25th of every month.

Let me know if you have any questions.

Tauqeer Khalid | Director of Finance and Admin.
Office: 1-214-245-4611 | Cell: 964-780-859-1956
tkhalid@sallyportglobal.com | www.sallyportglobal.com
SALLYPORT "Enabling Global Operations"

THIS MESSAGE IS CONFIDENTIAL. This e-mail message and any attachments are proprietary and confidential information intended only for the use of the recipient(s) named above. If you are not the intended recipient, you may not print, distribute, or copy this message or any attachments. If you have received this communication in error, please notify the sender by return e-mail and delete this message and any attachments from your computer.

---

**From:** John DeBlasio <jdeblasio@sallyportglobal.com>
**Date:** Fri, 1 Jul 2011 20:07:43 -0400
**To:** "franco@deblasiogroup.com" <franco@deblasiogroup.com>, Brian Arsenault <barsenault@kasemanllc.com>
**Cc:** Tauqeer Khalid <tkhalid@sallyportglobal.com>, Pat DeBlasio <tpbd@deblasiogroup.com>, Doug Lake <dlake@dccapitalpartners.com>, Win Scheel <wscheel@sallyportglobal.com>
**Subject:** RE: Payment Received - LBG Inma

Franco,

There are funds available. I would recommend seeing what hits on Tuesday/Wednesday and doing a bigger set of payments to Suppliers. We should pay Anele (Iraq food supplier ~$186K) for example as they give us a quick pay discount.

Thanks,

John

---

**From:** Franco DeBlasio [mailto:franco@deblasiogroup.com]
**Sent:** Friday, July 01, 2011 6:29 PM

1

**To:** John DeBlasio; Brian Arsenault
**Cc:** Tauqeer Khalid; Pat DeBlasio; Doug Lake; Win Scheel
**Subject:** Re: Payment Received - LBG Inma

The funds went out to Ops. We need to send out the payment to the full supplier.

Sent from my Verizon Wireless BlackBerry

---

**From:** John DeBlasio <jdeblasio@sallyportglobal.com>
**Date:** Fri, 1 Jul 2011 19:12:40 -0400
**To:** Brian Arsenault<barsenault@kasemanllc.com>
**Cc:** Tauqeer Khalid<tkhalid@sallyportglobal.com>; Franco DeBlasio<franco@deblasiogroup.com>; Pat DeBlasio<tpbd@deblasiogroup.com>; Doug Lake<dlake@dccapitalpartners.com>; Win Scheel<wscheel@sallyportglobal.com>
**Subject:** RE: Payment Received - LBG Inma

Brian/Franco,

Did the funds go out for Baghdad Ops and the Fuel Supplier yesterday?

Thanks,

John
John DeBlasio | President & COO
Office: 1-888-833-6506 x101 | Cell: 1-224-595-5720
jdeblasio@sallyportglobal.com | www.sallyportglobal.com
SALLYPORT "Enabling Global Operations"
MESSAGE CONFIDENTIALITY: This e-mail message and any attachments are proprietary and confidential information intended only for the use of the recipient(s) named above. If you are not the intended recipient, you may not print, distribute, re copy this message or any attachments. If you have received this communication in error, please notify the sender by return e-mail and delete this message and any attachments from your computer.

---

**From:** Brian Arsenault [mailto:barsenault@kasemanllc.com]
**Sent:** Friday, July 01, 2011 5:52 PM
**To:** John DeBlasio
**Cc:** Tauqeer Khalid; Franco DeBlasio; Pat DeBlasio; Doug Lake; Win Scheel
**Subject:** Re: Payment Received - LBG Inma

Thanks John - safe travels

On Jul 1, 2011, at 6:50 PM, "John DeBlasio" <jdeblasio@sallyportglobal.com> wrote:

Tauqeer/Franco,


We received the below listed payment from LBG-Inma today.

Tauqeer – can you please update the invoice tracker and send it out to the group so they can see where we are?

Franco – I think there will be another payment from LBG – Tijara next week.  You may want to have Win call and check to confirm so we know what's coming and not for the liquidity forecast.

Thanks,

John

| Payment currency : | USD |
| Amount : | 603,366.74 |
| Value date : | 01/07/2011 |
| Name : | THE LOUIS BERGER GROUP, INC. |
| Address : | 412 MT. KEMBLE AVE. MORRISTOWN, N.J. 07960 |

INV'S
89PSD,89LS,90LS,90PSD,91LS,91
    PSD,92PSD,92LS,93LS

3

<u>ANNEX D</u>

<u>JUNE 24, 2011 JOHN DEBLASIO EMAIL</u>

**Owens, J. Matthew**

**Subject:**          FW: Billing Statement
**Attachments:**    Sallyport Billing Statement.pdf; ATT00001.htm

**From:** John DeBlasio <jdeblasio@sallyportglobal.com>
**Date:** June 24, 2011 3:53:10 PM EDT
**To:** Jemimah Podraza <jpodraza@assuranceagency.com>
**Cc:** Brian Arsenault <barsenault@kasemanllc.com>, "Nicholas P. Gross"
<ngross@sallyportglobal.com>
**Subject: FW: Billing Statement**

Jemimah,


We will work to ensure they are paid by the 30th or very shortly thereafter.


Thanks,


John


**From:** Jemimah Podraza [mailto:jpodraza@assuranceagency.com]
**Sent:** Friday, June 24, 2011 2:39 PM
**To:** John DeBlasio; Nicholas P. Gross
**Subject:** FW: Billing Statement


Hello, just following up on payment status per attached.  We have worked with Chartis to allow us until 6/30 to get payment to them.  If we do not pay by then, Chartis will begin issuing notices of cancellation.  Please advise; thanks!


**JEMIMAH PODRAZA, ARM, CRIS, AIS**

Account Manager

Assurance Agency, Ltd. | 1750 E. Golf Road | Schaumburg, IL 60173

P 847.463.7273 | f 847.440.9127

jpodraza@assuranceagency.com | www.assuranceagency.com

**From:** Jemimah Podraza
**Sent:** Thursday, June 16, 2011 10:31 AM
**To:** John DeBlasio; 'Nicholas P. Gross'
**Cc:** John Mannebach
**Subject:** Billing Statement

Good morning John and Nick,

Attached is a current billing statement for all balances due our agency.  The second installment of the DBA premium was due 6/15/11, could you please let me know status as soon as possible.  As previously discussed, we can accept an AMEX payment, but there will be an approximate 3% additional fee to do so.

Thanks,

**JEMIMAH PODRAZA, ARM, CRIS, AIS**

Account Manager

Assurance Agency, Ltd. | 1750 E. Golf Road | Schaumburg, IL 60173

P 847.463.7273 | f 847.440.9127

jpodraza@assuranceagency.com | www.assuranceagency.com

Assurance Financial Services is successful in helping businesses properly maintain a retirement program that is comprehensive, compliant and robust.  Contact your Assurance Representative today for more information.

CONFIDENTIALITY NOTICE: The preceding correspondence and any attachments may contain confidential and legally protected information intended solely for the use of the addressee. If the reader of this communication is not the intended recipient, be advised that any review, copying, dissemination or other use of this communication is strictly prohibited. If you have received this message in error, please immediately notify the sender and then promptly delete this communication. Thank you.

2

ANNEX E

JULY 1, 2011 JOHN DEBLASIO EMAIL

**Owens, J. Matthew**

| | |
|---|---|
| **From:** | John DeBlasio [jdeblasio@sallyportglobal.com] |
| **Sent:** | Friday, July 01, 2011 8:15 PM |
| **To:** | Doug Lake; Pat DeBlasio; Franco DeBlasio |
| **Cc:** | JWingerter@cohenlaw.com; aflowers@cohenlaw.com; Tom Campbell; Gail Dady; Lavin, Kevin J.; Owens, J. Matthew; Brian Arsenault |
| **Subject:** | RE: Equity Proceeds |

Doug,

I thought the BoA account/overdraft fees related to the Tom Charron issue were going to be something you paid and went on your side of the "Transaction Expense" ledger. What I thought was that you were taking this on as a transaction expense and then I would pay you back if I were able to collect from Tom.

