D4JAACHAA                    Argument

1   UNITED STATES DISTRICT COURT
    SOUTHERN DISTRICT OF NEW YORK
2   ------------------------------x

3   THOMAS W. CHARRON, JR.,

4                   Plaintiff,

5            v.                              12 CV 6837 (WHP)

6   SALLYPORT GLOBAL HOLDINGS,
    INC., ET AL.,
7
                    Defendants.
8
    ------------------------------x
9                                            New York, N.Y.
                                             April 19, 2013
10                                           12:00 p.m.

11  Before:

12                  HON. WILLIAM H. PAULEY III,

13                                           District Judge

14                          APPEARANCES

15  BAILEY & GLASSER, LLP
         Attorneys for Plaintiff Charron
16  BY:   JAMES B. PERRINE
    ATHANASIOS BASDEKIS
17
    HUSCH BLACKWELL, LLP
18       Attorneys for Defendant Sallyport
    BY:   BRIAN P. WAGNER
19

20

21

22

23

24

25

                    SOUTHERN DISTRICT REPORTERS, P.C.
                          (212) 805-0300

D4JAACHAA                          Argument

1    (Case called)

2         THE COURT:  Good morning, counsel.  Please be seated.

3         MR. PERRINE:  J. B. Perrine and Athanasios Basdekis,

4    your Honor, for the plaintiff.

5         THE COURT:  Good morning, Mr. Perrine and

6    Mr. Basdekis.

7         MR. WAAGNER:  Good morning, your Honor.

8         Brian Waagner, for the defendants.

9         THE COURT:  Good afternoon, Mr. Waagner.

10        This is oral argument on the defendant's motion to

11   dismiss.  Do you want to be heard, Mr. Waagner?

12        MR. WAAGNER:  Yes, your Honor.  Thank you.  I will try

13   to be brief because I know you've read the briefs which were

14   extensive.

15        We view this case as an effort by the plaintiff who is

16   bound to a contract under which he received a $40 million pay

17   out for his interest in the company that he was a part owner

18   of.  This complaint is an effort to renegotiate the terms of

19   that contract using contract law, tort law, every bit of law

20   that the plaintiff could muster.  And in our view none of the

21   arguments that had been asserted by the plaintiff can avoid the

22   dismissal of the case especially the tort counts.

23        I want to talk about the fraud count first.  The only

24   allegation as to any statement that's alleged to have been

25   fraudulent appears in Paragraph 31 of the complaint under which

1      the plaintiff alleges that John DeBlasio advised the plaintiff

2      that D.C. Capital Partners was no longer interested in doing an

3      acquisition of Sallyport Global.

4            In our view even, if that was true, assuming as we

5      must for purposes of the motion to dismiss, there is no basis

6      for a fraud claim first because it's duplicative of the

7      contract.  That representation happened shortly before the

8      plaintiff and Mr. DeBlasio and Sallyport Global Holdings

9      negotiated a contract to purchase Mr. Charron's interest in the

10     company.  Under that contract he received a $40 million payout

11     for his interest in the company.  And he also received that

12     windfall protection promise which provides for an additional

13     payment to Mr. Charron, precisely, in the event that windfall a

14     purchase occurs.  And it was precisely the potential for a deal

15     with D.C. Capital Partners or another one of the companies that

16     had been looking at making an acquisition to Sallyport Global

17     Holdings that was the reason for that windfall protection

18     provision.

19           Mr. Charron was, certainly, well informed about the

20     possibility that there was going to be a subsequent deal.  He

21     was the CEO of the company.  He was the part owner of the

22     company.  He was, certainly, sophisticated enough to understand

23     the parameters of that arrangement.  He engaged Williams &

24     Connelly to represent him in the negotiation of that contract.

25     So in our view, that fraud count goes away because it's

1  duplicative for -- exactly duplicative of the contract claim.

2           Moreover, there's no reliance on the part of

3  Mr. Charron and, certainly, no reasonable reliance.  He engaged

4  counsel and negotiated contract provisions to protect himself,

5  etc.  The claim, if there is one, falls under the contract.

6           THE COURT:  If the defendants knowingly obscured the

7  real enterprise value of Sallyport, couldn't that constitute a

8  fraud as well as a breach of contract?

