AO 88B  (Rev. 06/09) Subpoena to Produce Documents, Information, or Objects or to Permit Inspection of Premises in a Civil Action

# UNITED STATES DISTRICT COURT
for the

Eastern District of Wisconsin

| | | |
|---|---|---|
| Thomas W. Charron, Jr., et al. | ) | |
| *Plaintiff* | ) | |
| v. | ) | Civil Action No.   1:12-cv-6837-WHP |
| Sallyport Global Holdings, Inc., et al. | ) | |
| | ) | (If the action is pending in another district, state where: |
| *Defendant* | ) | Southern District of New York           ) |

## SUBPOENA TO PRODUCE DOCUMENTS, INFORMATION, OR OBJECTS
## OR TO PERMIT INSPECTION OF PREMISES IN A CIVIL ACTION

To:  Nick Gross, 3733 S. Cherokee Way, Milwaukee, WI  53221

☑ *Production:* **YOU ARE COMMANDED** to produce at the time, date, and place set forth below the following documents, electronically stored information, or objects, and permit their inspection, copying, testing, or sampling of the material:  See attached Exhibit A.

| Place:  Accurate Process Services<br>5541 South 15 Place<br>Milwaukee, WI  53221 - or directly to undersigned | Date and Time:<br><br>05/28/2013 1:00 pm |
|---|---|

❒ *Inspection of Premises:* **YOU ARE COMMANDED** to permit entry onto the designated premises, land, or other property possessed or controlled by you at the time, date, and location set forth below, so that the requesting party may inspect, measure, survey, photograph, test, or sample the property or any designated object or operation on it.

| Place: | Date and Time: |
|---|---|
| | |

The provisions of Fed. R. Civ. P. 45(c), relating to your protection as a person subject to a subpoena, and Rule 45 (d) and (e), relating to your duty to respond to this subpoena and the potential consequences of not doing so, are attached.

Date:  ____05/03/2013____

*CLERK OF COURT*

OR

_____          _____
*Signature of Clerk or Deputy Clerk*                              *Attorney's signature*

The name, address, e-mail, and telephone number of the attorney representing *(name of party)*   Thomas W. Charron, Jr.
_____ , who issues or requests this subpoena, are:

Athanasios Basdekis (AB2574), Bailey & Glasser, LLP, 209 Capitol Street, Charleston, WV, 25301, (304) 345-6555, tbasdekis@baileyglasser.com.

## Exhibit A

Please refer to the following definitions of specific terms as used in these requests and as defined in Plaintiff's First Amended Complaint ("FAC"), attached hereto as Exhibit 1:

1.     "Sallyport Global Holdings, Inc." or "Sallyport" or "Company" shall refer to Sallyport Global Holdings, Inc., its agents, and all of its affiliates; all officers, directors, partners, owners, and members of Sallyport; and all other persons acting or purporting to act on its behalf including, but not limited to, its attorneys.

2.     "Sallyport Global Services Ltd. or "SGS" shall refer to Sallyport Global Services Ltd, its agent(s), and all of its affiliates; all officers, directors, partners, owners, and members of Sallyport; and all other persons acting or purporting to act on its behalf including, but not limited to, its attorneys.

3.      "KS International LLC" or "KSI" shall refer to KS International, LLC, its agent(s), and all of its affiliates; all officers, directors, partners, owners, and members of KS International LLC; and all other persons acting or purporting to act on its behalf including, but not limited to, its attorneys.

4.     "Sallyport Holdings LLC," shall refer to Sallyport Holdings LLC, its agent(s), and all of its affiliates; all officers, directors, partners, owners, and members of Sallyport Holdings LLC; and all other persons acting or purporting to act on its behalf including, but not limited to, its attorneys.

5.     "Kaseman, LLC" or "Kaseman" shall refer to Kaseman, LLC, its agent(s), and all of its affiliates; all officers, directors, partners, owners, and members of Kaseman; and all other persons acting or purporting to act on its behalf including, but not limited to, its attorneys.

6.     "Sallyport Global Inc." or "SGI" shall refer to Sallyport Global Inc., its agent(s), and all of its affiliates; all officers, directors, partners, owners, and members of SGI; and all other persons acting or purporting to act on its behalf including, but not limited to, its attorneys.

7.     "DeBlasio Group" shall refer to The DeBlasio Group, its agent(s), and all of its affiliates; all officers, directors, partners, owners, and members of The DeBlasio Group; and all other persons acting or purporting to act on its behalf including, but not limited to, its attorneys.

8.     "DeBlasio & DeBlasio Associates" shall refer to DeBlasio & DeBlasio Associates, its agent(s), and all of its affiliates; all officers, directors, partners, owners, and members of The DeBlasio Group; and all other persons acting or purporting to act on its behalf including, but not limited to, its attorneys.

9.     "John DeBlasio," shall refer to Gian Paul DeBlasio (aka John P. DeBlasio) his agent(s), and all other persons acting or purporting to act his behalf including, but not limited to, his attorneys.

10.     "Pat DeBlasio" shall refer to Pasquale DeBlasio his agent(s), and all other persons

1

acting or purporting to act his behalf including, but not limited to, his attorneys.

11.     "Franco DeBlasio," shall refer Franco DeBlasio his agent(s), and all other persons acting or purporting to act his behalf including, but not limited to, his attorneys.

12.     You" or "your" refers to the person or entity responding to this subpoena, your agents, affiliates, all officers, directors, partners, owners, members, and all other persons acting or purporting to act on your behalf including, but not limited to, your attorneys.

13.     "Defendants" collectively refers to each and every Defendant in this action.

14.     "John DeBlasio Charitable Trust for World Peace and Development," which later changed its name to the "GPD Charitable Trust dated December 7, 2010," shall refer to John DeBlasio Charitable Trust for World Peace and Development and the GPD Charitable Trust dated December 7, 2010, their agents, and all of its affiliates; all officers, directors, partners, owners, beneficiaries, and members of the John DeBlasio Charitable Trust for World Peace and Development and the GPD Charitable Trust dated December 7, 2010; and all other persons acting or purporting to act on its behalf including, but not limited to, Sallyport Global Services, Ltd. and JPD Private Trust company Ltd as trustees and their attorneys.

15.     "John DeBlasio Charitable Trust," which later changed its name to the "GPD Charitable Trust dated January 7, 2011," shall refer to the John DeBlasio Charitable Trust and the GPD Charitable Trust dated January 7, 2011, their agents, and all of its affiliates; all officers, directors, partners, owners, beneficiaries, and members of the John DeBlasio Charitable Trust and the GPD Charitable Trust dated January 7, 2011; and all other persons acting or purporting to act on its behalf including, but not limited to, Gian Paul DeBlasio and Pasquale DeBlasio, as trustees and their attorneys.

16.     "Lenders" shall refer to any person or entity that considered financing or financed the purchase of Sallyport Global Holdings Inc., including but not limited to PNC Bank, Bank of America, Kohlberg Capital Corporation, BNY-Mellon Alcentra Mezzanine III L.P., BNY Mezzanine Partners L.P., United Insurance Company of America, Solar Capital Ltd., Thomas J. Campbell, T. Gail Dady, and The John DeBlasio Charitable Trust for World Peace and Development.

17.     "Due Diligence Firms" shall refer to any entity that performed any diligence, whether legal, financial, tax or otherwise, on Sallyport Global Holdings Inc. in connection with or related to a proposed or actual purchase of all or any portion of Sallyport Global Holdings, Inc. or its assets, including but not limited to Ernst & Young, RSM International, McGladrey LLP, The McLean Group, The Spectrum Group, and Arnold & Porter.

18.     "Kaseman SPA" shall refer to that certain Securities Purchase Agreement dated May 6, 2011, and Amendment 1 dated June 29, 2011 by and among Defendant Sallyport, Non-Defendant Sallyport Holdings, Non-Defendant Kaseman, Non-Defendant Sallyport Global Inc., Defendant DeBlasio, and the Stockholders of Defendant Sallyport and of Sallyport Global Inc., including Disclosure Schedules 2.4, 6.4, 6.22, 6.33 and 6.34 thereto, attached to Plaintiff's First Amended Complaint as Exhibit H.

19.     Requests for any communication to or from Defendant John DeBlasio, include, but are not limited to, the following email accounts: jdeblasio@sallyportglobal.com, jdeblasio@comcast.net, and jdeblasio@bootstrapcapital.com.

20.     Requests for any communication to or from any corporation, LLC or trust, include all emails sent by or received into any corporate or company email account.

21.     The term "document" is defined to be synonymous in meaning and equal in scope to the usage of the term "documents or electronically stored information" in Fed. R. Civ. P. 34(a)(1)(A).  A draft or non-identical copy is a separate document within the meaning of this term.

22.     The term "communication" means the transmittal of information (in the form of facts, ideas, inquiries or otherwise).

23.     The term "concerning" means relating to, referring to, describing, evidencing or constituting.

24.     The terms "all," "any," and "each" shall each be construed as encompassing any and all.

25.     The connectives "and" and "or" shall be construed either disjunctively or conjunctively as necessary to bring within the scope of the discovery request all responses that might otherwise be construed to be outside of its scope.

26.     Number.  The use of the singular form of any word includes the plural and vice versa.

27.     The term "person" is defined as any natural person or any legal entity, including, without limitation, any business or governmental entity or association.


Please produce the following documents:

1.     Any and all records and/or documents, in whatever form or medium, related to the sale of Sallyport Global Holdings, Inc. pursuant to the Kaseman SPA as defined and described in paragraphs 68-84 of the FAC.

2.     Any and all communications, including any emails and text messages from any of your personal accounts, between you and any Defendant, DC Capital Partners, LLC, DC Capital Partners Investments, LLC, Thomas J. Campbell, Tony Grimes, Gail Dady, Doug Lake, Kaseman, LLC, KS International LLC, Sallyport Holdings LLC, Sallyport Global, LLC, Sallyport Global Services, Ltd, Gian Paul DeBlasio (a/k/a John Paul DeBlasio), Pasquale

3

DeBlasio, Franco DeBlasio, The DeBlasio Group, and DeBlasio and DeBlasio Associates during the period December 1, 2010 to June 30, 2011 related to the sale of Sallyport Global Holdings, Inc. pursuant to the Kaseman SPA as defined and described in paragraphs 68-84 of the First Amended Complaint.

3.      Any and all records and/or documents, in whatever form or medium, related to the formation of Sallyport Global Services Ltd., a Bermuda company with a principal place of business located at 2 Church Street, Hamilton, HM11, Bermuda and any communications related to the formation of Sallyport Global Services Ltd, electronic or otherwise.

4.      Any and all records and/or documents, in whatever form or medium, related to your role as a Director of Sallyport Global Services Ltd. including, but not limited to, any compensation and bonuses you received in that role and any communications related to your role as Director of Sallyport Global Services Ltd, electronic or otherwise.

5.      Any and all records and/or documents, in whatever form or medium, related to the formation of the John DeBlasio Charitable Trust for World Peace and Development, a Bermuda settlement that was created on December 7, 2010, and later changed its name to the GPD Charitable Trust Bermuda and any communications related to the formation of these trusts, electronic or otherwise.

6.      Any and all records and/or documents, in whatever form or medium, related to any compensation you received from Sallyport Global Services Ltd, or for work performed on behalf of Sallyport Global Services Ltd, and any communications related to that compensation, electronic or otherwise.

7.      Any and all records and/or documents, in whatever form or medium, related to any compensation you received from Sallyport Global Holdings, Inc. or for work performed on behalf of Sallyport Global Holdings, Inc. from December 1, 2010 to June 30, 2011 and any communications related to that compensation, electronic or otherwise.

# EXHIBIT 1

Athanasios Basdekis (AB2574)
Brian A. Glasser *(Pro Hac Vice)*
James B. Perrine *(Pro Hac Vice)*
**BAILEY & GLASSER, LLP**
209 Capitol Street
Charleston, WV 25301
(304) 345-6555 (main)
(304) 342-1110 (facsimile)
*Counsel for Plaintiff Thomas W. Charron Jr.,*
*Individually and as Trustee of the Thomas W.*
*Charron Jr. Grantor Retained Annuity Trust*
*Dated July 8, 2010*

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| THOMAS W. CHARRON JR., Individually and as Trustee of theTHOMAS W.CHARRON JR. GRANTORRETAINEDANNUITY TRUST DATED JULY 8, 2010,<br><br>Plaintiff,<br><br>v.<br><br>SALLYPORT GLOBAL HOLDINGS, INC.; GIAN PAUL DEBLASIO (aka John P. DeBlasio); JPD PRIVATE TRUST COMPANY, LTD., as Trustee of THE GPD CHARITABLE TRUST DATED DECEMBER 7, 2010;and SALLYPORT GLOBAL SERVICES, LTD., as Trustee of THE JOHN DEBLASIO CHARITABLE TRUST FOR WORLD PEACE AND DEVELOPMENT,<br><br>Defendants. | Civ. No. 12 CIV 6837<br><br><br>**FIRST AMENDED COMPLAINT** |

## FIRST AMENDED COMPLAINT

Plaintiff Thomas W. Charron Jr. ("Charron"), Individually and as Trustee of the Thomas W. Charron Jr. Grantor Retained Annuity Trust Dated July 8, 2010 (the "Charron Trust"),

bringsthis action against DefendantsSallyport Global Holdings, Inc. ("Sallyport" or the "Company"), Gian P. DeBlasio (a/k/a John P. DeBlasio) ("DeBlasio"),the JPD Private Trust Company, Ltd. ("JPD Private Trust Company"), as Trustee of The GPD Charitable Trust, and Sallyport Global Services, Ltd., ("SGS"), as Trustee ofThe John DeBlasio Charitable Trust for World Peace and Development (collectively, "Defendants"),[1]and states as follows, based on information and belief, with such information and belief being based on the investigation of Charron and his counsel as detailed below:

## STATEMENT OF THE CASE

1.      This action arises from three separate breaches of contract, each involving one or more Defendants,and Defendants' conspiracy and scheme to defraud Plaintiff out of millions of dollars, which conspiracy included the use of shell companies and offshore trusts to achieve their conspiratorial and fraudulent aims.

2.      Plaintiff alone founded Sallyport Global Holdings, LLC ("Sallyport Global Holdings") in 2003.  The business of Sallyport Global Holdings was to provide mission critical equipment to American security firms working in Iraq.  Sallyport Global Holdings was converted from an LLC to a C Corp in 2005 under the name Sallyport Global Holdings, Inc. ("Sallyport" or the "Company").  By then Plaintiff had brought on Defendant DeBlasio as a 50/50 owner of Sallyport.

3.      On December 7, 2010, Plaintiff, as an individual, and as Trustee of the Charron Trust, entered into a Stock Purchase Agreement (the "Agreement") with Defendant Sallyport.

---

[1] Plaintiff has brought tort claims against non-defendant individuals and entities in a parallel proceeding in the Circuit Court for Fairfax County, Virginia ("Fairfax County Litigation").  Each defendant in the Fairfax County Litigation is a "Conspirator," and collectively all defendants in the Fairfax County Litigation are referred to herein as the "Non-Defendant Conspirators," and with Defendants herein, collectively the "Conspirators."

On December 8, 2010, Plaintiff consummated the Agreement and Charron resigned his position as an officer, director, and employee of Defendant Sallyport. See Exh. A (Stock Purchase Agreement dated December 7, 2010).   Pursuant to the Agreement, Defendant Sallyport purchased Plaintiff's fifty percent equity in Defendant Sallyport represented by 2500 shares owned by Mr. Charron and 2500 shares owned by the Charron Trust.

