**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

------------------------------------------------------------------ X

THOMAS W. CHARRON JR., Individually and as    :
Trustee of the THOMAS W. CHARRON JR. GRANTOR :   No. 1:12-cv-06837-(WHP) (FM)
RETAINED ANNUITY TRUST DATED JULY 8, 2010  :
   :
     Plaintiff,              :  **DEFENDANTS' PROPOSED**
   :  **FINDINGS OF FACT AND**
     -against-           :  **CONCLUSIONS OF LAW**
   :
SALLYPORT GLOBAL HOLDINGS, INC., et al.,    :
   :
     Defendants.        :

------------------------------------------------------------------ X

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ................................................................. vi

INTRODUCTION ............................................................................. 1

PROPOSED FINDINGS OF FACT ..................................................... 2

I.     The parties ......................................................................... 2

II.    The Charron SPA ................................................................ 5

III.   The DC Capital Transaction was not a Windfall Sale ............. 6

    A.    The sellers in the DC Capital Transaction will never receive more than the agreed $65 million windfall threshold ............................... 6

    B.    The $64.5 million DCCP SPA price was the result of an arm's-length negotiation, not a conspiracy to avoid paying Charron .................. 9

    C.    The $3.8 million value for the Rollover Equity was a negotiated component of the transaction ...................................... 15

    D.    The merger of Sallyport Holdings and Kaseman Holdings to create KSI did not increase the value of the Rollover Equity ............. 19

    E.    Risius's valuation opinion is entitled to no weight ................... 24

        1.    Risius cherry-picked facts favorable to Charron ............... 24

            a.    Risius unreasonably relied on non-binding indications of interest ........................................ 26

            b.    Risius unreasonably relied on the Jefferies presentation ...................................................... 28

            c.    BNY's spreadsheet does not indicate a $120 million enterprise value ...................................... 30

            d.    Risius ignored a $62 million offer from Chart Capital Management ........................................ 31

            e.    Risius unreasonably omitted the market prices reflected in the Charron SPA and the negotiations between Charron and DeBlasio ......................... 32

        f.      Risius disregards the year-long unsuccessful attempt to find a buyer for SGH ........................................ 34

        g.      Risius ignored the DC Capital Transaction as an indication of value ............................................................. 37

        h.      Risius ignored McLean's revised valuation of SGH for Charron's trust ............................................................. 39

        i.      Risius ignored the fact that actual cash proceeds received from the sale will never exceed $60 million .......................................................................... 40

        j.      Risius omits facts that conflict with his identification of guideline public companies ................... 42

    2.      Risius's use of a zero percent specific-company risk factor ignores unique risks faced by SGH and KSI ............................... 43

    3.      Risius acted as an advocate, not an objective expert ........................ 48

IV.    Excess cash distributed to shareholders before the DC Capital Transaction was not "proceeds" of any third-party sale ........................................................... 50

    A.      Excess cash distributed to shareholders before the DC Capital Transaction was not "proceeds" of any third-party sale ........................... 51

    B.      Charron's expert incorrectly identified several transactions .................... 55

    C.      Loans assigned to WD Solutions were not "proceeds" of the sale and were not part of the "enterprise value" acquired by DCCP ............... 56

        1.    The Manzano loan was not "proceeds" of the DC Capital Transaction ................................................................................. 59

        2.    The ASG loan was not an operating asset ......................................... 60

        3.    The loan to PGS was not an operating asset ..................................... 62

    D.      Charron's claim to the cash and loans conflicts with the parties' understanding of "enterprise value" and with their expectations as to the disbursement of retained earnings ................................................... 63

V.    Even if a Windfall Sale had occurred, the measure of damages would be limited to 20 percent of the amount received in excess of $65 million ................ 71

    A.      Charron and DeBlasio agreed that any windfall payment would be 20 percent of the amount by which a subsequent sale exceeded the $65 million windfall threshold ................................................................. 71

B.     Charron fabricated a different version of events for the trial....................76

VI.    Charron is liable to SGH for theft.........................................................................85

A.     Charron lacked authority to write the checks to himself .........................85

B.     Charron was not entitled to any additional payment ................................87

1.   The $147,727 check for the "Tom/John Account"...........................87

2.   The $44,400 check for Charron's "salary"......................................90

3.   The $35,237.22 check for reimbursement of "expenses" ................91

C.     Charron acted knowingly..........................................................................92

D.     The Charron SPA closed on December 7, 2010 .......................................92

**PROPOSED CONCLUSIONS OF LAW** ..................................................................**95**

**DISCUSSION** .......................................................................................................**96**

I.    The DC Capital Transaction was not a Windfall Sale ...........................................96

A.     The DCCP SPA sales price of $64.5 million establishes the value
of SGH under the Windfall Protection provision ....................................97

B.     The price the buyer and seller established at arm's length is the
best evidence of SGH's value under New York's "sale price rule" .........98

1.   The $64.5 million purchase price was the result of arm's-
length negotiations .......................................................................99

2.   The DC Capital Transaction was not a "bargain purchase."...........100

3.   The $3.8 million Rollover Equity was a negotiated part of the
transaction, not a placeholder designed to disguise $20
million in additional compensation..............................................102

4.   The merger of Sallyport Holdings and Kaseman Holdings to
create KSI did not increase the value of the Rollover Equity.....104

5.   Charron's attempts to confuse are worthy of no consideration.......107

C.     The sellers will never receive more than $3.8 million for the
Rollover Equity from the buyer .............................................................108

II.   Risius's valuation opinion is unreliable, and deserving of no weight ................109

A.    Risius's opinions do not justify going beyond the purchase price.......... 110

      1.    Risius's valuation opinion disregards the parties' agreement that the Rollover Equity was worth $3.8 million....................... 111

      2.    Charron presented no evidence of fraud, conspiracy, or any other improper conduct ............................................... 112

      3.    Charron failed to meet his burden to show fraud or conspiracy by clear and convincing evidence on Risius's inferences alone.................................................................. 113

B.    Risius's valuation opinion is unreliable...................................114

C.    Risius violated applicable professional standards....................118

D.    Risius improperly applied the specific-company risk factor by ignoring unique risks facing SGH's business ...........................120

E.    Risius inappropriately acted as an advocate ...........................123

F.    At least three courts have published opinions rejecting Risius's analysis as biased and unsupported........................................126

III.    Disbursements of excess cash prior to the DC Capital Transaction were not part of the sale and are not part of SGH's "enterprise value."......................127

A.    Charron's claim to pre-sale disbursements conflicts with the language of the Charron SPA ..............................................128

B.    Selby's opinion is not helpful to the trier of fact .....................132

C.    The loans assigned to WD Solutions should be treated no differently from the cash disbursements .................................134

D.    The loans to Arkel Sallyport Global and Power Generation Solutions were not operating assets .......................................136

      1.    The loan to Arkel Sallyport Global was not an operating asset ...... 137

      2.    The Power Generation Solutions factoring agreement was not an operating asset .................................................. 139

IV.    The duty of good faith and fair dealing does not give Charron rights to control the disposition of SGH's assets ............................................140

V.    Even if there had been a Windfall Sale, Charron's damages would be limited to 20 percent of the amount received in excess of $65 million ...............143

      A.      The language in the windfall protection provision is ambiguous ............143

      B.      Parol evidence establishes the parties' agreement that a payment under the windfall clause would be 20 percent of the amount by which a subsequent sale exceeded the $65 million "windfall" threshold................................................................................................146

      C.      Charron's trial testimony as to his agreement with DeBlasio to "split the baby" is not credible .................................................152

      D.      In the alternative, there is sufficient evidence to demonstrate a scrivener's error with respect to the language of the agreement ............155

VI.     Charron is liable for treble damages and attorney's fees as a result of his theft ....................................................................................................................157

      A.      Charron's unilateral decision to take company funds in excess of the Charron SPA purchase price demonstrates civil theft under Florida law .........................................................................................159

           1.    Charron was not authorized to withdraw SGH funds on December 8, 2010 ....................................................... 160

           2.    Charron was not owed the funds he stole from SGH ...................... 163

               a.     Charron was not entitled to additional payment related to the "Tom/John Account" ................................ 163

               b.     Charron was not owed repayment of "business expenses" or authorized to write himself an expense check .................................................................................. 165

               c.     Charron was not permitted to cut himself a payroll check .................................................................................. 166

            3.    Charron concealed his intent because he knew he was not entitled to funds he withdrew...................................... 166

           D.    Charron is liable for conversion or unjust enrichment in the alternative.................................................................................. 167

      B.      The release clause in the Charron SPA was not a free pass to loot the company ...........................................................................168

CONCLUSION ..........................................................................................................170

CERTIFICATE OF SERVICE ................................................................................172

v

# TABLE OF AUTHORITIES

**Page**

## Federal Cases

*BLT Restaurant Group LLC v. Tourondel*,
   No. 10 CV 06488 (GBD), 2011 WL 3251536 (S.D.N.Y. Jul. 19, 2011) ...................... 155, 157

*Boyce v. Soundview Tech. Group, Inc.*,
   464 F.3d (2d Cir. 2006) ................................................................................... 106

*Broder v. Cablevision Sys. Corp.*,
   418 F.3d 187 (2d Cir. 2005) ............................................................................. 140

*Chem. Bank v. World Hockey Ass'n*,
   403 F. Supp 1374 (S.D.N.Y 1975) ..................................................................... 159

*Collins v. Harrison Bode*,
   303 F.3d 429 (2d. Cir. 2002) ............................................................................. 155

*Consolidated Edison, Inc. v. Northeast Utilities*,
   426 F.3d 524 (2d Cir. 2005) ............................................................................. 142

*Daubert v. Merrell Dow*,
   509 U.S. 579 (1993)......................................................................................... 122

*Davis v. Carroll*,
   No. 09 Civ. 1088 (JPO), 2013 WL 1285272 (S.D.N.Y. Mar. 29, 2013) ................................ 110

*Diesel Props S.r.l. v. Greystone Bus. Credit II LLC*,
   631 F.3d 42 (2d Cir 2011) ................................................................................. 96

General Electric Co. v. Joiner,
   522 U.S. 136 (1997)......................................................................................... 113

*Geren v. Quantum Chem. Corp.*,
   832 F. Supp. 728 (S.D.N.Y. 1993) ............................................................... 140, 142

*Gladstone Business Loan, LLC v. Randa Corp.*,
   No. 09 Civ. 4225 (LMM), 2009 WL 2524608 (S.D.N.Y. 2009)............................ 114

*GPA Inc. v. Liggett Grp. Inc.*,
   94 CIV. 5735 (AGS), 1996 WL 337288 (S.D.N.Y. June 18, 1996)....................... 145

*Henry v. Champlain Enterprises, Inc.*
   334 F. Supp. 2d 252 (N.D.N.Y. 2004), 445 F.3d 610 (2d Cir. 2006).................... 126

*In re Global Technovations, Inc.*,
   431 B.R. 739 (Bankr. E.D. Mi. 2010), *aff'd* 694 F.3d 705 (6th Cir. 2012) ............................ 126

*In re Trafford Distributing Center, Inc.*,
   431 B.R. 263 (Bankr. S.D. Fla. 2010) ........................................................................ 162

*Int'l Multifoods Corp. v. Commercial Union Ins. Co.*,
   309 F.3d 76 (2d Cir. 2002) .......................................................................... 143, 145

*Leucadia, Inc. v. Reliance Ins. Co.*,
   864 F.2d 964 (2d Cir. 1998) ........................................................................ 113

*Lippe v. Bairnco Corp.*,
   288 B.R. 678 (Bankr. S.D.N.Y 2003) ................................................... 112, 123, 125

*Marx & Co. v. Diners' Club*,
   550 F.2d. 505 (2d Cir. 1977) ....................................................................... 132

*Master-Halco, Inc. v. Scilia Dowling & Naterelli, LLC*,
   739 F. Supp. 2d 109 (D. Conn. 2010) ......................................................... 114

*Metro. Life Ins. Co. v. RJR Nabisco, Inc.*,
   716 F. Supp. 1504 (S.D.N.Y. 1989) .............................................. 127, 140, 141, 142

*Mink Mart, Inc. v. Reliance Ins. Co.*,
   65 F. Supp. 2d 176 (S.D.N.Y. 1999),
   *aff'd*, 12 Fed. App'x. 23 (2d Cir. 2000) ...................................................... 113

*MTX Communications Corp. v. LDDS/WorldCom, Inc.*,
   132 F. Supp. 2d 289 (S.D.N.Y. 2001) .......................................................... 122

*Nycal Corp. v. Inoco PLC*,
   988 F. Supp. 296 (S.D.N.Y. 1997) .................................................. 141, 151, 161

*Schlaifer Nance & Co. v. Estate of Warhol*,
   119 F.3d 91 (2d Cir. 1997) ........................................................................ 113

*Schonfeld v. Hilliard*,
   218 F.3d 164 (2d Cir. 2000) ................................................................. 98, 99

*Sharp v. United States*,
   191 U.S. 341 (1903) ................................................................................ 115

*Suitum v. Tahoe Reg'l Planning Agency*,
   520 U.S. 725 (1997) .................................................................................. 98

*Taylor v. Evans*,
   No. 94 Civ. 8425 (CSH), 1997 WL 154010 (S.D.N.Y. Apr. 1, 1997) .................. 113

*Tokio Marine & Fire Ins. Co. v. Nat'l Union Fire Ins. Co.*,
   91 F.2d 964 (2d Cir. 1937) ................................................. 157

*United States v. Scop*,
   846 F.2d 135 (2d Cir. 1988) ................................................. 113

*United Technologies Corp. v. Mazer*,
   556 F. 3d 1260 (11th Cir. 2009) ............................... 159, 167

*Williams v. Illinois*
   132 S. Ct. 2221 (2012) ....................................................... 115

*Zappa v. Rykodisc, Inc.*,
   819 F. Supp. 2d 307 (S.D.N.Y. 2011) ............................... 143

**State Cases**

*Application of 325 Highland LLC v. Assessor of the City of Mount Vernon*,
   No. 19751-03, 2004 WL 2683668 (N.Y. Sup. Ct. Nov. 23, 2004) ........................................ 117

*Babcock v. Johnson*,
   12 N.Y.2d 473 (1963) ......................................................... 159

*Barrow v. Lawrence United Corp.*,
   538 N.Y.S.2d 363 (App. Div. 1989) ............................ 144, 145

*Fantis v. Standard Importing*,
   49 N.Y.2d 317 (1980) ......................................................... 159

*Great Northern Assoc., Inc. v. Cont'l Cas. Co.*,
   596 N.Y.S.2d 938 (App. Div. 3d Dep't 1993) ............. 168, 169

*Greenberg v. Grossman*,
   683 So. 2d 156 (Fla. Dist. Ct. App. 1996) ........................ 158

*Hall v. Humana Hosp. Daytona Beach*,
   686 So.2d 653 (Fla. Ct. App. 1996) ................................... 168

*Loewe v. Seagate Homes, Inc.*,
   987 So. 2d 758 (Fla. Dist. Ct. App. 2008) .................. 168, 169

*Phoenix Capital Investments LLC v. Ellington Management Group, L.L.C.*,
   859 N.Y.S.2d 46 (App. Div. 1st Dep't. 2008) .................. 142

*Plaza Hotel Assoc. v. Wellington Assoc.*,
   37 N.Y.2d 273 (1975) ............................... 99, 100, 102, 117

*Renpack v. Oppenheimer*,
   104 So. 2d 642 (Fla. Dist. Ct. App. 4th Dist. 1958) .......... 162

*Seymour v. Adams*,
   638 So. 2d 1044 (Fla. Dist. Ct. App. 5th Dist. 1994) .......................................................... 167

*Shapiro v. State*,
   401 N.Y.S.2d 921 (App. Div. 3d Dep't 1978) ......................................................................... 99

*Vining v. Martyn*,
   660 So. 2d 1081 (Fla. Dist. Ct. App. 1995) .......................................................................... 158

*Winshall v. Viacom International, Inc.*,
   55 A.3d 629 (Del. Ct. Chan. 2011) (Strine, C.), *aff'd*, 76 A.3d 808 (Del. 2013) .................. 141

## Federal Statutes

Fla. Stat. § 55.03 ....................................................................................................... 96, 158

Fla. Stat. § 772.11 ............................................................................................... 96, 158, 159

Fla. Stat. § 775.082 ........................................................................................................ 159

Fla. Stat. § 775.083 ........................................................................................................ 159

Fla. Stat. § 812.014 ................................................................................................. 96, 159

## State Statutes

Fed. R. Civ. P. 54(d) ........................................................................................................ 96

Fed. R. Evid. § 702 ........................................................................................... 33, 110, 132

## Rules

*Branford Towne Houses Cooperative v. Taylor and City of Taylor and County of Wayne*,
   MTT Docket No. 90502 (Mi. Tax Court Sept. 1, 2005) ......................................................... 127

Jeffrey M. Risius, BUSINESS VALUATION:
   A PRIMER FOR THE LEGAL PROFESSIONAL 27 (2007) ...................................................... 71, 129

Restatement (Second) of Contracts § 155 (1981) ...................................................... 155

Restatement (Second) of Contracts § 195 (1981) ...................................................... 168

Richard M. Wise, *The Use and Abuse of Experts*,
   *in* HANDBOOK OF BUSINESS VALUATION 555
   (Thomas L. West et al. eds., 2d ed. 1999) .......................................................................... 126

Defendants John P. DeBlasio ("DeBlasio"), JPD Private Trust Co., Ltd. ("JPD Trust"), and Sallyport Global Holdings, Inc. ("SGH") (collectively "Defendants"), respectfully submit the following Proposed Findings of Fact and Conclusions of Law.

## INTRODUCTION

This case began in September 2012 with frenzied allegations of fraud and conspiracy, parallel litigation in Virginia state court against nearly every individual connected to SGH or DC Capital Partners ("DCCP"), and a wild demand for more than $100 million in compensatory and punitive damages.  Now, after countless hours of motions practice and discovery, millions of dollars in fees for lawyers and expert witnesses, and eight days of trial, Charron's case has been revealed for what it has always been.  Driven by a mixture of greed, confusion, and seller's remorse, this case is Charron's effort to punish John DeBlasio and to have the Court remake his buyout deal.  Though he had the benefit of education, position, experience, bargaining power, well-qualified advisors, and a good understanding of the risks, Charron wants a better deal for himself and a worse deal for DeBlasio.  But that is not the way it works.  Charron's delusional belief that the company he founded *must* have been worth more than anybody was willing to pay for it is not a sufficient basis for this Court to impose Charron's judgment on DeBlasio.

Defendants' account of the transactions at issue in this case has been consistent at every stage of this litigation.  *See, e.g.*, Dkt. No. 48 (memorandum in support of motion to dismiss); Dkt. No. 162 (memorandum in support of motion for summary judgment).  It is grounded in verifiable facts drawn from the documents the parties themselves negotiated and relied upon. Charron's approach to this case does not compare favorably.  He has presented—and abandoned—a kaleidoscope of theories seeking to avoid the implications of the purchase price in the DC Capital Transaction.  He claimed in his First Amended Complaint that the McGladrey

Audit "determined that the purchase price of Defendant Sallyport was $82.841 million."

FAC ¶ 14.  He pleaded the existence of a grand conspiracy to defraud him of millions of dollars.

FAC ¶ 5.  These pleadings have nothing in common with the case Charron put on at trial.

McGladrey did audit the transaction, but it agreed that the price was accurately stated and fair.

*See* Ex. 49.  No evidence of a conspiracy surfaced, and Charron's experts backpedalled at trial

from any suggestion that their claims depended on a showing that Defendants colluded to

deprive Charron of a windfall payment.  Indeed, Charron's experts continued to revise their

theories on the stand.  *See* Ex. 405(f).

The time has come to put an end to this costly charade.  On Charron's affirmative claims

for breach of contract and the duty of good faith and fair dealing, Defendants request the Court to

enter judgment in their favor and against Charron.  On the counterclaim for civil theft,

Defendants request the entry of judgment in their favor and against Charron individually in the

amount of $682,092.66, plus attorneys' fees and interest from December 8, 2010.

## PROPOSED FINDINGS OF FACT

### I.      The parties

1.      Plaintiff Thomas W. Charron ("Charron") is an educated and sophisticated

businessman with extensive military and business experience.  Charron has a Bachelor of

Science degree from the United States Military Academy at West Point and a Master's in

Business Administration ("MBA") from the University of North Carolina.  Tr. 403:12-404:3

(Charron Direct).  Charron held professional and executive positions with several companies

from 1992 to 2003, and he served as SGH's CEO from the company's founding in 2003 until

2010.  Tr. 504:6-506:8 (Charron Cross).

2.      Defendant DeBlasio is also a sophisticated businessman with extensive military and business experience.  DeBlasio graduated from West Point in 1989 and went on to complete 21 years of active and reserve service in the United States Army.  Tr. 220:21-221:3 (J. DeBlasio Direct).  When his years of active-duty service ended, DeBlasio entered a business career with General Electric before pursuing business opportunities created by the United States government's need for support services in Iraq and Afghanistan.  Tr. 221:9-24 (J. DeBlasio Direct).

3.      Charron founded Defendant SGH in 2003, and DeBlasio joined as an equal partner and president of the company in August 2004.  Tr. 1868:16-20 (Stipulations of Fact).  They remained 50/50 owners of SGH until December 2010.  Tr. 1868:25-1869:2 (Stipulations of Fact).

4.      Defendant SGH is, and has been since its founding, a defense contractor engaged in the business of providing security services and base operations support to the United States government and its contractors.  Tr. 222:4-20 (J. DeBlasio Direct), 404:18-406:21 (Charron Direct).  Its primary business concentration has been in "contingency operations," *i.e.*, short-term government operations abroad.  Tr. 143:8-11 (J. DeBlasio Cross), 235:13-236:15, 296:9-23 (J. DeBlasio Direct), 479:20-480:9 (Charron Direct).  From its founding in 2003 through its sale in 2011, SGH was engaged in the performance of contracts and subcontracts to support the United States government's activities in Iraq and Afghanistan.  Tr. 220:21-222:20, 225:18-226:10 (J. DeBlasio Direct); Ex. 68 at SALLYPORT003556-61.

5.      SGH conducted its business in part through a set of subsidiary entities, including:

a.      Sallyport Global Services ("SGS"), a Bermuda entity wholly owned by SGH, Tr. 132:7-21 (J. DeBlasio Direct);

   b. Sallyport Support Services ("SSS"), a Florida entity owned by SGH, Tr. 118:25-119:4 (J. DeBlasio Cross); and,

   c. Sallyport Global, Inc. ("SGI"), a Florida entity which was:  (i) owned by a trust affiliated with DeBlasio, and (ii) used for, among other things, payroll services, Tr. 115:7-11, 116:20-117:14, 120:1-9 (J. DeBlasio Cross); *see also* Ex. 132 at SGH1-00039912.

6. SGH, SGS, SSS, and SGI were all operated—and eventually sold—as a single business unit under the Sallyport umbrella.  *See* Tr. 116:12-119:4 (J. DeBlasio Cross), 628:7-14 (Campbell Cross), 1152:22-1155:1 (Lake Direct), 1848:13-1849:2 (P. DeBlasio Direct).

7. Charron and DeBlasio both transferred control of some or all of their ownership interests in SGH to trusts and other wealth-management entities in anticipation of a sale of the business.  Charron formed the Thomas W. Charron Grantor Retained Annuity Trust in July 2010 as the owner of half of Charron's 50 percent interest in the company.  Tr. 441:22-442:4 (Charron Direct).  In late 2010 and early 2011, DeBlasio created three trusts to serve distinct personal and charitable endeavors, namely:

   a. The John DeBlasio Charitable Trust for World Peace and Development (n/k/a the GPD Charitable Trust dated December 7, 2010) (the "Bermuda Charitable Trust"), Tr. 314:2-315:5 (J. DeBlasio Direct);

   b. The John P. DeBlasio Trust dated January 1, 2011 (the "Florida Business Trust"), Tr. 89:1-9 (J. DeBlasio Cross); and,

   c. The GPD Charitable Trust dated January 7, 2011 (the "Florida Charitable Trust"), Tr. 341:22-343:2 (J. DeBlasio Direct).

Charron and DeBlasio are each referred to in these proposed findings of fact and conclusions of

law interchangeably with their respective affiliated trusts unless otherwise indicated.

## II.      The Charron SPA.

8.       Charron and DeBlasio began to explore the sale of SGH and its affiliated

companies in the Fall of 2009.  Tr. 224:1-225:17 (J. DeBlasio Direct); *see also* Tr. 1869:5-7

(stipulations of fact).  Although they engaged consultants and investment bankers to market the

company for a third-party sale, they were not able to find a third-party buyer in 2009 or 2010.

Tr. 241:18-245:6 (J. DeBlasio Direct); *see also* Tr. 1869:5-16 (stipulations of fact).  After it

became clear that there would be no third-party purchaser, Charron agreed to sell his interest in

the company to DeBlasio.  *See* Ex. A.

9.       On December 7, 2010, Charron and DeBlasio executed a Stock Purchase

Agreement (the "Charron SPA") pursuant to which SGH redeemed all of Charron's shares in the

company.  Ex. A.  As a result of the Charron SPA, DeBlasio became the sole shareholder of

SGH.  Charron received a broad release of liability and cash payments totaling $40,765,964.

Ex. A.

10.       The Charron SPA includes the following "Windfall Protection" provision:

> 2.04.  Windfall Protection.  As additional consideration for the
> Shares, the Company agrees to make an additional payment to
> Sellers, on the basis and subject to the limitations provided in this
> Section 2.04.  If, on or prior to the first anniversary of the date
> hereof, John DeBlasio or any of his affiliates or any other direct or
> indirect equity holder sells or agrees to sell shares of the
> Company's capital stock (or equity of an intervening Person or
> assets of the Company or any Company subsidiary) constituting
> 20% or more by voting power or economic value of the
> Company's assets or equity to a third party in one or a series of
> related transactions for a price that reflects an enterprise value of
> the Company equal to or greater than $65,000,000 (a "Windfall
> Sale"), within three Business Days following the closing of such
> Windfall Sale, the Company or such stockholder shall pay Sellers

an amount equal to 20% of the proceeds received from the Windfall Sale, such payment to be made to Sellers pro rata in accordance with the percentages set forth on <u>Schedule I</u>.

[Ex. A § 2.04.]

11.     Charron is entitled to payment under this clause only if he can establish the following facts:  (1) "John DeBlasio or any of his affiliates or any other direct or indirect equity holder;" (2) sold or agreed to sell 20% or more of the company's stock or assets; (3) to a third party in one or a series of related transactions; (4) "for a price that reflects an enterprise value of the Company equal to or greater than $65,000,000."  *See* Ex. A § 2.04.

**III.     The DC Capital Transaction was not a Windfall Sale.**

12.     On June 29, 2011, Sallyport Holdings, LLC ("New Sallyport"), a holding company created by DCCP, acquired 100 percent of the outstanding capital stock of SGH and 100 percent of the membership interests in SGI (the "DC Capital Transaction") pursuant to a Securities Purchase Agreement dated May 6, 2011, and amended on June 29, 2011 (the "DCCP SPA").  Exs. B, C; *see also* Tr. 77:17-78:6 (O'Connor Cross), 85:1-8 (J. DeBlasio Cross), 1790:2-15 (Hitchner Redirect).

13.     The DC Capital Transaction was not a Windfall Sale under the Charron SPA because the total purchase price, including all contingent payments and noncash consideration, was less than the $65 million threshold.  *See* Ex. C at TCHAR0009768; Tr. 1667:17-1668:24 (Hitchner Direct).

**A.     The sellers in the DC Capital Transaction will never receive more than the agreed $65 million windfall threshold.**

14.     The total purchase price in the DC Capital Transaction, including all contingent payments and noncash consideration, was $64.5 million.  *See* Ex. C at TCHAR0009768; *see also* Tr. 90:17-19 (J. DeBlasio Cross), 603:18-604:5 (Campbell Direct).

15.    Indemnity obligations and "holdbacks" providing security for contingencies set forth in the DCCP SPA decreased the consideration actually paid to the sellers pursuant to the DCCP SPA. *See* Ex. C at TCHAR0009768; *see also* Tr. 105:20-107:14 (J. DeBlasio Cross); 594:13-23 (Campbell Direct); 697:3-10 (Campbell Redirect).

16.    Payment under the DCCP SPA occurred as follows:

a.    On June 29, 2011, the Bermuda Charitable Trust received wire transfers totaling $44,110,262.05. Ex. 327. The first wire of $38,385,262.05 represented the "Redemption Purchase Price" listed in the DCCP SPA, as amended, less seller expenses and holdbacks. *See* Ex. C at TCHAR0009768. The second wire of $5,725,000 was the cash raised through equity investments in the purchaser, less the $475,000 equity to Nick Gross, a Sallyport management employee. Ex. 327.

b.    On June 29, 2011, the Florida Business Trust received a 38 percent equity interest in New Sallyport (the "Rollover Equity") in lieu of $3.8 million of the purchase price. Ex. 7 at JD1-00000518.

c.    In 2012, the Bermuda Charitable Trust received the $2 million "Deferred Amount" due six months after the closing pursuant to the DCCP SPA. *See* Ex. C at TCHAR0009768; Tr. 106:5-10 (J. DeBlasio Cross).

d.    In 2011 and 2012, DCCP placed the $5 million "Trust Account Amount" and the $5 million "Mezzanine Note Amount" in a trust account created to secure the sellers' indemnity obligations as stated in the DCCP SPA. *See* Ex. C at TCHAR0009768; Tr. 339:4-19 (J. DeBlasio Direct).

17.     DCCP disputed the $4 million Initial Holdback Amount, which secured any liability to the buyers related to a working capital shortfall.  *See* Exs. B at SGH1-00013898, C at TCHAR0009768.  DCCP did not initially pay any of this amount, but instead notified DeBlasio by letter on February 23, 2012 of its intent to keep the full $4 million.  *See* Ex. 60.

18.     DeBlasio initiated litigation to address DCCP's withholding of payment.  Tr. 197:7-15 (J. DeBlasio Direct).  On May 29, 2013, the parties to the DCCP SPA, including DCCP, the Bermuda Charitable Trust, the Florida Business Trust, and related individual parties entered into a settlement agreement that liquidated the Rollover Equity and resolved DeBlasio's claims to the Initial Holdback Amount.  Ex. AD.  DCCP paid $4 million (less a $150,000 indemnity payment) in satisfaction of the Initial Holdback Amount and in exchange for the Florida Business Trust surrendering the Rollover Equity.  Ex. AD at SGH2-00000473, 79; *see also* Tr. 337:8-340:10 (J. DeBlasio Direct).  It also paid DeBlasio $300,000 for his employment severance and granted him a release of any claim related to the working capital shortfall it had alleged.  Ex. AD at SGH2-00000471, 83-84.

19.     To date, the sellers of SGH and SGI have received less than $50 million in cash as a result of the payments outlined above, including the settlement amount that liquidated the Rollover Equity.  Tr. 106:5-10 (J. DeBlasio Cross), 335:21-24, 337:8-340:10 (J. DeBlasio Direct); Exs. AD, 327.  Ten million dollars of the original $64.5 million purchase price remains in a trust account and will be released to sellers in 2015 if there are no further indemnity obligations.  Tr. 339:4-19 (J. DeBlasio Direct); *see* Exs. B at SGH1-00013905, C at TCHAR0009756-57.  Even if all of the remaining $10 million is released from the trust account, the total amount received by the sellers as a result of the DC Capital Transaction will not exceed $60 million.  Tr. 340:8-10 (J. DeBlasio Direct), 697:1-10 (Campbell Redirect).

**B.     The $64.5 million DCCP SPA price was the result of an arm's-length negotiation, not a conspiracy to avoid paying Charron.**

20.     Charron's contention that the DC Capital Transaction was rigged to avoid triggering an obligation under the Windfall Protection provision is unsupported by the evidence. Representatives of the buyer, sellers, and third-party investor BNY-Mellon Alcentra all described an arm's-length market process resulting in the $64.5 million purchase price. Tr. 312:24-324:1 (J. DeBlasio Direct), 592:5-23 (Campbell Direct), Ct. Ex. 1 at 105:2-106:13 (Gold Dep.). Defendants' expert agreed that the $64.5 million price for Sallyport was fair market value for the company established by a market process. Tr. 1668:11-1669:23 (Hitchner Direct).

21.     Consultants assisting with the sales process for SGH first contacted DCCP regarding a potential sale of the company in 2009. Tr. 310:2-25 (J. DeBlasio Direct). DCCP reviewed marketing materials and met with John DeBlasio, but ultimately declined to pursue a transaction in 2009. Tr. 1136:4-1137:1 (Lake Direct).

22.     SGH contacted DCCP again in 2010 through Sagent Advisors. Tr. 311:1-22 (J. DeBlasio Direct), 1137:2-7 (Lake Direct). DCCP again reviewed marketing materials and conducted limited due diligence. Tr. 239:22-241:3 (J. DeBlasio Direct), 1137:23-1138:7 (Lake Direct). On this occasion, DCCP responded by sending an indication of interest letter to SGH on August 12, 2010. Tr. 427:6-22 (Charron Direct), 589:5-11 (Campbell Direct); *see* Ex. 36 at TCHAR0008600.

23.     After further investigation, DCCP told SGH on September 28, 2010, that it would not pursue a deal at the valuation Sagent had initially suggested but would be interested in discussing a sale at a lower valuation. *See* Tr. 311:23-312:7 (J. DeBlasio Direct). Charron and DeBlasio did not pursue further discussions with DCCP at that time. Tr. 241:4-17 (J. DeBlasio Direct).

24.     Doug Lake, a partner at DCCP, explained at trial that he disfavored moving ahead with a deal in 2010 because the high price Sagent asked investors to pay was not justified in light of the risks the investment carried:

> Q.     Did you buy—make a—did you buy Sallyport in 2010?
>
> A.     No.
>
> Q.     Why not?
>
> A.     Huge disconnect on the value of the business.  The investment bankers at Sagent were basically advising or guiding towards a very excessive valuation, and we were nowhere near it.  So we communicated that and basically said, no thank you.  And walked away from the opportunity.
>
> Q.     What were the major issues of concern to you that related to the valuation?
>
> A.     Just the inherent risk in the business.  Sallyport was a business that was, you know, basically built in a war zone, in Iraq and then with operations in Afghanistan and other parts of the world.  As they advertised, you know, experts in doing work in remote, austere locations, you know, in light of the Iraq war and Afghanistan wars likely coming to an end at some point, you know, huge, obviously, risk there.  So a difficult business for anyone to really get their hands around, and a difficult business to value.  And with that, you pay a huge, you know, there's a difference of opinion on how you value a business like that.

[Tr. 1138:11-1139:6 (Lake Direct).]

25.     After the Charron SPA closed, John DeBlasio sent an email to several third parties, including DCCP, informing them of the Charron SPA transaction and advising them that SGH remained interested in an acquisition.  Tr. 312:24-313:19 (J. DeBlasio Direct), 1139:10-16 (Lake Direct).  DCCP's president Tom Campbell received the email and proposed further discussions with DeBlasio.  Tr. 312:24-313:19 (J. DeBlasio Direct), 614:20-615:15 (Campbell Cross).

26.    On January 20, 2011, DCCP sent a letter of intent to DeBlasio as president of
SGH.  Ex. X.  In the letter, DCCP stated that it was "prepared to pay $57,500,000 to purchase all
outstanding stock of Sallyport on a cash free, debt free basis."  Ex. X; Tr. 328:12-23 (J. DeBlasio
Direct), 590:1-17 (Campbell Direct).  The offer was subject to a $4,000,000 holdback, which
would remain unpaid for eighteen months to secure any indemnification claims.  Ex. X.  The
offer also required DeBlasio to purchase between 40 and 49 percent of the post-acquisition
company on the same terms as DCCP, an investment known as an "equity rollover."  Ex. X;
Tr. 328:6-11 (J. DeBlasio Direct), 590:18-591:9 (Campbell Direct).  DeBlasio responded
favorably.  He signed an exclusivity agreement that would allow for due diligence to occur
before the transaction closed.  Ex. 433.

27.    DCCP engaged numerous professional advisors to assist it with due diligence
related to its purchase of SGH.  It hired the Spectrum Group to review SGH's business and
customer relationships.  Tr. 623:6-8, 636:4-637:6 (Campbell Cross), 1141:8-10 (Lake Direct).  It
hired Ernst & Young to review SGH's finances and taxes.  Tr. 1141:3-7 (Lake Direct).  It hired
Aon Consulting to review SGH's insurance coverage.  Ex. 64; Tr. 1141:10-12 (Lake Direct).
DCCP's counsel at Arnold & Porter conducted legal due diligence.  Tr. 1140:22-1141:2 (Lake
Direct).

28.    DCCP's Doug Lake described Arnold & Porter's task as an "exhaustive legal
review of all aspects of, you know, legal organizational documents, litigation, etc., you name it,
all aspects of Sallyport in the background."  Tr. 1140:25-1141:2 (Lake Direct).  Because
Sallyport was a party to the Charron SPA, the potential that an obligation to Charron might arise
out of the transaction was included in this review.  As to the Windfall Protection provision of the
Charron SPA, Arnold & Porter's 111-page due diligence memorandum to DCCP concluded that

"[t]he Transaction, as currently structured, does not appear to implicate this provision." Ex. 74 at KCAP-002099.

29.     Both sides of the transaction described the months of negotiations that followed DCCP's January 20 letter as adversarial. *E.g.*, Tr. 592:5-23 (Campbell Direct). Campbell testified to "[a] lot of back and forth in negotiations and discussions with John, most of the time, quite candidly, not pleasant, which ended up in making a proposal that he would find acceptable." Tr. 592:8-11 (Campbell Direct). DeBlasio described how he nearly canceled the deal in March 2011:

> So as they began to go forward with this, he then came back in March and he revised the terms again, right? So from originally 51/49, you maintain ownership, 55 to 60 million, it turned into 57 1/2 million, and I give up controlling interest, to now we had another significant change. There was a big tax escrow. There were some other things. He wanted to retrade the deal, if you will. So it was March, and I walked away. I just said, Thank you very much. I don't think this is really where we are going to end up. You now changed the scenario such that I have to take on a great deal of future risk. It doesn't make sense for me.

> [Tr. 316:7-17 (J. DeBlasio Direct).]

30.     Correspondence between Campbell and DeBlasio documents their adversarial, arm's-length relationship. On March 23, 2011, DeBlasio's attorneys at Cohen & Grigsby outlined deal terms addressing several different issues about which DeBlasio had "significant concerns." Ex. 351 at SGH1-00018808. Among the most significant changes DeBlasio's attorneys proposed was a $4 million cap on the sellers' indemnity obligations. Ex. 351 at SGH1-00018808.

31.     DCCP rejected DeBlasio's proposal by letter on March 25, outlining numerous concerns with the proposed transaction and proposing to shift certain risks to the sellers. *See* Ex. 417. To address the impasse on the sellers' indemnity obligations, DCCP proposed an

arrangement under which $12.5 million of the purchase price would be placed in a trust account to secure potential future liabilities.  Ex. 417 at SGH1-00353440-41.

32.     DeBlasio personally sent a letter in response on March 31, 2011, rejecting the allocation of risk DCCP had proposed and expressing his intention to take steps to mitigate the risks associated with the company.  Ex. 352 at JD1-00019533-34.  DeBlasio closed the letter by telling DCCP, "I realize this will delay closure for some time and understand if you do not want to wait, however, I cannot assume the risks given the gravity of the issues your team outlined and the terms of the arrangement."  Ex. 352 at JD1-00019534.

33.     DCCP sent a revised offer letter to DeBlasio on April 11, 2011.  Ex. Y.  The revised offer increased the proposed purchase price to $64,500,000 in exchange for "all outstanding stock of Sallyport" to be delivered "on a cash free, debt free basis."  Ex. Y; Tr. 329:13-22 (J. DeBlasio Direct); *see also* Tr. 590:10-17 (Campbell Direct), 1147:16-1148:21 (Lake Direct).  In exchange, DeBlasio was asked to agree to a separate $10 million escrow account for certain potential liabilities.  Ex. Y.  The revised offer was still subject to a $4,000,000 hold back.  Ex. Y.  It also required a 45 percent equity rollover purchase on the same terms as DCCP.  Ex. Y.  There was no change in the total purchase price after DCCP sent its revised offer letter in April 2011.

34.     From the time of DCCP's revised April offer until the DCCP SPA was signed in May, counsel for both sides drafted the language of the SPA and related documents.  *See* Exs. 83, 434.  Each side was represented by counsel and continued to protect its own interests. *See* Tr. 325:4-21 (J. DeBlasio Direct).

35.     The $64.5 million price in the final DCCP SPA was the same amount DCCP proposed in its April revised offer.  As DeBlasio explained, $64.5 million was the offer DCCP

made after their dispute about the terms of the deal was resolved, and he was happy to accept it. Tr. 326:4-327:9 (J. DeBlasio Direct).  No evidence of a secret agreement on a higher price exists. Tr. 324:13-325:3, 335:13-336:16 (J. DeBlasio Direct), 593:20-594:3 (Campbell Direct).

36.     Third-party investors, including Bank of America and a mezzanine fund controlled by BNY-Alcentra, invested debt and equity in the DC Capital Transaction on the basis of the terms of DCCP SPA.  Tr. 317:3-320:11 (J. DeBlasio Direct); Ct. Ex. 1 at 32:8-33:12 (Gold Dep.); *see also* Exs. CI, 306.  Indeed, when Charron's counsel asked Scott Gold, a representative of BNY, whether he had discussed the value of Sallyport "as distinct from the purchase price," Gold responded, "I don't know what the difference is."  Ct. Ex. 1 at 33:4-12 (Gold Dep.).

37.     The independent valuation professionals and auditors that DCCP hired to review the transaction for accounting and tax purposes agreed that the $64.5 million purchase price did not represent a "bargain purchase."  Andy Smith of the McLean Group testified as follows:

> A.      . . . What you have in accounting is if the company is purchased for significantly less than market value, you have something called a bargain purchase, so a bargain purchase would have to be recorded, if it met the requirements of a bargain purchase.
>
> Q.      Did the transaction here meet the requirements of a bargain purchase?
>
> A.      No.  Not at all.  We had a transaction between market participants, it went through a market process.  It was not a distress sale.  It was not sold out of bankruptcy.  It also falls within supportive valuation process as well, so it did not meet a bargain purchase.  It was not recorded that way, and auditors did not record it that way.  They didn't ask us for a memo on it.  Some auditors will offer a memo, gray area.  We've often been engaged to write memos addressing bargain purchase accounting.

> [Tr. 1125:3-18 (Smith Redirect).]

38.     McLean was not the only third-party advisor that reviewed the transaction.  For DCCP, McGladrey completed a thorough post-transaction audit of the acquisition.  It concluded

that "net consideration transferred for the acquisition of Sallyport Global Holdings, Inc. by Sallyport Holdings LLC [was] $64,385,262, inclusive of all consideration of $64.5mm, offset by $114,738 of seller expenses."  Ex. 49 at McGladrey00001666.

39.     BNY also engaged a large accounting firm, KPMG, to audit its acquisition of $500,000 of equity in Sallyport Holdings.  Ct. Ex. 1 at 149:8-151:22 (Gold Dep.).  KPMG agreed that the equity position was properly valued at cost immediately after the transaction.  Ct. Ex. 1 at 153:7-154:3 (Gold Dep.).

### C.    The $3.8 million value for the Rollover Equity was a negotiated component of the transaction.

40.     The evidence shows that the value of the Rollover Equity DeBlasio received in the DC Capital Transaction was established in the arm's-length negotiations that produced the transaction as a whole.  The sophisticated investors who participated in the transaction agreed on and relied on the value indicated in the DCCP SPA.  Charron produced no evidence that DCCP and DeBlasio had an unwritten agreement to underreport the value of the Rollover Equity.  Both parties firmly denied this at trial.  Tr. 324:13-325:3, 326:4-327:9, 335:13-336:16 (J. DeBlasio Direct), 593:20-594:3 (Campbell Direct).

41.     All of DCCP's proposals to purchase SGH, as well as the final DCCP SPA the parties signed, required the seller to reinvest part of the purchase price in the purchasing entity. *See* Exs. X, Y, B, C.  Like the funds dedicated to holdbacks and potential indemnity obligations, the $3.8 million portion of the purchase price related to the Rollover Equity came with strings attached.  *See* Ex. C at TCHAR0009768.  DeBlasio was not free to apply this part of the price to anything he chose, but was required to "roll over" the amount back into the company.  Rather than make a payment to DeBlasio and have him give it back, DCCP simply transferred the equity interest in lieu of $3.8 million in cash.  Ex. 7; Tr. 656:19-658:6 (Campbell Cross).  The purpose

of requiring this reinvestment was to secure DeBlasio's continued involvement with the company.  Tr. 590:18-591:9 (Campbell Direct).

42.     The value of the portion of the company DeBlasio would receive in the form of Rollover Equity was not simply stated on a piece of paper.  Rather, the specific amount was negotiated and frequently changed in the months between DCCP's offer and the transaction's closing.  *See* Exs. X, Y, B, C; Tr. 330:1-9 (J. DeBlasio Direct).  These changes in the amount of equity led to changes in the amount of cash DeBlasio was to receive at close that were commensurate with the parties' understanding of the value of the equity.  *Compare* Ex. Y, *with* Exs. B at SGH1-00013964, *and* C at TCHAR0009768.  Balancing the cash and equity payments in this way kept the total purchase price at $64.5 million.  *See* Tr. 330:1-11 (J. DeBlasio Direct)

43.     The specifics of these negotiations went as follows.  In its January 2011 offer, DCCP proposed that DeBlasio purchase between 40 and 49 percent of the acquiring entity.  Ex. X.  In its April 2011 revised offer, DCCP proposed a 45 percent investment.  Ex. Y.  When the parties signed the DCCP SPA on May 6, 2011, the rollover equity investment had been reduced to 41 percent.  Ex. B at SGH1-00013964.  On June 29, 2011, the DCCP SPA was amended and the Rollover Equity investment was reduced to 38 percent.  Ex. C at TCHAR0009768.

44.     The effect of the Rollover Equity on the cash payable at closing was amended simultaneously as these percentages fluctuated.  The May 2011 SPA called for a Rollover Equity investment of $4.1 million and cash payments of $60.4 million, of which $16 million was deferred.  Ex. B at SGH1-00013964.  Under that agreement, DeBlasio would have received a 41 percent equity stake and a cash payment of $44.4 million.  Ex. B at SGH1-00013964.  The June 2011 amendments to the DCCP SPA reduced the Rollover Equity from 41 percent to

38 percent. Ex. C at TCHAR0009768. The value of the Rollover Equity decreased by $300,000 to $3.8 million. Accordingly, the amount payable in cash *increased* by $300,000 to $44.7 million. Ex. C at TCHAR0009768. There was no agreement to pile on whatever the equity was worth on top of a fixed cash amount; the agreement was a total price of $64.5 million inclusive of cash and equity.

45.     The final agreement on the Rollover Equity investment was formalized in the June 29, 2011 equity contribution agreement between Sallyport Holdings LLC and the Florida Business Trust, a trust affiliated with DeBlasio that acted as one of the sellers in the transaction. Ex. 7; Tr. 130:18-23 (J. DeBlasio Cross).

46.     The Rollover Equity was not additional compensation on top of the $64.5 million purchase price. Instead, the seller received the Rollover Equity in lieu of $3.8 million of the total purchase price. Ex. 7; Tr. 656:19-657:11 (Campbell Cross). DeBlasio's purchase of Rollover Equity reduced the amount of the purchase price payable in cash at closing. *See* Ex. C at TCHAR0009768; Tr. 320:17-321:3 (J. DeBlasio Direct). DeBlasio explained at trial that he was "happy to go down from 49 to 38" and "would have gone down lower" to maximize the cash value of the transaction. Tr. 320:17-321:3 (J. DeBlasio Direct).

47.     DeBlasio and DCCP priced the 38 percent Rollover Equity at $3.8 million based on the other equity investments in Sallyport Holdings and the debt–equity structure of the transaction as a whole. As Campbell and DeBlasio both testified, the total equity investment necessary to complete the sale was determined by subtracting the $54.5 million part of the transaction value that was funded with debt and future obligations to the sellers from the total $64.5 million purchase price. Tr. 85:1-8, 86:17-87:8 (J. DeBlasio Cross), 594:4-12, 600:6-17 (Campbell Direct), 662:14-663:1 (Campbell Cross).

48.     The remaining $10 million was funded with a series of equity investments.  For instance, DCCP paid a total of $5.225 million in cash for 52.25 percent of the equity.  Exs. CI; 306 (Tab C "Sallyport_Equity Flow").  BNY paid $500,000 in cash for 5 percent.  Exs. CI, 306 (Tab C "Sallyport_Equity Flow").  DeBlasio's investment of $3.8 million of the purchase price equated to 38 percent on the same terms.  Tr. 86:15-87:8, 89:23-90:16 (J. DeBlasio Cross), 318:8-321:3 (J. DeBlasio Direct), 595:13-24, 596:7-15 (Campbell Direct).

49.     Charron's attempts to raise questions about these numbers are unavailing.  His own trial exhibits include wire receipts and transaction numbers corresponding to the real cash transfers that funded the equity contributions discussed above.  Ex. 306 (Tab C – Sallyport _Equity Flow); *see also* Ex. 327.  The parties simply applied the same price these investors paid to the 38 percent Rollover Equity and subtracted the resulting $3.8 million from the total price of $64.5 million.  *See* Ex. 296 at MCL-00000269.  The $10 million total that all the investors paid for Sallyport Holdings equity is "simple math."  Tr. 600:13-17 (Campbell Direct).

50.     When all the investments in Sallyport Holdings were completed with the closing of the DC Capital Transaction, the total equity capitalization of the new entity was as follows:

| CLASS A OWNERSHIP OF NEW SALLYPORT | | |
|---|---|---|
| **Equity Investor** | **Contribution** | **Equity Ownership** |
| John P. DeBlasio Trust (the "Florida Trust") | $3,800,000 | 38% |
| KS International Equity LLC[1] | $5,225,000 | 52.25% |
| Nick Gross | $475,000 | 4.75% |
| BNY Mellon-Alcentra Mezzanine III | $500,000 | 5% |
| **Total** | **$10,000,000** | **100%** |

---

[1] KS International Equity LLC was a legal entity formed by DCCP to make the equity investment whose members included Campbell and his partners.  Tr. 676:4-12 (Campbell Cross).

[*See* Exs. C at TCHAR0009768, CI, and 296 at MCL-00000269; *see also* Tr. 594:24-595:24 (Campbell Direct).]

      **D.**      **The merger of Sallyport Holdings and Kaseman Holdings to create KSI did not increase the value of the Rollover Equity.**

51.      Charron presented no evidence to support his assertions that the merger of Sallyport Holdings and Kaseman Holdings was part of a conspiracy to obscure the value of the Rollover Equity or that the merger in fact increased the value of the Rollover Equity.

52.      The July 29, 2011 merger converted all of the equity in Sallyport Holdings and Kaseman Holdings to interests in KSI.  *See* Tr. 1871:2-4 (Stipulations of Fact); *see also* Tr. 199:11-13 (J. DeBlasio Cross).  At least ten distinct investors held interests in the entities affected by the combination.  Ex. CI.  All of these holders' interests were converted to KSI interests through the application of a merger ratio.  Ex. CI.

53.      The sellers agreed that the purchaser would be merged with another DCCP entity, Kaseman Holdings, in connection with the DCCP SPA negotiations.  Ex. C at TCHAR0009758-59.  The arm's-length negotiations on the value of the equity interests each investor would receive took place with the knowledge that the merger would occur.  *See* Ct. Ex. 1 at 34:6-17 (Gold Dep.).

54.      Both DeBlasio and Campbell testified that they negotiated the final merger ratio itself in good faith after the closing.  Tr. 203:7-204:2, 204:11-21, 208:13-22, 210:23-211:20 (J. DeBlasio Cross), 321:4-323:23 (J. DeBlasio Direct), 596:16-597:23 (Campbell Direct).  Although he had agreed to "something close to 50/50," Tr. 203:19, DeBlasio questioned the value of Kaseman.  Tr. 203:12-204:2 (J. DeBlasio Cross).  Campbell refused to make significant concessions to allocate more of the merged entity to the Sallyport Holdings side.  Tr. 322:21-323:14 (J. DeBlasio Direct).

55.     DeBlasio ultimately agreed to a merger ratio allocating roughly 51 percent of the new entity to Sallyport Holdings.  DeBlasio explained his motives for accepting this ratio as follows:

> Q.     Why did you think that 51/49 merger ratio was feasible?
>
> A.     It was a combination of factors.  I looked at Kaseman as a business, and I felt that—when I looked at the KSI opportunity and D.C. Capital Partners, that was about as good a place to park and nurture Sallyport the business into the future.  So for me, I looked at this as an opportunity, right?  I did not want to come into this with a battle.  I did not want to fight over nickels and watch something bigger go by.  For me, it was more important to establish partnership on the right footing, to get the business integrated, begin to work together, to begin to be part of the D.C. Capital Partners portfolio, all of that.  So I didn't feel it warranted the extra machinations to walk away and come back to try to get an extra 5 percent of 3.8 million—right?—when 94 percent of the transaction was already secured.

[Tr. 322:1-15 (J. DeBlasio Direct).]

56.     DeBlasio was not the only investor who consented to the merger ratio.  All of the equity owners of Kaseman Holdings and Sallyport Holdings agreed to the merger and approved the merger ratio.  *See* Ex. CI; Tr. 597:9-23 (Campbell Direct).

20

57.     Upon the completion of the KSI merger, the interests in Kaseman Holdings and

Sallyport Holdings were converted to KSI interests as follows:

| CLASS A OWNERSHIP OF KSI AFTER MERGER | | | | | |
|---|---|---|---|---|---|
| **Equity Investor** | **Kaseman Equity** | **Kaseman Equity** | **New Sallyport Equity** | **New Sallyport Equity** | **KSI Equity after merger ratio applied** |
| DC Capital Partners | | | $5,250,000 | 52.25% | 26.6500% |
| John DeBlasio | | | $3,800,000 | 38% | 19.3818% |
| Nick Gross | | | $475,000 | 4.75% | 2.4227% |
| BNY Mellon-Alcentra Mezzanine III | | | $500,000 | 5% | 2.5502% |
| DCCP Elite Investments | $6,705,000 | 59.6000% | | | 29.2011% |
| DC Capital Partners | $1,226,552.15 | 10.9027% | | | 5.3418% |
| 747 Santa Fe Elite Corp. | $750,000 | 6.6667% | | | 3.2663% |
| David Kaseman | $322,500 | 2.8667% | | | 1.4045% |
| David Kaseman Family Dynasty Trust | $240,000 | 2.1333% | | | 1.0452% |
| BNY Mezzanine Partners LP | $1,658,297.85 | 14.7404% | | | 7.2221% |
| United Insurance Company | $347,650 | 3.0902% | | | 1.5141% |
| Sub Total | $11,250,000 | 100% | $10,000,000 | 100% | 100% |
| **Merged Total** | **$21,250,000** | | | | **100%** |

[*See* Ex. CI.; *see also* Tr. 597:24-599:9 (Campbell Direct).]

58.     All of the invested amounts listed above were cash or investments in Kaseman

Holdings and Sallyport Holdings prior to the merger.  *See* Ex. CI; Tr. 598:25-600:3 (Campbell

Direct); *see also* Tr. 1742:11-1744:18 (Hitchner Cross).  Existing equity investments in Kaseman

Holdings and Sallyport Holdings were combined and interests converted to KSI equity interests

according to the agreed merger ratio.  Ex. CI; *see also* Tr. 599:17-600:3 (Campbell Direct).

21

59.     There is no evidence that the merger increased the value of the Rollover Equity.

DeBlasio understood that the merger had no effect on the value of his Rollover Equity interest:

> Q.     How did the merger with Kaseman affect the value of your rollover equity?
>
> A.     The ratio reduced the overall share ownership.  It reduced the percentage.  It didn't reduce the value necessarily.
>
> Q.     What was your understanding of the dollar value that was ascribed to those shares after the merger?
>
> A.     That it was equivalent.
>
> Q.     To what number?
>
> A.     3.8 million.
>
> Q.     At any time did you have an understanding that your equity in KSI could be worth as much as 20 million?
>
> A.     No.
>
> [Tr. 323:15-324:1 (J. DeBlasio Direct).]

Campbell agreed:

> Q.     Can you tell from this document how the merger ratio affected John DeBlasio's interest in Sallyport Holdings when it was merged into KSI International?
>
> A.     Its interest went from—on a stand-alone basis he owned 38 percent, which is, as we talked about before, a 3.8 million over 10 of Sallyport Global Holdings; and then on a post-merger basis, as you would expect, it went down by a little bit more than half or the 51 or the 19.38 percent.
>
> Q.     Did the merger affect the value of John DeBlasio's interest in Sallyport or Sallyport or KSI?
>
> A.     The value?  The value pre was eleven two fifty and ten.  After it is simple, you know, you had the values.
>
> Q.     Did the merger increase the overall value of the company?
>
> A.     At the time of the merger?  No.
>
> Q.     The plaintiff in this case has asserted that John's—that John DeBlasio's ownership interest in new Sallyport, this is Sallyport Holdings LLC was worth more than $20 million at the time of the D.C. Capital acquisition.  How do you respond to that?
>
> A.     Politely, whoever came up with that math is wrong.

22

> Q. Tell me why.
>
> A. We just went through it.  We paid a certain purchase price. You back out the debt.  The equity is the equity.  It is pretty straightforward, simple math.  So at the time of the acquisition, purchase price less debt equals equity, that is $10 million.

[Tr. 599:17-600:17 (Campbell Direct).]

60. After the merger, DCCP hired accounting and other professional advisors to review the transaction to comply with Generally Accepted Accounting Principles ("GAAP").  Tr. 1120:18-1122:7 (Smith Direct).  These advisors agreed that the Rollover Equity in KSI was properly accounted for in the transaction.  The McLean Group conducted a purchase price allocation for the DC Capital Transaction.  *See* Ex. 33.  McLean valued the Rollover Equity at $3,871,033 in connection with this engagement.  Ex. 27 at MCL-00002611.  Later, DCCP's auditor McGladrey reviewed McLean's work and agreed with McLean's assessment.  Tr. 960:6-961:8 (Smith Direct), 1120:3-17 (Smith Redirect); see also Ex. 49.

61. In particular, McGladrey reviewed McLean's discount-rate analysis in connection with its review of the purchase price allocation.  *See* Ex. CK.  McGladrey noted that McLean assigned risk factors that would indicate "a company on the riskier end of the spectrum" when it valued the Rollover Equity interest in KSI.  Ex. CK at McGladrey00001756.  McGladrey found that this judgment was "reasonable" in light of several issues facing the company, including decreasing federal spending.  Ex. CK at McGladrey00001756.  McGladrey's final assessment concluded that "once the proper fair value models were applied, the final rollover equity value totaled $3,734,841."  Ex. 49 at McGladrey00001666.

62. BNY's auditors also reviewed the value of its interest in KSI after the merger and came to the conclusion that the equity was properly valued at cost after the merger.  Ct. Ex. 1 at 153:17-154:3 (Gold Dep.).

63.     One year after the DC Capital Transaction, DeBlasio came to believe that Campbell and the Kaseman investors got the better end of the merger deal in light of Kaseman's poor financial performance.  Tr. 206:13-23 (J. DeBlasio Cross).  DeBlasio's complaints in 2012 suggest that, if the merger had any effect on the value of the Rollover Equity, it was to reduce it rather than increase it.

64.     DeBlasio's expression of dissatisfaction with the merger ratio did not result in further compensation to him or a revision of the merger agreement.  DeBlasio cashed out his equity in KSI pursuant to the May 2013 settlement agreement that extinguished all of DeBlasio's claims under the DCCP SPA for an amount less than the contract called for.  Exs. AD, C at TCHAR0009768; Tr. 106:11-107:14 (J. DeBlasio Cross).  DeBlasio would not have agreed to such a transaction if the Rollover Equity had been worth more than $20 million, as Charron's expert claims.

**E.     Risius's valuation opinion is entitled to no weight.**

65.     Despite the arm's-length agreement of the buyers and sellers as to the value of the Rollover Equity and the significant evidence conflicting with his opinion, Charron's expert Jeffery Risius concludes that the Rollover Equity was worth over $20 million—more than five times the value the parties agreed on at arm's length after exhaustive due diligence.  Tr. 1341:16-1342:6 (Risius Direct).  Despite the scientific veneer to his methods, the evidence demonstrates that Risius's opinion is unreliable, unpersuasive, and tainted by improper advocacy.  Every piece of documentary evidence presented at trial and every fact witness's testimony contradicted Risius's conclusions.

**1.     Risius cherry-picked facts favorable to Charron.**

66.     There is no excuse for the blatant cherry-picking that infects Mr. Risius's expert opinion.  Risius appears to be well-qualified in the field of business valuation.  He has 25 years

24

of relevant experience and asserts that he has personally issued "thousands" of valuation

opinions.  Tr. 1396:15-21 (Risius Cross).  He asserts that a significant percentage of his opinions

have been issued in the context of a dispute in litigation.  *See* Tr. 1396:22-1397:18 (Risius

Cross).  He is knowledgeable about the applicable professional standards governing his work and

familiar with the requirements of the Federal Rules of Civil Procedure.  *See* Tr. 1390:23-1391:12

(Risius Cross).

68.     Risius's work was not limited by budget or time constraints.  By July 2014, his

firm had billed approximately $1.7 million on this case and engaged the services of four

employees of his firm.  Tr. 1394:12-1395:12, 1524:1-4 (Risius Cross).  That billed amount does

not include the time Risius and his associates spent preparing for and attending the second half of

the trial in August.  Tr. 1524:5-8 (Risius Cross).  Risius had access to and reviewed all of the

documents essential to his analysis.  Tr. 1420:1-3, 1424:23-1425:2 (Risius Cross).

68.     His firm was actively engaged in supporting the litigation.  It identified the

numerous third parties who should receive document subpoenas and participated in drafting the

requests for documents.  Tr. 1421:17-1422:8 (Risius Cross).  His firm handled the electronic

database used to manage the discovery documents.  Tr. 1422:9-21 (Risius Cross).  He drafted

questions for each of the depositions taken by Plaintiff's counsel and was frustrated when

counsel "didn't ask the question in the right way."  Tr. 1403:9-1405:17 (Risius Cross).

69.     Despite Risius's qualifications and his broad access, the evidence demonstrates

that his opinion is purely a work of fiction.  His opinion places undue weight on inadmissible

third-party indications of interest, sales presentations, and other documents that bear no

relationship to reality.  At the same time, he ignores numerous facts that are obviously relevant to

his analysis, apparently only because they are inconsistent with Charron's objectives.

a.   **Risius unreasonably relied on non-binding indications of interest.**

70.   Risius identified a series of indications of interest ("IOI"s) received by SGH in the summer of 2010 as real world "indications of value" to support the reasonableness of his opinion.  Tr. 1355:24-1356:21 (Risius Direct.); *see also* Exs. 36 (DCCP IOI), 112 (Madison Dearborn Partners IOI), 113 (Cerberus IOI), 114 (Levine Leichtman IOI); 181 (Sun Capital IOI), 115 (Wackenhut IOI), 116 (Gores IOI), 383 (Mustang IOI), 195 (Veritas IOI).

71.   At trial, Mr. Risius acknowledged the facts that render these documents irrelevant and unreliable as an indication of the fair market value of SGH or KSI.  He acknowledged that the IOIs "obviously didn't close, and those deals were obviously subject to additional due diligence, and those deals were not binding."  Tr. 1356:13-15 (Risius Direct).  He agreed that the majority of the IOIs were withdrawn because of "the Iraq question at that point in time." Tr. 1430:7-21 (Risius Cross).  Risius conceded that private equity firms regularly submit IOIs not because they plan to complete a transaction but simply because they are trying to get information.  Tr. 1549:15-17 (Risius Re-cross).

72.   But he was not so frank in his expert report.  Risius's expert report identified the IOIs as a reliable indicator of market value and concealed the facts that made them unreliable. For example, the report omitted that the IOIs were:  (i) non-binding; (ii) conditioned upon the completion of due diligence; and (iii) withdrawn from consideration.  Tr. 1428:23-1430:10 (Risius Cross); Ex. 98, App'x. 5 at 2-3.  The report omitted the fact that none of the IOIs resulted in an actual offer to purchase in 2010.  *See* Ex. 98, App'x. 5 at 2-3, App'x. 8 at 8-9.  The report omitted the reasons for the withdrawal of the IOIs, including the risks presented by the drawdown of the United States military presence in Iraq and SGH's employment of armed

individuals.  *See* Ex. 98, App'x. 5 at 2-3, App'x. 8 at 8-9.  Risius knew of these facts when he

prepared his report but chose not to include them.  Tr. 1430:11-1431:8 (Risius Cross).

73.     Risius tried to defend his omission of these significant limiting factors by

claiming that he used the IOIs solely as a "gut check" and that he was not "hanging his hat" on

them.  Tr. 1548:8-1549:2 (Risius Re-cross).  But Risius's report presents the IOIs not as a "gut

check," but as relevant and reliable information that confirms his valuation conclusions.  *See*

Ex. 98, App'x. 8 at 8-9.  The evidence presented at trial demonstrates that this use of the IOIs

was highly inappropriate and misleading.

74.     The IOIs were not independent assessments of market value, but responses to a

specific solicitation by Sagent.  *See* Tr. 1194:16-23 (Lake Cross) (describing DCCP's own IOI as

"meaningless").  John DeBlasio, Peter Phelps, and Doug Lake all testified that Sagent guided

investors to a range of dollar figures that should be included in their IOI.  Tr. 312:8-20 (J.

DeBlasio Direct), 850:7-15 (Phelps Direct), 1138:11-18 (Lake Direct).  A management meeting

would be held only after an IOI was presented in the required range:

> OK.  So then over time, we have a lot of meetings.  We met with a
> lot of different companies.  The barrier to entry to be in the
> meeting was for them to agree to a number that potentially could
> pay, based on, kind of based on nothing, like saying to you, OK, if
> everything is, if everything is fine, would you pay, say, whatever
> the number, say $99 million dollars for this company, well, you
> have no way of knowing, but they would say, sure, you know,
> because they've had so many contingencies.

> [Tr. 850:7-15 (Phelps Direct).]

Despite his broad role in discovery, his access to original documents, and his observation of all

of the testimony at trial, Risius claimed that he was not aware of this fact.  Tr. 1549:3-22 (Risius

Re-cross), 1551:22-1552:8 (Risius Redirect).

75.     Defendants' expert, James Hitchner, confirmed that IOIs like those SGH received in the Summer of 2010 have no bearing on the value of company and that they are not typically considered as indicators of market value:

> Q.     And we were talking about the indications of interest that were received by SGH in the summer of 2010.  Do you have any opinion about the reasonableness of Mr. Risius' use of those indications of value?
>
> A.     Well, as I think I said yesterday, these LOIs and IOIs, I mean, all appraisers will consider them, take a look at them.  I do, too.  Typically they're not used because they're not indicative of value.  They're not a value.  And what I'm interested in, if you have 10 LOIs or IOIs and somebody transacts out of that group, I'm interested in the company that's transacting.  And if they transact at a higher number, so be it.  If they transact at a lower number, so be it.  Because now you've got two people negotiating and you've got a deal.  So—and the only one that transacted was DCCP.  So I wouldn't in this case put any emphasize [*sic*] on those LOIs or IOIs at all.  Would I consider them if I was doing a valuation?  Yes, but I would dismiss them.

> [Tr. 1701:5-22 (Hitchner Direct).]

### b.     Risius unreasonably relied on the Jefferies presentation.

76.     Risius also relied heavily on a range of figures computed by investment banking firm Jefferies & Company to support the reasonableness of his valuation opinion.  Tr. 1512:23-1513:8 (Risius Cross); Ex. 98 at 12-13, 16, 23, App'x. 5 at 13, App'x. 6 at 12-14, App'x. 7 at 7-8, 13-14, 22, App'x. 8 at 9.  But there is no reasonable basis for this use of the Jefferies figures.

77.     The figures reflected in the Jefferies documents were part of an aspirational sales pitch.  At best, Jefferies's conclusions were an optimistic guess as to a prospective future sales price.  *See* Tr. 186:4-187:16, 188:12-21 (J. DeBlasio Cross).  No foundation for the reliability of the Jefferies numbers was presented.  No one from Jefferies testified at trial, and no other evidence was offered to support Risius's reliance on them.

78.     The facts presented at trial affirmatively demonstrate that the Jefferies figures were speculative and unreliable.  Jefferies prepared a confidential information memorandum ("CIM") and distributed it to 20 groups of investors who signed confidentiality agreements.  Tr. 1276:9-15 (Lake Redirect); *see also* Ex. 476.  These groups were given access to a data room and other due diligence materials.  Tr. 1276:16-1277:1 (Lake Redirect).  As Doug Lake explained at trial, no buyer was interested in acquiring KSI at anywhere near the valuation that Jefferies proposed after reviewing these materials:

> Q.     Did any of the roughly 20 prospective buyers that signed the agreement, did any of them make an offer to purchase the company?
>
> A.     In the end only one did.
>
> Q.     And was that offer anywhere near the expected or a number contained in the Jeffries memo as to projected valuation?
>
> A.     Nowhere near.
>
> [Tr.1277:2-8 (Lake Redirect).]

In the end, the Jefferies sales process did not result in a sale of KSI.  Tr. 1277:9-1278:8 (Lake Redirect).

79.     Risius's defense of his decision to rely on the Jefferies documents was nonsensical.  He never even bothered to find out whether Jefferies successfully solicited any offers from investors in the range Jefferies proposed:

> Q.     Well, you heard Doug Lake's testimony yesterday that they were not able to get any purchasers interested in acquiring KSI, correct?
>
> A.     I don't remember his exact testimony.  It is what it is.  I really looked at information that was right around June 29, 2011, as opposed to subsequent events.
>
> Q.     Right.  Well—OK.  So would the fact that KSI did not get any offers at the figures that Jefferies put on the company, does that affect your assessment of the reasonableness of the Jeffries' figures?

> A. It may or may not.  I guess I just don't think we had discovery on anything of that nature that I can recall.  So it's just a representation of Doug Lake in this courtroom is all I really had to go on.
>
> Q. You don't know otherwise?
>
> A. I don't know otherwise.  I don't think, like I mentioned.
>
> [Tr. 1513:18-1514:17 (Risius Cross).]

This explanation for Risius's decision to take the Jefferies figures at face value without investigating how they were used is absurd.  His firm directed the discovery efforts that would have uncovered the fact that no investor agreed with Jefferies.  Tr. 1421:17-1422:21 (Risius Cross).  If Risius did not learn this information before trial, it was the result of his own failure to ask.

80.     Risius's assertion that he was entitled to ignore the market's reaction to Jefferies's analysis because the sales process occurred after the DC Capital Transaction closed was equally ridiculous.  As Defendants' expert observed, the Jefferies CIM itself was not produced until November 2011, several months after the closing.  *See* Ex. 476; Tr. 1708:9-13 (Hitchner Direct).  Only Risius's imperative to advocate for his client explains his decision to emphasize one set of post-closing facts—the big numbers in the Jefferies documents—while ignoring the facts that provide their context and undermine their reliability.  *See* Tr. 1708:14-1709:1 (Hitchner Direct).

### c.    BNY's spreadsheet does not indicate a $120 million enterprise value.

81.     Although he did not mention it at trial, Risius also included in his report a stray figure he found in a BNY spreadsheet as evidence that BNY estimated the enterprise value of SGH to be $120 million.  *See* Ex. 98, App'x. 8 at 9.  His report concludes that "[t]he BNY analysis supports my concluded EV of $103 million."  Ex. 98, App'x. 8 at 9.

82.     Risius's reliance on this purported BNY admission is a third example of his use of unreliable information to bolster his unreasonable opinion of value.  Scott Gold, the BNY employee that Charron's counsel confronted with the spreadsheet, testified at his deposition that the $120 million figure in the BNY spreadsheet was a carryover from another project using the same template spreadsheet and that it did not represent the purchase price or the enterprise value of SGH or KSI.  Ct. Ex. 1 at 218:8- 220:23 (Gold Dep.).  Risius certainly either knew or should have known about Gold's testimony when he issued his report a month after the deposition.  His assertion in spite of this information that the $120 million figure was a "real world indication" that his own $103 million valuation was reasonable is patently misleading.

### d.     Risius ignored a $62 million offer from Chart Capital Management.

83.     Risius's omission of other, more reliable, real-world indications of value further illustrates his inappropriate cherry-picking.  First, Risius completely omitted any reference to the offers and counteroffers exchanged with Chart Capital Management in late December 2009 and early January 2010.

84.     Chart initially presented an offer to buy SGS that put a $60 million value on Sallyport as a whole.  Tr. 303:9-304:9 (J. DeBlasio Direct); Ex. F.  Charron and DeBlasio counteroffered at a $64 million enterprise value.  Tr. 303:9-304:9 (J. DeBlasio Direct); Ex. F. Chart then countered at an enterprise value of $62 million.  In a January 14, 2010 email, DeBlasio explained to Charron that Chart's counteroffer "values the enterprise at $62M which is in the range I believe we will find out on the market."  Tr. 228:11-229:2 (J. DeBlasio Direct), 554:12-22 (Charron Cross); Ex. H at SGH1-00038455.  Charron did not object to DeBlasio's explanation.

85.     The Chart offer and the counteroffer by the owners of Sallyport clearly would have been relevant historical "indications of value" in the context of Risius's discussion of other IOIs and offers to purchase the company.  *See* Ex. 98, App'x. 8.  But Risius neglected to even include the relevant communications on his list of documents considered.  Tr. 1433:16-1434:9 (Risius Cross).

86.     Risius failed to provide a plausible explanation for omitting the Chart offers  *See* Tr. 1432:4-1437:4 (Risius Cross).  His assertion that the Chart offers were too remote in time to be considered, Tr. 1433:4-15 (Risius Cross), was obviously a post-hoc rationalization for a significant omission.  It conflicts with the chronological presentation of "relevant facts" in Appendix 5 of his report, which begins with Charron's and DeBlasio's September 2009 efforts to find a third-party purchaser.  *See* Ex. 98, App'x. 5.  It also conflicts with the professional standards applicable to Risius's work, which require an appraisal report to be objective and not to omit material that would be relevant to the appraisal.  Even if he ultimately reached the conclusion that they were not relevant, Risius should have identified the Chart offers and reconciled them against his own opinion of value.

         **e.**      **Risius unreasonably omitted the market prices reflected in the Charron SPA and the negotiations between Charron and DeBlasio.**

87.     Another example of Risius's cherry-picking can be found in his decision to disregard the enterprise value of SGH indicated by the Charron SPA and the negotiations between Charron and DeBlasio that preceded it.

88.     On November 30, 2010, Charron sent DeBlasio an offer to sell his interest in SGH at a $60 million enterprise value.  Ex. R at SGH1-229840.  The final purchase price in the Charron SPA reflected a $50 million enterprise value for SGH as of December 7, 2010.  Ex. 99 at 54 ("Following the failed investment banking efforts of Sallyport, Mr. Charron sold his 50%

equity interest back to the Company.  The deal was negotiated between the parties based on a

$50 million enterprise value plus the cash balance . . . ."); Tr. 278:13-279:3 (J. DeBlasio Direct).

Risius did not dispute this conclusion when confronted with it on cross-examination.  Tr.

1449:11-1450:21 (Risius Cross).

89.     Risius's report entirely omits both Charron's $60 million offer and the

$50 million enterprise value that the parties ultimately settled on.  Tr. 1437:5-1438:14, 1449:8-

1450:21 (Risius Cross).  In fact, Risius did not even consider the November 30 email exchange

in which Charron and DeBlasio discussed Charron's counteroffer and proposal for a windfall

clause.  Ex. 98, App'x. 1.

90.     When confronted with his omission on cross-examination, Risius asserted that the

figures could not be considered because they were presented in the context of a "business

divorce."  Tr. 1438:5-14 (Risius Cross).  Risius even said that he would rely more heavily on an

unconsummated IOI as a real-world indication of value.  Tr. 1438:5-14 (Risius Cross).

91.     This view is unsupported by the facts and defies common sense.  DeBlasio and

Charron were educated and experienced business owners with an in-depth understanding of their

own business.  They had access to all of the relevant facts and the advice of experienced

consultants and attorneys.  Tr. 1544:12-1545:25 (Risius Re-cross).  Each of them had the ability

to recognize and employ his own leverage in the negotiations.  Neither was under compulsion to

buy or sell.  If anything, these two individuals had more insight than anyone else into the value

of SGH and the ability to negotiate a fair price for an equity interest in the company.  *See* Tr.

1702:23-1704:14 (Hitchner Direct).

92.     Charron freely signed the Charron SPA.  Any financial pressure in the

negotiations resulted from the preferences of the owners, including DeBlasio's desire to address

the difficulties created by the 50/50 management structure and Charron's preference to complete a transaction as soon as possible so that he could leave Florida and join his family in Massachusetts.  Tr. 852:4-853:5 (Phelps Direct).  Charron understood his negotiating position and used it to his advantage.  Among other things, Charron withheld his signature on an important new contract to put pressure on DeBlasio to close the transaction quickly and to accept his proposed contract terms.  Tr. 252:24-255:4 (J. DeBlasio Direct), 1546:16-1547:3 (Risius Re-cross); Exs. R, BM.

93.     Ultimately, Charron negotiated and received an immediate cash payment of more than $40 million, a complete release of liability, and a contract provision granting him the possibility of additional compensation in the future.  *See* Ex. A.  Charron does not assert that his agreement was the result of duress, undue influence, or overreaching.  He seeks to enforce its terms, not to rescind them.

### f.     Risius disregards the year-long unsuccessful attempt to find a buyer for SGH.

94.     Risius's conclusion that the enterprise value assigned by Charron and DeBlasio is irrelevant also ignores the fact that the price they agreed upon in December 2010 was the final result of a year-long sales process that began in September 2009.  *See* Tr. 242:23-245:6 (J. DeBlasio Direct).

95.     Charron and DeBlasio hired Glenn Corliss, an individual business broker, and TransEquity Advisors, also known as Business Valuation Center ("BVC"), to assist with marketing the company for sale in September 2009.  Tr. 532:19-22 (Charron Cross); Ex. D. Corliss and TransEquity identified several interested investors, arranged marketing presentations, and distributed a CIM describing the business of SGH.  Tr. 227:4-229:2 (J. DeBlasio Direct); *see also* Ex. 230.

96.     They received an offer from Chart Capital Management in December 2009, and countered in January 2010.  Ex. F.

97.     In February 2010, SGH hired Sagent Advisors.  *See* Ex. BA.  Charron believed that hiring a more prestigious investment banking firm would help the company achieve a higher sales price.  Tr. 229:4-21 (J. DeBlasio Direct).

98.     Throughout their efforts to find a third-party buyer, Charron and DeBlasio discussed alternative arrangements that would have allowed one or the other to take control of the company.  DeBlasio proposed a "buy-sell agreement" to Charron in January 2010.  Ex. H. DeBlasio's proposal would have given either party the right to purchase the other party's shares for the price one party proposed if the party receiving the offer declined to sell.  Tr. 851:8-852:3 (Phelps Direct).  DeBlasio explained to Charron that such a deal would be useful in the event "I may want to take a deal at $62M but you don't want to do so because you don't believe the price is high enough."  Ex. H.

99.     Alternatives to a third-party sale remained under discussion as the sales process continued.  In April 2010, Charron told DeBlasio that, rather than agreeing to a buy-sell arrangement, he would arrange an "orderly wind down of the company."  Ex. I.  DeBlasio and SGH's CFO Peter Phelps both understood the wind-down proposal to be a third option if a third-party sale or an internal buyout could not be completed.  Tr. 296:9-300:2 (J. DeBlasio Direct); 859:17-860:19 (Phelps Direct).

100.    Several investors responded to Sagent's solicitations throughout the summer and fall of 2010, but all of them eventually declined to pursue a transaction.  Tr. 238:21-239:18 (J. DeBlasio Direct).

101.    As the investors that Sagent contacted declined to complete a purchase, DeBlasio began to believe that he and Charron had different opinions about the value of SGH in the marketplace and the likelihood of completing a sale at the price range Sagent proposed—just as he had warned might happen in January.  Tr. 235:13-239:18 (J. DeBlasio Direct); *see also* Ex. H.

102.    On October 2, 2010, DeBlasio renewed his "buy-sell" proposal.  Ex. L.  He offered to purchase Charron's 50 percent of the company or to allow Charron to purchase his 50 percent for $26,250,000.  Ex. L; *see also* Tr. 286:9-287:20 (J. DeBlasio Direct).

103.    By late October 2010, only one potential third-party investor remained active in the sales process.  Tr. 239:5-18 (J. DeBlasio Direct).  When this final third-party investor withdrew its offer, DeBlasio and Charron turned their attention to negotiating a buyout of Charron's half of the company.  *See* Tr. 239:5-18, 241:5-22 (J. DeBlasio Direct).

104.    The Charron SPA was clearly not the result of duress or a compulsion to sell.  It was not a "forced sale" or a "bargain sale."  On the contrary, the Charron SPA was the end result of a long market process pursuant to which numerous third-party investors declined to purchase Sallyport.  Tr. 565:11-15 (Charron Cross), 1124:21-1125:18 (Smith Redirect).  Risius's assertion that the parties were under a compulsion to sell ignores all of the back and forth negotiations between the parties.  Tr. 1438:5-1442:3 (Risius Cross).  DeBlasio's proposals to enter a buy-sell agreement were frequently and consistently expressed.  Tr. 287:21-288:3 (J. DeBlasio Direct); 855:9-856:22 (Phelps Direct).  The "wind-down" option was not a threat levied by DeBlasio to extort Charron's agreement, but an option introduced by Charron as one of the potential alternatives to a third-party sale.  Ex. I.

g.      **Risius ignored the DC Capital Transaction as an
indication of value.**

105.    Risius takes the same skewed and obfuscatory approach to the indications of

value reflected in the negotiations with DCCP.  He identified the IOI that DCCP submitted in

August 2010 as one of the key "indications of value" that support the conclusion that SGH was

worth at least $103 million in June 2011.  Ex. 36; Ex. 98, App'x. 8 at 9; Tr. 1451:24-1452:23

(Risius Cross).  But he omitted the fact that DCCP withdrew its IOI in September 2010, Ex. 10;

the $50-$60 million offer that DCCP presented in September 2010, Ex. 10; the $57.5 million

offer that DCCP presented in January 2011, Ex. X; the $64.5 million offer that DCCP presented

in April 2011, Ex. Y; and the $64.5 million sales price reflected in the DCCP SPA, Exs. B, C,

132.

106.    Though the omissions are not explained in his expert report, Risius asserted at

trial that he omitted the DCCP offers because they were not a "cash equivalent for a hundred

percent of the company offer."  Tr. 1451:17-23; Tr. 1452:24-1453:23 (Risius Cross).

107.    The fact that DCCP's offers required a seller investment in Rollover Equity is not

sufficient grounds to disregard them.  First, Risius's trial testimony is inconsistent with the

documents.  Both of DCCP's 2011 offer letters propose to pay a fixed lump sum "to purchase all

outstanding stock of Sallyport on a cash free, debt free basis."  Ex. X, at JD1-00002632; Ex. Y,

at SGH1-00015000.  Of the $57,550,000 set forth in the January 2011 offer, for example,

$53,500,000 was to be paid "in cash at closing" and $4,000,000 was to be held back to secure

indemnification claims.  Ex. X at JD1-00002632.

108.    As to the rollover equity requirement, the January 2011 offer letter sets forth a

simple requirement:  "The current management *would purchase* up to 49.0%, but not less than

40.0%, of the reconstituted business on the same terms, conditions, and valuation as DC Capital

and other shareholders." Ex. X at JD1-00002632 (emphasis added). This was a requirement for current management "*to purchase*" stock in the acquiring business using a portion of the funds from the total price. It was not a statement that DCCP would be paying more or less consideration or an ambiguity that makes it impossible to use the top-line number.

109. It is common practice in the private equity industry to require the seller of a closely held company to purchase equity in the newly formed company. Tom Campbell testified that DCCP requires former owners to purchase equity interest in the new company to ensure a continuing interest in the company.

> Q. Why would D.C. Capital Partners require a seller to have an equity rollover interest in the new company that's formed.
>
> A. From my perspective it is an alignment of interest and it gives us more confidence in past performance and potential for future performance and it keeps a continuity amongst customers, employees. A good variety of reasons. Just, from my perspective, makes good business sense.
>
> [Tr. 591:3-9 (Campbell Direct).]

110. Finally, Risius's explanation is contradicted by his approach to the other indications of value his report identified. In his report, for example, Risius relied on an IOI from the Mustang Group ("Mustang") dated August 3, 2010. Ex. 98, App'x. 8 at 9 (citing Ex. 118). He neglected to mention, however, that Mustang's IOI stated that the purchase price would consist in part of "$20.0 million rollover equity to the Shareholders." Ex. 118 at SGH1-00005249. Risius cited Mustang's total proposed purchase price without expressing any reservations about the rollover equity component of the deal. *See* Ex. 98, App'x. 8 at 9. The only inference that can be drawn from Risius's different approach to DCCP's offer letters is that he was engaged in improper cherry-picking.

> **h.** **Risius ignored McLean's revised valuation of SGH for Charron's trust.**

111.     Risius's list of indications of value includes two figures developed by Andy Smith of the McLean Group. Ex. 98, App'x. 8 at 9.  The figures were drawn from business valuation reports prepared for Charron's use in his estate plan.  Tr. 441:15-442:14 (Charron Direct); Exs. 67, 99.  Risius's presentation imports undue weight to the first report, which Charron himself rejected as incorrect.

112.     McLean issued its first report on August 5, 2010.  Ex. 67.  It estimated the enterprise value of SGH at $99,542,777.  Ex. 67 at TCHAR0009539.  Andy Smith testified that the first report was incorrect because it was based on limited information provided by Charron's estate-planning attorney David Brown.  Tr. 1110:8-13 (Smith Redirect).

113.     Upon reviewing the August 2010 report, Charron reported to Brown that McLean's report was not correct.  Tr. 1110:13-15, 1115:13-23 (Smith Redirect).  Brown then provided Smith with additional information about the business of SGH and requested that Smith prepare a corrected report.  Tr. 1110:13-24 (Smith Redirect).

114.     McLean issued the second report on February 28, 2011.  Ex. 99.  Based on new information provided by Charron's counsel, the corrected report estimated SGH's enterprise value at $52,216,466.  Ex. 99 at 8.  Smith testified that the corrected report incorporated a "dramatically" better understanding of the risks facing Sallyport's business.  Tr. 1111:16-1112:4 (Smith Redirect).  The most important of these risks involved unique aspects of Sallyport's business in Iraq and Afghanistan:

> Q.     Could you describe what were the factors that influenced you in terms of increasing the specific company risk?
>
> A.     Again, valuing government contractors is very difficult. It's a unique, very unique type business.  And different government contractors have different values.  Their values

can range drastically based on qualitative value drivers; specifically, the contract backlog, the nature of the work you're doing, the nature of the contracts, the expected sustainability of the contracts and of the margins.

In this case, we had a staffing company with very little office overhead existence here in the U.S. that was staffing people in, in a war environment, where people were getting shot at and getting killed. We have other clients in similar space, and as we got to understand Sallyport more, we understood the risks that are involved to it.

Q.    Does the fact that Sallyport is performing services in Iraq and Afghanistan increase the risk of its future performance?

A.    Well, depends what the forecast of the future performance is, but it's, being a security guard in Baghdad is much more risky than being a security guard at Fort Campbell in Kentucky. There's different risk of environments, different competitive process. It's a different type of contract. It's a different profit level, and it's a different expectation of how long you'll be there. Iraq and Afghanistan, there's, even at that time, it was not a long term of us being there for 15 or 20 years. So you have to understand the nature of the work that they're doing.

[Tr. 1112:10-1113:11 (Smith Redirect).]

115.    Upon completing the revised report in February 2011, Smith orally rescinded the August 2010 report. Tr. 1110:13-24 (Smith Redirect). Smith's rescission of his report, the fact that the corrections to the report were based on information obtained from Charron, and the fact that Charron used the $52 million valuation opinion in his estate plan are not discussed in Risius's report. *See* Ex. 98, App'x. 8. Risius should have been aware of these facts, but there is no indication that he took them into consideration in his analysis.

### i.    Risius ignored the fact that actual cash proceeds received from the sale will never exceed $60 million.

116.    Risius's commitment to his guess as to what DeBlasio's Rollover Equity might have been worth is so strong that he ignores the real-world consequences of the DC Capital

Transaction, including the cash payments actually received and the May 29, 2013 settlement agreement liquidating the rollover equity.  Tr. 1480:4-13 (Risius Cross).

117.    On May 29, 2013, the parties to the DC Capital Transaction entered into a settlement agreement addressing all of the disputes that had arisen after the transaction.  Ex. AD; Tr. 107:6-14 (J. DeBlasio Cross), 336:17-339:3 (J. DeBlasio Direct).  Under the agreement, DeBlasio accepted $3.85 million in cash in exchange for mutual releases of claims to the $4 million Initial Holdback Amount and in exchange for relinquishing the Rollover Equity interest held by the Florida Business Trust.  *See* Ex. AD.  As a result of the May 29 settlement agreement, DeBlasio no longer holds any equity interest in KSI or its successor entities.  Adding the cash amount DeBlasio received to the cash payments DCCP made pursuant to the DCCP SPA establishes that DeBlasio's total proceeds from the sale of SGH are $49,960,262.05.  *See* Exs. 327, AD; Tr. 106:5-10 (J. DeBlasio Direct).  Thus, DeBlasio will never receive more than the $65 million "windfall" threshold even if no further indemnity obligations arise and all $10 million held in trust is released.

118.    Charron's skewed approach to this case is exemplified by Risius's decision to completely ignore these facts.  Though he was aware of the settlement agreement when he wrote his report, Risius testified that he "purposely did not place any weight and consideration" on it. Tr. 1457:11-14 (Risius Cross).  His report neglects to even mention the existence of the settlement.  *See* Ex. 98.  At trial, Risius testified that the fact that DeBlasio will never receive the $20 million Risius claims the Rollover Equity was worth is somehow not relevant to his analysis. Tr. 1456:19-1457:10 (Risius Cross).  When asked about the gap between the $103 million enterprise value posited in his expert report and the $49,960,262.05 that DeBlasio has received in cash so far, Risius could offer no explanation.  Tr. 1479:1-4 (Risius Cross).

41

**j.      Risius omits facts that conflict with his identification of guideline public companies.**

119.     Risius relied on the guideline public company method as an element of his valuation opinion.  But there are significant flaws with his approach.  Risius identified a group of public companies based on their Standard Industrial Classification code ("SIC code"), which identifies the type of work performed.  Tr. 1494:5-24 (Risius Cross).  But he declined to consider whether SGH or KSI had ever performed contracts under this SIC code.  Tr. 1495:9-1496:20 (Risius Cross).  Despite earning more than $1.7 million in fees for his work, Risius failed to conduct even basic research on the companies he selected.  *See* Tr. 1495:9-1496:20 (Risius Cross) (admitting that contract information for SGH and KSI would have been publicly accessible on the internet).  If he had done more than simply reprint summaries from an online database, he would have learned that the companies he chose are not comparable to SGH or KSI. *See* Tr. 1496:18-1497:25 (Risius Cross).

120.     The public companies identified by Risius are not comparable to SGH or KSI. See Tr. 1495:9-1496:20 (Risius Cross), 1722:13-1723:9 (Hitchner Direct).  They are distinctly different in size, revenue, number of employees, exposure to federal contracts generally and to contracts performed outside the United States, exposure to contracts in Iraq and Afghanistan, and exposure to contracts requiring the use of armed employees.  Tr. 1716:25-1723:9 (Hitchner Direct).

121.     AECOM, for example, is a $7 billion company.  *See* Tr. 1718:1-21 (Hitchner Direct).  The majority of its services are performed in the United States for a diversified group of government and commercial clients.  Tr. 1718:17-21 (Hitchner Direct).  Very few of its contracts are performed in war zones.  Tr. 1718:11-21 (Hitchner Direct), 1498:1-1503:4 (Risius Cross).  Fluor Corporation is also a multi-billion dollar company.  Tr. 1719:3-10 (Hitchner Direct).  Only

14.7 percent of Fluor's business comes from federal contracts.  Tr. 1719:3-10 (Hitchner Direct).

By contrast, almost all of KSI's business is derived from federal contracts.  Exs. 68 at

SALLYPORT003562, 476 at SGH1-00308327.  Fluor was 117 times larger than KSI.  Tr.

1719:3-10 (Hitchner Direct).

122.    All of the companies selected by Risius are inappropriate comparisons.  They all

have diversified business portfolios, perform work primarily inside the United States, and are

many times the size of KSI.  Tr. 1718:10-1722:12 (Hitchner Direct).  It was therefore

inappropriate to assume that these companies' EBITDA multiples could be used to value SGH or

KSI.  Tr. 1723:1-19 (Hitchner Direct).

### 2. Risius's use of a zero percent specific-company risk factor ignores unique risks faced by SGH and KSI.

123.    A major element of Risius's valuation opinion is his criticism of Andy Smith's

use of specific-company risk in the valuation opinions he prepared for Charron and DCCP.  Tr.

1709:16-19 (Hitchner Direct).  But even Risius recognizes that specific-company risk is a

subjective factor.  Tr. 1480:1-1481:2 (Risius Cross).  He agrees that specific-company risk calls

for the application of judgment, and that two appraisers looking at the same company might

reasonably come to a differently assessment.  Tr. 1481:2-8 (Risius Cross).  He agrees that his

criticism of Andy Smith's use of specific-company risk is just a difference of opinion.

Tr. 1481:20-23 (Risius Cross).  He agrees that his own opinion that the specific-company risk

should be zero is itself a judgmental decision.  Tr. 1483:20-1484:5 (Risius Cross).  He also

acknowledges that there are no treatises, reports, or studies that might provide a quantitative

basis for the assessment of specific-company risk.  Tr. 1481:24-1482:20 (Risius Cross).

124.    Even if a valuation was required, Risius's opinion as to specific-company risk

applicable to SGH and KSI was not persuasive.  KSI and SGH faced serious risks as a result of

doing business in Iraq, Afghanistan, and other remote and hostile areas.  Tr. 235:13-236:15

(J. DeBlasio Direct), 857:11-22 (Phelps Direct), 1114:3-15, 1126:20-1127:9 (Smith Redirect),

1138:11-1139:6 (Lake Direct), 1711:2-1716:16 (Hitchner Direct).

125.    John DeBlasio explained that the risks facing SGH and KSI were much greater

than those facing most companies, not only because the work was concentrated in Iraq, but

because the work itself was dangerous:

> So, again, the government undertakes operations in the event of a
> contingency, right, so it's not a permanent basing arrangement.
> It's there for a contingency, right, a short term.  And because we
> were very focused on contingency operations and because we had
> operations in a very dangerous place in Iraq—we had, during the
> course of my time, we had 23 people, we had 23 people killed.  We
> had 19 people pulled off a bus and summarily executed.  So this
> wasn't—you weren't playing tiddlywinks.  It was one of those
> types of businesses where people had to really swallow hard to get
> the hairball down.

[Tr. 235:14-24 (J. DeBlasio Direct).]

126.    Working in Iraq in 2010 and 2011 exposed SGH and KSI to the uncertainty

arising from the impending withdrawal of United States troops.  Tr. 225:5-226:10, 241:23-

242:22 (J. DeBlasio Direct), 857:11-22 (Phelps Direct).  As DeBlasio testified, "[a]t Sallyport

what we had was very short-term revenue profile.  Everything had a sunset around the end of the

presence in Iraq."  Tr. 207:14-16 (J. DeBlasio Cross).  Even Sallyport's contracts in other

locations served the United States government's efforts in Iraq.  Tr. 225:20-226:10 (J. DeBlasio

Direct).

127.    One third of SGH's revenue in 2011 was derived from a single subcontract with

KBR to provide firefighters in Iraq under the United States Army's LOGCAP contract.  Ex. 64 at

ALC00000165.  Projecting the effect of a drawdown in Iraq on these LOGCAP earnings

challenged investors' ability to foresee Sallyport's future revenues and, thus, to value the

company.  Tr. 602:16-603:8 (Campbell Direct), 632:13-633:14, 638:3-17 (Campbell Cross); *see also* Ex. 99 at 54.

128.   Investors frequently mentioned the risks associated with work in Iraq throughout the sales process Charron and DeBlasio conducted in 2009 and 2010.  Tr. 284:20-286:8 (J. DeBlasio Direct); *see also* Tr. 548:20-549:8 (Charron Cross).  Risius concedes that the risk derived from doing business in Iraq impacted potential investors' interest in SGH in 2010. Tr. 1430:7-21 (Risius Cross).

129.   Risius asserts that the risks were less severe in 2011 because there was more certainty as to when United States troops would be withdrawn from Iraq.  Tr. 1358:11-1359:3 (Risius Direct).  But the risks Sallyport faced perpetuated well into 2011.  Campbell and Lake testified that these risks affected their view of Sallyport prior to the transaction.  Tr. 631:22-633:14 (Campbell Cross), 1138:11-1139:6 (Lake Direct).

130.   Ultimately, these fears proved justified.  As Campbell testified, the LOGCAP contract ended sooner than expected and business in Iraq withered:

> A.   . . . I hate to say, in hindsight, I was right because there was no Status of Forces Agreement signed by Iraq, there was a full pullout, LOGCAP went pretty much away, and, you know, I don't like to say I was right, but, again, yeah, I disagreed with the report in terms of being as bold as it was, and expressed that to the banks and others.
>
> Q.   I'm really trying to figure out what was going on in your mind as of June 28, or thereabouts, when this transaction happened.  And I'm just trying to lock down the time that you received this report on May 23, 2011, did you disagree with the analysis from Spectrum that Sallyport appeared well positioned to make this shift?
>
> A.   I told you what I thought.  I said I thought in my judgment that on an adjusted-EBITDA basis, the company would be valued more around the $10 million EBITDA company, not a 27 or $35 million EBITDA company because there is a lot of risk in Iraq, the company was Iraq-centric, and that

> would be foolish for anybody to assert that, to just base it on that.
>
> One of the largest contracts that I mentioned before was a fire contract with KBR under a LOGCAP IDIQ, and it went away. And overnight, as you know, the company went from high 20s to, you know, again, 10 million.

[Tr. 632:6-12, 632:25-633:3 (Campbell Cross).]

131.     Risius's assignment of a company-specific risk factor of zero was unreasonable in light of the risks that DeBlasio, Campbell, and other witnesses described. Smith's testimony regarding McLean's judgment that KSI's business was more risky than average was far more credible in this context:

> Q.     Would it have been appropriate to use a negative specific company risk factor or a zero specific company risk factor for Sallyport or KSI?
>
> A.     Not for a company like Sallyport or KSI. The risk profile for this business is extremely risky, relative to, relative to your starting point. Your starting point for that risk factor, remember, there's the equity risk premium and the risk-free rate, and that basically reflects the risk of a Fortune 500 company, an average company. That's why then you have to reflect the risk of the industry, the risk of the company in the industry, and the risk of the forecast for the company. And all of those are risky in this situation. So that would yield an increase, that would, that would, that would tell the valuation analyst, you should reflect the specific company risk premium.

[Tr. 1126:20-1127:9 (Smith Redirect).]

> Q.     Is Sallyport more or less risky in terms of its business profile than the other guideline public companies that you looked at in your valuation report, in 2010?
>
> A.     I would say it's much more risky. The business is, the other guideline public companies have less risk. They're larger, significantly larger companies. They're much more diversified. They operate in the civilian world more. They also, I would say, do higher end services—pardon me. There's more know-how in some of the larger companies out there. For example, ManTech was one. ManTech's a relatively low-end government contractor, and they do a lot

46

of staffing work, but they also have proprietary technology.
They have the cyber security, diversified portfolio of
contracts.

[Tr. 1114:3-15 (Smith Redirect).]

132.   Defendants' expert agreed with Smith that the risks Sallyport faced as a result of

doing business in Iraq justified a significant specific-company risk factor:

Q.   Mr. Risius says that the only proper analysis of specific
company risk with respect to Sallyport and KSI is zero
percent.  Is that an appropriate assessment?

A.   No.

Q.   Why not?

A.   That doesn't make any sense to me at all. How can you put
zero percent on a company that primarily operates in
austere environments/war zones.  If you take a look at the
inputs to these models that we use, the vast majority of
those companies are not operating in war zones.  A lot of
them—most of them are U.S.-based, particularly the
smaller ones.  And so you have to adjust for that.
Otherwise, if you use a zero specific company risk in a
valuation of KSI, or Sallyport, your assumption is every
other company that you relied on operates in a war zone,
operates in an austere environment.  I don't think—you
know, I don't think IBM is necessarily doing that. I don't
think IBM has employees carrying guns.  So I can go
through a whole list of companies that make up these
inputs, you know, make up these indexes that we use in our
models, and we all use the same information.  So in my
mind, zero percent specific company risk would equate to
everybody operates in a war zone.  Everybody operates
with, you know, thin management.  Everybody operates
with lack of diversification and so on.  So I think Sallyport
and KSI deserve a significant—and I said that in my
report—a significant specific company risk premium.

[Tr. 1712:13-1713:13 (Hitchner Direct).]

133.   As with his approach to real world indications of value, Risius's approach to

specific-company risk is plagued by cherry-picking.  Risius cites the McGladrey audit report and

uses the audited financial statements prepared by McGladrey in his own analysis.  Tr. 1485:25-

47

1486:20 (Risius Cross).  Risius agrees that McGladrey is a reputable accounting firm with an arm's-length relationship with DCCP.  Tr. 1493:20-1494:4 (Risius Cross).  But his report omits any reference to the fact that McGladrey found a high rate of specific-company risk reasonable. Tr. 1484:5-1486:20 (Risius Cross); *see also* Ex. CK.

134.    Risius agrees that McGladrey performed a fair value assessment of the Rollover Equity in accordance with GAAP.  Tr. 1489:9-19 (Risius Cross).  His report actually quotes McGladrey's Record of Consultation Memo summarizing its fair value assessment, but the quotation omits the language reflecting McGladrey's conclusion that "the final rollover equity value totaled $3,734,841."  Tr. 1487:11-1488:18 (Risius Cross); *Compare* Ex. 49 at McGladrey00001666, *with* Ex. 98 at 9, ¶ 27.  Risius also omitted McGladrey's conclusion that the total purchase price was $64,413,000.  Tr. 1491:18-1493:19; *see* Ex. 49.  These were not just editing mistakes.  Risius admits that he made the decision to omit McGladrey's conclusions from his report.  Tr. 1487:11-1488:18 (Risius Cross).

### 3.    Risius acted as an advocate, not an objective expert.

135.    Risius's role as an advocate for the Charron's cause extends far beyond selective presentation of facts to support his opinion.  Risius not only provided expert testimony, but trained plaintiff's counsel.  Tr. 1401:1-18 (Risius Cross).  He developed theories of the case. Tr. 808:9-24 (Charron Cross).  He helped define the questions that would be put to him and those that would be presented to Charron's other expert, Daniel Selby.  Tr. 1407:3-8 (Risius Cross). He determined which third parties would receive subpoenas and the documents that would be requested.  Tr. 1421:17-19, 1422:2-8 (Risius Cross).  His firm managed the documents collected in discovery, receiving the documents from third parties and operating the electronic database. Tr. 1402:22-1403:8 (Risius Cross).

136.     Risius prepared questions for each of the depositions Charron's counsel took.  Tr. 1403:9-18 (Risius Cross); *see also* Tr. 811-2:10 (Charron Cross).  He was frustrated when counsel did not ask questions properly or follow up when needed and wished that he could have posed the questions himself:  "I recall wishing that I could ask the questions so that I could get the answers that . . . that counsel didn't understand what he was saying or he didn't ask the question in the right way."  Tr. 1405:9-17 (Risius Cross).

137.     The hours devoted to this case and the fees Risius's firm charged highlight just how far over the line Risius went.  Risius testified that he performs up to 120 business valuations per year, spending only two hours on a significant number of those valuations.  Tr. 1396:15-21, 1398:2-12 (Risius Cross).  By contrast, Charron paid McLean less than $15,000 for the two business valuation opinions Andy Smith prepared in 2010 and 2011.  Tr. 559:24-560:3, 806:23-807:7 (Charron Cross).

138.     Risius personally spent more than 700 hours on this case.  Tr. 1299:6-8 (Risius Direct).  At $625 an hour, charges for Risius's personal time likely exceed $450,000.  *See* Tr. 1299:4-10 (Risius Direct).  Through the beginning of June 2014, Stout Risius & Ross had been paid at least $1.7 million for its work on this case, a fee that vastly exceeds the typical charges for a business valuation.  *See* Tr. 1524:1-4 (Risius Cross).  Including the additional time Risius and his associate Brian Hock spent preparing for and attending the trial in August, the fair inference is that Stout Risius & Ross will charge fees of more than $1.8 million.  *See* Tr. 1400:1-8 (Risius Cross).

139.     Stout Risius & Ross charges by the hour, but their timesheets do not distinguish between Risius's services as an expert witness and their litigation management.  Tr. 1400:19-25, 1402-5-1403:10 (Risius Cross).  Risius's junior associate Brian Hock devoted more than half of

his time on the case directly to supporting the litigation.  Tr. 1401:19-1402:4 (Risius Cross).

Hock attended all of Charron's fact depositions and sat at counsel's table throughout the trial.

Tr. 1394:15-25 (Risius Cross).  Risius is not aware of whether Hock holds any credentials in

business valuation.  Tr. 1395:13-15 (Risius Cross).

**IV.    Excess cash distributed to shareholders before the DC Capital Transaction
was not "proceeds" of any third-party sale.**

140.    Charron's experts identified a kitchen sink of pre-sale cash transfers and

investments they claimed were part of the sale—even though no third party paid for any of them.

These items included:  (i) a $23,400,000 donation by SGS of its retained earnings to the

Bermuda Charitable Trust; (ii) a $5.7 million distribution from SGI to its sole member, the

Florida Business Trust; (iii) a $14 million contribution from the account of the Bermuda

Charitable Trust to the Florida Charitable Trust; and (iv) three loans assigned to WD Solutions, a

Mauritius entity affiliated with DeBlasio.  Although he abandoned these claims at trial,

Charron's expert Daniel Selby also asserted in his report that DeBlasio had also received a $3.5

million bonus and loan forgiveness of more than $5 million.

141.    There is no factual support for Charron's position, which amounts to nothing

more than an effort to inflate the value of the DC Capital Transaction by labeling these

disbursements as "proceeds" arising from "related transactions" or assets that should be included

in a recapitulation of SGH's "enterprise value."  Presale disbursements of retained earnings and

the assignment of non-operational investments to entities affiliated with the sellers have no effect

on the "enterprise value" reflected in the DC Capital Transaction, and the dollar amounts

involved are not "proceeds" of the sale.

### A.    Excess cash distributed to shareholders before the DC Capital Transaction was not "proceeds" of any third-party sale.

142.    Charron's attempt to claim a portion of the cash transferred to shareholders prior to the DC Capital Transaction as "proceeds" of the sale is unsupported by evidence.  The presale cash transfers Charron identifies were independent uses of retained earnings that were already the property of the shareholders and not purchased by DCCP.  *See* Tr. 1672:9-24 (Hitchner Direct).

143.    As the DCCP offer letters confirm, the acquisition of SGH was to take place on a "cash free, debt free" basis.  Exs. X, Y.  Cash held by SGH and its affiliates in excess of the minimum working capital specified in the DCCP SPA was "excess cash."  Tom Campbell of DCCP testified at trial that cash-free, debt-free meant that any excess cash was not DCCP's concern:

> Q.    Did you have an understanding or did D.C. Capital Partners have an understanding as of the time of the acquisition of Sallyport about Sallyport's disbursement of cash prior to the sale?
>
> A.    I don't understand.  Cash free/debt free.  None of my business.
>
> [Tr. 600:18-23 (Campbell Direct).]

DCCP's Doug Lake testified that DCCP had no interest in purchasing cash in this transaction or any other:

> Q.    Did it at any point in your discussions with Mr. DeBlasio come up that there was a proposal to sell the cash with the business?
>
> A.    Yes.
>
> Q.    What's your recollection of how that happened?
>
> A.    It was suggested to us by Mr. DeBlasio or his counsel, and we had zero interest in doing that.
>
> Q.    Why?

A.    We're not in the business of buying cash.  No interest.

. . .

[Y]ou know, what are we going to do with cash sitting in a bank account offshore?  Why would we want to buy cash sitting in a bank account in Bermuda that, if we were to repatriate, we would have to pay taxes on?  A whole list of reasons.  No interest in having cash in an international account for international purposes.  Just no real business, business reason.

Q.    In your experience, is it typically your practice to purchase companies in deals like this without cash, excess cash?

A.    Always.  All of our transactions are always cash-free, debt-free, and that's pretty much typical of the private equity business.

Q.    What typically happens to the cash, if there is excess cash, before your deal?

A.    The cash is owned by the owner of the business.  They have generated that cash by operating the business efficiently.  It's their money to take with them at that point in time when new ownership steps in.

[Tr. 1147:16-1148:21 (Lake Direct).]

144.    In its final form, the DCCP SPA required the sellers to retain a Target Minimum Working Capital amount of $22 million at closing.  Ex. B at SGH1-00013902.  Except for the minimum working capital required by the DCCP SPA, DCCP expected SGH to disburse cash and other investments that were not required to operate SGH's business before closing.  Tr. 1147:16-1148:21 (Lake Direct).

145.    DCCP's decision to invest on a cash-free, debt-free basis was consistent with practice throughout the private equity industry:

But very few deals that I've been involved with or that I've seen do they sell cash.  Have there been some deals where I've seen some cash component used?  Yes.  It's not very common, and it's usually based on some tax strategy that a tax attorney or a tax accountant—and I'm not either one of those.  I'm not a tax accountant.  I'm not a tax attorney.  I don't know why they do

52

> what they do.  But the majority of the transactions that I've been
> on are indeed usually cash-free/debt-free.

> [Tr. 1671:25-1672:8 (Hitchner Direct).]

Even Charron business valuation expert Jeffrey Risius acknowledged that the majority of stock

sales are conducted on a cash-free, debt-free basis, and that it is common in such transactions for

the owners to disburse excess cash prior to the sale.  Tr. 1412:17-1413:4 (Risius Cross).

146.    As Charron and DeBlasio had planned to do in 2009 and 2010, and as expected by

DCCP, SGH disbursed cash and other non-operating investments in excess of the Target

Minimum Working Capital before the June 29, 2011 closing.  Tr. 87:9-25 (J. DeBlasio Cross),

713:21-714:2 (Charron Cross), 1147:16-1148:21 (Lake Direct).  SGS donated an aggregate

amount of $22,884,886 to the Bermuda Charitable Trust.  Ex. 210; *see also* Tr. 1835:1-14 (P.

DeBlasio Direct).  The Florida Business Trust received $5,786,507.  Tr. 1835:22-1836:7 (P.

DeBlasio Direct); *see also* Tr. 170:3-15 (J. DeBlasio Cross).  All of these disbursements were

drawn from Sallyport's operating profits, not payments from DCCP.  Tr. 1831:13-19, 1836:21-

1837:1 (P. DeBlasio Direct).

147.    These disbursements to shareholders were normal in the context of a cash-free,

debt-free transaction because the cash the buyer did not purchase already belonged to the

shareholders:

> Q.    When you use that phrase cash-free/debt-free—and we've
> heard lots of testimony about it in this case—what does that
> mean in the context of business valuation?

> A.    Well, the cash that's already been earned, the cash that's
> already been earned is owned by the current owner.  It's his
> or her cash.  It's the company's cash.  In this case a single
> owner would be Mr. DeBlasio.  It's his cash through his
> corporation.  And when an owner—or when a potential
> buyer comes in, they want to buy the future.  They want to
> buy the present value of the future cash flows going
> forward.

So the retained earnings, the cash that's already been earned, you know, up to the valuation date is seldom part of the deal and it's—sometimes there is some working capital, because working capital, you've got to have a certain percentage of working capital when you do the deal that's fairly normal as well.

[Tr. 1672:9-24 (Hitchner Direct).]

Even Charron's expert Jeff Risius agreed on this point:

Q.   And you've done how many valuation opinions in connection with transactions like the one we have here?  In other words, stock purchase transactions.

A.   A lot.

Q.   How many are cash free/debt free?  What percentage?

A.   You mean in terms of the actual deal terms?

Q.   Yes.

A.   I don't have a percentage.  I'd say they're the majority.

Q.   And in those transactions it's common for the selling owners to disburse cash that's not being purchased prior to the sale, right?

A.   Yes.  In those transactions where it's structured as a cash free/debt free basis, that's true.

[Tr. 1412:17-1413:4 (Risius Cross).]

148.    Nothing about the timing of the disbursements was unusual or indicative of an effort to defraud Charron.  As Defendants' expert Jim Hitchner explained, business owners typically make arrangements to remove non-operating assets like excess cash in the days before a closing:

The other thing about this, too, is the transactions I've been involved with that I've seen done, an awful lot of things happen in the few days before the transaction takes place.  I've been involved in transactions where the owners are doing charitable things, they're doing—gifting stuff to their kids, they're doing all kinds of things with the money that's available.

So the fact that this is happening in proximity is pretty normal to me.  I mean, you know, you're going to do it cash

free/debt free.  So you've got to get the money out.  So you've got
to hire accountants, you've got to hire lawyers if you want to do a
lot of this stuff that he's doing, particularly the charitable stuff, and
get the money out.

[Tr. 1680:10-22 (Hitchner Direct).]

149.    Cash disbursed to the shareholders cannot be considered "proceeds" of the DC

Capital Transaction under the Windfall Protection provision of the Charron SPA.  Consistent

with the sellers' disclosures to DCCP, the donation to the Bermuda Charitable Trust and the

disbursements to the Florida Business Trust were not third-party transactions as the Windfall

Protection provision would require.  Ex. A § 2.04.  The amounts transferred to the trusts were not

consideration in a sale of the company's stock or assets.  This money was earned by SGH and

SGS for the benefit of their shareholders and was properly disbursed prior to the sale.  Tr. 87:9-

16 (J. DeBlasio Cross).

### B.    Charron's expert incorrectly identified several transactions.

150.    Selby's testimony as a forensic accountant was not helpful.  His assertion that the

contributions to the Bermuda Charitable Trust and the Florida Charitable Trust should be

considered "proceeds" because they were "related" to the DC Capital Transaction is inconsistent

with the terms of the Charron SPA, the DCCP SPA, and with Charron and DeBlasio's

understanding that excess cash would be disbursed prior to any cash-free, debt-free sale.  His

opinions on this point amount to improper legal argument that should not be considered.

151.    In addition, Selby failed to identify any disbursements beyond those that John and

Pat DeBlasio described.  Indeed, the evidence at trial showed that several of the transactions that

Selby identified as "proceeds" of the DC Capital Transaction were not payments at all.  One

transaction was a movement of cash from one DeBlasio account to another.  The other two

"transactions" never happened at all.

152.    First, Selby incorrectly identified a $14 million payment to the Florida Charitable Trust based on an ambiguous statement in the Trust's tax return.  *See* Ex. 353.  Selby chose to disregard the two bank statements showing that the $14 million was not a new payment from DCCP, but a transfer of funds from the Bermuda Charitable Trust's account to the Florida Charitable Trust.  *See* Exs. 276, 299.

153.    DeBlasio explained at trial that the $14 million identified on the return was a transfer to the Florida Charitable Trust of part of the cash purchase price originally paid to the Bermuda Charitable Trust.  Tr. 215:5-20; 218:5-24 (J. DeBlasio Cross).  The money was moved from one charitable trust to the other to fund activities in the United States.  Tr. 341:10-343:2 (J. DeBlasio Direct).  No $14 million payment was made by DCCP to any DeBlasio-affiliated entity.  Tr. 218:14-24 (J. DeBlasio Cross), 1838:9-1840:2 (P. DeBlasio Direct).

154.    Second, Selby admitted that his opinion regarding two of the transactions he had called proceeds of the transaction was not correct.  Tr. 1594:1-1598:6 (Selby Direct).  Though they appeared in his expert report and were emphasized in Plaintiff's Pretrial Memorandum, these amounts were literally crossed out at trial.  *See* Ex. 405(f) (as amended at trial).

155.    Third, Selby ignored an important source of information about the precise amounts that were disbursed—the McGladrey audit workpapers.  McGladrey identified the date and the exact dollar amounts of the disbursements to the Bermuda Charitable Trust totaling $22,884,886.  Ex. 210.  Selby relied instead on DeBlasio's rounded-off statement from memory, and "assumed" McGladrey was consistent.  Tr. 1633:19-1635:10 (Selby Cross).

**C.    Loans assigned to WD Solutions were not "proceeds" of the sale and were not part of the "enterprise value" acquired by DCCP.**

156.    Charron's effort to recapture the value of three loans assigned to DeBlasio and excluded from the DC Capital Transaction is similarly not supported by the evidence.  The

sellers received no consideration for the loans in the DC Capital Transaction and the loans were transferred to a DeBlasio affiliate.  The loans were not operating assets of SGH and are not properly included in the "enterprise value" of SGH.

157.    SGS assigned the rights associated with three loans to WD Solutions prior to the closing of the DC Capital Transaction:  (a) a $700,000 loan to Bernardo Garcia Manzano made on November 28, 2008, Ex. 17; (b) a revolving loan to Arkel Sallyport Global, Ltd. ("ASG") made on April 11, 2011, Ex. 23; and (c) a factoring agreement signed on May 23, 2011 under which SGS earned a fee in exchange for advancing cash to be repaid with receivables due to Power Generation Solutions ("PGS") on a project in Afghanistan, Ex. 91.

158.    The assignment to WD Solutions was not a third-party sale of Sallyport's assets within the scope of the Windfall Protection provision.  *See* Ex. CG.  WD Solutions was a Mauritius company under DeBlasio's control.  Tr. 45:13-20 (O'Connor Direct), 89:1-9 (J. DeBlasio Direct); Ex. 132 at SGH1-00039943.  DeBlasio signed the assignment agreement for both SGS and WD Solutions.  Ex. CG at JD1-00000704.  As McGladrey concluded in its audit of the DC Capital Transaction, the assignment was properly treated as a distribution to DeBlasio. Ex. 210.  There is no meaningful distinction between this distribution and the distributions of cash that Charron anticipated in 2010.

159.    The assignment to WD Solutions cannot be considered part of the enterprise value that the DC Capital Transaction price reflects.  The loans were specifically discussed in the negotiations leading to the DC Capital Transaction.  Ex. CD; Tr. 1155:25-1162:3, 1178:25-1180:5 (Lake Direct).  DeBlasio and DCCP partner Doug Lake agreed that the loans could not be considered operating assets of SGH and that they should be excluded from the transaction.  Tr. 1178:25-1180:5 (Lake Direct).  Through these arm's-length negotiations, DCCP agreed that the

loans were investments of retained earnings and that they were not part of SGH's business.  Tr. 1161:13-1162:3, 1178:25-1180:5 (Lake Direct).

160.    As Doug Lake explained, DCCP had no interest in buying the loans for the same reason it did not want to purchase cash:

> Again, given the cash-free, debt-free nature of the transaction that we proposed, we weren't interested in buying these, no interest in being in the business of lending money to people that we didn't know, etc., which is why we did not want to retain it through the transaction.  So, you know, we did not obviously—you know, these were not part of the purchase.

> [Tr. 1158:6-11 (Lake Direct).]

161.    The fact that the loans were assigned to WD Solutions rather than transferred as part of the sale is confirmed by the disclosure schedules to the DCCP SPA.  Ex. 132 at SGH1-00039943.

162.    The reasonableness of the parties' conclusion that the loans were non-operating assets that were properly excluded from the sale is also supported by the facts.  DeBlasio testified that the loans were investments that had no effect on the operation of Sallyport's business:

> Q.    Was there any operational role for Sallyport in connection with those [loans]?

> . . .

> A.    No.  I had a noncompete, so there was no consideration that there was any operational role for Sallyport in conducting these loans.  The transfer of the loans to a third-party entity did not affect operations of Sallyport in any way.  Post transaction, we were—there was no effect, so post transaction, the third-party loans were third-party loans to those two entities held by WD Solutions, so they had no operational impact whatsoever.

> [Tr. 344:1-12 (J. DeBlasio Direct).]

Several other witnesses agreed that the loans were non-operating assets.  Tr. 1179:13-1180:5

(Lake Direct), 1676:19-1677:22 (Hitchner Direct), 1844:13-1846:3 (P. DeBlasio Direct).

163.    All three loans were opportunistic investments of Sallyport's overseas earnings.

Tr. 141:20-149:22 (J. DeBlasio Cross), 1157:12-15, 1158:12-1159:3 (Lake Direct).  Rather than

disbursing excess cash to the shareholders, it was used to fund investments for the benefit of the

shareholders.

164.    Charron admitted that "Sallyport didn't have a loan business."  Tr. 544:19-22

(Charron Cross).  Indeed, Sallyport was never a bank and lending was never a core part of

SGH's business.  *See* 542:19-552:2 (Charron Cross); Ex. 68.

### 1.    The Manzano loan was not a "proceed" of the DC Capital Transaction.

165.    SGS issued an interest-free loan in the principal amount of $700,000 to Bernardo

Garcia Manzano on November 25, 2008.  Ex. 17.  The loan was secured by real property in

Puerto Vallarta, Mexico.  Ex. 17.  The loan was not part of Sallyport's business.  Its purpose was

to fund construction of a house in Mexico.  Tr. 159:24-160:22 (J. DeBlasio Cross).

166.    The Manzano loan was not a proceed of the DC Capital Transaction.  SGS

assigned the Manzano loan to WD Solutions on June 28, 2011; both companies were affiliated

with DeBlasio.  Ex. CG.  No consideration changed hands, as DCCP did not purchase the loan.

Tr. 1162:9-22 (Lake Direct).

167.    Selby's testimony that the Manzano loan should be treated as proceeds because

the assignment was effectuated after the May 6, 2011 signing of the DCCP SPA was

nonsensical.  Selby based his opinion on provisions of the DCCP SPA that protected DCCP in

the period before the closing.  Tr. 1583:19-1584:18 (Selby Direct); *see* Ex. C at §§ 4.2, 4.3, 6.8,

6.10.  Nothing about the DC Capital Transaction remotely suggests that Charron was a third-

party beneficiary of these provisions, and nothing in the Charron SPA restricted DeBlasio from assigning the loan.

### 2. The ASG loan was not an operating asset.

168.    ASG was a joint venture between SGS and Arkel International ("Arkel") formed to pursue business in Africa.  Ex. AW; Tr. 479:20-480:14 (Charron Direct).  The ASG loan transaction occurred in April 2011, when SGS agreed to provide a revolving loan to finance Arkel's participation in the joint venture's work in Southern Sudan.  *See* Ex. 23.

169.    Although SGS was half of the joint venture, it extended credit to ASG as a third party to fund Arkel's half of the joint venture's working capital:

> Q.    The party to the joint venture agreement is Sallyport Global Services Ltd., correct?
>
> A.    Correct.
>
> Q.    That's the party that made the loan that was assigned to WDS Solutions [*sic*], correct?
>
> A.    That's correct.
>
> Q.    So there is no third party making a loan, Mr. DeBlasio, is there?
>
> A.    The ASGS is a second, is an independent entity.  It's a joint venture between two companies.  Arkel didn't have cash to put into the business, so we backstopped Arkel's portion.
>
> [Tr. 146:3-22 (J. DeBlasio Cross).]

170.    The ASG loan was not an operating asset of SGS.  Arkel guaranteed the loan independently of ASG's commitment to repay SGS.  Ex. 23 at Arkel 000039.  Thus, unlike a working capital investment in its own share of the JV's operations—which would only be profitable if the joint venture itself was profitable—SGS maintained a right to repayment of the ASG loan regardless of whether the joint venture's operations were successful.

171.    Rather than an operating asset that would be used to continue SGS's core functions, the ASG loan was strictly an investment of cash that SGS had already earned.  Funds

extended to ASG were drawn from the retained earnings of SGS.  Tr. 145:4-6 (J. DeBlasio Cross).  As Charron was aware in 2010, excess cash of the kind used to finance the ASG loan would otherwise have been disbursed to the shareholders prior to a third-party sale.  *See infra* Part II.D.

172.    On June 28, 2011, the loan agreement with ASG was assigned to WD Solutions so that repayment of the investment would continue to accrue to the sellers as if it had been distributed.  *See* Ex. CG.  Other than the risk of nonpayment, there is no practical difference between the assignment of a loan and a disbursement of cash.  Tr. 343:3-12 (J. DeBlasio Direct).

173.    Charron asserted at trial that SGS's overseas cash had strategic uses.  Tr. 480:15-25 (Charron Direct).  Although Charron's testimony generally deserves little credibility, accepting his testimony on this point would not convert cash or cash equivalents into operating assets.  Charron admitted that it was up to the shareholders to decide what to do with the cash.  Tr. 715:19-716:3 (Charron Cross).  DeBlasio was free to reinvest in the company's operations or to distribute the cash prior to the sale of the business.

174.    Charron's testimony that the joint venture was used to expand Sallyport's reach outside of Iraq, Tr. 488:8-489:7 (Charron Direct), is also unpersuasive.  Assignment of the ASG loan had no effect on the operation of the joint venture, which continued its work after the transaction closed.  Tr. 344:1-12 (J. DeBlasio Direct), 1160:2-15 (Lake Direct).  The joint venture agreement defining SGS's operations with Arkel in Southern Sudan was sold with the company and transferred to the buyer.  *See* Exs. AW, CD at JD1-00014352.  The loan agreement, by contrast, did not call for any operational input from SGS or from WD Solutions following the assignment.  *See* Ex. 23.

175.     Risius ignored the distinction between the operating agreement for the joint

venture and the ASG loan that was assigned to WD Solutions.  *See* Tr. 1314:25-1315:13 (Risius

Direct).  This distinction formed the basis of Lake and DeBlasio's agreement on the treatment of

these assets.  *See* Tr. 1179:13-1180:5 (Lake Direct).

176.     Moreover, Risius ignored the unusual nature of the underlying joint venture as

compared to Sallyport's core lines of business.  Sallyport's core businesses were operations and

management, security, fire and emergency services, and food and hospitality services.  *See* Ex.

68 at SALLYPORT003538; Tr. 545:7-547:5 (Charron Cross).  Construction made up less 0.3%

of Sallyport's 2010 revenue.  Ex. 68 at SALLYPORT003538.  None of Sallyport's contracts was

for the provision of engineering or construction services.  *See* Ex. 68 at SALLYPORT003540;

*see also* Tr. 547:14-549:10 (Charron Cross).  In this context, even the joint venture's

construction contract to build a hospital was not a core business asset.  The loan agreement that

financed it is even more remote.

### 3.     The loan to PGS was not an operating asset.

177.     SGS made a second investment of retained earnings in May 2011 when it entered

into a factoring agreement to finance PGS's work on a power project in Afghanistan in exchange

for a fee.  *See* Ex. 91.

178.     As with the loan to ASG, the funds extended to PGS were retained earnings of

SGS, which would otherwise have been disbursed to the sellers prior to the DCCP SPA closing.

DCCP viewed the loan as a non-operating asset that would not be purchased in a cash-free, debt-

free transaction.  Tr. 1157:7-1158:11 (Lake Direct).

179.     Like the loan to ASG, the factoring agreement with PGS was assigned to

WD Solutions on June 28, 2011, so that repayment of the investment of SGS's retained earnings

would continue to accrue to the sellers as if it had been distributed instead of invested.  *See* Ex. CG.

180.    Neither SGS nor WD Solutions played an operational role on the power project. Although SGS and PGS discussed the possibility of using an SGS employee ("full-time equivalent" or "FTE") at the power project, this element was rejected and the final agreement was strictly a financial investment.  *Compare* Ex. 45 (interim agreement), *with* Ex. 91 (final agreement); *see also* Tr. 149:25-150:11 (J. DeBlasio Cross).  DeBlasio assured DCCP that, if any operational role for SGS was identified in the future, the right to that participation would belong to SGS independently of the factoring arrangement.  Ex. CJ at SGH1-00119508-09.

181.    In coming to his conclusion that the PGS loan was an operating asset, Risius relied on his assumption that the FTE slot was included in the deal, but he never reviewed the final agreement to find out.  *See* Ex. 98, App'x. 1 (List of Documents Considered); Tr. 1316:20-1317:16 (Risius Direct).  Risius's opinion on this matter cannot be credited because it is based on multiple faulty assumptions.

### D. Charron's claim to the cash and loans conflicts with the parties' understanding of "enterprise value" and with their expectations as to the disbursement of retained earnings.

182.    In addition to the absence of evidence supporting Charron's claim to excess cash and assigned loans, his claim conflicts with his usage of the term "enterprise value" in the Charron SPA and in earlier discussions between Charron and DeBlasio.  Charron understood the term "enterprise value" to exclude cash and non-operating investments.  He understood that it was the shareholders who would decide what to do with excess cash and other non-operating investments.  Charron and DeBlasio understood that a cash-free, debt-free transaction was almost inevitable if a sale was to occur at all.  In that case, they expected that excess cash and other non-

operating investments would be disbursed prior to the sale.  *See* Tr. 713:21-714:2 (Charron

Cross).

183.     In 2009 and 2010, Charron, DeBlasio, and their advisors frequently discussed

how excess cash would be treated in a sale of the company during the market process that

culminated in the Charron SPA.  DeBlasio explained that the consensus was that it was up to the

Sallyport shareholders what to do with the money once it was earned:

> Q.     Who made the decision about whether to distribute the cash
>          or to keep it in the bank account outside the U.S.?
>
> A.     Tom and I.
>
> Q.     Because you were the shareholders or because of some
>          other reason?
>
> A.     Because we were the shareholders and because we ran the
>          company.
>
> [Tr. 305:21-306:2 (J. DeBlasio Direct).]

Charron did not dispute this:

> Q.     You expected that you and John DeBlasio would make a
>          disbursement of cash in 2010, didn't you?
>
> A.     I think we, we had talks with buyers.  Some wanted to buy
>          the company with cash.  Some wanted to not buy it with
>          cash.  Some wanted to buy some of it.  So we made an
>          agreement that what a potential buyer did not want, we
>          would issue as a dividend to shareholders.
>
> [Tr. 713:21-714:2 (Charron Cross).]

184.     Charron's emails confirm this understanding.  On January 5, 2010, Charron asked

DeBlasio and Glenn Corliss, a consultant retained to help sell the company, to clarify "what

assets and their amounts are conveyed as part of the sale" in connection with a proposal to sell

the company at a $64 million enterprise value.  Ex. F.  Corliss responded to Charron by

explaining that the term "enterprise value" excluded excess cash on the books and that Charron

would be free to take half the excess cash in addition to the purchase price:

<u>Pricing</u>: Keep in mind Chart offered $60 million enterprise value. We countered with $64 million.  They have yet to accept or decline this.  I suspect they'll come back at us splitting the difference at $62 million, but that's just a guess.

<u>What assets convey</u>: All of them, except for . . . excess cash - pretty much all of the $35 million that John outlines below would be distributed to you and John personally before the transaction is consummated.  That money is NOT counted in the $64 million enterprise value.  So, you get half of $64 million plus half the cash.

[Ex. F.]

Charron received Corliss's explanation that excess cash would be distributed to the shareholders and would not be included in the enterprise value measure of Chart's offer, and he did not object. *See* Ex. F; *see also* Tr. 302:8-15 (J. DeBlasio Direct).

185.    Charron adopted the same position with respect to excess cash when Sagent took over the marketing process later in 2010.  On July 28, 2010, Charron told Sagent and DeBlasio that SGH would be "issuing a dividend pre-sale" if a buyer's price did not include additional compensation for cash remaining on the books.  Ex. BG.

186.    Charron distinguished between enterprise value and cash again on November 1, 2010 when he sent an email to SGH's advisors seeking advice on whether a sale of "the company for $124M *($90M enterprise value plus 85% value of $40M excess cash on the books)*" would be "a strategy that benefits both buyer and seller."  Ex. BJ (emphasis added).  After some discussion, Charron wrote a week later, "[i]t is looking like the only option is some mix of bonus and dividend pre-sale."  Ex. BK.

187.    Charron confirmed that excess cash was distinct from enterprise in negotiations relating specifically to the Charron SPA.  When DeBlasio proposed a reciprocal buy-sell agreement in October 2010, he told Charron:

I would be willing to sell my shares and rights in the company *(net of the investments, cash, and equivalents currently in the company)*

for $26,250,000 thus implying an enterprise value for Sallyport of $52,500,000.

[Ex. L at SGH1-00002858 (emphasis added).]

Charron rejected DeBlasio's offer at the time, noting that he hoped to get more for his shares and, separately, that the company "continue[d] to churn out impressive amount of cash flow." Ex. L at SGH1-00002857.

188.    When discussion turned to the Charron SPA, Charron clearly understood that the basis of the price was a $50 million enterprise value for the shares plus a portion of the cash on hand.  *See* Exs. BM, 370.

189.    On November 30, Charron counteroffered seeking "a $60M valuation" and "a windfall provision if you flip the company in three years."  Ex. R at SGH1-00229840.  He admitted at trial he was using the term "valuation" to capture the price of the stocks, separate from the cash component of the sale:

> Q.    You are using the phrase "$60 million valuation," right?
>
> A.    Yes.
>
> Q.    So you are using the term "valuation" the same way John used it in his prior e-mail communications, right?
>
> A.    Yeah.  He was kind of saying, you know, half of 50 and half the cash.  I was saying, okay, can we go up, half of 60 and half the cash.  It was just a negotiation trying to get the purchase price up.

[Tr. 740:3-10 (Charron Cross).]

190.    Charron reiterated his understanding that the price was composed of $25 million for the shares and a separate amount of the retained earnings on December 3, 2010:

> We also need to agree on that price which stands at $25M plus Y = Z.  Since I do not have access to any company financials I have asked Peter to run a cash flow statement for me to determine what is reasonable and fair for the Y.  We should be generating over $1.7M+ in operating profits (cash) a month based on what you are showing the banks and what Pat sent sent me yesterday for draft

October 31st lst Qtr financials without aging reports does not
support that.  I know this is a stock sale but I look it as more as an
amicable divorce where we split the sheets (assets minus liabilities
= Y) as of a certain date and you get all of the future value of the
brand, past  performance, infrastructure, ongoing contracts profits
etc for the 25M.  We add 25M to Y to get Z which is the stock
purchase price.

[Ex. BM at JD1-00006675.]

191.    Charron's trial testimony, in which he attempted to deny the plain inferences from

his own documents and characterize them as including excess cash as a component of "enterprise

value" was nonsensical, evasive, and inconsistent with the evidence in the record.

192.    When asked about receiving advice from Glenn Corliss's email of January 6,

2010 (Ex. G), in which Corliss stated that excess cash would be distributed to shareholders over

and above the enterprise value under discussion, Charron refused to admit that he understood the

email:

Q.    Glenn Corliss, in this e-mail, is treating cash separately
from enterprise value, is he not?

A.    You have to ask Glenn Corliss.

Q.    That's what his e-mail says.

A.    Glenn Corliss is best to speak to what the e-mail –

Q.    Okay, but he's responding to your specific question on that
subject, isn't he?

A.    Yes.

[Tr. 710:10-17 (Charron Cross) (discussing Ex. G).]

As to whether he agreed or disagreed with Corliss's plain statement, Charron's only response

was that he could not recall:

Q.    And you didn't respond to him in writing, right?

A.    There's no evidence here that I did.

Q.    And you don't recall having done that?

A.    I recall usually many e-mails followed up with calls,
talking about things, discussing them.

67

> Q.    Okay.  You didn't call up Glenn Corliss or send him an e-
>       mail and say, Glenn, I'm still confused about your use of
>       enterprise value; enterprise value includes the cash, doesn't
>       it?
>
> A.    I don't recall.
>
> Q.    You didn't say that?
>
> A.    I don't recall.
>
> [Tr. 710:18-711:4 (Charron Cross) (discussing Ex. G).]

193.    Charron's testimony was similarly evasive when he was confronted with his own

words on the issue—his November 1, 2010 inquiry about a potential sale of "the company for

$124M (*$90M enterprise value plus 85% value of $40M excess cash on the books)*."  *See* Ex. BJ

(emphasis added).  Despite the plain language of Charron's own email, Charron denied making

any distinction between the "$90M enterprise value" and "$40M excess cash on the books":

> Q.    And in this e-mail, you're treating the term "enterprise
>       value" separately from the cash, right?
>
> A.    No.  The enterprise value is 124.  I was trying to distinguish
>       for Cohen & Grigsby what portion of that 124 was cash.
>
> Q.    Okay.  So the total, I see that, the total is 124 million?
>
> A.    Yes, yes.
>
> Q.    But you say 90 million enterprise value, right?
>
> A.    Yes.
>
> Q.    And then you say plus 85 percent of the 40 million in
>       excess cash, right?
>
> A.    Yes.  Because we offered it at a discount so a discount of
>       the total which would bring enterprise value to something.
>
> Q.    So you're using the term "enterprise value" separately from
>       excess cash in this e-mail, aren't you?
>
> A.    No.  I think I'm using it as part of it.  My transaction
>       included cash and enterprise value of $81.2 million.  It
>       included cash.  I think we're just showing that of the 124
>       million, can we, can we discuss the cash.
>
> [Tr. 717:2-718:6 (Charron Cross).]

194.     When Charron was asked about DeBlasio's offer to sell "my shares and rights in the company *(net of the investments, cash, and equivalents currently in the company)* for $26,250,000 thus implying an enterprise value for Sallyport of $52,500,000," Ex. L at SGH1-00002858, he admitted that his definition of enterprise value had evolved over the course of the litigation:

> Q.     Do you recognize that John DeBlasio is using the term "enterprise value" separately from cash at this point?
>
> A.     Well, he is kind of using the wrong definition for enterprise value.
>
> Q.     What is the definition of enterprise value?
>
> A.     There is industry ways to calculate enterprise value.  It is 100 percent of an entity calculated, as my testimony says, by using a multiple of EBITDA or a multiple of revenue or discounted cash flow or public multiple, not is there –
>
> Q.     And you recall having that understanding of the term enterprise value back in the fall of 2010?
>
> A.     I understood it meant 100 percent of the entity.  *I have gotten a lot smarter over the last year.*
>
> [Tr. 729:1-13 (Charron Cross) (emphasis added).]

As to whether he held this interpretation in December 2010, Charron could not recall.  Nor could Charron recall stating an objection to DeBlasio's purported use of the "wrong definition" of enterprise value:

> Q.     I am looking for your understanding as of October 2010.
>
> A.     I meant 100 percent of the entity; and if we were selling the company with cash, included the cash.
>
> Q.     So John says, "Net of the investments, cash and equivalents currently in the company."  You interpreted that to mean that John was using the term "enterprise value" incorrectly, right?
>
> A.     That was his definition in this e-mail.  That's how he was using—how he was defining it.
>
> Q.     Did you respond to him and clarify that you thought he was misusing the term enterprise value?

A.     I don't recall.  I probably—we had calls.  These e-mails are snippets of a lot of conversations John and I had over the phone, in the e-mails, so you can't—in October/November, we are trying to sell the company.  There is a lot of dialogue between John and I, the lawyers, Peter Phelps, John, Pat.  Everybody is talking, trying to get a deal done.  We are in the middle of an audit right now, trying to get that done.  So just a lot of communications.  These are just snippets of at a given point in time.  They don't paint the whole picture of all the discussions we had and all the negotiations and that were going on at this time.

[Tr. 729:14-730:9 (Charron Cross).]

Charron's reference to "calls" was too vague, too conclusory, and too inconsistent with other evidence to rebut the conclusion that Charron and DeBlasio used the term "enterprise value" consistently throughout 2010 to refer to the value of the company net of excess cash and investments.  Charron's assertions are similarly insufficient to rebut the conclusion that Charron and DeBlasio expected to make a significant disbursement of cash and other forms of retained earnings prior to any third-party sale.  To the extent that Charron might have wished for a limit on such pre-sale disbursements or to claim an interest in these prior profits through the application of the Windfall Protection clause, he had an opportunity to do so with the addition of specific language in the Charron SPA.

195.    Finally, Charron's suggestion that he intended an "industry standard" definition to apply makes no difference with respect to excess cash and non-operating investments.  Risius himself defines enterprise value as the market value of "operating assets minus operating liabilities."  Tr. 1408:1-17 (citing Ex. 98); 1410:20-1411:3 (Risius Cross).  His definition is consistent with his book on business valuation, which defines "business enterprise value" as "the present value of all *future cash flows* expected to be generated from that company . . . the value of any business or asset is related to the cash flow it generates, n*ot the net income as reflected on the company's income statement or tax return*."  JEFFREY M. RISIUS, BUSINESS VALUATION: A

PRIMER FOR THE LEGAL PROFESSIONAL 27 (2007) (emphases added).  Defendants' expert Jim

Hitchner agreed that excess cash is not included.  Tr. 1669:24-1672:8 (Hitchner Direct).

**V.      Even if a Windfall Sale had occurred, the measure of damages would be
limited to 20 percent of the amount received in excess of $65 million.**

196.      The parties dispute the calculation of any payment that might be due under the

Windfall Protection clause.  The language in the clause is ambiguous on this point, but parol

evidence decisively resolves the ambiguity.  In a series of emails exchanged on November 30,

2010, Charron and DeBlasio agreed that any windfall payment would be based on a percentage

of the amount by which a future sale exceeded the windfall threshold.  *See* Ex. R; *see also* Tr.

249:14-250:3 (J. DeBlasio Direct); 861:19-864:14 (Phelps Direct).  This email exchange

forecloses any claim that Charron might have to recover 20 percent of everything of value

received by SGH's shareholders.

**A.      Charron and DeBlasio agreed that any windfall payment would be
20 percent of the amount by which a subsequent sale exceeded the
$65 million windfall threshold.**

197.      Charron first proposed that a "windfall provision" be included in any deal to buy

out his shares in a November 30, 2010 email sent to DeBlasio, Charron's advisor David Cohen,

SGH CFO Peter Phelps, and SGH attorneys Graham Robinson and Kevin Smith of WilmerHale.

*See* Ex. R at SGH1-00229840.

198.      After DeBlasio agreed to the inclusion of such a provision, Charron requested that

Robinson and Smith "provide John and I language on the terms of an industry standard windfall

clause to be included in the LOI [Letter of Intent]."  Ex. R at SGH1-00229837-39.

199.      In response to Charron's request, SGH's attorneys Graham Robinson and Kevin

Smith provided an example of such a clause.  *See* Ex. R at SGH1-00229832-36.

200.     Shortly after receiving the sample clause, DeBlasio responded at 11:29 a.m. EST.

DeBlasio's email explains that his intent for a windfall protection provision was to allow

Charron to share in an incremental portion of the proceeds of a sale over a threshold value:

> [T]he intent here is not to put a payment on the total purchase price
> in the future, but rather the incremental value beyond a normalized
> amount.  What I'm thinking is that the basic offer put forth to Tom
> as an internal transaction has a comparable valuation from an
> External Buyer in 2011 of ~$66M.  In the event of a transaction in
> the next calendar year, he can share in a reasonable portion of
> anything above that amount.
>
> [Ex. R at SGH1-00229835.]

DeBlasio's statement was clear and unequivocal as to his intention with respect to how any

windfall payment would be calculated.

201.     Other parties involved in the discussion of the clause, including SGH's attorneys

and Charron himself, expressed their adoption of DeBlasio's interpretation.  At 12:16 p.m. EST,

Robinson replied to DeBlasio and Charron, "That's correct." Ex. R at SGH1-00229834.

202.     At 1:09 p.m. EST, Charron responded to Robinson and DeBlasio to confirm how

the incremental approach DeBlasio described would work.  He asked:

> Now I am confused with the carry forward language.  If I sell to
> John for $50M enterprise value and he flips and sells the company
> for $100M, doesn't some percentage of incremental share price go
> to me vs some enterprise threshold being met and then a payment.
>
> [Ex. R at SGH 1-00229833.]

203.     At 1:26 p.m. EST, Robinson responded to Charron's question by explaining how

a windfall payment would be calculated using DeBlasio's incremental approach:

> The way it works is this:
>
> If you sell to John for $50mm enterprise value (so $25mm for your
> 50%), then here are the results in two different scenarios, assuming
> for this illustration that the carry is 20%:

Scenario 1: John sells the whole company for $100mm. You get 20% of $50mm, or $10mm. The math there is 20% of the amount by which (A) $100mm / 100%, exceeds (B) two times $25mm. Simplifying, that's 20% of $100mm minus $50mm, or $10mm.

Scenario 2: John sells 70% of the whole company for $60mm. You get 20% of .  [*sic*]  The math there is 20% of the amount by which (A) $60mm / 70%, exceeds (B) two times $25mm. Simplifying again, that's 20% of $85,714,285 minus $50mm, or $7.14mm.

[Ex. R at SGH1-00229832.]

Kevin Smith provided a correction a half hour later:

[T]he second sentence in scenario 2 didn't get filled in - I think it should be "You get 20% of approx. $35mm, or $7.14mm"

[Ex. R at SGH1-00229832.]

204.    Charron received these emails, which were responses to his own questions, and never suggested that a different methodology be used for the calculation. Tr. 251:25-252:3 (J. DeBlasio Direct), 741:20-25 (Charron Cross), 863:13-864:3 (Phelps Direct). The concept of using the gross value of a subsequent sale—rather than the "windfall" portion—in the calculation of a windfall payment was not discussed again after November 30, 2010. Tr. 250:6-251:10 (J. DeBlasio Direct). Sallyport's CFO Peter Phelps testified that the "incremental" interpretation was resolved entirely in this email:

Q.    Turn your attention to Exhibit R in that red book in front of you.

A.    Okay. Okay. Right.

Q.    Is that the e-mail exchange where you're talking about how the windfall provision would work?

A.    Yes, it is. Yes, it is.

Q.    Were there any discussions about how the windfall provision would work after this e-mail?

A.    Not that I'm aware of. This is, this is the way that, this is the way that it was settled before we did the, before we did the closing.

73

[Tr. 864:4-14 (Phelps Direct).]

205.     Though he sought to offer a different explanation at trial, even Charron's own testimony confirms that there were no other discussions of the gross versus incremental payment issue.  Charron admitted that he never objected in writing to DeBlasio's statement of intent.  Tr. 741:16-23 (Charron Cross).  And he affirmed his deposition testimony that he could not recall any specific conversations in which he orally repudiated it.  Tr. 747:11-748:5 (Charron Cross).  Charron's unexpressed subjective intent does not rebut DeBlasio's plainly worded statement.

206.     Drafts of the Letter of Intent ("LOI") and SPA confirm that the operative terms of the windfall provision were in place by November 30.  DeBlasio sent Charron the first draft of the windfall provision at 7 a.m. the morning following the November 30 discussion.  Ex. T; Tr. 266:11-267:11 (J. DeBlasio Direct).  The draft Windfall Protection provision in the LOI reads as follows:

> 5. <u>Windfall Protection</u>. The Selling Shareholder will receive Windfall Protection defined as follows:
>
> > a. In the event that Sallyport commits to sell shares, to a third party, subsequent to this transaction, for a purchase price exceeding an enterprise value of $65 million, in the period ending one year from the date of closing, the Selling Shareholder will receive 20% of the sales proceeds, as additional compensation.

[Ex. T.]

The use of the terms "enterprise value of $65 million" and "20% of the sales proceeds" nearly exactly as they appear in the final Charron SPA indicates that no substantive changes to these provisions were made after the morning of December 1.

207.     Charron's response to the draft LOI also confirms that an understanding had already been reached by that time.  In a December 1, 2010 email, Charron states his understanding of "the agreement" that had been reached on the windfall provision:

> [T]he agreement was if any of the sale shareholders sell any of
> their stock *over a $6500/share price* I would get *20% of those
> proceeds* if entered into any agreement to sell within 12 months of
> the closing date.
>
> [Ex. 183 (emphases added).]

Because Charron never told DeBlasio he meant something else, DeBlasio reasonably interpreted

Charron's email to mean he accepted the incremental approach discussed on November 30 and

expected to receive 20 percent of the "proceeds" "over a $6500 share price." *See* Ex. 183; Tr.

269:7-19 (J. DeBlasio Direct). DeBlasio's reading of the email was reasonable in light of the

emails exchanged the day before, and Charron's statement was insufficient to put DeBlasio on

notice that there might be a question as to the language used in the LOI. *See* Tr. 251:25-252:3 (J.

DeBlasio Direct).

208.    Subsequent drafts of the LOI and SPA did not substantively alter the operative

language in the Windfall Protection provision. Between December 3, 2010, and December 7,

2010, counsel for SGH and Charron's attorney exchanged several drafts of the document that

would become the Charron SPA. Tr. 57:9-18 (O'Connor Cross). The final agreement continued

to employ the operative terms "purchase price," "enterprise value," and "proceeds" just as they

are used in the original LOI. *Compare* Ex. A, *with* Ex. T, V.

209.    Charron's attorney Michael O'Connor admitted that he was not aware of any

discussions concerning the windfall protection provision prior to receiving a draft of the Charron

SPA on December 3, 2010. Tr. 58:6-16 (O'Connor Cross). In fact, O'Connor was not shown

the November 30 email chain until the week of the trial. Tr. 58:6-59:3 (O'Connor Cross).

210.    The failure to change the operative terms of the Windfall Protection provision

precludes any argument that the fundamental purpose of the provision was changed. As Phelps

explained, the provision was clarified as the parties exchanged drafts until the final agreement, but no changes were made to the payment mechanism:

> Q.   So do you agree with me that the final agreement, the final definition of what is a windfall sale, embodies both changes from the LOI to the benefit of Mr. DeBlasio and changes from the LOI to the benefit of Mr. Charron?
>
> A.   I—no, I don't really agree with that.  I'll tell you what, because they're totally different.  OK.  One is a minor modification to the clause, OK, basically saying, OK, you could sell us at 20 percent so that, you know, that's one thing.  But to change the economics of the other part from 20 percent, 20 percent including the 65 million threshold, that's a $13 million change.  That would have been discussed.  We never discussed that $13 million change.

[Tr. 911:17-912:3 (Phelps Cross).]

**B.   Charron fabricated a different version of events for the trial.**

211.   Charron's testimony on this subject can be given no weight because key details of his version of events were fabricated for trial.

212.   Charron agreed that he first proposed a windfall provision in connection with a $60 million counteroffer he submitted to DeBlasio on November 30, 2010.  Ex. R.  At that time, Charron requested "a windfall provision if you flip the company in three years which others suggest to me is your plan."  Ex. R; Tr. 414:1-6 (Charron Direct).  In response, DeBlasio agreed to include a windfall provision, but only for a one-year term.  Ex. R; Tr. 414:7-20 (Charron Direct).

213.   Charron admits that he never objected in writing to DeBlasio's suggestion of a one-year term.  *See* Ex. R; Tr. 741:16-23 (Charron Cross).  Yet he claimed at trial—for the first time in this litigation—that he continued to negotiate the issue and that DeBlasio agreed to significant concessions in return for the one-year term that appears in the Charron SPA.  Tr.

741:24-742:5 (Charron Cross).  Charron described these negotiations as a "split the baby"

agreement:

> Q.   Can you describe was there any—you said earlier that you
> wanted a three-year provision in the windfall protection
> clause, is that right?
>
> A.   Yes, John . . . wanted one and incremental.  I wanted 3 and
> gross.  So we split the baby and ended up at 1 and gross.
>
> Q.   What do you mean you split the baby and you ended up at
> three and gross?
>
> A.   No.  I mean, that's what I wanted, and then we had a
> number of conversations, you know, collectively as a group
> or between myself, Wilmer Hale, and John and me and
> Peter, and we discussed that part of the term.  I said I don't
> want one in an [sic] incremental.  John didn't want to give
> me three and gross.  So we split the baby and said one and
> gross or one in [sic] proceeds, and that's what's captured in
> the stock purchase agreement that we signed.
>
> [Tr. 440:18-441:11 (Charron Direct).]

This testimony cannot be reconciled with Charron's prior deposition testimony, Charron's

assertions in opposition to Defendants' motion for summary judgment, or the documentary

evidence in this case.

214.   First, Charron's detailed description of a "split the baby" agreement at trial was

starkly inconsistent with his own prior deposition testimony, in which he claimed not to

remember any specific discussions of the windfall provision's payment calculation mechanism.

*See* Tr. 745:23-752:13 (Charron Cross).

215.   Charron failed to explain his new recollections when confronted with his

deposition testimony at trial.  For instance, Charron said at his deposition that he did not recall

discussing the calculation of a windfall payment other than the November 30 email:

> Q.   And you recall being asked the following questions in the
> middle of the page, line 7: "And do you recall any specific

discussion about the calculation of a windfall payment that might be due under—in the event of a windfall sale?"

You gave the answer, "I do not recall."

Do you recall doing that?

A.      Yes.

[Tr. 746:12-15 (Charron Cross).]

216.      When asked how he could claim to remember specific discussions at trial that he did not recall at his deposition, Charron argued he would not have mentioned the "split the baby" agreement at his deposition because the question did not specifically inquire about the tail, *i.e.*, the term of the windfall provision:

Q.      And your memory was better in July 2013 than it is today, right?

A.      Well, no.  We were—the one year is not a calculation. That's the tail.  Calculation was what's the threshold, you know, the 20 percent, where it came in.  There were a number of discussions around the triggers and everything else.

[Tr. 746:18-23 (Charron Cross).]

217.      But when Charron was confronted at trial with other instances in which he testified he did not remember any specific conversations, he became evasive and claimed he recently realized the details were important:

Q.      And turn over to page 266 [of the deposition].  I asked you the question:  "But you told me that you don't recall the conversations." And you gave the answer:  "I am stating that we had a lot of conversations, but I do not recall the conversations." Do you recall giving that answer?

A.      Yes.

Q.      And you stand by that answer?

A.      Yes.  We discussed a lot of the specifics of the conversations, but they are all with regards to arriving at a stock purchase agreement.  That was—

> Q. You don't recall, and you told me then in the deposition that you didn't recall the substance of those conversations, didn't you?
>
> A. Yes.
>
> Q. And you didn't volunteer in the deposition anything about exchanging the three-year tail provision for the incremental provision?
>
> A. Well, I have seen a lot more documentation now, so I have the ability over the time to gain an understanding that that was an important aspect of it.

[Tr. 747:11-748:5 (Charron Cross).]

Charron's evasive answers and failure to explain what caused him to remember the "split the baby" agreement at trial allow only one conclusion. Charron fabricated the "split the baby" testimony in a greedy and self-serving effort to avoid the consequences of his prior agreement and to claim an interest in 20 percent of the entire transaction.

218. Charron's deposition was not the first time he failed to mention the "split the baby" agreement when it would have been to his own benefit to do so. In fact, his attorney Michael O'Connor had never even seen the November 30 email discussion out of which the supposed agreement grew:

> Q. Were you aware of as of December 6 that there had been e-mail negotiations regarding the windfall sale provision between your client, Mr. Charron, and people on the DeBlasio side of the wall?
>
> A. No, I don't think so. I mean, the windfall protection provision was presented to me in the purchase agreement on December 3. And I was told this was the provision that Wilmer Hale had proposed. So there was, in between December 3 and December 6, there was negotiation over it, in the sense that I edited it and made proposals and we went back and forth in documents, changing the, working on changes to the provision.
>
> Q. Will you turn to Exhibit R, please, in your binder. The red binders, there should be one up near you. There it is. Do you recognize Exhibit R?

MR. GATJE:  And for the record, it is an e-mail dated November 30, 2010, from Kevin Smith to Tom Charron and a number of other folks and the subject matter is carry forward.

Q.      Have you seen that e-mail ever before?

A.      Yes, I have.

Q.      When was the first time you saw it?

A.      Sunday.

Q.      This Sunday?

A.      Yes.

[Tr. 58:6-59:3 (O'Connor Cross).]

219.    Charron never mentioned the "split the baby" agreement in his complaint (Dkt. No. 1), amended complaint, oppositions to Defendants' motions to dismiss (Dkt. Nos. 64-65), or opposition to Defendants' motion for summary judgment (Dkt. Nos. 172, 173).

220.    Indeed, Charron's statement of material facts submitted in response to DeBlasio's motion for summary judgment flatly contradicts the sequence of events Charron described at trial.  *See* Dkt. No. 173-1 ("Plaintiff's Amended Response to Defendants' Statement of Material Facts and Additional Facts in Support of Plaintiff's Opposition to Defendants' Motion for Summary Judgment").  Not only did Charron fail to mention a "split the baby" agreement in that document, but he affirmatively denied that he and DeBlasio came to *any* agreement on the subject before they signed the Charron SPA:

64.      Prior to the execution of the Charron SPA, Charron and DeBlasio also agreed that any payment in the event of a windfall sale would be based on the incremental amount received over a specified threshold, not a flat percentage of the entire sale. Ex. A ¶ 33.

RESPONSE:  Denied.  *Plaintiff denies any agreement prior to the execution of the Charron SPA on such a definition of how payments would be calculated in the event of a windfall sale.*  The Charron SPA is a final and fully integrated agreement between the parties.  The words "incremental amount received over a specified

threshold" does [*sic*] not appear anywhere in the Charron SPA.
Ex. 2 at 2.04.

[Dkt. No. 173-1, ¶ 64 (emphasis added); *see also id.* ¶¶ 71-75
(same assertion).]

221.    Charron's statements before trial portrayed a completely different story.  He

denied repeatedly that discussions concerning the "Sallyport Purchase Group" draft LOI had

anything to do with negotiation of the Charron SPA:

> 76.    At 10:02 P.M. EST, hours after the email discussion
> among Charron, Robinson, and DeBlasio concerning the intent of
> the provision, SGH's Chief Financial Officer, Peter Phelps,
> distributed the first draft of a letter of intent addressing the buyout
> of Charron's interest in SGH that included a requirement for a
> windfall payment. Ex. A ¶ 45, Ex. A-18.
>
> RESPONSE:  Denied.  The communication cited in
> Statement 76 concerned a proposed deal with "Sallyport Purchase
> Group" - - a different entity than SGH, the party who ultimately
> signed the Letter of Intent and the Agreement with Mr. Charron.
> (See Charron Dep. at 267:3-16.) . . . .

[Dkt. No. 173-1, ¶ 76 (emphasis added); see also ¶¶ 65, 77-81, 95,
98 (making the same assertion).]

And he stated that the unspecified discussions that resulted in his understanding of the Charron

SPA only began after he hired Michael O'Connor to represent him:

> 76.    At 10:02 P.M. EST, hours after the email discussion
> among Charron, Robinson, and DeBlasio concerning the intent of
> the provision, SGH's Chief Financial Officer, Peter Phelps,
> distributed the first draft of a letter of intent addressing the buyout
> of Charron's interest in SGH that included a requirement for a
> windfall payment. Ex. A ¶ 45, Ex. A-18.
>
> RESPONSE:  Denied. . . .
> Furthermore, as testified to by Plaintiff in his deposition, at the
> time that the referenced draft letter of intent was distributed,
> Plaintiff was not represented by counsel. *Counsel began his
> involvement on either December 2nd or December 3rd, following
> the December 1st dealings.  Ex. 1 at 264:1-265:6.  Following
> Plaintiff's retention of counsel, the parties engaged in numerous
> conference calls to negotiate the Windfall Protection provision and
> the final Charron SPA.  Ex. 1 at 273:2-9; 277:7-16.*

> [Dkt. No. 173-1, ¶ 76; *see also* 82, 84, 85, 100 (making the same assertion).]

These claims directly contradict Charron's trial testimony that he and DeBlasio came to a "split the baby" arrangement while discussing the "Sallyport Purchase Group" draft LOI on December 1, 2010. *See* Tr. 440:18-441:11 (Charron Direct), 743:21-744:18 (Charron Cross).

222.     Perhaps most tellingly, Charron also failed to mention the "split the baby" agreement when, in 2012, he called Peter Phelps to discuss this litigation.  Phelps testified that he told Charron he believed the windfall provision was intended to be calculated based on the amount exceeding the windfall threshold, as described in the November 30, 2010 email chain. Charron did not attempt to convince Phelps he was wrong; rather he told him the provision was not *worded* that way:

> Q.     Tell us about the conversation.
>
> A.     Sure.  We had, Tom called me out of the blue.  I was on vacation, on a boat somewhere.  I had my cell phone.  He goes, hey, Peter, I want to talk to you about Sallyport.  I think he started saying that he's working on some litigation related to this.  See, I wasn't that involved with the subsequent sale, so I didn't know that much about it.  So he asked me a little bit about this, and he talked about, he talked about the windfall provision and said, you know, the windfall provision is, is on 20 percent of the entire sales proceeds subsequent.  Again, I didn't know, I didn't know what the sales proceeds were, but I did know that it was never 20 percent of the total, it was 20 percent of the increment.  So I said, Tom, no, that's not correct.  He said, well, if you read it, the way it's worded, it's 20 percent.  I said the wording is not perfect, okay, let's face it, but it does say windfall and windfall has a special meaning. Windfall means above and beyond ordinary.  Okay.  So what we always meant by windfall was that was the increment above 65 million.

> [Tr. 865:23-866:16 (Phelps Direct).]

223.    The version of events Charron asserted at trial also conflicts with the contemporaneous documents reflecting the negotiations.  Charron claimed that he and DeBlasio agreed to "split the baby" during a telephone conference during which they discussed an offer from the "Sallyport Purchase Group."  Tr. 743:21-744:18 (Charron Cross).  Charron provided the following account of this call:

> Q.    This phone call, this communication where you said you exchanged the three-year for the gross and incremental, this happened by telephone?
>
> A.    Yeah, it was in—if you don't—we had conference calls after this.  There was a large conference call I think Peter Phelps or WilmerHale put together, where all this chatter from November 30 was put on the table and everybody started talking about what this looked like, how would it be structured, what were the economics of it.  WilmerHale was the one who actually introduced on December 1, he says, whoa, because I had questions, I said, Who is this Sallyport Purchase Group?  I had never heard of them before.  They've got a Bridgeville address but it was—I was—I just was confused.  So the whole idea was, well, this is what we need to do.  We need to structure the transaction differently.  So they basically said, We are going to structure it as a redemption, and then we started talking about that.  It was a lot of work.  And if you look at the stock purchase agreement, the different iterations, that language continued to change.  So that was one of the sections that everybody—there was a lot of dialogue and negotiation with respect to it, and ultimately we signed the stock purchase agreement, so both parties agreed to the language.  That's very clear in here.

> [Tr. 743:21-744:18 (Charron Cross).]

224.    This sequence of events could not have happened as Charron asserts because the term and payment mechanism language were already established by the time the call Charron described occurred.  DeBlasio sent Charron the draft LOI from "Sallyport Purchase Group" at 7 a.m. on December 1, 2010.  Ex. T.  The LOI already limited the windfall provision to a one-year term *and* used the same operative terms for calculating a windfall payment as would be

found in the final Charron SPA.  *Compare* Ex. T, *with* Ex. A.  Charron responded to the initial

draft at 10:21 a.m. that morning by noting, "the agreement was if any of the sale shareholders

sell any of their stock *over a $6500/share price* I would get *20% of those proceeds* if entered into

any agreement to sell *within 12 months of the closing date.*"  Ex. 183 (emphases added).  The

"agreement" Charron referred to establishes that the parties' negotiation of these issues was

already finished by the morning of December 1, 2010—before Charron testified the discussion

resulting in the "split the baby" agreement occurred.

225.     In fact, there were no meaningful changes to the term or payment calculation

clauses of the windfall provision after initial draft LOI.  The Windfall Protection provision in the

draft LOI Charron received on December 1 at 7 a.m. read as follows:

> 5. <u>Windfall Protection</u>. The Selling Shareholder will receive
> Windfall Protection defined as follows:
>
>> a. In the event that Sallyport commits to sell shares, to a
>> third party, subsequent to this transaction, for a purchase
>> price exceeding an enterprise value of $65 million, in the
>> period ending *one year from the date of closing*, the Selling
>> Shareholder will receive *20% of the sales proceeds*, as
>> additional compensation.
>
> [Ex. T (emphases added).]

The final LOI Charron signed at 8:42 p.m. did not alter either phrase:

> 3. <u>Windfall Protection</u>. The Selling Shareholders will receive
> Windfall Protection defined as follows:
>
>> a. In the period beginning on the closing date and ending
>> *one year from the date of closing*, in the event that
>> Sallyport commits to sell shares to a third party for a
>> purchase price exceeding an enterprise value of $65
>> million, the Selling Shareholders will receive *20% of the
>> sales proceeds*, as additional purchase price for this
>> transaction.
>
> [Ex. V (emphases added).]

226.     Charron's testimony that he and DeBlasio agreed to fundamentally alter the payment mechanism in the windfall provision cannot be reconciled with these documents.  The cumulative weight of these contradictions and omissions requires an inference that Charron fabricated the "split the baby" agreement for trial.

## VI.     Charron is liable to SGH for theft.

227.     Charron withdrew $227,364.22 from SGH on December 8, 2010 by presenting three checks at a Bank of America branch in Florida drawn on SGH's account and payable to himself.  *See* Ex. AS; Tr. 793:11-14 (Charron Cross).  Charron was a resident of Florida in 2010.  Tr. 1872:1 (Stipulations of Fact).

### A.     Charron lacked authority to write the checks to himself.

228.     Charron lacked the written approval to write the checks required by the board resolution SGH had adopted at Charron's behest earlier in 2010.  Tr. 784:11-23 (Charron Cross).  The board of directors of SGH enacted a board resolution on July 9, 2010 requiring the written authorization of both DeBlasio and Charron for any "[w]ithdrawals or payments from any Company or subsidiary bank account by check, wire or ACH in excess of $25,000."  Ex. AG.  Charron had insisted on the July 9 resolution.  Except as to the three checks he cashed on December 8, 2010, Charron observed the dual-authorization requirement after the resolution was enacted.  *See* Exs. AH; Tr. 784:11-787:3 (Charron Cross).

229.     Charron also lacked inherent or implied authority to cash checks as CEO of SGH because, among other reasons, he had already resigned when he presented them.  He signed his resignation letter on December 7, 2010.  Tr. 771:9-15 (Charron Cross).  He was informed on December 7 that SGH planned to notify Bank of America the following day that Charron was no

longer associated with the company or authorized to make transactions on its account. *See*

Ex. AK.

230.    Charron's conduct demonstrates that Charron understood his resignation was

effective on December 7, 2010.  Charron had been SGH's "custodian of records."  Tr. 484:6-8

(Charron Direct); 521:11-18 (Charron Cross).  He testified that he packed up and shipped away

all of the SGH files DeBlasio had requested him to return the morning of December 8, 2010—

before he cashed the checks:

> Q.    And you told me that on the morning, I think you said on
>         direct examination that on the morning of December 8,
>         2010, you packed up the files that you had in your home
>         office in Florida and sent them by FedEx to John, correct?
>
> A.    Yeah.  Stuff he was asking for, the DigiPasses, bank
>         statements, insurance, everything that I had.
>
> Q.    And you packed it up on the morning of December 8,
>         correct?
>
> A.    Yes.
>
> Q.    And you FedEx'd it?
>
> A.    That morning.
>
> . . .
>
> Q.    So you went to the bank on December 8, 2010, and you
>         tendered those three checks, right?
>
> A.    Yeah.  I went to FedEx in the morning, ran a couple
>         errands, grabbed a bite to eat, then went to the bank and
>         dropped off the checks.
>
> [Tr. 776:24-777:8; 779:20-24 (Charron Cross); *see also* Tr. 463:8-
> 13 (Charron Direct).]

231.    Charron did not seek or obtain DeBlasio's approval prior to presenting the checks.

Tr. 350:14-24; 358:1-6 (J. DeBlasio Direct).  In fact, Charron did not tell his lawyers, his

consultants, or anyone at SGH about his plan to take the money until December 9, 2010—the

day after he presented the checks:

Q.     And who at Sallyport did you notify that you were going to
be depositing these checks on December 8?

A.     I put it in a FedEx to them, so they got notified by me
sending copies of my checks and the supporting
documentation.

Q.     You didn't call John DeBlasio on December 8 and say,
John, just a reminder, I'm going to be depositing those
three checks?

A.     No.

Q.     And you didn't call Pat DeBlasio and tell him that same
thing, did you?

A.     Why—I had no requirement to do that.

Q.     And you didn't call Michael O'Connor and say I'm going to
be depositing these three checks?

A.     No.

Q.     And you didn't call Graham Robinson and say that?

A.     Nope.

Q.     And you didn't call Kevin Smith and say that?

A.     No.

Q.     And you didn't tell David Tanner that you were doing that?

A.     Nope.

Q.     And you didn't tell Peter Phelps that you were doing it?

A.     Nope.

[Tr. 793:11-794:10 (Charron Cross).]

**B.     Charron was not entitled to any additional payment.**

232.     In addition to misstating his authority to write the checks, Charron misrepresented

at trial his entitlement to the funds represented by the checks.  Charron was not owed any

additional funds on December 8, 2010.  Tr. 869:16-870:6 (Phelps Direct).

**1.     The $147,727 check for the "Tom/John Account."**

233.     Charron claimed that DeBlasio agreed he could write a check to himself in the

amount of $147,727 to balance the "Tom/John Account."  Tr. 781:7-14 (Charron Cross).  But

Charron's version of events was so vague and evasive that it carries no weight.  Charron could

not identify the date or time of the alleged oral agreement.  He could not describe the words

DeBlasio is alleged to have used.  His only basis for the purported agreement was "the context"

of his "discussions" with DeBlasio over "the last six months:"

> Q.     You're saying that you don't recall any specific discussions
> about that subject, or you do?
>
> A.     No, I don't—I recall over six months a number of
> discussions on that topic.
>
> . . .
>
> Q.     You're saying that John made a statement, yeah, looks
> good, just deal with it?  Those are his words, is that what
> you're saying?
>
> A.     I'm not using any specific words.  The context of our
> conversation was he was fine with the Tom/John account as
> we had discussed over the last six months, and I wrote a
> check to close it out.
>
> Q.     And when did that conversation occur?
>
> A.     I don't, I don't recall.  It was in the latter part of November,
> December.
>
> . . .
>
> Q.     So you're saying that the conversation ended with an
> agreement that you would write yourself a check to close
> out the John/Tom account?
>
> A.     Yeah, balance it out with a check. I would either write John
> a check or I'd write myself a check.  It turned out the
> difference between the John and Tom account was I write
> myself a check.
>
> Q.     John specifically approved you writing the check?
>
> A.     If you're referring to the resolution, no.  . . .
>
> [Tr. 781:3-6, 782:4-13, 784:4-12 (Charron Cross).]

234.   DeBlasio denied any agreement to close out the Tom/John account and denied

giving Charron authorization to write a check to do so.  The testimony of SGH CFO Peter Phelps

confirms that there was no agreement on the close-out of the Tom/John account.  Tr. 868:22-

870:3; 872:10-874:5 (Phelps Direct). There was a discussion of the Tom/John account as the closing of the Charron SPA approached, but the consensus was that it was impossible to reconcile all of the questions and disagreements. Tr. 868:22-870:6 (Phelps Direct). The only indication of any agreement on the Tom/John account was that it would be "a wash" and no additional payment would be made to reconcile it. Tr. 869:16-870:3, 871:14-18 (Phelps Direct). John DeBlasio corroborated Phelps's testimony. Tr. 355:6-356:18 (J. DeBlasio Direct). Even Charron admitted that at least some part of the balance of the Tom/John account was still under discussion. Tr. 780:11-14 (Charron Cross) ("I think Pat wanted to do some final calculation. He was supposed to get back to me with a calculation if one needed to change. He didn't, so I wrote, I wrote that check.").

235.    The sequence of events further establishes that Charron wrote himself the check before there was any agreement on the Tom/John account balance. Charron wrote Check 1046 on December 3, 2010. Ex. 145 at SGH1-00375546. But he wrote an email to DeBlasio and Phelps *three days later*, on December 6, 2010, acknowledging that the Tom/John Account balance remained open for discussion. In Charron's words, he was asking for Phelps's assistance to "[f]igure out a closeout number for the Tom-John Acct today." Ex. 440 at SGH1-00006296. If Charron wrote the check because there was an agreement that he could do so, the agreement would have had to be concluded by December 3. But his email establishes that there had been no agreement as of December 6.

236.    The one-page spreadsheet that Charron offered to support his position on the Tom/John account is not proof that any amount was owed. *See* Tr. 359:22-360:6 (J. DeBlasio Re-cross), 461:15-462:8 (Charron Direct); *see* Ex. 145. This document was not the final version

of the spreadsheet.  It was one of numerous versions of a spreadsheet tracking the Tom/John

account.  Tr. 359:22-360:6 (J. DeBlasio Re-cross), 870:7-871:1; 872:10-874:5 (Phelps Direct).

> ### 2.    The $44,400 check for Charron's "salary."

237.    Charron's testimony as to the $44,400 check he wrote for salary was also not

credible.  He claimed it was the "normal course of business" for him to write a check of this

nature.  Tr. 794:11-21 (Charron Cross).  But this assertion was contradicted at trial.

238.    It was not the ordinary course of business at SGH for Charron to write himself

payroll checks.  Charron stated that the last time he had done so was "in the early days" before

John DeBlasio became president of the company.  Tr. 789:17-790:1 (Charron Cross).  The real

ordinary course of business was that Charron, DeBlasio, and their employees would receive

automatic payroll deposits.  Tr. 789:1-16 (Charron Cross).

239.    As one would expect, SGH's CFO reacted with disbelief when he found out that

Charron had deviated from this practice the day after finalizing his buyout:

> So I'm like, I'm like you guys have got to be kidding and they said
> no, we're not kidding.  And I said, I said I was shocked.  I said I
> don't understand how that could happen.  I mean, the payroll is,
> the payroll is done by the DeBlasio Group.  There's no issue on the
> payroll, the payroll just happens.  You don't write yourself a check
> on the payroll.

> [Tr. 868:7-12 (Phelps Direct).]

240.    Upon learning of Charron's theft of company funds, Sallyport's accountant, Pat

DeBlasio, was similarly shocked.  Tr.  1852:18-1853:5 (P. DeBlasio Direct).

241.    In fact, there was no agreement that SGH owed Charron any additional salary

payment at all.  DeBlasio's understanding was that Charron was fully compensated when he

received $40,765,964 in exchange for his interest in the company.  Tr. 356:6-357:25 (J. DeBlasio

Direct); Tr. 1853:23-1854:23 (P. DeBlasio Direct).  This understanding is supported by the terms

of the Charron SPA, which released SGH from any further liability to Charron for "any and all claims, causes of action, suits, disputes, obligations, proceedings, promises, liabilities, costs, expenses, fees (including attorneys' fees), or damages of any kind (collectively, "Claims") arising by any means out of any event, circumstance, act or failure to act relating to the Company or any of its subsidiaries preceding the Closing."  Ex. A § 5.02.

### 3.     The $35,237.22 check for reimbursement of "expenses."

242.     Charron wrote check 1045 in the amount of $35,237.22 to compensate himself for various alleged business expenses.  As with the other checks, Charron did not tell anyone he planned to take the money, and Charron could not recall any specific discussion resulting in his authorization to do so.  Tr. 788:1-3, 806:7-22 (Charron Cross).

243.     The majority of the charges for which Charron reimbursed himself were disputed items that SGH never agreed to treat as business expenses.  Charron reimbursed himself over $29,000 for the rent on a house in Florida for his family of four.  Ex. 402 at TCHAR5000026. The property came with a pool that Charron admitted was not necessary for SGH's business. Tr. 805:7-21 (Charron Cross).  Charron paid the rent on June 24, 2010 with a check drawn on a joint account with his wife.  Tr. 402 at TCHAR5-0000030.  He failed to submit a reimbursement request for five months, then took the money without notifying anyone at SGH that he planned to do so.

244.     There is no evidence that Charron's Florida residence was in fact a reimbursable business expense.  Phelps testified that there was no agreement to reimburse Charron for this amount.  Tr. 872:25-874:5 (Phelps Direct).  Charron treated the rent on the Florida residence as a personal benefit to himself on his version of the Tom/John Account spreadsheet.  *See* Ex. 145 at SGH1-00375545 ($80,187 in 2009 and $28,364 in 2010 for the "Naples Florida Corporate

Rental").  Charron's inclusion of the rental on his own side of the account amounts to an admission that it was not a legitimately reimbursable.

### C.     Charron acted knowingly.

245.     There can be no doubt that Charron acted knowingly and that he did so with the intent to permanently deprive SGH of $227,364.22 and to appropriate the money to his own use. Charron had signed the Charron SPA on December 7, 2010 and resigned his position with the Company effective December 7, 2010.  The Charron SPA included a mutual release of liability and specified payments to Charron of $40,765,364, funds that he knew had been released on December 7, 2010.  *See* Ex. AQ at JD1-00006916; Ex. AR.  Charron knew that there was no agreement to pay him the additional funds reflected in his three checks, and that he lacked independent authority to write checks to himself.  Charron wrote two of the checks on December 3, 2010, but he hid his intention to cash them from everyone involved in the transaction, including DeBlasio, CFO Phelps, accountant Pat DeBlasio, SGH's counsel at WilmerHale, and even his own attorney.

246.     On April 29, 2013, SGH demanded that Charron return the money or face a suit for treble damages and attorneys' fees under Florida law.  Tr. 1872:5-7 (Stipulations of Fact); Ex. AV. Charron did not respond.  *See* Tr. 76:17-77:16 (O'Connor Cross).

### D.     The Charron SPA closed on December 7, 2010.

247.     The evidence does not support Charron's claim that he cannot be held liable for theft because of the release language in the Charron SPA.  The parties understood the closing of the Charron SPA to have occurred on December 7, 2010.  Tr. 352:13-25 (J. DeBlasio Direct), 867:6-868:5 (Phelps Direct), 1808:16-17 (P. DeBlasio Direct).  Charron's theft occurred on

December 8, 2010.  Ex. AS.  He was not granted a free day to loot the company in the interim by virtue of the release.

248.     After Charron's lawyer, Michael O'Connor, made his final edits to the Charron SPA, he sent an email at 10:39 a.m. on December 7, 2010, "[c]onfirming that the closing date is today" and recommending that the parties "go to execution versions and discuss wiring funds and exchanging signature pages."  Ex. AJ.  SGH's counsel, Kevin Smith, then told DeBlasio and Charron to send their signed pages to him and that he and Michael O'Connor would let everyone know when they were "all set."  Ex. AQ at JD1-00006914.

249.     Charron signed both the Charron SPA and his resignation letter on December 7, 2010.  Tr. 771:9-11, 774:1-9 (Charron Cross).  At 3:19 p.m. on December 7, SGH's counsel sent an email to Charron, O'Connor, and DeBlasio confirming the exchange of signatures and advising that the time had come to complete the wires to Charron:  "We now have both sets of signature pages so you can complete the wires."  Ex. AQ at JD1-00006913.

250.     Charron, DeBlasio, and Phelps took steps to make sure the funds would be released to Charron that day.  Tr. 346:21-347:9 (J. DeBlasio Direct).

251.     DeBlasio and Charron successfully confirmed the wires on December 7.  Tr. 67:9-13 (O'Connor Cross), 347:4-7 (J. DeBlasio Direct).  Due to preexisting authorization limits on SGH's HSBC bank account, Charron and DeBlasio both needed to authorize the wires.  Tr. 347:9-15.  This delayed Charron's receipt of the funds until the next day.  *See* Ex. AR.  As John DeBlasio testified, however, there was no doubt on the seventh that the money had been committed to Charron:

> Everybody had released the funds.  The funds were gone, it was very clear.  Tom had, in so many instances, been involved in transactions from HSBC and back to the U.S., so there was no naivete here.  He knew that the funds were there.  He was getting

his funds.  He saw the check in, I don't know when he recognized the funds were actually available, but he knew with 100 percent certainty because he released the funds from HSBC to his own account.  He was the primary authorizer on that account as well as I.  So he released the funds to himself.  On that day, December 7, he, we closed the transaction, and there was no turning it back.

[Tr. 352:15-25 (J. DeBlasio Direct).]

252.    To avoid any confusion on the status of the closing, Kevin Smith wrote an email

at 4:36 P.M., on December 7, 2010, stating that the parties should continue to treat December 7,

2010, as the "closing date" as set forth in the contract:

For everyone's benefit, I understand that wire payment instructions have been received and confirmed by HSBC/Bank of Bermuda but may clear tomorrow due to the joint execution/authorization issues this afternoon.  When Tom is able to confirm funds have been deposited (today or tomorrow morning), we should connect by phone to confirm closing.  *We would expect that everyone can treat today as the closing date as provided in the purchase agreement even if confirmation of the funds deposit lags until tomorrow.*  If anyone has a further update on the banking front, please let us know.

[Ex. AR.]

253.    Neither Charron nor O'Connor responded to Kevin Smith's email.  Tr. 68:8-69:17

(O'Connor Cross), 353:1-25 (J. DeBlasio Direct).  DeBlasio and Phelps both believed that the

closing was already finalized when Charron cashed the checks.  Tr. 352:13-25 (J. DeBlasio

Direct), 867:6-868:5 (Phelps Direct).

## PROPOSED CONCLUSIONS OF LAW

1.     The Windfall Protection provision of the Charron SPA grants Charron a right to payment only upon the occurrence of all the conditions defining a "Windfall Sale" under its terms.  A Windfall Sale would occur under the Windfall Protection provision only if:  (a) DeBlasio or his affiliates' sold or agreed to sell; (b) shares of SGH's capital stock or assets; (c) constituting 20 percent or more . . . of the Company's assets or equity; (d) to a third party; (e) for a price that reflects an enterprise value of the Company equal to or greater than $65,000,000.

2.     There was no Windfall Sale.  DeBlasio and his affiliates sold 100 percent of SGH and all of its affiliated and subsidiary entities in an arm's-length transaction for a total price of $64.5 million in the DC Capital Transaction.  The DCCP SPA "reflects an enterprise value" for the company of $64.5 million.  No further payment is due under the Charron SPA.

3.     Charron failed to establish a violation of the implied covenant of good faith and fair dealing in connection with DeBlasio's decision to sell the company for a price below the Windfall Sale threshold.  Charron's contention that DeBlasio and DCCP colluded to misstate the price in the DC Capital Transaction predicates his breach of contract claims on allegations of fraud, bad faith, and conspiracy.  Charron failed to prove these predicate facts under a fraud standard of proof by clear and convincing evidence.

4.     Charron failed to show a breach of the implied covenant of good faith and fair dealing in connection with DeBlasio's disbursement of cash and investments prior to the sale. The contention that DeBlasio owed Charron a portion of the profits SGH earned before the DC Capital Transaction closed is not supported by any bargained-for benefit of the Charron SPA. Charron freely sold all the rights associated with ownership of SGH shares for a $40,765,964 payment by signing the Charron SPA on December 7, 2010.  The Windfall Protection provision

does not include any rights to approve or disapprove of DeBlasio's management of SGH.  The Charron SPA was not procured by fraud, duress, or undue influence.

5.      The Windfall Protection provision of the Charron SPA is ambiguous as to the measure of the payment Charron would be owed in the event of a "Windfall Sale."  Parol evidence decisively demonstrates that DeBlasio and Charron intended any payment to be calculated as a percentage of the "windfall" amount above the agreed $65 million threshold.  The Court need not decide this issue; however, because no Windfall Sale occurred.

6.      Florida law applies to SGH's counterclaim.  Charron took $227,364.22 from SGH knowing he lacked authority to do so and knowing SGH had not agreed to pay him the money.  Charron's actions constitute civil theft, as defined in §§ 772.11 and 812.014 of the Florida Statutes.  SGH is entitled to triple damages for civil theft in the amount of $682,092.66 under Fla. Stat. § 772.11 and prejudgment interest in the amount of $22,351.09 under Fla. Stat. § 55.03(2).

7.      SGH is entitled to reasonable attorneys' fees incurred in connection with SGH's counterclaim, in an amount to be proven by post-trial motion pursuant to Rule 54(d).

## DISCUSSION

## I.      The DC Capital Transaction was not a Windfall Sale.

Charron's burden of proof in this case is to show by a preponderance of the evidence that a sale of SGH occurred in 2011 for a price of $65 million or more.  *See Diesel Props S.r.l. v. Greystone Bus. Credit II LLC*, 631 F.3d 42, 52 (2d Cir. 2011) (holding a preponderance of the evidence standard applies to breach of contract claims).  He failed.  The evidence shows that SGH and all of its affiliates and operating assets were sold in an arm's-length transaction for $64.5 million.  There was no "Windfall Sale."  Indeed, Charron's entire case hinges on the

notion that the DCCP SPA masks the true value of SGH in the DC Capital Transaction. But no evidence supports that conclusion. Every aspect of the transaction was the subject of negotiations. These sophisticated investors did not mistakenly or disinterestedly write down an arbitrary number on a multimillion dollar contract; the price was the result of the information available and unrelated parties pursuing their own interests. Nor did anyone connected with the transaction consider the $64.5 million purchase price a sham. The evidence affirmatively shows that there was no collusion or manipulation. Most tellingly, no party received any of the purported extra "value" that Charron alleges changed hands in the DC Capital Transaction, much less the $40 million in secret consideration identified by Charron's expert/advocate. There is no need for an expert to estimate the value of SGH because the value was conclusively established by the agreement of the parties in arm's-length negotiations. The price is the price.

> **A.   The DCCP SPA sales price of $64.5 million establishes the value of SGH under the Windfall Protection provision.**

The decisive issue in this case is the price at which SGH was sold, not a theoretical assessment of its value. The Windfall Protection provision looks specifically to the "price." The Charron SPA makes a sale of SGH to a third party for "a price that reflects an enterprise value equal to or greater than $65,000,000" a condition precedent to any windfall payment obligation. Ex. A § 2.04. Under the contractual standard established by the Charron SPA, the Court need look no further than the DCCP SPA to establish the price to be paid for the acquisition of SGH and its affiliated companies. Charron presents no reason for the Court to look beyond the price to determine that a sale at $65 million or more occurred.

The use of the phrase "enterprise value" does not permit Charron to ignore the price and introduce hypothetical after-the-fact estimates of value. If there is any ambiguity as to the term "enterprise value" in the Charron SPA, parol evidence resolves it. Charron actively negotiated

numerous offers to sell part of the company in which the "enterprise value" of SGH referred to

the total value of the company extrapolated from a given sale price, separate from excess cash on

the books.  For example, the Chart Capital offer to buy half of the company for $30 million

indicated a $60 million enterprise value, and Charron and DeBlasio's $32 million counteroffer

represented a $64 million enterprise value.  *See* Exs. E, F, H.  Similarly, DeBlasio's offer to

purchase Charron's 50 percent of the shares for $26,250,000 "impl[ied] an enterprise value for

Sallyport of $52,500,000."  Ex. L at SGH1-00002858.  In his counteroffer to DeBlasio, Charron

proposed "a $60M valuation," which would have resulted in a $30 million payment for his half

of the company.  Ex. R at SGH1-00229840.  Charron expressly acknowledged that the trigger

depended on the per-share price while the Charron SPA was under discussion on December 1,

2010:

> Needs some legal rewriting but agreement was if any of the post
> sale shareholders sell any of their stock *over a $6500/share price* I
> would get 20% of *those proceeds* if entered into any agreement to
> sell within 12 months of the closing date.

> [Ex. U at JD1-00006606 (emphases added).]

The parties' use of the term "enterprise value" in this manner throughout 2010 resolves any

doubt as to the intended meaning of the term in the Charron SPA.

> **B.    The price the buyer and seller established at arm's length is the best
> evidence of SGH's value under New York's "sale price rule."**

Even if there were no clear mandate in the Charron SPA to look to the price, the fact that

the DCCP SPA was the result of arm's-length negotiations between independent buyers would

make the $64.5 million price for SGH dispositive in this case.  Under the "sale price rule,"

evidence of the price in a recent arm's-length transaction is the best evidence of value.

*Schonfeld v. Hilliard*, 218 F.3d 164, 178-79 (2d Cir. 2000) (citing *Suitum v. Tahoe Reg'l*

*Planning Agency*, 520 U.S. 725, 741-42 (1997)).  If evidence of an arm's-length transaction is

introduced, the burden rests with the opposing party to demonstrate "special circumstances which would negate [the relevance] of a prior arm's-length purchase price."  *Id.* at 179 (quoting *Shapiro v. State*, 401 N.Y.S.2d 921, 922 (App. Div. 3d Dep't 1978) (alteration in original)). Charron failed to "explain away" the $64.5 million DCCP SPA price as the best evidence of SGH's value.  *See Plaza Hotel Assoc. v. Wellington Assoc.*, 37 N.Y.2d 273, 277-78 (1975).  The DC Capital Transaction was negotiated by sophisticated investors following an 18-month effort to sell the company.  The evidence confirms that negotiations leading to the DC Capital Transaction in 2011 were conducted at arm's length between willing buyers and sellers under no compulsion to transact and informed by relevant market information.

### 1. The $64.5 million purchase price was the result of arm's-length negotiations.

Charron bears the burden of showing "special circumstances" that would justify looking beyond the price in this case because the DCCP SPA was negotiated at arm's length.  *Schonfeld*, 218 F.3d at 179; *see also Plaza Hotel*, 37 N.Y.2d at 277-78.  The $64.5 million price resulted from the market process that began with Charron and DeBlasio's marketing efforts in 2009 and continued through the close of the DCCP SPA in June 2011.  *See* Proposed Findings of Fact (FOF) ¶ 20-35.

DCCP considered acquiring SGH in 2009 and again in 2010 but declined to pursue a transaction on both occasions.  *See* FOF ¶¶ 21-24.  A final series of negotiations between DCCP and DeBlasio began when DeBlasio contacted DCCP again after the Charron SPA closed and lasted five months.  *See* FOF ¶ 25-35.  There is no dispute that the terms of DCCP's offer, including the $64.5 million price, were the direct result of the adversarial negotiations that occurred between DCCP's January offer and the closing on June 29, 2011.  *See* FOF ¶¶ 29-33; *see also* Tr. 592:5-23 (Campbell Direct); 1543:10-1544:2 (Risius Re-cross).

The complexity of the final DC Capital Transaction does not justify discarding the $64.5 million bottom line. As the Court of Appeals of New York held in *Plaza Hotel*, the existence of "seemingly complicated terms" does not render a transaction "unusual" such that the price should be ignored. 37 N.Y.2d at 278. Instead, the relevant question is whether the buyer and seller were aware of the meaning of the terms and "agreed upon a price that [they] thought reasonable under the circumstances." *Id.* DCCP and DeBlasio understood the terms of the DCCP SPA and agreed on a price each considered reasonable. Both were represented by experienced counsel. Tr. 1543:17-1544:2 (Risius Re-cross). DeBlasio had spent several years managing and growing SGH's business as the president and 50 percent owner of the company. He had spent the previous 18 months marketing SGH to investors. He knew the market had rejected Sagent's efforts to sell SGH at the valuation Charron proposes in this litigation, and he knew the impending withdrawal of troops from Iraq presented significant risks to future growth. DCCP was an experienced buyer focused specifically on the government contracts business sector. Tr. 586:22-587:4 (Campbell Direct). DCCP hired consultants to conduct due diligence on virtually every aspect of SGH's business and employed accountants and business valuation experts to audit the transaction after the fact. Both sides were well informed and made investment decisions they thought reasonable in light of the information available. There is no reason to second-guess those decisions and assign a "value" to SGH based on a purported expert witness's estimate.

### 2.    The DC Capital Transaction was not a "bargain purchase."

There is no evidence that the DC Capital Transaction was a "bargain purchase" that can be disregarded as evidence of value. The $64.5 million price at which a transaction ultimately took place in 2011 reflects the market's lack of interest in SGH, DCCP's perception of the risks

to the company's business, and DeBlasio's concerns that the market for government contractors in Iraq was evaporating.  Doug Lake, a partner at DCCP, explained that DCCP thought the price Sagent asked investors to pay in 2010 was too high in light of the risks faced by the company, including "doing work in remote, austere locations, you know, in light of the Iraq war and Afghanistan wars [sic] likely coming to an end at some point, you know, huge, obviously, risk there."  Tr. 1138:11-1139:6 (Lake Direct).

As it became clear in the latter part of 2010 that the sales process would conclude without a third-party transaction, DeBlasio began to share Lake's view that the price range he and Charron were seeking was not realistic:

> And as we began to find buyers that no longer were interested . . . it began to be apparent to me that we were not going to successfully sell the company anywhere near the range that Sagent had thrown to get stars in our eyes, right, because that sales presentation, from the beginning, was always this 90 to 100 million dollars, 90 to 100 million dollars . . . .  And that's what we were going for.  And as you began to get down to the end of it, we were recognizing that wasn't going to happen.

> [Tr. 238:21-239:4 (J. DeBlasio Direct).]

Moreover, DeBlasio believed that the situation would only get worse as less work became available in Iraq and Afghanistan and SGH's revenues naturally decreased:

> Q.   And so you realized you weren't going to find a third-party purchaser in 2010 approximately what time?

> A.   So I had hoped all the way through November.  I think in October, it was becoming clear that it wasn't going to go the way we wanted.

> . . .

> But at the end of the day the other big sword that was hanging over our heads was the pending drawdown and the unnerving mystery of what 2011 and 2012 was going to look like.  Right.  And nobody knew that.  And so my theory was, we were in a hurry because eventually what's going to happen is that transparency, that mystery is going

> to go away and everybody is going to know what this looks
> like, and it's likely going to be a very small market
> depending on what we're playing in now.

      [Tr. 241:18-22, 242:11-18 (J. DeBlasio Direct).]

DeBlasio's decision to accept an offer of $64.5 million in June 2011 was his prerogative as the sole shareholder of the company.  In light of the feedback from the 18 month marketing process and the very real risks created by the withdrawal of troops from Iraq, there can be no doubt that it was reasonable.  No more is needed to satisfy the Court's inquiry into the DCCP SPA price.  *See Plaza Hotel*, 37 N.Y.2d at 278.

      Both the independent valuation professionals and auditors that DCCP hired to study the transaction for accounting and tax purposes agreed that the $64.5 million purchase price did not represent a "bargain purchase."  *See* Tr. 1125:3-18 (Smith Redirect).  Neither the McLean nor McGladrey recorded the DC Capital Transaction as a bargain purchase.

      **3.**      **The $3.8 million Rollover Equity was a negotiated part of the transaction, not a placeholder designed to disguise $20 million in additional compensation.**

      Charron's attempt to isolate and "correct" the value of the Rollover Equity exchanged in the DC Capital Transaction is not supportable.  First, he ignores evidence showing that the Rollover Equity amount was an integrated part of the total price for SGH.  Second, he ignores the effect of the equity investments in Sallyport Holdings that the other transaction participants made at the same time as DeBlasio.  These facts, which were uncontroverted at trial, prove that DeBlasio accepted a 38 percent interest in New Sallyport in lieu of $3.8 million in cash.  The "value" of the Rollover Equity is the price that the buyer and the seller agreed to in arm's-length negotiations.  As with the transaction price as a whole, there is no "unusual" circumstance that would justify a post-hoc valuation of the Rollover Equity by itself.

The Rollover Equity was not additional compensation beyond the $64.5 million purchase price.  DeBlasio received a 38 percent Rollover Equity interest in Sallyport Holdings *in lieu of* $3.8 million of the purchase price.  Exs. 7; 296; Tr. 656:19-657:11 (Campbell Cross). DeBlasio's purchase of the Rollover Equity reduced the amount of cash paid at closing.  *See* Ex. C at TCHAR0009768; Tr. 320:17-321:3 (J. DeBlasio Direct).  Like the total purchase price, the specific percentage of Rollover Equity that DeBlasio acquired was also negotiated at arm's-length in the months between DCCP's offer and the closing.  *See* Exs. X, Y, B, C; Tr. 330:1-9 (J. DeBlasio Direct).  In its January 2011 offer, DCCP proposed that DeBlasio purchase between 40 and 49 percent of the acquiring entity.  Ex. X.  In its April 2011 revised offer, DCCP proposed a 45 percent investment.  Ex. Y.  When the parties signed the DCCP SPA on May 6, 2011, the Rollover Equity investment had been reduced to 41 percent.  Ex. B at SGH1-00013964.  On June 29, 2011, the DCCP SPA was amended and the Rollover Equity investment was reduced to 38 percent.  Ex. C at TCHAR0009768.

Evidence presented at trial directly contradicts Charron's assertion that there was no link between the Rollover Equity and cash.  Each of DCCP's proposals to purchase SGH, as well as the DCCP SPA itself, allocated the total purchase price among three types of consideration: (1) cash; (2) Rollover Equity; and (3) "deferred obligations."  *See* Exs. X, Y, B, and C. Throughout the negotiations, changes to the amount of Rollover Equity corresponded directly with changes to the amount payable in cash.  *Compare* Ex. Y, *with* Exs. B at SGH1-00013964 *and* C at TCHAR0009768.  The May 2011 SPA called for a Rollover Equity investment of $4.1 million and cash payments of $60.4 million, of which $16 million was deferred.  Ex. B at SGH1-00013964.  Under that agreement, DeBlasio would have received a 41 percent equity stake and a cash payment of $44.4 million.  The June 2011 amendments to the DCCP SPA

reduced the Rollover Equity from 41 percent to 38 percent.  The value of the Rollover Equity decreased by $300,000 to $3.8 million.  Accordingly, the amount payable in cash *increased* by $300,000 to $44.7 million.  Ex. C at TCHAR0009768.  DeBlasio explained at trial that he "would have gone down lower" to maximize the cash paid at closing.  Tr. 320:17-321:3 (J. DeBlasio Direct).

As DeBlasio and DCCP negotiated the balance of cash and equity that would fund the $64.5 million total, they priced the Rollover Equity component based on the anticipated debt financing and new cash investment.  The $10 million equity investment necessary to complete the sale was determined by subtracting the $54.5 million funded by debt and deferred obligations from the total $64.5 million purchase price.[2]  *See* Tr. 85:1-8, 86:17-87:8 (J. DeBlasio Cross), 597:4-12, 600:6-17 (Campbell Direct), 662:14-663:1 (Campbell Cross).  DCCP and other investors paid a total of $6.2 million for 62 percent of the $10 million equity.  Ex. 306 (Native Excel file at Tab C, "Sallyport Equity Flow").  DeBlasio paid $3.8 million for a 38 percent interest valued on the same terms.  Tr. 86:15-87:8, 89:23-90:16 (J. DeBlasio Cross), 318:8-321:3 (J. DeBlasio Direct), 595:13-24, 596:7-15 (Campbell Direct)

### 4.    The merger of Sallyport Holdings and Kaseman Holdings to create KSI did not increase the value of the Rollover Equity.

The July 29, 2011 merger of Sallyport Holdings and Kaseman Holdings to create KSI had no effect on the value of DeBlasio's Rollover Equity.  The only consequence of the merger was that DeBlasio's Rollover Equity interest in Sallyport Holdings was converted into an interest in KSI.  This was accomplished through a "merger ratio," which DeBlasio and Campbell negotiated and all of the equity holders in New Sallyport and Kaseman accepted.  *See* Ex. C at

---

[2]  The $57 million referenced in Exhibit CH covered the immediate payments due to DeBlasio at closing and accrued interest, prepayment penalties, and transaction expenses.  *See* Exs. 49, 306, Tr. 1826:23-1827:24 (P. DeBlasio Direct).

TCHAR0009759. There were no additional cash investments. There was no sudden increase in the "value" of any equity holder's interest as a consequence of the merger. Despite Charron's conspiracy theories, there is no admissible evidence that the merger somehow resulted in DeBlasio receiving an additional $20 million in equity.

Like all of the other aspects of the transaction, the merger to create KSI was negotiated at arm's length. The buyers and sellers agreed that New Sallyport would be merged with another DCCP entity, Kaseman Holdings. Ex. C at TCHAR0009758-59. Both DeBlasio and Campbell testified that they negotiated the final merger ratio in good faith after the closing of the DCCP SPA. Tr. 203:7-204:2, 204:11-21, 208:13-22, 210:23-211:20 (J. DeBlasio Cross), 321:4-323:23 (J. DeBlasio Direct), 596:16-597:23 (Campbell Direct). They ultimately agreed to a merger ratio allocating roughly 51 percent of the equity in KSI to the owners of Sallyport Holdings. Ex. C at TCHAR0009758-59.

The merger had no effect on the value of the Rollover Equity. Tr. 323:15-324:1 (J. DeBlasio Direct), 599:17-600:17 (Campbell Direct). When the merger was completed on July 29, 2011, *all* of the equity interests in Sallyport Holdings and Kaseman Holdings were converted to interests in KSI. *See* Tr. 1871:2-4 (Stipulations of Fact); *see also* Tr. 199:11-13 (J. DeBlasio Cross). At least ten distinct investors held interests in the entities affected by the combination. Ex. CI. All of the equity holders agreed to the merger and approved the merger ratio. *See* Ex. CI; Tr. 597:9-23 (Campbell Direct).

Charron's assertion that the merger resulted in DeBlasio owning a $20 million interest in KSI implies absurd results for the rest of the KSI investors. Some investors would have realized extraordinary gains, while others would have experienced dilution. Accepting the conclusions of Charron's expert would mean, for example, that BNY's $500,000 cash investment increased by

105

430 percent to $2,649,057 over the course of a single month.  See Tr. 1706:11-1707:8 (Hitchner

Direct).  It also would have meant that "the 5.225 million of equity that D.C. Capital was putting

in on the closing day was worth something in excess of $30 million.  That's just not reality."  Tr.

1192:15-23 (Lake Direct).  Investors on the Kaseman side would have enjoyed similar gains—

despite uncontroverted evidence that Kaseman's revenue and EBITDA were declining when the

merger occurred.  *See* Ex. 64 at ALC00000160.

      Even if Risius's figures were not implausible on their face, Charron failed to carry his

burden to show that Risius's speculation reflects reality.  There is no evidence that any party to

the transaction considered the merger with Kaseman to create any increase in value.  McLean

performed a valuation of the merged entity, and third-party auditors, McGladrey, reviewed the

merger and concluded the merger ratio had been appropriately applied.  Accordingly, no gain

similar to Charron's assertions of value was reported.

      The conduct of the parties after the KSI merger further conflicts with Charron and

Risius's wild claims.  In the May 29, 2013 settlement agreement, DeBlasio and DCCP agreed to

liquidate the Rollover Equity in connection with their settlement of a dispute over DeBlasio's

entitlement to the $4 million "Initial Holdback Amount" called for in the DCCP SPA.  Ex. AD.

The combined settlement payment for these two items, less a $150,000 indemnity payment, was

$3.85 million—nearly $4 million less than the $7.8 million set forth in the DCCP SPA.  *See*

Exs. AD, C at TCHAR0009768; Tr. 106:11-107:14 (J. DeBlasio Cross).  Mr. Risius's assertions

as to the value of DeBlasio's interest in KSI after the merger fail even the most basic test of

common sense.  *See Boyce v. Soundview Tech. Group, Inc.*, 464 F.3d 376, 388 n. 8 (2d Cir.

2006) ("A sound valuation will be based upon all the relevant facts, but the elements of common

sense, informed judgment and reasonableness *must* enter into the process of weighing those facts

and determining their aggregate significance." (internal citations omitted) (emphasis in original)).  If the Rollover Equity had been worth more than $20 million, as Mr. Risius asserts, DeBlasio would not have rationally accepted the Settlement Agreement.

### 5.    Charron's attempts to confuse are worthy of no consideration.

Left with no evidence and no logical argument to establish the occurrence of a Windfall Sale, Charron seeks to misdirect and confuse.  SGH's alleged admissions in litigation with Sagent, that the DC Capital Transaction involved a sale of less than 100 percent of SGH, are a red herring.  At trial, DeBlasio conceded that these statements were "too aggressive" and "a mistake."  Tr. 97:17-20 (J. DeBlasio Cross).  But the importance of DeBlasio's statements in the Sagent litigation is significantly overstated.  DeBlasio's after-the-fact arguments have no effect on the reality of the DC Capital Transaction.  It is undisputed that the DC Capital Transaction was a sale of 100 percent of SGH and its affiliated companies.  Tr. 85:4-8 (J. DeBlasio Cross); *see* Exs. B, C.  Charron's counsel admitted it during the hearing on the cross-motions for summary judgment.  Hr'g Tr. 8:1-2 (Sept. 26, 2013).  Charron's expert admitted it in his report. In Appendix 5 of his report, ¶ 44, Risius concludes:  "Effective June 29, 2011, SGH was acquired by DCCP through its portfolio company Kaseman.  On this date the DeBlasio Charitable Trust sold 10,000 shares of SGH, which represented 100 percent of the equity of SGH, to SH."  Tr. 1790:2-15 (Hitchner Direct).  According to Risius, "One would expect that if John DeBlasio, the sole shareholder of SGH, sold 100 percent of the equity of SGH, it would be reasonable to expect that the proceeds received would be equal to the enterprise value of SGH." Tr. 1459:20-1460:1 (Risius Cross) (quoting Ex. 98 at ¶ 38).

Charron's focus on the treatment of SGI in the DC Capital Transaction is similarly lacking in substance.  DCCP agreed to pay a $64.5 million price for the acquisition of all of the existing Sallyport entities.  As Tom Campbell and Doug Lake testified, it was immaterial to the

buyer what portion of the total price was allocated to which DeBlasio entity.  Tr. 655:17-656:10

(Campbell Cross); 1154:15-1155:1 (Lake Direct).  SGI was created in January 2011 as the

intended successor for Sallyport Support Services, an operating entity that had previously been

set up and operated by Charron prior to his resignation.  Ex. 132 at SGH1-00039912.  Most of

the Sallyport entities were owned by SGH directly at the time of the DC Capital Transaction, but

the membership units of SGI were held separately.  Tr. 1849:7-15 (P. DeBlasio Direct).  To

properly document the transaction, there were two sellers in the DCCP SPA:  the Bermuda

Charitable Trust, which was the sole shareholder of SGH, and the Florida Business Trust, which

held SGI.  Tr. 1847:14-1848:12 (P. DeBlasio Direct); *see also* Exs. B, C.  DCCP negotiated a

price to acquire Sallyport, including all of its affiliates and operating assets, for $64.5 million.

The fact that the agreement allocated a percentage of the purchase price to SGI is not relevant to

a determination of the value of the entire Sallyport enterprise.  Tr. 1848:13-1849:2 (P. DeBlasio

Direct).

> **C.**     **The sellers will never receive more than $3.8 million for the Rollover Equity from the buyer.**

Charron's inability to present a case consistent with the facts extends beyond the price in

the DC Capital Transaction.  Just as he asks the Court to ignore the parties' agreement on the

price, he also seeks to brush aside evidence of the consideration that DeBlasio actually received

for the Rollover Equity.  This is both illogical and unfair.  Even if there were some reason to

second-guess the price, Charron's failure to identify actual consideration over $3.8 million

makes it impossible to conclude that his purported "real value" in fact reflects a Windfall Sale.

In fact, DeBlasio will never receive more than $3.8 million for the Rollover Equity in

New Sallyport or KSI.  If there was any uncertainty about the value the Rollover Equity

contributed to the DC Capital Transaction price, it was resolved by the May 29, 2013 settlement

agreement.  *See* Ex. AD.  As a result of this agreement, Defendants no longer own any of the

company, and there is no possibility they will receive the outlandish amounts Charron proposes.

Charron has presented an array of arguments about what DeBlasio might have received in

the DC Capital Transaction, but there is no mystery in this regard.  DCCP agreed to pay $64.5

million.  Considering the settlement of the indemnity obligations and the surrender of the

Rollover Equity, it will never pay more than $61 million.  Charron's claim to 20 percent of

whatever his expert deems the value of SGH to be is particularly untenable when viewed in light

of what DeBlasio actually received.  Rather than seeking to share in a "windfall," Charron wants

to be paid a percentage of a price that was never agreed to or realized.  The Windfall Protection

provision does not support these demands.

## II.    Risius's valuation opinion is unreliable and deserving of no weight.

The opinions of Charron's expert witness Jeffrey Risius are not a basis to conclude that

SGH was sold at a price that reflects an enterprise value greater than $65 million.  First, Charron

has offered no reason to consider a post-hoc valuation.  He points to no evidence of fraud,

conspiracy, or other special circumstances that would negate the price set in the arm's-length

negotiations among DeBlasio, DCCP, and the other parties to the DC Capital Transaction.  The

evidence demonstrates that the $64.5 million total purchase price, the $3.8 million value of the

Rollover Equity, and all of the other aspects of the transaction were the subject of arm's-length

negotiations.  Although he points repeatedly to the economic incentive to avoid making a

payment under the Windfall Protection provision, even Risius would not say that the parties took

any action in furtherance of it.  *See* Tr. 1460:7-1463:12 (Risius Cross).  Risius's valuation

opinion is simply not relevant.

Second, even if there were some basis to consider a third-party valuation, Risius's

opinion deserves no weight.  Risius's reliance on a partial and misleading selection of evidence

conflicts with the applicable professional standards and does not survive scrutiny under Rule 702

of the Federal Rules of Evidence. *See Davis v. Carroll*, No. 09 Civ. 1088 (JPO), 2013 WL

1285272, at *25 (S.D.N.Y. Mar. 29, 2013) (expert's opinion is unreliable when it rests on a

misleading and biased selection of facts). His opinion is further undermined by his role as a

partisan advocate. The evidence demonstrates that Risius was hired specifically to make the case

for Charron. Risius and the firm of Stout, Risius & Ross trained Plaintiff's counsel, developed

the theory of the case, framed the questions presented to the expert witnesses, coordinated the

issuance of third-party subpoenas, managed the document database, drafted deposition questions,

and actively participated in Charron's trial presentation. His firm will at least $1.8 million in

fees for its work in this case. Such advocacy from a witness whose only permitted role is as an

objective assistant to the trier of fact is not appropriate.

A.     **Risius's opinions do not justify going beyond the purchase price.**

Risius asserts that the enterprise value of SGH on the day of the DC Capital Transaction

was more than $100 million and that the actual purchase price was more than $80 million—

significantly more than the $64.5 million set forth in the DCCP SPA. Risius's opinion is that the

Court should substitute his hypothetical "estimate" of the value of SGH for the actual price

negotiated at arm's-length. Apart from the substantive flaws and bias underlying his

conclusions, Risius's opinion would require the Court to conclude that the Defendants agreed to

misrepresent the purported "true" value of SGH and to create a false set of contract documents in

order to avoid making a windfall payment to Charron. There is no basis for this opinion. There

is no evidence of conspiracy, fraud, misrepresentation, or any other improper conduct of any

kind. Absent proof of such "special circumstances," the negotiated purchase price, including the

negotiated value of the Rollover Equity, is conclusive.

### 1.    Risius's valuation opinion disregards the parties' agreement that the Rollover Equity was worth $3.8 million.

Risius's initial justification for the Court's consideration of his valuation opinion is that $3.8 million is not the "true value" of the Rollover Equity.  Since it was not literally paid in cash, Risius asserts that a business valuation analysis is necessary to estimate the true value.  Tr. 1320:7-19 (Risius Cross).  That argument conflicts with the evidence demonstrating that all of the parties to the transaction agreed that the Rollover Equity was worth $3.8 million in cash on June 29, 2011, that the percentage of Rollover Equity DeBlasio would receive was linked to cash throughout the negotiations, and that DeBlasio accepted the Rollover Equity interest "in lieu" of receiving $3.8 million in cash.  Exs. X, Y, 296, 351, C, CI.  As Tom Campbell explained, the use of Rollover Equity was simply a tax-efficient way of requiring DeBlasio to use $3.8 million of the purchase price to buy equity in the newly formed company:

> Q.    Turn to Exhibit C, schedule 2.4.
>
> A.    Yup.  Yes, I have it.
>
> Q.    It says contributed stock value on schedule 2.4, the last page of Exhibit C, doesn't it, Mr. Campbell?
>
> A.    Yeah, I think that's a legal term.
>
> Q.    Right.  You don't give money, you contribute this thing and you get back another thing, right?
>
> A.    In lieu of cash proceeds, let's back it off.  So you had $64.5 million as the total purchase price as we discussed.  You back off the two holdbacks of two and four, you get cash of 58.5.  You back out the debt, gives you resulting equity of 10.  John invested 3.8.  There's a lot of different ways you can invest 3.8.  You can do it in a tax-inefficient way, where you give him the cash, pay taxes and then he put in 3.8.  Or you would, on a tax-efficient way, as allowed under the tax code, you would roll it over or, in essence, contribute that 3.8.  I think that's what this is meant to say.
>
> Q.    Okay.  So as a matter of metaphysical fact, he didn't get cash and pay for something; he rolled over equity.  He contributed these shares and got back 38 percent of Sallyport Holdings, correct?

A.      He took, he took part of his, the way I look at it, he took
        part of his cash consideration in $3.8 million of stock.

[Tr. 656:19-657:11 (Campbell Cross).]

Including the Rollover Equity as an element of the consideration avoided having DCCP transfer

$3.8 million in cash to DeBlasio and then having DeBlasio send the money back to a DCCP

account in exchange for a stock certificate in New Sallyport.  The Rollover Equity was

equivalent to $3.8 million in cash on the day of the sale.  It was not an add-on to the cash that

had to be separately valued.

### 2.      Charron presented no evidence of fraud, conspiracy, or any other improper conduct.

Risius's opinion that the purchase price should be disregarded in favor of his valuation

requires a finding of fraud, conspiracy, or other improper conduct by the parties to the DC

Capital Transaction.  In both his expert report and his trial testimony, Risius asserted that the

parties to the DC Capital Transaction had an incentive to make the transaction appear as if it was

not a Windfall Sale.  Tr. 1460:7-1463:14 (Risius Cross); Ex. 98 at 5, 13, 40-42.  But no evidence

of fraud, conspiracy, or other special circumstances that might justify looking beyond the

purchase price was presented.  Not a single email, agreement, or document exists to support such

a conspiratorial agreement.  No witness testified to anything remotely close to the conspiratorial

agreement that Risius describes.  On the contrary, all of the evidence demonstrates that the

buyers and sellers were negotiating at arm's length for their own interests in the deal.  *See* Tr.

592:5-23 (Campbell Direct); Tr. 316:7-17 (J. DeBlasio Direct).  Risius himself firmly and

repeatedly denied reaching the conclusion that the buyers and sellers took steps to advance their

incentive to avoid making a windfall payment.  *See* Tr. 1474:13-1475:18 (Risius Cross).  That

makes sense, because speculation as to the actions and motives of the parties is beyond the scope

of Risius's subject matter expertise.  *See Lippe v. Bairnco Corp.*, 288 B.R. 678, 687 (Bankr.

S.D.N.Y 2003) (citing *United States v. Scop*, 846 F.2d 135, 142 (2d Cir. 1988) ("Expert testimony is not relevant if the expert is offering a personal evaluation of the . . . motivations of the parties."); *Taylor v. Evans*, No. 94 Civ. 8425 (CSH), 1997 WL 154010, *2 (S.D.N.Y. Apr. 1, 1997) ("[M]usings as to defendant's motivations [are in]admissible if given by any witness—lay or expert.").

The only other possible rationale to consider Risius's opinion of value rather than the value agreed upon by the parties to an arm's-length transaction is Risius's self-serving opinion that the equity of KSI could not possibly have been worth as little as $3.8 million.  But that is a circular argument that first requires the Court to accept the validity of Risius's conclusions. Putting aside the problems with Risius's underlying analysis and his apparent role as an advocate in this case, the say so of an expert witness is not a reason to disregard the agreement of the parties.  *See General Electric Co. v. Joiner*, 522 U.S. 136, 146 (1997) ("A court may conclude that there is simply too great an analytical gap between the data and the opinion proffered."); *see also Mart, Inc. v. Reliance Ins. Co.*, 65 F. Supp. 2d 176, 180 (S.D.N.Y. 1999), *aff'd*, 12 Fed. App'x. 23 (2d Cir. 2000) (rejecting an expert opinion as unreliable because it was based on nothing but his own speculation and opinion).

### 3.  Charron failed to meet his burden to show fraud or conspiracy by clear and convincing evidence on Risius's inferences alone.

Even if Risius's conspiracy theory were a basis to consider his opinion, Charron would be required to prove the supporting facts by clear and convincing evidence.  *See Schlaifer Nance & Co. v. Estate of Warhol*, 119 F.3d 91, 98 (2d Cir. 1997).  The heightened evidentiary standard applies to issues of fraud and conspiracy in a civil claim even when it arises out of the same facts as a breach of contract claim.  *See Leucadia, Inc. v. Reliance Ins. Co.*, 864 F.2d 964, 971-92 (2d Cir. 1998) (applying the clear and convincing evidence standard to the civil fraud claim and the

preponderance of the evidence standard to other claims); *see also Gladstone Business Loan, LLC v. Randa Corp.*, No. 09 Civ. 4225 (LMM), 2009 WL 2524608, at * 2-3 (S.D.N.Y. 2009) (applying the clear and convincing standard to fraud and conspiracy claims arising out of the breach of contract claim).  Charron cannot carry this burden on the strength of Risius's inferences about the parties' "incentives" alone.

Even though Charron's fraud and conspiracy claims have already been dismissed, the clear-and-convincing evidence standard applies to Charron's claim that DeBlasio and DCCP conspired to misrepresent the price in the DCCP SPA.  The Connecticut District Court's decision in *Master-Halco, Inc. v. Scilia Dowling & Naterelli, LLC*, 739 F. Supp. 2d 109, 114-119 (D. Conn. 2010) is instructive in this regard.  In *Master-Halco,* the plaintiff filed a claim alleging a civil conspiracy to commit fraud.  The court held that the clear-and-convincing evidence standard applicable to the underlying fraud claim also applied to the allegations of conspiracy: "Here again, the logic is unambiguous:  since the civil conspiracy claim was premised on fraud, which must be proven by clear and convincing evidence, the elements unique to the civil conspiracy claim also must be established by the heightened evidentiary burden."  *Id*. at 117-18. This reasoning is applicable here as well.  Charron's breach of contract claims are untenable unless the DCCP SPA is disregarded as a fraudulent misrepresentation of the price at which SGH was sold.  Risius's speculation that the parties to the DC Capital Transaction had the incentive to engage in fraud—without any evidence to suggest they actually did—plainly does not meet Charron's burden.

### B.      Risius's valuation opinion is unreliable.

Assuming Charron meets his initial burden of establishing that a valuation opinion is relevant to the occurrence of a Windfall Sale, Risius's opinion cannot be properly considered because it is unreliable.  Risius trumpets irrelevant information that appears favorable to Charron

114

and buries relevant evidence that appears unfavorable. He cites inadmissible evidence such as unreliable third-party indications of interest and sales presentations, but he ignores actual offers, counter-offers, and completed transactions. Even though there is no basis for comparison, he cites figures derived from large and diverse public companies and sets them out with his authoritative opinion that they are "comparable." The result is a biased and unreliable opinion that does not conform to applicable professional standards and does not meet the basic threshold for admissibility set forth in the Federal Rules of Evidence.

Risius relies heavily on indications of interest received by SGH in 2010 to support the reasonableness of his conclusion. He asserts that the indications of interest indicate an enterprise value from $80-100 million, but he omits the fact that they were "nonbinding" and conditioned on the performance of due diligence. Tr. 1355:24-1356:21 (Risius Direct); Ex. 98 at 15 ¶ 47. It is the conditional nature of these expressions of interest, and the fact that they all were ultimately withdrawn, that makes them unreliable as evidence of value. *See Sharp v. United States*, 191 U.S. 341, 348-39 (1903) ("[Offers to purchase property] do not tend to show value, and they are unsatisfactory, easy of fabrication, and even dangerous in their character upon this subject."). Risius's use of these documents as support for his opinion does not make them reliable evidence of value. *See* Tr. 425:13-426:23 (Charron Direct) (admitting the indications of interest only to show Charron's state of mind); *see also Williams v. Illinois*, 132 S. Ct. 2221, 2234-35 (2012) ("[I]t is presumed that the judge will understand the limited reason for disclosure of the underlying inadmissible evidence [relied on by an expert in forming his or her opinion] and will not rely on that information for any improper purpose.").

In addition to unduly emphasizing unreliable information, Risius's review of "historical indications of value" completely ignored the higher quality indications of value that contradicted

his theory.  A reader of Risius's expert report would be unaware of the following facts and

circumstances:

- In December 2009, Charron and DeBlasio received an offer from Chart Capital that placed an enterprise value of $60 million on the company.  Ex. F.  After consulting with an advisor assisting with their efforts to sell the business, Charron and DeBlasio submitted a $64 million counteroffer to Chart in January 2010.  *See* Ex. F.  Chart then submitted a term sheet proposing a $62 million enterprise value.  DeBlasio told Charron "This offer values the enterprise at $62M which is in the range I believe we will find out on the market."  Ex. H.

- In October 2010, DeBlasio offered to buy out Charron's shares "for $26,250,000 thus implying an enterprise value for Sallyport of $52,500,000."  Ex. L.

- On November 30, 2010, Charron sent DeBlasio a counteroffer proposing a "$60M valuation."  Ex. R at SGH1-00229840.

- On December 7, 2010, Charron agreed to the Charron SPA, which placed an enterprise value of $50 million on the company. Ex. BM; Tr. 1449:11-1450-21 (Risius Cross), 1798:16-1799:13 (Hitchner Cross).

- On January 20, 2011, DCCP offered to "pay $57,500,000 to purchase all the outstanding stock of Sallyport on a cash free, debt free basis."  Ex. X.

- On April 11, 2011, after extensive negotiation, DCCP increased its offer.  DCCP offered to "pay $64,500,000 to purchase all the outstanding stock of Sallyport on a cash free, debt free basis." Ex. Y.

- The June 29, 2011 DC Capital Transaction establishes a total price of $64,500,000, with $48,385,262 due at closing, including the amount of the price that was reinvested in the Rollover Equity.  Ex. C at TCHAR0009768.

The scope of these omissions makes it clear that Risius's "historical indications of value" are a

carefully crafted mirage intended to deceive the reader.

In addition to omitting relevant information and documents from his report, Risius

considered an unrepresentative sample of historical valuations, financial models, and sales

documents.  For example, Risius relies on the McLean Group's valuation of SGH for Charron's

Grantor Retained Annuity Trust, which estimated SGH's enterprise value at $99,542,777, but ignores the later version of the valuation that estimated the enterprise value at $52,216,466. *See* Exs. 67 at TCHAR0009539, 99 at 8. Rather than considering BNY's investment of $500,000 for a five percent share of New Sallyport, Risius selects a stray number in a draft spreadsheet and concludes that BNY's report "supports my concluded EV of $103 million as of the Valuation Date." Ex. 98, App'x 8 at 9 ¶ 24. BNY representative Scott Gold's testimony confirmed that the figure relied upon by Risius was not representative of BNY's projections for SGH. *See* Ct. Ex. 1 at 217:22-220:23 (Gold Dep.). Risius also relies on the range of values that Jefferies presented, but he omits the fact that no purchaser made an offer that might validate those estimates. Tr. 1708:3-1709:1 (Hitchner Direct).

Risius's reliance on DCCP's efforts to market KSI at a price higher than it paid for SGH is akin to citing a real estate listing for property that never sold while ignoring the price a buyer actually paid. Courts in New York have, unsurprisingly, rejected this approach. *See Application of 325 Highland LLC v. Assessor of the City of Mount Vernon*, No. 19751-03, 2004 WL 2683668 (N.Y. Sup. Ct. Nov. 23, 2004). In *325 Highland*, the petitioner-property owner filed a tax appeal challenging the city's tax assessment on his property, which the city based on his attempt to sell the property for more than twice the amount he had paid for it. The petitioner argued, and the court agreed, that the recent purchase price for the subject property was the best evidence of value because it had been reached in an arm's-length transaction. Citing *Plaza Hotel*, the court found that the burden was on the city to show "abnormal circumstances" that would displace the price the petitioner had actually paid in an arm's-length transaction as evidence of value. *See id.* at *1 (citing *Plaza Hotel*, 37 N.Y.2d at 278). The court rejected the city's argument that the real estate listing was one such circumstance. Efforts to sell at a higher price than was originally paid

"do not provide evidence of market value" and are not "abnormal circumstances" that would justify disregarding the purchase price. *Id*. at *2. The Court should reject Risius's use of the Jefferies documentation for the same reasons.

### C. Risius violated applicable professional standards.

The impropriety of Risius's opinion is highlighted by the fact that his work was done in violation of the professional standards applicable to his field of expertise. Risius is a "Senior Appraiser" and a member of the American Society of Appraisers ("ASA"). Tr. 1381:9-10 (Risius Cross). ASA administers the business valuation qualification test and the continuing education courses cited by Risius. Tr. 1381:12-17 (Risius Cross). Risius's affiliation with ASA appears on his business card and Risius concedes the ASA Business Valuation Standards apply to his work in business valuation. Tr. 1381:18-23 (Risius Cross); Ex. 109. Risius argued repeatedly that his work was not an "appraisal." Tr. 1378:15-1379:6, 1382:12-13, 1386:15-20 (Risius Cross). But his position on this point is not credible. The ASA Business Valuation Standards define an appraisal as "the act or process of determining the value of a business, business ownership interest, security, or intangible asset." Tr. 1381:22-1382:11 (Risius Cross).

Standards 9 and 10 of the Uniform Standards for Professional Appraisal Practice ("USPAP") are also applicable to Risius's work in this case. The applicability of the USPAP rules in the context of litigation consulting are addressed in Advisory Opinion AO-21, which was admitted in evidence as Plaintiff's Exhibit 410. Advisory Opinion AO-21 provides for the applicability of USPAP 9 and 10 whenever an expert's services include "providing an opinion of value." Ex. 410 at A-69. Though he asserted that he was not subject to the USPAP standards because he was acting as a litigation consultant, Risius ultimately admitted that his analysis

includes an "opinion of value." Tr. 1389:5 (Risius Cross). He uses the term "conclusion of value" in his report. *E.g.*, Ex. 98 at 14. The USPAP rules are applicable for this reason.

Risius failed to comply with the USPAP requirements. Risius admitted making the conscious determination not to make the certifications required by USPAP Standard 10-3. *See* Ex. AF. Risius's in-court pledge of compliance with the certifications does not avoid the non-compliance. The requirement is that the certifications appear in the report. This is to allow the reader of a business valuation report to ascertain its objectivity from the text of the document. The Risius report does not offer this guarantee of objectivity. A reader should not need to wait a year after the original report is published to see if the appraiser makes the certifications in a trial in which the appraiser's reliability and objectivity are in issue.

Risius also plainly violated USPAP Standard 9, which requires the appraiser to consider both the positives and the negatives that would affect the valuation and prohibits the presentation of a misleading selection of facts. Standard 9-1(b), for example, provides that an appraiser must "not commit a substantial error of omission or commission that significantly affects an appraisal." Ex. AF. Standard 9-2(f) requires the appraiser to "identify any extraordinary assumptions." Ex. AF. Standard 9-4(b) requires the appraiser to analyze the effect of past sales of capital stock or other ownership interests in the business enterprise or intangible asset being appraised. *See* Ex. AF (USPAP Standard 9-4(b)(iv) and 9-4(b)(v)). Risius violated all of these standards with his selective presentation of facts, reliance on irrelevant indications of value, and omission of actual market indicators—including the past sale of stock reflected in the Charron SPA. This is precisely the kind of conduct USPAP Standard 9 prohibits.

**D.      Risius improperly applied the specific-company risk factor by ignoring unique risks facing SGH's business.**

The viability of Risius's discounted cash flow method relies substantially on the reasonableness of his application of zero percent specific-company risk in the discounted cash flow models he presents for SGH and KSI.  Tr. 1483:20-1484:4 (Risius Cross).  The evidence demonstrates that Risius's use of zero percent specific-company risk is inappropriate.  First, the evidence shows that SGH and KSI faced considerable unique risks that are not captured in the projections or in other aspects of the discounted cash flow model.  The risks arise from the nature of their work, the fact that the primary business was to provide armed personnel to support contingency operations in war zones, as well as from the impending drawdown of American troops in Iraq.  *E.g.*, Tr. 1112:25-1114:2 (Smith Redirect).  The safety risks involved with doing business in Iraq were not abstract.  SGH lost 23 employees in Iraq, including 19 who were pulled off a bus and summarily executed.  Tr. 235:13-24 (J. DeBlasio Direct).

SGH faced considerable financial risk because the majority of its business was contingent on troops remaining in Iraq.  McLean identified this as a real risk to SGH's business because the government had already signed a Status of Forces Agreement requiring the complete withdrawal of American troops from Iraq by the end of 2011:

> Q.      There was a status of forces agreement in place in 2010 that called for the United States to withdraw its troops and its contractors from Iraq by December 2011.  Did that influence your assessment of the specific company risk in 2010?
>
> A.      Yes.  As I mentioned before, our firm is very active in government contracting.  We sold over 41 government contractors since 2010.  We're very familiar with the government contracting operating environment.  And that does affect—I'm sorry.  To be specific, if the expectation is to draw down troops and contractors in Iraq by a certain date, that, those put additional pressure on the contracts, forecasts, and the expectation that a buyer would have.

> And we were trying to measure what a hypothetical willing buyer would look at a business, hypothetical willing buyer would assign risk to that business, relative to a company doing similar services in a different environment.

[Tr. 1113:12-1114:2 (Smith Redirect).]

Due to the expected withdrawal of troops, SGH was at risk of losing its largest contract, the LOGCAP III contract for firefighting services in Iraq.  Risius challenges the McLean Group's adjustment of DCF analysis which factored in the risk of losing of the LOGCAP III contract.  Tr. 1327:7-22 (Risius Direct).  But he ignores evidence showing that DCCP knew that the majority of SGH's revenue derived from LOGCAP and that SGH was at risk of losing the LOGCAP III contract in 2011.  And he ignores the fact that the McLean model adjusted the specific-company risk downward by five percentage points when it removed the LOGCAP contract.  Tr. 1715:15-1716:1 (Hitchner Direct).

Sallyport faced additional risk as a result of its lack of diversification and heavy dependency on continuing United States involvement in Iraq.  Tr. 1112:25-1114:2 (Smith Redirect); Tr.1711:19-1712:12 (Hitchner Direct).  Unlike SGH's competitors, who had "higher end services," Sallyport's prime business was to provide contingency operation services to the troops in Iraq, and its business was much more risky than the companies that Risius found comparable to Sallyport.  *E.g.*, Tr. 1114:3-15 (Smith Redirect).  Because the majority of Sallyport's business came from supporting the troops in Iraq, an end to the Iraq war put the company's financial future in extreme jeopardy.  A company's lack of diversification is a commonly cited factor in assessing specific-company risk.  Tr. 1712:13-1713:13 (Hitchner Direct).  The risks Sallyport faced due to the nature of the government contracts business, the nature of Sallyport's contingency operation services, and the likely end to the war in Iraq all factored into the McLean Group's analysis of specific-company risk.

Risius ignores the evidence proving that DCCP factored these risks into its offer to acquire SGH. Both Tom Campbell and Doug Lake of DCCP testified that the price they offered to pay was affected by their awareness of the Iraq drawdown. Tr. 602:16-603 (Campbell Direct), 632:13:633:14 (Campbell Cross), 1138:19-1139:6, 1223:5-13 (Lake Cross). As predicted by DCCP, and appropriately factored into the McLean valuation, Sallyport lost its largest contract, LOGCAP III, in 2011. Tr. 631:22-632:12 (Campbell Cross), 1223:13-15 (Lake Cross).

Risius's failure to consider these factors renders his valuation opinion unreliable. In *MTX Communications Corp. v. LDDS/WorldCom, Inc*., 132 F. Supp. 2d 289, 292 (S.D.N.Y. 2001), the plaintiff's expert performed a valuation that failed to look at the company's financials and evidence of quality of management that the company had provided. The court granted the defendant's *Daubert* motion to exclude the expert's opinion based, in part, on the expert's failure to take into account evidence showing risks faced by the company:

> Common sense and experience, as well as the flexibility afforded me by *Daubert* and its progeny, dictate that financials and quality of management-particularly of a start-up company-must be considered in valuing a company and its probability of success. It makes little, if no sense at all, to consider a company's lifeline in a vacuum. Every business, after all, is subject to economic downturns, managerial mistakes or, even, natural disaster. [The expert's] failure to include these factors, as well as to even consider learning how much actual money was taken in by MTX via a true-up, renders his valuation unreliable and unfit for the jury's consideration. [*Id*. at 292.]

Like the expert in *MTX Communications*, Risius's opinion is unreliable because he fails to consider key factors including the risks faced by SGH and considered by the buyer.

Finally, there is widespread agreement that specific-company risk is a subjective determination, that there is no uniform quantitative methodology to assign specific-company risk, and that two appraisers presented with the same set of facts can reasonably reach two different conclusions as to the specific-company risk that should be applied. Tr. 1480:25-

1481:19 (Risius Cross), 1710:10-1711:1 (Hitchner Direct).  Risius presented his figures as if they were the only permissible way to approach the issue, but he admitted at trial that others might reasonably reach different conclusions.  The fact that his discounted cash flow method begins with a "conservative" set of revenue projections does not dictate that the specific-company risk must be zero.  McLean and McGladrey both concluded that a high degree of specific-company risk was needed to address the unique risks facing the business of SGH and KSI.  Mr. Hitchner agrees with them, and Risius has not established that their opinions were objectively incorrect or unreasonable.  Given the nature of the company's business and the impending drawdown of troops in Iraq, it was reasonable to conclude that even the most conservative projections carried with them a significant degree of risk.

### E.    Risius inappropriately acted as an advocate.

The objectivity and reliability of Risius's expert opinion are further undermined by his position as an advocate for Charron.  *See e.g.*, *Lippe*, 288 B.R. at 687 ("An expert's role is to assist the trier of fact by providing information and explanations; the expert's role is not to be an advocate.").  Risius's role in this case far exceeds that of an expert hired to help the trier of fact understand complex financial data.  He acted improperly as a legal advocate by developing arguments and theories on behalf of the plaintiff.  Risius's role as a partisan expert drives his valuation opinion and pervades his analysis.  Risius himself concedes that it is difficult to discern between his litigation support services and his expert analysis: "there is a fine line between if I'm analyzing a document that is financial analysis or is that document review."  Tr. 1403:4-6 (Risius Cross).  Because of his dual role, Risius's objectivity was compromised to a degree that should render his testimony inadmissible.  *See, e.g.*, *Lippe*, 288 B.R. at 687 ("Indeed, when expert witnesses become partisans, objectivity is sacrificed to the need to win.").

Charron testified that Risius was hired as an advocate "to prove that the enterprise value of SGH was more than 65 million." Tr. 808:12-17 (Charron Cross). Everything Risius has done in this case has been in support of that mission. In addition to developing legal theories on behalf of Charron, Risius's firm performed all of the document review and operated the litigation support software. Tr. 1421:17-19 (Risius Cross). Risius's firm drafted deposition questions for all witnesses. Tr. 811:2-10 (Charron Cross), 1402:22-1406:4 (Risius Cross). Risius's associate, Brian Hock, attended all of the depositions with counsel. Tr. 1394:21-25 (Risius Cross). Risius's firm determined which third parties should receive subpoenas and helped identify which documents should be sought in discovery requests. Tr. 1421:17-19, 1422:2-8 (Risius Cross). Risius also improperly performed the functions of a partisan advocate during the trial. Brian Hock sat beside lead counsel at trial in the seat typically utilized by the second-chair attorney and consulted with Charron's counsel throughout the duration of the trial. Tr. 809:19-810:2, 811:23-812:3 (Charron Cross), 1394:15-20 (Risius Cross).

Risius's cross-over from objective advocate to zealous advocate is presented squarely in his admission on cross-examination that he wished he could have been the one asking deposition questions so as to elicit the right answers from the deponents:

> Q.  And do you recall noting the similarity between the questions that you had prepared and the questions that were asked in the deposition?
>
> A.  I recall wishing that I could ask the questions so that I could get the answers that were, that counsel didn't understand what he was saying so he didn't reask the question in the right way, so I recall that, because he used, my recollection in reading his deposition is that certain parts he kind of avoided what the real question was.

[Tr. 1405:9-17 (Risius Cross).]

124

Risius's impulse to elicit testimony that supports Charron's theory of the case, along with his development of legal theories and performance of litigation functions, all support a finding that Risius acted inappropriately as an advocate for Charron.

Court decisions are uniformly critical of experts acting as partisan advocates.  The expert in *Lippe v. Bairnco* called himself a consultant or analyst, but performed the functions of an attorney.  As in this case, his scope of work included "help[ing] plaintiffs explore and develop legal theories, identify[ing] the legal issues and the facts—the kinds of facts that would be necessary to support various claims, formulat[ing] and develop[ing] issues and theories in the case, and evaulat[ing] the defense that would be put up in the case."  288 B.R. at 684.  The expert in *Lippe* inappropriately suggested areas of cross-examination for the defendant.  *Id.*  Over the objections of the plaintiff, who sought to salvage portions of the expert testimony on which he could still offer objective opinions, the court ruled, "because of his advocacy on behalf of plaintiffs as counsel and legal advisor, I do not believe that he can now testify with the detachment and independence that one would expect from an expert witness offering views as a professional."  *Id.* at 689.

The amount of fees Risius's firm charged strongly supports the conclusion that Risius acted as a partisan advocate.  Risius's firm will receive fees of approximately $1.8 million for its work in this case.  Those fees include payment for work by Risius to carefully select from the various available documents to make the case for Charron.  The fees for training Charron's counsel, for managing the document discovery, for identifying witnesses and preparing document subpoenas, and for preparing deposition questions are all lumped together with Risius's fees for his appraisal services.

The role played by Risius is well outside the bounds of acceptable conduct in the business valuation community. The USPAP standards prohibit an appraiser from acting as an advocate in a case in which he offers an opinion of value. Ex. 410 at A-69 ("[An expert] may provide litigation services by either acting as an appraiser or acting as an advocate for the client's cause; however, she must not perform both roles in the same case."). Industry publications regularly caution business valuators against crossing the line into advocacy. *See e.g.*, Richard M. Wise, *The Use and Abuse of Experts*, *in* HANDBOOK OF BUSINESS VALUATION 555, 559 (Thomas L. West et al. eds., 2d ed. 1999) (warning valuation professionals to "maintain an objective and professional posture with respect to all aspects" and never "under any circumstances be an advocate (that is the attorney's role)."

### F. At least three courts have published opinions rejecting Risius's analysis as biased and unsupported.

This is not the first time Risius's opinions have been deemed unreliable due to his reliance on a misrepresentative selection of data. At trial, Risius denied ever having served as an advocate for his clients. Tr. 1417:21-1418:10 (Risius Cross). But his lack of recall on this issue appears to have been merely an effort to avoid the question. In *Henry v. Champlain Enterprises, Inc.*, the court disregarded Risius's valuation because he was "a retained expert . . . clearly hired to make the case for the plaintiffs." 334 F. Supp. 2d 252, 268 (N.D.N.Y. 2004), *rev'd on other grounds*, 445 F.3d 610, 621 (2d Cir. 2006). As he did in this case, Risius presented a biased valuation opinion by "carefully select[ing] from the various options to reach a result which would enhance the potential damage sustained by the [plaintiffs]." *Id.* The court in *In re Global Technovations, Inc.*, 431 B.R. 739, 767-68 (Bankr. E.D. Mi. 2010), *aff'd* 694 F.3d 705 (6th Cir. 2012), similarly rejected Risius's valuation opinion because he had relied on unreliable sales documents and projections.

Risius's opinion was also disregarded as unreliable in an opinion issued by the Michigan Department of Labor and Economic Growth.  *See Branford Towne Houses Cooperative v. Taylor and City of Taylor and County of Wayne*, MTT Docket No. 90502 (Mi. Tax Court Sept. 1, 2005) (copy at Exhibit CW).  In that case, Risius affirmatively stated his compliance with the USPAP standards in his appraisal report.  The court found his analysis to be noncompliant with USPAP Standards 9 and 10.  Like his report in this case, Risius's report in *Branford Town Houses* failed to discuss both the "positives" and the "negatives" affecting his valuation conclusions.  The court rejected Risius's post-hoc efforts to redeem his opinion, finding the report to be in direct conflict with USPAP Standard 10, which requires the report to "clearly and accurately set forth the appraisal in a manner that will not be misleading."  *Id.* at 78-80.  Risius's opinion in this case is the result of precisely the same type of impermissible advocacy.  Even assuming that the Court finds it relevant, Risius's opinion should be disregarded.

## III.    Disbursements of excess cash prior to the DC Capital Transaction were not part of the sale and are not part of SGH's "enterprise value."

Charron does not limit himself to demanding 20 percent of a hypothetical sale price that DeBlasio never achieved.  He also wants 20 percent of the profits the company generated and disbursed before the DC Capital Transaction took place.  Charron's effort to recapture these retained earnings is flawed on many levels.  The Charron SPA does not grant Charron any right to share in disbursements among DeBlasio and his affiliates, and its terms do not expressly or impliedly restrict DeBlasio's control over the company's excess cash.  *See Metro. Life Ins. Co. v. RJR Nabisco, Inc.*, 716 F. Supp. 1504, 1516-17 (S.D.N.Y. 1989) (holding duty of good faith and fair dealing only operates to protect explicitly bargained-for benefits).  Charron freely signed away the right to share in SGH's profits when he sold his half of the company for more than $40

million.  Neither of Charron's experts identified any facts that would justify Charron's attempt to recapture these rights with respect to any of DeBlasio's uses of cash in 2011.

A. **Charron's claim to pre-sale disbursements conflicts with the language of the Charron SPA.**

The Charron SPA links the occurrence of a Windfall Sale to a series of conditions, each of which must be present before any payment obligation to Charron arises.  To be considered a Windfall Sale, a transaction or series of transactions must:  (1) effectuate DeBlasio or his affiliates' sale or agreement to sell; (2) shares of the Company's capital stock; (3) constituting 20 percent or more by voting power or economic value of the Company's assets or equity; (4) to a third party; (5) for a price that reflects an enterprise value of the Company equal to or greater than $65,000,000.  Ex. A § 2.04.  If a Windfall Sale occurs, an additional payment to Charron would be required.  Pre-sale disbursements of cash and non-operating assets excluded from a sale are not part of the "price" that reflects the "enterprise value" of SGH.  They are not "proceeds" of a sale to a third party and they do not fall within the scope of the language seeking to capture payments in "related transactions."

First, the pre-sale disbursements do not contribute to the enterprise value reflected by the price in the DC Capital Transaction.  Charron understood when he signed the Charron SPA that disbursements of retained earnings were not included in the "enterprise value" measure in the Windfall Protection provision.  Throughout their efforts to sell Sallyport to a third-party buyer and in their negotiations of the Charron SPA itself, Charron and DeBlasio regularly and consistently used the term "enterprise value" to distinguish the value of their ownership interests from the value of excess cash and investments of retained earnings.  *See* Tr. 273:19-274:8 (J. DeBlasio Direct).  The investment bankers hired to help sell Sallyport in 2009 adopted this distinction in their communications with Charron and DeBlasio.  *See* Exs. F, G; *see also* Tr.

302:8-15 (J. DeBlasio Direct).  In January 2010, consultant Glen Corliss explained to Charron that their discussion of an offer using the term "enterprise value" excluded "excess cash," which would have been distributed to the shareholders before the transaction was completed.  "That money is NOT counted in the $64 million enterprise value.  So, you get half of $64 million plus half the excess cash."  Ex. F.

Charron repeatedly used this distinction throughout the marketing process with Sagent and in the negotiations that led to the Charron SPA.  When John DeBlasio proposed the buy-sell agreement in October 2010, he offered to "sell my shares and rights in the company (net of the investments, cash and equivalents current in the company) for 26,250,000, thus implying an enterprise value for Sallyport of $54,400,000."  Ex. L.  On November 1, 2010, Charron forwarded DeBlasio a memorandum prepared by SGH's counsel describing the tax implications of a proposed transaction in which "the Buyer buys the company for $124M ($90M Enterprise Value plus 85% value of 40M excess cash on the books)."  Ex. BJ.

Charron's trial testimony that he intended an "industry standard" definition of enterprise value makes no difference.  *See* Tr. 570:24-571:9 (Charron Cross).  Charron and DeBlasio's usage was consistent with the expert testimony in this case that the industry standard definition of the term "enterprise value" looks exclusively at the *future* value of a company.  Risius defines enterprise value as "the present value of all future cash flows expected to be generated from that company . . . the value of any business or asset is related to the cash flow it generates, not the net income as reflected on the company's income statement or tax return."  JEFFREY M. RISIUS, BUSINESS VALUATION: A PRIMER FOR THE LEGAL PROFESSIONAL 27 (2007).  Defendants' expert Jim Hitchner agreed.  Tr. 1669:24-1672:8 (Hitchner Direct).  Cash and other investments in excess of a company's working capital are typically excluded from "enterprise value" because

they represent a company's past earnings and are not necessary to generate future cash flows. Tr. 1671:20-1672:24 (Hitchner Direct).  Applying an industry standard definition here does not make the retained earnings distributed prior to the DC Capital Transaction part of SGH's enterprise value.  Those earnings already belonged to DeBlasio as the sole shareholder.

Second, the cash and loans disbursed prior to the sale were not "proceeds" of the sale to DCCP, but profits and investments of profits earned by Sallyport in the operation of the company prior to the sale.  *See* Tr. 305:21-306:21 (J. DeBlasio Direct); Tr. 1831:13-19 (P. DeBlasio Direct).  The DC Capital Transaction was "cash-free, debt-free."  *See* Exs. X, Y; *see also* Ex. B at SGH1-00013902; Tr. 1672:25-1673:8 (Hitchner Direct).  DCCP did not purchase any of the excess cash.  Tr. 1147:20-24 (Lake Direct).  Neither did it purchase the loans DeBlasio had made using SGS's retained earnings, for the same reasons.  Tr. 1157:22-1158:11 (Lake Direct).  The cash-free, debt-free nature of the DC Capital Transaction is consistent throughout the private equity industry.  Tr. 1412:1-1413:4 (Risius Cross), 1671:20-1673:2 (Hitchner Direct).  In fact, no prospective buyer of Sallyport, from 2009 through 2011, ever offered to purchase the cash in excess of working capital, despite Charron and DeBlasio's efforts to market the cash as an asset for sale with the company.  Tr. 309:11-24 (J. DeBlasio Direct); *see also* Ex. BJ.  Investors like DCCP were interested in SGH's future earnings, not the money the company had already earned. Tr. 1671:10-19 (Hitchner Direct).  As Doug Lake explained, "The cash is owned by the owner of the business . . . .  It's their money to take with them at that point in time when new ownership steps in."  Tr. 1148:18-21 (Lake Direct).  The retained earnings and investments already belonged to DeBlasio when he redirected these assets to his affiliates before the DC Capital Transaction closed.  They were not "proceeds" of the sale.

Third, the pre-sale disbursements, assignments, and contributions were not sales to a third party.  The entities that initiated the transfers, SGS and SGI, were DeBlasio's affiliates, the Bermuda Charitable Trust and the Florida Business Trust.  The receiving entities, the Bermuda Charitable Trust and WD Solutions, were also DeBlasio's affiliates.  The sellers received no payments from third parties for any of the cash or cash invested in the form of loans disbursed prior to the sale.  The Court has already ruled in this litigation that transactions between DeBlasio and his affiliates cannot be Windfall Sales because they do not meet these requirements.  *See* Dkt. No. 73 (dismissing breach of contract claims predicated on transactions between DeBlasio affiliates).  The contributions, distributions, and assignments should be treated the same way.  They cannot be considered a series of transactions effecting a Windfall Sale because they were not "sales" of assets to a "third party."

Finally, Charron's expert Daniel Selby's testimony that the disbursements were proceeds because they were "related" to the sale misses the point.  *See* Tr. 1579:19-1580:12 (Selby Direct).  The pre-sale disbursements of cash and investments to the shareholders and their affiliates are not part of a "series of related transactions" simply by virtue of having occurred in the same time period as a sale.  The "series of related transactions" language in the Windfall Provision prevented the sellers from avoiding the occurrence of a Windfall Sale by breaking up a sale into multiple separate sales that would not individually trigger a payment obligation, *e.g.*, several sales of less than 20 percent of the company.  But that phrase does not override the other requirements of a Windfall Sale, which the pre-sale contributions, distributions, and assignments all fail to meet.  Indeed, the disbursements Selby identified were not "sales" of the company's assets at all:  no one, third party or otherwise, paid a dime for them.  Nothing in the Charron SPA justifies Charron's effort to have those disbursements be deemed part of the transaction.

**B.      Selby's opinion is not helpful to the trier of fact.**

Charron's principal source of support for his claim to the pre-sale disbursements is professional testifier Daniel Selby.  Selby's expert opinion should be disregarded because it is unhelpful, factually inaccurate, and conceptually flawed.  Selby's opinion amounts to a creative accounting exercise to connect every possible source of funds DeBlasio received to the DC Capital Transaction without regard for whether the funds were actually paid by the buyer or even paid at all.  The Court should disregard his opinion entirely.

Selby's opinion is unhelpful under Rule 702(a).  John DeBlasio freely testified on the first day of the trial that cash amounts totaling roughly $29 million were transferred to the Bermuda Charitable Trust and Florida Business Trust before the sale.  *See* Tr. 170:3-15 (J. DeBlasio Cross).  McGladrey's workpapers detail the exact dates and amounts of these transfers. Ex. 210; *see also* Tr. 1830:1-1835:14 (P. DeBlasio Direct) (discussing Exhibit 210).  Whether the transfers that did occur were "proceeds" within the meaning of the Charron SPA is a legal issue for the Court to determine and—as Selby himself recognized, Tr. 1623:22-1624:6, 1651:17-22 (Selby Cross)—not a proper subject for expert testimony.  *See Marx & Co. v. Diners' Club*, 550 F.2d. 505, 510-12 (2d Cir. 1977) (holding it impermissible for an expert to opine on legal obligations of parties under a contract).

As to other purported cash disbursements, Selby's testimony was so riddled with factual errors and implausible assumptions that it should carry no weight.  Selby admitted in his direct examination that two transactions identified in his report as proceeds from the sale of SGH never actually happened.  Tr. 1594:1-1598:6 (Selby Direct).  In open court, Charron's counsel used a magic marker to cross out $8.5 million that appeared on a pie chart prepared for the specific purpose of summarizing the alleged "proceeds" of the DC Capital Transaction. Ex. 405(f).  Other figures in the pie chart revealed smaller inaccuracies in Selby's testimony, including the

$23.45 million he ascribed to the donation to the Bermuda Charitable Trust and the $2.75 million value assigned to the loans assigned to WD Solutions. *Compare* Ex. 210 (McGladrey audit of disbursement amounts)*, with* Ex. 405(f) (pie chart); *see also* Tr. 1835:1-21, 1840:17-1842:8 (P. DeBlasio Direct) (discussing Ex. 210). Selby appears to have simply chosen the higher figure whenever he encountered a discrepancy in the documents. *See* Tr. 1633:19-1335:10 (Selby Cross). This is not expert testimony; it is advocacy.

Selby's largest error is the most egregious of all. Selby incorrectly interpreted a tax return for the Florida Charitable Trust to come to an opinion that DCCP paid DeBlasio an additional $14 million through SGI in December 2011. *See* Exs. 405(f), 353; Tr. 1611:8-11 (Selby Direct). As Pat DeBlasio explained, this $14 million actually consisted of cash the Bermuda Charitable Trust received from the pre-sale donation from SGS. Tr. 1839:11-19 (P. DeBlasio Direct). Selby double-counted the $14 million as additional cash paid by a third-party, when in fact it was an internal transfer of funds from the Bermuda Charitable Trust to the Florida Charitable Trust. In addition to Pat DeBlasio's explanation, Selby ignored the bank statements showing the $14 million wire transfer from the Bermuda Charitable Trust and the $14 million deposit received by the Florida Charitable Trust on the same day. *See* Exs. 276, 299.

In addition to these factual errors, the theories by which Selby purported to identify proceeds of the DC Capital Transaction were preposterous. There is no basis for Selby's assertions that cash disbursements are "proceeds" of a third-party sale just because they happened only a few days apart, for example, or for his assertion that a charitable donation must be fraudulent because the company had not previously made such a large donation. Selby's opinion that the pre-sale disbursements were proceeds of the DC Capital Transaction because McGladrey accounted for the loan amounts as distributions rather than expenses should be

dismissed out of hand.  *See* Tr. 1577:18-1579:15, 1586:22-1587:6, 1603:14-1604:6 (Selby

Direct).  Pat DeBlasio—the accountant who originally booked the amounts as expenses—

explained that the characterization as a distribution or expense was an internal accounting issue

for KSI after the sale.  Tr. 1832:8-1834:15 (P. DeBlasio Direct).  Selby offered no coherent

reason why it made any difference to the question of proceeds.  Instead, he offered his own say-

so:  "In reality, in substance it was distribution.  That means it's a proceed."  Tr. 1645:10-11

(Selby Cross).  Selby's statement is not a substitute for evidence.

### C.    The loans assigned to WD Solutions should be treated no differently from the cash disbursements.

Charron's litigation strategy involved drawing an artificial distinction between the pre-

sale distributions that Selby calls proceeds and the loan investments that Risius calls operating

assets.  The Court should reject Charron's false dichotomy because the cash and loans are

indistinguishable for all relevant purposes.  All of these assets were either excess cash or

investments of excess cash generated by the operation of Sallyport's business for the benefit of

DeBlasio.  DCCP was apprised of the existence of all them, but it declined to purchase them.  No

third-party funds were exchanged in consideration of either the cash or the loans.  These

common elements disqualify the assigned loans from being considered "proceeds" or part of the

"enterprise value" that the DC Capital Transaction price reflects.

The $64.5 million price that DCCP agreed to pay included an arm's-length agreement

that the loans were non-operating assets that would not transfer in the sale.  DCCP and DeBlasio

discussed whether the loans would be included in the sale price for Sallyport before the

transaction closed.  Ex. CD; Tr. 1159:23-1162:3 (Lake Direct).  DCCP ultimately agreed that

they would not.  Tr. 1157:22-1158:11 (Lake Direct); *see* Ex. 132 at SGH1-00039943-44.

McGladrey audited the transfer and concluded the loans were properly treated as distributions to

DeBlasio.  Ex. 210; Tr. 1163:23-1167:1 (Lake Direct).  Nothing in the Charron SPA empowers Charron or Risius to remake the arm's-length agreement DCCP and DeBlasio reached on this matter.

Risius's ploy to sever two of the loans from this logic by labeling them "operating assets" is therefore flawed from the beginning.  The Charron SPA does not hinge on a hypothetical discussion of SGH's "enterprise value."  The triggering clause instead looks to whether the *price* reflects an enterprise value equal to or greater than $65 million. Ex. A at § 2.04.  The price under these circumstances does not "reflect" an enterprise value equal to $64.5 million plus the book value of the loans.  Rather, it "reflects" DCCP and DeBlasio's judgment that the loans were non-operating assets that were properly excluded from the sale.  There is no basis to undo their judgment on this matter in the absence of fraud or conspiracy—a showing that Charron's experts disclaimed any intention of making.  The value the loans might have contributed to SGH's enterprise value cannot be separated from the real issue in this case:  the value reflected by the price to which DCCP and DeBlasio agreed at arm's length.

Finally, to the extent Charron's pie chart suggests that the loans were "proceeds" of the DC Capital Transaction, this assertion is also unsupported.  All three loans were merely investments of the free cash flow that belonged to DeBlasio as the sole shareholder.  Selby's testimony that the Manzano loan should be treated as proceeds because the assignment was effectuated after the May 6, 2011 signing of the DCCP SPA was particularly nonsensical.  Selby based his opinion on provisions of the DCCP SPA that protected DCCP in the period before the closing. Tr. 1583:19-1584:18 (Selby Direct); *see* Ex. C at §§ 4.2, 4.3, 6.8, 6.10.  But he never considered that Charron's claim to the Manzano loan conflicts with the release clause in the Charron SPA.  *See* Tr. 1649:15-1652:1 (Selby Cross); *see also* Ex. A § 5.02.  The assignment of

all three loans fails to meet the criteria imposed by the Windfall Protection provision for the same reasons as the cash disbursements:  the loans were not sold to a third party, no third party paid anything for them that could be considered "proceeds," and the value of the investments does not contribute to the enterprise value of SGH.  Charron's experts cannot remake his contract to avoid these criteria.

### D.    The loans to Arkel Sallyport Global and Power Generation Solutions were not operating assets.

Even if the Court were to accept the premise that the Charron SPA permits Risius to reverse the parties' arm's-length agreement on this matter, the loans assigned to WD Solutions cannot reasonably be called operating assets.  Operating assets are the things necessary to run a company's core business.  Tr. 1674:13-1675:19 (Hitchner Direct).  There is no dispute that Sallyport's core business was providing base operations support services, including personnel, services, and "mission critical equipment," to the United States government and its contractors. Tr. 222:4-20 (J. DeBlasio Direct), 404:18-406:21 (Charron Direct).  Neither of the loans Risius puts at issue was a contract to provide anything remotely similar to these items within the scope of SGS's core business.  The loans only obligated SGS to provide funding to others in return for fees and interest.  These purely financial investments cannot be called operating assets.  Sallyport was not a bank.  Charron conceded "Sallyport didn't have a loan business."  Tr. 544:21 (Charron Cross).  The assignment to WD Solutions was consistent with the DCCP SPA, accepted by the buyer, and approved by the third-party auditors.  *See* Ex. 210; Tr. 1163:23-1167:1 (Lake Direct). Nothing Charron presented at trial would permit a factual finding reversing DCCP and DeBlasio's contemporaneous judgment that the loans were not operating assets.

136

### 1.    The loan to Arkel Sallyport Global was not an operating asset.

The buyer's and seller's agreement that the Arkel Sallyport Global ("ASG") loan was an investment of retained earnings and not an operating asset was reasonable.  ASG was a joint venture between SGS and Arkel International ("Arkel") formed for the purpose of pursuing business in Southern Sudan.  Ex. AW.  Through the April 11, 2011 loan, SGS provided Arkel's portion of the capital required by the joint venture to finance a new project to renovate a clinic in Sudan.  Tr. 145:4-19 (J. DeBlasio Cross); 1159:9-22 (Lake Direct).  This portion of the funding would otherwise have come from Arkel pursuant to the joint venture agreement, which required SGS and Arkel to split the expenses of contract mobilization equally.  Ex. AW at § 5.04.  Arkel did not have the money to participate, so SGS "backstopped" its position.  Tr. 146:12-13 (J. DeBlasio Cross).  Thus, although SGS was a participant in the joint venture, it provided "funds from SGS as if it were a third-party lender."  Ex. CD at JD1-00014352.  Arkel personally guaranteed the loan independently of the joint venture's performance.  Ex. 23 at Arkel 000039.

DCCP was aware of these facts prior to the closing of the DC Capital Transaction and agreed at arm's-length that the ASG loan was not an operating asset that would form part of the ongoing business it was purchasing.  Though he initially challenged the sellers' characterization of the ASG loan as a non-operating asset, Doug Lake of DCCP ultimately accepted this conclusion and allowed the pre-sale transfer of the loan.  *See* Ex. CD; *see also* Tr. 1159:23-1162:3 (Lake Direct).  Lake recognized that SGS's interest in the joint venture itself was a continuing operating asset (although not a profitable one).  Tr. 1159:9-1160:15 (Lake Direct).  This asset was properly transferred to the buyer in the DC Capital Transaction.  Tr. 1179:24-1180:5 (Lake Direct); *see also* Ex. AW.

Risius's opinion presents no reason to redraw the line Lake and DeBlasio drew between the joint venture itself and the mere financial agreement assigned to WD Solutions.  Risius

testified that he was aware that DCCP and DeBlasio had negotiated "fiercely" over the loans.  Tr. 1543:10-16 (Risius Re-cross).  Yet he ignored these negotiations in coming to his conclusion that the ASG loan was an operating asset.  In fact, DeBlasio's responsive email at Exhibit CD was not even considered in Risius's report.  *See* Ex. 98, App'x 1.  The position Risius took at trial was that the loan related to the joint venture and was therefore necessarily an operating asset.  *See* Tr. 1314:25-1315:13 (Risius Direct).  This approach unjustifiably reverses the agreement that Lake and DeBlasio negotiated, which distinguished between the operating requirements embodied in the joint venture agreement and the purely financial role called for in the loan agreement.  Moreover, Risius's opinion paints with too broad a brush.  As Defendants' expert Jim Hitchner agreed, the purpose of the loan agreement—lending money—was not a core business of Sallyport:

> I think they're nonoperating assets.  And the simple reason is because my understanding is Sallyport is not—is not a bank; it is not in the business of lending money.  And I don't see lending money as their—remember, I mentioned core business?  I don't see that as their core business, lending money.

> [Tr. 1676:23-3 (Hitchner Direct)].

Finally, even if the loan was inseparable from the joint venture's operations as Risius proposed, Charron failed to prove that the project in Sudan was itself a part of Sallyport's core operations.  The fact that SGS acted as a construction lender to ASG does not convert Sallyport into a construction company.  Sallyport did not have a contract to construct the clinic and was not even generally in the business of construction.  Sallyport's core businesses were operations and management, security, fire and emergency services, and food and hospitality services.  *See* Ex. 68 at SALLYPORT003538; Tr. 545:7-547:5 (Charron Cross).  Construction made up less than 0.3% of Sallyport's 2010 revenue.  *Id.*  None of Sallyport's contracts were for the provision of construction services.  *See* Ex. 68 at SALLYPORT003540; *see also* Tr. 547:14-549:10

(Charron Cross). This evidence does not provide a sound basis to reverse the parties' arm's-length agreement that the ASG loan was not an operating asset.

2.      The Power Generation Solutions factoring agreement was not an operating asset.

The parties to the DCCP Transaction also reasonably agreed that the Power Generation Solutions ("PGS") factoring agreement was an investment of retained earnings and not an operating asset. Tr. 153:2:-6 (J. DeBlasio Cross). Like the Arkel loan, the PGS factoring agreement was a purely financial investment to provide working capital financing to PGS, which had a contract to build a power plant in Kandahar. *See* Tr. 1151:14-22, 1157:7-21 (Lake Direct). Like the Arkel loan, DCCP was aware of the loan and agreed it would not be transferred with the company:

Q.      Was the PGS loan an operating asset of Sallyport in your view?

A.      No.

Q.      Why not?

A.      It was a kind of one-and-done loan by essentially John to some people that he knew. You know, I never really knew the full extent of the details. The extent of our diligence really centered on Ernst & Young, our consultant who was conducting quality of earnings due diligence, basically brought these to our attention, and these were just essentially opportunistic loans that we didn't want to retain and had no interest in and didn't really spend that much time on.

[Tr. 1158:1-1159:3 (Lake Direct).]

DCCP and their consultants Ernst & Young reviewed the loans and concluded that they were not operational assets of Sallyport and therefore declined to acquire them in the deal.

Risius based his conclusion that the PGS loan was an operating asset of Sallyport on a flawed and incomplete analysis that excluded the PGS-SGS agreement itself. He stated at trial that he relied "particularly" on his belief that the PGS agreement gave SGS the right to place an

employee on the project.  Tr. 1316:20-1317:16 (Risius Direct).  This was simply not true.

Although the term sheet that preceded the PGS loan contemplated the possibility of an SGS

employee on the project, the final agreement excluded this element.  *Compare* Ex. 45, *with* Ex.

91.  Sallyport never deployed a single employee to the project.  Tr. 150:15-151:24 (J. DeBlasio

Cross).  Risius ignored this information.

## IV.   The duty of good faith and fair dealing does not give Charron rights to control the disposition of SGH's assets.

Charron asks the Court to find that DeBlasio breached his duty of good faith and fair

dealing by operating SGH for his own benefit and failing to sell the company at a price that

would constitute a Windfall Sale.  This is not the law.  Charron sold his rights to receive

distributions of the company's retained earnings and to approve a sale of the company's stock

when he signed the Charron SPA.  He bargained for a conditional right to payment in the future

that he knew was contingent on DeBlasio's decisions as the sole remaining shareholder.  The

duty of good faith and fair dealing cannot be used to excuse the nonoccurrence of a condition

and grant Charron a payment for which he did not bargain.

The duty of good faith and fair dealing exists to enforce the explicitly bargained-for

benefits of a contract.  It does not add substantive provisions that the parties did not agree to

include.  *Broder v. Cablevision Sys. Corp.*, 418 F.3d 187, 198-99 (2d Cir. 2005); *Geren v.*

*Quantum Chem. Corp.*, 832 F. Supp. 728, 732 (S.D.N.Y. 1993); *Metro. Life Ins. Co. v. RJR*

*Nabsico, Inc.*, 716. F. Supp. 1504, 1517 (S.D.N.Y. 1989).  The Charron SPA does not contain

any provision restricting distributions of retained earnings to shareholders.  It does not restrict

the payment of bonuses or the making of loans.  It does not bar charitable donations.  It does not

restrict the right to sell the company.  As Charron was well aware, these decisions belonged to

the shareholders.  The duty of good faith and fair dealing cannot be used to "shoehorn into [the]

contract" these additional provisions that Charron now wishes he had included.  *Metro. Life Ins.*, 716. F. Supp. at 1519; *see also Winshall v. Viacom International, Inc.*, 55 A.3d 629, 631 (Del. Ct. Chan. 2011) (Strine, C.), *aff'd*, 76 A.3d 808 (Del. 2013) ("The implied covenant of good faith and fair dealing is not a license for a court to make stuff up . . . .").

Charron's assertion at trial that he expected DeBlasio to continue to run the company in the "ordinary course," *see* Tr. 496:1-497-1 (Charron Direct), is not a basis to award him an interest in SGH's earnings that he did not bargain for in the Charron SPA.  Charron's own statements demonstrate the fallacy in his claim to the cash disbursed to the Bermuda Charitable Trust prior to the DC Capital Transaction.  While negotiating the Charron SPA, Charron expressed his understanding of the purpose of the agreement.  In his words, Charron was to receive $25 million in cash for his half of the company and DeBlasio would acquire "all of the future brand, past performance, infrastructure, ongoing contracts profits etc."  Ex. BM.  To the extent he had any other unexpressed understanding of the rights and obligations of the parties after the signing of the contract, they are irrelevant.  *See Nycal Corp. v. Inoco PLC*, 988 F. Supp. 296, 301-02 (S.D.N.Y. 1997) ("[U]nexpressed subjective intent has no bearing.  Only the parties' objective manifestations of intent are considered.").

Charron's claim that he expected DeBlasio would sell the company for much more than he did similarly fails to identify an express contractual obligation that could be enforced by the covenant of good faith and fair dealing.  Charron bargained for the right to a future payment only *if* a sale meeting all the requirements of a Windfall Sale occurred, including a price at or above $65 million.  DeBlasio's promise to make a payment under these conditions does not imply an obligation to bring them into existence.

Courts have rejected claims like Charron's numerous times.  In *Phoenix Capital Investments LLC v. Ellington Management Group, L.L.C.*, 859 N.Y.S.2d 46-48 (App. Div. 1st Dep't. 2008), an investment banker sued on a contract giving it a right to payment if a sale occurred within one year of its client's termination of their agency agreement.  The court found no breach of the duty of good faith and fair dealing when the client completed a sale more than a year after the termination and refused to pay the banker.  In *Consolidated Edison, Inc. v. Northeast Utilities*, 426 F.3d 524 (2d Cir. 2005), shareholders with rights to payment in the event of a merger sued when the merger failed to materialize, arguing that their company's merger partner wrongfully prevented the condition from occurring.  The Second Circuit found that their argument would "transform a narrow right to secure payment [upon the completion of the merger] into a billion-dollar penalty for the failure to merge."  *Id.* at 529.  And in both *Geren* and *Metropolitan Life*, courts rejected good faith and fair dealing claims by corporate bondholders arising from acts that benefited the shareholders but reduced the value of the bonds.  *See Geren*, 832 F. Supp. at 732; *Metro. Life*, 716 F. Supp. at 1517.  As the court found in *Metropolitan Life*, so long as the express terms of a contract have been complied with, "there is no implied covenant restricting any action that might subject plaintiffs' investment to greater risk of non-payment." 716. F. Supp. at 1519 n. 24.

These cases plainly control Charron's claim that the implied duty of good faith required DeBlasio to sell SGH for more than $65 million.  DeBlasio only agreed to pay Charron *if* such a sale took place.  The sale was ultimately completed at the $64.5 million price that DCCP negotiated at arm's length.  DeBlasio had no incentive—and, more importantly, no duty—to reject DCCP's offer simply because it would not result in a Windfall Payment to Charron.

DeBlasio's promise to pay if a Windfall Sale took place cannot be enforced by imposing a penalty because one did not.

**V.      Even if there had been a Windfall Sale, Charron's damages would be limited to 20 percent of the amount received in excess of $65 million.**

Even if Charron could prove that a Windfall Sale occurred, his claim is significantly overstated.  The evidence unambiguously demonstrates that the parties intended any windfall payment to be based on the incremental amount *above the $65 million windfall threshold*. Charron's testimony to the contrary was obviously dishonest and fabricated for trial.  There is no document and no testimony from any witness supporting Charron's current interpretation. Despite having numerous opportunities to raise the issue and being asked specifically about the subject in his deposition, Charron himself never disclosed his purported agreement to "split the baby" until the presentation of his direct testimony at trial.

**A.      The language in the Windfall Protection provision is ambiguous.**

The Court is free to rely on parol evidence to determine the meaning of the payment mechanism in the Windfall Protection provision because the contract is ambiguous on its face. *See Int'l Multifoods Corp. v. Commercial Union Ins. Co.*, 309 F.3d 76, 87 (2d Cir. 2002); *Zappa v. Rykodisc, Inc.*, 819 F. Supp. 2d 307, 316 (S.D.N.Y. 2011) (Pauley, J.) (explaining parol evidence may be used if contract terms in question are ambiguous and finding the term "technical standard" ambiguous).  Even if Charron's narrow reading were supportable, Defendants' interpretation of the contract is more consistent with the purpose of the contract and with the terms of the Windfall Protection provision as a whole.

The Court is not confined to Charron's narrow reading of the single word "proceeds" in deciding that the provision is ambiguous under New York law.  Rather, courts in similar situations look to the entire agreement to decide whether competing interpretations are

reasonable.  For instance, in *Barrow v. Lawrence United Corp.*, the court discussed whether the

term "commissions" in a clause granting the seller a portion of the future value of the business

meant all commissions or only commissions from existing customers at the time of the sale.  538

N.Y.S.2d 363, 365 (App. Div. 3d Dep't 1989).  The court was aware that, read "literally and in

isolation," the word "commissions," coupled with the lack of any explicit limitation, implied that

all commissions were included.  *Id.* at 365.  But the court's analysis did not end there.  Rather, it

noted several countervailing indications elsewhere in the contract that made reliance on extrinsic

evidence appropriate.  Most importantly, the "dominant objective of the transaction was the sale

and acquisition of . . . existing accounts."  *Id.*  Furthermore, awarding a payment based on new

business would have amounted to "double compensation" when the plaintiff's

contemporaneously-signed employment agreement was also taken into account.  *Id.* at 366-67.

The court found that it would be "incongruous" to include new customers' commissions despite

the relatively clear language the parties adopted in the particular clause under consideration.

Just as in *Barrow*, reading the word "proceeds" "literally and in isolation" fails to take

into account the "dominant objective" of the Windfall Protection provision.  The dominant

objective of the Windfall Protection provision is evident from its title, its use of the term

"windfall," and the purpose of the transaction as a whole.  Tr. 866:12-16 (Phelps Direct)

("Windfall means above and beyond ordinary.  Okay.  So what we always meant by windfall was

that was the increment above 65 million."); Tr. 903:21-907:6 (Phelps Cross) ("I agree with you

on that point, that 'Windfall' is not very well defined.  But it's a term that has meaning.  I mean,

if you didn't want a meaning to windfall, you wouldn't use the word windfall.").  Charron sold

his shares to DeBlasio for a total payment of $40,765,964, leaving DeBlasio as the sole

shareholder.  *See* Ex. A § 2.02.  The Windfall Protection provision protects Charron from the

144

possibility that DeBlasio might complete a subsequent sale above the specified price.  *See* Ex. A § 2.04.  The contract's use of the term "windfall" in this context cannot be ignored.  The only part of such a sale that would amount to a windfall to DeBlasio would be the part *exceeding* the specified value.  Given the fact that Charron had already received compensation in exchange for his ownership interest, it is entirely reasonable to interpret the language of the contract to limit Charron's recovery to a portion of only the excess.

Defendants' interpretation is also reasonable in light of the absurd and unfair results that follow from Charron's interpretation.  As the Court recognized at trial, Charron's reading produces a massive disincentive to sell the company above $65 million.  Tr. 829:9-834:4 (Charron Redirect).  Indeed, a sale at $65 million would penalize DeBlasio to the tune of $13 million.  This result makes no sense, and there is no indication in the text of the Charron SPA that it was intended.  Courts should "avoid construing an agreement in a manner that would effectively require double compensation or produce other unreasonable or unfair results." *Barrow*, 538 N.Y.S.2d at 367; *see also GPA Inc. v. Liggett Grp. Inc.*, 94 CIV. 5735 (AGS), 1996 WL 337288, at *4 (S.D.N.Y. June 18, 1996) (refusing to "permit an interpretation of a contract that leads to an absurd result.").

Charron's narrow reading of the word "proceeds" does not resolve this issue.  The relevant inquiry is whether the contract supports Defendants' reading in light of its purpose and all of its terms considered as a whole.  *Int'l Multifoods*, 309 F.3d at 83 ("An ambiguity exists where the terms . . . could suggest more than one meaning when viewed objectively by a reasonably intelligent person *who has examined the context of the entire integrated agreement and who is cognizant of the customs, practices, usages and terminology as generally understood in the particular trade or business*." (emphasis added and quotations omitted)).  Charron's

contention that the Windfall Protection clause is not ambiguous because it does not expressly use the term "incremental" misses the point. The Windfall Protection provision does not use either of the terms "incremental" or "gross" with respect to the proceeds of a windfall sale. The Court may examine the parol evidence to determine which approach was intended.

### B. Parol evidence establishes the parties' agreement that a payment under the windfall clause would be 20 percent of the amount by which a subsequent sale exceeded the $65 million "windfall" threshold.

All of the parol evidence in this case indicates that Charron and DeBlasio intended the Windfall Protection provision to allow Charron to share in the portion of a future sale that exceeded the $65 million "windfall" threshold. As Defendants have indicated at every stage in this case, Charron and DeBlasio agreed on this approach to the Windfall Protection provision in a November 30, 2010, email chain among themselves, their lawyers at WilmerHale, and several advisors. *See* Ex. R; Tr. 860:20-864:14 (Phelps Direct). There is simply no other evidence of intent that is capable of clarifying the ambiguity on this issue.

The relevant communications began on November 30 with Charron's $60 million enterprise value counteroffer to DeBlasio's buyout proposal. Ex. R at SGH1-00229840. Charron proposed the addition of a "windfall provision" in an email sent at 7:24 a.m. to DeBlasio, Charron's advisor David Cohen, SGH CFO Peter Phelps, and attorneys Graham Robinson and Kevin Smith of WilmerHale, who represented SGH. Ex. R at SGH1-00229840. DeBlasio stated his agreement to the inclusion of such a provision, but only for a one-year term. Ex. R at SGH1-00229839; Tr. 863:16-24 (Phelps Direct). He explained that any longer term would exceed the purpose of allowing Charron to share in a "windfall." Ex. R at SGH1-00229839. Charron did not comment on DeBlasio's reasoning regarding the term of the windfall provision, and a three-year term proposal does not appear in any subsequent writing.

Having agreed in principle to the inclusion of a windfall provision in the buyout, Charron and DeBlasio continued their discussion by examining the payment mechanics common to clauses of this type.  At 10:04 a.m., Charron requested that Robinson and Smith "provide John and I language on the terms of an industry standard windfall clause."  Ex. R at SGH1-00229837. SGH's attorney Graham Robinson provided an example of such a clause.  *See* Ex. R at SGH1-00229836.  Robinson's example would have provided Charron the gross measure of proceeds he seeks in this case:  "Mr. Charron would receive a cash payment equal to [PERCENT]% of the aggregate purchase price paid (or to be paid) by such Subsequent Purchaser."  Ex. R at SGH1-00229836.  Charron and DeBlasio could have agreed to Robinson's first proposal allocating a portion of the total price to Charron, but they did not.

In an 11:29 a.m. email, DeBlasio unequivocally rejected the gross-proceeds approach. He explained that the windfall provision was intended to allow Charron to share in an incremental portion of the proceeds of a sale over a threshold value:

> [T]he intent here is not to put a payment on the total purchase price in the future, but rather the incremental value beyond a normalized amount.  What I'm thinking is that the basic offer put forth to Tom as an internal transaction has a comparable valuation from an External Buyer in 2011 of ~$66M.  In the event of a transaction in the next calendar year, he can share in a reasonable portion of anything above that amount.

> [Ex. R at SGH1-00229835.]

Robinson agreed that DeBlasio's approach was more appropriate.  At 12:16 p.m., Robinson replied: "That's correct—the example I borrowed from was one where there was no up-front sale price."  Ex. R at SGH1-00229834.

Charron continued to engage in the discussion with DeBlasio, Phelps, and SGH's counsel at WilmerHale.  Neither Charron nor anyone else expressed an objection to DeBlasio's statement of intent or Robinson's clarification that the gross-proceeds approach was suited to a different

147

kind of transaction.  Tr. 863:13-864:14 (Phelps Direct).  At 1:09 p.m., Charron specifically asked

for clarification on how the "incremental" approach would work:

> Now I am confused with the carry forward language.  If I sell to
> John for $50M enterprise value and he flips and sells the company
> for $100M, doesn't some percentage of incremental share price go
> to me vs some enterprise threshold being met and then a payment.

> [Ex. R at SGH 1-00229833.]

 At 1:26 p.m., Robinson offered a mathematical illustration, showing the application of the

incremental approach in two different scenarios:

> The way it works is this:
>
> If you sell to John for $50mm enterprise value (so $25mm for your
> 50%), then here are the results in two different scenarios, assuming
> for this illustration that the carry is 20%:
>
> Scenario 1: John sells the whole company for $100mm. You get
> 20% of $50mm, or $10mm.  The math there is 20% of the amount
> by which (A) $100mm / 100%, exceeds (B) two times $25mm.
> Simplifying, that's 20% of $100mm minus $50mm, or $10mm.
>
> Scenario 2: John sells 70% of the whole company for $60mm.
> You get 20% of .  [*sic*]  The math there is 20% of the amount by
> which (A) $60mm / 70%, exceeds (B) two times $25mm.
> Simplifying again, that's 20% of $85,714,285 minus $50mm, or
> $7.14mm.

> [Ex. R at SGH1-00229832.]

Half an hour later, Kevin Smith provided a clarification of Robinson's email:

> [T]he second sentence in scenario 2 didn't get filled in - I think it
> should be "You get 20% of approx. $35mm, or $7.14mm"

> [Ex. R at SGH1-00229832.]

There is no evidence of any further discussion of how a windfall payment would be calculated,

and no evidence of any change in the parties' acceptance of the incremental approach.

   Indeed, there is no evidence at all that would contradict the conclusion that the

November 30 email chain represents Charron and DeBlasio's final agreement on the mechanics

of a windfall payment.  By the afternoon of November 30, DeBlasio had unmistakably rejected a

gross-proceeds approach and SGH's attorneys had provided clear instructions on how to

calculate an incremental share.  DeBlasio's statement at 11:29 a.m. on November 30 is the only

clear, unequivocal, written expression of intent on this point from any of the parties to the

Charron SPA.  *Charron did not ask any further questions or raise any objections to DeBlasio's*

*statement of intent*.  Tr. 251:25-252:3 (J. DeBlasio Direct), 741:20-25 (Charron Cross), 863:13-

864:3 (Phelps Direct).  In fact, the concept of using the gross value of a subsequent sale—rather

than the "windfall" portion—in the calculation of a windfall payment was not even discussed

again after November 30, 2010.  Tr. 250:6-251:10 (J. DeBlasio Direct).  Sallyport's CFO Peter

Phelps was included on the November 30 email chain and was heavily involved in the

negotiation.  Tr. 861:1-862:24 (Phelps Direct).  He testified on this point:

> Q.    Were there any discussions about how the windfall
>       provision would work after this e-mail?
>
> A.    Not that I'm aware of.  This is, this is the way that, this is
>       the way that it was settled before we did the, before we did
>       the closing.

[Tr. 864:4-14 (Phelps Direct).]

Subsequent discussions did not alter Charron and DeBlasio's November 30 agreement.

Drafts of the Letter of Intent ("LOI") and SPA show that the operative terms of the windfall

provision were already in place by November 30.  DeBlasio sent Charron the first draft of the

windfall provision at 7 a.m. on the morning following the November 30 discussion.  Ex. T; Tr.

266:12-267:11 (J. DeBlasio Direct).  The draft Windfall Protection provision in the LOI read as

follows:

> 5. <u>Windfall Protection</u>. The Selling Shareholder will receive
> Windfall Protection defined as follows:
>
>> a. In the event that Sallyport commits to sell shares, to a
>> third party, subsequent to this transaction, for a purchase

> price exceeding an enterprise value of $65 million, in the
> period ending one year from the date of closing, the Selling
> Shareholder will receive 20% of the sales proceeds, as
> additional compensation.

[Ex. T at JD1-00011868.]

The draft LOI uses the terms "enterprise value of $65 million" and "20% of the sales proceeds"

nearly exactly as they appear in the LOI that the parties signed on December 1 and in the final

Charron SPA they signed on December 7.  Indeed the only material change between the signed

version of the LOI and the Windfall Protection provision in the Charron SPA was the addition of

the qualifier "Windfall Sale" to characterize the term "proceeds."  *Compare* Ex. A § 2.04

("proceeds received from a Windfall Sale"), *with* Ex. V ("sales proceeds"); Tr. 906:7-22 (Phelps

Cross).  Neither Charron nor his counsel identified any other material changes in the operative

language.  Comparing the documents demonstrates that there were none.  *Compare* Ex. A § 2.04,

*with* Ex. T at JD1-00011868 *and* Ex. V.

Charron's response to the draft LOI also confirms that an understanding had already been

reached by the time the first draft of the LOI was prepared.  Charron reiterated his understanding

of "the agreement," stating:

> [T]he agreement was if any of the sale shareholders sell any of
> their stock *over a $6500/share price* I would get *20% of those
> proceeds* if entered into any agreement to sell within 12 months of
> the closing date.

[Ex. 183 (emphases added).]

Because Charron never told DeBlasio he meant something else, DeBlasio reasonably interpreted

Charron's email to mean he accepted the incremental approach discussed on November 30 and

expected to receive 20 percent of the "proceeds" "over a $6500 share price."  *See* Ex. 183; Tr.

269:7-19 (J. DeBlasio Direct).  DeBlasio's reading of the email was natural in the context of the

previous discussion.  Even if Charron had credibly testified that he held a different interpretation,

his statement was insufficient to put DeBlasio on notice of it.  *See* Tr. 251:25-252:3 (J. DeBlasio

Direct).  His unexpressed subjective intentions are of no consequence.  *See Nycal*, 988 F. Supp.

at 301-02 ("[U]nexpressed subjective intent has no bearing.  Only the parties' objective

manifestations of intent are considered.").

 Subsequent drafts of the LOI and SPA did not alter the operative language of the

Windfall Protection provision.  Between December 3, 2010, and December 7, 2010, counsel for

SGH exchanged several drafts of the Charron SPA with Charron's attorney, Michael O'Connor.

Tr. 57:9-18 (O'Connor Cross).  Several terms were clarified, but O'Connor admitted that the

subject of the November 30 email discussion was never raised again:

> Q. Were you aware of as of December 6 that there had been e-mail negotiations regarding the windfall sale provision between your client, Mr. Charron, and people on the DeBlasio side of the wall?
>
> A. No, I don't think so.  I mean, the windfall protection provision was presented to me in the purchase agreement on December 3.  And I was told this was the provision that Wilmer Hale had proposed.  So there was, in between December 3 and December 6, there was negotiation over it, in the sense that I edited it and made proposals and we went back and forth in documents, changing the, working on changes to the provision.

 [Tr. 58:6-16 (O'Connor Cross).]

Indeed, Charron never even showed his counsel the November 30 discussion until the week of

the trial.  Tr. 58:6-59:3 (O'Connor Cross).  O'Connor could not have reworked the provision

without being apprised of the earlier discussion.

 The final agreement employs the operative terms "purchase price," "enterprise value,"

and "proceeds" almost exactly as they are found in the drafts of the LOI and SPA.  *Compare*

Ex. A *with* Ex. S, T, V.  The only explanation for this consistency is that Charron and DeBlasio

had already agreed on the basis of the bargain by the time the first version was drafted on

November 30.  As CFO of the company, Phelps was involved in all major discussions related to the buyout of Charron's shares.  He testified that the parties never discussed or agreed to Charron's interpretation, which would have indicated at least a $13 million difference in the calculation of a windfall payment.  Tr. 911:17-912:19 (Phelps Cross).  The minor alterations and clarifications that were incorporated into the final agreement do not support Charron's contention that he and DeBlasio abandoned the incremental interpretation and adopted the gross-proceeds interpretation.

> ### C.    Charron's trial testimony as to his agreement with DeBlasio to "split the baby" is not credible.

Charron admits that he never objected in writing to DeBlasio's agreement to only a one-year term.  *See* Tr. 741:16-23 (Charron Cross).  He affirmed the accuracy of his prior testimony that he could not recall any specific conversations in which he orally repudiated it.  Tr. 745:23-747:20 (Charron Cross).  Yet he claimed at trial—for the first time in this entire case— that DeBlasio agreed to abandon his stated intention on the payment mechanism in exchange for reducing the tail period from three years to one.  Tr. 741:24-742:5 (Charron Direct).  This purported "split the baby" agreement was obviously invented for trial and should be disregarded entirely.  Despite having numerous opportunities and reasons to do so, Charron never before mentioned it—not to his attorney during the negotiation of the deal, not in the complaint or the amended complaint, not in response to the motions to dismiss or the motion for summary judgment, not in response to discovery requests, and not in his deposition.  Omitting this purported "fact" all the way through the litigation was not an accident.

In his deposition testimony, Charron testified that he did not recall *any discussion* of the windfall payment outside of the November 30 email.  *See* Tr. 745:23-752:13 (Charron Cross). At trial, he described his recollection of a large conference call involving himself, the attorneys

from WilmerHale, and Peter Phelps, "where all this chatter from November 30 was put on the table and everybody started talking about what this looked like, how would it be structured, what were the economics of it." Tr. 743:21-744:18 (Charron Cross).

Charron's explanations for his sudden recollection are preposterous. Charron first tried to parse the deposition questions to justify giving an evasive answer at the deposition, suggesting that first question on the subject was limited to phone calls regarding the "calculation":

> Q.     And your memory was better in July 2013 than it is today, right?
>
> A.     Well, no. We were—the one year is not a calculation. That's the tail. Calculation was what's the threshold, you know, the 20 percent, where it came in. There were a number of discussions around the triggers and everything else.

[Tr. 746:18-23 (Charron Cross).]

After realizing that he had given similar answers to follow up deposition questions, he then recanted his trial testimony and affirmed the truth of his prior statement, claiming he only recently realized the "split the baby" agreement was important. Tr. 747:11-748:5 (Charron Cross). Beyond the inherent inconsistency of this testimony, other witnesses clearly contradicted Charron's assertions. Peter Phelps testified that the *only* conversations regarding the operation of the Windfall Protection provision took place by email on November 30, 2010. Tr. 864:4-14 (Phelps Direct).

Charron's deposition was not the first time he omitted any reference to his "split the baby" agreement. Michael O'Connor, Charron's personal attorney from Williams & Connolly, testified that he had never even seen the November 30 email discussion until Sunday, May 25, 2014, just before the trial. He was not aware that there had been any discussion or agreement as to the interpretation of the windfall provision during the week that he worked on revising the

Charron SPA.  Charron's trial counsel never mentioned the "split the baby" agreement over the nearly two years they have been handling this litigation.  The agreement does not appear in Charron's complaint (Dkt. No. 1), amended complaint, oppositions to Defendants' motions to dismiss (Dkt. Nos. 64-65), or in his opposition to Defendants' motion for summary judgment (Dkt. Nos. 172, 173).  Indeed, Charron's statement of facts in opposition to summary judgment flatly contradicts the sequence of events Charron described at trial.  *See* Dkt. No. 173-1.

Perhaps most tellingly, Charron failed to mention the "split the baby" agreement when he called Peter Phelps in 2012 to solicit input on his windfall claim.  In the conversation, Charron asserted that the windfall protection provision in the Charron SPA would entitle him to 20 percent of the proceeds from a subsequent sale above the threshold.  Tr. 865:23-866:16 (Phelps Direct).  Phelps objected to Charron's interpretation.  He reminded Charron that the windfall provision had always been intended to provide for a percentage on the amount exceeding the windfall threshold.  Charron did deny Phelps's statement, but suggested instead that the wording of the clause could be read to entitle him to "20 percent of the entire sales proceeds subsequent." Tr. 865:23-866:16 (Phelps Direct).  Phelps responded that the such a reading would not be correct and that "windfall has a very special meaning.  Windfall means above and beyond ordinary.  Okay.  So what we always meant by windfall was that was the increment above 65 million."  Tr. 866:13-16 (Phelps Direct).

Beyond the inferences that can be drawn from Charron's omissions, the evidence affirmatively demonstrates that the "split the baby" story cannot be true.  Charron claimed that he and DeBlasio agreed to "split the baby" during a telephone conference that took place on December 1, 2010.  Tr. 743:21-744:18.  By this time, the one-year term and the agreement on the incremental approach to the windfall payment had already been resolved.  Charron sent an email

at 7:24 am on November 30, 2010 proposing "a windfall provision if you flip the company in three years." Ex. R at SGH1-00229840; Tr. 414:1-6 (Charron Direct). DeBlasio immediately agreed to include a windfall provision, but only for a one-year term. Ex. R at SGH1-00229839; Tr. 414:7-20 (Charron Direct). Charron said nothing about the change from a three-year to a one-year term, but he asked for SGH's attorneys to provide language that would provide for a windfall payment. Ex. R at SGH1-00229837. When DeBlasio expressed his intention to limit the windfall payment to a percentage of the incremental proceeds above a specified threshold, Charron asked for clarification of the incremental approach but said nothing about the one-year term. Ex. R at SGH 1-00229833. SGH's attorneys provided the explanation Charron requested, and the subject did not come up again. Tr. 58:6-16 (O'Connor Cross), 250:6-251:10 (J. DeBlasio Direct), 864:4-14 (Phleps Direct).

> **D.   In the alternative, there is sufficient evidence to demonstrate a scrivener's error with respect to the language of the agreement.**

Even if the Windfall Protection provision unambiguously supported Charron's reading, the Court may consider the parol evidence to reform the contract under the doctrine of mistake. Restatement (Second) of Contracts § 155 (1981). Reformation is appropriate where a party shows "in no uncertain terms" that a mistake exists and demonstrates "exactly what was really agreed upon between the parties." *Collins v. Harrison Bode*, 303 F.3d 429, 435 (2d. Cir. 2002); *BLT Restaurant Group LLC v. Tourondel*, No. 10 CV 06488 (GBD), 2011 WL 3251536, at *5 (S.D.N.Y. Jul. 19, 2011) (Under New York Law, the court may order the reformation of a written agreement where, "[i]n a case of mutual mistake, the parties have reached an oral agreement and, unknown to either, the signed writing does not express that agreement"). The evidence proving what Charron really agreed upon has already been discussed. The only indication of the parties' intended construction of the Windfall Protection provision is

DeBlasio's November 30 statement that "the intent here is not to put a payment on the total purchase price in the future, but rather the incremental value beyond a normalized amount." Ex. R at SGH1-00229835.  DeBlasio rejected the construction Charron now seeks to impose in the same email chain.  *See* Ex. R at SGH1-00229835-36.  Charron read DeBlasio's statements, sought clarification, and left it at that.  Ex. R at SGH1-00229833-32.  No one heard Charron express a different view until he called Phelps in 2012 to discuss this litigation.  Tr. 251:25-252:3 (J. DeBlasio Direct), 741:20-25 (Charron Cross), 863:13-864:3 (Phelps Direct).  There is no evidence of any other agreement.

Ample evidence also supports the conclusion that the failure of the Charron SPA to accurately reflect Charron and DeBlasio's intent is the result of a mutual mistake.  Phelps drafted the language that became the Windfall Protection.  SGH employed an attorney who was pressed for time because he was planning to take a position at another company.  Tr. 398:16-399:15 (J. DeBlasio Redirect).  In response to a question by Charron's counsel, Sallyport CFO Peter Phelps explained that agreement between Charron and DeBlasio as to how the windfall payment would be calculated was not completely captured in the Charron SPA:

> Q.     And it is, if, on—or prior to the first anniversary of the date here of, John DeBlasio or any of his affiliates or any other direct or indirect equity holder sells or agrees to sell shares of the company's capital stock or equity of an intervening person or assets of the company or any company subsidiary constituting 20 percent or more by voting power or economic value of the company's assets or equity to a third party in one or a series of related transactions for a sale that reflects an enterprise value of the company equal to or greater than 65 million (windfall sale)," you agree with me that that is the definition of "windfall sale"?
>
> A.     No.  No.  I don't—no, I don't agree with that, because, because the thing was not drafted exactly properly.  OK.  And there's a reason for that, because the attorneys, one of the attorneys was on their way out the door, at the time it was drafted.  So all along we refer to a windfall sale as the

increment.  There's no difference, ever, where it says it's
not the increment.  And so—

[Tr. 907:25-9081-17 (Phelps Cross).]

Charron's deal attorney Michael O'Connor would not have known to address the issue because
he had not seen the preceding email communications and Charron did not tell him.  Tr. 58:6-16
(O'Connor Cross).  The Charron SPA was drafted and closed in less than a week.  As the Court
remarked, "a little more time spent on the agreements would have been to everybody's benefit."
Tr. 399:3-4 (J. DeBlasio Cross).

Defendants would be entitled to reformation even if the mistake were deemed to be
unilateral.  *See Tokio Marine & Fire Ins. Co. v. Nat'l Union Fire Ins. Co.*, 91 F.2d 964, 966-67
(2d Cir. 1937) ("[A] formal agreement will be reformed where it departs from the original
understanding which that agreement was avowedly supposed to embody, where the mistaken
party, justifiably relying on the expressed or implied representation of literal conformity, fails to
observe and note the alterations."); *BLT Restaurant*, 2011 WL 3251536 at *5.  Charron knew
DeBlasio believed the contract was consistent with his November 30 expression of intent.  He
accepted DeBlasio's interpretation in writing, and his only affirmative statement of his own
intent was too ambiguous to put DeBlasio on notice of a different interpretation.  Charron did not
alert his own attorney to the existence of the November 30 email chain that would have put him
on notice of the issue.  Charron cannot take advantage of a drafting mistake that he knew about
and had an opportunity to correct.

## VI.   Charron is liable for treble damages and attorney's fees as a result of his theft.

On December 7, 2010, Charron signed a letter resigning his position as CEO of Sallyport.
He signed the Charron SPA transferring all his rights as a shareholder in SGH.  He exchanged
emails with DeBlasio addressing the logistics of returning company documents and advising

Bank of America that he would no longer be an authorized signatory.  He worked with DeBlasio to ensure the completion of the wires to himself pursuant to the Charron SPA.  By the end of the day, Charron knew that wires totaling more than $40.7 million had been irreversibly committed to his personal account.

On the morning of December 8, 2010, Charron packed up his SGH files, dropped them off for overnight delivery to SGH, and grabbed a bite to eat.  Knowing his name was still on the signature card for SGH's operating account at Bank of America, he walked into a Florida branch office and presented three SGH checks payable to himself for a total of $227,364.22.  There is no evidence that Charron carried a gun that day, but he stole that money nonetheless.  He knew at the time that the $40.7 million payment he had negotiated to cash out his interest in the company had already been wired to his personal accounts.  He knew that there was no other agreement to pay him the amounts represented on the checks.  He knew that no one at SGH was aware of his plan.  And he knew that DeBlasio planned to tell Bank of America that he was no longer with the company that very day.  Charron took the money anyway.

Pursuant to Florida's civil theft statute, Charron is required to pay treble damages of $682,092.66; prejudgment interest, which is still accruing and has reached a current amount of $39,918.26;[3] and attorneys fees'.  Fla. Stat. Ann. § 772.11; Fla. Stat. § 55.03(2); *Greenberg v. Grossman,* 683 So. 2d 156, 157-58 (Fla. Dist. Ct. App. 1996) (providing that a civil theft victim may receive either punitive damages or trebled civil theft award, prejudgment interest on the amount stolen, and attorneys' fees); *Vining v. Martyn*, 660 So. 2d 1081, 1082 (Fla. Dist. Ct. App.

---

[3] The current prejudgment interest amount is equal to the amount Charron stole ($227,364.22) multiplied by the statutory interest rate for the applicable period of time after the theft until the date of this filing.  For applicable daily rates, see Florida Department of Financial Services, *Historical Judgment Interest Rates*, http://www.myfloridacfo.com/Division/AA/Vendors/JudgmentInterestRates.htm#.U-p1Z-NdU9Y.

4th Dist. 1995) (awarding treble damages and prejudgment interest calculated on the amount

actually stolen in a civil theft).  In the alternative, Charron should be held liable for damages

equal to the value of the property stolen plus interest under claims of conversion, unjust

enrichment, or breach of fiduciary duty.  *See Fantis v. Standard Importing*, 49 N.Y.2d 317, 327

(1980) ("The usual measure of damages for conversion is the value of the property at the time

and place of conversion, plus interest.").

A.     **Charron's unilateral decision to take company funds in excess of the Charron SPA purchase price demonstrates civil theft under Florida law.**

Charron's withdrawal of $227,364.22 from SGH's account at a Bank of America branch

in Florida on December 8, 2010, constitutes civil theft under Florida law.[4]  Fla. Stat. § 772.11,

812.014.[5]  Civil theft occurs when the defendant "(1) knowingly (2) obtained or used . . . [the

plaintiff's] property with (3) 'felonious intent' (4) either temporarily or permanently to (a)

deprive [plaintiff] of its right to or benefit from the property or (b) appropriate the property to

[its] own use or to the use of any person not entitled to the property."  *United Technologies Corp.*

*v. Mazer*, 556 F. 3d 1260, 1270 (11th Cir. 2009).  There is no dispute that Charron knowingly

took $227,364.22 from SGH for his own use on December 8, 2010 and refused to return it.

Defendants produced clear evidence of his criminal intent at trial.  Charron knew that he was not

---

[4] Florida law applies to the counterclaim because the intentional tort of civil theft took place in Florida.  *See Babcock v. Johnson*, 12 N.Y.2d 473, 481 (1963); *Chem. Bank v. World Hockey Ass'n*, 403 F. Supp. 1374, 1380 (S.D.N.Y 1975) (place of injury is deemed to occur in the place where defendant's intentionally tortious acts took place).  Charron was a Florida resident in 2010, and was in Florida when he deposited the funds from SGH into his personal Bank of America account.  Tr. 523:3-10 (Charron Cross).

[5] Florida Statutes § 812.014 defines the crime of theft.  Fla. Stat. § 812.014(1).  A theft of property valued at $100,000 or more is "grand theft in the first degree, punishable as a felony of the first degree."  *Id.* § 812.014 (2)(a)1.  Under Florida law, felonies of the first degree carry a fine up to $10,000 and "a term of imprisonment not exceeding 30 years."  *Id.* §§ 775.082(3)(b); 775.083(1)(b).

authorized to unilaterally withdraw SGH funds on December 8, 2010, and he knew there was no agreement to pay him the funds he stole.  *See* Ex. AS; Tr. 793:11-14 (Charron Cross).  He could not have honestly believed any additional payment was authorized, and he could not have believed he had suddenly obtained the unilateral right to issue and present checks payable to himself.  He concealed his actions from everyone involved in the transaction, including SGH's accountants and CFO and the attorney representing Charron himself.  Charron's decision to take the $227,364.22 amounts to theft.

> **1.   Charron was not authorized to withdraw SGH funds on December 8, 2010.**

Charron's argument that he was authorized to take $227,364.22 for his own use on December 8, 2010 because he was an officer and director of SGH is not supported by the facts. Charron no longer had any position with SGH on December 8, 2010.  The day prior, December 7, 2010, Charron and DeBlasio executed copies of the Charron SPA, submitted signed copies to SGH's counsel at WilmerHale, and authorized wire payments of $40.7 million to Charron pursuant to the Charron SPA.  *See* Exs. A; AN, AO, AP, AQ.  Charron signed and submitted his resignation letter on December 7, 2010.  Tr. 771:9-15 (Charron Cross); Ex. AI. DeBlasio specifically told Charron on December 7 that SGH planned to notify Bank of America the following day that Charron was no longer associated with the company or authorized to make transactions on its account.  *See* Ex. AK.

The argument that Charron's actions to sever ties with SGH on December 7 did not become effective until Charron received access to the Charron SPA wires the next day is unavailing.  Sallyport CFO Peter Phelps explained that both sides fulfilled their obligations to close the deal by sending their signature pages to counsel on December 7, 2010.  *See* Tr. 867:1-21 (Phelps Direct).  Once he received both sets of signature pages, Sallyport's attorney Kevin

Smith authorized release of the wire payments.  Ex. AQ ("We now have both sets of signature pages so you can complete the wires.").  Later, Smith recognized that Charron might not receive the funds until the next day, and clarified that, regardless of when the funds were received, the parties should still treat December 7, 2010 as the closing date:

> For everyone's benefit, I understand that wire payment instructions have been received and confirmed by HSBC/Bank of Bermuda but may clear tomorrow due to the joint execution/authorization issue this afternoon.  When Tom is able to confirm funds have been deposited (today or tomorrow morning), we should connect by phone to confirm closing.  *We would expect that everyone can treat today as the closing date as provided in the purchase agreement even if confirmation of the funds deposit lags until tomorrow.*  If anyone has a further update on the banking front, please let us know.

> [Ex. AR (emphasis added).]

Neither Charron nor his attorney Michael O'Connor objected to treating December 7, 2010 as the closing date.  On the contrary, Michael O'Connor sent an email earlier that day "confirming that the closing date is today."  Ex. 172.  He never submitted a second email withdrawing that statement or correcting Kevin Smith's email.  The parties agreed that the deal closed on December 7, 2010.  To the extent Michael O'Connor had a different understanding of the closing date, he was under an obligation to speak up and correct the other expressed intention.  *See Nycal Corp.*, 988 F. Supp. at 301-02.

Charron's own actions on December 8 confirm that he already treated his resignation as effective and knew he had no authorization to access the company's bank account.  Before he cashed the checks, Charron packed up and shipped away all of the SGH files in his possession that DeBlasio had requested upon his resignation.  Tr. 776:24-777:8, 779:20-24 (Charron Cross); *see also* Tr. 463:8-13 (Charron Direct).

Charron's withdrawal of $227,364.22 on December 8 was also in direct contravention of the board resolution that Charron and DeBlasio implemented on July 9, 2010. *See* Ex. AG; Tr. 784:11-23 (Charron Cross), Tr. 871:7-25 (Phelps Direct). The July 9 board resolution adopted in accordance with the company bylaws precluded the unilateral withdrawal of funds in excess of $25,000 without written authorization of both Charron and DeBlasio. Exs. AG, CP. From its passage in July 2010 through the close of the DCCP SPA, both Charron and DeBlasio complied with the resolution and obtained consent from the other party before withdrawing company funds in excess of $25,000. *See* Ex. AH; Tr. 784:1-787:3 (Charron Cross), 874:6-875:16 (Phelps Direct). But Charron did not seek or obtain DeBlasio's approval prior to presenting the checks. Tr. 350:14-24; 358:1-6 (J. DeBlasio Direct).

Even if Charron remained an officer and director with authority to access SGH's bank account on December 8, his actions would have been inconsistent with his fiduciary duties. *See Renpack v. Oppenheimer*, 104 So. 2d 642, 644 (Fla. Dist. Ct. App. 4th Dist. 1958) ("[A]n officer of a corporation occupies a fiduciary or quasi-fiduciary relation to the organization, requiring loyalty and good faith on his part; and he cannot assume a position contrary to the interest of the organization."); *In re Trafford Distributing Center, Inc.,* 431 B.R. 263, 290 (Bankr. S.D. Fla. 2010) (the duty of loyalty imposed on the directors and officers of a corporation is breached when "that person depart[s] from his corporate responsibility and start[s] serving himself."). Charron's self-dealing actions on December 8, 2010 were directly at odds with the interests of the corporation. Prior to the closing, DeBlasio warned Charron that payment under the Charron SPA would wipe out nearly all of the company funds making it difficult to make payroll in the following months. *See* Ex. 370. Charron understood and responded with a promise that he would not allow the company to miss payroll. Despite having knowledge of the precariously low

funds, Charron withdrew the remaining money in the company account.  Tr. 281:6-282:12 (J.

DeBlasio Direct).  This action put Charron's interests ahead of the company's, in direct violation

of his fiduciary duties.

### 2.  Charron was not owed the funds he stole from SGH.

Just as Charron could not have honestly believed he was authorized to access the

company bank account after he resigned and returned company property, there was no ambiguity

as to his entitlement to the amounts he stole.  SGH agreed to pay Charron $40,765,964 pursuant

to the Charron SPA.  Ex. A § 2.02.  Charron knew SGH did not agree to any payments in

addition to this amount.  His unilateral decision to take more money from the company was theft.

### a.  Charron was not entitled to additional payment related to the "Tom/John Account."

Charron asserts that he was entitled to the $147,727 made payable on check 1046 because

DeBlasio authorized him to balance the "Tom/John Account."  *See* Ex. AS.  The Tom/John

Account was a spreadsheet created to keep track of Charron and DeBlasio's payments, benefits,

and expenses.  *See* Tr. 148:10-149:3 (J. DeBlasio Cross), 780:5-9 (Charron Cross), 868:22-

870:3 (Phelps Direct), 1853:12-22 (P. DeBlasio Direct).  The evidence at trial showed that there

was no agreement to pay Charron any amount associated with this account.  Tr. 1853:23-1854:15

(P. DeBlasio Direct).  Indeed, Charron wrote himself the check before discussions on the matter

were even completed.  The evidence shows Charron made a unilateral decision to pay himself

without the agreement of John DeBlasio, Peter Phelps or Pat DeBlasio.  Accordingly, Charron

was neither entitled to the $147,727, nor permitted to write himself a check for that amount.

As evidence of his entitlement, Charron presented a version of a spreadsheet showing that

at a particular point in time, John was ahead by $147,727.  Ex. 145.  He neglected to mention

that at any given time various versions of this spreadsheet existed and none was considered final.

*See* Tr. 870:22-871:1 (Phelps Direct).  Peter Phelps, who served as the CFO testified that the

Tom/John Account was not reconciled before the close of the Charron SPA:

> For months, Pat DeBlasio and I were rec—trying to reconcile this
> thing and Tom was pushing me really hard to reconcile it and I'm
> pushing Pat really hard to reconcile it and it was very complicated
> and we had, I had a spreadsheet going, we probably had 50
> derivatives of the spreadsheet back and forth.  At the end of the
> day we couldn't reconcile it.  We said look, there's valuation
> issues, there's, there's difference of opinion.  We just can't
> reconcile it.  So, this was leading right up to the stock purchase
> agreement.  So what we basically did, maybe just between Pat and
> I, I don't know, we basically said, look, this is irreconcilable, so
> we're going to call it, we're going to call, we're going to call it a
> wash, call it even.

> [Tr. 869:-16-870:3 (Phelps Direct)].

*See also* Tr. 1853:23-1854:15 (P. DeBlasio Direct).  Because the parties were unable to reconcile

the Tom/John Account, they reached an agreement that no additional payment would be required

after the wire transfer of $40.7 million to Charron for the Charron SPA.  Tr. 870:4-871:1 (Phelps

Direct).  Charron cannot rely on his own version of a spreadsheet that was never finalized to

justify his actions.

The parties were still negotiating the close out of the Tom/John Account when Charron

wrote himself the check.  Charron wrote and signed the check on December 3, 2010.  *See*

Ex. 440; Tr. 1858:12-1861:5 (P. DeBlasio Direct).  Charron testified that, prior to writing this

check, he and DeBlasio reached an agreement to close out the Tom/John Account, and DeBlasio

authorized Charron to write himself a check for $147,727.  Tr. 782:4-783:14 (Charron Cross).

But an email that Charron sent on December 6 proves that the parties had not reached an

agreement when he wrote the check on December 3, 2010.  Ex. 440 at SGH1-00006286; Tr.

1858:12-1861:5 (P. DeBlasio Direct).  In his December 6 email, Charron made a list of tasks to

complete prior to closing the Charron SPA, including "Figure out a closeout number for the

Tom-John Acct today." Ex. 440 at SGH1-00006286; Tr. 1858:12-1861:5 (P. DeBlasio Direct).
This email confirms that Charron intentionally decided to pay himself on December 3 when he
knew the Tom/John Account issue was not yet resolved.

> **b.      Charron was not owed repayment of "business
> expenses" or authorized to write himself an expense
> check.**

Charron's unilateral decision to reimburse himself for alleged "business expenses" was
also unjustified. Just as with the Tom/John Account balance, there was no agreement that the
amounts Charron took were business expenses at all. His attempts to justify his actions after the
fact fail to overcome his lack of any company agreement to pay him the amounts he took.

Charron presented receipts and cashed checks to show that the $35,237.22 he took
through check 1045 was reimbursement for business expenses. *See* Exs. AS, 402. This evidence
fails to show Charron was entitled to the money he took because it does not show any agreement
by anyone at SGH to reimburse the amounts shown. Charron failed to follow company
procedure for reimbursement, which required him to submit all receipts to Peter Phelps for
assessment of whether the amounts were truly business expenses. Tr. 875:17-23 (Phelps Direct).
Charron himself implemented the requirement that reimbursement checks go through Peter
Phelps. *See* Tr. 874:6-875:16 (Phelps Direct). Charron enforced this policy against DeBlasio by
requiring Peter Phelps to approve DeBlasio's American Express transactions. *See* Tr. 876:4-
877:12 (Phelps Cross). Despite incurring $29,695 of the $35,237.22 in June, Charron never
asked anyone at SGH for approval. *See* Ex. 402 at TCHAR5-000030. He could not have
believed he was entitled to hide this amount and then take it on the way out the door.

Not only did Charron fail to seek approval of his business expenses, but he also knew
there was a dispute about whether they were reimbursable at all. The largest of Charron's
claimed business expenses was a rent check for his personal residence, which doubled as the

company headquarters in 2009 and 2010. The company never decided to reimburse Charron for his rental property in Florida. Tr. 872:25-874:5 (Phelps Direct). Indeed, as Phelps suggested, the fact that Charron knew the expense was not approved is evident from Charron's own handling of the expense. He wrote the $29,000 rent check in June 2010, but did not submit a request for reimbursement. Rather, he included the rental property as a credit to himself on his own Tom/John Account spreadsheet. *See* Ex. 145. Charron himself treated the rental as a personal benefit. He was not entitled to unilaterally reimburse himself for the same amount through the $35,237 business expense reimbursement check.

> **c.**     **Charron was not permitted to cut himself a payroll check.**

The last of the three checks Charron wrote to himself purported to be a payroll check. Charron's decision to write himself a payroll check was in direct conflict with SGH's established practice. At that time, the company used a payroll service provided by the DeBlasio Group to provide payroll for all of Sallyport's employees, including Charron. *See* 789:1-16 (Charron Cross), 868:9-17 (Phelps Direct). As Phelps testified, Charron did not have authority to avoid this procedure and write his own payroll checks. Tr. 868:7-17 (Phelps Direct). It was the understanding of the parties at the time that the payment of over $40 million to Charron in December 2010 would cover any payroll owed at that point in time. *See* Ex. A (releasing SGH from future liability to Charron for, *inter alia*, "any and all claims . . . obligations . . . [and] liabilities."); *see also* Tr.356:6-357:25 (J. DeBlasio Direct). Charron was neither entitled to this money nor authorized to issue his own paycheck.

> **3.**     **Charron concealed his intent because he knew he was not entitled to funds he withdrew.**

Charron's criminal intent is further demonstrated by his acts of concealment. Despite daily conversations throughout the negotiation of the SPA, at no point before the closing did

166

Charron advise DeBlasio, the CFO, the accountant, or counsel that he was entitled to additional funds and planned to withdraw the funds himself.  Tr. 792:11-794:10 (Charron Cross), 350:14-24, 358:1-6 (J. DeBlasio Direct).  He planned to take the funds himself and wrote all three of the checks before the closing of the Charron SPA, but kept his plans secret.  *See* Tr. 793:11-794:10 (Charron Cross).  Rather than sending an email or a phone call to address his questions, he concealed his intentions until the payments required by the Charron SPA had been irrevocably wired into his account.  Only after he received payment under the Charron SPA did he send the copies of the checks to SGH.  *See* Exs. AS, AT; Tr. 776:24-777:8, 779:20-24 (Charron Cross); *see also* Tr. 463:9-13 (Charron Direct).

### B.     Charron is liable for conversion or unjust enrichment.

Even if the Court finds the evidence insufficient to hold him responsible under the Florida Civil Theft statute, Charron should be found liable for conversion or unjust enrichment.  Charron's theft of company funds constitutes conversion even if Charron maintained an honest, but mistaken belief that he was entitled to the money.  *See United Technologies*, 556 F.3d at 1270 (citing *Seymour v. Adams*, 638 So. 2d 1044, 1047 (Fla. Dist. Ct. App. 5th Dist. 1994).  The tort of conversion occurs when a person "wrongfully refuses to relinquish property to which another has the right of possession."  *Id.*  Here, the evidence establishes that Charron was not entitled to the funds he withdrew on December 8, 2010.  As Peter Phelps explained, the agreement was that no further funds were owed to Charron after the close of the SPA.  Tr. 868:7-17, 871:7-25, 872:25-874:5, 875-17-23 (Phelps Direct).  Thus, even if Charron operated under the mistaken belief that he was entitled to the reimbursement of these funds, he is required to return them to Defendants.

Charron is also obligated to return the funds under a claim of unjust enrichment and money had and received.  "An action for money had and received, or the more modern action for

167

unjust enrichment . . . is an equitable remedy requiring proof that the money had been paid due to fraud, misrepresentation, imposition, duress, undue influence, mistake, or as a result of some other grounds appropriate for intervention. . . ."  *Hall v. Humana Hosp. Daytona Beach*, 686 So.2d 653, 656 (Fla. Dist. Ct. App. 3d Dist. 1996).  Charron was not entitled to any of the funds he removed, and must return them under either legal theory.

C.    **The release clause in the Charron SPA was not a free pass to loot the company.**

The release in the Charron SPA does not bar SGH's counterclaim.  Charron's alternative defense to the counterclaim is that he is exempt from liability because the parties signed a release.  This defense fails first because the Company Release in the Charron SPA only releases Charron from claims "preceding the closing . . . ."  Ex. A § 5.03.  The events at issue in the counterclaim took place on December 8, 2010, after the parties agreed that the Charron SPA had closed.  *See* FOF ¶¶ 247-53.

Second, the retrospective release in the Charron SPA cannot insulate Charron from intentionally tortious conduct that had not yet occurred when he signed the agreement.  Public policy in both Florida and New York prohibits the enforcement of exculpatory clauses that seek to release a party from liability for intentional torts.  *See e.g.*, *Loewe v. Seagate Homes, Inc*., 987 So. 2d 758, 760 (Fla. Dist. Ct. App. 5th Dist. 2008); *Great Northern Assoc., Inc. v. Cont'l Cas. Co.*, 596 N.Y.S.2d 938, 940 (App. Div. 3d Dep't 1993) ("[U]nder announced public policy [exculpatory clauses] are ineffective to insulate the releasee from intentional, willful, or grossly negligent acts."); *see also* Restatement (Second) of Contracts § 195 (1981) ("A term exempting a party for harm caused intentionally or recklessly is unenforceable on the grounds of public policy.").

Charron concedes that courts "may prohibit a release from insulating the parties from intentional tortious conduct," but seeks to limit the prohibition exclusively to clauses that are "forward-looking." Dkt No. 174 at 5. Neither of the cases cited by Charron contains such a narrow interpretation of the policy. *See Loewe*, 987 So. 2d at 760; *Great Northern Assoc.*, 596 N.Y.S.2d at 940. On the contrary, the court in *Great Northern* specifically stated, "[s]o strong is this policy that it is applicable regardless of whether exemption of such conduct was within the parties' contemplation at the time the agreement was executed." *Great Northern Assoc.*, 596 N.Y.S.2d at 940.

Moreover, the public policy reasons influencing the decisions in *Loewe* and *Great Northern* also apply to this case. In each of these cases, the court refused to enforce a prospective release that exempted the parties from *future* tortious conduct. The policy objective is to preclude parties from waiving their right to sue for acts that have not yet occurred. For the same reason, the release in the Charron SPA cannot exculpate Charron. Even if the deal did not close until December 8, a retrospective release cannot exempt Charron from torts he had not yet committed when he signed the agreement. The parties executed the Charron SPA on December 7. Charron looted the company account on December 8. Under the policy articulated in *Loewe* and *Great Northern*, Charron cannot be released by an agreement he signed on December 7 for events that were not known of by the parties and that did not occur until December 8. Charron's argument that the deal did not close until he confirmed receipt of payment is irrelevant. He does not get a free day from liability merely because there might have been a lag in the transfer of funds.

## CONCLUSION

On his affirmative claims for breach of contract (Count IV) and breach of the duty of good faith and fair dealing (Count V), Defendants request the Court to enter judgment in their favor and against Charron.  On the counterclaim for civil theft, Defendants request the entry of judgment in their favor and against Charron individually in the amount of $682,092.66, plus attorneys' fees and interest from December 8, 2010.

DATED this 20th day of August 2014.

Respectfully submitted,

/s/ Brian P. Waagner
Brian P. Waagner*
Michael A. Gatje*
Elizabeth Leavy
Thomas Rath*
HUSCH BLACKWELL LLP
750 17th Street N.W.
Suite 900
Washington, D.C.  20006
Telephone:  (202) 378-2300
Fax:  (202) 378-2319
brian.waagner@huschblackwell.com
michael.gatje@huschblackwell.com
elizabeth.leavy@huschblackwell.com
thomas.rath@huschblackwell.com

170

Daniel P. Jaffe
HUSCH BLACKWELL LLP
60 East 42nd Street
Suite 4600
New York, NY  10165
Direct:  (212) 485-9805
Fax:  (314) 480-1505
dan.jaffe@huschblackwell.com

*Counsel for Defendants Sallyport Global Holdings, Inc., JPD Private Trust Company, Ltd., and John DeBlasio*

*Admitted *pro hac vice*

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

```
------------------------------------------------------------   X
THOMAS W. CHARRON JR., Individually and as         :
Trustee of the THOMAS W. CHARRON JR. GRANTOR       :     No. 1:12-cv-06837-(WHP) (FM)
RETAINED ANNUITY TRUST DATED JULY 8, 2010          :
                                                   :
                       Plaintiff,                  :     CERTIFICATE OF SERVICE
                                                   :
         -against-                                 :
                                                   :
SALLYPORT GLOBAL HOLDINGS, INC., et al.,           :
                                                   :
                       Defendants.                 :
------------------------------------------------------------   X
```

I hereby certify that on August 20, 2014 I electronically filed a true and correct copy of

the foregoing with the Clerk of the Court using the CM/ECF system and that the following

counsel of record will be served via Notice of Electronic Filing generated by the CM/ECF

system:

> Athanasios Basdekis
> Brian Glasser
> J.B. Perrine
> BAILEY & GLASSER, LLP
> 209 Capitol Street
> Charleston, WV 25301
> *Counsel for Plaintiff Thomas W. Charron, Jr.*

> Respectfully submitted,


> /s/ Elizabeth Leavy
> Elizabeth Leavy
> HUSCH BLACKWELL LLP
> 750 17th Street N.W.
> Suite 900
> Washington, D.C.  20006
> Telephone:  (202) 378-2300
> Fax:  (202) 378-2319
> elizabeth.leavy@huschblackwell.com