Athanasios Basdekis (AB2574)
Brian A. Glasser *(Admitted Pro Hac Vice)*
**BAILEY & GLASSER, LLP**
209 Capitol Street
Charleston, WV 25301
(304) 345-6555 (main)
(304) 342-1110 (facsimile)
*Counsel for Plaintiff Thomas W. Charron Jr.,*
*Individually and as Trustee of the Thomas W.*
*Charron Jr. Grantor Retained Annuity Trust*
*Dated July 8, 2010*

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| THOMAS W. CHARRON JR., Individually and as Trustee of the THOMAS W. CHARRON JR. GRANTOR RETAINED ANNUITY TRUST DATED JULY 8, 2010,<br><br>            Plaintiff,<br><br>    v.<br><br>SALLYPORT GLOBAL HOLDINGS, INC.; GIAN PAUL DEBLASIO (aka John P. DeBlasio); JPD PRIVATE TRUST COMPANY, LTD., as Trustee of THE GPD CHARITABLE TRUST DATED DECEMBER 7, 2010,<br><br>            Defendants. | Civ. No. 12 CIV 6837 |

**PLAINTIFF'S PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW**

## TABLE OF CONTENTS

I.  INTRODUCTION ........................................................................................................ 1

II.  FINDINGS OF FACT AND CONCLUSIONS OF LAW REGARDING
     PLAINTIFF'S BREACH OF CONTRACT CLAIMS ................................... 4

A.  THE CHARRON SPA ............................................................................................ 4

   1. The Sale of Plaintiff's Fifty Percent Interest in SGH ................................. 4

   2. The Plain Language of the Windfall Protection Clause ............................. 5

       a)  The Four Corners of the SPA ......................................................... 6

       b)  Even the Parol Evidence Supports the Plain Language of the Windfall
           Protection Clause and Total Proceeds as the Measure for Damages ................. 9

       c)   Defendants' Interpretation of the Windfall Protection Clause Conflicts with
           the Plain Language of the Clause ................................................. 13

B.  THE DC CAPITAL TRANSACTION ..................................................................... 15

C.  THE DC CAPITAL TRANSACTION TRIPPED THE ENTERPRISE VALUE
     THRESHOLD OF THE WINDFALL PROTECTION CLAUSE OF THE
     CHARRON SPA IN AT LEAST 4  SEPARATE AND INDEPENDENT WAYS .... 17

   1. Breach of Contract ...................................................................................... 17

   2. Defendant SGH Has Admitted That John DeBlasio Only Sold 64.09% of the
      Economic Value of SGH for $59 Million ................................................. 18

   3. The Enterprise Value of SGH as Reflected by the Price of SGH in the DC   Capital
      Transaction is Greater than $65 million ................................................. 19

       a) Defendant DeBlasio Retained Operating Assets of SGH Worth $2.75 Million by
          Transferring Them to WD Solutions Ltd. on June 28, 2011 .............................. 20

           (i.) Cash in SGS in Bermuda Used for Working Capital Loans to Joint Venture
               Partners since 2008 ..................................................................... 21

           (ii.) History of Arkel Sallyport Global Ltd. Contract ................................... 21

           (iii.) PGS Contract Receivables Agreement is Another Strategic Loan ............. 23

           (iv.) The DC Capital SPA Indicates that the ASG and PGS Strategic Loans  are
               Material Contracts to SGH ............................................................... 24

       b) Correction of the McLean KSI Valuation Math Errors Reflect an Enterprise
          Value Above $65 ............................................................................. 25

       c) Defendant DeBlasio's Equity Interest in KSI was Worth at least $20.1 Million 26

       d) Mr. Risius' Independent Valuation of SGH ...................................................... 28

D.  UNUSUAL AND UNEXPLAINABLE ASPECTS OF THE DC CAPITAL
     TRANSACTION EVIDENCE CONSCIOUSNESS OF GUILT OF BREACH OF
     CONTRACT AND BREACH OF THE DUTY OF GOOD FAITH AND FAIR
     DEALING .......................................................................................................... 30

i

1. Evidence of Structuring the DC Capital Transaction to Appear to Fall below $65 million Establishes a Breach of the Covenant of Good Faith and Fair Dealing ....... 30

2. Parties' Joint Incentives to Maintain the Appearance That the Keep Purchase Price was Below $65 million ................................................................................... 30

3. Communication with Plaintiff's Attorney about the DC Capital Transaction .......... 32

4. SGI is a Shell Company and a Sham ....................................................................... 34

5. Worthless Stock of SGI Allegedly and Inexplicably Worth the Same as DeBlasio's Retained Interest in the Company ................................................................. 37

6. Same Shares of SGH Given Different Values in the DC Capital SPA For No Reason .................................................................................................................. 37

7. Based on Forecasts for SGH as of June 30, 2011 and the Price of SGH as Stated in the DC Capital SPA, SGH was Allegedly Sold for an Unbelievable Price of 1.8X EBITDA ............................................................................................................. 38

8. The internal "allocation" of debt to SH and KH Reflects a Lack of Arms-length Negotiation .......................................................................................................... 40

9. Vastly Different Projections Provided to Different Consultants by DC Capital Partners Reflects Effort to Manufacture Low Value for KSI Valuation and Thus Enterprise Value of SGH ..................................................................................... 41

E.  PROCEEDS RECEIVED FROM THE WINDFALL SALE AND PLAINTIFF'S DAMAGES ............................................................................................................ 42

1. Proceeds Received by John DeBlasio From the Windfall Sale .................................. 43

2. Transfer of $23.45 Million to the Bermuda Trust on June 28, 2011 ........................ 46

3. Distribution of $5.7 Million to the Florida Business Trust ....................................... 49

4. Transfer of $14 Million to the Florida 501(c)(3) Trust After the Closing of the DC Capital Transaction .............................................................................................. 50

5. Transfer of the Manzano Loan to WD Solutions ..................................................... 51

F.  COUNTERCLAIMS ............................................................................................... 52

1. The Charron SPA Contains a Choice of Law Provision ........................................... 52

2. The Charron SPA Contains a Broad Mutual Release for Both Parties ..................... 53

3. The Events of December 7, 2010 ............................................................................ 54

4. The Events of December 8, 2010 ............................................................................ 55

5. Charron's Entitlement to the Amounts in the Three Checks .................................... 56

   a) Salary ................................................................................................................ 56

   b) Business Expenses ............................................................................................. 56

   c) Tom-John Account ............................................................................................ 57

6. Charron and DeBlasio Honored the Bylaws and the Board Resolution was Honored in the Breach for Salary and Expenses and the Tom-John Account Reconciliation . 58

**G.**    **PREJUDGMENT INTEREST** ........................................................................... **59**

**III.   CONCLUSION** ................................................................................................. 61

# TABLE OF AUTHORITIES

## Cases

Vermont Teddy Bear Co., Inc. v. 538 Madison Realty Co., 1 N.Y.3d 470, 807 N.E.2d 876 (2004) ................................................................................................ 8

511 W. 232nd Owners Corp. v. Jennifer Realty Co., 98 N.Y.2d 144 (2002) ............................... 30

About.Com, Inc. v. Targetfirst, Inc., 01V1665(GBD), 2002 WL 826953 (S.D.N.Y. Apr. 30, 2002). ............................................................................................. 53

Adams v. Lindblad Travel, Inc., 730 F.2d 89 (2d Cir.1984) ........................................................ 60

Ascoli v. Lynch, 2 A.D.3d 553, 769 N.Y.S.2d 567 (2003) ........................................................... 17

Bank v. Ho Seo, No. 06 Civ. 15445(LTS)(RLE), 2009 WL 5341672 (S.D.N.Y. Dec. 16, 2009) ................................................................................................. 43

Betal Envtl. Corp. v. Local Union No. 78, 39 F. App'x 688 (2d Cir. 2002) ................................ 60

Betal Envtl. Corp. v. Local Union No. 78, Asbestos, Lead & Hazardous Waste Laborers, 162 F. Supp. 2d 246 (S.D.N.Y. 2001 .................................................................... 60

Cargill v. Charles Kowsky Resources, Inc., 949 F.2d 51 (2d Cir.1991). .................................... 52

Fin. One Pub. Co. Ltd. v. Lehman Bros. Special Fin., Inc., 414 F.3d 325 (2d Cir. 2005) ........... 52

Furia v. Furia, 116 A.D.2d 694, 498 N.Y.S.2d 12 (1986) ........................................................... 17

Harris v. Seward Park Housing Corp., 79 A.D.3d 425 (1st Dep't 2010) ..................................... 17

Hounddog Prods., L.L.C. v. Empire Film Grp., Inc., 826 F. Supp. 2d 619 (S.D.N.Y. 2011) ...... 43

House of Diamonds v. Borgioni, LLC, 737 F. Supp. 2d 162 (S.D.N.Y.2010) ............................. 43

Indu Craft, Inc. v. Bank of Baroda, 47 F.3d 490 (2d Cir.1995) ................................................... 42

L & K Holding Corp. v. Tropical Aquarium, 192 A.D.2d 643, 596 N.Y.S.2d 468, 469 (N.Y. App. Div. 1993) ............................................................................ 54

Matter of Primex Intl. Corp. v. Wal–Mart Stores, 89 N.Y.2d 594, 657 N.Y.S.2d 385, 679 N.E.2d 624 (1997) .......................................................................................... 7

McNally Wellman Co., a Div. of Boliden Allis, Inc. v. New York State Elec. & Gas Corp., 63 F.3d 1188 (2d Cir. 1995). ........................................................................ 60

Merrill Lynch & Co., Inc. v. Allegheny Energy, Inc., 500 F.3d 171 (2d Cir.2007)..................... 43

Moore v. Pecora, 191 Misc. 2d 256, 741 N.Y.S.2d 394, 397 (Dist. Ct. 2002)............................. 60

Nissho Iwai Europe PLC v. Korea First Bank, 99 N.Y.2d 115, 752 N.Y.S.2d 259, 782 N.E.2d 55, 60, 49 U.C.C. Rep. Serv. 2d 259 (2002)................................................................................... 8

Pallette Stone Corp. v. Guyer Builders Inc., 212 A.D.2d 862, 622 N.Y.S.2d 127 (1995). .......... 59

Quantum Chem. Corp. v. Reliance Group, 180 A.D.2d 548, 580 N.Y.S.2d 275, lv. denied 79 N.Y.2d 760, 584 N.Y.S.2d 448, 594 N.E.2d 942; CPLR 5001[b]) ..................................... 59

Scholastic, Inc. v. Snap TV, Inc., No. 09 Civ 4349(GBD) (GWG), 2011 WL 1330246, at *3 (S.D.N.Y. Apr. 8, 2011)................................................................................................... 42, 43

Schron v. Troutman Sanders LLP, 20 N.Y.3d 430, 986 N.E.2d 430 (2013)............................. 7, 8

Sobiech v. International Staple & Mach., 867 F.2d 778 (2d Cir.1989) ........................................ 60

Turtur v. Rothschild Registry Int'l, Inc., 26 F.3d 304 (2d Cir. 1994) ......................................... 53

W.W.W. Associates, Inc. v. Giancontieri, 77 N.Y.2d 157, 566 N.E.2d 639 (1990) ..................... 8

**Other Authorities**

22A N.Y. Jur. 2d Contracts § 429................................................................................................. 17

N.Y. C.P.L.R. 5001....................................................................................................................... 59, 60

N.Y. Pattern Jury Instr.--Civil 4:1 (3d ed. 2013) ...................................................................... 17

N.Y. U.C.C. §§ 2-709 .................................................................................................................... 60

This matter was tried on May 27-29, June 2-3, and August 4-7, 2014, before Judge William H. Pauley III, sitting without a jury. Having received into evidence the testimony of witnesses and exhibits, heard the arguments of the parties, and considered the entire record in this case, the Court now makes the following findings of fact and conclusions of law:

## I.    INTRODUCTION

On December 8, 2010, Sallyport Global Holdings, Inc., a government contracting business ("SGH"), redeemed Plaintiff Tom Charron's  50% ownership of SGH for a purchase price of $40.6 million. The stock purchase agreement ("Charron SPA" ) contains a Windfall Protection clause which states the following:

> 2.04  <u>Windfall Protection</u>. As additional consideration for the Shares, the Company agrees to make an additional payment to Sellers, on the basis and subject to the limitations provided in this Section 2.04. If, on or prior to the first anniversary of the date hereof, John DeBlasio or any of his affiliates or any other direct or indirect equity holder sells or agrees to sell shares of the Company's capital stock (or equity of an intervening Person or assets of the Company or any Company subsidiary) constituting 20% or more by voting power or economic value of the Company's assets or equity to a third party in one or a series of related transactions for a price that reflects an enterprise value of the Company equal to or greater than $65,000,000 (a "Windfall Sale") within three Business Days following the closing of such Windfall Sale, the Company or such stockholder shall pay Sellers an amount equal to 20% of the proceeds received from the Windfall Sale, such payment to be made to Sellers *pro rata* in accordance with the percentages set forth on <u>Schedule I</u>.

(Exhibit A at Section 2.04.)

On June 29, 2011, SGH was sold to DC Capital Partners ("DC Capital Transaction".) The two questions that the Court must answer are (1) was the DC Capital Transaction a Windfall Sale under Section 2.04, and, if so, (2) what are the proceeds that Defendants received from the Windfall Sale?

Plaintiff asserts four sufficient reasons for the Court to find that a Windfall Sale occurred:

(1)     Defendants swore under oath to the Supreme Court of New York in the Sagent litigation that Defendants sold less than 70% of SGH in the DC Capital Transaction.  Specifically, Defendants repeatedly told the court that in that transaction a 64.09% interest was sold for $59,542,000, thus making 100% of SGH worth more than $65 million. The fair administration of justice denies Defendants the right take irreconcilable positions on the value of SGH in the DC Capital Transaction in two different courts based on the same core evidence on which they rely in both cases.

(2)     As part and parcel of the DC Capital Transaction, SGH transferred certain operating assets worth $2.75 million to John DeBlasio. Defendants' expert does not dispute the value of those assets and agrees that if those assets are operating assets, then a Windfall Sale occurred. (James Hitchner ('Hitchner"), Trial Tr. at 1759:17-1760:17.)

(3)     The $3.8 million value Defendants ascribed to the19.38% equity interest in KSI John DeBlasio received as consideration in the DC Capital Transaction was a sham. The transaction documents did not speak to the value of Defendant DeBlasio's interest in KSI, but rather marked the value of a "straw man" -- the utterly empty shell company SGI. Instead of SGI, the evidence at trial established  the value of KSI and proved that Defendant DeBlasio's equity interest in KSI at the time of the DC Capital Transaction was worth as least $20.1 million.

(4)     Simply correcting for the mathematical errors Andy Smith of the McLean Group made in valuing KSI, without changing any of the cash flow

projections, data inputs or valuation assumptions, establishes that Defendant DeBlasio's equity interest in KSI at the time of the DC Capital Transaction was worth at least $4.55 million. Defendants' expert agreed with the mathematical corrections to the McLean valuation and provided no alternative value for Defendant DeBlasio's equity interest in KSI. When $4.55 million is added to the $60.7 million, the DC Capital Transaction qualifies as a Windfall Sale even if the Court accepts every jot and tittle of Defendants' case. (Jeffrey Risius ("Risius"), Trial Tr. at 1322:9-1323:24; Hitchner, Trial Tr. at 1776:22-1777:2; Exhibit 405(k).046.)

Any one of these bases provides the Court with ample justification to find that by a preponderance of the evidence the DC Capital Transaction was a Windfall Sale.