Can you confirm?

Bank of America Overdraft Fees (Sallyport)                                   43,237.95

Thanks,

John
John DeBlasio | President & COO
Office: 1-888-833-6506 x101 | Cell: 1-224-595-5720
jdeblasio@sallyportglobal.com | www.sallyportglobal.com
SALLYPORT "Enabling Global Operations"
MESSAGE CONFIDENTIALITY: This e-mail message and any attachments are proprietary and confidential information intended only for the use of the recipient(s) named above. If you are not the intended recipient, you may not print, distribute, or copy this message or any attachments. If you have received this communication in error, please notify the sender by return e-mail and delete this message and any attachments from your computer.

---

**From:** Doug Lake [mailto:dlake@dccapitalpartners.com]
**Sent:** Thursday, June 30, 2011 8:11 AM
**To:** John DeBlasio; Pat DeBlasio; Franco DeBlasio
**Cc:** JWingerter@cohenlaw.com; aflowers@cohenlaw.com; Tom Campbell; Gail Dady; Lavin, Kevin; Owens, J. Matthew; Brian Arsenault
**Subject:** FW: Equity Proceeds

John,

Please find attached a funds flow summary schedule outlining the 2 wire transfers to the DeBlasio Charitable Trust. I spoke with Matt Owens and it sounds like there is some confusion over the wire transfer for $5.725 million. This transfer represents the Base Purchase Price amount of $6.2 million less Nick Gross's $475K equity investment. As per our email trail below and in my telephone conversation with Pat (and maybe you were on) you guys instructed me to wire net of the $475K. Otherwise, Nick was going to have to wire $475K in to the Sallyport Holdings, LLC account so that I could then wire out the $6.2 million.

Regards,

Doug

Douglas T. Lake Jr.
DC Capital Partners, LLC

1

975 F Street NW
Washington, DC 20004
Office: (202) 737-5223
Cell: (917) 826-1606
dlake@dccapitalpartners.com
www.dccapitalpartners.com

---

**From:** Nicholas P. Gross [mailto:ngross@sallyportglobal.com]
**Sent:** Wednesday, June 29, 2011 9:57 AM
**To:** Doug Lake; John DeBlasio
**Subject:** Re: Equity Proceeds

Doug,

I believe its coming from sallyport direct

---

**From:** Doug Lake [mailto:dlake@dccapitalpartners.com]
**Sent:** Wednesday, June 29, 2011 09:15 AM
**To:** Nicholas P. Gross
**Subject:** Equity Proceeds

Nick - How are you funding your equity investment of $475K? Is John rolling over dough for you or will you be wiring money in?

Douglas T. Lake Jr.
DC Capital Partners, LLC
975 F Street NW
Washington, DC 20004
Office: (202) 737-5223
Cell: (917) 826-1606
dlake@dccapitalpartners.com
www.dccapitalpartners.com

2

Exhibit D



# Kaseman Holdings, LLC And Subsidiaries And Sallyport Holdings, LLC And Subsidiaries

Consolidated And Combined Financial Report
June 30, 2011

**Contents**

| Independent Auditor's Report On The Financial Statements | 1 |
|---|---|

**Financial Statements**

| Consolidated And Combined Balance Sheet | 2 |
|---|---|
| Consolidated And Combined Statement Of Operations | 3 |
| Consolidated And Combined Statement Of Members' Equity | 4 |
| Consolidated And Combined Statement Of Cash Flows | 5 — 6 |

| Notes To Consolidated And Combined Financial Statements | 7 — 20 |
|---|---|

| Independent Auditor's Report On The Supplementary Information | 21 |
|---|---|

**Supplementary Information**

| Proforma Consolidated And Combined Statements Of Operations | 22 |
|---|---|
| Schedule Of Adjusted Operating Earnings Before Interest, Taxes, Depreciation And Amortization (Non-GAAP Measure) | 23 |

McGladrey & Pullen, LLP

 McGladrey

**Independent Auditor's Report**

To the Board of Directors
Kaseman Holdings, LLC and Subsidiaries and Sallyport Holdings, LLC and Subsidiaries
McLean, Virginia

We have audited the accompanying consolidated and combined balance sheet of Kaseman Holdings, LLC and Subsidiaries and Sallyport Holdings, LLC and Subsidiaries (collectively, "the Company") as of June 30, 2011, and the related consolidated and combined statements of operations, members' equity and cash flows for Kaseman Holdings, LLC for the year ended June 30, 2011, and Sallyport Holdings, LLC for the period from June 29, 2011 (Inception) through June 30, 2011. These financial statements are the responsibility of the Company's management. Our responsibility is to express an opinion on these financial statements based on our audit.

We conducted our audit in accordance with auditing standards generally accepted in the United States of America. Those standards require that we plan and perform the audit to obtain reasonable assurance about whether the consolidated and combined financial statements are free of material misstatement. An audit includes examining, on a test basis, evidence supporting the amounts and disclosures in the financial statements. An audit also includes assessing the accounting principles used and significant estimates made by management, as well as evaluating the overall financial statement presentation. We believe that our audit provides a reasonable basis for our opinion.

In our opinion, the consolidated and combined financial statements referred to above present fairly, in all material respects, the consolidated and combined financial position of Kaseman Holdings, LLC and Subsidiaries and Sallyport Holdings, LLC and Subsidiaries as of June 30, 2011, and the results of their consolidated and combined operations and cash flows of Kaseman Holdings, LLC and Subsidiaries for the year ended June 30, 2011, and Sallyport Holdings, LLC and Subsidiaries for the period from June 29, 2011 (Inception) through June 30, 2011, in conformity with accounting principles generally accepted in the United States of America.

*McGladrey & Pullen, LLP*

Vienna, Virginia
March 30, 2012

1

**Kaseman Holdings, LLC And Subsidiaries And Sallyport Holdings, LLC And Subsidiaries**

**Consolidated And Combined Balance Sheet**
**June 30, 2011**
**(Dollars In Thousands)**

| Assets | | |
|---|---|---|
| Current Assets | | |
| Cash and cash equivalents | $ | 7,766 |
| Accounts receivable, net | | 44,513 |
| Due from related party | | 1,398 |
| Prepaid expenses and other current assets | | 3,186 |
| **Total current assets** | | 56,863 |
| Property And Equipment, net | | 2,255 |
| Other Assets | | |
| Deferred financing costs, net of accumulated amortization of $327 | | 2,212 |
| Restricted cash | | 139 |
| Other assets | | 6,336 |
| Goodwill | | 61,392 |
| Other intangible assets, net | | 11,698 |
| | | 81,777 |
| | $ | 140,895 |

| Liabilities and Members' Equity | | |
|---|---|---|
| Current Liabilities | | |
| Current maturities of long-term debt | $ | 6,900 |
| Accounts payable | | 8,293 |
| Accrued expenses and other current liabilities | | 9,157 |
| Accrued salaries and leave | | 9,464 |
| Deferred revenue | | 488 |
| Due to related parties | | 510 |
| **Total current liabilities** | | 34,812 |
| Long-Term Liabilities | | |
| Long-term debt, net of current maturities | | 92,244 |
| Other long-term obligations | | 6,139 |
| | | 133,195 |
| Commitments And Contingencies | | |
| Members' Equity | | |
| Members' equity | | 21,271 |
| Accumulated deficit | | (14,093) |
| **Total members' equity attributable to the Company** | | 7,178 |
| Noncontrolling interest | | 522 |
| **Total members' equity** | | 7,700 |
| | $ | 140,895 |

See Notes To Consolidated And Combined Financial Statements.