9           MR. WAAGNER:  There's two aspects of that.  The

10  allegation in the complaint is that there was an attempt to

11  obscure the enterprise value after the fact.  And that,

12  certainly, couldn't be an allegation, couldn't support an

13  allegation of fraud because there is a contract remedy.  If

14  there was an attempt to obscure an after the fact it,

15  certainly, would be the element of reliance that would have led

16  Mr. Charron to take some action to his detriment.  It,

17  certainly, didn't do that.  And if there was some kind of

18  obfuscation or something that was improper under the contract

19  then the contract would protect Mr. Charron's interests.

20           THE COURT:  What about the cash transfers?

21           MR. WAAGNER:  The cash transfers were legitimate

22  activities of the 100 percent shareholder owner of the company

23  that happened prior to the transfer.  And in our view the cash

24  transfers are not a basis for a claim precisely because the

25  contract doesn't address that.  The contract says if there is a

1    sale at a price reflecting an enterprise value of $65 million

2    then there would be an additional payment due as a windfall

3    payment.

4              The cash transfers that happened prior to that were,

5    one, there was, certainly, nothing improper about those.  All

6    the transactions that had been under consideration prior to the

7    D.C. Capital Partners transaction had been on the basis of a

8    cash free deal.  No company was going to acquire a company and

9    pay one dollar to get a dollar of cash.

10             THE COURT:  Why is the term "enterprise value"

11   ambiguous as applied to the Kaseman transaction, K-a-s-e-m-a-n,

12   the Kaseman transaction?

13             MR. WAAGNER:  It's not ambiguous because the contract

14   says "price".  It's not -- it doesn't allow for a third party

15   evaluation of enterprise value.  The contract says if a

16   transaction occurs at a price reflecting an enterprise value

17   then there's a windfall.  And the price here was for 100

18   percent of the stock, $64.5 million.  There really isn't any

19   ambiguity that needs to be resolved.  There is no doubt that

20   the price was $64.5 million.  There's, certainly, nothing in

21   the complaint, the reference to McGladry audit, for example.

22   That's a generally accepted accounting principle, sort of

23   analysis that's done for the acquiring company with respect to

24   how it records assets that it's acquired on its books for

25   depreciation purposes and other things.  It's not a

1     retrospected look at what the real value of the transaction

2     was.  In fact, the McGladry report was the real value of the

3     transaction was something less than $64.5 million with

4     holdbacks and what not.

5          I want to talk just about the good faith and fair

6     dealing elements.  The only argument that the plaintiff has

7     asserted with respect to good faith and fair dealing and

8     there's two counts to that is that it was his understanding

9     that the owners of Sallyport wouldn't take any action after he

10    sold out his interest in the company that would be to his

11    detriment.  Well, there, certainly, isn't anything in the

12    contract that would have supported that.  And if the Court were

13    to accept that as an argument, there would be one inconsistent

14    with the contract which the cases clearly don't allow.  And we

15    point out the Metropolitan Life Insurance case and a couple

16    other cases in our brief that are, specifically, on point with

17    respect to that.  That would be, essentially, an argument that

18    the plaintiff after having sold out his interest in the company

19    can have some say in what activities the company took after he

20    sold his interest.

21         Now, if John DeBlasio had decided to liquidate the

22    company or just to stop doing any activities altogether and

23    drive the company into the ground there, certainly, wouldn't be

24    any remedy at all.  There wouldn't be a tort remedy, etc., and

25    that's, essentially, what we're arguing about in our view.

D4JAACHAA                          Argument

1          THE COURT:  I think I understand your arguments.  Let

2     me hear from your adversary.

3          Mr. Perrine?

4          MR. PERRINE:  Yes, your Honor.

5          Your Honor, one thing is I believe as we pled in our

6     first amended complaint that we are willing to simplify this

7     case, preserve judicial economy, reduce litigation costs, all

8     the things in our interests and the Court's interests if the

9     defendants are willing to admit that they're bound to the

10    agreement, to the contract, the December 2010.  If the company,

11    John DeBlasio and World Peace Trust through its trustees are

12    willing to admit that they're bound to that agreement, then

13    we've pled all of these tort claims in the alternative.  And if

14    they're willing to admit they're bound to the agreement through

15    the duration of this litigation and won't raise that as a

16    defense now until we get to the jury or get before the Court,

17    then we're willing to dismiss the fraud and the tortuous

18    interference and the conspiracy and unjust enrichment claim.