4.      Section 2.04 of the Agreement provides "Windfall Protection" to Plaintiff in the event "on or prior to the first anniversary date [of the Agreement] John DeBlasio, or any of his affiliates or any other direct or indirect equity holder sells or agrees to sell shares of the Company's capital stock (or equity of an intervening Person or assets of the Company or any Company subsidiary) constituting 20% or more by voting power or economic value of the Company's assets or equity to a third party in one or a series of related transactions for a price that reflects an enterprise value of the Company equal to or greater than $65,000,000 (a 'Windfall Sale')."  The occurrence of a Windfall Sale obligated Defendant Sallyport and/or the selling stockholder to pay Plaintiff an amount equal to 20% of the proceeds received from the Windfall Sale within three Business Days of the closing of such Windfall Sale.[2]

5.      Three Windfall Sales occurred prior to the first anniversary of the Agreement, namely, on December 8, 2010 (the "First Windfall Sale"), May 5, 2011 (the "Second Windfall

---

[2] Section 2.04 reads as follows: "Windfall Protection. As additional consideration for the Shares, the Company agrees to make an additional payment to Sellers, on the basis and subject to the limitations provided in this Section 2.04. If, on or prior to the first anniversary of the date hereof, John DeBlasio or any of his affiliates or any other direct or indirect equity holder sells or agrees to sell shares of the Company's capital stock (or equity of an intervening Person or assets of the Company or any Company subsidiary) constituting 20% or more by voting power or economic value of the Company's assets or equity to a third party in one or a series of related transactions for a price that reflects an enterprise value of the Company equal to or greater than $65,000,000 (a "Windfall Sale"), within three Business Days following the closing of such Windfall Sale, the Company or such stockholder shall pay Sellers an amount equal to 20% of the proceeds received from the Windfall Sale, such payment to be made to Sellers *pro rata* in accordance with the percentages set forth on Schedule I."

Sale") and June 29, 2011 (the "Third Windfall Sale").[3]  Plaintiff has not received any payment for any of the three Windfall Sales from either Defendant Sallyport or any of the selling stockholders, namely, Defendant Sallyport, Defendant DeBlasio, and Defendants SGS and JPD Private Trust Company, as trustees of theJohn DeBlasio Charitable Trust for World Peace and Development, even though the enterprise value of Defendant Sallyport for each of the three Windfall Sales was equal to or more than $65,000,000.00.  Plaintiff brings this lawsuit to recover the Windfall Protection to which he was entitled for each of the three Windfall Sales, which sums were at least, $8,133,192.80, $8,450,000, and $21,620,000, respectively,-- representing an amount equal to 20% of the proceeds received from each Windfall Sale.  In sum, Plaintiff is owed at least $38,203,192.80.

6.      The selling stockholder for each of the Windfall Sales was Defendant Sallyport, Defendant DeBlasio, and the John DeBlasio Charitable Trust for World Peace and Development, respectively.  Defendant SGS was the trustee of the John DeBlasio Charitable Trust for World Peace and Development at the time of the closing of the Third Windfall Sale.  Defendant JPD Private Trust Company replaced Defendant SGS as the trustee of the John DeBlasio Charitable Trust for World Peace and Development on the same day as the closing of the Third Windfall Sale.  The John DeBlasio Charitable Trust for World Peace and Development later changed its name to the GPD Charitable Trust dated December 7, 2010.

7.      In addition to the breaches of the Agreement, Defendantsandthe Non-Defendant Conspirators conspired to defraud Plaintiff into entering the Agreement, to hide and structure the First, Second, and Third Windfall Salesto avoid having to pay Plaintiff Windfall Protection,to

---

[3] In the Original Complaint, Plaintiff defined the Third Windfall Sale as the "Kaseman Acquisition."

interfere with and induce and cause one or more breaches of the Agreement, and to split the money which should have been paid to Plaintiff.

8.      Non-Defendant Conspirators Thomas J. Campbell ("Campbell"), DC Capital Partners, LLC ("DC Capital Partners"), DC Capital Partners Investments, L.L.C. ("DC Capital Partners Investments"), Kaseman LLC ("Kaseman"), and Sallyport Holdings, LLC ("Sallyport Holdings") (collectively, the "Acquiring Group Conspirators") profited from this scheme and conspiracy by being able to acquire Defendant Sallyport at a price they deemed favorable as a result of not paying Plaintiff millions of dollars.

9.      Non-Defendant Conspirator KS International, LLC ("KS International") is the renamed entity following the merger of Non-Defendant Conspirators Sallyport Holdings, LLC and Kaseman Holdings, LLC ("Kaseman Holdings) which occurred a few weeks after the closing of the Third Windfall Sale.

10.      Acquiring Group Conspirators Campbell, DC Capital Partners, and DC Capital Partners Investments made their investment in Sallyport Holdings, Kaseman Holdings, and KS International more lucrative through their active participation in a purposefully complex and illegitimate scheme to evade Defendants' contractual obligations to Plaintiff.

11.      Non-Defendant Conspirator Sallyport Global, LLC ("Sallyport Global") and Defendant SGS (collectively, the "Conduit Conspirators"), participated as unlawful conduits for funds moving away from Defendant Sallyport to conceal the true enterprise value of Defendant Sallyport in the Third Windfall Sale.

12.      DefendantDeBlasio,Defendant SGS, as trustee of The John DeBlasio Charitable Trust for World Peace and Development, Defendant JPD Private Trust Company, as Trustee of The John DeBlasio Charitable Trust for World Peace and Development, which was later renamed the GPD Charitable Trust dated December 7, 2010, Non-Defendant Conspirator Pasquale DeBlasio, individually and as Trustee of the John P. DeBlasio Trust,Non-Defendant

Conspirator The DeBlasio Group, Non-Defendant Conspirator DeBlasio and DeBlasio Associates, and Non-Defendant Conspirator Franco DeBlasio (collectively, the "Seller Group Conspirators") assisted Defendants in concealing the First, Second, and Third Windfall Sales from Plaintiff andprofited from the scheme and conspiracy by being able to sell Defendant Sallyport in the Third Windfall Sale at a price they deemed more favorable by concealing and falsely reporting the true enterprise value of Defendant Sallyport.  The members of the Seller Group Conspirators who were actual shareholders of Defendant Sallyport profited directly by receiving more financial value for their shares than would otherwise have been possible in the absence of the conspiracy and scheme to defraud Plaintiff.  The members of the Seller Group Conspirators who were not direct shareholders of Defendant Sallyport were paid cash for their participation in the conspiracy and fraudulent scheme, or received other pecuniary or non-pecuniary benefits important to them.

13.    A key element of the conspiracy to defraud Plaintiff was hiding the first two Windfall Sales from Plaintiff and falsely reporting to Plaintiff the alleged enterprise value of Defendant Sallyport for purposes of the Third Windfall Sale at the contrived sum of $64,500,000.00 — a sum conveniently stated to appear to rest just under the $65,000,000.00 enterprise value threshold which triggered payment obligations to Plaintiff.

14.    Defendants Sallyport and DeBlasio so reported this false enterprise value for the Third Windfall Saleto counsel for Plaintiff in writing despite knowing that McGladrey LLP in an independent audit performed on March 30, 2012, determined that the purchase price of Defendant Sallyport was $82.841 million for the Third Windfall Sale (the "McGladrey Audit"), and that they had deliberately and intentionally caused, with the full knowledge and participation of all the other Defendants and Non-Defendant Conspirators, the occurrence of multiple transactions in the run-up to the closing of the Third Windfall Saledesigned to complicate the Third Windfall Sale so as to obfuscate and artificially lower the reported enterprise value of Defendant Sallyport, avoid the strictures of the Windfall Protection clause, and provide financial benefit to Defendants.  These transactions included, but were not limited to, within days of the

- 6 -

Third Windfall Sale (1) having Defendant SGS transfer away $23,450,000 from Defendant Sallyport to The John DeBlasio Charitable Trust for World Peace and Development, (2) having Defendant SGS assign $10.75 million of loans payable to Defendant SGS to WD Solutions, Ltd, a Mauritius company of which Defendant DeBlasio is an officer and part owner, (3) having Defendant Sallyport forgive a loan of $5.0 million made to Defendant DeBlasio, (4) having Defendant Sallyport pay Defendant DeBlasio a bonus of $3.5 million, and (5) having Defendant Sallyport sign a service agreement with Sallyport Global, Inc. ("SGI") (now Non-Defendant Conspirator Sallyport Global LLC) where SGI charged Defendant Sallyport a 2% fee to provide employees to Defendant Sallyport to perform work on United States government classified contracts on which these same individuals had previously been working as employees of Defendant Sallyport at a lower cost to the government so as to financially benefit SGI's sole shareholder, namely, the John P. DeBlasio Trust, the trustee of which was Non-Defendant Conspirator Pasquale DeBlasio.

15.     Plaintiff brings this action to recover all amounts to which he is entitled in law and equity as a direct and proximate cause of each breach of the Agreement by each Defendant and the tortious and fraudulent actions and conspiracy to defraud of Defendants and the Non-Defendant Conspirators.

## PLAINTIFF'S INVESTIGATION

16.     Plaintiff's allegations, including those based on information and belief, are based on an investigation that includes the review of, among other things:

a.      the Agreement, attached hereto as Exh. A;

b.      that certain Term Promissory Note, dated December 7, 2010, made by Defendant Sallyport with SGS for $40,665,964.00, attached hereto as Exh. B;

c.      that certain Assignment of Debt, dated December 8, 2010, between SGS and The John DeBlasio Charitable Trust for World Peace and Development, attached hereto as Exh. C;

- 7 -

d.      that certainCapital Contribution Agreement, dated December 8, 2010, between The John DeBlasio Charitable Trust for World Peace and Developmentand Defendant Sallyport, attached hereto as Exh. D;

e.      those certain Resolutions of the Board of Directors and Stockholders of Defendant Sallyport, dated February 16, 2011, attached hereto as Exh. E;

f.      that certain Stock Purchase Agreement dated May 5, 2011, between Defendant DeBlasio and The John DeBlasio Charitable Trust for World Peace and Development, attached hereto as Exh. F;

g.      that certain Demand Promissory Note, dated May 5, 2011, made by Defendant DeBlasio with The John DeBlasio Charitable Trust for World Peace and Development for $42,250,000, attached hereto as Exh. G;

h.      that certain Securities Purchase Agreement dated May 6, 2011, by and among Defendant Sallyport, Non-Defendant Sallyport Holdings, Non-Defendant Kaseman, Non-Defendant Sallyport Global Inc., Defendant DeBlasio, and the Stockholders of Defendant Sallyport and of Sallyport Global Inc., including Disclosure Schedules 2.4, 6.4, 6.22, 6.33 and 6.34thereto, (the "Kaseman SPA"), attached hereto as Exh.H;

i.      Amendment No. 1 to the Kaseman SPA, dated June 2011, including Schedule 2.4 thereto, attached hereto as Exh.I;

j.      that certain Board Minutes of Defendant Sallyport, dated June 28 2011, for approval of sale of Defendant Sallyport, attached hereto as Exh. J;

k.      that certain Board Minutes of Defendant SGS dated June 27, 2011, for approval of sale of Defendant Sallyport, assignment of loans to WD Solutions Ltd. and retirement as trustee, attached hereto as Exh. K;

l.      that certain Board Minutes of Non-Defendant Conspirator Sallyport Global LLCdated June 28, 2011, for approval of sale of Non-Defendant Sallyport Global LLC attached hereto as Exh. L;

m.      that certain Equity Contribution Agreement between Non-Defendant Conspirator Sallyport Holdings LLC and The John P. DeBlasio Trust dated June 29, 2011, attached hereto as Exh. M;

n.      The Complaint and accompanying exhibits, including the McGladrey Audit, from JPD Private Trust Company, Ltd. v. KS International, LLC, Civil Action No.: 1:12CV572-AJT/JFA in the United States District Court for the Eastern District of Virginia (the "EDVA Litigation"), which are attached hereto as Exh. N;

o.      that certain letter dated September 20, 2011, from David J. Kalson, Cohen & Grigsby, P.C., ("Kalson") to Michael F. O'Connor, Williams & Connolly LLP, ("O'Connor"), attached hereto as Exh. O;

p.      that certain letter dated October 6, 2011, from O'Connor to Kalson, attached hereto as Exh. P;

q.      that certain email dated July 14, 2012, sent by Defendant DeBlasio to Plaintiff, attached hereto as Exh. Q;

r.      that certain email dated September 28, 2010, sent by Defendant DeBlasio to Plaintiff, attached hereto as Exh. R;

s.      that certain Board Minutes of Defendant Sallyport, dated April 1, 2011, for revolving promissory note for $5,500,000, attached hereto as Exh. S;

t.      that certain Revolving Promissory Note, dated April 1, 2011, between Defendant DeBlasio, Borrower, and Defendant Sallyport as Lender, for $5,500,000, attached hereto as Exh T;

u.      that certain Acknowledgement of Satisfaction and Agreement to Terminate Note dated June 28, 2011 between Defendant DeBlasio, Borrower, and Defendant Sallyport as Lender attached hereto as Exh U;

v.      that certain Assignment and Assumption Agreement, dated June 28, 2011, between SGS and WD Solutions, Ltd., as Assignee, attached hereto as Exh. V;

w.      that certain Action by Consent in Writing of the Stockholders of Defendant Sallyport, dated June 28, 2011, attached hereto as Exh. W;

x.      that certain Service Agreement between Sallyport Global Inc. and Defendant Sallyport, dated January 18, 2011, attached hereto as Exh. X;

y.      that certain Declaration of Trust, dated January 7, 2011, for the GPD Charitable Trust dated January 7, 2011, organized under the laws of the State of Florida, attached hereto as Exh. Y;

z.      that certain Loan Agreement, dated November 28, 2008, between Sallyport Global Services, Ltd., and Barnardo Garcia Manzano as "Borrower" regarding a loan in the amount of $700,000, attached hereto as Exh. Z;

aa.     that certain Personal Guaranty of John P. DeBlasio executed in consideration of that certain Loan Agreement between Sallyport Global Services, Ltd., and Barnardo Garcia Manzano as "Borrower," attached hereto as Exh. AA;and

bb.     that certain Assignment and Assumption Agreement between The John P. DeBlasio Trust and Non-Defendant Conspirator Sallyport Holdings LLC dated June 29, 2011, attached hereto as Exh. BB.

## JURISDICTION AND VENUE

17.     This Court has jurisdiction over the subject matter of this action pursuant to diversity jurisdiction under 28 U.S.C. § 1332(a)(1) since complete diversity of citizenship exists between the parties.  Plaintiff individually is a citizen of the State of Florida as Thomas Charron is a citizen of the State of Florida and Plaintiff as trustee of the Charron Trust is a citizen of the State of Florida as the Charron Trust is a trust organized under the laws of Florida.  Defendant Sallyport is a citizen of the State of Delaware since it is a Delaware corporation and is a citizen of the State of Virginia since its principal place of business is at 1600 Tysons Boulevard, Suite 1400, McLean, Virginia 22102.Defendant Gian (John) DeBlasio is a citizen of the State of

Illinois over the age of eighteen. DefendantSallyport Global Services, Ltd.is a Bermuda company with a principal place of business located at 2 Church Street, Hamilton, HM11, Bermuda, and was the former trustee of The John DeBlasio Charitable Trust for World Peace and Development. DefendantJPD Private Trust Company, Ltd. is a Bermuda company with a principal place of business located at Mintflower Place, 8 Par-la-Ville Road, Hamilton, HM08, Bermuda, and is the Trustee of the GPD Charitable Trust dated December 7, 2010, formerly known as The John DeBlasio Charitable Trust for World Peace and Development.