Instead of analyzing the economic substance of the DC Capital Transaction, the representations of Defendants and DC Capital contemporaneous to the DC Capital Transaction, and the sworn testimony of Defendants in the Sagent litigation, Defendants rest their whole case only upon the DC Capital SPA – a document Defendants and DC Capital structured, drafted and signed with full knowledge and appreciation of and concern for the Windfall Sale provision in the Charron SPA (Exhibits B, C and 132). Defendants argue that these three documents trump all of Plaintiff's evidence and should lead the Court to find that the enterprise value of SGH for the DC Capital Transaction was precisely $64.5 million, $500,000 under the Windfall Sale trigger. The evidence at trial, however, exposed the naiveté of Defendants' argument and informed the Court of the true economic substance of and what occurred in the DC Capital Transaction.

With respect to the "proceeds from the Windfall Sale," the relevant metric is the money Defendant DeBlasio put into his pocket and the bank accounts of his various trusts on account of

the DC Capital Transaction. The proceeds Defendant DeBlasio received falls into three buckets: (1) cash DC Capital paid to Defendant DeBlasio; (2) the 19.38% interest in KSI Defendant DeBlasio received; and (3) other assets (cash and contracts) of SGH leaked to Defendant DeBlasio as part and parcel of the DC Capital Transaction.

The parties agree DC Capital paid cash of $60.7 million. The parties dispute the value of the rollover equity interest in KSI, as discussed infra. As to the assets leaked to Defendant DeBlasio, the actual transfer of the assets is largely undisputed. But, Defendants claim that the asset leakage cannot constitute proceeds from the Windfall Sale since the cash and valuable contracts came from SGH itself, not the buyer of SGH. Defendants' argument, however, rings hollow because all of the asset transfers occurred after the signing of the DC Capital SPA and would not have occurred but for the sale to DC Capital. The Windfall Protection clause of the Charron SPA was designed to distribute 20% of whatever economic value the sellers of SGH put in their pockets from the Windfall Sale. Therefore, under the Windfall Protection clause, Plaintiff is entitled to 20% of the cash ($12.14 million), the rollover equity ($4.02 million) and the assets leaked to Defendant DeBlasio in connection with the sale to DC Capital ($9.3 million) for a total of $25.46 million in damages.

## II. FINDINGS OF FACT AND CONCLUSIONS OF LAW REGARDING PLAINTIFF'S BREACH OF CONTRACT CLAIMS

### A. THE CHARRON SPA

#### 1. The Sale of Plaintiff's Fifty Percent Interest in SGH

1.     Plaintiff gave to John DeBlasio, at no cost, a 50% ownership upon Mr. DeBlasio joining the company. (Thomas Charron ("Charron"), Trial Tr. at 407:10-16.)

2.     Pursuant to the Charron SPA, SGH redeemed Plaintiff's 50% stockholding in SGH on December 8, 2010. (Michael O'Connor ("O'Connor"), Trial Tr. at 9:1-10; Exhibit A.)

3.      SGH redeemed Plaintiff's stock for a purchase price of $40.675 million of which $100,000 was paid for a non-compete agreement with Tom Charron. (O'Connor, Trial Tr. at 9:19-24; Exhibit A at Section 2.02.)

4.      The money paid to Plaintiff for the redemption came from profits that existed within SGH. None of the funds paid to Plaintiff came from John DeBlasio personally and no outside financing was needed or used. (Peter Phelps, Trial Tr. at 893:17-894:16; John DeBlasio ("DeBlasio"), Trial Tr. at 274:14-20.)

5.      Defendants and Plaintiff were both represented by experienced counsel in the negotiation and documentation of the Charron SPA, Plaintiff by Williams & Connolly LLP and Defendants by Wilmer Hale and Chris Schwartz. (Charron, Trial Tr. at 408:4-409:4; O'Connor, Trial Tr. at 8:16-18, 10:7-9; DeBlasio, Trial Tr. at 397:1-20.)

6.      The closing of the Charron SPA occurred remotely on December 8, 2010 at 5:10 PM when the bankers and Plaintiff's counsel confirmed the fund transfers and Defendant SGH's attorney released the signature pages for both parties.  (O'Connor, Trial Tr. at 17:8-17, 17:20-23, 21:19-22:22, 18:22-25, Exhibits 48, 139 and 163.)

### 2.      The Plain Language of the Windfall Protection Clause

7.      The central dispute in this case concerns section 2.04 of the Charron SPA, the Windfall protection clause. This clause reads in full as follows:

2.04 <u>Windfall Protection</u>. As additional consideration for the Shares, the Company agrees to make an additional payment to Sellers, on the basis and subject to the limitations provided in this Section 2.04. If, on or prior to the first anniversary of the date hereof, John DeBlasio or any of his affiliates or any other direct or indirect equity holder sells or agrees to sell shares of the Company's capital stock (or equity of an intervening Person or assets of the Company or any Company subsidiary) constituting 20% or more by voting power or economic value of the Company's assets or equity to a third party in one or a series of related transactions for a price that reflects an enterprise value of the Company

equal to or greater than $65,000,000 (a "Windfall Sale") within three Business Days following the closing of such Windfall Sale, the Company or such stockholder shall pay Sellers an amount equal to 20% of the proceeds received from the Windfall Sale, such payment to be made to Sellers *pro rata* in accordance with the percentages set forth on <u>Schedule I</u>.

(Exhibit A at Section 2.04.)

8.      A Windfall Sale occurs when John DeBlasio or any of his affiliates sells or agrees to sell shares of the Company's capital stock constituting 20% or more by voting power or economic value of SGH's assets or equity to a third-party in one or a series of related transactions for a price that reflects an enterprise value equal to or greater than $65,000,000. (O'Connor, Trial. Tr. at 10:21-11:1; Exhibit A at section 2.04.)

9.      The concept of "economic value" is one that Defendants seek to ignore despite these words being expressly stated in the definition of "Windfall Sale." This Court, however, cannot ignore the economic value (<u>i.e.</u>, substance) of the transaction in determining whether a Windfall Sale occurred and if so, the proceeds Defendant DeBlasio received from the Windfall Sale. (Daniel Selby ("Selby"), Trial Tr. at 1559:17-23; Exhibit A Section 2.04.)

### a)      The Four Corners of the SPA

10.      In terms of proceeds, the plain language of the Charron SPA controls. It states that the sellers shall be paid "an amount equal to 20 percent of the proceeds received from the Windfall Sale." The clause does not state that Plaintiff shall receive only 20% of the amount that Defendants received from the buyer of SGH. The clause contemplates 20% of the proceeds emanating from the Windfall Sale regardless of whether the source of the proceeds was the buyer's bank account or assets of SGH transferred to Defendant DeBlasio. (Exhibit A at Section 2.04.)

11.     Defendants ask that this Court ignore the unambiguous language of Section 2.04 and rewrite the Charron SPA to say that Plaintiff is only entitled to "incremental proceeds" above $65 million "received from the buyer." However, neither the word "incremental" nor the source of proceeds limitation appears in the Charron SPA. Defendants presented no evidence to lead the Court to reform or rewrite the unambiguous language of the Charron SPA. (O'Connor, Trial Tr. at 12:5-18; Exhibit A at Section 2.04).

12.     In addition, Defendants' interpretation of the Windfall Protection clause cannot survive the circumstance of more than 20% but less than 100% of the shares of SGH being sold during the Windfall Protection window – an occurrence the parties and clause expressly contemplated and addressed in the Charron SPA. Plaintiff's construction of the Windfall Clause suffers from none of these defects as it is consistent with a plain reading of the contractual language, does not require the Court to rewrite a single word of the contract, and adeptly handles the sale of any SGH shares from 20% to 100% of the Company.  Accordingly, the plain language of the Windfall Protection clause controls and Defendants owe Plaintiff 20% of the proceeds Defendant DeBlasio actually "put in his pocket" from the Windfall Sale. (See infra at ¶¶ 195-226.)

13.     Under New York law, parol evidence is not admissible where the contract contains an integration clause. Schron v. Troutman Sanders LLP, 20 N.Y.3d 430, 436, 986 N.E.2d 430, 433-34 (2013) (quoting Matter of Primex Intl. Corp. v. Wal–Mart Stores, 89 N.Y.2d 594, 599, 657 N.Y.S.2d 385, 679 N.E.2d 624 (1997).

14.     It is well settled that "extrinsic and parol evidence is not admissible to create an ambiguity in a written agreement which is complete and clear and unambiguous upon its

face." <u>W.W.W. Associates, Inc. v. Giancontieri</u>, 77 N.Y.2d 157, 162, 566 N.E.2d 639, 642 (1990) (internal citations omitted).

15.     Unless the terms of the contract are "written so blindly and imperfectly that its meaning is doubtful" a contract should not be considered ambiguous and parol evidence should not be admitted. <u>Nissho Iwai Europe PLC v. Korea First Bank</u>, 99 N.Y.2d 115, 121-122, 752 N.Y.S.2d 259, 264, 782 N.E.2d 55, 60, 49 U.C.C. Rep. Serv. 2d 259 (2002).

16.     These legal principles apply even more strongly in the context of a commercial contract like the Charron SPA where "the instrument was negotiated between sophisticated, counseled business people negotiating at arm's length."  In such circumstances, "courts should be extremely reluctant to interpret an agreement as impliedly stating something which the parties have neglected to specifically include."  Hence, "courts may not by construction add or excise terms, nor distort the meaning of those used and thereby make a new contract for the parties under the guise of interpreting the writing." <u>Vermont Teddy Bear Co., Inc. v. 538 Madison Realty Co.</u>, 1 N.Y.3d 470, 475, 807 N.E.2d 876, 879 (2004) (internal  citations omitted).

17.     Further, the Charron SPA includes an integration clause that states:

6.10 <u>Entire Agreement</u>. This Agreement contains the entire agreement among the parties hereto, and supersedes all prior agreements and undertakings (written or oral) between the parties hereto, relating to the subject matter hereof.

(O'Connor, Trial Tr. at 15:10-17; Exhibit A at Section 6.10.)

18.     Given the inclusion of this integration clause, the Court would have to ignore black letter New York law to rewrite the Charron SPA at Defendants' urging since such a provision bars the admission and consideration of extrinsic evidence to vary or contradict the terms of the agreement. <u>Schron v. Troutman Sanders LLP</u>, 20 N.Y.3d 430, 436, 986 N.E.2d 430, 433-34 (2013) (quoting <u>Matter of Primex Intl. Corp. v. Wal–Mart Stores</u>, 89 N.Y.2d 594, 599, 657 N.Y.S.2d 385, 679 N.E.2d 624 (1997) ("Furthermore, where a contract contains a merger

clause, a court is obliged 'to require full application of the parol evidence rule in order to bar the introduction of extrinsic evidence to vary or contradict the terms of the writing.'").

19.     Given able counsel respectively represented the parties to the Charron SPA, the Court has no evidence before it to set aside the unambiguous language of the Windfall Protection clause especially where counsel and the parties intentionally included an integration clause in the agreement. Accordingly, the Court declines Defendants' request to rewrite the contract and will instead interpret it as written. (O'Connor Testimony, Trial Tr. at 8:5-18; 55:18-20, 20:15-16.)

b)     **Even the Parol Evidence Supports the Plain Language of the Windfall Protection Clause and Total Proceeds as the Measure for Damages**

20.     Even if the Court were to consider parol evidence, such evidence does not support Defendants' interpretation of the Windfall Protection clause.

21.     It was Tom Charron's idea to add the Windfall Protection clause to the Charron SPA. He first proposed the concept on November 30, 2010. (Charron, Trial Tr. 413:20-414-3; Exhibit R at SGHI-00229840.)

22.     Mr. Charron proposed the idea because the relationship between John DeBlasio and him had grown increasingly strained. Mr. Charron felt forced to sell his share of the company and was willing to sell it for a significant discount because of John DeBlasio's unwillingness to continue working with him and unwillingness to continue trying to find a third-party buyer. (Charron, Trial Tr. at 826:19-827:10; DeBlasio, Trial Tr. at 82:21-83:13, 157:12-24; Phelps, Trial Tr. at 885:18-21, 888:5-22.)

23.     As confirmed by several witnesses, at the time that Plaintiff redeemed his shares in the company, SGH was producing large amounts of cash and would continue to do so through the closing of the DC Capital Transaction and beyond. Peter Phelps testified that SGH had $49 million in cash at the time it redeemed Plaintiff's shares for $40.6 million in December 2010. Pat

DeBlasio likened SGH to the "goose that laid the golden egg." Defendant's expert Mr. Hitchner agreed that SGH was a "cash cow," and that from June 2010 through July 2011, SGH was experiencing "very rapid growth" which translated into rapid cash generation since the business that had no debt.  Similarly, Doug Lake agreed that SGH's business grew dramatically from June 2010 until July 2011. (Phelps, Trial Tr. at 893:2-13; Pat DeBlasio ("P. DeBlasio"), Trial Tr. at 1822:3-9; Hitchner, Trial Tr. at 1728:14-1729:4; Doug Lake ("Lake"), Trial Tr. at 1194:5-15; Exhibit 435 at p. 46.)

24.     That growth trajectory was visible to Plaintiff when the company redeemed Plaintiff's shares. (P. DeBlasio, Trial Tr. at 1824:8-1826:11.)

25.     Defendant DeBlasio confirmed the compulsion surrounding the Charron SPA. He testified that he felt "forced to buy out Tom Charron's stock in Sallyport" and that he had no other alternative "after a long and difficult process" of trying to sell the company to a third-party. (DeBlasio, Trial Tr. at 82:21-83:13, 157:12-24; Exhibit 21, at the DeBlasio Affidavit at paragraphs 46-47, and Exhibit 384.)

26.     The Windfall Protection clause as it appears in the executed Charron SPA differs markedly from the early discussions about the substance of such a provision in the Charron SPA. (Compare, for example, Exhibits R and V to Exhibit A at 2.04; Charron, Trial Tr. at 414:1-418:17; Phelps, Trial Tr. at 906:23-913:12.)

27.     The initial Letter of Intent signed by the parties contained the following:

The Selling Shareholders will receive Windfall Protection defined as follows:

a.   In the period beginning on the closing date and ending one year from the date of closing, in the event that Sallyport commits to sell shares to a third party for a purchase price exceeding an enterprise value of $65 million, the Selling Shareholders will receive 20% of the sales proceeds, as additional purchase price for this transaction.

(Exhibit V.)

28.     John DeBlasio admitted that there were at least three versions of the Charron SPA received and revised before signing the final version and in each instance changes were proposed to Section 2.04 and in each instance he had the ability to object to or attempt to modify those changes. (DeBlasio, Trial Tr. at 373:22-374:11.)

29.     Mr. O'Connor first received a draft of the Charron SPA on December 3, 2010 and four or five drafts of the Charron SPA were exchanged between the parties in the course of negotiations over the next days. (O'Connor, Trial Tr. at 57:9-18.)

30.     Mr. O'Connor circulated his changes to the proposed agreement to all parties, including SGH counsel, Mr. DeBlasio's personal counsel, Peter Phelps, and others, inviting comments to his changes and particularly drawing attention to the fact that he was proposing changes to the concept of windfall protection set forth in Section 2.04.  (Phelps, Trial Tr. at 878:11-879:19; Exhibit 437.)