2

**Kaseman Holdings, LLC And Subsidiaries And Sallyport Holdings, LLC And Subsidiaries**

**Consolidated And Combined Statement Of Operations**
**Year Ended June 30, 2011**
**(Dollars In Thousands)**

|  | Kaseman Holdings, LLC For The Year Ended June 30, 2011, And Sallyport Holdings, LLC For The Period June 29, 2011 (Inception) Through June 30, 2011 |
|---|---|
| Revenue | $ 50,366 |
| Cost of revenue | 38,615 |
| Gross profit | 11,751 |
|  |  |
| Operating expenses: |  |
|    Selling, general and administrative | 13,623 |
|    Depreciation and amortization | 1,558 |
|    Transaction expenses | 2,952 |
|       **Operating loss** | (6,382) |
|  |  |
| Interest expense, net | 4,324 |
|       **Net loss attributable to the Company** | (10,706) |
|  |  |
| Less net income attributable to the noncontrolling interest | 32 |
|  |  |
|       **Net loss** | $ (10,738) |

See Notes To Consolidated And Combined Financial Statements.

3

**Kaseman Holdings, LLC And Subsidiaries And Sallyport Holdings, LLC And Subsidiaries**

**Consolidated And Combined Statement Of Members' Equity**
**Year Ended June 30, 2011**
**(Dollars In Thousands)**

|  | Kaseman Holdings, LLC | Sallyport Holdings, LLC | Combined |
|---|---|---|---|
| **Members' Equity** |  |  |  |
| Balance, beginning | $ 11,200 | $ - | $ 11,200 |
| Contributions | - | 10,071 | 10,071 |
| Balance, ending | 11,200 | 10,071 | 21,271 |
|  |  |  |  |
| **Accumulated Deficit** |  |  |  |
| Balance, beginning | (3,355) | - | (3,355) |
| Net loss | (9,432) | (1,306) | (10,738) |
| Balance, ending | (12,787) | (1,306) | (14,093) |
| Total Kaseman Holding, LLC and Sallyport Holdings, LLC members' equity | (1,587) | 8,765 | 7,178 |
|  |  |  |  |
| **Noncontrolling Interest** |  |  |  |
| Balance, beginning | - | - | - |
| Contributions | 490 | - | 490 |
| Net income | 32 | - | 32 |
| Balance, ending | 522 | - | 522 |
|  |  |  |  |
| **Total members' equity** | $ (1,065) | $ 8,765 | $ 7,700 |

See Notes To Consolidated And Combined Financial Statements.

**Kaseman Holdings, LLC And Subsidiaries And Sallyport Holdings, LLC And Subsidiaries**

**Consolidated And Combined Statement Of Cash Flows**
**Year Ended June 30, 2011**
**(Dollars In Thousands)**

| | Kaseman Holdings, LLC For The Year Ended June 30, 2011, And Sallyport Holdings, LLC For The Period June 29, 2011 (Inception) Through June 30, 2011 |
|---|---:|
| **Cash Flows From Operating Activities** | |
| Net loss attributable to the Company | $ (10,706) |
| Adjustments to reconcile net loss to net cash used in operating activities: | |
| Depreciation and amortization | 1,558 |
| Amortization of deferred loan costs | 430 |
| Deferred rent | 411 |
| Non-cash interest accretion on subordinated notes | 645 |
| Forward loss accrual | 12 |
| Changes in assets and liabilities: | |
| (Increase) decrease in: | |
| Accounts receivable, net | 3,122 |
| Prepaid expenses and other current assets | 3,011 |
| Increase (decrease) in: | |
| Accounts payable | 2,747 |
| Accrued expenses and other current liabilities | (6,340) |
| Accrued salaries and leave | 721 |
| Deferred revenue | 128 |
| **Net cash used in operating activities** | (4,261) |
| **Cash Flows From Investing Activities** | |
| Acquisition of business, net of cash of $161 | (49,654) |
| Contingency payment on prior acquisition | (6,001) |
| Net decrease in restricted cash | 258 |
| Purchase of property and equipment | (480) |
| **Net cash used in investing activities** | (55,877) |
| **Cash Flows From Financing Activities** | |
| Net repayments under revolving credit agreement | (7,299) |
| Proceeds from issuance of subordinated notes | 61,759 |
| Repayment of subordinated notes | (26,698) |
| Proceed from issuance of term debt | 35,185 |
| Net advances from related party | 460 |
| Decrease in cash overdraft | (195) |
| Deferred loan costs | (1,998) |
| Contributions from members | 6,200 |
| Contribution from noncontrolling interest | 490 |
| **Net cash provided by financing activities** | 67,904 |
| **Net increase in cash and cash equivalents** | 7,766 |
| **Cash And Cash Equivalents** | |
| Beginning | - |
| Ending | $ 7,766 |

(Continued)

5

**Kaseman Holdings, LLC And Subsidiaries And Sallyport Holdings, LLC And Subsidiaries**

**Consolidated And Combined Statement Of Cash Flows (Continued)**
**Year Ended June 30, 2011**
**(Dollars In Thousands)**

| | Kaseman Holdings, LLC For The Year Ended June 30, 2011, And Sallyport Holdings, LLC For The Period June 29, 2011 (Inception) Through June 30, 2011 |
|---|---|
| **Supplemental Disclosures Of Cash Flow Information** | |
| Cash payments for interest | $ 4,062 |
| | |
| **Supplemental Schedules Of Noncash Investing And Financing Activities** | |
| Acquisition of Business | |
| Acquisition of business, net of cash of $161 | $ 49,654 |
| Rollover equity from acquiree | 3,871 |
| Note issued to seller | 5,000 |
| Holdback and deferred amount, net | 4,888 |
| Total consideration | 63,413 |
| Fair value of net assets acquired | 22,489 |
| Intangible assets acquired including goodwill | $ 40,924 |

See Notes To Consolidated And Combined Financial Statements.

**Kaseman Holdings, LLC And Subsidiaries And Sallyport Holdings, LLC And Subsidiaries**

Notes To Consolidated And Combined Financial Statements (Dollars In Thousands)

Note 1.     Nature Of Business And Significant Accounting Policies

Nature of business: Kaseman Holdings, LLC (Kaseman) is a provider of mission critical operational support including construction and project management services, engineering and technical services, training and security services and program management services to various agencies of the U.S. government through its wholly owned subsidiary, Kaseman, LLC, and has a 51% interest in International Development Solutions, LLC (IDS). Kaseman Holdings, LLC is a Delaware Limited Liability Company formed under a previous trade name in March 2008. The rights and obligations of the members are contained in Kaseman's LLC Agreement dated June 9, 2008. Kaseman is headquartered in McLean, Virginia.

Sallyport Holdings, LLC (Sallyport) provides defense and technical services and government outsourced solutions primarily to U.S. government agencies throughout the U.S. and internationally. Key offerings include base maintenance and operations and personal and physical security services. Primary customers include the U.S. Department of Defense and the U.S. Department of State. Sallyport Holdings, LLC was organized in February 2011 for the purpose of acquiring Sallyport Global Holdings, Inc. and its subsidiaries, and Sallyport Global, Inc. The rights and obligations of the members are contained in Sallyport's LLC Agreement dated June 29, 2011.

Under each LLC Agreement, Kaseman and Sallyport shall continue in existence until resolution by the Board to dissolve, at the request of the majority of the Class A members, or through judicial dissolution. As an LLC, no members shall be obligated personally for any debt, obligation or liability of the Company. No member of either Kaseman or Sallyport shall have the right to withdraw capital or demand or receive distributions or other returns of any amount in its capital account except as outlined within the respective LLC Agreements.

Kaseman Holdings, LLC and Sallyport Holdings, LLC (together, the Company) are owned 52% and 52.25%, respectively, by DC Capital Partners. DC Capital Partners purchased its share of Kaseman in June 2008 and Sallyport in June 2011. The percentages not owned by them are owned by related investors and debt holders of the respective companies. The financial statements for Kaseman and Sallyport as of June 30, 2011, and the results of operations and cash flows of Kaseman for the year ended June 30, 2011, and Sallyport for the period from June 29, 2011 (Inception) through June 30, 2011, have been combined for presentation purposes due to common control.