19    We've pled them all in the alternative in the instance that the

20    Court would find that one of the defendants was not bound to

21    the contract.

22          THE COURT:  Well, let's focus on the contract aspects

23    of this case.  At the time of the two alleged, the first two

24    alleged windfall sales, weren't the World Peace Trust and the

25    Sallyport affiliates of Mr. DeBlasio?

1              MR. PERRINE:  No, your Honor.  We would say that

2      they're not affiliates.  One, with respect to the agreement and

3      in one of that is -- cause the contract says if John DeBlasio

4      or his affiliates or direct or indirect equity holder sells 20

5      percent or more of the company, then the windfall sale

6      occurred.  "Affiliates" isn't defined in the agreement.  So,

7      one is it's an undefined term in the agreement.  What does that

8      mean?  But more so, if you just look at the three things you

9      just named, your Honor, you have an individual, John DeBlasio,

10     who is a citizen of Illinois.  You have Sallyport Global

11     Holdings which is a Delaware C corporation.  Then you have the

12     World Peace Trust which is a Bermuda irrevocable charitable

13     trust which John DeBlasio does not control.  He cannot operate

14     that quarriable trust willy-nilly any way he wants.  They all

15     file separate tax returns.  There's been no argument on either

16     side of this case that the Court should pierce the corporate

17     veil of any of these entities.  They all file separate tax

18     returns.  The fact that on each one --

19             THE COURT:  Isn't it his trust?

20             MR. WAAGNER:  No, it's not his trust, your Honor.

21     It's not like a grand tort trust done for estate planning

22     purposes like the plaintiffs grand tort trust.  It is a Bermuda

23     entity that is governed by Bermuda law and it is not his.

24             THE COURT:  It's named for him.

25             MR. PERRINE:  It is named for him, that's correct,

1   your Honor, but --

2            THE COURT:  It's his money.

3            MR. PERRINE:  I would say he can't treat the money in

4   the trust any way that he wants to.  He can't take the money of

5   the trust and buy himself a Maserati.  He cannot do that.  If

6   it's in his bank account, John DeBlasio's personal bank

7   account, he could.  But if it's in the bank account of the

8   World Peace Trust he cannot take the money out and buy himself

9   a yacht and go sail around the French Riviera.  It is not his

10  money.  It is the trust money.  And he is the mere protector of

11  the trust.  He is not the trustee and he is not the

12  beneficiary.

13           THE COURT:  But aren't they affiliated?  I mean, isn't

14  the agreement clear that an affiliate is not a third party and

15  that a windfall sale has to be to a third party?

16           MR. PERRINE:  I would admit, your Honor, that third

17  party, little "t", little "p" is what's reared to trigger a

18  windfall sale.  I would say with all due respect, your Honor,

19  that at this point in time, a motion to dismiss stage that is

20  an ambiguous term in the contract.  It is not ripe for

21  dismissal.  It could be after the discovery is taken and

22  depositions are had and expert testimony weighs in that it

23  could be that they are what was in ten of the parties in

24  writing the agreement that the World Peace Trust is not a third

25  party.  But at this stage at best, your Honor, that is an

```
 1    ambiguous term in the contract.  That is not right for

 2    dismissal.

 3         THE COURT:  Doesn't the trust further DeBlasio's

 4    charitable goals, whatever they may be?

 5         MR. PERRINE:  Your Honor, the trust furthers the

 6    charitable objects that the trust itself through its trustees

 7    and directors appoint.  And John DeBlasio as I said, your

 8    Honor, is not the trustee.  He is the protector.  He is not the

 9    one who decides how the trust money should be spent and there's

10    restrictions in the trust document on what the purposes can be

11    used for.  John DeBlasio and the World Peace Trust are just

12    simply not the same, your Honor.

13         THE COURT:  I understand they're not the same.  The

14    question is whether they're third parties or affiliates.

15         MR. PERRINE:  And I would say, your Honor, at this

16    point in the litigation that is ambiguous at best and it cannot

17    be decided now on the present record.  Nobody is arguing to

18    disregard the corporate form.  If they were going to disregard

19    the corporate form then why for the first windfall sale did

20    they have all the formal agreements in place?  We had a

21    promissory note that was given by the Delaware Corp, Sallyport

22    Global Holdings, to Sallyport Global Services Limited, a

23    Bermuda entity.  And then the SGS, the Bermuda entity, gifted

24    that through a formal assignment to the World Piece Trust.  And

25    then again, you had formal documents of the capital
```