18.     Venue is proper in this District pursuant to Section 6.05 of the Agreement and 28 U.S.C. § 1391. Section 6.05 of the Agreement states in relevant part as follows: "Governing Law; Choice of Forum. This Agreement shall be governed by and construed in accordance with the laws of the State of New York. The parties agree that the exclusive place of jurisdiction for any action, suit or proceeding relating to this Agreement shall be in the courts of the United States of America sitting in the Borough of Manhattan in the City of New York or, if such courts shall not have jurisdiction over the subject matter thereof, in the courts of the State of New York sitting therein, and each such party hereby irrevocably and agrees to submit to the jurisdiction of such courts for purposes of any such action, suit or proceeding. Each party irrevocably waives any objection it may have to the venue of any action, suit or proceeding brought in such courts or to the convenience of the forum. Each party hereto consents to service of process in any such proceeding in any manner permitted by New York law, and agrees that service of process by registered or certified mail, return receipt requested, at such party's address set forth in Section 6.04 is reasonably calculated to give actual notice. Final judgment in any such action, suit or proceeding shall be conclusive and may be enforced in other jurisdictions by suit on the judgment, a certified or true copy of which shall be conclusive evidence of the fact and the amount of any indebtedness or liability of any party herein."

19.     Defendants are all parties to the Agreement by being either signatories to the Agreement and/or obligors of payments due to Plaintiff pursuant to Section 2.04 of the Agreement, of which they were aware at the time they succeeded to their interests as

shareholders and which reads in relevant part that "the Company or such stockholder shall pay Seller [Charron and the Charron Trust] an amount equal to 20% of the proceeds received from the Windfall Sale, such payment to be made to Sellers *pro rata* in accordance with the percentages set forth on Schedule I."

## PARTIES

1.     Plaintiff individually is a citizen of the State of Florida and over the age of eighteen.  Plaintiff is also the Trustee of the Charron Trust, a trust organized under the laws of Florida, which has a principal address of14250 Royal Harbour Court 1017, Fort Myers, Florida 33908..

2.     Defendant Sallyport is a Delaware corporation with a principal place of business located at 1600 Tysons Boulevard, Suite 1400, McLean, Virginia 22102.

3.     Defendant John DeBlasio is a citizen of the State of Illinois over the age of eighteen.  Defendant DeBlasio was formerly CEO, President, Treasurer, and Secretary of Defendant Sallyport, President of Defendant SGS, CEO of Non-Defendant Conspirator Sallyport Holdings LLC, President, Treasurer and Secretary of Non-Defendant Conspirator Sallyport Global LLC, andPresident, Treasurer & Secretary of Sallyport Support Services LLC, and currently is trustee of the GPD Charitable Trust dated January 7, 2011, organized under the laws of the State of Florida, trust protector of the GPD Charitable Trust dated December 7, 2010 organized under the laws of Bermuda, Director of Defendant JPD Private Trust Company Ltd., and an officer of and owner in WD Solutions Ltd. a Mauritius company.

4.     DefendantSallyport Global Services, Ltd.is a Bermuda company with a principal place of business located at 2 Church Street, Hamilton, HM11, Bermuda and was the former trustee of The John DeBlasio Charitable Trust for World Peace and Development.

5.      DefendantJPD Private Trust Company Ltd. is a Bermuda company with a principal place of business located at Mintflower Place, 8 Par-la-Ville Road, Hamilton, HM08, Bermuda, and is the Trustee of the GPD CharitableTrust dated December 7, 2010, formerly known as The John DeBlasio Charitable Trust for World Peace and Development.

6.      Non-Defendant Conspirator DC Capital Partners is a Virginia limited liability company with a principal place of business located at 11 Canal Center Plaza, Suite 350, Alexandria, Virginia, 22314.

7.      Non-Defendant Conspirator DC Capital Partners Investments is a Virginia limited liability company with a principal place of business located at 1600 Tysons Boulevard, Suite 900, McLean, Virginia, 22101.

8.      Non-Defendant Conspirator KS International is a limited liability company with a principal place of business located at 1600 Tysons Boulevard, Suite 1400, McLean, Virginia 22102.   Non-DefendantConspirator KS International is a portfolio company of Non-DefendantConspirator   DC   Capital   Partners.   Upon   information   and   belief,   Non-DefendantConspirator KS International is a subsidiary of, affiliate of, or is managed, controlled or owned in whole or in part by, Non-DefendantConspirator DC Capital Partners.

9.      Non-Defendant Conspirator Kaseman is a Virginia limited liability company with a principal place of business located at 1600 Tysons Boulevard, Suite 1400, McLean, Virginia 22102.  Defendant Kaseman is a subsidiary of Defendant KS International. Upon information and belief, Defendant Kaseman is a subsidiary of, affiliate of, or is managed, controlled or owned in whole or in part by Non-Defendant Conspirators KS International and/or DC Capital Partners.

10.     Non-DefendantConspirator Sallyport Holdings is a Delaware limited liability company with a principal place of business at 1600 Tysons Boulevard, Suite 1400, McLean, Virginia 22102.Non-DefendantConspirator Defendant Sallyport Holdings is (or was) a portfolio company of Non-DefendantConspirator DC Capital Partners. Upon information and belief, Non-

DefendantConspirator Sallyport Holdings is (or was) a subsidiary of, affiliate of, or is (or was) managed, controlled or owned in whole or in part by Non-DefendantConspirators KS International and/or DC Capital Partners.

11.    Non-Defendant Conspirator Sallyport Global is a Florida limited liability company with a principal place of business at 27200 Riverview Center Boulevard, Suite 309, Bonita Springs, Florida 34134, and is the successor-in-interest to Non-Defendant Conspirator Sallyport Global, Inc.

12.    Non-Defendant Conspirator Pasquale DeBlasio is a citizen of the Commonwealth of Pennsylvania over the age of eighteen and is the Trustee of the DeBlasio Trust, a business trust organized under the laws of the State of Florida.

13.    Non-Defendant Conspirator DeBlasio Group is a Pennsylvania business trust with a principal place of business located at 445 Washington Avenue, Bridgeville, Pennsylvania 15107.

14.    Non-Defendant Conspirator DeBlasio and DeBlasio Associates is a Pennsylvania corporation with a principal place of business located at 447 Washington Avenue, Bridgeville, Pennsylvania 15107.

15.    Non-Defendant Conspirator Franco DeBlasio is a citizen of the Commonwealth of Pennsylvania over the age of eighteen and an owner and/or manager of Non-Defendant Conspirators DeBlasio Group and DeBlasio and DeBlasio Associates.

16.    Non-Defendant Conspirator Thomas J. Campbell is a citizen of Virginia over the age of eighteen and is the President and Founder of Non-Defendant Conspirator DC Capital Partners.

# FACTUAL BACKGROUND

**A.**     **Conspiracy to Defraud:  Plaintiff Relies Upon Defendants' False Representations and Intentional and Knowing Concealment of Material Facts in Executing and Consummating the Agreement to Sell Shares of Defendant Sallyport.**

17.     This action arises from breaches of the Agreement by each Defendant and the conspiracy and scheme to defraud Plaintiff out of millions of dollars, including through the use of shell companies and offshore trusts, by Defendants and the Non-Defendant Conspirators.Each Defendant has breached the Agreement at least once by not paying Plaintiff Windfall Protection pursuant to Section 2.04 of the Agreement following a Windfall Sale.  Plaintiff executed and consummated the Agreement as a result of the conspiracy to defraud between Defendantsand the Non-Defendant Conspirators.  In particular, Defendant DeBlasio,whose actions in furtherance of the conspiracy are binding on all Defendants and the Non-Defendant Conspiratorsupon their joining the conspiracy, made false representations of material fact to and knowingly concealed material facts from Plaintiff and Plaintiff relied upon these false representations and concealment of material fact in executing and consummating the Agreement.The conspiracy included: (a) an agreement prior to December 7, 2010 by and among Defendant DeBlasio and the other Conspirators to eliminate Plaintiff Charron from the Sallyport picture prior to the intended Third Windfall Sale; (b) an agreement prior to December 7, 2010 by and among Defendant DeBlasio and the other Conspirators to fraudulently structure the ultimate sale of Defendant Sallyport via the Third Windfall Sale, without paying anything to Plaintiff; (c) an agreement prior to December 7, 2010 by and among Defendant DeBlasio and the other Conspirators to fraudulently claim that the intended Third Windfall Sale of Defendant Sallyport would be for an enterprise value of less than $65 million; and (d) conduct by Defendantsand the Non-Defendant Conspirators to execute the objects of their conspiracy by making false representations of material fact to and intentionally and knowingly concealing material facts from Plaintiff Charron, by hiding from Plaintiff the First and Second Windfall Sales, by causing and participating in the transactions described previously to obfuscate and artificially lower the reported enterprise value of Defendant Sallyport and increase the proceeds to Defendants for the

Third Windfall Sale, including, but not limited to, within days of the closing of the Third Windfall Sale (1) having Defendant SGS transfer away $23,450,000 from Defendant Sallyport to The John DeBlasio Charitable Trust for World Peace and Development, the trustee of which was Defendant SGS, (2) having Defendant SGS assign $10.75 million of loans payable to Defendant SGS to WD Solutions, Ltd, a Mauritius company of which Defendant DeBlasio is an officer and part owner, (3) having Defendant Sallyport forgive a loan of $5.0 million made to Defendant DeBlasio, (4) having Defendant Sallyport pay Defendant DeBlasio a bonus of $3.5 million, and (5) having Defendant Sallyport sign a service agreement with Sallyport Global, Inc. ("SGI") (now Non-Defendant Conspirator Sallyport Global LLC) where SGI charged Defendant Sallyport a 2% fee to provide employees to Defendant Sallyport to perform work on United States government classified contracts on which these same individuals had previously been working as employees of Defendant Sallyport at a lower cost to the government so as to financially benefit SGI's sole shareholder, namely, the John P. DeBlasio Trust, the trustee of which was Non-Defendant Conspirator Pasquale DeBlasio, and by falsely reporting the enterprise value of Defendant Sallyport for the Third Windfall Sale to be $64.5 million, instead of correctly reporting that the enterprise value was equal to or more than $65,000,000.00.

18.    The relevant facts begin in August 2009, when Plaintiff and Defendant DeBlasio, each a fifty percent (50%) owner of Defendant Sallyport, started to search for purchasers of the Company.

19.    On or about September 15, 2009, Defendant Sallyport entered into an agency agreement with Trans Equity Advisors under which Trans Equity Advisors would identify purchasers for, and assist in, the sale of Defendant Sallyport.  The agreement with Trans Equity Advisors was effective from September 15, 2009, until January 31, 2010.

20.    In late October 2009, Glenn Corliss working on behalf of Trans Equity Advisors introduced Plaintiff and Defendant DeBlasio to Non-Defendant Conspirator DC Capital Partners and Non-Defendant Conspirator Campbell, who expressed interest in buying Defendant Sallyport, but allegedly decided not to pursue an acquisition at that particular time.

21.     On or about February 2, 2010, Defendant Sallyport terminated its agreement with Trans Equity Advisors.

22.     On or about February 25, 2010, Defendant Sallyport entered into an agreement with Sagent Advisors, Inc. ("Sagent"), under which Sagent would serve as Defendant Sallyport's exclusive financial advisor with respect to any sale, merger, consolidation or other similar transaction.

23.     On or about June 22, 2010, Sagent sent out a preliminary interest letter to numerous possible acquirers for the acquisition of Defendant Sallyport.

24.     From on or about July 13, 2010, to on or about August 6, 2010, Sagent received at least six responses of Indication of Interest which placed the value of Defendant Sallyport between $90 million and $110 million.

25.     Defendant DeBlasio and the rest of the Seller Group Conspirators were each aware of these indications of value.

26.     On or about August 11, 2010, Chris Oliver, Managing Director of Sagent, and Defendant DeBlasio met with Non-Defendant Conspirator Campbell to discuss a potential acquisition of Defendant Sallyport by Non-Defendant Conspirator DC Capital Partners.   In particular, the discussions centered on a transaction where Non-Defendant Conspirator DC Capital Partners would acquire Defendant Sallyport and merge it with an existing portfolio company, Non-Defendant Conspirator Kaseman.   They also discussed the potential synergies between Defendant Sallyport and Non-Defendant Conspirator Kaseman.   Plaintiff Charron, at the behest of Sagent and Defendant DeBlasio, did not have any conversations with any representative of Non-Defendant Conspirator DC Capital Partners, including Non-Defendant Conspirator Campbell, about the sale of Defendant Sallyport.

27.     On or about August 12, 2010, Sagent received an Indication of Interest from Non-Defendant Conspirator DC Capital Partners to acquire Defendant Sallyport which placed the value of Defendant Sallyport between $85 million and $105 million.   Later that day, Non-Defendant Conspirator Campbell requested that Defendant DeBlasio meet with Robert

"Tony"Grimes, the Chief Executive Officer of Non-Defendant Conspirator Kaseman, to explain the business of Defendant Sallyport.

28.     Thereafter, Sagent provided Non-Defendant Conspirator DC Capital Partners with access to a virtual data room and other financial, operating and legal information for Non-Defendant Conspirator DC Capital Partners' due diligence investigation leading to a formal proposal to acquire Defendant Sallyport. This information allowed the Acquiring GroupConspirators' to gain unique insight into Defendant Sallyport, which they planned to buy.

29.     From on or about August 19, 2010 to on or about September 30, 2010, representatives of Sagent and Defendant Sallyport regularly conferred with representatives of Non-Defendant Conspirators DC Capital Partners and Kaseman to discuss the details of a merger of Defendant Sallyport and Non-Defendant Conspirator Kaseman.

30.     On or about September 27, 2010, Defendant DeBlasio and Chris Oliver of Sagent provided a management presentation to Non-Defendant Conspirator DC Capital Partners.

31.     On or about September 28, 2010, Non-Defendant Conspirator DC Capital Partners called Chris Oliver of Sagent and proposed an acquisition of Defendant Sallyport. On that day, Chris Oliver of Sagent called Defendant DeBlasio to discuss this proposal and discuss next steps given that Non-Defendant Conspirator DC Capital Partners proposal was lower than expected. In response, Defendant DeBlasio told Chris Oliver to let Non-Defendant Conspirator DC Capital Partners sit for a while. Later that day, Defendant DeBlasio, with the knowledge and agreement of the Seller Group Conspirators and the Acquiring Group Conspirators, had a private conversation with Non-Defendant Conspirator DC Capital Partners. After this private conversation, Defendant DeBlasio, with the knowledge and agreement of the other Seller Group Conspirators and the Acquiring Group Conspirators, falsely represented to Plaintiff Charron, Sagent's Chris Oliver, and Peter Phelps (the then-CFO of Sallyport), that the Acquiring Group Conspirators were not interested in acquiring Defendant Sallyport because they were interested in a different acquisition opportunity. In particular, Defendant DeBlasio stated that "they (DCCP) low-balled. They didn't truly make an offer and basically were suggesting something in

- 18 -

the $50-60M range which isn't real and they probably knew it." Defendant DeBlasio and the Non-Defendant Conspirators had already hatched a conspiratorial scheme to eliminate Plaintiff Charron and for the Acquiring Group Conspirators to purchase Defendant Sallyport on terms favorable to Defendant DeBlasio and all the other Conspirators. See Exh. R.

32.    In October and November 2010, Defendant DeBlasio, aided and abetted by all the other Non-Defendant Conspirators and others, and pursuant to a conspiratorial agreement among them all, continually sought to purchase Plaintiff's shares in Defendant Sallyport for a sum well below the enterprise value of the Company as measured by, among other things, the Indications of Interest secured by Sagent. Defendant DeBlasio's efforts to force a buyout of Plaintiff's shares included threats to shut down the business of the Company if Plaintiff did not agree to a stock sale.

33.    On or before December 8, 2010, Defendant DeBlasio, aided and abetted by all the Conspirators and others, and pursuant to a conspiratorial agreement among them all: (i) affirmatively stated to Plaintiff, on behalf of all Conspirators, that Non-Defendant ConspiratorDC Capital Partners had no interest in purchasing Defendant Sallyport, or any similar transaction involving the acquisition of Defendant Sallyport, which was a false statement when made; (ii) intentionally and knowingly concealed from Plaintiff, on behalf of all Conspirators, that, within one year of the Agreement, Defendant DeBlasio intended to have the Company enter into a transaction for the shares of Sallyport where the enterprise value of the Company equaled or exceeded $65 million, and (iii) on behalf of all Conspirators, falsely represented that he and Defendant Sallyport and others would provide Windfall Protection to Plaintiff as stated in the Agreement, when in truth and fact they had no intention of providing Windfall Protection to Plaintiff when the Agreement was executed or thereafter.