31.     The final version of the Windfall Protection provision in the executed Charron SPA is materially different from the version in the Letter of Intent.  The final version of the Windfall Protection provision provides:

> 2.04  Windfall Protection. As additional consideration for the Shares, the Company agrees to make an additional payment to Sellers, on the basis and subject to the limitations provided in this Section 2.04. If, on or prior to the first anniversary of the date hereof, **John DeBlasio or any of his affiliates or any other direct or indirect equity holder sells or agrees to sell shares of the Company's capital stock (or equity of an intervening Person or assets of the Company or any Company subsidiary) constituting 20% or more by voting power or economic value of the Company's assets or equity to a third party in one or a series of related transactions for a price that reflects an enterprise value of the Company equal to or greater than $65,000,000 (a "Windfall Sale") within three Business Days** following the closing of such Windfall Sale, the Company or such stockholder shall pay Sellers an amount equal to **20% of the proceeds received from the Windfall Sale**, such payment to be made to Sellers *pro rata* in accordance with the percentages set forth on Schedule I.

11

(Exhibit A at Section 2.04, emphasis added.)

32.     The final version of the clause picks up and binds "**John DeBlasio or any of his affiliates or any other direct or indirect equity holder**" as opposed to only SGH.  This change protects Mr. Charron more than does the version of the clause in the Letter of Intent. (Exhibit A at Section 2.04, emphasis added.)

33.     The final version of the clause is implicated when a bound party "**sells or agrees to sell shares of the Company's capital stock (or equity of an intervening Person or assets of the Company or any Company subsidiary) constituting 20% or more by voting power or economic value of the Company's assets or equity to a third party in one or a series of related transactions.**"  This change gives something valuable to both parties.  It gives Mr. DeBlasio a clear right to sell up to 19.9% of the Company's economic value without sharing any proceeds with Plaintiff.   With respect to Plaintiff, it captures both direct sales of stock and indirect sales of stock of a parent corporation, and it expands the ambit of protection from mere stock sales to transfers of economic value in one or a series of related transactions. (Exhibit A at Section 2.04, emphasis added.)

34.     The final version of the clause defines a Windfall Sale by reference to "**a price that reflects an enterprise value of the Company equal to or greater than $65,000,000 (a "Windfall Sale")**…."  The Letter of Intent focused only on "purchase price."  This difference is materially important here because the enterprise value of SGH requires the Court to consider the consideration paid by the buyer in the DC Capital Transaction as well as assets (cash and contracts) transferred to Defendant DeBlasio just prior to closing and not merely the "stated purchase price."  On this point, the final version's language is more protective of Plaintiff than was the Letter of Intent. (Exhibit A at Section 2.04, emphasis added.)

35.     The final version of the clause requires payment to Plaintiffs of "**20% of the proceeds received from the Windfall Sale.**"  The Letter of Intent required payment of "20% of the sales proceeds."  The final version's language is more protective of Plaintiff than the Letter of Intent.  The Letter of Intent's focus only on "sales proceeds" is less broad than the final version's focus on "proceeds received from the Windfall Sale."  "Windfall Sale" is, in the final version, a defined term that captures movement of economic value in one or a series of related transactions. The asset leakage to get to the purchase price reflects that economic value. (Exhibit A at Section 2.04, emphasis added.)

36.     Neither Mr. DeBlasio nor Mr. Charron finally agreed to any draft proposal or version of the Windfall Protection clause other than that which appears in the Charron SPA at Section 2.04. (Charron, Trial Tr. at 414:1-418:17; Exhibits A, R and V.)

37.     In sum, the changes to the Windfall Protection concept are so extensive between December 1, 2010 and Closing that the Court finds that the parol evidence reveals an extensive, and intensive, negotiation that provided benefits and detriments to each party, that each party was represented by competent, independent counsel and that no reason exists to vary the unambiguous terms of the final version of Section 2.04 based on parol evidence. (O'Connor, Trial Tr. at 8:5-18, 55:18-20, 20:15-16.)

38.     If fact, the parol evidence before the Court only strengthens its conclusion that Plaintiff's construction of the Windfall Protection is the proper interpretation of Section 2.04.

**c)     Defendants' Interpretation of the Windfall Protection Clause Conflicts with the Plain Language of the Clause**

39.     Defendants' interpretation of the Windfall Protection clause is not logical given the plain language of the clause.

40.     Peter Phelps testified to Defendants' position that under the Windfall Protection clause Plaintiff is only entitled to 20% of the incremental proceeds over $65,000,000. (Phelps, Trial. Tr. at 907:21-908:17.)

41.     However, in the case of a minority sale where more than 20% of the stock was sold for a price that reflected an enterprise value above $65,000,000, under their proposed interpretation, as Mr. Phelps testified, (Phelps, Trial. Tr. at 932:14-935:19), Defendants could end up having to pay more than 20% of the undisputed proceeds from the sale, a result that defies logic and conflicts with the language of the provision:

```
14 THE COURT: I'd like you to walk me through the math
15 of the sale of 25 percent of the company for $25 million. Are
16 you with me?
17 THE WITNESS: Yes.
18 THE COURT: OK. Now, assuming that Mr. DeBlasio sold
19 25 percent of the company for $25 million, what if anything,
20 under your understanding of the windfall provision, would
21 Mr. Charron be entitled to receive?
22 THE WITNESS: Sure. OK. So you would say, OK, you
23 would say it was 25, 25 million for a quarter. So you would
24 gross that up times 4. So that 25 million would equal 100.
25 And you would say 100 minus 65 equals 35. 35 times 20 percent

1 equals 7 million.
2 THE COURT: All right. So if you look at the windfall
3 protection provision, take out, look at 2.04, and the last
4 portion of the provision says that the company for the
5 stockholder, in this case DeBlasio, would pay sellers an amount
6 equal to 20 percent of the proceeds received from the windfall
7 sale.
8 THE WITNESS: Right.
9 THE COURT: But, here, in this hypothetical, the
10 proceeds received were 25 million. Right?
11 THE WITNESS: Yes.
12 THE COURT: 25 million. 20 percent of 25 million is
13 what?
14 THE WITNESS: 20 percent of 25 million?
15 THE COURT: Yes.
16 THE WITNESS: Would be 5 million.
```

(Phelps, Trial. Tr. at 932:14-933:16.)

42.     Nothing it the record nor common sense can justify the Court departing from the unambiguous language of the Windfall Protection clause; therefore, that language controls the Court's disposition of the issues before it.

### B.  THE DC CAPITAL TRANSACTION

43.     Although John DeBlasio claims that at the time of the negotiations and closing of the Charron SPA that he did not have any intention of "flipping" SGH in the next year, the evidence at trial contemporaneous to the closing of the Charron SPA shows that within weeks after the closing, John DeBlasio and DC Capital Partners were already well on their way to a deal. (DeBlasio, Trial Tr. at 393:19-396:9; Lake, Trial Tr. at 1196:24-1197:18; Exhibits BO, 267, X and B.)

44.     On December 19, 2010, the week following the closing of the Charron SPA, John DeBlasio and Tom Campbell of DC Capital Partners exchanged emails already proposing the possibility of a transaction. (Exhibit BO.)

45.     On January 11, 2011, John DeBlasio and Doug Lake of DC Capital Partners exchanged emails in which Mr. Lake promised a letter of intent from DC Capital by the end of the week, reported that Tom Campbell was "currently coordinating meetings with management candidates that you and Tom discussed," and proposed a closing in 45 days. John DeBlasio responded that he did not think they needed 45 days to close "given all of the interactions thus far," clearly reflecting that he had been having recent and extensive discussions with Tom Campbell and DC Capital Partners about doing a transaction to sell a significant equity interest in SGH. (Exhibit 267.)

46.     Mr. Campbell's testimony corroborates this evidence as he testified that prior to January 20, 2011, he had looked into SGH's contract backlog, business, future prospects and some of its assets. (Thomas Campbell ("Campbell"), Trial Tr. at 616:24-617:13.)

47.     On January 20, 2011, DC Capital Partner sent a letter of intent to John DeBlasio for the purchase of SGH. (Exhibit X.)

48.     On May 6, 2011, the parties signed the DC Capital SPA. (Exhibit B.)

49.     On June 29, 2011, DC Capital Partners and Defendants closed the DC Capital Transaction. (Exhibits B, C and 132.)

50.     Pursuant to the DC Capital Transaction, SGH and Sallyport Global, Inc. ("SGI") were sold to Sallyport Holdings LLC ("SH"), a special purpose entity set up for the purposes of the transaction and the subsequent merger into Kaseman Holdings LLC ("KH") to form KS International ("KSI"), the surviving entity. (O' Connor, Trial Tr. at 30:1-31:4; Exhibit C at Section 4.13).

51.     At the time of the sale, the GPD Charitable Trust Dated December 7, 2010, formerly known as the John DeBlasio Charitable Trust for World Peace and Development ("Bermuda Charitable Trust") owned 100% of the stock (10,000 shares) of SGH. (O'Connor, Trial. Tr. 35:6-12; Exhibit C at Schedule 2.4.)

52.     SGI, a shell company the shares of which were transferred to SH in the DC Capital Transaction, was owned by the John P. DeBlasio Trust Dated January 1, 2011 ("Florida Business Trust") whose Grantor and Trustee was Pat DeBlasio. (O'Connor, Trial Tr. at 35:20-25; Exhibit C at Schedule 2.4.)

53.     On the face of the deal documents, the Florida Business Trust ostensibly exchanged its 100% ownership of SGI for a 38% membership interest in SH with the parties

ascribing a value of $3.8 million for the shares of the shell company, SGI. (O'Connor, Trial Tr. at 36:1-3; DeBlasio, Trial Tr. at 86:15-87:8; Exhibit C at Schedule 2.4.)

54.    The DC Capital SPA required the merger of SH and KH to form KS International, LLC ("KSI"). This merger is an express and indivisible part of the DC Capital Transaction. Thus, as part of the DC Capital Transaction, Defendant DeBlasio received a 19.38% interest in KSI. (Hitchner, Trial Tr. at 1739:12-15, 1739:20-1740:15; P. DeBlasio, Trial Tr. at 1818:18-1819:2; Risius, Trial Tr. at 1293:7-1294:6; Exhibit C at ¶19.)

55.    The DC Capital SPA does not contain any value, stated or otherwise, for the final merged entity, KSI. (Hitchner, Trial Tr. at 1740:16-18.)

### C. THE DC CAPITAL TRANSACTION TRIPPED THE ENTERPRISE VALUE THRESHOLD OF THE WINDFALL PROTECTION CLAUSE OF THE CHARRON SPA IN AT LEAST 4 SEPARATE AND INDEPENDENT WAYS

#### 1.    Breach of Contract

56.    The elements of a cause of action for breach of contract are (1) formation of a contract between plaintiff and defendant, (2) performance by plaintiff, (3) defendant's failure to perform, and (4) resulting damage, N.Y. Pattern Jury Instr.--Civil 4:1 (3d ed. 2013) citing Furia v. Furia, 116 A.D.2d 694, 695, 498 N.Y.S.2d 12 (1986); Ascoli v. Lynch, 2 A.D.3d 553, 769 N.Y.S.2d 567 (2003) citing PJI 4:1); Harris v. Seward Park Housing Corp., 79 A.D.3d 425, 426 (1st Dep't 2010); 22A N.Y. Jur. 2d Contracts § 429.

57.    The Windfall Protection clause states that if within a year of the closing of the Charron SPA, Defendants sold or agreed to sell shares of SGH's capital stock constituting 20% or more by voting power or economic value of SGH's assets or equity to a third party in one or a series of related transactions for a price that reflected an enterprise value of SGH of $65 million or more, Defendants had to pay Plaintiff within 3 days.

58.     The Court finds that the Charron SPA was a Windfall Sale and that Defendants breached this contract by not paying Plaintiff any sum within three days of the transaction.

### 2.     Defendant SGH Has Admitted That John DeBlasio Only Sold 64.09% of the Economic Value of SGH for $59 Million

59.     SGH and John DeBlasio repeatedly claimed that the DC Capital Transaction did not involve the sale of 100% of the company. (DeBlasio Testimony, Trial Tr. at 83:14-21, 93:10-17, 95:7-19; O'Connor, Trial Tr. at 48:8-22, 50:7-21, 51:22-53:15; Exhibits 21 and 22.)

60.     Economically, this is true, since the purchasing entity SH was simply SGH minus the assets leaked to John DeBlasio and John DeBlasio's Florida Business Trust retained 38% of SH, which became a 19.38% interest in KSI.

61.     Defendants have represented, in writing, to the Supreme Court of New York County in related litigation involving Sagent Advisors, Inc. ("Sagent") that on June 29, 2011, Defendants sold only a 64.09% interest in SGH for $59,542,000. (DeBlasio, Trial Tr. at 93:10-17; O'Connor, Trial Tr. at 48:8-22; Exhibit 21.)

62.     Defendants represented in sworn testimony before the court in the Sagent litigation that they retained more than 30% of the interest in the newly formed company as part of the DC Capital Transaction. (DeBlasio, Trial Tr. at 83:14-21, 93:10-17; O'Connor, Trial Tr. at 50:7-21; Exhibit 21 at Affidavit of J. DeBlasio.)

63.     In a letter from SGH's attorney David J. Kalson of Cohen & Grigsby P.C. to Sagent dated August 10, 2011, John DeBlasio again states that he sold only a 64.09% interest in the DC Capital Transaction for $64.5 million. (DeBlasio, Trial Tr. at 95:7-19; O' Connor, Trial Tr. at 51:22-53:15; Exhibits 21 and 22.)

64.     Just over a month later on September 20, 2011, Defendants' attorney Mr. Kalson, at the direction of John DeBlasio, sent a letter to Plaintiff's attorney Michael O'Connor

representing that greater than 20% of SGH was sold for $64.5 million but did not state that only 64.09% of the company had been sold at that price. (O'Connor, Trial Tr. at 54:13-55:6; DeBlasio, Trial Tr. at 94:7-19; Exhibit 8.)

65.     John DeBlasio testified at trial that he sold 100% of the voting power of SGH to SH, but retained 38% of the voting power in SH. (DeBlasio Testimony, Trial Tr. at 85:24-86:8.)

66.     These representations and sworn statements are entirely inconsistent with Defendants' sworn testimony and representations in this case and are inconsistent with their expert's testimony at trial. Mr. Hitchner admitted that his opinion offered in this case was based on the sale of 100% of SGH which is different than Defendants' representations and testimony in Sagent that they sold only 64.09% of the company in the DC Capital Transaction. (Hitchner, Trial Tr. at 1747:5-17; Exhibit C.)

67.     Defendants' expert could offer no explanation for the inconsistencies in Defendants; sworn testimony in the two cases. (Hitchner, Trial Tr. at 1747:5-17.)

### 3.     The Enterprise Value of SGH as Reflected by the Price of SGH in the DC Capital Transaction is Greater than $65 million

68.     Plaintiff's expert, Jeffrey M. Risius, CPA/ABV, CFA. ASA, provided testimony on three issues: (1) the enterprise value that is reflected in the price of SGH and SGI pursuant to the DC Capital SPA, including a valuation of the rollover stock in KSI received by Defendant DeBlasio as part of the DC Capital Transaction; (2) the amount of proceeds from operating assets Defendant DeBlasio received from the DC Capital Transaction; and  (3) the value of SGH as of June 30, 2011, the closing date for the DC Capital Transaction (Risius, Trial Tr. at 1292:24-1293:6.)

69. Mr. Risius based his opinion on his education and more than 25 years of experience as a financial analyst and business valuator. (Risius, Trial Tr. at 1289:23-1292:1; Exhibit 98.)