A summary of the Company's significant accounting policies follows:

Principles of combination and consolidation: The accompanying consolidated and combined financial statements include the accounts of the above named businesses as of June 30, 2011, and for the year ended June 30, 2011, for Kaseman and for Sallyport, from the date of acquisition, June 29, 2011 through June 30, 2011. Kaseman and Sallyport, individually, consolidate the accounts of majority owned subsidiaries. All material related party balances and transactions have been eliminated in combination and/or consolidation.

Revenue and cost recognition: The Company recognizes revenue when a contract has been executed, the contract price is fixed and determinable, delivery of services or products has occurred and collectability of the contract price is considered probable and can be reasonably estimated. Revenue is earned under time and materials contracts, cost reimbursable and fixed-price contracts. On time and material contracts, revenue is recognized based on the level of hours incurred at the appropriate contract billing rates, plus other reimbursable contract costs incurred. Revenue on cost reimbursable contracts is recognized as costs are incurred plus a pro rata portion of the associated fee. Revenue on fixed-price contracts is recognized ratably over the service period or cost-to-cost percentage of completion method depending on the nature of the contract. Under the cost-to-cost percentage of completion method, individual contract revenue earned is measured by the percentage relationship that contract costs incurred to date bear to management's estimate of total contract costs.

Kaseman Holdings, LLC And Subsidiaries And Sallyport Holdings, LLC And Subsidiaries

Notes To Consolidated And Combined Financial Statements (Dollars In Thousands)

Note 1.     Nature Of Business And Significant Accounting Policies (Continued)

Contract accounting requires significant judgment relative to assessing risks, estimating contract revenue and costs, and making assumptions for schedule and technical issues. Due to the size and nature of the Company's contracts, the estimation of total revenue and cost at completion requires the use of estimates. Contract costs include material, labor and subcontracting costs, as well as an allocation of allowable indirect costs. Assumptions have to be made regarding the length of time to complete the contract because costs also include expected increases in wages and prices for materials. For contract change orders, claims or similar items, the Company applies judgment in estimating the amounts and assessing the potential for realization. These amounts are only included in contract value when they can be reliably estimated and realization is considered probable. Estimates of total contract revenue and costs are continuously monitored during the term of the contract and are subject to revision as the contract progresses. Anticipated losses on contracts accounted for under the percentage of completion method are recognized in the period they are deemed probable and can be reasonably estimated.

Deferred revenue is recorded when amounts are received from the customer prior to the services being performed by the Company. The deferred revenue will be recognized in the period earned.

Cash and cash equivalents: For purposes of reporting cash flows, the Company considers all highly liquid debt instruments purchased with an original maturity of three months or less to be cash equivalents.

Accounts receivable: Accounts receivable are generated from prime and subcontracting arrangements with U.S. governmental agencies. Billed amounts represent invoices that have been prepared and sent to the customer. Unbilled amounts primarily represent costs and fees incurred in excess of billings. In accordance with industry practice, contract receivables relating to long-term contracts are classified as current, even though portions of these amounts are not expected to be realized within one year.

Billed accounts receivable are considered past due if the invoice has been outstanding more than 30 days. The Company does not charge interest on accounts receivable; however, U.S. governmental agencies may pay interest on invoices outstanding more than 30 days. The Company records interest income from U.S. governmental agencies when received. The provision for doubtful accounts is based on management's evaluation of the status of existing accounts receivable. Receivables are written off when deemed uncollectible. Recoveries of accounts receivable previously written off are recorded when received.

Restricted cash: Restricted cash consists of amounts held at a financial institution for reimbursable payments the Company collects and remits for one of its contracts.

Property and equipment: Property and equipment are stated at cost. Depreciation has been provided over the estimated useful lives of the respective assets (generally five years) using the straight-line method. Leasehold improvements are generally amortized using the straight-line method over the remaining lease term or the useful life of the improvements, whichever is shorter. Repairs and maintenance costs are expensed as incurred.

Valuation of long-lived assets: The Company accounts for the valuation of long-lived assets under ASC 360-10-15, *Accounting for the Impairment or Disposal of Long-Lived Assets*. This pronouncement requires that long-lived assets and certain intangible assets be reviewed for impairment whenever events or circumstances indicate that the carrying amount of an asset may not be recoverable. Recoverability of the long-lived asset is measured by a comparison of the carrying amount of the asset to future undiscounted net cash flows expected to be generated by the asset. If such assets are considered to be impaired, the impairment to be recognized is measured by the amount by which the carrying amount of the assets exceeds the estimated fair value of the assets. Assets to be disposed of are reportable at the lower of the carrying amount or fair value, less costs to sell.

**Kaseman Holdings, LLC And Subsidiaries And Sallyport Holdings, LLC And Subsidiaries**

Notes To Consolidated And Combined Financial Statements (Dollars In Thousands)

Note 1.    Nature Of Business And Significant Accounting Policies (Continued)

Deferred financing costs: Deferred financing costs arising from the Company's credit agreements are amortized using the interest method over the term of the related debt financing. The following table presents the deferred financing costs, accumulated amortization and net balance:

|  | Deferred Loan Costs | | Accumulated Amortization | | Total | |
|---|---|---|---|---|---|---|
| Balance, June 30, 2010 | $ | 1,206 | $ | (562) | $ | 644 |
| Additions |  | 1,998 |  | (322) |  | 1,676 |
| Disposals |  | (665) |  | 557 |  | (108) |
| Balance, June 30, 2011 | $ | 2,539 | $ | (327) | $ | 2,212 |

Goodwill and other intangible assets: The Company records as goodwill the excess of the purchase price over the fair value of the identifiable net assets and other intangibles acquired. The Company tests its recorded goodwill for impairment on an annual basis, or more often if indicators of potential impairment exist, by determining if the carrying value of each reporting unit exceeds its estimate fair value. The Company determined that no impairment of goodwill existed because the estimated fair value of the reporting unit exceeded its carrying amount. The Company has elected to perform its annual analysis during the fourth quarter of each fiscal year.

Intangibles are amortized using either the straight-line or an accelerated, cash flow based methodology, over their respective estimated lives. No indicators of impairment were identified related to other intangible assets during the year ended June 30, 2011.

Income taxes: Kaseman and Sallyport are limited liability companies (LLCs) for federal income tax purposes, which also applies to most states. As an LLC, the Company is generally not subject to income taxes and the income, deductions, credits, and other tax attributes of the Company flow to the members of the company.

Sallyport Global Holdings, Inc., a subsidiary of Sallyport Holdings, LLC, is a C corporation and is subject to income taxes at the entity level. As such, deferred taxes are calculated using the liability method whereby deferred tax assets are recognized for deductible temporary differences and operating loss and tax credit carryforwards, and deferred tax liabilities are recognized for taxable temporary differences. Temporary differences are the differences between the reported amounts of assets and liabilities and their tax bases. Deferred tax assets are reduced by a valuation allowance when, in the opinion of management, it is more likely than not that some portion or all of the deferred tax assets will not be realized. Deferred tax assets and liabilities are adjusted for the effects of changes in tax laws and rates on the date of enactment.

Fair value: The Company records certain assets and liabilities at their fair value. The carrying amount of the Company's financial instruments, which include cash and cash equivalents, accounts receivable, payables and other current liabilities, approximate fair value due their short maturities. The carrying amount of long-term debt approximates fair value due to the approximation of the applicable interest rates to those available in the marketplace.

Use of estimates: The preparation of financial statements requires management to make estimates and assumptions that affect the reported amounts of assets and liabilities and disclosure of contingent assets and liabilities at the date of the financial statements, and the reported amounts of revenue and expenses during the reporting period. Actual results could differ from those estimates.

9

Kaseman Holdings, LLC And Subsidiaries And Sallyport Holdings, LLC And Subsidiaries

Notes To Consolidated And Combined Financial Statements (Dollars In Thousands)

Note 1.    Nature Of Business And Significant Accounting Policies (Continued)

Financial credit risk: Substantially all of the Company's contract receivables are derived from prime contracts and subcontracts with U.S. government agencies or commercial entities. All contract receivables are on an unsecured basis.

The Company maintains its cash in bank deposit accounts which, at times, may exceed federally insured limits. The Company has not experienced any losses in such accounts. The Company believes it is not exposed to any significant credit risk on cash.