1    contribution of that same promissory note back to the company

2    and then you had a formal transfer of stock ownership to the

3    World Peace Trust.

4           THE COURT:  Couldn't a distinct entity still be an

5    affiliate without piercing any veil?

6           MR. PERRINE:  I think, your Honor, that it all depend

7    on what the intent of the parties was with respect to this

8    agreement and at this point in time that we have not proceeded

9    far enough in discovery to determine what the intent of the

10   parties was with respect to this particular transaction.  Could

11   it be?  It may be, your Honor, but we don't know yet because we

12   have not explored the intent of the parties on what was meant

13   by this provision and it is not defined in the agreement.

14          THE COURT:  How could SGS or JPD trust be liable for

15   breach of contract?

16          MR. PERRINE:  Well, one, your Honor, if they admit

17   they're bound to the agreement they're acting.  So, one, they

18   can assume the agreement which we have stated in our papers

19   that the JPD Trust as trustees for World Peace Trust has

20   assumed contractual liability and that in the agreement it

21   states that the company or the selling stockholder in this --

22   and for the -- I guess, the Court is referring to the third

23   windfall sale because that would be the sale which the trust

24   was the selling stockholder, that the trust was the selling

25   stockholder can only be held liable to the contract through its

D4JAACHAA                         Argument

1     representative, the trustee, which is SGS, the former trustee,

2     and not JPD trust, the current trustee.  And so even though

3     they may have not been signatories to the agreement that the

4     agreement, specifically, makes reference to them as selling

5     stockholders, they knew about the agreement because John

6     DeBlasio was the president of SGS, was the protector of the

7     trust.  He did sign and negotiate the agreement with Tom

8     Charron, so that SGS was aware and JPD was aware of the

9     agreement and that they both benefited from the agreement and

10    that the shares obtained from Tom Charron were transferred to

11    the World Peace Trust.  And World Peace Trust sold those shares

12    and in exchange has received roughly $89 million.

13              And I would say, your Honor, the current trustee of

14    the trust is not arguing that the trust is not bound to the

15    agreement.  In fact, they're saying just the opposite in their

16    papers that they are bound to the agreement.

17              THE COURT:  All right.  Anything further?

18              MR. PERRINE:  No, your Honor.

19              THE COURT:  Anything further, Mr. Waagner?

20              MR. WAAGNER:  Just on the affiliate question.  You can

21    look at the exhibits to the first amended complaint and it

22    identifies John DeBlasio as the signatory on both sides of

23    those transactions which are affiliated company transactions.

24    There is no ambiguity about whether they are affiliates or not.

25    The documents attached to the amended complaint clearly address

1    that.

2            THE COURT:  This Court has reviewed all of the

3    parties' extensive motion papers and I've considered your

4    arguments and I am prepared to rule on motion.

5            The plaintiff Thomas W. Charron, Jr. asserts breach p

6    contract and tort claims against defendants, Sallyport Global

7    Holdings Inc., Sallyport Global Services Limited, JPD Private

8    Trust Company Limited and John P. DeBlasio.  All defendants

9    move pursuant to Rule 12(b)(6) to dismiss Charron's amended

10   complaint for failure to state a claim.  SGS, that's Sallyport

11   Global Services, also moves to dismiss on personal jurisdiction

12   grounds under Rule 12(b)(2).

13           Demonstrating personal jurisdiction is Charron's

14   burden.  See Robinson v. Overseas Military Sales Corp., 21 F.3d

15   502, 507 (2d Cir. 1994).  To meet his burden, Charron must make

16   a prima facie showing which requires an averment facts that, if

17   credited, would you suffice to establish jurisdiction over the

18   defendant.  Chloe v. Queen Bee of Beverly Hills, LLC, 616 F.3d

19   158, 163 (2d Cir. 2010).  The Court construes the parties'

20   submissions in the light most favorable to Charron resolving

21   all doubts in his favor.  Southern New England Telephone Co. v.