34.    Defendant DeBlasio, on behalf of himself and all other Conspirators, intentionally, knowingly, and deliberately made all of these false representations and concealed material facts on behalf of and to benefit himself and all other Conspirators as part of their conspiracy and scheme to defraud Plaintiff. All of the Conspirators all along wanted the

Acquiring Group Conspirators to purchase Defendant Sallyport, but wanted to do so with Plaintiff out of the equation.

35.     Non-Defendant Conspirator The DeBlasio Group performed bookkeeping, payroll, and tax services for Defendant Sallyport.   Non-Defendant Conspirator Pasquale DeBlasio was the principal liaison between Defendant Sallyport and Non-Defendant Conspirators The DeBlasio Group and DeBlasio and DeBlasio Associates.   On or before December 8, 2010, Defendant DeBlasio and the Non-Defendant Conspirators Pasquale DeBlasio, Franco DeBlasio, The DeBlasio Group and DeBlasio and DeBlasio Associates, on behalf of themselves and all other Conspirators, intentionally, knowingly, and deliberately withheld and concealed material facts, including financial and operational data, about Defendant Sallyport from Plaintiff Charron to impede his ability to evaluate the financial condition of and to frustrate his financial interest in the Company.   Defendant DeBlasio and the Non-Defendant Conspirators Pasquale DeBlasio, Franco DeBlasio, The DeBlasio Group and DeBlasio and DeBlasio Associates, on behalf of themselves and all other Conspirators, concealed these material facts on behalf of and to benefit themselves and all other Conspirators as part of their conspiracy and scheme to defraud Plaintiff by denying Plaintiff access to the financial data of the Company to lead him to rely upon Defendant DeBlasio's false representations and to execute and consummate the Agreement.

36.     On September 17, 2010, Plaintiff Charron sent an email to Peter Phelps and Defendant DeBlasio and Non-Defendant Conspirators Franco and Pasquale DeBlasio asking for Defendant DeBlasio to produce monthly financial statements for Defendant Sallyport so he and prospective buyers could evaluate the financial condition of the Company.   In a responsive email toPlaintiff Charron, Peter Phelps, and Non-Defendant Conspirators Franco and Pasquale DeBlasio, Defendant DeBlasio made clear that he would not have Non-Defendant ConspiratorThe DeBlasio Group prepare any monthly financial statements for Defendant Sallyport.   In fact, in Defendant DeBlasio's email dated September 20, 2010 to Chris Oliver of Sagent, Plaintiff Charron, Peter Phelps and Non-Defendant Conspirators Franco and Pasquale

DeBlasio, Defendant DeBlasio stated that having Non-Defendant ConspiratorThe DeBlasio Group prepare monthly financial statements would be wasted effort. On September 20 and 21, 2010, Plaintiff Charron again sent emails to Defendant DeBlasio and Non-Defendant Conspirators Franco and Pasquale DeBlasio asking for Non-Defendant ConspiratorThe DeBlasio Group to prepare quarterly and monthly financial statements so that he and prospective buyers could evaluate the Company. Pursuant to the conspiracy to defraud between Defendant DeBlasio and the other Conspirators, Defendant DeBlasio caused Non-Defendant Conspirators Pasquale and Franco DeBlasio, The DeBlasio Group, and DeBlasio and DeBlasio Associates not to prepare the financial information which Plaintiff Charron had requested and which was contractually required of them.

37.     Plaintiff relied and acted upon these false representations and intentional and knowing concealment of material facts when on or about December 7, 2010, Plaintiff, individually and as Trustee of the Charron Trust, entered into the Agreement.

38.     Plaintiff required the inclusion of the Windfall Protection in Section 2.04 of the Agreement to protect his interest in any lost opportunity from a sale of Defendant Sallyport subsequent to the Agreement. Plaintiff reasonably believed and understood thatDefendant Sallyport, Defendant DeBlasio, and/or any selling stockholder would pay the amounts owed under the Windfall Protection Clause, and that Defendants and the Non-Defendant Conspirators Pasquale and Franco DeBlasio, The DeBlasio Group, and DeBlasio and DeBlasio Associates would not engage in misconduct, either collectively or with others, including the other Conspirators, designed to improperly manipulate and lower the Enterprise Value of Defendant Sallyport or to otherwise intentionally interfere with and induce or cause a breach of the Agreement. At the time of executing the Agreement, Plaintiff reasonably believed and understood that Defendant DeBlasio was accepting the Agreement and binding himself and "any of his affiliates or any other direct or indirect equity holder" of Defendant Sallyport to the Agreement, including to the obligation to pay Windfall Protection to Plaintiff as stated in Section 2.04 of the Agreement. Plaintiff had this reasonable belief and understanding based on the

express language of Section 2.04 of the Agreement and based on Defendant DeBlasio and any later direct or indirect equity holder receiving the benefits of the Agreement, including the benefit of acquiring and being able to sell Plaintiff's shares in Defendant Sallyport for their financial gain.  Consistent with Plaintiff's reasonable belief and understanding, Defendants DeBlasio and Defendants SGS and JPD Private Trust Company, as trustees for the John DeBlasio Charitable Trust for World Peace and Development, the protector of which is and always has been Defendant DeBlasio, have received the benefits of the Agreement by acquiring the shares of Defendant Sallyport sold by Plaintiff pursuant to the Agreement and later selling these same shares for millions of dollars to profit Defendant DeBlasio and the John DeBlasio Charitable Trust for World Peace and Development, now known as the GPD Charitable Trust dated December 7, 2010.  In fact, Defendant DeBlasio is using the money that Defendants SGS and JPD Private Trust company received on behalf of the GPD Charitable Trust dated December 7, 2010 from selling shares in Defendant Sallyport which Plaintiff sold pursuant to the Agreement to fund venture capital projects for his personal benefit.

39.    Plaintiff further relied and acted upon the aforementioned false representations and intentional and knowing concealment of material facts by Defendant DeBlasio, made on behalf of all Conspiratorswhen, on or about December 8, 2010, Plaintiff, individually and as Trustee of the Charron Trust, consummated the Agreement, sold his and the Charron Trust's shares in Defendant Sallyport, and resigned from his offices as a director and officer and as an employee of Defendant Sallyport effectively immediately.

**B.    The Three Windfall Sales and Breaches of the Agreement.**

40.    Immediately after Plaintiff executed the Agreement, Defendants planned, structured, and consummated three Windfall Sales for which Plaintiff has not received any Windfall Protection payment.

41.    To accomplish the Windfall Sales and to further the conspiracy to defraud, Defendants, conspiring with and aiding and abetting each other and the other Conspirators, created multiple new entities, including, the John DeBlasio Charitable Trust for World Peace and

Development, a Bermuda charitable trust, the John P. DeBlasio Trust, a Florida business trust, and Sallyport Global, Inc., a Florida corporation wholly owned by the John P. DeBlasio Trust, to participate in one or more of the Windfall Sales. Defendants and the Conspirators used these new entities to conceal material facts about the three Windfall Sales, to effectuate transactions that sought to obfuscate and artificially lower the reported enterprise value of Defendant Sallyport for the Third Windfall Sale, to enable Defendants to avoid the strictures of the Windfall Protection Clause, and to channel proceeds from the Windfall Sales to Defendants.

     **1.**     **The First Windfall Sale: Defendant Sallyport Sells 5000 Shares of Common Stock to The John DeBlasio Charitable Trust for World Peace and Development on December 8, 2010.**

     42.     On December 7, 2010, the same day Plaintiff executed the Agreement, Defendant DeBlasio, with the conspiratorial agreement of and aided and abetted by Defendants, the Non-Defendant Conspirators and others, created The John DeBlasio Charitable Trust for World Peace and Development in Bermuda, with Defendant SGS named as the Trustee and Defendant DeBlasio named as the Protector. The John DeBlasio Charitable Trust for World Peace and Development later became known as the GPD Charitable Trust dated December 7, 2010.

     43.     The First Windfall Sale occurred in the following fashion. On December 7, 2010, Defendant Sallyport made a Term Promissory Note ("Note") with SGS whereby Defendant Sallyport agreed to pay SGS $40,665,964.00 on or before January 6, 2011. See Exh. B. In exchange for the Note, SGS loaned Defendant Sallyport $40,665,964.00.

     44.     On December 8, 2010, Defendant Sallyport used the $40,665,964.00 to purchase Plaintiff's fifty percent ownership in Sallyport pursuant to the Agreement. On that same day, Defendant SGS gifted the Note to The John DeBlasio Charitable Trust for World Peace and Development via an Assignment of Debt. See Exh. C. Defendant SGS was the trustee of The John DeBlasio Charitable Trust for World Peace and Development and Defendant DeBlasio was the President of SGS. Also on December 8, 2010, The John DeBlasio Charitable Trust for World Peace and Development contributed via a Capital Contribution Agreement the Note to

Defendant Sallyport in exchange for fifty percent ownership in Defendant Sallyport, namely the 5,000 shares of Defendant Sallyport which Defendant Sallyport had just purchased from Plaintiff.  See Exh. D.

45.    On February 16, 2011, the Board of Directors of Defendant Sallyport and Defendant DeBlasio, as sole stockholder of Defendant Sallyport,approved the purchase of Plaintiff's shares, the Note, and sale of 5000 shares to The John DeBlasio Charitable Trust for World Peace and Development.  See Exh. E.

46.    The end result of this transaction is that Defendant Sallyport received proceeds of $40,665,964.00 in value by selling a fifty percent stake in the Company to The John DeBlasio Charitable Trust for World Peace and Development in exchange for the Note it had issued for that same amount.

47.    Given that fifty percent of the company was soldfor $40,665,964.00, the enterprise value of the Company for this transaction was equal to or more than $65,000,000.00.

48.    This transaction qualifies for a Windfall Sale under Section 2.04 of the Agreement because Defendant Sallyport was a "direct or indirect equity holder" that sold "shares of the Company's capital stock . . . constituting 20% or more by voting power or economic value of the Company's assets or equity to a third party . . . for a price that reflects an enterprise value of the Company equal to or greater than $65,000,000." The John DeBlasio Charitable Trust for World Peace and Development is a "third party" under the Windfall Protection clause because it is a distinct entity from Defendant Sallyport.

49.    Plaintiff is therefore entitled to "an amount equal to 20% of the proceeds received from the Windfall Sale."  In this case, Defendant Sallyport received proceeds of $40,665,964.00, the amount of the Note, and therefore, Plaintiff is entitled to an amount equal to 20% of $40,665,964.00, or $8,133,192.80.  Pursuant to the Agreement, Defendant Sallyport owes Plaintiff this amount as the Company and as the selling stockholder.

2.   **The Second Windfall Sale: Defendant DeBlasio Sells 5000 Shares of Common Stock to The John DeBlasio Charitable Trust for World Peace and Development on May 5, 2011.**

50.    On December 19, 2010, eleven days after causing Defendant Sallyport to buy out Plaintiff's shares and consummating the First Windfall Sale, Defendant DeBlasio emailed Non-Defendant Conspirator Tom Campbell and copied Non-Defendant Conspirators Pasquale and Franco DeBlasio and others about Defendant Sallyport's purchase of Plaintiff's shares.  Though Non-Defendant Conspirator Campbell was already aware of Defendant DeBlasio's dealings with Plaintiff, Defendant DeBlasio wanted to give Campbell the "official update" that Plaintiff had sold his shares in Defendant Sallyport so that Defendant DeBlasio now had sole control over the Company.  In response to this email, on the same day, Non-Defendant Conspirator Campbell emailed only Defendant DeBlasio that he and Non-Defendant Conspirator DC Capital Partners wanted to partner with Defendant DeBlasio, including purchasing substantial equity in Defendant Sallyport.  In addition, on the same day, Robert "Tony" Grimes of Non-Defendant Conspirator Kaseman responded to Defendant DeBlasio with a similar email that Defendant Sallyport and Non-Defendant Conspirator Kaseman had established a very good working relationship and that he looked forward to continuing their joint pursuit of business opportunities.

51.    These emails evidence the conspiracy between Defendants and the Non-Defendant Conspirators to defraud Plaintiff by showing the speed with which they moved to execute their prior agreement to get Plaintiff out of the picture so that Defendants could sell Defendant Sallyport to the Acquiring Group Conspirators in the agreed upon Third Windfall Sale.

52.    Prior to the Third Windfall Sale, however, on May 5, 2011, Defendant DeBlasio closed the Second Windfall Sale.

53.    In particular, on May 5, 2011, Defendant DeBlasio entered into a Stock Purchase Agreement with The John DeBlasio Charitable Trust for World Peace and Development by which Defendant DeBlasio sold his fifty percent ownership in Defendant Sallyport (5,000 shares of common stock) to The John DeBlasio Charitable Trust for World Peace and Development for an aggregate purchase price of $42,250,000.00.  See Exh. F.  The purchase price was made

- 25 -

payable by The John DeBlasio Charitable Trust for World Peace and Development by delivering to Defendant DeBlasio a Demand Promissory Note in the principal amount of $42,250,000.00. See Exh. G.

54.     Given that fifty percent of Defendant Sallyport was sold for $42,250,000.00, the enterprise value of the Company for this transaction was equal to or more than $65,000,000.00.

55.     This transaction qualifies for a Windfall Sale under Section 2.04 of the Agreement because "John DeBlasio" sold "shares of the Company's capital stock . . . constituting 20% or more by voting power or economic value of the Company's assets or equity to a third party . . . for a price that reflects an enterprise value of the Company equal to or greater than $65,000,000." The John DeBlasio Charitable Trust for World Peace and Development is a "third party" under the Windfall Protection clause because it is a distinct entity from John DeBlasio.For the Second Windfall Sale, Defendant SGS and Defendant DeBlasio were the Trustee and Protector, respectively, of The John DeBlasio Charitable Trust for World Peace and Development.

56.     Plaintiff is therefore entitled to "an amount equal to 20% of the proceeds received from the Windfall Sale." In this case, Defendant DeBlasio received proceeds of $42,250,000.00, the amount of the Note, and therefore, Plaintiff is entitled to an amount equal to 20% of $42,250,000.00, or $8,450,000.00. Pursuant to the Agreement, Defendant Sallyport owes Plaintiff this amount as the Company and Defendant DeBlasio owes this amount as the selling stockholder.

**3.     The Third Windfall Sale: The John DeBlasio Charitable Trust for World Peace and Development Sells 10,000 Shares of Common Stock to Sallyport Holdings LLC on June 29, 2011.**

57.     As referenced above, immediately after Plaintiff Charron was eliminated from the Company, Defendantsand the Non-Defendant Conspirators moved swiftly to execute their plan for Defendant DeBlasio to sell Defendant Sallyport to the Acquiring Group Conspirators in the Third Windfall Sale. In particular, between December 8, 2010, and June 29, 2011,

Defendantsand the Non-Defendant Conspirators, pursuant to their conspiratorial agreement and aided and abetted by each other and others, structured, orchestrated and closed the Third Windfall Sale, which occurred on June 29, 2011, when The John DeBlasio Charitable Trust for World Peace and Development sold 10,000 shares of common stock in Defendant Sallyport, representing 100% of the equity in the Company, to Non-Defendant Conspirator Sallyport Holdings at an enterprise value for Defendant Sallyport which was equal to or more than $65,000,000.00.