70. Mr. Risius defined enterprise value as the market value of the entire business including all operating assets (Risius, Trial Tr. at 1299:17-19.)

a) **Defendant DeBlasio Retained Operating Assets of SGH Worth $2.75 Million by Transferring Them to WD Solutions Ltd. on June 28, 2011**

71. On June 15, 2011, two weeks before the DC Capital Transaction closed, John DeBlasio created WD Solutions, Ltd., a Mauritius entity ("WDS"), wholly owned by the Bermuda Trust. John DeBlasio is a Director and Officer of WDS. (DeBlasio, Trial Tr. at 89:4-9; Charron, Trial Tr. at 479:1-4.)

72. Pursuant to the Assignment and Assumption Agreement, dated June 28, 2011, between Sallyport Global Services, Ltd. ("SGS") and WDS, as Assignee, Defendant SGH via SGS transferred all of SGS's rights, title, interest and obligations under the $2,700,000 loan made by SGS to Arkel Sallyport Global Ltd. ("ASG") and the $750,000 contracts receivable agreement made by SGS to Power Generation Solutions, Ltd. ("PGS"). (DeBlasio, Trial Tr. at 134:5-22; Exhibit CG.)

73. The full listing of assets assigned to WD Solutions is contained within Schedule 6.33 ("Absence of Undisclosed Changes") to the SPA. (Exhibit 132 at SGH1-00395838-00395839.)

74. As Mr. Risius testified and Mr. Hitchner corroborated, the enterprise value of SGH includes all operating assets and if any operating assets were transferred to Defendant DeBlasio as part of the sale of SGH to DC Capital, those assets are additional consideration to him and the value of these assets must be included in the calculation of the enterprise value of

SGH. (Risius, Trial Tr. at 1313:7-22; Hitchner, Trial Tr. at 1759:17-1760:17; Exhibit 405(a).009.)

75. The parties agree that if either of the two contracts transferred to WDS are operating assets of SGH then their value should be included in the calculation of the enterprise value of SGH. (Hitchner, Trial Tr. at 1759:17-1760:17.)

76. Mr. Risius concluded that the contracts were operating assets and had a combined value of $2.75 million. Mr. Hitchner offered no opinion on the value of the two loans. (Risius, Trial Tr. at 1313:25-1314:18.)

### (i.) Cash in SGS in Bermuda Used for Working Capital Loans to Joint Venture Partners since 2008

77. SGS was a Bermuda company SGH set up to service USAID contracts overseas. The funds earned overseas were then kept at SGS to eventually be repatriated or to be used toward other overseas projects. (DeBlasio, Trial. Tr. at 132:7-133:13; Exhibit CG.)

78. SGH strategically used the cash in SGS to provide working capital to fund projects that helped SGH grow and diversify its business. (Charron, Trial Tr. at 493:10-20.)

79. As early as 2008, SGS had been making "strategic loans" to entities involved in projects that SGH had identified as vehicles by which it could extend and diversify its work in new regions. (DeBlasio, Trial. Tr. at 136:17-20, 138:11-25, 139:8-14, 141:3-5, 143:8-11, 145:2-18, 149:8-22.)

### (ii.) History of Arkel Sallyport Global Ltd. Contract

80. On February 26, 2008, SGH caused SGS to enter into a joint venture agreement with Arkel International, LLC to form ASG. (DeBlasio, Trial. Tr. at 138:11-25; Defendants' Exhibit AW.)

81.     The joint venture agreement in Section 5.05 expressly recognizes that either party to the joint venture may loan money to ASG to ensure the viability and success of the enterprise and project. (DeBlasio, Trial Tr. at 141:3-5; Defendants' Exhibit AW.)

82.     Pursuant to section 5.05 of the joint venture agreement, SGS made the first loan, for $3,000,000, to the joint venture ASG on February 29, 2008-- two days after the parties had entered the joint venture agreement. (Charron, Trial Tr. at 481:25-483:21; Exhibits AW and 411.)

83.     ASG used the $3 million loan to start up a number of projects in Iraq and South Sudan and allowed ASG to win a spot on the AECOM AFRICAP team and to perform work on two major task orders under AFRICAP in 2010. (Charron, Trial Tr. at 487:9-488:7; DeBlasio, Trial Tr. at 155:2-15.)

84.     In 2011, again pursuant to Section 5.05 of the joint venture agreement, SGS made another loan to ASG to build a hospital in the South Sudan.  (DeBlasio, Trial Tr. at 139:8-14, 155:2-19; Exhibit 23 and 197.)

85.     At the time of the DC Capital Transaction, ASG was still building the hospital. (DeBlasio, Trial Tr. at 139:15-25.)

86.     ASG could not have performed any of these projects and produced any revenues therefrom without working capital SGS provided. (DeBlasio, Trial Tr. at 145:2-18; Charron, Trial Tr. at 481:20-24.)

87.     One reason SGS made these loans to ASG by SGS was to grow SGH's business, including by diversifying its business and extend its operations into Africa.  (DeBlasio, Trial Tr. at 139:8-11; 155:2-156:13; Charron, Trial Tr. at 488:8-489:4.)

88.     SGH caused SGS to assign the April 11, 2011 loan agreement and other contracts related to the loan between SGS and ASG to WDS on June 28, 2011. (DeBlasio, Trial Tr. at 146:3; Defendants' Exhibit CG.)

89.     Based on these facts, Mr. Risius concluded that the April 11, 2011 loan agreement that was transferred to WDS was an investment made in the joint venture to help it succeed in its business and was unquestionably an operating asset of SGH. (Risius, Trial. Tr. at 1314:25-1316:15.)

### (iii.)  PGS Contract Receivables Agreement is Another Strategic Loan

90.     On May 23, 2011, SGS and PGS entered into a factoring agreement. (DeBlasio, Trial Tr. at 136:17-20; Exhibits 91 and 45.)

91.     The factoring agreement included a provision to put in place a revolving credit note of $5,000,000 for PGS to perform a project in the United Arab Emirates. (DeBlasio, Trial Tr. at 134:23-135:5; Exhibits 91 and 45.)

92.     Providing PGS with the line of credit was a part of the factoring agreement and allowed PGS to complete their project in UAE and helped SGH build a relationship with PGS whereby SGH would bid with PGS on other projects. (Charron, Trial Tr. at 494:25-495:14; Risius, Trial Tr. at 1316:20-1317:21; DeBlasio, Trial Tr. at 152:2-3.)

93.     The factoring agreement provided for SGH receiving a $2.5 million fee that SGH earned upon signing the agreement and SGH got the right to put a full-time equivalent on the project which was intended to helped SGH expand its relationships in that region by showing a past performance of working in that geographic location. (Risius, Trial Tr. at 1316:20-1317:21.)

94.     At the time of the assignment of the PGS factoring agreement, the $2.5 million fee had been earned but not yet paid. (Risius, Trial Tr. at 1317:17-21.)

95.     SGH caused SGS to assign the factoring agreement between SGS and PSG to WDS on June 28, 2011. (DeBlasio, Trial Tr. at 136:17-20; Defendants' Exhibit CG.)

96.     Based on these facts, Plaintiff's expert Mr. Risius concluded that the factoring agreement between SGS and PS that was transferred to WDS was an investment made in the joint venture to ensure its success and was undoubtedly an operating asset of SGH. (Risius, Trial. Tr. at 1314:25-1316:15.)

**(iv.)**     **The DC Capital SPA Indicates that the ASG and PGS Strategic Loans are Material Contracts to SGH**

97.     The DC Capital SPA requires that assets or the provision of services which are outside the ordinary course of business of the company group be listed in Schedule 6.26(h.) (Hitchner, Trial Tr. at 1762:14-21; Exhibit 132 at Section 6.26(h).)

98.     Despite Defendants' claim that the PGS and Arkel loans are outside the ordinary business of SGH, these loans are not listed in the schedule of material contracts outside the ordinary course of business of the company group. (Hitchner, Trial Tr. at 1763:2-19, 1765:22-1767:7; Exhibit 132 at Section 6.26(h).)

99.     The joint venture agreement and other contracts between Arkel and Sallyport are listed as a material agreements in the ordinary course of business in Schedule 6.26 (a) and (d) of the DC Capital SPA. (Hitchner, Trial Tr. at 1765:1-11; Exhibit 132 at Sections 6.26 (a) and (d).)

100.    The Promissory Note and Corporate Guarantee between Arkel and Sallyport are listed as a Joint Venture Agreement in Section 6.26(j) of the DC Capital SPA. (Hitchner, Trial Tr. at 1765:12-23; Exhibit 132 at Section 6.26(j).)

101.    If the parties to the agreement listed the Arkel and PGS loans in the "Material Contracts" and "Joint Venture" sections of the DC Capital SPA and did not list them as contracts

24

that were "outside the ordinary course of business," then those contracts were considered as operating assets by the parties at the time of the deal.

### b) Correction of the McLean KSI Valuation Math Errors Reflect an Enterprise Value Above $65

102. The DC Capital Transaction as written and performed resulted in the required merger of SH and KH to form KSI at a ratio that ultimately yielded to the Defendants a 19.38% equity interest in KSI. (Risius, Trial Tr. at 1293:7-1294:6; Hitchner, Trial Tr. at 1739:20-1741:11; Exhibit C at ¶ 19.)

103. Therefore, the value of that equity interest in KSI is part of the consideration received by Defendants so that the value of the KSI must be determined in order to know the actual transaction price. (Risius, Trial Tr. at 1320:8-1321:21.)

104. The DC Capital SPA does not contain a stated value for the merged entity of KSI. (Hitchner, Trial Tr. at 1740:16-18, 1741:9-1742:19; Exhibit C at ¶ 19.)

105. Following the DC Capital Transaction, the auditor McGladrey required that the rollover equity interest in KSI be valued. McLean performed the valuation. (Risius, Trial Tr. at 1321:22-1323:5.)

106. Plaintiff's expert Mr. Risius discovered mathematical errors in the McLean report that, if corrected, would put the price for SGH as reflected in the DC Capital SPA above $65 million threshold. (Risius, Trial Tr. at 1323:10-1324:2.)

107. Mr. Risius found, and Andy Smith of McLean admitted, that McLean used the incorrect percentage for the rollover equity received by Defendants. In its final report, McLean used 17.95% rather than the correct 19.38%. (Risius, Trial Tr. at 1322:9-17; Andy Smith ("Smith"), Trial Tr. at 1101:11-14, 1104:17-23; Exhibit 405(k).046.)

108.    Next, McLean, when performing its valuation of KSI understood that the Class A stock of KSI did not share in the economic benefits of a company called IDS and therefore McLean subtracted the value of IDS from its conclusion of enterprise value. (Smith, Trial Tr. at 1105:2-1106:4; Risius, Trial Tr. at 1322:18-22; Exhibit 33, at p.8).

109.    If the projections used by McLean in its valuation of KSI did not include any revenue for the IDS joint venture and therefore no adjustment had to be made to account for it, the enterprise value of KSI would increase as would the value of the Class A units owned by John DeBlasio. (Smith, Trial Tr. at 1108:18-1109:13).

110.    As discovered by Mr. Risius, the IDS joint venture cash flows had already been subtracted from the projections used by McLean in their valuation of KSI and therefore the subtraction a second time resulted in an incorrect valuation. (Risius, Trial Tr. at  1322:22).

111.    Correcting only for McLean's math errors and changing nothing else about its report, the value of Defendants' rollover equity in KSI would be $4.549 million and the price for SGH as reflected in the DC Capital SPA would clear the $65 million threshold. (Risius, Trial Tr. at 1323:3-1324:2; Exhibit 405(k).046 at Row 2).

112.    Defendants' expert Mr. Hitchner agrees that the math errors in McLean's valuation of KSI that were identified and corrected by Plaintiff's expert Mr. Risius were properly corrected. (Hitchner, Trial Tr. at 177619-1777:2; Exhibit 405(k).046.)

> c)    **Defendant DeBlasio's Equity Interest in KSI was Worth at least $20.1 Million**

113.    Plaintiff's expert Mr. Risius performed an independent valuation of KSI.  As part of his valuation, Mr. Risius considered McLean's work and then using the discounted cash flow method and guideline public company method, concluded that Defendant DeBlasio's equity in KSI was worth at least $20,133,126. (Exhibit 405(k)046.)

26

114.    Of all the projections Mr. Risius could have elected to use in his analysis, he chose the most conservative set available and, the same set McLean used for its KSI valuation. Mr. Hitcher agrees that Mr. Risius chose the most conservative available projections. (Risius, Trial Tr. at 1343:5-19, 1513:3-7; Hitchner, Trial Tr. at 1732:16-1733:4.)

115.    Over 800,000 pages of documents were produced in discovery in this case, and they demonstrate that nine sets of projections were created by participants in the DC Capital Transaction from March 2011 to January 2012. (Exhibit 405(k).009.)

116.    In particular, the conservative projections that Mr. Risius used were the projections Doug Lake of DC Capital Partners prepared from removing a number of contracts from SGH's contract waterfall, including SGH's largest contract LOGCAP III, which had actually generated revenue for SGH in the months following the closing of the DC Capital Transaction. In addition to removing numerous contracts from the cash flow projections, Mr. Lake did not add in any new business to the projections. (Lake, Trial Tr. at 1267:24-1268:22; Risius, Trial Tr. at 1327:7-22; Exhibit 51, 51A and 405(k).030.)

117.    Mr. Hitchner does not offer any opinion of value of KSI. (Hitchner, Trial Tr. at 1733:21-1734:15.)

118.    Mr. Risius took into consideration that the cash flows on which McLean based its valuation of KSI already incorporated the risk to the future cash flows when Mr. Lake removed multiple contracts from the projections. (Risius, Trial Tr. at 1329:11-13; Exhibit 51A.)

119.    Mr. Risius calculated a discount rate of 14.5%, eliminating the SCA altogether, as it had already been accounted for in the cash flow projections Lake prepared for McLean's valuation work. (Risius, Trial Tr. at 1328:20-1329:13; Exhibit 405(k).046 at Row 3.)

120.    The discount rate of 14.5% which Risius used to value KSI is in line with the 12%-14% discount rate Jefferies, the investment banker DC Capital Partners hired to market KSI immediately after the DC Capital Transaction utilized even though  its discount rate was based on projections Lake gave it which were not nearly as conservative as the McLean/Risius projections. (Risius, Trial Tr. at 1337:8-1339:4; Exhibit 405(a).010.)

121.    Finally, Mr. Risius performed a valuation of KSI using the guideline public company method since the use of the DCF method alone can result in a less informed conclusion, especially where market data exists as it does in this case. (Risius, Trial Tr. at 1341:1-16; Exhibit 405(k).046 at Row 6.)

122.    The guideline public company method considers the multiples of other public companies which is important in this case where the subject company has competitors, customers and potential purchasers who were all public companies. (Risius, Trial Tr. at 1341:1-16.)

123.    When the value of Defendant DeBlasio's equity interest in KSI ($20.1 million) is added to the cash consideration ($60.7 million) and the value of the operating assets assigned to WDS Solutions ($2.15 million and $600,000, respectively), the enterprise value of SGH as reflected in the purchase price in the DC Capital SPA is $83.6 million. (Risius, Trial Tr. at 1342:21-25.)

### d)    Mr. Risius' Independent Valuation of SGH

124.    Given the overly complicated structure of the DC Capital Transaction, Mr. Risius performed an independent valuation of SGH on a standalone basis as of June 29, 2010, just before the merger. Mr. Risius used both the DCF and the guideline public company methods for valuing SGH. (Risius, Trial Tr. at 1351:17-1352:17; Exhibit 405(k).083.)