New accounting pronouncements: In August 2009, the FASB issued Accounting Standards Update (ASU) 2009-05, Measuring Liabilities at Fair Value, which amends FASB ASC 820 to provide guidance on accounting for the fair value measurement of liabilities. This standard provides clarification that in certain circumstances in which a quoted price in an active market for the identical liability is not available, a reporting entity is required to measure fair value using one or more of the following valuation techniques: the quoted price of the identical liability when traded as an asset, the quoted prices for similar liabilities or similar liabilities when traded as assets, and/or another valuation technique that is consistent with the principles of fair value measurements. This standard clarifies that a company is not required to include an adjustment for restrictions that prevent the transfer of the liability and if an adjustment is applied to the quoted price used in a valuation technique, the result is a Level 2 or Level 3 fair value measurement. This standard was effective for the Company on July 1, 2010. The Company's adoption of this guidance did not have a material impact on our consolidated and combined financial statements.

In January 2010, the FASB issued ASU 2010-06, Improving Disclosures about Fair Value Measurements, which amends ASC 820, Fair Value Measures and Disclosures. ASU 2010-06 requires disclosure of transfers into and out of Level 1 and Level 2 fair value measurements, and also requires more detailed disclosure about activity within Level 3 fair value measurements. The changes to the ASC as a result of this update were effective for the Company on July 1, 2010, except for requirements related to Level 3, which are effective for the Company on July 1, 2011. The Company's adoption of this standard did not and is not expected to have a material impact on our consolidated and combined financial statements.

In May 2011, the FASB issued ASU 2011-04, Amendments to Achieve Common Fair Value Measurement and Disclosure Requirements in U.S. GAAP and IFRS. The new guidance limits the highest-and-best-use measure to nonfinancial assets, permits certain financial assets and liabilities with offsetting positions in market or counterparty credit risks to be measured at a net basis, and provides guidance on the applicability of premiums and discounts. Additionally, the new guidance expands the disclosures on Level 3 inputs by requiring quantitative disclosure of the unobservable inputs and assumptions, as well as description of the valuation processes and the sensitivity of the fair value to changes in unobservable inputs. This standard is effective for the Company on July 1, 2011. The Company's adoption of this guidance is not expected to have a material impact on our consolidated and combined financial statements.

In September 2011, the FASB issued ASU 2011-08, Intangibles – Goodwill and Other, which allows an entity to first assess qualitatively whether it is necessary to perform the two-step goodwill impairment test. Under these amendments, an entity is not required to calculate the fair value of a reporting unit unless the entity determines, based on a qualitative assessment, that it is more likely than not that its fair value is less than its carrying amount. ASU 2011-08 would have been effective for the Company on July 1, 2012, but the Company elected early adoption as of July 1, 2010. The Company's adoption of this guidance did not have a material impact on our consolidated and combined financial statements.

Subsequent events: The Company evaluates subsequent events through March 30, 2012, the date on which the financial statements are available to be issued. See Note 13 for subsequent events.

**Kaseman Holdings, LLC And Subsidiaries And Sallyport Holdings, LLC And Subsidiaries**

Notes To Consolidated And Combined Financial Statements (Dollars In Thousands)

Note 2.     Acquisition

On June 29, 2011, Sallyport Holdings, LLC entered into a Securities Purchase Agreement to acquire 100% of the shares of Sallyport Global Holdings, Inc. and Sallyport Global, Inc. The aggregate purchase price consisted of $49.7 million paid in cash, $5 million note payable to the seller, deferred amount of $2 million to be paid six months after the closing date, $4 million holdback amount as security for certain indemnification obligations of the seller to be paid at a time defined in the agreement, plus membership interests in the Sallyport Holdings, LLC to the selling shareholder valued at $3.8 million. The holdback amount has been reduced $960 for a working capital deficit and $152 for a minimum cash deficit, per the agreement, to a net amount of $2,888. The acquisition allows the combined companies to expand their capabilities worldwide, significantly benefiting their customers and business partners by being able to offer enhanced solutions to rapidly expanding requirements of their industry.

The following table summarizes the purchase price allocation for Sallyport Global Holdings, Inc. and Subsidiaries, based on the estimated fair values of assets acquired and liabilities assumed at the date of acquisition:

| Computation of purchase price: | | |
|---|---|---|
| Cash paid | $ | 49,815 |
| Note payable issued | | 5,000 |
| Deferred and holdback liability | | 4,888 |
| Rollover equity issued | | 3,871 |
| Less cash acquired | | (161) |
| Total acquisition price | | 63,413 |
| | | |
| Fair value of liabilities assumed | | |
| Accounts payable | | 3,234 |
| Accrued expenses | | 16,194 |
| Total fair value of liabilities assumed | | 19,428 |
| Total purchase price to be allocated to assets acquired | $ | 82,841 |

| Allocation of Purchase Price | | |
|---|---|---|
| Fair value of assets acquired: | | |
| Accounts receivable, net | $ | 32,807 |
| Prepaid expenses and other assets | | 7,941 |
| Property and equipment | | 1,169 |
| Identifiable intangible assets | | 10,550 |
| Goodwill | | 30,374 |
| | $ | 82,841 |

Separately identifiable intangibles were valued by a third-party valuation specialist. Customer related intangibles were valued using the discounted cash flow method. Total transaction costs related to the acquisition of $2,952 are reported in the statement of operations for the year ended June 30, 2011.

Kaseman Holdings, LLC And Subsidiaries And Sallyport Holdings, LLC And Subsidiaries

Notes To Consolidated And Combined Financial Statements (Dollars In Thousands)

**Note 3.    Accounts Receivable**

Accounts receivable at June 30, 2011, consist of the following:

| | | |
|---|---|---:|
| Billed accounts receivable | $ | 36,860 |
| Unbilled accounts receivable | | 8,664 |
| Other receivables | | 10 |
| | | 45,534 |
| Less allowance for doubtful accounts | | 1,021 |
| | $ | 44,513 |

**Note 4.    Property And Equipment**

Property and equipment as of June 30, 2011, consist of the following:

| | | |
|---|---|---:|
| Furniture and fixtures | $ | 410 |
| Machinery and equipment | | 1,208 |
| Computers and software | | 1,062 |
| Leasehold improvements | | 158 |
| | | 2,838 |
| Less accumulated depreciation and amortization | | 583 |
| | $ | 2,255 |

Depreciation and amortization charged to operations was $279 for Kaseman Holdings, LLC for the year ended June 30, 2011, and Sallyport Holdings, LLC for the period from June 29, 2011 (Inception) through June 30, 2011.

**Kaseman Holdings, LLC And Subsidiaries And Sallyport Holdings, LLC And Subsidiaries**

Notes To Consolidated And Combined Financial Statements (Dollars In Thousands)

Note 5.    Goodwill And Intangible Assets

The following table summarized the change in goodwill for the year ended June 30, 2011:

| | | |
|---|---|---:|
| Goodwill, June 30, 2010 | $ | 25,017 |
| Goodwill adjustment (Kaseman) | | 6,001 |
| Goodwill acquired (Sallyport) | | 30,374 |
| Goodwill, June 30, 2011 | $ | 61,392 |

During the year ended June 30, 2011, the Company paid $6,001 to liquidate the Class Z members who were former owners of Kaseman prior to the 2008 DC Capital acquisition. The payment was triggered by certain transactions occurring during the year ended June 30, 2011, and is considered an adjustment to the Kaseman purchase price. At the time of the acquisition, the accounting standards did not require contingency payments to be recorded as part of the original purchase price allocation, but rather provided for adjustment through goodwill when the amount became known. As such, the payment to the Class Z members is an adjustment to goodwill in the current year.