22    Global NAPs Inc., 624 F.3d 123, 138 (2d Cir. 2010).

23           The Stock Purchase Agreement contains a New York form

24   selection clause.  But SGS, a Bermuda entity, did not sign the

25   agreement.  And the shareholders of a Delaware corporation like

1  Sallyport Global Holdings Inc. are not bound by the

2  corporation's contracts.  See NetJets Aviation Inc., v. LHC

3  Communications LLC 537 F.3d 168, 176 (2d Cir. 2008).  Because

4  there's indication that SGS IS claiming benefits under the

5  Stock Purchase Agreement, SGS is not bound by the Agreement's

6  form selection clause.  CF American Steamship Owners Mutual

7  Protection & Indemnity Association Inc. v. American Boat Co.,

8  No. 11 CV 6804 (PAE), 2012 WL 527209 at *4 (S.D.N.Y. February

9  17, 2012).

10        SGS's alleged contacts with New York are not nearly

11  continuous and systematic enough to subject it to general

12  jurisdiction here.  See In re: Terrorist Attacks on September

13  11, 2001, F.3d 2013 WL 1590255 at *10 (2d Cir. 2013).  And SGS

14  is not subject to long-arm jurisdiction and CPLR Section

15  302(a)(1) because it's alleged contacts with New York have

16  nothing to do with this lawsuit.  Accordingly Charron's claims

17  against SGS are dismissed for lack of personal jurisdiction.

18  Jurisdictional discovery is unwarranted because Charron

19  provides no information suggesting that such discovery would

20  uncover any facts showing personal jurisdiction over SGS.

21        Turning tot he 12(b)(6) motions, this Court accepts

22  the factual allegations in the complaint as true and construes

23  all reasonable inferences in plaintiff's favor.  McGarry v.

24  Pallito 687 F.3d 505, 510 (2d Cir. 2012).  To survive a motion

25  to dismiss "a complaint must contain sufficient factual matter

1    accepted as true, to state a claim to relief that is plausible

2    on its face."  Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009).

3            Regarding the breach of contract claims, Charron's

4    allegations show that the first two alleged windfall sales were

5    merely transfers among DeBlasio and his affiliates, not sales

6    to "third parties".  Because a windfall sale must be a sale to

7    a third party these two transactions cannot form the basis of a

8    breach of contract claim.  Charron's breach of contract with

9    respect to the first two alleged windfall sales are therefore

10   dismissed as are his faith and fair dealing claims in

11   connection with these transactions.

12           On the other hand, Charron states a plausible breach

13   of contract claim regarding the Kaseman transaction.  Whether

14   the Kaseman transaction reflected an enterprise value of

15   Sallyport greater than 65 million turns on disputed factual

16   issues including the purpose of Sallyport's cash transfers.

17   "If a contract is ambiguous as applied to a particular set of

18   facts, a Court has insufficient data to dismiss a complaint for

19   failure to state a claim."  Eternity Global Master Fund Limited

20   v. Morgan Guar. Trust Co., 375 F.3d 168, 178 (2d Cir. 2004).

21   At a minimum the Agreement's use of the term "enterprise value"

22   is ambiguous as applied to the Kaseman Transaction, at least

23   accepting Charron's allegations as true.  And this ambiguity

24   precludes resolving this claim at the pleading stage.

25   Similarly, whether defendants breached their implied covenant

1    of good faith and fair dealing in connection with the Kaseman

2    Transaction presents a factual question that cannot be resolved

3    on the pleadings.  See Anderson News, L.L.C. v. Am. Media Inc.

4    670 F.3d 162, 185 (2d Cir. 2012).

5            Because damages are a "largely factual issue," Ainger

6    v. Michigan General Corp., 632 F.2d 1025, 1027 (2d Cir. 1980),

7    they are not properly considered as a basis for dismissal of

8    Charron's contract claim at the pleading stage.  See Anderson

9    News 680 F.3d at 185.  Further, the plain language of Section

10   2.04 of the Stock Purchase Agreement shows that Sally may be

11   liable to Charron in the event of a windfall sale even if it

12   did not receive the proceeds from such a sale.  Accordingly,

13   defendants' motions to dismiss Charron's breach of contract

14   claim in connection with the Kaseman transaction are denied.