58.     Defendantsand the Non-Defendant Conspirators purposefully and intentionally structured the Third Windfall Sale so as to avoid the Windfall Protection Clause in the Agreement and for Defendant Sallyport and The John DeBlasio Charitable Trust for World Peace and Development to avoid paying Plaintiff Windfall Protection. To structure the Third Windfall Sale, Defendants and the Non-Defendant Conspirators took many actions, described below in more detail, including the formation of new domestic entities and Bermuda trusts and the movement of $23,450,000 away from Defendant Sallyport to the recently formedJohn DeBlasio Charitable Trust for World Peace and Development.   These actions permitted Defendantsand the Non-Defendant Conspirators to achieve their conspiratorial objectives,Defendants DeBlasio and Sallyport to falsely report to Plaintiff that the enterprise value of Defendant Sallyport for the Third Windfall Sale was $64.5 million, conveniently placed below the $65 million trigger to pay Windfall Protection to Plaintiff, and Defendants and Non-Defendant Conspirators to profit from their conspiracy and tortious acts, and the breaches of the Agreement.

59.     After the exchange of emails between Defendant DeBlasio, Non-Defendant Conspirator Campbell and Robert "Tony" Grimes on December 19, 2010, referenced above, the following events occurred culminating in the Third Windfall Sale.

60.     On January 4, 2011, Defendant DeBlasio and Non-Defendant Conspirator Campbell made plans to speak the following day about the transaction in which the Non-Defendant Conspirator DC Capital Partners would purchase Defendant Sallyport.

61.    On January 7, 2011, Defendant DeBlasio with the conspiratorial agreement of and aided and abetted by Defendants and the Non-Defendant Conspirators and others, caused the creation of the GPD Charitable Trust dated January 7, 2011 (f/k/a John DeBlasio Charitable Trust) in Florida and caused himself and Non-Defendant Conspirator Pasquale DeBlasio to be named as trustees of this trust.

62.    On January 11, 2011, Doug Lake of Non-Defendant Conspirator DC Capital Partners prepared a timeline which he sent to Defendant DeBlasio in which he stated that the closing of the transaction should occur by the end of February 2011. Defendant DeBlasio responded in an email that he was not sure why 45 days were needed to close the deal given the extensive previous interaction between him and the Acquiring Group Conspirators.

63.    At least by January 18, 2011, Defendant DeBlasio, with the conspiratorial agreement of and aided and abetted by Defendant SGS, the Non-Defendant Conspirators and others, caused the creation of the John P. DeBlasio Trust, a Florida business trust, and caused Non-Defendant Conspirator Pasquale DeBlasio to be named as Trustee of the John P. DeBlasio Trust and Defendant DeBlasio as Trust President.

64.    On or about January 18, 2011, Defendant DeBlasio, with the conspiratorial agreement of and aided and abetted by Defendants, the Non-Defendant Conspirators and others, caused the creation of Sallyport Global, Inc. ("SGI") (now Non-Defendant Conspirator Sallyport Global), a corporation organized under the laws of the State of Florida and wholly owned by the John P. DeBlasio Trust. The President of SGI was the John P. DeBlasio Trust.

65.    On or about January 18, 2011, Defendant Sallyport signed a Service Agreement with Non-Defendant Conspirator SGI under which SGI was to provide employees to Defendant Sallyport to do the work required under Defendant Sallyport's United States governmentclassified contracts in exchange for 2% mark up (fee) of the payroll. SeeExh. X. Previously, these same individuals who were now employees of Non-Defendant Conspirator SGI were the same employees of Sallyport Support Services, LLC a wholly owned company of

Defendant Sallyport and had been performing this same work for Defendant Sallyport on its United States Government classified contracts at a lower cost. See Exh. H-6.

66.     On January 20, 2011, an exclusivity letter agreement was signed by Non-Defendant Conspirator Campbell and forwarded to Defendant DeBlasio for signature.

67.     On that same date, January 20, 2011, Non-Defendant Conspirator Campbell in a separate letter to Defendant DeBlasio listed firms that were available as resources to Defendant Sallyport as he and Defendant DeBlasio went about consummating their previously-struck agreement to defraud Plaintiff and profit from having Non-Defendant Conspirator DC Capital Partners purchase Defendant Sallyport in a manner to avoid the Windfall Protection Clause of the Agreement.In that same letter of January 20, 2011, nearly $50 million of value of Defendant Sallyport was artificially wiped out.  Instead of coming in at the $105 million number that Non-Defendant Conspirator DC Capital Partners had previously tendered, Non-Defendant Conspirator DC Capital Partners' letter tendered only $57,500,000 for Defendant Sallyport.

68.     As early as February 2011, counsel for Defendants and Non-Defendant Conspirator SGIand counsel for the Acquiring Group Conspirators began drafting the deal documents, which eventually led to the execution of the Stock Purchase Agreement, dated May 6, 2011 (the "KasemanSPA") – the closing document for the Third Windfall Sale, and Amendment No. 1 to the SPA.SeeExhs. H & I.

69.     On or about March 15, 2011, Defendant Sallyport, through its agent Defendant DeBlasio, terminated the Letter Agreement with Sagent so that Sagent and its representatives would not be privy to the material facts about the Third Windfall Sale and so learn about the tortious actions against and conspiracy to defraud Plaintiff by Defendants.

70.     Two days later, on March 17, 2011, Non-Defendant Conspirator Campbell, aided and abetted by the Acquiring Group Conspirators and others, caused the creation of Non-Defendant Conspirator Sallyport Holdings, the eventual purchaser of Defendant Sallyport in the Third Windfall Sale.  After the Third Windfall Sale, Non-Defendant Conspirator Sallyport

Holdings merged with Non-Defendant Kaseman Holdings, LLC with the new resulting entity being named Non-Defendant KS International, LLC.

71.    On April 11, 2011, Non-Defendant DC Capital Partners, via a subsequent Letter of Intent signed by Non-Defendant Conspirator Campbell, slightly increased its tender for Defendant Sallyport to $64,500,000 – but still a sum conveniently placed $500,000 below the trigger for a Windfall Protection payment to Plaintiff.

72.    On June 13, 2011, Defendant DeBlasio, with the conspiratorial agreement of and aided and abetted by Defendantsandthe Non-Defendant Conspirators and others, caused the Memorandum of Association for Defendant SGS to be altered and amended so that one of the objects of Defendant SGS was to act as trustee of The John DeBlasio Charitable Trust for World Peace and Development.

73.    On or about June 24, 2011, as required by Section 9.13 of the Kaseman SPA, Defendant DeBlasio, aided and abetted by Defendants, the Selling Group Conspirators and others, and with the knowledge and assent of the Acquiring Group Conspirators, caused the incorporation of Defendant JPD Private Trust Company in Bermuda.  Defendants and all the other Conspirators agreed that Defendant JPD Private Trust Company would replace Defendant SGS as trustee of The John DeBlasio Charitable Trust for World Peace and Development immediately after the closing of the Third Windfall Sale.

74.    On or about June 28, 2011 Defendant Sallyport, Defendant SGS and Non-Defendant Conspirator SGI approved the sale of Defendant Sallyport and Non-Defendant Conspirator SGI in the Third Windfall Sale and Non-Defendant Conspirator SGI and Defendant SGS approved assignment of $10,750,000 in loans to WD Solutions Ltd. and retirement of Defendant SGS as trustee of The John DeBlasio Charitable Trust for World Peace and Development. See Exhs. J, K, & L.

75.    Non-Defendant Conspirator Sallyport Holdings was the Purchaser in the Third Windfall Sale and acquired one hundred percent (100%) of the shares of Defendant Sallyport and of Non-Defendant Conspirator SGI, which were then held solely by The John DeBlasio

Charitable Trust for World Peace and Development, and the John P. DeBlasio Trust, respectively.

76.     Defendants SGS and JPD Private Trust Company, as trustees of The John DeBlasio Charitable Trust for World Peace and Development, and then the GPD Charitable Trust dated December 7, 2010, received cash proceeds from Non-Defendant Conspirator Sallyport Holdings' purchase of all the shares of Defendant Sallyport in the Third Windfall Sale.

77.     The Acquiring Group Conspirators provided funding for Non-Defendant Conspirator Sallyport Holdings to give to Defendant SGS in exchange for the shares of Defendant Sallyport.

78.     Non-Defendant Conspirator Pasquale DeBlasio signed the Kaseman SPA as Trustee of the John P. DeBlasio Trust and on behalf of SGI as its President. Defendant DeBlasio signed the Kaseman SPA as President and CEO of Defendant Sallyport, as President of the Trustee of the John DeBlasio Charitable Trust for World Peace and Development, and individually. Non-Defendant Conspirator Campbell signed the Kaseman SPA as Managing Member of Non-Defendant Conspirator Sallyport Holdings and as Chairman of Non-Defendant Conspirator Kaseman.

79.     In Amendment No. 1 to the Kaseman SPA, Non-Defendant Conspirator Campbell signed in five different capacities: (1) as Chairman of Defendant Sallyport, (2) as Chairman of Non-Defendant Conspirator Sallyport Global, (3) as Chairman of Non-Defendant Conspirator Sallyport Holdings, (4) as Chairman of Non-Defendant Conspirator Kaseman, and (5) as Managing Member of Non-Defendant Conspirator D.C. Capital Partners Investments. Defendant DeBlasio signed Amendment No. 1 in his individual capacity and on behalf of the John DeBlasio Charitable Trust for World Peace and Development. Non-Defendant Conspirator Pasquale DeBlasio signed Amendment No. 1as Trustee of the John P. DeBlasio Trust.

80.     Myriad aspects of the Third Windfall Sale clearly show the consciousness of guilt of Defendantsand the Non-Defendant Conspirators to structure around the Windfall Protection Clause to defeat Plaintiff's financial interests for their financial gain.

81.     During the drafting of the Kaseman SPA, Defendants and the Acquiring Group Conspirators included language in Section 2.2(c) that specifically stated that the enterprise value of the Company was $64,500,000 irrespective of any other aspect of the deal.  The only reason to include a reference to "enterprise value" in this SPA was to address, and "counteract," the "enterprise value" of $65 million contained in the December 7, 2010 Windfall Protection clause that would have triggered a payment to Plaintiff.  Realizing this provision in the Kaseman SPA strongly evidenced their conspiracy and tortious actions and/or anticipated breach of the Agreement, Defendants and the Acquiring Group Conspirators excised from the Kaseman SPA this explicit reference to the $64.5 million enterprise value.  However, Schedule 2.4 of the Kaseman SPA does contain the $64.5 million figure, thus evidencing the conscious guilt of Defendants and the Acquiring Group Conspirators to avoid the Windfall Protection clause and defeat Plaintiff's legitimate financial interests.

82.     Defendants and the Acquiring Group Conspirators also specifically agreed to how Defendants DeBlasio, SGS, and JPD Private Trust Company, along with the Selling Group Conspirators, would siphon off funds from Defendant Sallyport immediately prior to the Third Windfall Sale to benefit Defendants DeBlasio, SGS, and JPD Private Trust Company and the Seller Group Conspirators, to obfuscate and artificially lower the reported enterprise value of Defendant Sallyport and cause or induce a breach of the Agreement.  In particular, Defendant DeBlasio, with the consent of the Acquiring Group Conspirators, made it a pre-condition of the Third Windfall Sale that he have the authority, with the consent of Non-Defendant Conspirator DC Capital Partners, to transfer away from Defendant Sallyport any and all funds necessary to ensure that the purported enterprise value fell below $65 million. Within days of the closing of the Third Windfall Sale on June 29, 2011,, Defendants caused Defendant SGS to transfer away $23,450,000 from Defendant Sallyport to The John DeBlasio Charitable Trust for World Peace and Development, see Exh. H-6,  and assign $10.75 million of loans payable to Defendant SGS to WD Solutions, Ltd, a Mauritius company of which Defendant DeBlasio is an officer and part owner, see Exhs. H-5, K, V, Z, & AA, and Defendant Sallyport to forgive a loan of $5.0 million

- 32 -

made to Defendant DeBlasio, pay Defendant DeBlasio a bonus of $3.5 million, seeExhs. S, T ,U, & W,and (4) had Defendant Sallyport to transfer millions of dollars to Non-Defendant Conspirator SGI (now Non-Defendant Conspirator Sallyport Global LLC) by signing a service agreement under which SGI charged Defendant Sallyport a 2% markup (fee) to provide employees to Defendant Sallyport to perform work on United States government classified contracts on which these same individuals had previously been working as employees of Defendant Sallyport at a lower cost to the United States government so as to financially benefit SGI's sole shareholder, namely, the John P. DeBlasio Trust, the trustee of which was Non-Defendant Conspirator Pasquale DeBlasio.SeeExhs. H-6 & X.

83.   In Sections 11.1(e) and 13.17 of the SPA, Defendant DeBlasio, the John DeBlasio Charitable Trust for World Peace and Development, and the John P. DeBlasio Trust agreed to indemnify the Acquiring Group Conspirators"from any demand, claim, suit, action, cause of action, proceeding or assessment brought by any former stockholder of the Company." Plaintiff, individually and as Trustee, was the only former stockholder of the Company. All Defendants and Conspirators therefore knew Defendant Sallyport was not going to pay Plaintiff at the closing of the Third Windfall Sale and that the Conspirators planned to look to Defendant DeBlasio and his related trusts for financial protection in the event Plaintiff ever discovered the conspiracy and scheme to defraud, tortious acts, and/or breach of the Agreement.

84.   On June 29, 2011, Non-Defendant Conspirator Sallyport Holdings, as "Purchaser," and Non-Defendant Conspirator Kaseman, as "Sponsor Affiliate," consummated the Third Windfall Sale with Defendant Sallyport, SGI (now Non-Defendant Conspirator Sallyport Global LLC), Defendant DeBlasio, the John DeBlasio Charitable Trust for World Peace and Development, and the John P. DeBlasio Trust whereby Non-Defendant Conspirator Sallyport Holdings purchased 100% of the outstanding shares of Defendant Sallyport held by the John DeBlasio Charitable Trust for World Peace and Development and 100%of the outstanding shares of SGI held by the John P. DeBlasio Trust.

85.     This transaction qualifies as a Windfall Sale under Section 2.04 of the Agreement because The John DeBlasio Charitable Trust for World Peace and Development was "a direct or indirect equity holder" which sold "shares of the Company's capital stock . . . constituting 20% or more by voting power or economic value of the Company's assets or equity to a third party . . . for a price that reflects an enterprise value of the Company equal to or greater than $65,000,000." Non-Defendant Conspirator Sallyport Holdings is a "third party" under the Windfall Protection clause because it is a distinct entity from The John DeBlasio Charitable Trust for World Peace and Development. For the Third Windfall Sale, Defendant SGS and Defendant DeBlasio were the Trustee and Protector, respectively, of The John DeBlasio Charitable Trust for World Peace and Development.

86.     Though the Kaseman SPA reports a purchase price of $64.5 million, all Defendants and Conspirators knew that the true Enterprise Value of Defendant Sallyport for the Third Windfall Sale was equal to or more than $65,000,000.00. The McGladrey Audit shows that the purchase price for Defendant Sallyport for the Third Windfall Sale was $82,841,000. See Exh. N.

87.     Plaintiff is entitled to "an amount equal to 20% of the proceeds received from the Windfall Sale." For the Third Windfall Sale, Defendant SGS, and then Defendant JPD Private Trust Company, as trustee of The John DeBlasio Charitable Trust for World Peace and Development, received proceeds of cash equal to $64.5 million at the time of closing. In addition, as part of the Third Windfall Sale, (1) Defendant SGS, and then Defendant JPD Private Trust Company, as trustee of The John DeBlasio Charitable Trust for World Peace and Development received proceeds of $23,450,000 in cash from SGS, (2) Defendant DeBlasio received $5,000,000 in proceeds in loan forgiveness by Defendant Sallyport, and $3,500,000 in proceeds by a cash bonus from Defendant Sallyport, (3) WD Solutions, Ltd., in which Defendant DeBlasio is an officer and owner, received $10,750,000 in loans payable to Defendant SGS by causing SGS to assign these loans to WD Solutions Ltd,, and (4) SGI, whose sole stockholder was the John P. DeBlasio Trust received at least $900,000 in cash proceeds from having

Defendant Sallyport pay SGI for employees at a higher cost than what these individuals as employees of Defendant Sallyport cost Defendant Sallyport and the United States Government to perform the classified contracts of Defendant Sallyport.Total proceeds received from the Third Windfall Sale are therefore at least $108,100,000. Under the Agreement, Plaintiff is entitled to an amount equal to 20% of the proceeds from the Third Windfall Sale ($108,100,000), which is $21,620,000.00. Pursuant to the Agreement, Defendant Sallyport owes Plaintiff this amount as the Company, and Defendant SGS and Defendant JPD Private Trust Company owe this amount as the former trustee andsuccessor trustee, respectively, of the selling stockholder.