125.    As discussed, supra, Mr. Risius used the most conservative cash flow projections available, the same cash flow projections Mr. Lake prepared by removing various contracts from

SGH's contract waterfall. (Risius, Trial Tr. at 1310:1-8; 1353:7-17; Exhibits 51, 51A and 405(k).083.)

126.    Mr. Hitchner agrees that Mr. Risius used the most conservative projections available in performing his independent valuation of SGH. (Hitchner, Trial Tr. at 1730:13-1731:1, 1731:16-1732:6.)

127.    Mr. Hitchner agrees that use of less aggressive projections justifies choosing a lower specific company risk factor. He also agreed that a valuator must avoid double counting risk, which occurs when a valuator uses both conservative projections and assigns a high specific company adjustment. (Hitchner, Trial Tr. at 1733:7-20.)

128.    Using a discount rate of 15.5% to 16.5% and a long-term growth rate of 3% to 4%,  via the DCF method Mr. Risius calculated an enterprise value for SGH on a stand along basis of $$97.3 to $104.3 million with $100.7 million as the midpoint value. (Risius, Trial Tr. at 1353:19-1354:1; Exhibit 405(k).083.)

129.    To check the reasonableness of his DCF work, Mr. Risius also valued SGH via the guideline public company method. Utilizing an EBIDTA multiple of 3.5 times trailing EBITDA and 4 to 4.5  time forward looking EBITDA, Mr. Risius arrived at an value for SGH on a standalone basis of $100 to $110 million. (Risius, Trial Tr. at 1354:7-1355:2; Exhibits 405(k).086 and 405(k).087.)

130.    Synthesizing these two valuation methods, Mr. Risius arrived at a final conclusion of $103 million for the enterprise value of SGH as of June 29, 2011. (Risius, Trial Tr. at 1355:11-18; Exhibit 405(k).086.)

131.    Mr. Hitchner did not perform a valuation of SGH on a standalone basis and did not perform any DCF or GPCM analysis of SGH.

### D. UNUSUAL AND UNEXPLAINABLE ASPECTS OF THE DC CAPITAL TRANSACTION EVIDENCE CONSCIOUSNESS OF GUILT OF BREACH OF CONTRACT AND BREACH OF THE DUTY OF GOOD FAITH AND FAIR DEALING

#### 1. Evidence of Structuring the DC Capital Transaction to Appear to Fall below $65 million Establishes a Breach of the Covenant of Good Faith and Fair Dealing

132.    Under New York law, the duties of good faith and fair dealing require the same elements as a breach of contract claim. In addition, these duties imply obligations in the contract which encompass "any promises which a reasonable person in the position of the promisee would be justified in understanding were included" and "embraces a pledge that neither party shall do anything which will have the effect of destroying or injuring the right of the other party to receive the fruits of the contract."   511 W. 232nd Owners Corp. v. Jennifer Realty Co., 98 N.Y.2d 144, 153 (2002) (internal citations omitted).

133.    Defendants' efforts to structure the DC Capital Transaction to make it appear that the enterprise value fell below the $65 million threshold attempted to deprive Plaintiff of his rights under the Windfall Protection provision and constitutes a breach of the duty of good faith and fair dealing inherent in the Charron SPA.

#### 2. Parties' Joint Incentives to Maintain the Appearance That the Keep Purchase Price was Below $65 million

134.    As the new owner of SGH, DC Capital was aware of SGH's obligation to Plaintiff under the Charron SPA Windfall Protection clause, in the event of a Windfall Sale. (Lake, Trial Tr. at 1198:12-1199:2; Exhibit 74.)

135.    As evidence that the parties were fully aware of the possible implications of the Windfall Protection clause, a draft of the DC Capital SPA contains the following provision: "Anything to the contrary herein notwithstanding, the parties acknowledge and agree that the enterprise value of the company is $64.5 million." (Exhibit 83 at Section 2.2(c).)

136.     Neither Defendants nor their expert were able to explain clearly how this clause made its way into the draft, why it was subsequently taken out, or what it signified. (DeBlasio Testimony, Trial Tr. at 387:25-289:11; Hitchner, Trial Tr. at 1796:2-1797:18.) The email to which this draft SPA was attached makes clear, however, that John DeBlasio's attorneys proposed this language. That is consciousness of guilt evincing an intention to avoid the Windfall Protection obligation owing to Plaintiff.

137.     The potential liability for both Defendant DeBlasio and DC Capital Partners-controlled SGH caused them to work together to structure the sale to make it appear on the surface that the price being paid reflected an enterprise value below $65 million. (DeBlasio, Trial Tr. at 108:12-19; Selby, Trial Tr. at 1606:7-1607:14; Hitchner, Trial Tr. at 1795:23-1798:1; Exhibit 83.)

138.     As further evidence, the DC Capital SPA contains an indemnification provision that indemnifies the buyers against any demand, claim, suit or action by a former stockholder of SGH. The only former stockholders at the time of the DC Capital SPA were John DeBlasio and Plaintiff. This provision survived the closing. (O'Connor, Trial Tr. at 31:12-25; Exhibit B at Section 11.1.)

139.     In addition, the DC Capital SPA contains a personal guarantee by John DeBlasio in which he agrees that he, along with SGH, "shall be jointly and severally liable for the full and timely performance of all of the seller's obligations under this agreement, including those obligations that survive the closing."   Here, John DeBlasio is personally indemnifying any lawsuits by Plaintiff under the Windfall Protection clause in the Charron SPA. (O'Connor, Trial Tr. at 32:2-16, 34:7-15; Exhibit 132; Exhibit B at Sections 11.1 and 13.17.)

140.     Section 6.26 of the DC Capital SPA lists the Charron SPA as a material contract and specifically references the Windfall Protection clause. (Exhibit 132 at Section 6.26.)

141.     Arnold & Porter, counsel for DC Capital Partners in the DC Capital transaction, opined in their due diligence report dated March 8, 2011, that the DC Capital Transaction "as currently structured does not appear to implicate the windfall protection provision." However, this opinion was based on the letter of intent from DC Capital to SGH dated January 20, 2011, and was not based upon the final deal whose structure changed significantly from January 20, 2011 to Closing on June 29, 2011. (Lake, Trial Tr. at 1198:12-1201:17; Exhibits 74 and X.)

142.     Clearly, DC Capital was fully aware of the existence of, and SGH's obligations under, the Windfall Protection clause in the Charron SPA. (DeBlasio, Trial Tr. at 108:12-19; Selby, Trial Tr. at 1606:7-1607:14; Hitchner, Trial Tr. at 1795:23-1798:1; Exhibit 83.)

### 3.     Communication with Plaintiff's Attorney about the DC Capital Transaction

143.     Defendants did not voluntarily inform Plaintiff about the closing of the DC Capital Transaction and made it difficult for Plaintiff to obtain the documents he needed to assess the transaction. About 8 months after the closing of the Charron SPA, Mr. O'Connor contacted David Kalson, attorney for John DeBlasio, to inquire whether there had been a subsequent sale of SGH that may have implicated the Windfall Protection clause. (O'Connor, Trial Tr. at 23:20-24:4.)

144.     In a letter to Mr. O'Connor, authorized by John DeBlasio and dated September 20, 2011, Mr. Kalson stated that "a transaction involving the sale of greater than 20 percent by voting power of Sallyport's equity was consummated on June 29, 2011 for a price that reflected an enterprise value of Sallyport and related entities of $64.5 million." (O'Connor, Trial Tr. at 24:9-14; Exhibit 8.)

145. This September 20, 2011 letter to Mr. O'Connor was markedly different from another letter that Mr. Kalson sent, again with John DeBlasio's authorization, to Sagent, on the same subject matter, on August 10, 2011. (Exhibit 22.)

146. In the more detailed, two-page August letter to Sagent, Mr. Kalson explained as follows:

> On June 29, 2011, the parties closed the transactions under the SPA (the "Closing".) The transactions resulted in the redemption by SGH of 84.5% of the outstanding common stock owned by the John DeBlasio Charitable Trust for World Peace and Development, the sole stockholder of SGH, and the remaining 15.5% of the outstanding common stock of SGH was purchased by the Purchaser. The sole stockholder of SGI, the John P. DeBlasio Trust (the "DeBlasio Trust"), rolled over all of the outstanding common stock of SGI into units of the Purchaser, resulting in the DeBlasio Trust owning 38%, of the issued and outstanding voting membership units of the Purchaser (35.91% of the total number of outstanding membership units of the Purchaser.) **In short, the transaction with the Purchaser resulted in the direct and indirect owners of SGH and SGI prior to the Closing selling 64.09% of the affiliated group's capital stock to purchasers unrelated to the owners of SGH and SGI prior to the Closing.**
> ****
> In addition, please note the SPA is and will remain highly confidential and, therefore, is subject to the Confidentiality Agreement dated January 22, 2010 between SGH and Sagent. **In particular, nothing provided or discussed herein or in any subsequent communications or dealings among Sagent and any of the SGH Affiliated Parties is to be shared in any way with Tom Charron**, who is no longer affiliated with SGH and has no right to receive directly or indirectly any of such information.

(Exhibit 22, emphasis added.)

147. The letter is significant for at least two reasons. First, the August letter explains the actual economic substance of the DC Capital Transaction. In contrast, the September letter to Mr. O'Connor excludes a key provision of the actual Windfall Protection clause —namely Mr. Kalson referred only to a sale involving 20% by voting power, and did not refer to **economic value, assets or equity**, despite those terms being expressly used in Section 2.04 of the Charron SPA. (O'Connor, Trial Tr. 24:9-12; Exhibit 22; Exhibit A at Section 2.04.)

148.    Second, the letter to Sagent also illustrates the extent to which SGH wanted to hide the deal from Mr. Charron.   This attempt to keep Mr. Charron in the dark about the economic substance of the transaction manifests a consciousness of guilt about breaching the contractual obligations Defendants made to Plaintiff in the Charron SPA. (Exhibit 22.)

149.    Mr. O'Connor responded to Mr. Kalson by letter dated October 6, 2011, requesting a copy of the transaction documents so that Plaintiff could verify compliance with the Windfall Protection clause. (O'Connor, Trial Tr. 25:17-26:7; Exhibit 9.)

150.    Mr. Kalson would not provide the deal documents to Mr. O'Connor until April 2012, only after Plaintiff agreed to sign a non-disclosure agreement promising not to use the documents for any other purpose other than helping SGH with the Sagent Litigation. (O'Connor, Trial Tr. 26:16-25; 27:24-29:2; Charron, Trial Tr. at 451:1-17.)

151.    This overall evasiveness on the part of Defendants reflects their desire to keep the details of the DC Capital Transaction from Plaintiff and show their consciousness of guilt.

### 4.    SGI is a Shell Company and a Sham

152.    An analysis of SGI's role in the DC Capital Transaction, and the inexplicable exchange of the worthless stock of SGI for at least $20.1 million in rollover equity in KSI compels the Court to look behind the form of the DC Capital Transaction as presented by the Defendants and instead discern what actually happened economically in the deal.

153.    Even Defendants' expert, Mr. Hitchner, agreed that that an "exchange of equivalent value" is "part and parcel" of a fair market value event. (Hitchner, Trial Tr. at 1739:6-8.)

154.    This Court finds that there was no such exchange of equivalent value in respect of the rollover equity interest in KSI. The following items are the key facts pertinent to the Court's conclusion.

155.    SGI was formed on January 18, 2011. Its sole shareholder was the Florida Business Trust, whose grantor and trustee was Pat DeBlasio, and whose beneficiary was John DeBlasio and his family. It was converted to a limited liability company on June 8, 2011, strictly for the purposes of the DC Capital Transaction. (DeBlasio, Trial Tr. at 116:12-19; Exhibits 157(f).)

156.    SGI did not have any bank accounts or accounting records. (O'Connor, Trial Tr. at 43:21-25; DeBlasio, Trial Tr. at 118:11-13; Exhibit 132.)

157.    SGI did not have any government contracts. (DeBlasio, Trial Tr. at 112:23-113:3; Exhibit 132.)

158.    SGI did not have a facility clearance or any employees with security clearances to provide services to SGH. (DeBlasio, Trial Tr. at 110:18-19, 115:4-11, 116:20-25; Exhibit C at Schedule 6.29.)

159.    SGI did not own any intellectual property, did not own any real property, did not have any insurance coverage, government approvals or security clearances for the company or for any employee. (O'Connor, Trial Tr. at 36:24-38:12, 42:20-43:2, 43:6-15; DeBlasio, Trial Tr. at 109:23-110:25, 116:20-25; Exhibit 132.)

160.    SGI did not have any contracts associated with it that provided payment to SGI for more than $25,000, or any contracts where a supplier, vendor or other contractor received payment in excess of $25,000 per year. (O'Connor, Trial Tr. at 40:25-41:1l; DeBlasio, Trial Tr. at 111:1-112:9; Exhibit 132.)

35

161.    SGI was not a party to any non-compete or confidentiality agreements. (O'Connor, Trial Tr. at 41:12-19; DeBlasio, Trial Tr. at 112:10-15; Exhibit 132.)

162.    SGI did not have any guarantees or indemnities in excess of $25,000. (O'Connor, Trial Tr. at 41:20-42:1; DeBlasio, Trial Tr. at 112:16-25; Exhibit 132.)

163.    SGI did not have any joint ventures, partnerships, teaming agreements, employment contracts, or contracts with consultants. (O'Connor, Trial Tr. at 42:2-19; DeBlasio, Trial Tr. at 112:10-15, 113:1-9, 114:5-22; Exhibit 132.)

164.    SGI was effectively unable to provide any services absent a bank account, contracts, or employees, and yet Schedule 6.22 to the DC Capital SPA lists a contract dated January 18, 2011 for the provision of services. (O'Connor, Trial Tr. at 44:1-13; Exhibit 132; Exhibit 16.)

165.    In fact, SGH never told any third-party or counterparty to any SGH contract of the existence of SGI despite claiming that SGI employees serviced those contracts and were paid by SGI. (DeBlasio, Trial Tr. at 127:23-128:4.)

166.    Prior to the DC Capital Transaction, DC Capital did not perform any due diligence on SGI. Indeed, SGI is nowhere mentioned in the Arnold & Porter due diligence report, the Spectrum due diligence report, the BNY Investment Memorandum, or the Kaseman Board Presentation. (Exhibits 74, 63, 53, 64.)

167.    In fact, SGI was added to the DC Capital SPA only the day before the parties signed the deal documents. (Exhibit 434.)

168.    Defendants' expert never looked into any of the background of SGI despite SGI being exchanged for an equity stake in KSI that the Defendants claim was worth exactly $3.8 million. (Hitchner, Trial Tr. at 1749:18-1752:9.)

169.     Defendants' expert does not opine on the value of SGI.

**5.     Worthless Stock of SGI Allegedly and Inexplicably Worth the Same as DeBlasio's Retained Interest in the Company**

170.     Only the stock of SGI was contributed in return for the 38% class A membership interest in SH, which converted to a 19.38% interest in KSI upon merger. (DeBlasio, Trial Tr. at 131:8-13; Smith, Trial Tr. at 972:24-973:7; O'Connor, Trial Tr. at 34:21-35:2; Exhibits C, 7 and 27.)

171.     The inexplicable nature of the contribution of worthless SGI stock for 19.38% of KSI calls into question the reliability of Schedule 2.4 of the DC Capital SPA as a true reflection of the economic reality of the transaction.