As of June 30, 2011, the Company had identifiable intangible assets as follows:

| | Gross Carrying Amount | | Accumulated Amortization | | Net Carrying Amount | |
|---|---:|---|---:|---|---:|---|
| Customer-related intangibles (Kaseman) | $ | 7,480 | $ | (6,332) | $ | 1,148 |
| Customer-related intangibles (Sallyport) | | 10,550 | | - | | 10,550 |
| | $ | 18,030 | $ | (6,332) | $ | 11,698 |

The Company evaluated various aspects of business operations, relationships with its vendors and customers, overall industry and market conditions, and other objective and subjective considerations in its determination of the fair values assigned to the identifiable intangible assets and the related estimated lives, which are being utilized to amortize these assets and monitor the business environment associated with these costs, to determine if it needs to revise the estimated lives being utilized to amortize these assets.

Amortization expense charged to operations was $1,279 for Kaseman Holdings, LLC for the year ended June 30, 2011. Estimated aggregate amortization in future years is as follows:

Years Ending June 30,

| | | |
|---|---|---:|
| 2012 | $ | 7,707 |
| 2013 | | 3,195 |
| 2014 | | 796 |
| | $ | 11,698 |

13

**Kaseman Holdings, LLC And Subsidiaries And Sallyport Holdings, LLC And Subsidiaries**

Notes To Consolidated And Combined Financial Statements (Dollars In Thousands)

Note 6.    Long-Term Debt

The following is a summary of amounts outstanding as of June 30, 2011:

| | | |
|---|---|---:|
| Senior indebtedness: | | |
| Term loan, net of discount of $825 | $ | 34,175 |
| Revolving credit facility, net of discount of $300 | | 5,700 |
| Total senior indebtness | | 39,875 |
| Subordinated notes, net of discount of $1,741 | | 58,259 |
| IDS notes payable | | 1,010 |
| Total long-term debt | | 99,144 |
| Less current maturities of long-term debt | | 6,900 |
| Total long-term debt, less current maturities | $ | 92,244 |

In connection with the acquisition discussed in Note 2, the Company entered into a financing arrangement with a new creditor and terminated the former line of credit agreement. Subordinated notes held were also replaced with new subordinated notes.

2011 Term Debt and Revolving Credit Facility
In conjunction with the Sallyport acquisition, the Company entered into a new credit facility as of that date with a group of lenders and Sallyport and Kaseman as joint borrowers. The credit facility consists of a term loan of $35 million and a $20 revolving credit line, both with a maturity date of June 15, 2015. The credit facility requires that certain financial and non-financial covenants be met on a quarterly basis, and is secured by substantially all of the Company's assets.

The term loan requires quarterly installments of $2,300,000 beginning on the last business day of December 2011, and continuing on the last business day of each March, June, September and December thereafter through the maturity date. Interest on the term loan is either at a base rate or Eurodollar rate. Base rate means for any day a fluctuating rate per annum equal to the highest of (a) the Federal Funds Rate plus ½ of 1% (b) the rate of interest in effect for such day as publicly announced by the lender as its prime rate and (c) the Eurodollar Rate plus 1%. Eurodollar rate means for any interest period, the rate per annum equal to (i) the British Bankers Association LIBOR Rate as published two days prior to the interest period or (ii) if such rate is not available at such time for any reason, the rate per annum determined by the administrative agent to be the approximate rate being offered by the lender's London branch to major banks in the London interbank Eurodollar market. As of June 30, 2011, the term loan had an outstanding balance of $35 million and an interest rate of 6.25%.

The revolving credit line provides for a $20 million borrowing capacity, with a sublimit in the credit agreement of $20 million available for letters of credit and $3 million for a swing line loan. There are no scheduled repayments; until maturity, the Company is permitted to borrow, repay and reborrow as long as the outstanding balance and commitments for letters of credit and swing line loan does not exceed $20 million. Interest on borrowings under the revolver is at the Company's option, the base rate or Eurodollar rate as described above. There was $6 million outstanding on the revolving credit line as of June 30, 2011, and the interest rate was 6.25%. There were no outstanding borrowings on the swing line or letters of credit as of June 30, 2011.

In conjunction with the 2011 Term Debt and Revolving Credit Facility, the Company recorded a debt discount of $1,125 for fees paid to the lenders. In addition, $711 of fees paid to third parties was capitalized as deferred loan costs. Fees related to the term loan and revolving credit line were allocated between them based on specific identification or pro-rata basis, as applicable, and are being amortized to interest expense until the maturity date of the debt.

**Kaseman Holdings, LLC And Subsidiaries And Sallyport Holdings, LLC And Subsidiaries**

**Notes To Consolidated And Combined Financial Statements (Dollars In Thousands)**

Note 6.   Long-Term Debt (Continued)

Subordinated Notes

As of July 1, 2010, Kaseman had subordinated notes with three parties that are also member unit holders for a total of $17,869. During January and April 2011, Kaseman issued three additional notes totaling $5,000 and one note for $3,500, respectively, for aggregate total new borrowings of $8,500. These notes were unsecured and were subordinated to borrowings under the 2008 Revolving Credit Agreement. Borrowings under the subordinated notes bear interest at 13% per year plus 1.75% paid-in-kind interest plus 2% penalty interest. Paid-in-kind interest accrued during the year was $645. As part of the Sallyport acquisition, the subordinated notes held by Kaseman were paid off and new subordinated notes were issued to Kaseman and Sallyport as co-borrowers. Kaseman paid pre-payment penalty interest of $780 in conjunction with the early pay-off of the notes.

The new borrowings by Kaseman and Sallyport consisted of five notes with a total outstanding balance of $60,000 as of June 30, 2011. The notes were issued with a total discount of $1,741 which will be amortized over the loan term. Under the notes, the Company is subject to certain financial and nonfinancial covenants and restrictions including leverage ratios and minimum operational thresholds. Borrowings under the subordinated notes bear interest at an annual rate of 14.5%, which is required to be paid quarterly. Borrowings on the subordinated notes are payable on June 29, 2017, except if paid earlier at the option of the Company or from certain liquidating or recapitalization events as defined. Prepayment penalties, ranging from 2 – 3%, may be applied to principal payments made before the maturity date.

For Kaseman, the change in notes was treated as a modification and fees paid to the lenders, including the prepayment penalties described above, were recorded as debt discount and amounted to $875. As Sallyport did not hold any previous notes with the lenders, amounts paid to the subordinated lenders of $866 are recorded as a debt discount and fees paid third parties of $1,287 are capitalized as deferred loan costs.

2008 Revolving Credit Facility

Prior to the June 28, 2011, financing, Kaseman had a revolving credit agreement (Revolving Credit Agreement) with a commercial bank that provided access to a revolving credit facility. The Revolving Credit Agreement provided for borrowings of up to $20,000. The Revolving Credit Agreement was collateralized by substantially all of the Company's assets. Interest on borrowings under the Revolving Credit Agreement was based on the Company's option of either (i) a rate based on the London Interbank Offered Rate plus a margin ranging from 2.0% to 3.25% or (ii) a rate based on the base rate, which is defined as the higher of the federal funds rate plus one-half of 1% or the prime rate plus a margin of up to 0.5%. The 2008 Revolving Credit Facility was terminated June 28, 2011. The Company also paid a fee ranging from 0.25% to 0.375% of the amount of unused availability to maintain the Revolving Credit Agreement. The Company was subject to certain financial and nonfinancial covenants.

IDS Notes Payable

IDS entered into two note agreements, one with DC Capital and the other with the noncontrolling member on March 16, 2011, which totaled $1,010. The notes are due March 16, 2014, and charge interest at a rate of 14.5%; accrued interest is required to be paid monthly. There are prepayment penalties ranging between 1 – 5% in the event any portion of the principal is paid prior to the maturity date.

Interest expense charged to operations was $4,324 for Kaseman Holdings, LLC for the year ended June 30, 2011, and Sallyport Holdings, LLC for the period from June 29, 2011 (Inception) through June 30, 2011.