15           In addition to his breach of contract claims, Charron

16   brings an assortment tort claims asserting that defendants

17   conspired to deny him compensation for windfall sales.  But

18   this smorgasbord of claims reflect an unwarranted and all too

19   common attempt to transmogrify a straightforward contract

20   dispute into a wide-ranging tort case.

21           First, Charron's claims for tortious interference with

22   contractual relations fail.  The JPD Trust didn't exist at the

23   time of the first two purported breaches, so it cannot

24   plausibly have caused them.  And JPD Trust was formed under the

25   Kaseman Stock Purchase Agreement, so it did not plausibly cause

D4JAACHAA                    Argument

1  the Kaseman Transaction.  Further, even assuming that this

2  Court had jurisdiction over SGS, Charron alleges that SGS was a

3  mere conduit that DeBlasio used to facilitate his breaches.

4  SGS was not, therefore, the "but for" cause of any breach.  See

5  Granite Partners LP v. Bear, Stearns & Co., 17 F.Supp. 2d 275,

6  293 (S.D.N.Y. 1998).

7        Charron's claims for fraud and constructive fraud are

8  similarly unavailing.  Charron's fraud claim boils down to the

9  allegation that defendants intended to breach the windfall sale

10 provision from the outset.  But this theory is not cognizable.

11 "It is well settled under New York law that party cannot

12 maintain a claim fraud predicated on a breach of contract

13 merely by alleging that the breaching party never intended to

14 perform."  C3 Media & Marketing Group LLC v. FirstGate Internet

15 Inc., 419 F.Supp 2d 419, 430, (S.D.N.Y. 2005).  A fine opinion,

16 if I say so myself.  Further, DeBlasio's alleged statements are

17 not actionable because they're unrelated to uncertain future

18 events.  See Eternity Global Master Fund 375 F.3d at 187-88.

19 Accordingly, Charron's fraud and constructive fraud claims are

20 dismissed.

21       Next, Charron's civil conspiracy claim fails because

22 this is an ordinary breach of contract case, not a tort case.

23 Because Charron fails to state a claim regarding any underlying

24 tort, his civil conspiracy claim is dismissed.  See World

25 Wrestling Federation Entertainment, Inc. v. Bozell, 142 F.

1   Supp. 2d 514, 532-33 (S.D.N.Y. 2001).

2          Finally, Charron's unjust enrichment claims fail

3   because a written contract, the Stock Purchase Agreement,

4   governs whether Charron is entitled to compensation for the

5   purported windfall sales.  The existence of a valid and

6   enforceable written contract governing a particular subject

7   matter ordinarily precludes recovery in quasi contract for

8   events arising out of the same subject matter."  Deisel Props

9   S.r.L. v. Greystone Business Credit II LLC, 631 F.3d 42, 54,

10  (2d Cir. 2011).  Accordingly, Charron's unjust enrichment

11  claims are dismissed.

12         For the foregoing reasons defendant's motions to

13  dismiss are granted in part and denied in part.  All claims

14  against SGS are dismissed for lack of personal jurisdiction.

15  Charron's breach of contact claims against the first two

16  alleged windfall fall sales are dismissed as are his tort

17  claims.  But defendant's motion to dismiss Charron's breach of

18  contract claims regarding the Kaseman transaction are denied.

19  This constitutes the ruling of this Court.  I'll enter a short

20  order on the docket reflecting the ruling.

21         Now, do we have a discovery schedule in place in this

22  case?

23         MR. PERRINE:  We do, your Honor.

24         THE COURT:  All right.  So you'll proceed with

25  discovery.  If you can't settle the case -- but this is a

D4JAACHAA                    Argument

1    breach of contract case, so the concession that you were

2    seeking at the start of your argument, Mr. Perrine, has largely

3    been dealt with by the Court and this case should go forward

4    promptly and, ultimately, we'll try it if you don't settle it.

5              All right.  Anything further?

6              MR. PERRINE:  No, your Honor.

7              MR. WAAGNER:  No, your Honor.

8              THE COURT:  Thank you.  Have a good afternoon.

9                        (Adjourned)