88.    No closing statement for the Third Windfall Sale ever included payments to Plaintiff, and Plaintiff has not received the money due to Plaintiff, both individually and as Trustee, under the Windfall Protection provision. Defendants Sallyport, SGS and JPD Private Trust Company breached the Agreement by not paying Plaintiff Windfall Protection for the Third Windfall Sale.

### 4.    Defendants and the Non-Defendant Conspirators Cover Up their Tortious Actions Against and Conspiracy to Defraud Plaintiff and/or the Breach of the Agreement from the First, Second, and Third Windfall Sales.

89.    Defendants and the Non-Defendant Conspiratorsacted to cover up their tortious conduct against, and conspiracy to defraud, Plaintiff and the breaches of the Agreement by one or more Defendants in the First, Second, and Third Windfall Sales. No Defendant or Non-Defendant Conspirator ever voluntarily revealed to Plaintiff the existence, closing or details of the First, Second, or Third Windfall Sales. Plaintiff has learned about the three Windfall Sales only upon inquiry and litigation efforts undertaken since Plaintiff learned of the Third Windfall Sale through a source other than any Defendant or Non-Defendant Conspirator.

90.    As described above, Defendant DeBlasio, aided and abetted by the other Defendants and the Seller Group Conspirators and others, caused the formation in Bermuda of the GPD Charitable Trust dated December 7, 2010, the successor-in-interest to the John DeBlasio Charitable Trust for World Peace and Development, and Defendant JPD Private Trust

Company, the Trustee of the GPD Charitable Trust dated December 7, 2010. Defendant DeBlasio and the Seller Group Conspirators, with the knowledge and assent of the other Defendants and the Acquiring Group Conspirators, caused the formation of the GPD Charitable Trustdated December 7, 2010 and Defendant JPD Private Trust Company to help disguise and conceal material facts about the First, Second, and Third Windfall Sales from Plaintiff and make it more difficult for Plaintiff to learn about, and trace the flow of money from the First, Second, and Third Windfall Sales and so learn about the tortious actions against and conspiracy to defraud Plaintiff by Defendants DeBlasio, SGS, and JPD Private Trust Company and the Non-Defendant Conspirators and/or the breach of the Agreement by Defendants in the First, Second, and Third Windfall Sales.

91.     On or about July 29, 2011, the Acquiring Group Conspirators, with the knowledge of all Defendants and the Selling Group Conspirators, caused Non-Defendant Conspirator Sallyport Holdings to merge into Kaseman Holdings, LLC, and upon the merger date, the name of the surviving entity was changed to Non-Defendant Conspirator KS International, LLC. This merger helped disguise and conceal material facts about the First, Second, and Third Windfall Salesfrom Plaintiff and made it more difficult for Plaintiff to learn about, and trace the flow of money from the First, Second, and Third Windfall Salesand so learn about the tortious actions against and conspiracy to defraud Plaintiff by Defendants DeBlasio, SGS, and JPD Private Trust Company and the Non-Defendant Conspirators and/or the breaches of the Agreement for the First, Second, and Third Windfall Sale by Defendants.

92.     Upon learning of the Third Windfall Sale, Plaintiff, through counsel, made repeated requests to Defendants Sallyport and DeBlasio, and the Acquiring Group Conspirators for a copy of the deal documents so that Plaintiff could verify the purported enterprise value of $64.5 million. On each occasion, Defendants Sallyport and DeBlasio and the Acquiring Group Conspirators refused to provide the deal documents and told Plaintiff to trust them about the veracity of the purported enterprise value of Defendant Sallyport for the Third Windfall Sale.

93.    On or about September 20, 2011, Defendant DeBlasio, with full knowledge of all the other Defendants and Conspirators and acting on their behalf pursuant to their conspiratorial agreements, instructed a lawyer for Cohen & Grigsby to misinform counsel for Plaintiff, in writing, that the enterprise value of Defendant Sallyport for the Third Windfall Sale was $64.5 million. See Exh. O. This false representation was an attempt to disguise and conceal material facts about the First, Second, and Third Windfall Sales from Plaintiff and made it more difficult for Plaintiff to learn about, and trace the flow of money from the First, Second, and Third Windfall Salesand so learn about the tortious actions against and conspiracy to defraud Plaintiff by Defendants DeBlasio, SGS, and JPD Private Trust Company and the Non-Defendant Conspirators and/or the breaches of the Agreement for the First, Second, and Third Windfall Sale by Defendants.

94.    On or about October 6, 2011, counsel for Plaintiff requested from Defendant Sallyport's lawyer from Cohen & Grigsby a copy of the purchase agreement and any related documents from the Third Windfall Sale so that Plaintiff could verify the asserted transaction value of $64.5 million.See Exh. P.

95.    On or about December 2, 2011, the lawyer from Cohen & Grigsby, at the instruction of Defendant DeBlasio, and with the knowledge, agreement, and consent of all the other Defendants and Conspirators, told counsel for Plaintiff that the Third Windfall Sale had resulted in a "pre-structuring" value of Defendant Sallyport of $60.7 million and an overall enterprise value of$64.5 million. Defendants and Conspirators caused this false representation to be made to Plaintiff's counsel to disguise and conceal material facts about the First, Second, and Third Windfall Sales from Plaintiff and made it more difficult for Plaintiff to learn about, and trace the flow of money from the First, Second, and Third Windfall Salesand so learn about the tortious actions against and conspiracy to defraud Plaintiff by Defendants DeBlasio, SGS, and JPD Private Trust Company and the Non-Defendant Conspirators and/or the breaches of the Agreement for the First, Second, and Third Windfall Sale by Defendants.

96.     On or about July 13, 2012, counsel for Plaintiff requested by letter that Defendants Sallyport and DeBlasio provide information to permit Plaintiff to verify Defendant Sallyport's compliance with the Windfall Protection provision.  Again, Defendants Sallyport and DeBlasio, with the knowledge of all the other Defendants and Conspirators, refused to answer the questions.

97.     On or about March 8, 2012, Sagent filed a complaint against Sallyport in the Supreme Court of the State of New York, County of New York (the "Sagent Litigation").  In this lawsuit, Sagent claims that Sallyport breached their agreement by not paying Sagent's fee associated with the Third Windfall Sale.  The filings in the Sagent Litigation revealed to Plaintiff that the Defendants purposefully did not disclose the Third Windfall Sale to Sagent or Plaintiff prior to its consummation.  The secrecy by which Defendants conducted the Third Windfall Sale evidences the tortious actions against and conspiracy to defraud Plaintiff by Defendants DeBlasio, SGS and JPD Private Trust Company and the Non-Defendant Conspirators.

98.     Shortly after the initiation of the Sagent Litigation, Defendant DeBlasio contacted Plaintiff and asked for his assistance in trying to resolve that lawsuit.  As a precondition of getting involved in any settlement efforts, Plaintiff requested that Defendant DeBlasio and the Acquiring Group Conspirators provide a copy of the deal documents for the Third Windfall Sale, for which Plaintiff had already made several requests to no avail.  Defendant DeBlasio agreed to produce deal documents only on condition that Plaintiff enter into a Confidentiality Agreement. Plaintiff and Defendant DeBlasio executed the Confidential Agreement on or about March 3, 2012, and on or about April 6, 2012, a lawyer for Cohen & Grigsby, acting at the instruction of Defendant DeBlasio and the Acquiring Group Conspirators, provided selective deal documents to counsel for Plaintiff, including the Kaseman SPA and all schedules related thereto. Noticeably absent from the documents provided to Plaintiff was the McGladrey Audit, completed on March 30, 2012, which showed a total purchase price of $82,841,000 for Defendant Sallyport in the Third Windfall Sale.  Plaintiff had no knowledge of the McGladrey Audit until on or about July 19, 2012, when counsel for Plaintiff was informed about the EDVA

Litigation by a lawyer for Cohen & Grigsby who represented Defendant DeBlasio and the Acquiring Group Conspirators.   After learning of the EDVA Litigation, Plaintiff's counsel acquired the pleadings from the EDVA Litigation and discovered the McGladrey Audit for the first time.  None of the Defendants or Conspirators ever disclosed to Plaintiff the existence of the McGladrey Audit.

99.     Non-Defendant Conspirators DeBlasio & DeBlasio Associates and The DeBlasio Group at 447 Washington Ave., Bridgeville, Pennsylvania provided accounting, financial, and tax services in connection with the First, Second, and Third Windfall Sales and provided such services, with the full knowledge and agreement of all Defendants and Conspirators, including so as to artificially lower and misrepresent the enterprise value of Defendant Sallyport for the Third Windfall Sale, intentionally interfere with and cause a breach of the Agreement and cause damage to Plaintiff.

100.    On August 30, 2012, after learning certain of the material facts about the Third Windfall Sale and that he had been damaged by the breach of the Agreement by one or more of the Defendantsand the tortious actions and conspiracy to defraud of DefendantsDeBlasio, SGS, and JPD Private Trust Company and the Non-Defendant Conspirators, Plaintiff demanded full payment within seven days from Defendant Sallyport and Defendant DeBlasio or the Acquiring Group Conspirators for breach of the Agreement for the Third Windfall Sale either pursuant to the obligations under the Agreement or because they control Defendant Sallyport and can cause it to pay what it owes.  Plaintiff has not received any payment from Defendant Sallyport or any Defendant or Conspirator.  Plaintiff has no alternative but to seek redress in this Honorable Court.

## CLAIMS FOR RELIEF

### COUNT I
**(Breach of Contract)**
**(Against Defendant Sallyport for the First Windfall Sale)**

101.     Plaintiff repeats and realleges the allegations set forth in all preceding paragraphs of this First AmendedComplaint as if set forth fully herein.

102.     The essential elements of a breach of contract action are: (1) the existence of a contract; (2) the plaintiff's performance pursuant to that contract; (3) the defendant's breach of its obligations pursuant to the contract; and (4) damages resulting from that breach.

103.     In this case, Plaintiff and Defendant Sallyport entered into the Agreement on or about December 7, 2010.  The Agreement is a contract that was in existence at all relevant times herein.

104.     Plaintiff at all times performed his obligations pursuant to the Agreement.

105.     Defendant Sallyport at all relevant times had obligations under the Agreement, which obligations were breached by Defendant Sallyport in connection with the First Windfall Sale.  These obligations and related breaches include but are not limited to Defendant's failure to pay Windfall Protection to Plaintiff.

106.     As a direct and proximate result of Defendant Sallyport's acts and omissions, and breaches of the Agreement, Plaintiff has suffered compensatory damages in an amount equal to 20% of the proceeds ($40,665,964.00) received from the First Windfall Sale, or $8,133,192.80.

### COUNT II
**(Breach of Contract)**
**(Against Defendants Sallyport and John DeBlasio for the Second Windfall Sale)**

107.     Plaintiff repeats and realleges the allegations set forth in all preceding paragraphs of this First AmendedComplaint as if set forth fully herein.

108.    The essential elements of a breach of contract action are: (1) the existence of a contract; (2) the plaintiff's performance pursuant to that contract; (3) the defendant's breach of its obligations pursuant to the contract; and (4) damages resulting from that breach.

109.    In this case, Plaintiff and Defendants Sallyport and John DeBlasio entered into the Agreement on or about December 7, 2010.  The Agreement is a contract that was in existence at all relevant times herein.

110.    Plaintiff at all times performed his obligations pursuant to the Agreement.

111.    Defendants Sallyportand John DeBlasio at all relevant times had obligations under the Agreement, which obligations were breached by Defendants Sallyport and John DeBlasio in connection with the Second Windfall Sale.  These obligations and related breaches include but are not limited to Defendants' failure to pay Windfall Protection  to Plaintiff.

112.    As a direct and proximate result of Defendants Sallyport and John DeBlasio's acts and omissions, and breaches of the Agreement, Plaintiff has suffered compensatory damages in an amount equal to 20% of the proceeds received from the Second Windfall Sale ($42,250,000.00), or $8,450,000.00.

## COUNT III
### (Breach of Implied Covenant of Good Faith and Fair Dealing)
### (Against Defendants Sallyport and DeBlasio for the Second Windfall Sale)

113.    Plaintiff repeats and realleges the allegations set forth in all preceding paragraphs of this First Amended Complaint as if set forth fully herein.

114.    Under New York law, all contracts imply a covenant of good faith and fair dealing in the course of performance. This covenant embraces a pledge that neither party shall do anything which will have the effect of destroying or injuring the right of the other party to receive the fruits of the contract.  The duties of good faith and fair dealing imply obligations

which encompass any promises which a reasonable person in the position of the promisee would be justified in understanding were included.

115.    In this case, in connection with the Second Windfall Sale, Defendants Sallyport and DeBlasio failed to exercise good faith and deal fairly in fulfilling the terms and promises contemplated by the Agreement entered into on or about December 7, 2010.

116.    Plaintiff at all times performed his obligations pursuant to the Agreement. Plaintiff also reasonably understood and was promised by Defendants Sallyport and DeBlasio that Defendants would pay the amounts owed under the Windfall Protection Clause of the Agreement, and that Defendants Sallyport and DeBlasio (1) would not claim that DeBlasio was not a party to the Agreement, given that he accepted the benefits of the Agreement and has payment obligations under Section 2.04 of the Agreement, which reads in relevant part that if "John DeBlasio . . . sells or agrees to sell shares of the Company's capital stock . . . constituting 20% or more by voting power or economic value of the Company's assets or equity," then "the Company or such stockholder [here, DeBlasio] shall pay Sellers [here, Charron and his trust] an amount equal to 20% of the proceeds received from the Windfall Sale," and (2) would not otherwise attempt to frustrate the Agreement.

117.    DefendantsSallyport and DeBlasio at all relevant times had obligations under the Agreement, which obligations were breached by Defendants.   These obligations and related breaches include but are not limited to DefendantsSallyport and DeBlasio's failure to pay Windfall Protection to Plaintiff for the Second Windfall Sale and Defendants Sallyport and DeBlasio's attempts to otherwise frustrate the Agreement, and other misconduct described above.

118.    As a direct and proximate result of DefendantsSallyport and DeBlasio's acts and omissions, and breaches of the Agreement and of the implied duties of good faith and fair dealing, Plaintiff has suffered compensatory damages in an amount equal to 20% of the proceeds received from the Second Windfall Sale ($42,250,000.00), which is $8,450,000.00.

## COUNT IV
### (Breach of Contract)
### (Against Defendants Sallyport, SGS, and JPD Private Trust Company for the Third Windfall Sale)

119.    Plaintiff repeats and realleges the allegations set forth in all preceding paragraphs of this First AmendedComplaint as if set forth fully herein.

120.    The essential elements of a breach of contract action are: (1) the existence of a contract; (2) the plaintiff's performance pursuant to that contract; (3) the defendant's breach of its obligations pursuant to the contract; and (4) damages resulting from that breach.

121.    In this case, Plaintiff and Defendants Sallyport, SGS, and JPD Private Trust Companyentered into the Agreement on or about December 7, 2010.   The Agreement is a contract that was in existence at all relevant times herein.

122.    Plaintiff at all times performed his obligations pursuant to the Agreement.

123.    Defendants Sallyport, SGS, and JPD Private Trust Companyat all relevant times had obligations under the Agreement, which obligations were breached by Defendants Sallyport, SGS, and JPD Private Trust Company in connection with the Third Windfall Sale. These obligations and related breaches include but are not limited to Defendants' failure to pay Windfall Protection to Plaintiff.