172.     It does not follow from the fact that SGI is worthless that 19.38% of KSI was worthless; instead, the inclusion of worthless SGI in the deal shows that the parties had the clear intent to "document" a transaction that does not comport with economic value or economic reality. The Defendants acts of obfuscation of the economic realities of the DC Capital Transaction requires this Court, then, to examine the substance of the actual transaction, rather than just the value "stated" by parties who would all be responsible for a payment under Section 2.04 of the Charron SPA if the $65 million EV threshold was triggered.

**6.     Same Shares of SGH Given Different Values in the DC Capital SPA For No Reason**

173.     Another unexplained factor in the D.C. Capital Transaction is that shares of SGH that have the exact same legal rights and order of priority were assigned different values on Schedule 2.4 of Exhibit C. (Exhibit C at Schedule 2.4.)

174.     As part of the DC Capital Transaction, 1,550 of the shares of SGH were said to be purchased for $4,000 per share and 8,450 of the shares were said to be redeemed for $6,449 per share. (Campbell, Trial Tr. at 661:10-663:21; Exhibit C at Schedule 2.4.)

175.     Defendants' inability to provide any coherent explanation for why the shares differed in price is further evidence that the Court must look behind the documents and Defendants' explanations to find out what economic value was really exchanged in the DC Capital Transaction. (Campbell, Trial Tr. at 661:10-663:21; DeBlasio, Trial Tr. at 335:4-11; Exhibit C at Schedule 2.4.)

**7.     Based on Forecasts for SGH as of June 30, 2011 and the Price of SGH as Stated in the DC Capital SPA, SGH was Allegedly Sold for an Unbelievable Price of 1.8X EBITDA**

176.     Tom Campbell, the current controlling owner of Defendant SGH, testified he believed at the time of the execution the DC Capital Transaction that "the company was going to make somewhere in the neighborhood of $10 million of EBITDA." However, despite the fact that more than 800,000 pages of documents have been produced in this case, no contemporaneous document exists that reflects Mr. Campbell's view. (Campbell, Trial Tr. at 635:25-637:14; Lake, Trial Tr. at 1210:6-24, 1225:19-23; Risius, Trial Tr. at 1306:19-1307:10; Exhibit 405(k).090.)

177.     The lowest projected EBITDA for any year in the six year period contained in any of the available projections, including DC Capital's own internal projections, for SGH was $20.677m. (Risius, Trial Tr. at 1307:1-10; Exhibit 405(k).090.) Hitchner agreed that the record was devoid of any projections showing a $10 million EBITDA scenario for SGH. (Hitchner, Trial Tr. 1731:8-1733:6).

178.   In contrast, the evidence at trial established that that in 2011 SGH was growing rapidly and throwing off large amounts of cash. (P. DeBlasio, Trial Tr. at 1822:6-10, 1822:18; Hitchner, Trial Tr. at 1727:15-1729:4.)

179.   The Spectrum Report, which cost $400,000 to produce and was distributed to all of the other investors in the DC Capital Transaction and the banks loaning $101 million into the deal, reflects a forecasted adjusted EBITDA for FY2011 for SGH of just under $40 million and a forecasted adjusted EBITDA in other years as follows: $36.29 million in FY2012; $27.36 million in FY2013; and $24.9m in FY2014 . (Lake, Trial Tr. at 1204:1-1206:2; Exhibit 63 at p. 15.)

180.   Mr. Lake agreed that at the time of the DC Capital Transaction, the EBITDA of SGH had improved "dramatically" from the previous year, and was $36 million as of July 2011. (Lake, Trial Tr. at 1194:5-15, 1194:24-1195:17.)

181.   As of May 2011, Mr. Lake was sending out information to potential investors informing them that the earlier projections for SGH had not changed but that numerous recent developments including contract extensions and new business awards had the potential for further upside. He also reported that recent news of a less extensive drawdown of troops in Iraq meant that the forecast related to the future of the business was conservative. (Lake, Trial. Tr. at 1216-1219:10, 1219:16-1220:1; Exhibit 474.)

182.   In June 2011, DC Capital presented to the Board of Directors of Kaseman the following EBITDA forecast for SGH: $39.4 million in FY2011, $35.3 million for FY2012, $27.4 million for FY2013 and $24.9 million for FY2014. (Lake, Trial. Tr. at 1223:19-1224:17; Exhibit 64.)

183.     If Defendants' purported enterprise value is accepted at the time of the DC Capital Transaction SGH actually sold in its economic entirety for only $64.5 million, then SGH traded for an EBITDA multiple of 1.8 times, when government contracting companies like SGH are usually sold within a range of 5 to 10 times EBITDA. (Risius, Trial Tr. at 1302:9-1303:20; 1348:9-18; Exhibit 405(a).002; BNY Investment Memorandum, Exhibit 53 at 45 (noting that engineering and construction services companies trade for 8.0x to 11.0x EBITDA and government services 6.0x to 8.0x).)

### 8.     The internal "allocation" of debt to SH and KH Reflects a Lack of Arms-length Negotiation

184.     As part of the merger of SH with KH, the two entities jointly assumed $101 million in debt. The senior credit agreement with Bank of America contains restrictive covenants that apply to SH and KH on a consolidated basis. (Lake, Trial Tr. at 1206:15-1208:6, 1212:14-1213:21; Exhibit 55 at p. 6 and Section 7.11.)

185.     If SH and KH allowed the ratios contained in the financial covenants to fall below the stated levels they would be in breach of the credit agreement. (Lake, Trial Tr. at 1208:13-15; Exhibit 55 at Section 7.11.)

186.     Although the $101 million in debt was assumed jointly by SH and KH, the Parties wrote a side letter stating "Notwithstanding anything to the contrary set forth in the Credit Documents, the parties to this letter agreement … acknowledge and agree that $57,056,177.59 of the internal principal amount of the debt incurred pursuant to the Credit Documents … shall be allocated to Sallyport and $40,460,081.97 … shall be allocated to Kaseman." Tom Campbell signed the "allocation" letter on behalf of SH and KH because at the time of the "allocation" he controlled both entities. (Exhibit CH.)

187.    This "allocation" makes no sense.  First, it is directly contrary to the actual credit agreements. Second, it has no apparent real economic purpose. Third, it makes no sense in light of the credit ratios explicitly demanded by the credit documents themselves because KH, on a standalone basis, could not in fact bear $40.4 million in debt without breaching the Consolidated Total Leverage Ratio covenant in the Bank of America Credit Agreement (Hitchner, Trial Tr. at 1755:13-1757:6; Exhibit 55 at Section 7.11; Exhibit 64).

188.    The Court finds the allocation letter to be nothing more than another self-serving attempt to disguise the true economic realities of the DC Capital Transaction and Defendants' attempt to avoid their contractual obligations to Plaintiff.

**9.    Vastly Different Projections Provided to Different Consultants by DC Capital Partners Reflects Effort to Manufacture Low Value for KSI Valuation and Thus Enterprise Value of SGH**

189.    Doug Lake of DC Capital simultaneously worked both with Mr. Smith at McLean and with Jeffries & Co. ("Jeffries"), the investment bank hired to sell KSI, to provide both companies with financial forecasts on which to base their value analysis of KSI. (Lake, Trial Tr. at 1267:24-1268:22; 1237:15-18.)

190.    On November 9, 2011, Jeffries published the Confidential Information Memorandum (CIM) for the sale of KSI. The CIM contained a set of projections provided by Mr. Lake from which Jeffries concluded that KSI was worth between $275 million and $325 million as of June 30, 2011. The low end of that range makes 19.38% of KSI worth $53.5 million The EBITDA projections from KSI in its CIM were $38.8 million for FY2011, $41.6 million for FY 2012, $47.1 million for FY 2013, $52.1 million for FY 2014. (Lake, Trial Tr. at 1281:12-1282:8; Exhibit 476 at p. 36.)

191.    Just five days later, on November 14, 2011, Mr. Lake sent an entirely different set of cash flow projections to Andy Smith of McLean, who was hired to value KSI for allocating the purchase price in the DC Capital Transaction. The EBITDA forecasts from this set of projections were dramatically lower than the projections sent to Jeffries: $36.2 million for FY2012, $27.3 million for FY 2013, $24.9 million for FY 2014, $23.9 million for FY 2015. (Risius, Trial Tr. at 1327:1-12; Lake, Trial Tr. at 1267:24-1268:22;  Exhibits 50 and 50A.)

192.    These November 14, 2100 projections were resent to Andy Smith on December 16, 2011. In both sets of projections, Mr. Lake removed a number of contracts from the cash flows, including SGH's largest contract LOGCAP III, which had actually produced income in the interim months since the closing of the DC Capital Transaction. Mr. Lake did not add in any new business to the projections. (Lake, Trial Tr. at 1267:24-1268:22; Risius, Trial Tr. at 1327:7-22; Exhibits 50, 50(a), 51, 51(a) and 405(k).030.)

193.    The Court finds that DC Capital Partners' purposefully excising contracts from SGH's contract waterfall to prepare a significantly lower set of cash flow projections for McLean's work while at the same time preparing higher cash flow projections for Jefferies shows a consciousness of guilt and intent for Defendant SGH to avoid the contractual obligations it promised Plaintiff in the Charron SPA.

### E.  PROCEEDS RECEIVED FROM THE WINDFALL SALE AND PLAINTIFF'S DAMAGES

194.    "[A] successful plaintiff in a breach of contract action is entitled to damages in the 'amount necessary to put the plaintiff in the same economic position he would have been in had the defendant fulfilled his contract.' " Scholastic, Inc. v. Snap TV, Inc., No. 09 Civ. 4349(GBD) (GWG), 2011 WL 1330246, at *3 (S.D.N.Y. Apr. 8, 2011) (quoting Indu Craft, Inc. v. Bank of Baroda, 47 F.3d 490, 495 (2d Cir.1995)); accord Merrill Lynch & Co., Inc. v. Allegheny Energy,

Inc., 500 F.3d 171, 185 (2d Cir.2007) ("A party injured by breach of contract is entitled to be placed in the position it would have occupied had the contract been fulfilled according to its terms."); Hounddog Prods., L.L.C. v. Empire Film Grp., Inc., 826 F. Supp. 2d 619, 629 (S.D.N.Y. 2011). Where, as here, "the breach of contract was a failure to pay money, the plaintiff is entitled to recover the unpaid amount due under the contract plus interest." Scholastic, Inc., 2011 WL 1330246, at *3 (citing House of Diamonds v. Borgioni, LLC, 737 F. Supp. 2d 162, 172 (S.D.N.Y.2010)); accord Bank v. Ho Seo, No. 06 Civ. 15445(LTS)(RLE), 2009 WL 5341672, at *3 (S.D.N.Y. Dec. 16, 2009) (citation omitted).

### 1.   Proceeds Received by John DeBlasio From the Windfall Sale

195.   The Court received testimony on the amount of money and assets received by John DeBlasio associated with the Windfall Sale. In large part, the parties did not dispute Mr. DeBlasio's actual receipt of these proceeds. The following chart, based on the testimony received and on Plaintiff's Exhibit 405(f), illustrates Mr. DeBlasio's receipt of these proceeds:

| Event | Proceeds | Dispute? |
|---|---|---|
| Cash | $60,700,000 | No dispute |
| JPD Trust (actually distributions) | $5,786,507 | No dispute |
| Manzano Loan | $547,025 | No dispute |
| "Donations" (actually distributions) | $23,450,000 | Defendants say $22,844,886 |
| Other WDS Asset Leakage | $2,750,000 | Defendants say $1,300,000 |
| Rollover Equity Interest (REI) | $20,133,126 | Defendants say $3,800,000 |
| SGI/Florida 501(c)(3) Trust | $14,000,000 | Disputed as double counting |
| **(Total)** | **$127,366,658** | **$94,978,418** |

196.   No dispute exists that Defendant DeBlasio received at least $94,978,418. Plaintiff's position, however, is that he actually received $127,366,658, which amount the Court finds has been established for the reasons set forth below.

197.   Almost all of the transfers listed in Exhibit 405(f), and as set forth above, occurred during a "restricted" period, from May 6, 2011 to June 29, 2011. The very terms of

Section 2.04 illustrate the importance of the May 6th date.  As the plain language shows, Section 2.04 is triggered "[i]f, on or prior to the first anniversary of the date hereof, John DeBlasio or any of his affiliates or any other direct or indirect equity holder **"sells or agrees to sell**" measured by "voting power" or "economic value." John DeBlasio clearly "agreed to sell" on May 6, 2011 when he signed the DC Capital SPA. (Exhibit A, Section 2.04 (emphasis added); Exhibit B.)

198.     The significance of the May 6, 2011 date also includes the plain fact that the DC Capital SPA contained numerous restrictions that prevented Defendant DeBlasio from making transfers out of SGH unless DC Capital Partners approved of them under the DC Capital SPA. (Exhibit B, C and Exhibit 132 at Sections 4.2, 4.3, 6.8 and 6.10.)

199.     Thus, contrary to Mr. Hitchner's position, Defendant DeBlasio was not "free" to do "whatever he wanted" with SGH's assets on and after May 6, 2011. In other words, because Mr. DeBlasio needed D.C. Capital's permission to move any money, the proceeds distributed to structure the sale were received by the sellers "from" the Windfall Sale with the knowledge and approval of DC Capital Partners. Section 2.04 does not require these "proceeds" to have been paid by DC Capital itself; it covers proceeds "received from the Windfall Sale", whether from DC Capital Partners, or pulled out of the company by Defendant DeBlasio. (Hitchner, Trial Tr. at 1678:1-13; Exhibits B and C; Exhibit 132 at Sections 4.2, 4.3, 6.8 and 6.10; Exhibit A at Section 2.04.)

200.     The key sections  of the DC Capital SPA are the following: Sections 4.2, 4.3, 6.8, and 6.10. In short, they required both "notice" to DC Capital, and "approval" by D.C. Capital, before the making of any transfer above $250,000, thus making all such transfers absolutely subject to the D.C. Capital Transaction. The relevant portions of the DC Capital SPA are as follows:

*Section 4.2 Notice of Certain Events*: "On or prior to the Closing Date, the Company or either Seller **shall promptly notify purchaser** in writing upon the occurrence, to Sellers' Knowledge, of any of the following:  . . . .(d) **damage to any of the Assets in an amount in excess of $250,000**; [or] . . . . (f) any occurrence, event or circumstance materially affecting or relating to the Business **that is outside the ordinary course of business of the Company Group and involves at least $250,000** . . . ." (Emphasis added)

The other key sections are to similar effect. They read in relevant part as follows:

*Section 4.3  Conduct of Business by the Company Group*: "Between the date of this Agreement and the Closing Date, the Sellers and the Company will cause the Company Group to, and the Company will, use its Best Efforts to (a) preserve intact the Business and the business organization of each member of the Company Group . . . . **Between the date of this Agreement and the Closing Date, (a) the Companies will not, and the Sellers and the Company will cause each member of the Company Group not to, take any action that would be outside of the ordinary course of business for similarly situated companies** operating in the federal services and/or government contracting industry without receiving the prior consent of Purchaser (such consent not to be unreasonably withheld, conditioned or delayed), and (b) representatives of the Company Group and Purchaser shall speak at least once a week to discuss any such actions to be taken by any member of the Company Group." (Emphasis added.)

*Section 6.8 Amendments, Dividends and Other Distributions*: "**Since July 31, 2010**, except as set forth in Schedule 6.8, no member of the Company Group has . . . (ii) declared, set aside, made or paid any dividend or other distribution of assets of securities whether consisting of money, property or any other thing of value, or . . . ."