Kaseman Holdings, LLC And Subsidiaries And Sallyport Holdings, LLC And Subsidiaries

Notes To Consolidated And Combined Financial Statements (Dollars In Thousands)

Note 6.     Long-Term Debt (Continued)

Maturities of long-term debt as of June 30, 2011, are as follows:

Years Ending June 30,

|  | | |
|---|---|---|
| 2012 | $ | 6,900 |
| 2013 | | 9,200 |
| 2014 | | 10,210 |
| 2015 | | 15,700 |
| 2016 | | - |
| Thereafter | | 60,000 |
| | $ | 102,010 |

Note 7.     Members' Equity

Kaseman

Kaseman has four classes of interests under the Amended and Restated Limited Liability Company Agreement (the LLC Agreement), which provides certain provisions for the governance of the Company as well as the transfer, issuance and buyback of members' interest. Only Class A members have voting interests. The priority rights and distributions of each class of member interest are as follows:

Class Z

Class Z members were entitled to a first priority distribution equal to (i) a cumulative 8.5% return on their member capital and (ii) their member capital. Class Z members could elect to request redemption of all or part of their member interests (and cumulative preferred return) upon the earlier of (i) six months following the repayment of all long-term debt subordinated to the Revolving Credit Agreement, (ii) May 31, 2013, or (iii) a change of control, as defined in the LLC Agreement. Due repayment of the subordinated long-term debt, the first triggering event described above occurred, and the Class Z members' interest was paid out. The total amount paid was $6,001, consisting of $4,625 of the Class Z preferred interest and an 8.5% cumulative return of $1,376.

Class A

Class A interests were issued as a result of capital contributions from the members. Following distributions to Class Z members, Class A members are entitled to (i) a cumulative 8.5% return on the value of their respective capital accounts and (ii) return of their capital accounts. Class A members also share 90% of any residual funds available for distribution after the initial distributions to Class Z and Class A members. The unpaid cumulative 8.5% return on Class A interest was $2,687 at June 30, 2011.

Class B

Class B interests were issued to certain members of senior management during 2008. Following distributions to Class Z and Class A members, Class B members are entitled to distributions only upon certain liquidating events at amounts that equal first, the pro rata amount paid to Class A members for their cumulative 8.5% return on their respective capital accounts and second, 10% of any residual funds available for distribution after all senior distributions, including their own, are made. Of the 10% interest allocated to Class B, approximately 8% has been granted as of June 30, 2011.

Kaseman Holdings, LLC And Subsidiaries And Sallyport Holdings, LLC And Subsidiaries

Notes To Consolidated And Combined Financial Statements (Dollars In Thousands)

Note 7.     Members' Equity (Continued)

The fair value of Class B interests was determined at the dates the interests were granted based on the probability-weighted expected return of various potential liquidating events. The Class B awards vest 20% per year over five years on the anniversary of the grant with accelerated vesting upon certain change of control events, as defined in the agreements. Upon any such change of control event, any unvested portions of Class B awards remain unvested unless and until the holder of such award remains employed by the Company or any of its affiliates for one year following such event, unless other conditions are met.

The Company has the right, but not the obligation, to redeem the vested Class B interests, at fair market value, if the holder terminates employment for "other than cause." Class B interests are also subject to dilution in connection with future needs to raise additional equity capital.

The Company completed valuations of the Class B interests at the time of issuance using a discounted cash flow mode. No expense has been recognized in the year ended June 30, 2011, as any expense would be insignificant.

Class B interests consist of the following as of June 30, 2011:

|  | Ownership Percentage |
|---|---|
| Unvested at June 30, 2010 | 5.77% |
| Granted | 1.02% |
| Vested | -1.20% |
| Forfeited | -0.80% |
| Unvested at June 30, 2011 | 4.79% |

Sallyport
Sallyport has two classes of interests under the Amended and Restated Operating Agreement (the Operating Agreement), which provides certain provisions for the governance of the Company as well as the transfer, issuance and buyback of members' interest. Only Class A members have voting interests. The priority rights and distributions of each class of member interest are as follows:

Class A
Class A interests were issued as a result of capital contributions from the members. Class A members are entitled to a return of their capital accounts prior to any other distributions, provided it does not result in an adjusted capital deficit. After the return of capital, distributions are proportional based on net book adjustments and percentage interests as defined by the Operating Agreement.

Class B
The Operating Agreement allows for Class B profit sharing interests to be awarded to executive management. No Class B shares were awarded as of June 30, 2011.

Note 8.     Retirement Plans

Kaseman maintains a 401(k) plan. On the first day of the month after employment commences, eligible employees can contribute up to 100% of their annual eligible income and the Company will match 50% of the first 4% of the employee's contribution up to the Internal Revenue Service covered compensation maximum. $63 was charged to operations for the year ended June 30, 2011.

**Kaseman Holdings, LLC And Subsidiaries And Sallyport Holdings, LLC And Subsidiaries**

Notes To Consolidated And Combined Financial Statements (Dollars In Thousands)

Note 9.     Leasing Arrangements

The Company leases certain office space and equipment under various non-cancelable operating leases expiring at various dates through September 2016. The leases are subject to increases for operating expenses and real estate taxes. Rent expense, along with the related operating expenses, charged to operations for the year ended June 30, 2011, was $1,045.

Future minimum lease payments as of June 30, 2011, are as follows:

| Years Ending June 30, | | |
|---|---|---|
| 2012 | $ | 756 |
| 2013 | | 787 |
| 2014 | | 818 |
| 2015 | | 851 |
| 2016 | | 810 |
| | $ | 4,022 |

Note 10.     Income Taxes

The Company is a limited liability company (LLC) for federal income tax purposes, which applies to most states. As an LLC it is generally not subject to income taxes. One of the Company's subsidiaries, Sallyport Global Holdings, Inc. (SGH), is a C corporation.

No provision is made for U.S. income taxes on the undistributed earnings of non-U.S. subsidiaries because these earnings are deemed indefinitely reinvested or otherwise indefinitely retained for continuing international operations. The Company is not subject to tax in foreign jurisdictions in which it operates, as a result of local country exemptions granted to government contractors of USAID donor work. These earnings would become subject to income tax if they were remitted as dividends, were loaned to the Company or a U.S. affiliate, or if the Company were to sell its ownership interest in the subsidiaries. Determination of the amount of unrecognized deferred U.S. income tax liability on these unremitted earnings is not practicable.

Effective with its tax years starting in 2008, the Company and its subsidiaries have adopted accounting guidance related to certain tax positions which prescribes a comprehensive model for recognizing, measuring, presenting, and disclosing in the financial statements tax positions taken or expected to be taken on a tax return. Under the guidance, a tax benefit from an uncertain tax position may be recognized only if it is "more likely than not" that the position is sustainable based on technical merits.

Kaseman Holdings, LLC And Subsidiaries And Sallyport Holdings, LLC And Subsidiaries

Notes To Consolidated And Combined Financial Statements (Dollars In Thousands)

Note 10.    Income Taxes (Continued)

Significant judgment is required in determining the Company's provision for income taxes and recording the related assets and liabilities. In the ordinary course of the Company's business, there are transactions and calculations where the ultimate tax determination is uncertain. SGH maintains a management services agreement with an affiliated entity which provides labor and services for performance of its contracts. The Company has evaluated the terms of this arrangement and recorded a liability of $5,500 for unrecognized tax benefits expected to be taken on its tax return in connection with this service agreement. In conjunction with the Sallyport acquisition, the purchase agreement provides for indemnification from the seller for tax obligations of the acquired companies incurred through June 29, 2011. The amount of the indemnification is unlimited for domestic tax liabilities. The indemnification for foreign tax liabilities that Sallyport Global Holdings, Inc. did not know, and could not have known after reasonable inquiry as of the closing date that it would have an obligation to pay, is limited to $4 million. $5 million of the purchase price that was otherwise payable to the Seller is held in a trust account with a financial institution as a reserve for any tax indemnification claims. Additionally, the Company can reduce a $5 million subordinated note (Note 6) held by the Seller for any tax indemnification claims.  The Company has recorded an indemnification receivable as of June 30, 2011, of $5,500. The liability and asset are included as other long-term obligations and other assets, respectively, on the balance sheet.

The Company records accrued interest and penalties related to unrecognized tax benefits in income tax expense. The Company has recorded approximately $240,000 for interest and penalties related to previously recorded unrecognized tax benefits accrued as of June 30, 2011.