124.    As a direct and proximate result of Defendants Sallyport, SGS, and JPD Private Trust Company's acts and omissions, and breaches of the Agreement, Plaintiff has suffered

compensatory damages in an amount equal to 20% of the proceeds received from the Third Windfall Sale($108,100,000), which is $21,620,000.

## COUNT V
### (Breach of Implied Covenant of Good Faith and Fair Dealing)
### (Against Defendants Sallyport, DeBlasio, SGS, and JPD Private Trust Company for the Third Windfall Sale)

125.    Plaintiff repeats and realleges the allegations set forth in all preceding paragraphs of this First AmendedComplaint as if set forth fully herein.

126.    Under New York law, all contracts imply a covenant of good faith and fair dealing in the course of performance. This covenant embraces a pledge that neither party shall do anything which will have the effect of destroying or injuring the right of the other party to receive the fruits of the contract. The duties of good faith and fair dealing imply obligations which encompass any promises which a reasonable person in the position of the promisee would be justified in understanding were included.

127.    In this case, in connection with the Third Windfall Sale, Defendants Sallyport, DeBlasio, SGS and JPD Private Trust Company failed to exercise good faith and deal fairly in fulfilling the terms and promises contemplated by the Agreement entered into on or about December 7, 2010.

128.    Plaintiff at all times performed his obligations pursuant to the Agreement. Plaintiff also reasonably understood and was promised by Defendants Sallyport, DeBlasio, SGS and JPD Private Trust Companythat Defendants would pay the amounts owed under the Windfall Protection Clause of the Agreement, and that Defendants Sallyport, DeBlasio SGS and JPD Private Trust Company (1) would not claim that Defendants DeBlasio, SGS and JPD Private Trust Company were not parties to the Agreement, given that they accepted the

- 44 -

benefits of the Agreement and have payment obligations under Section 2.04 of the Agreement, which reads in relevant part that if "John DeBlasio or any of his affiliates of any other direct or indirect equity holder sells or agrees to sell shares of the Company's capital stock. . . constituting 20% or more by voting power or economic value of the Company's assets or equity," then "the Company or such stockholder [here, SGS and JPD Private Trust Company] shall pay Sellers [here, Charron and his trust] an amount equal to 20% of the proceeds received from the Windfall Sale," and (2) would not engage in misconduct designed to artificially and improperly manipulate and lower the enterprise value of the Company so as to destroy or injure the right of the Plaintiff to receive the fruits of the contract.

129.    DefendantsSallyport, DeBlasio, SGS and JPD Private Trust Companyat all relevant times had obligations under the Agreement, which obligations were breached by Defendants.    These obligations and related breaches include but are not limited to DefendantsSallyport, SGS and JPD Private Trust Company's failure to pay Windfall Protection to Plaintiff for the Third Windfall Sale and DefendantsSallyport, DeBlasio, SGS and JPD Private Trust Company'sattempts to artificially lower the reported enterprise value of Sallyport for the Third Windfall Sale and avoid the strictures of the Windfall Protection provision, and other misconduct described above.

130.    As a direct and proximate result of DefendantsSallyport, DeBlasio, SGS and JPD Private Trust Company's acts and omissions, and breaches of the Agreement and of the implied duties of good faith and fair dealing, Plaintiff has suffered compensatory damages in an amount equal to 20% of the proceeds received from the Third Windfall Sale($108,100,000), which is $21,620,000.

## COUNT VI
### (Tortious Interference with Contractual Relations)
### (Against Defendants SGS and JPD Private Trust Company, in the Alternative,
### for the First, Second, and Third Windfall Sales)

131.   Plaintiff repeats and realleges the allegations set forth in all preceding paragraphs of this First Amended Complaint as if set forth fully herein.

132.   A plaintiff states a claim for tortious interference with contractual relations where he alleges: (1) the existence of a contract between the plaintiff and a third party; (2) the defendant's knowledge of the contract; (3) the defendant's intentional inducement of the third party to breach or otherwise render performance impossible; and (4) damages to the plaintiff.

133.   In this case, Plaintiff and Sallyport entered into the Agreement on or about December 7, 2010.   The Agreement is a contract that was in existence at all relevant times herein.

134.   Sallyport at all relevant times had obligations under the Agreement, which obligations were breached by Sallyport. These obligations and related breaches include but are not limited to Sallyport's failure to pay Plaintiff twenty percent (20%) of the proceeds from the First, Second, and Third Windfall Sales.

135.   Defendants SGS and JPD Private Trust Company knew of the above valid contractual relationship in the Agreement and Sallyport's obligation to pay Plaintiff under the Windfall Protection provision.

136.   Defendants SGS and JPD Private Trust Company intentionally interfered with the above valid contractual relationship, thereby inducing or causing a breach of said relationship, by, among other things, knowingly and intentionally concealing from Plaintiff material facts about the First, Second, and Third Windfall Sales, inducing or causing Sallyport's failure to pay Plaintiff twenty percent (20%) of the proceeds from the First, Second, and Third Windfall Sales, and engaging in transactions designed to obfuscate, artificially lower, and lead to the false reporting of the enterprise value of Defendant Sallyport for the Third Windfall Sale.

137.   The interference of Defendants SGS and JPD Private Trust Company was the proximate cause of damage to Plaintiff because they planned, structured, orchestrated, executed, and covered up material facts about the First, Second, and Third Windfall Sales to cause or induce Sallyport and/or others not to pay Plaintiff money rightfully due to Plaintiff under the Windfall Protection provision of the Agreement.

138.   Defendants SGS and JPD Private Trust Company, as trustees of the John DeBlasio Charitable Trust for World Peace and Development, profited and benefited financially and otherwise from their tortious conduct causing or inducing the breach of the Agreement for each Windfall Sale by receiving shares in Sallyport, cash, or other benefits important to them.

139.   Wherefore, as a direct and proximate result of Defendants' acts and omissions, Plaintiff has suffered compensatory damages in an amount equal to 20% of the proceeds received from the First, Second, and Third Windfall Sales, namely, $8,133,192.80, $8,450,000.00, and $21,620,000, for a total sum of $38,203,192.80.

140.   Punitive damages, which are something in addition to full compensation, can be awarded as a punishment to Defendants and as a warning and example to deter them and others from committing like wrongs.  If Plaintiff alleges, as here, that Defendants SGS and JPD Private Trust Company acted wantonly, oppressively, or with such recklessness or negligence as evidenced a conscious disregard for the rights of others, or with such malice as implied a spirit or mischief, or criminal indifference to civil obligations, then an award of punitive damages is appropriate as are called for by the circumstances of the case.

141.   In this case, Plaintiff is entitled to punitive damages because Defendants SGS and JPD Private Trust Company willfully and maliciously injured Plaintiff by conspiring and participating in a scheme and artifice to defraud Plaintiff by planning, structuring, orchestrating, executing, and covering up material facts about the three Windfall Sales so as to induce and cause Sallyport and/or others not to pay Plaintiff money rightfully due to Plaintiff under the Windfall Protection provision of the Agreement.  By taking these actions, Defendants SGS and JPD Private Trust Company acted wantonly, oppressively, or with such recklessness or

negligence as evidenced a conscious disregard for the rights of Plaintiff and others, or with such malice as implied a spirit or mischief, or criminal indifference to civil obligations, that an award of punitive damages is appropriate as are called for by the circumstances of this case.

142.    As a direct and proximate result of the acts and omissions of Defendants SGS and JPD Private Trust Company, Plaintiff has suffered compensatoryand punitive damages in an amount to be proven at trial, in the amount of 20% of the proceeds ($40,665,964.00) received from the First Windfall Sale, or $8,133,192.80, 20% of the proceeds ($42,250,000.00) received from the Second Windfall Sale, or $8,450,000.00, and 20% of the proceeds ($108,100,000)received from the Third Windfall Sale, or $21,620,000.00, plus punitive damagesup to the limit permitted by law for their intentional and tortious conduct as described herein.

**COUNT VII**
**(Fraud)**
**(Against All Defendants, Except Defendant Sallyport, in the Alternative)**

143.    Plaintiff repeats and realleges the allegations set forth in all preceding paragraphs of this First Amended Complaint as if set forth fully herein.

144.    Prior to executing and consummating the Agreement with Plaintiff, Defendants had a duty to Plaintiff not to commit fraud, that is not to falsely represent material facts to and not to intentionally, knowingly and deliberately conceal material facts from Plaintiff.

145.    Prior to execution and consummation of the Agreement, Defendants, aiding and abetting each other, knowingly and intentionally made false representations to and knowingly, intentionally, and deliberately concealed material facts from Plaintiff as described elsewhere in this First Amended Complaint, with the intent to mislead Plaintiff into entering and consummating the Agreement, and/or with the intent to defraud Plaintiff of money rightfully owed to him, and/or with the intent to harm Plaintiff. The fraudulent conduct, including both false representations and material omissions, included but was not limited to the following:

- An agreement by and among Defendants to eliminate Tom Charron from the Sallyport picture prior to the First, Second, and Third Windfall Sales;

- An agreement to execute the First, Second, and Third Windfall Sales without paying anything to Plaintiff;

- An agreement not to reveal to Plaintiff material facts about the First, Second, and Third Windfall Sales;

- An agreement by and among Defendants to fraudulently claim that the Third Windfall Sale would be for an enterprise value of less than $65 million;

- Conduct by all of the Defendants to execute the objects of their conspiracy by making false representations of material fact to and intentionally and knowingly concealing material facts from Tom Charron, surreptitiously transferring away millions of dollars from Sallyport, and falsely reporting the enterprise value of Sallyport in the Third Windfall Sale to be $64.5 million;

- Defendant DeBlasio, aided and abetted by, and on behalf of, the Defendants and others: (i) affirmatively stated to Plaintiff, on behalf of all Defendants, that DC Capital Partners had no interest in conducting the Third Windfall Sale, or any such similar acquisition involving Sallyport, which was a false statement when made; (ii) intentionally and knowingly concealed from Plaintiff, on behalf of all Defendants, that, within one year of the Agreement, Defendant DeBlasio intended to have the Company enter into a transaction for the shares of Sallyport where the enterprise value of the Company equaled or exceeded $65 million, and (iii) on behalf of all Defendants, falsely represented that he and the Company and others would provide Windfall Protection to Plaintiff as stated in the Agreement, when in truth and fact they had no intention of providing Windfall Protection to Plaintiff when the Agreement was executed or thereafter, in connection with the First, Second, and Third Windfall Sales.

- On or about August 12, 2010, the Acquiring Group Conspirators gave an Indication of Interest to acquire Sallyport of between $85 million and $105 million;

- By the next month, after Defendants had conducted a series of conversations and negotiations, Defendant DeBlasio falsely reported to Plaintiff that the Acquiring Group Conspirators had no interest in purchasing Sallyport; and

- After defrauding Charron into selling his shares in Sallyport on December 8, 2010, Defendants quickly executed the First, Second, and Third Windfall Sales, whereby Defendants DeBlasio, SGS and JPD Private Trust Company and the other Conspirators reaped the benefits of their unlawful conspiracy.

146.    All of the Defendants were aware of and consented to these false representations

of material fact being made to and material facts being intentionally, knowingly, and deliberately

concealed from Plaintiff and had the same intent to mislead Plaintiff into executing and consummating the Agreement, and/or defrauding him of money, and/or otherwise harming Plaintiff.

147.    Plaintiff relied upon the false representations and intentional, knowing, and deliberate concealment of material facts when Plaintiff executed and consummated the Agreement and took other actions and inactions as described in this First Amended Complaint.

148.    All Defendants knew that Plaintiff was acting upon the false representations and intentional, knowing and deliberate concealment of material facts when he executed and consummated the Agreement, and/or when he was defrauded out of money and was otherwise harmed.

149.    Plaintiff was damaged by his reliance upon the false representations and intentional, knowing and deliberate concealment of material facts by Defendants when he executed and consummated the Agreement, including but not limited to the lost opportunity to sell shares in Sallyport for an amount greater than the purchase price under the Agreement, and/or when he was defrauded out of money and was otherwise harmed.

150.    Wherefore, as a direct and proximate result of Defendants' acts and omissions, Plaintiff has suffered monetary damage in an amount to be proven at trial.

151.    After Plaintiff executed and consummated the Agreement, Defendants continued to act in concert to defraud Plaintiff by concealing their fraudulent and deceptive acts.

152.    Punitive damages, which are something in addition to full compensation, can be awarded as a punishment to the Defendants and as a warning and example to deter them and others from committing like wrongs.    If Plaintiff alleges, as here, that Defendants acted wantonly, oppressively, or with such recklessness or negligence as evidenced a conscious disregard for the rights of others, or with such malice as implied a spirit or mischief, or criminal indifference to civil obligations, then an award of punitive damages is appropriate as are called for by the circumstances of the case.

153.     In this case, Plaintiff is entitled to punitive damages because Defendants willfully and maliciously injured Plaintiff by intentionally, knowingly, and deliberately making false representations of material facts to and concealing material facts from Plaintiff with the intent to mislead Plaintiff to execute and consummate the Agreement, and/or mislead him as he was being defrauded out of money and was otherwise harmed, while knowing that Plaintiff was relying upon such false representations and knowing concealment to his detriment and for Defendants' financial gain and by covering up their fraudulent actions.  By taking these actions, Defendants acted wantonly, oppressively, or with such recklessness or negligence as evidenced a conscious disregard for the rights of Plaintiff and others, or with such malice as implied a spirit or mischief, or criminal indifference to civil obligations, that an award of punitive damages up to the amount permitted by law should be awarded against Defendants.

154.     As a direct and proximate result of the acts and omissions of Defendants, Plaintiff has suffered compensatory and punitive damages in an amount to be proven at trial, but which in any event equals or exceeds $38,203,192.80 in compensatory damages. Punitive damages up to the limit permitted by law should also be awarded against these Defendants for their intentional and tortious conduct as described herein.

### COUNT VIII
### (Constructive Fraud)
### (Against All Defendants Except Sallyport, in the Alternative)

155.     Plaintiff repeats and realleges the allegations set forth in all preceding paragraphs of this First Amended Complaint as if set forth fully herein.

156.     Constructive, or "legal," fraud consists of an act done or omitted that is tantamount to positive fraud, or is construed as a fraud by the court, because of its detrimental effect on public interests and public or private confidence although the act is not done or omitted with any actual design to perpetrate positive fraud or injury on other persons.  Similarly, constructive fraud may be defined as the breach of a duty which, irrespective of moral guilt and intent, the law declares fraudulent because of its tendency to deceive, to violate a confidence, or

to injure public or private interests that the law deems worthy of special protection, as here. Constructive fraud also occurs where, as here, one party has superior knowledge over the other.

157.   In this case, Defendants had superior knowledge, and injured both public and private interests, and made the following fraudulent statements and/or omissions of material fact, among others, to Plaintiff, including but not limited to:

- An agreement by and among Defendants to eliminate Tom Charron from the Sallyport picture prior to the First, Second, and Third Windfall Sales;

- An agreement by and among Defendants to execute the First, Second, and Third Windfall Sales without paying anything to Plaintiff;

- An agreement by and among Defendants not to reveal to Plaintiff material facts about the First, Second, and Third Windfall Sales

- An agreement by and among Defendants to fraudulently claim that the intended Third Windfall Sale of Sallyport would be for an enterprise value of less than $65 million;

- Conduct by all of the Defendants to execute the objects of their conspiracy by making false representations of material fact to and intentionally and knowingly concealing material facts from Tom Charron, surreptitiously transferring away millions of dollars from Sallyport, and falsely reporting the enterprise value of Sallyport in the Third Windfall Sale to be $64.5 million;

- Defendant DeBlasio, aided and abetted by, and on behalf of, the Defendants and others: (i) affirmatively stated to Plaintiff, on behalf of all Defendants, that DC Capital Partners had no interest in conducting the Third Windfall Sale, or any such similar acquisition involving Sallyport, which was a false statement when made; (ii) intentionally and knowingly concealed from Plaintiff, on behalf of all Defendants, that, within one year of the Agreement, Defendant DeBlasio intended to have the Company enter into a transaction for the shares of Sallyport where the enterprise value of the Company equaled or exceeded $65 million, and (iii) on behalf of all Defendants, falsely represented that he and the Company and others would provide Windfall Protection to Plaintiff as stated in the Agreement, when in truth and fact they had no intention of providing Windfall Protection to Plaintiff when the Agreement was executed or thereafter, in connection with the First, Second, and Third Windfall Sales.