*Section 6.10   No Material Adverse Changes*: "Since July 31, 2010, whether or not in the ordinary course of business, there has not been, occurred or arisen: (i) any change in or event affecting the Company Group that has had or would reasonably be expected to have a Material Adverse Effect . . . or (iii) **any casualty, loss, damage or destruction (whether or not covered by insurance) of any material Asset**.

(Exhibit B, C and Exhibit 132 at Sections 4.2, 4.3, 6.8 and 6.10.)

201.    Mr. Risius testified to the value of the operating assets in the transaction, namely $60.7 million in cash, $2.75 million in additional operating assets leaked to WDS and a minimum of $20.1 million for the rollover equity. Plaintiff's expert Daniel L. Selby, MBA, CPA, CFF, CVA testified to the additional proceeds from the Windfall Sale, explained below.

45

202.     Mr. Selby based his analysis on a forensic accounting methodology that Defendants left unchallenged at trial, including by the their expert, Mr. Hitchner. This methodology focuses on looking at the relationship between transactions and events. Mr. Selby has nearly 30 years of experience as a forensic accountant actively involved with civil litigation. (Selby, Trial Tr. at 1553:16-1555:11, 1559:1-25, 1560:1-1561:9; Exhibit 186A.)

203.     In his experience, factors that are relevant to determining if funds are related to a transaction include, but are not limited to: (1) the timing of occurrence; (2) the degree to which an event is unusual; (3) opportunity to take the money; (4) whether there was a meeting of the minds on the amounts to be distributed; (5) whether the events were listed on disclosure schedules; (6) whether there was any structuring to hide the nature of the transfer; (7) whether there were mechanisms set up to receive such proceeds; and (8) were the transactions interrelated or random. Moreover, there must be adequate evidence that these events were not mere accidents, but were related in nature. All of these factors were applied to the proceeds at issue in this case. (Selby, Trial Tr. at 1579:20-1582:14.)

### 2.     Transfer of $23.45 Million to the Bermuda Trust on June 28, 2011

204.     The evidence is clear that, prior to December 8, 2010, SGH had no corporate giving program and never made any large donation to a charity in the ordinary course of business. (DeBlasio, Trial Tr. at 108:20-23; Charron, Trial Tr. at 495:21-497:2.)

205.     John DeBlasio testified that on June 28, 2011, the day before the closing of the DC Capital Transaction, John DeBlasio and his affiliates caused the transfer of $23,450,000 to the Bermuda Charitable Trust. (DeBlasio Testimony, Trial Tr. at 87:13-20.) Defense expert James Hitchner did not dispute this point. Pat DeBlasio quibbled with the number, citing a McGladrey audit that reversed $22,844,886 of distributions to the Bermuda Trust misclassified in SGH ledgers as "expenses." In sum, the parties agree at least $22,844,866 was transferred

46

using this mechanism.  (Hitchner, Trial Tr. at 1727:20-25, 1728:1-3; P. DeBlasio, Trial Tr. at 1828:25-1829:10; Exhibits 132 and 210).

206.    Pat DeBlasio testified that he opened the HSBC Bermuda Bank account to receive these proceeds on June 6, 2011. (P. DeBlasio, Trial Tr. 1830:1-1832:25).

207.    This cash constituted "proceeds received" by John DeBlasio and his affiliates, given, among other reasons, (1) the close timing of the transactions to the Closing; (2) the unusual nature of the transactions (i.e., out of the normal course of business SGH, which had never made a charitable donation before to any one entity over a few thousand dollars) and (3) the transactions were all disclosed in the Disclosure Schedules to the D.C. Capital SPA, which shows their direct relationship to the Windfall Sale. (Charron, Trial Tr. 495:21-497:2; Selby, Trial Tr. at 1583:19-1584:18, 1588:8-22; DeBlasio, Trial. Tr. at 108:20-23).

208.    Evidence of "structuring," to hide the character of the transfers to the Bermuda Trust also exists in that John DeBlasio tried to classify these transfers as "expenses," not distributions, at the time they were made. McGladrey later corrected this classification in its audit. (Exhibit 210.)

209.    Further evidence of structuring appears in the false paper-trail the DeBlasios set up around a loan forgiveness for $5 million and a bonus of up to $3.5 million, neither of which actually occurred:

```
3 Q. What other money leaked out? What other money did you take
4 out of this transaction?
5 A. I think we -- I know we disclosed everything that came out.
6 There was -- that was it.
7 Q. The 23.4 million.
8 A. There was 23.4 million that went into the charitable trust.
9 We had a portion which was -- again, I'm not sure of what the
10 definition of it eventually turned out to be. A portion that
11 went to the John DeBlasio Trust. Right. That was --
12 Q. DeBlasio.
13 A. The money that was in SGH went into the John DeBlasio
14 Trust. So that was 5.7 million. 23.4 million went into the
15 charitable trust.
```

(DeBlasio, Trial Tr. at 170:3-15.)

210.    John DeBlasio testified that a shareholder consent was signed and not used to allow them accounting purposes after the sale to classify the proceeds as they saw fit which is a demonstration that the proceeds were related to the transaction by the timing, unusual nature and structuring:

```
     Q. This is a corporate consent executed the day of about the
15 closing of the D.C. Capital Partners transaction authorizing a
16 bonus of up to $3.5 million for you; is that right,
17 Mr. DeBlasio?
18 A. That's correct.
19 Q. Were you in fact paid an amount under this shareholders
20 consent?
21 A. No.
22 Q. Why did you go to the trouble of writing a shareholders
23 consent for a payment to yourself of up to $3.5 million if you
24 didn't execute it?
25 A. We were looking at different options for categorization of

1 income out of the transaction. There were three. We had a
2 loan. We had a bonus. And I, I -- one dividend wasn't one of
3 them. But we had three different options. And so this was one
4 of them.
5 Q. All right. And now explain that to me? So there was --
6 because of the transaction, cash was going to come out of the
7 purchased entity. Right?
8 A. I said it was a cash-free, debt-free transaction.
9 Q. OK. Go ahead.
10 A. I received funds for my stock, cash from the balance sheet
11 was a dividend or sent, put out to the shareholders.
12 Q. Well, I'm trying to figure out, you told me that you did it
13 because you could have done the pushing of the money out in
14 several different ways. And I'm asking, what were those ways?
15 A. Yeah. I think we had three -- I can't recall all three.
16 We had one was a bonus. Another was a loan. Another was a
17 straight dividend. I can't recall all three. But there were
18 three different options, which we later solidified around the
19 single option.
20 Q. So you later solidified, just sent it all out to the trust.
21 A. No. The funds were transferred in June. This was really
22 more for, I want to call it accounting purposes later.
```

(DeBlasio, Trial Tr. at 168:14-15; 169:1-22).

211.    McGladrey Audit Workpapers with respect to the $23.45M in Note BB states:

Amounts represent distributions in cash from HSBC to John DeBlasio in advance of the sale of the company.  The distributions were paid in cash on the dates indicated as evidenced by credits on the bank statement noted below.  As these were distributions of cash to the owner and not payments for services provided,

they should not be reflected as expense, rather they should be reductions of
equity….

(Exhibit 2010). Mr. Selby agrees with McGladrey  with respect to the inappropriately
classification  of this distribution as an expense and which constitutes a form of structuring.
(Selby, Trial Tr. at 1578:1-23).

212.    These extractions of resources were so unusual for SGH and its wholly owned
subsidiary SGS, that they cannot be construed as anything but part of the subject sale. And the
transfers were made, with DC Capital Partners' approval, during the restricted period, so they
must be considered to be part and parcel of the series of related transactions constituting the
Windfall Sale. (Selby, Trial Tr. at 1581:15-1582:24; 1586:22-1588:22; DeBlasio, Trial Tr. at
87:13-25.)

### 3.    Distribution of $5.7 Million to the Florida Business Trust

213.    As set forth in the testimony above, prior to the closing of the DC Capital
Transaction, SGH transferred $5.7 million to the Florida Business Trust. The dates of these
transfers where April 30, 2011 ($1.2 million), May 31, 2011 ($4 million), and the balance was
transferred on June 29, 2011. (DeBlasio, Trial Tr. at 170:3-15; Exhibit 210 at p. 1, cell 47; Selby,
Trial Tr. at 1604:7-1605:11.)

214.    The Court finds that the $5,786,507.00 of transfers were made in connection with
the Windfall Sale. (Exhibit 210 at p. 1, cell 47; Exhibit 403 at p. 1 at cell 33.)

215.    John DeBlasio admitted that these transfers were made as did Mr. Hitchner and
Pat DeBlasio. (DeBlasio, Trial Tr. at 170:3-15; Hitchner, Trial Tr. at 1727:20-1728:3; P.
DeBlasio, Trial Tr. at 1836:4-11; Exhibit 210 at p. 1, cell 47; Exhibit 135 at p. 13; Exhibit 131 at
p. 25, cell 19.)

216.    This $5,786,507 in cash constituted "proceeds received" by John DeBlasio and his affiliates.  Like the "donations" discussed above, it is plain that but for the DC Capital Transaction, the distributions would not have been made.   In addition, the nature of the transactions was highly unusual. The Florida Business Trust did not own SGH.  It owned SGI, but SGI had no bank accounts, no contracts, no employees and no legal way to generate $5.7 million dollars. So this series of "distributions" went from SGH to a non-owner affiliated with John DeBlasio and set up for John DeBlasio's benefit.  (See supra at ¶¶152-172; DeBlasio, Trial Tr. at 380:4-381:25; P. DeBlasio, Trial Tr. at 1846:18-1848:12, 1849:3-15; Exhibit 210 at p. 1, cell 47; Exhibit 135 at p. 13; Exhibit 131 at p. 25, cell 19; Exhibit 403, p. 1, cell 33.)

217.    Moreover, as with the "donations" discussed above, there was especially strong evidence of "structuring," in that SGH tried to classify these transfers as "expenses," not distributions, at the time they were made and because SGI did no business with SGH. Calling these items "expenses" and dividing the transfers into smaller units was a clear attempt to mask the actual receipt of proceeds, by a non-owner, affiliated with John DeBlasio. Accordingly, these transfers constitute a receipt of proceeds in "one or a series of related transactions" relating to the Windfall Sale. (Exhibit 210 at p.1, Cell 47; DeBlasio, Trial Tr. at 87:21-25; Selby, Trial Tr. at 1604: 9-1606:25, 1608:1-4).

### 4.    Transfer of $14 Million to the Florida 501(c)(3) Trust After the Closing of the DC Capital Transaction

218.    An additional $14,000,000.00 in proceeds was transferred from "Sallyport Global" to the Florida 501(c)(3) Trust affiliated with John DeBlasio in "one or a series of related transactions" relating to the Windfall Sale. (Exhibit 353 at JD1-00021543.)

219.    According to federal tax documents  which Defendant DeBlasio signed under penalty of perjury, $14 million was donated from "Sallyport Global" to the Florida Charitable

Trust in fiscal year July 1, 2011 to June 30, 2012 — after the closing of the Windfall Sale. (DeBlasio Testimony, Trial Tr. at 216:12- 217:12; Exhibit 353.)

220.    "Sallyport Global" at the official address of SGI/SGS reported on the Florida 501(c)(3) Trust's 2011 Form 990PF Filed Return for the period of July 1, 2011 to June 30, 2012 as making a $14,000,000 "donation" to the Florida 501(c)(3) Trust.   (Exhibit 353 at JD1-00021543.)

221.    The official address of SGI was 27200 Riverview Center Blvd., Suite 309, Bonita Springs, FL, 34134. The same address as the donor on the tax return. This address is also confirmed by SGI/SGL's articles of incorporation. (Exhibit 157(f) at JD1-00000090; Exhibit 353 at JD1-00021543; Exhibit 121 at SGH1-00353392.)

222.    The Court also reviewed the Florida 501(c)(3) Trust's prior year tax return (for fiscal year July 1, 2010 to June 30, 2011), and it shows no significant contributions received from any source.  (Exhibit 353.) Therefore, the tax documents clearly indicate that $14,000,000 went from SGI/SGL to the Florida 501(c)(3) Trust subsequent to the closing of the Windfall Sale. (Exhibit 353 at JD1-00021543.)

223.    No evidence was presented at the trial that Defendant DeBlasio had an ownership interest in SGI/SGL after the closing of the Windfall Sale, or that any additional money from DC Capital Partners should have been paid to Defendant DeBlasio under the deal documents. (DeBlasio Testimony, Trial Tr. at 217:13-17.) Thus, the $14 million transfer constitutes a receipt of proceeds in "one or a series of related transactions" relating to the Windfall Sale.

### 5.    Transfer of the Manzano Loan to WD Solutions

224.    A loan for $750,000 was made by SGH to Bernardo Garzia Manzano, a friend of John DeBlasio's. (DeBlasio Testimony, Trial Tr. at.) The loan was made to allow Mr. Manzano

to build a house for John DeBlasio's personal use. (DeBlasio Testimony, Trial Tr. at 160:8-22; Exhibits 17, 18 and 400.)

225.    This loan and the associated guarantee from John DeBlasio were assigned to WDS on June 28, 2011. (DeBlasio Testimony, Trial Tr. at 133:25-134:4; Exhibits CE, CG and 18.)

226.    Discounting that loan for the reasons received during testimony, the Court finds that this note receivable was worth $547,025.43. As above, this transaction was made incident to the Windfall Sale, with DC Capital Partner's approval, during the restricted period, and so it must be considered to be related to the Windfall Sale. (Exhibits 132, 66 and CE; Selby, Trial Tr. at 1592:10-1593:25.)

## F.  COUNTERCLAIMS

### 1.    The Charron SPA Contains a Choice of Law Provision

227.    The Charron SPA contains a broad choice-of-law provision, which states:

> This Agreement shall be governed by and construed in accordance with the laws of the State of New York. The parties agree that the exclusive place of jurisdiction for any action, suit or proceeding relating to this agreement shall be in the Court of the United States of America sitting in the Borough of Manhattan in the City of New York or, if such courts shall not have jurisdiction over the subject matter thereof, in the courts of the State of New York sitting therein…."

(Exhibit A at Section 6.05.)

228.    This Court is bound to apply New York law to determine the scope of the choice-of-law provision contained in the Charron SPA. Fin. One Pub. Co. Ltd. v. Lehman Bros. Special Fin., Inc., 414 F.3d 325, 333 (2d Cir. 2005).

229.    Under New York law, this Court will "[i]n the absence of a violation of a fundamental state policy, … defer to the choice of law made by the parties to a contract." Cargill v. Charles Kowsky Resources, Inc., 949 F.2d 51, 55 (2d Cir.1991).

230.     In cases involving almost identical choice-of-law provision as to that which appears in the Charron SPA, New York courts have consistently held that such a provision is sufficiently broad to encompass both contract and tort claims. See <u>Turtur v. Rothschild Registry Int'l, Inc</u>., 26 F.3d 304, 309 (2d Cir. 1994).

231.     Where the provision refers to any claim "arising out of or relating to" the contract, it is sufficiently broad such that New York law will apply to the plaintiffs' tort claims as well as their breach of contract claims. <u>Turtur</u> at 309-10; <u>About.Com, Inc. v. Targetfirst, Inc</u>., 01V1665(GBD), 2002 WL 826953 (S.D.N.Y. Apr. 30, 2002).

232.     The "relating to" language contained in the Charron SPA forum selection clause broadens the provision so as to include both the breach of contract claims brought by Plaintiff and the tort-based counterclaims brought by Defendants.