Kaseman files its income tax returns on a December 31 year end. Kaseman's December 31, 2008 through December 31, 2010 income tax returns remain subject to examination by taxing authorities. Sallyport's subsidiary, Sallyport Global Holdings, Inc., files its income tax returns on a July 31 year end. The subsidiary's July 31, 2008 through July 31, 2010 income tax returns remain subject to examination by taxing authorities.

Note 11.    Related Party Transactions

The Company has entered into management agreements with its majority shareholder, whereby the shareholder is paid certain fees for general management, transactional, financial and other corporate advisory services. The annual management fee is $375, to be paid on a quarterly basis, plus reasonable and customary out-of-pocket expenses associated with services to the Company. The management agreements continue through June 2018 unless terminated in connection with certain change of control events or as may be mutually agreed upon by the parties. Fees and expenses paid under this agreement for the year ended June 30, 2011, were $371.

The Company has an amount due to a member of $510 at June 30, 2011. The amount is non-interest bearing and unsecured. The Company intends to repay the amount during the next fiscal year. The Company also had an amount due of $1,398 due from a related party service professional service provider; the entire amount had been received from the related party by November 2011.

**Kaseman Holdings, LLC And Subsidiaries And Sallyport Holdings, LLC And Subsidiaries**

Notes To Consolidated And Combined Financial Statements (Dollars In Thousands)

**Note 12.    Contingencies**

The Company, at times, may recognize revenue in excess of the funded value due to timing of funding provided by the U.S. government. Management believes that the Company has complied with the Limitation of Funds Clause as required by FAR 52 and has shown a history of being subsequently funded. Management believes that the Company is at no significant risk of liability related to underfunded amounts.

The Company is subject to various claims and assessments during the normal course of business. In the opinion of management, none of these will result in a material adverse impact on the Company's financial position or results of operations. Accordingly, no liability has been recorded in the accompanying consolidated and combined financial statements related to these matters.

**Note 13.    Subsequent Events**

Effective July 29, 2011, Kaseman Holdings, LLC and Sallyport Holdings, LLC entered into an agreement to merge Sallyport with and into Kaseman. Upon the merger date, the name of the surviving entity was changed to KS International LLC.

In September 2011, the Company entered into a Securities Purchase Agreement for 100% of the ownership interest in Project Management Services, Inc. The purchase price was $2.5 million. The Company obtained a $2.5 million supplemental term loan to finance the acquisition.

McGladrey & Pullen, LLP

 McGladrey

**Independent Auditor's Report On The Supplementary Information**

To the Board of Directors
Kaseman Holdings, LLC and Subsidiaries and Sallyport Holdings, LLC and Subsidiaries
McLean, Virginia

Our audit was made for the purpose of forming an opinion on the basic consolidated and combined financial statements taken as a whole for Kaseman Holdings, LLC for the year ended June 30, 2011, and for Sallyport Holdings, LLC for the period from June 29, 2011 (Inception) though June 30, 2011. The supplementary information presented in the Proforma Consolidated and Combined Statements of Operation, including the information for the period July 1, 2010 through June 28, 2011, for Sallyport Holdings, Inc. is presented for purposes of additional analysis and is not a required part of the basic financial statements. The Total* column is the combination of the combined statements of operations for Kaseman Holdings, LLC and Subsidiaries and Sallyport Holdings, LLC and Subsidiaries for the periods described above and Sallyport Global Holdings, Inc. and Subsidiaries for the period July 1, 2010 through June 28, 2011, and is not intended to be a presentation in conformity with accounting principles generally accepted in the United States. Such information has been subjected to the auditing procedures applied in the audits of the basic combined financial statements and, in our opinion, is fairly stated in all material respects in relation to the basic consolidated and combined financial statements taken as a whole.

The supplementary information presented in the Schedule of Adjusted Operating Earnings Before Interest, Taxes, Depreciation and Amortization (Non-GAAP Measure) is presented for purposes of additional analysis and is not a required part of the basic consolidated and combined financial statements. Such information has not been subjected to the auditing procedures applied in the audit of the basic consolidated and combined financial statements and, accordingly, we express no opinion on it.

*McGladrey & Pullen, LLP*

Vienna, Virginia
March 30, 2012

21

Kaseman Holdings, LLC And Subsidiaries And Sallyport Holdings, LLC And Subsidiaries

Proforma Consolidated And Combined Statements Of Operations
Year Ended June 30, 2011
(Dollars In Thousands)

| | Kaseman Holdings, LLC For The Year Ended June 30, 2011, And Sallyport Holdings, LLC For The Period June 29, 2011 (Inception) Through June 30, 2011 | Sallyport Global Holdings, Inc. And Subsidiaries July 1, 2010 Through June 28, 2011 | Total* |
|---|---|---|---|
| Revenue | $ 50,366 | $ 165,412 | $ 215,778 |
| Cost of revenue | 38,615 | 122,817 | 161,432 |
| Gross profit | 11,751 | 42,595 | 54,346 |
| | | | |
| Operating expenses: | | | |
| Selling, general and administrative | 13,623 | 11,243 | 24,866 |
| Depreciation and amortization | 1,558 | 590 | 2,148 |
| Transaction expenses | 2,952 | - | 2,952 |
| Operating (loss) income | (6,382) | 30,762 | 24,380 |
| | | | |
| Other income | - | 510 | 510 |
| Interest expense, net | 4,324 | (53) | 4,271 |
| (Loss) income attributable to Company | (10,706) | 31,325 | 20,619 |
| | | | |
| Less net income attributable to the noncontrolling interest | 32 | - | 32 |
| | | | |
| Net (loss) income | $ (10,738) | $ 31,325 | $ 20,587 |

* Represents the combined results of operations for the twelve-month period ended June 30, 2011, for Kaseman Holdings, LLC and Subsidiaries and Sallyport Holdings, LLC and Subsidiaries for the period June 29, 2011 (Inception) through June 30, 2011, and Sallyport Global Holdings, Inc. and Subsidiaries for the period July 1, 2011 through June 28, 2011.

**Kaseman Holdings, LLC And Subsidiaries And Sallyport Holdings, LLC And Subsidiaries**

**Schedule Of Adjusted Operating Earnings Before Interest, Taxes, Depreciation
    And Amortization (Non-GAAP Measure)**
**Year Ended June 30, 2011**
**(Dollars In Thousands)**

| | Kaseman Holdings, LLC For The Year Ended June 30, 2011, And Sallyport Holdings, LLC For The Period June 29, 2011 (Inception) Through June 30, 2011 | | Sallyport Global Holdings, Inc. And Subsidiaries July 1, 2010 Through June 28, 2011 |
|---|---|---|---|
| Net income (loss) | $ | (10,738) | $ 31,325 |
| Interest expense, net | | 3,894 | (53) |
| Realized gains | | - | (562) |
| Depreciation | | 279 | 590 |
| Amortization of intangibles | | 1,279 | - |
| Amortization of deferred financing costs | | 430 | |
| Management fees | | - | - |
| One-time restructuring costs | | 192 | - |
| Acquisition related costs | | 2,952 | 2,174 |
| Shareholder salary and bonus | | - | 4,770 |
| Adjusted Operational EBITDA | $ | (1,712) | $ 38,244 |

The Company defines Adjusted Operating EBIDTA as gross earnings before interest, taxes, depreciation and amortization as adjusted for restructuring/moving expenses, and other non-core and one-time-expenses. The Company presents the Adjusted Operating EBITDA for the consolidated companies because they believe Operating EBITDA is a useful analytical tool for assessing financial performance, including the ability to meet future debt service obligation and capital expenditure and working capital requirements. Operating EBITDA is not, however, a measure of financial performance or liquidity under U.S. generally accepted accounting principles (non-GAAP). Accordingly, Operating EBITDA should not be considered a substitute for net income or cash flows as an indicator of operation performance or liquidity. Note that $625 in income for forgiveness of amounts to a related party professional service provider is included in Sallyport net income and EBITDA for the period of July 1, 2010 through June 28, 2011.