- On or about August 12, 2010, the Acquiring Group Conspirators gave an Indication of Interest to acquire Sallyport of between $85 million and $105 million;

- By the next month, after Defendants had conducted a series of conversations and negotiations, Defendant DeBlasio falsely reported to Plaintiff that the Acquiring Group Conspirators had no interest in purchasing Sallyport;

- After defrauding Charron into selling his shares in Sallyport on December 8, 2010, Defendants quickly executed the First, Second, and Third Windfall Sales, whereby Defendants and the other Conspirators reaped the benefits of their unlawful conspiracy; and

- Causing Defendant Sallyport to transfer millions of dollars to Non-Defendant Conspirator SGI (now Non-Defendant Conspirator Sallyport Global LLC) by signing a service agreement under which SGI charged Defendant Sallyport a 2% fee to provide employees to Defendant Sallyport toperform work on U.S. Government classified contracts on which these same individuals had previously been working as employees of Defendant Sallyport at a lower cost to the government so as to financially benefit SGI's sole shareholder, namely, the John P. DeBlasio Trust, the trustee of which was Non-Defendant Conspirator Pasquale DeBlasio.

158.    All of the Defendants were aware of and consented to these false representations of material fact being made to and material facts being intentionally, knowingly, and deliberately concealed from Plaintiff and had the same intent to mislead Plaintiff into executing and consummating the Agreement, and/or defrauding him of money, and/or otherwise harming Plaintiff and the public.

159.    These statements and/or omissions of material fact constituted false representations of material facts, they were made innocently or negligently by these Defendants, and they were made with the intention of causing Plaintiff to act on those representations and omissions.

160.    Plaintiff did in fact act on those representations when he executed the Agreement and caused himself and the Charron Trust to sell their shares in Sallyport on or about December 8, 2010 and when he did not immediately demand payment in full following the First, Second, and Third Windfall Sales, and/or was defrauded out of money, and/or was otherwise harmed.

161.    Plaintiff's reliance on the representations and omissions of material fact caused damage to Plaintiff and the public because he executed the Agreement and caused himself and the Charron Trust to sell their shares in Sallyport in reliance upon the Windfall Protection provision of the Agreement and because he has not been paid money he is lawfully owed, and

when he did not immediately demand payment in full following the First, Second, and Third Windfall Sales, and/or was defrauded out of money, and/or was otherwise harmed.

162.    The representations and omissions of material fact of Defendants were the proximate cause of damage to Plaintiff and the public because Plaintiff executed the Agreement and caused himself and the Charron Trust to sell their shares in Sallyport in reliance upon the Windfall Protection of the Agreement and did not receive the money he was owed thereafter, and when he did not immediately demand payment in full following the First, Second, and Third Windfall Sales, and/or was defrauded out of money, and/or was otherwise harmed.

163.    Wherefore, as a direct and proximate result of Defendants' acts and omissions, and breaches of the Agreement, Plaintiff has suffered monetary damage in an amount to be proven at trial, but which in any event equals or exceeds $38,203,192.80 in compensatory damage.

164.    In this case, Plaintiff is entitled to punitive damages because Defendants willfully and maliciously injured Plaintiff by intentionally, knowingly, and deliberately making false representations of material facts to and concealing material facts from Plaintiff with the intent to mislead Plaintiff to execute and consummate the Agreement, and/or mislead him as he was being defrauded out of money and was otherwise harmed, while knowing that Plaintiff was relying upon such false representations and knowing concealment to his detriment and for Defendants' financial gain and by covering up their fraudulent actions.  By taking these actions, Defendants acted wantonly, oppressively, or with such recklessness or negligence as evidenced a conscious disregard for the rights of Plaintiff and others, or with such malice as implied a spirit or mischief, or criminal indifference to civil obligations, that an award of punitive damages up to the amount permitted by law should be awarded against Defendants.

165.    As a direct and proximate result of the acts and omissions of Defendants, Plaintiff has suffered compensatory and punitive damages in an amount to be proven at trial, but which in any event equals or exceeds $38,203,192.80 in compensatory damages. Punitive damages up to

the limit permitted by law and in equity should also be awarded against these Defendants for their intentional and tortious conduct as described herein.

## COUNT IX
### (Civil Conspiracy to Commit Fraud and Tortiously Interfere with Contract)
### (Against All Defendants Except Sallyport, in the Alternative)

166.    Plaintiff repeats and realleges the allegations set forth in all preceding paragraphs of this First Amended Complaint as if set forth fully herein.

167.    To plead a cause of action to recover damages for civil conspiracy, the plaintiff must allege a cognizable tort, coupled with an agreement between the conspirators regarding the tort, and an overt action in furtherance of the agreement.

168.    Defendants conspired, agreed, combined, and acted in concert among themselves and each other to accomplish fraud and tortious interference against Plaintiff, as described above.

169.    Defendants conspired, combined, agreed, and acted in concert among themselves and each other for Defendants to knowingly, deliberately, and intentionally make the false representations of material fact and conceal material facts from Plaintiffas described above.

170.    Defendants conspired, combined, agreed and acted in concertamong themselves and each other with the intent to mislead Plaintiffinto executing and consummating the Agreement, and/or with the intent to delay or deny Plaintiff from seeking damages as he was defrauded out of money and was otherwise harmed.

171.    As a direct and proximate result of Defendants' conspiracy, combination, agreement, and concerted action, Plaintiff executed and consummated the Agreement, and/or was delayed or denied the right to seek damages as he was defrauded out of money and was otherwise harmed.

172.    In this case, Plaintiff is entitled to punitive damages because Defendants willfully and maliciously injured Plaintiff by conspiring and participating in a scheme and artifice to defraud Plaintiff by planning, structuring, orchestrating, executing, and covering up material facts about the First, Second, and Third Windfall Sales so as to induce Plaintiff to enter into the

Agreement and sell Plaintiff's shares in Sallyport and to induce and cause Defendant Sallyport and others not to pay Plaintiff money rightfully due under the Windfall Protection provision of the Agreement.  By taking these actions, Defendants acted wantonly, oppressively, or with such recklessness or negligence as evidenced a conscious disregard for the rights of Plaintiff and others, or with such malice as implied a spirit or mischief, or criminal indifference to civil obligations, that an award of punitive damages is appropriate as are called for by the circumstances of this case.

173.   As a direct and proximate result of the acts and omissions of Defendants, Plaintiff has suffered compensatoryand punitive damages in an amount to be proven at trial, but which in any event equals or exceeds $38,203,192.80in compensatory damages.Punitive damages up to the limit permitted by law and in equity should also be awarded against these Defendants for their intentional and tortious conduct as described herein.

**COUNT X**
**(Unjust Enrichment)**
**(Against All Defendants Except Sallyport, in the Alternative)**

174.   Plaintiff repeats and realleges the allegations set forth in all preceding paragraphs of this First Amended Complaint as if set forth fully herein.

175.   Unjust enrichment arises when: (1) one person has obtained money or property from another; (2) under such circumstances that in good conscience it should not be retained, and (3) the law imposes a duty to repay or return it.

176.   Defendants have obtained and divided among themselves money which belongs to Plaintiff and obtained this money by conspiring and scheming to defraud Plaintiff through their unlawful design, structure, execution, and concealment of the First, Second and Third Windfall Sales.  Defendants are not entitled to Plaintiff's money and the law requires Defendants to repay and/or return this money to Plaintiff.

177.   As a direct and proximate result of the acts and omissions of Defendants,Plaintiff has suffered monetary damage in an amount to be proven at trial, but which in any event exceeds

$38,203,192.80 in compensatory damages.Punitive damages up to the limit permitted by law and should also be awarded against these Defendants for their intentional and tortious conduct as described herein.

## <u>DEMAND CLAUSE</u>

WHEREFORE, as to the foregoing claims, Plaintiff Thomas W. Charron Jr., Individually and as Trustee of the Thomas W. Charron Jr. Grantor Retained Annuity Trust Dated July 8, 2010, prays for a judgment in his favor and against Defendants, for the actual damages sustained, to be determined at trial, in the amount of $38,203,192.80, together with punitive damages up to the limit permitted by law and in equity, attorneys' fees, related expenses, and pre- and post-judgment interest, and such other relief as this Court may deem just and appropriate.

**DATED**, this 1st day of March, 2013.

Respectfully submitted,

THOMAS W. CHARRON JR., Individually
and as Trustee of the THOMAS W.
CHARRON JR. GRANTOR RETAINED
ANNUITY TRUST DATED JULY 8, 2010

By:    *Athonasios Basdekis*
       _____
       Athanasios Basdekis (AB2574)
       Brian A. Glasser (admitted *pro hac vice*)
       James B. Perrine (admitted *pro hac vice*)
       **BAILEY & GLASSER, LLP**
       209 Capitol Street
       Charleston, WV 25301
       (304) 345-6555 (main)
       (304) 342-1110 (facsimile)
       *Counsel for Plaintiff Thomas W. Charron,
       Jr., Individually and as Trustee of the
       Thomas W. Charron Jr. Grantor Retained
       Annuity Trust Dated July 8, 2010*

AO 88B  (Rev.  06/09) Subpoena to Produce Documents, Information, or Objects or to Permit Inspection of Premises in a Civil Action (Page 2)

Civil Action No.   1:12-cv-6837-WHP

## PROOF OF SERVICE
### *(This section should not be filed with the court unless required by Fed. R. Civ. P. 45.)*

This subpoena for *(name of individual and title, if any)* _____

was received by me on *(date)* _____ .

❏ I served the subpoena by delivering a copy to the named person as follows: _____

_____ on *(date)* _____ ; or

❏ I returned the subpoena unexecuted because: _____

_____ .

Unless the subpoena was issued on behalf of the United States, or one of its officers or agents, I have also tendered to the witness fees for one day's attendance, and the mileage allowed by law, in the amount of

$ _____ .

My fees are $ _____ for travel and $ _____ for services, for a total of $   0.00   .

I declare under penalty of perjury that this information is true.

Date: _____          _____
                                                *Server's signature*

                                        _____
                                                *Printed name and title*

                                        _____
                                                *Server's address*

Additional information regarding attempted service, etc:

AO 88B (Rev. 06/09) Subpoena to Produce Documents, Information, or Objects or to Permit Inspection of Premises in a Civil Action(Page 3)

## Federal Rule of Civil Procedure 45 (c), (d), and (e) (Effective 12/1/07)

**(c) Protecting a Person Subject to a Subpoena.**

(1) *Avoiding Undue Burden or Expense; Sanctions.* A party or attorney responsible for issuing and serving a subpoena must take reasonable steps to avoid imposing undue burden or expense on a person subject to the subpoena. The issuing court must enforce this duty and impose an appropriate sanction — which may include lost earnings and reasonable attorney's fees — on a party or attorney who fails to comply.

(2) *Command to Produce Materials or Permit Inspection.*

(A) *Appearance Not Required.* A person commanded to produce documents, electronically stored information, or tangible things, or to permit the inspection of premises, need not appear in person at the place of production or inspection unless also commanded to appear for a deposition, hearing, or trial.

(B) *Objections.* A person commanded to produce documents or tangible things or to permit inspection may serve on the party or attorney designated in the subpoena a written objection to inspecting, copying, testing or sampling any or all of the materials or to inspecting the premises — or to producing electronically stored information in the form or forms requested. The objection must be served before the earlier of the time specified for compliance or 14 days after the subpoena is served. If an objection is made, the following rules apply:

(i) At any time, on notice to the commanded person, the serving party may move the issuing court for an order compelling production or inspection.

(ii) These acts may be required only as directed in the order, and the order must protect a person who is neither a party nor a party's officer from significant expense resulting from compliance.

(3) *Quashing or Modifying a Subpoena.*

(A) *When Required.* On timely motion, the issuing court must quash or modify a subpoena that:

(i) fails to allow a reasonable time to comply;

(ii) requires a person who is neither a party nor a party's officer to travel more than 100 miles from where that person resides, is employed, or regularly transacts business in person — except that, subject to Rule 45(c)(3)(B)(iii), the person may be commanded to attend a trial by traveling from any such place within the state where the trial is held;

(iii) requires disclosure of privileged or other protected matter, if no exception or waiver applies; or

(iv) subjects a person to undue burden.

(B) *When Permitted.* To protect a person subject to or affected by a subpoena, the issuing court may, on motion, quash or modify the subpoena if it requires:

(i) disclosing a trade secret or other confidential research, development, or commercial information;

(ii) disclosing an unretained expert's opinion or information that does not describe specific occurrences in dispute and results from the expert's study that was not requested by a party; or

(iii) a person who is neither a party nor a party's officer to incur substantial expense to travel more than 100 miles to attend trial.

(C) *Specifying Conditions as an Alternative.* In the circumstances described in Rule 45(c)(3)(B), the court may, instead of quashing or modifying a subpoena, order appearance or production under specified conditions if the serving party:

(i) shows a substantial need for the testimony or material that cannot be otherwise met without undue hardship; and

(ii) ensures that the subpoenaed person will be reasonably compensated.

**(d) Duties in Responding to a Subpoena.**

(1) *Producing Documents or Electronically Stored Information.* These procedures apply to producing documents or electronically stored information:

(A) *Documents.* A person responding to a subpoena to produce documents must produce them as they are kept in the ordinary course of business or must organize and label them to correspond to the categories in the demand.

(B) *Form for Producing Electronically Stored Information Not Specified.* If a subpoena does not specify a form for producing electronically stored information, the person responding must produce it in a form or forms in which it is ordinarily maintained or in a reasonably usable form or forms.

(C) *Electronically Stored Information Produced in Only One Form.* The person responding need not produce the same electronically stored information in more than one form.

(D) *Inaccessible Electronically Stored Information.* The person responding need not provide discovery of electronically stored information from sources that the person identifies as not reasonably accessible because of undue burden or cost. On motion to compel discovery or for a protective order, the person responding must show that the information is not reasonably accessible because of undue burden or cost. If that showing is made, the court may nonetheless order discovery from such sources if the requesting party shows good cause, considering the limitations of Rule 26(b)(2)(C). The court may specify conditions for the discovery.

(2) *Claiming Privilege or Protection.*

(A) *Information Withheld.* A person withholding subpoenaed information under a claim that it is privileged or subject to protection as trial-preparation material must:

(i) expressly make the claim; and

(ii) describe the nature of the withheld documents, communications, or tangible things in a manner that, without revealing information itself privileged or protected, will enable the parties to assess the claim.

(B) *Information Produced.* If information produced in response to a subpoena is subject to a claim of privilege or of protection as trial-preparation material, the person making the claim may notify any party that received the information of the claim and the basis for it. After being notified, a party must promptly return, sequester, or destroy the specified information and any copies it has; must not use or disclose the information until the claim is resolved; must take reasonable steps to retrieve the information if the party disclosed it before being notified; and may promptly present the information to the court under seal for a determination of the claim. The person who produced the information must preserve the information until the claim is resolved.

**(e) Contempt.** The issuing court may hold in contempt a person who, having been served, fails without adequate excuse to obey the subpoena. A nonparty's failure to obey must be excused if the subpoena purports to require the nonparty to attend or produce at a place outside the limits of Rule 45(c)(3)(A)(ii).