### 2.     The Charron SPA Contains a Broad Mutual Release for Both Parties

233.     The Charron SPA contains a broad mutual release that releases both parties to the contract from anything that occurred prior to the closing of the agreement. (O'Connor, Trial Tr. at 32:17-33:11; Exhibit A at Section 5.03.)

234.     The Charron SPA contains broad mutual broad releases. The clause which applies here states:

> 5.03 Company Release. The Company, on behalf of itself and any of its present or former directors, officers, employees, auditors, counsel, stockholders, subsidiaries, representatives, agents, successors or assigns hereby, knowingly and voluntarily, forever releases and discharges with prejudice Sellers, their successors and assigns from any and all Claims arising by an means out of any event, circumstance, act or failure to act relating to Sellers' relationship to the Company or any of its subsidiaries in any capacity preceding the Closing, whether know or unknown, accrued or not accrued, foreseen or unforeseen, or mature or immature, other than Claims pursuant to this Agreement.

(Exhibit A at Section 5.03.)

235.    The release is clear, was knowingly and voluntarily entered into and will be enforced by this Court. L & K Holding Corp. v. Tropical Aquarium, 596 N.Y.S.2d 468, 469 (N.Y. App. Div. 1993).

236.    Since the Court finds that the closing of the Charron SPA occurred at 5:10 p.m. on December 8, 2010 and the evidence shows that Plaintiff deposited the three checks at issue before the closing of the Charron SPA, Plaintiff is released from any claims made by Defendants related to the depositing of the checks. (See supra at ¶ 6 and infra at ¶¶ 237-247.)

### 3.    The Events of December 7, 2010

237.    The closing of the Charron SPA was governed by Section 2.03, which reads in relevant part as follows:

> 2.03. The Closing. Upon the terms and subject to the conditions set forth in this Agreement, the redemption by the Company of the Shares (herein called the "Closing") shall take place Tuesday, December 7, 2010 at 2:30 pm at the offices of WilmerHale LLP, 1875 Pennsylvania Ave., NW, Washington, DC, or remotely via the exchange of documents and signatures, concurrently with the execution and delivery of this Agreement.

(O'Connor, Trial Tr. at 10:2-6; Exhibit A at Section 2.03.)

238.    On December 7, 2010, the parties did not conduct the closing in the office of Wilmer Hale. (Charron, Trial Tr. 773:2-10.)

239.    The parties to the transaction had collected the signature pages of both parties so that once the purchase funds were successfully wired to Plaintiff, there would be no delay in the closing. The signatures were not to be released until the parties were satisfied that the conditions of the closing had been met. (O' Connor, Trial Tr. at 18:10-20.)

240.    Plaintiff wrote to his bankers at JP Morgan, copying all parties, and instructed them to confirm by email to himself, his attorney Mr. O'Connor and attorney for SGH Kevin Smith, when the wired funds had reached his account "so the paperwork can be exchanged when

we have a sale." Other than being notified by JP Morgan, Mr. Charron had no other way of knowing that the wire had been deposited into his account. (O'Connor, Trial Tr. at 19:15-23; Charron, Trial Tr. 459:18-461:17; Exhibit 189.)

241.    At 4:58 p.m. on December 7, 2010, after making some changes to the Charron SPA, Kevin Smith wrote to say "when we confirm receipt of the wires, we'll circulate this version of the purchase agreement with signatures pages for your records." (O'Connor, Trial Tr. at 20:13-25; Exhibit 176.)

### 4.    The Events of December 8, 2010

242.    On December 8, 2010, the parties to the Charron SPA were awaiting the wire transfer of funds to reach Plaintiff's account to release the signatures to the agreement and confirm closing of the transaction. (O'Connor, Trial Tr. at 17:20-23, 21:19-22:22; Exhibits 48 and 139.)

243.    In the morning of December 8, 2010, Plaintiff packaged up and mailed to Defendants a FedEx box containing corporate documents and copies of the three checks and their supporting documents. (Charron, Trial Tr. at 458:4-16; Exhibit 145.) These items were sent before Plaintiff deposited the checks.

244.    At 12:46 on December 8, 2010, Plaintiff deposited the three checks at Bank of America. (Charron, Trial Tr. at 462:22-463:7; Exhibit 31.)

245.    On December 8, 2010, just before 5:00 p.m., Mr. O'Connor immediately after learning that Mr. Charron had received his payments under the Charron SPA, called Wilmer Hale and told them to release the signatures to the Charron SPA. (O'Connor, Trial Tr. at 18:22-25.)

246.    At 5:10 p.m., Kevin Smith of Wilmer Hale, attorney for SGH, sent an email saying "The wire transfers have been confirmed and the signature pages have been released.

55

Attached is [a] fully executed copy of the purchase agreement and a copy of the resignation letter. Congratulations." (O' Connor, Trial Tr. at 17:8-17; Exhibit 163.)

247.    Based on the facts presented, the Court finds that the closing of the Charron SPA occurred when the wires were confirmed and the signatures were officially released at 5:10 on December 8, 2010.

### 5.    Charron's Entitlement to the Amounts in the Three Checks

#### a)    Salary

248.    During the time that Plaintiff was CEO of SGH, both he and John DeBlasio received a monthly salary. (Charron, Trial Tr. at 466:24-467:5.)

249.    Prior to the closing of the Charron SPA, Plaintiff had not been paid his monthly salary since October 31, 2010. (Charron, Trial Tr. at 467:6-12.)

250.    Check # 1047 for $44,400.00 represented the salary owed to Plaintiff for the period November 1, 2010 to December 7, 2010. This amount was reported on Plaintiff's 2010 W-2 by Defendants and Plaintiff paid taxes on this income. (Charron, Trial Tr. at 467:11-14.)

251.    Plaintiff and John DeBlasio did not approve one another's monthly salary in advance. They received their salaries in the ordinary course of business. (DeBlasio, Trial Tr. at 360:7-11; Charron, Trial Tr. at 467:15-21.)

#### b)    Business Expenses

252.    Check # 1045 for $35,237.22  represents valid business expenses incurred by Plaintiff prior to the closing of the Charron SPA for a retail agreement and business travel. (Charron, Trial Tr. at 468:3-470:21; Exhibit 402.)

253.    Plaintiff and John DeBlasio did not approve in writing  another' business expenses in advance. The received reimbursement of their business expenses in the ordinary

course of business (Charron, Trial Tr. at 475:20-477:15; DeBlasio, Trial Tr. at 360:7-11, 361:17-18; Phelps, Trial Tr. at 877:1-14; Exhibit AG.)

254.    Peter Phelps was asked to assist in reviewing business expenses for Plaintiff and John DeBlasio but was not given authority to sign off on the other's business expenses (DeBlasio, Trial Tr. at 360:7-11; Charron, Trial Tr. at 467:15-21, 476:3-477:15; Phelps, Trial Tr. at 877:1-14.)

### c)      Tom-John Account

255.    From the beginning of the partnership between Plaintiff and John DeBlasio, they kept an account maintained by SGH called the "Tom/John Account." This account kept track of the distributions that were made to each of them for their benefit. (DeBlasio, Trial Tr. at 148:10-149:3; Charron, Trial Tr. at 457:12-458:3.)

256.    From time to time Plaintiff and John DeBlasio would ensure that as 50/50 owners of SGH they were each drawing the same amount of money from the company. (DeBlasio, Trial Tr. at 148:10-149:3.)

257.    In the second half of 2010 Plaintiff and John DeBlasio discussed and agreed to reconcile the Tom/John Account. (Charron, Trial. Tr. at 464:20- 465:14; DeBlasio, Trial Tr. at 355:6-8; Exhibit 423.)

258.    Peter Phelps was hired in 2010 to assist SGH with, among other things, reconciliation of the Tom/John Account. Contrary to John DeBlasio's testimony, Mr. Phelps had no recollection of Plaintiff and John DeBlasio agreeing that the Tom/John account was a wash. (DeBlasio, Trial Tr. at 355:10-20; Phelps, Trial Tr. at 886:21-24.)

259.    Check # 1046 for $147,727.00 represented the balance owed to Plaintiff on the Tom/John Account. This amount was reported on Plaintiff's W-2 received from Defendants and

Plaintiff paid taxes on this income. (Charron, Trial Tr. at 465:22-466:18, 466:19-23; Exhibit 145.)

> **6.    Charron and DeBlasio Honored the Bylaws and the Board Resolution was Honored in the Breach for Salary and Expenses and the Tom-John Account Reconciliation**

260.    Plaintiff, as CEO of SGH, had the authority under the bylaws of SGH to write checks on any of SGH's corporate accounts. The July 9, 2010 board resolution did not amend the corporate bylaws. (Charron, Trial Tr. at 472:16-473:6; Exhibit CP at Art. 7.)

261.    The July 9, 2010 SGH board resolution requiring both Plaintiff's and John DeBlasio's signature for withdrawals or payments over $25,000 was understood as not applying to transactions between the two of them. Following the passage of this resolution, they each continued their historical practice of receiving their salary and reimbursed business expenses without the other's approval. (Charron, Trial Tr. at 475:20-477:15; DeBlasio, Trial Tr. at 360:7-11, 361:17-18; Phelps, Trial Tr. at 877:1-14; Exhibit AG.)

262.    The July 9, 2010 board resolution was honored in the beach with respect to a two-party written signature of approval for payment to Plaintiff or John DeBlasio for monthly salary and business expense reimbursement. (DeBlasio, Trial Tr. at 360:7-11; Charron, Trial Tr. at 467:15-21, 476:3-477:15; Phelps, Trial Tr. at 877:1-14.)

263.    Before depositing the checks, Plaintiff sent by FedEx to SGH a copy of the three checks in question on the morning of December 8, 2010 with the documentation to support each one which John DeBlasio received and of which he was aware. (Charron, Trial Tr. at 458:11-16; 458:24-17; 463:8-13; 470:22-471:1; DeBlasio, Trial Tr. at 359: 1-12; Exhibits 145, 31 and 402.)

264.    Based on these facts, the Court finds that even if the closing occurred prior to Charron's deposit of the three checks, Mr. Charron was entitled to these funds such that no conversion of funds from SGH occurred.

### G.  PREJUDGMENT INTEREST

265.    In a standard breach of contract case such as the one here, the date of breach is sufficient to trigger prejudgment interest because that is the date on which the cause of action accrued.

266.    The New York statute on prejudgment interest states:

**(a) Actions in which recoverable.** Interest shall be recovered upon a sum awarded because of a breach of performance of a contract, or because of an act or omission depriving or otherwise interfering with title to, or possession or enjoyment of, property, except that in an action of an equitable nature, interest and the rate and date from which it shall be computed shall be in the court's discretion.

**(b) Date from which computed.** *Interest shall be computed from the earliest ascertainable date the cause of action existed*, except that interest upon damages incurred thereafter shall be computed from the date incurred. Where such damages were incurred at various times, interest shall be computed upon each item from the date it was incurred or upon all of the damages from a single reasonable intermediate date.

N.Y. C.P.L.R. 5001 (Emphasis added).

267.    The court will generally look to the date of **accrual**. As a New York Court has explained, "We also reject defendant's contention that interest should have been computed only from the date of plaintiff's demand for payment. It is not the date of demand but, rather, the date of accrual of a cause of action that measures the period for interest (see, Quantum Chem. Corp. v. Reliance Group, 180 A.D.2d 548, 580 N.Y.S.2d 275, lv. denied 79 N.Y.2d 760, 584 N.Y.S.2d 448, 594 N.E.2d 942; CPLR 5001[b])." Pallette Stone Corp. v. Guyer Builders Inc., 212 A.D.2d 862, 863, 622 N.Y.S.2d 127, 128 (1995).

268.    Other cases are to similar effect. As a New York Court explained, "NYSEG argues that McNally's right to prejudgment interest did not accrue while a good faith dispute existed concerning McNally's entitlement to payment. N.Y. Civ. Prac. L. & R. § 5001(b) (McKinney 1992), however, states that a party is entitled to prejudgment interest "computed

from the earliest ascertainable date the cause of action existed." *See also* N.Y. U.C.C. §§ 2-709, 2-710 (McKinney 1993). The "earliest possible date" in contract actions arises when the alleged breach occurred, regardless of the parties' states of mind or subsequent discussions. See Sobiech v. International Staple & Mach., 867 F.2d 778, 781 (2d Cir.1989)." McNally Wellman Co., a Div. of Boliden Allis, Inc. v. New York State Elec. & Gas Corp., 63 F.3d 1188, 1200 (2d Cir. 1995).

269.    Likewise, as another Court explained, "In accordance with the combined short form judgment signed herewith, plaintiffs are entitled to one judgment in the amount of $3,000, together with interest on that amount from December 1, 2001, the earliest date upon which the termination of the contract of sale can be deemed to have become complete (see CPLR 5001[b].)" Moore v. Pecora, 191 Misc. 2d 256, 259-60, 741 N.Y.S.2d 394, 397 (Dist. Ct. 2002). "Given the above, this court finds in favor of Betal in its claim against York for breach of contract and orders York to pay Betal compensatory damages in the amount of $16,000. York is also directed to pay Betal prejudgment interest at a statutory rate of 9% per annum. *See* N.Y. C.P.L.R. 5001, 5004; see also Adams v. Lindblad Travel, Inc., 730 F.2d 89, 93 (2d Cir.1984) ("Under the law of New York ... prejudgment interest is normally recoverable as a matter of right in an action at law for breach of contract."). Because York terminated Betal's contract on September 30, 1999 and failed to make the required payments to Betal at that time, the date from which prejudgment interest shall be calculated is September 30, 1999." Betal Envtl. Corp. v. Local Union No. 78, Asbestos, Lead & Hazardous Waste Laborers, 162 F. Supp. 2d 246, 260 (S.D.N.Y. 2001) aff'd sub nom. Betal Envtl. Corp. v. Local Union No. 78, 39 F. App'x 688 (2d Cir. 2002).

## III.    CONCLUSION

270.    Based on the foregoing findings of facts and applicable law, the Court finds that the Plaintiff has established liability under the Windfall Protection clause of the Charron SPA. Plaintiff is therefore entitled to damages of 20% of the proceeds from the Windfall Sale or $25,473,331. The Court will apply prejudgment interest to the damages due to Plaintiff at the appropriate rate.

Dated:  August 20, 2014

Respectfully submitted,

/s/ Athanasios Basdekis
Athanasios Basdekis (AB2574)
Brian A. Glasser *(Admitted Pro Hac Vice*)
**BAILEY & GLASSER, LLP**
209 Capitol Street
Charleston, WV 25301
(304) 345-6555 (main)
(304) 342-1110 (facsimile)
*Counsel for Plaintiff Thomas W. Charron Jr., Individually and as Trustee of the Thomas W. Charron Jr. Grantor Retained Annuity Trust Dated July 8, 2010*

## CERTIFICATE OF SERVICE

I hereby certify that on the 20th day of August, 2014, a true and correct copy of the foregoing PLAINTIFF'S PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW has been electronically filed with the Clerk of the Court using the CM/ECF system, which automatically provides email notification of the filing to the following attorneys of record:

> Brian P. Waagner (*pro hac vice*)
> Michael A. Gatje
> Elizabeth Leavy
> Thomas Rath (*pro hac vice*)
> HUSCH BLACKWELL, LLP
> 750 17th Street, NW, Suite 900
> Washington, DC 20006
> brian.waagner@huschblackwell.com
> claude.goddard@huschblackwell.com
> sarah.graves@huschblackwell.com
> *Counsel for Defendants*

> /s/ Athanasios Basdekis
> Athanasios Basdekis (AB2574)