UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

```
USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED: 12/10/14
```

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - -X
                                                          :
THOMAS W. CHARRON, JR.,                                   :      12cv6837
                                                          :
                    Plaintiff,                            :      OPINION & ORDER
                                                          :
             -against-                                    :
                                                          :
SALLYPORT GLOBAL HOLDINGS,                                :
INC., *et al.*,                                           :
                                                          :
                    Defendants.                           :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - -X

WILLIAM H. PAULEY III, District Judge:

       This breach of contract action arises out of a business divorce. For many in the

service of their country, terrible sacrifices have been exacted in Iraq and Afghanistan. For

others, including Plaintiff Thomas W. Charron, Jr. and Defendant John P. DeBlasio, those armed

conflicts presented lucrative opportunities. Just how lucrative is put into stark relief by this case.

The two primary players in this lawsuit grew a startup government contractor into an enterprise

with thousands of employees providing mission-critical logistical support to Government

operations abroad and generating annual revenues in the tens of millions of dollars.

       While their business boomed, animosity between the two abounded, leading to an

agreement in which DeBlasio bought out Charron. But that deal had a catch: if DeBlasio sold

the company within one year at a sufficient price, Charron got to share in the proceeds of the

sale. That provision is the primary subject of this lawsuit. Also at issue, Defendant Sallyport

Global Holdings, Inc. counterclaims that Charron misappropriated funds as his transaction with

DeBlasio closed. Following a three-week bench trial, this Court makes the following findings of

fact and conclusions of law pursuant to Federal Rule of Civil Procedure 52.

## BACKGROUND

It is little surprise the two main players in this case ended up as military contractors.  Both Charron and DeBlasio graduated from the United States Military Academy at West Point.  After seven years of active duty, Charron left military service and earned an MBA at the University of North Carolina.  (Tr. 403–04 (Charron).[1])  Thereafter, he held a number of positions in the high-tech industry before founding Defendant Sallyport Global Holdings, Inc. (SGH).  Charron started SGH as a sole proprietorship in 2003 and funded it with a $100,000 home equity loan.  (Tr. 403, 504–06 (Charron).)  DeBlasio left military service as a lieutenant colonel after 21 years of active and reserve duty.  (Tr. 220–21 (J. DeBlasio).)  While a reservist, he spent several years in executive positions in three different divisions at General Electric.  (Tr. 221 (J. DeBlasio).)

In January 2004, Charron and DeBlasio were introduced to each other in Iraq by another West Point graduate.  (Tr. 222 (J. DeBlasio); 404 (Charron).)  They met again in April and began working together, utilizing their networks of contacts in Iraq.  (Tr. 222 (J. DeBlasio).)  Their initial collaboration was successful, and later in 2004, Charron offered DeBlasio a 50% equity interest in his fledgling enterprise.  (Tr. 407 (Charron).)  DeBlasio accepted Charron's offer of sweat equity.  Under their operating agreement, Charron was the chief executive officer, and DeBlasio served as president.  (Tr. 504–06 (Charron)), 1868 (stipulations of fact).)  Each owned half the company until December 2010.  (Tr. 1868–69 (stipulations of fact).)

As the United States Government's involvement in Iraq and Afghanistan escalated, SGH's logistics business grew exponentially.  With Charron and DeBlasio at the helm,

---

[1] "Tr." refers to the Trial Transcript.

SGH was hard-wired into the Department of Defense's military operations.  SGH provided

facility maintenance and logistical support to the United States Government and its contractors.

(Tr. 222 (J. DeBlasio); 404–06 (Charron).)  It dealt primarily with "contingency operations,"

providing short-term services abroad, principally in Iraq and Afghanistan, and more recently, in

South Sudan.  (Tr. 143, 220–22, 225–26, 235–36, 296 (J. DeBlasio); 479–80 (Charron); Ex. 68.)

Many of its contracts were "no-bid," cloaked in secrecy, and tied to Operation Iraqi Freedom or

Operation Enduring Freedom (Afghanistan).  (Tr. 225–226 (J. DeBlasio).)  Those contracts

involved great risks: a number of SGH employees were killed, including 19 who were pulled off

a bus and executed on the side of the road.  (Tr. 235 (J. DeBlasio).)  In DeBlasio's words, "it was

one of those businesses where people had to really swallow hard to get the hairball down."  (Tr.

235 (J. DeBlasio).)  SGH's contracts ran the gamut from fire services at military installations to

housing compounds in Mansour.  (Tr. 143 (J. DeBlasio).)

       SGH is the parent company of various subsidiaries.  Among them, Sallyport

Global Services (SGS) is a Bermuda entity wholly owned by SGH.  (Tr. 132 (J. DeBlasio).)

Sallyport Support Services (SSS) is a Florida entity also owned by SGH.  (Tr. 118–19 (J.

DeBlasio).)

       As the drawdown in Iraq began in the fall of 2009, Charron and DeBlasio tried to

sell their company.  (Tr. 224–25 (J. DeBlasio); 1869 (stipulations of fact).)  The motivation to

sell SGH was driven, at least in part, by growing friction between Charron and DeBlasio.  (Tr.

826–27 (Charron); 82–83, 157 (J. DeBlasio); 885, 888 (Phelps).)  Because their relationship was

acrimonious, Charron and DeBlasio retained various consultants to facilitate communications

between them.  (Tr. 408–09 (Charron).)  But their differences were irreconcilable.  DeBlasio's

brother was SGH's accountant and tightly controlled access to the company's financial

information.  Charron believed he had "lost control" of his company and "felt [it] had been

hijacked from underneath [him]."  (Tr. 422 (Charron).)  Charron no longer wanted to travel to

Iraq, and instead sought to develop new opportunities in the United States with other

Government agencies like NASA.  (Tr. 490–91, 500–01 (Charron).)  They retained additional

investment bankers to market the company, but no firm offers materialized in 2009 or 2010.  (Tr.

241–45 (J. DeBlasio); 1869 (stipulations of fact).)

I.    The Charron Buyout

When it became clear no third party would save them from each other, the two

began discussing the possibility of one partner buying out the other or winding down the

business.  DeBlasio even proposed a "Dutch auction," where he would name a price at which he

would either sell his interest or purchase Charron's, at Charron's election.  (Tr. 287

(J. DeBlasio).)  While threats to wind down the business were exchanged, they eventually agreed

that the company would redeem Charron's shares.

SGH retained WilmerHale to draft a stock purchase agreement.  Outside

consultants placed valuations on the company.  On November 30, the concept of a "windfall

protection" provision surfaced for the first time.  (Ex. R.[2])  Charron proposed "windfall

protection" in the event DeBlasio sold the company within three years.  (Ex. R.)  DeBlasio was

"fine with a provision giving [Charron] something in the event I 'flip' the company in the next

calendar year, but beyond that it's not really fair to ask as beyond a year there would be no

'windfall' to speak of."  (Ex. R.)  Hours later, WilmerHale drafted an "industry standard"

windfall protection provision and circulated it to the parties and their advisers.  (Ex. R.)  That

---

[2] "Ex." refers to exhibits received in evidence at trial.

provision allowed Charron to receive a percentage of all proceeds from a subsequent sale.  In

response, DeBlasio instructed WilmerHale that Charron should only share in a percentage of

proceeds above a threshold amount.  (Ex. R.)  A new draft windfall provision was generated in

less than an hour and circulated reflecting that permutation.  (Ex. R.)  Confused by the new draft

provision, Charron asked for clarification and input from WilmerHale about a "reasonable

timeframe" for the provision to apply.  (Ex. R.)  WilmerHale offered different scenarios to

illustrate the operation of the provision, which let Charron share in a percentage of proceeds

above a certain amount.  After this email exchange, WilmerHale circulated a draft agreement that

included the following:

> In the event that Sallyport commits to sell shares, to a third party,
> subsequent to this transaction, for a purchase price exceeding an
> enterprise value of $65 million, in the period ending one year from
> the date of closing, the Selling Shareholder will receive 20% of the
> sales proceeds, as additional compensation.

(Ex. T at JD1-00011868.)  This language is closer to the language that was circulated earlier in

the day than it is to the language that DeBlasio requested.  But for the first time, a threshold

enterprise value of $65 million was inserted.  That figure came from DeBlasio.  (Tr. 824

(Charron).)  Charron accepted that number because he believed that the company was worth

"way more" than $65 million.  (Tr. 825 (Charron).)  There were no other iterations proposed in

subsequent email traffic.

Charron did not retain his own counsel until December 1, 2010, when he hired

Williams & Connolly.  (Tr. 55 (O'Connor).)  By that point, negotiations were well underway.

Charron's lawyer saw the draft agreement for the first time on Friday, December 3.  (Tr. 57

(O'Connor).)  He revised the proposed windfall protection language and exchanged drafts over

the weekend and on Monday, December 6.  (Tr. 58 (O'Connor).)

On December 7, Charron and SGH executed a stock purchase agreement in which SGH redeemed all of Charron's shares, leaving DeBlasio as the sole shareholder. (Ex. A.) The sense of urgency was palpable on all sides, but in retrospect, no one can explain why the parties and their highly-paid professionals rushed to conclude the transaction on an arbitrary and "self-imposed" deadline. (Tr. 398 (J. DeBlasio).) Perhaps this litigation could have been averted by several days' reflection.

Charron sold his interest in SGH for just over $40.7 million. He believed he was selling at a significant discount and that SGH was actually worth somewhere between $80 and $115 million. (Tr. 418, 424–25 (Charron).) In particular, just two months earlier, SGH had secured its largest government contract, known as LOGCAP III ("LOGCAP" stands for Logistics Civil Augmentation Program, which provides contingency support to the U.S. Army). Charron knew he would not share in this new significant source of revenue, even though the company had financed the startup costs before his departure. (Tr. 825–26 (Charron).)

The December 2010 agreement contained the following:

> 2.04   <u>Windfall Protection</u>.  As additional consideration for the Shares, the Company agrees to make an additional payment to Sellers, on the basis and subject to the limitations provided in this Section 2.04.  If, on or prior to the first anniversary of the date hereof, John DeBlasio or any of his affiliates or any other direct or indirect equity holder sells or agrees to sell shares of the Company's capital stock (or equity of an intervening Person or assets of the Company or any Company subsidiary) constituting 20% or more by voting power or economic value of the Company's assets or equity to a third party in one or a series of related transactions for a price that reflects an enterprise value of the Company equal to or greater than $65,000,000 (a "Windfall Sale"), within three Business Days following the closing of such Windfall Sale, the Company or such stockholder shall pay Sellers an amount equal to 20% of the proceeds received from the Windfall Sale, such payment to be made to Sellers *pro rata* in accordance with the percentages set forth on <u>Schedule I</u>.

(Ex. A § 2.04 ("Windfall Provision").)

One of the few things the parties agree on is that DeBlasio did sell the company within a year.  Whether that sale constituted a "Windfall Sale," and if so, what Charron is owed, are the primary topics of this litigation.

There are also counterclaims against Charron relating to money Charron paid himself as the stock purchase transaction closed.  On December 8, 2010, Charron deposited three checks he wrote to himself from SGH's bank account totaling $227,364.22.  (Tr. 793; Ex. AS.)  Charron claims he is entitled to these funds.  According to Charron, he was owed $44,400 in salary for November 1, 2010 to December 7, 2010.  (Tr. 467 (Charron).)  He paid himself $35,237.22 to reimburse business expenses.  (Tr. 468–70 (Charron).)  And Charron paid himself $147,727 to settle the "Tom/John account."  (Tr. 465–66 (Charron); Ex. 145.)  DeBlasio and Charron would occasionally take cash out of SGH for personal use, which they tracked in a crude method they referred to as the "Tom/John account."  (Tr. 148–49 (J. DeBlasio); 457–58 (Charron).)  They kept track of each other's distributions with the aim of ensuring they were roughly equal over time.  SGH asserts Charron was entitled to none of these payments and that they had agreed the Tom/John account was a "wash."  (Tr. 869–70; 871 (Phelps); 355–56 (J. DeBlasio).)  SGH makes counterclaims for the money, arguing it was a simple theft.

II.    The DC Capital Transaction

DeBlasio maintains that he had no intention of selling SGH at the time the company redeemed Charron's shares.  (Tr. 246 (J. DeBlasio).)  However, this claim is belied by the fact that on December 19, 2010, less than two weeks after the Charron transaction, DeBlasio emailed Thomas Campbell of DC Capital Partners, a private equity firm, to inform him that he

Case 1:12-cv-06837-WHP   Document 264   Filed 12/10/14   Page 8 of 42

was now SGH's sole shareholder. (Ex. BO.) Campbell responded that he "would still suggest" that DC Capital buy half of SGH, revealing this was not the first time they had discussed that possibility. (Ex. BO.) On January 11, 2011, Doug Lake of DC Capital emailed DeBlasio a proposed timeline for a transaction between DC Capital and SGH, including a 45-day exclusivity agreement and anticipated closing at the end of February. (Ex. 267.) DeBlasio responded he was "not sure why we need 45 days for closing and exclusivity given all the interaction thus far." (Ex. 267.) Clearly a sale was already on DeBlasio's mind in December 2010.

DC Capital had been a possible partner for SGH for some time. SGH's consultants contacted DC Capital in 2009 when Charron and DeBlasio first attempted to sell the company. (Tr. 310 (J. DeBlasio).) DC Capital reviewed marketing materials and met with DeBlasio, but did not move forward. (Tr. 1136–37 (Lake).) SGH reached out to DC Capital again in 2010, this time through the investment bank Sagent Advisors. DC Capital reviewed materials and conducted some due diligence (Tr. 239–41 (J. DeBlasio); 1137–38 (Lake)), and in August 2010 Campbell sent Charron and DeBlasio an indication of interest in acquiring SGH, stating DC Capital valued the company at $85 to $105 million. (Ex. 36.) DC Capital later backed away from that valuation, and no deal materialized. (Tr. 241; 311–12 (J. DeBlasio).)

After communication reopened following the Charron buyout, Campbell sent DeBlasio a letter of intent on January 20, 2011 proposing that DC Capital purchase SGH. (Ex. X.) Negotiations carried on for months, and the parties signed a final agreement on May 6, 2011. (Ex. B.) The deal closed on June 29, 2011 (the "DC Capital Transaction"). (Exs. B, C, 132.) DC Capital established a new entity, Sallyport Holdings LLC ("New Sallyport"), to acquire SGH. New Sallyport acquired not only SGH and its affiliated companies, but also an unaffiliated entity called Sallyport Global, Inc. (SGI.) At the time of the sale, SGI was owned by

-8-

the John P. DeBlasio Trust dated January 1, 2011, ("Florida Business Trust") and SGH was owned by what is now known as the GPD Charitable Trust dated December 7, 2010 ("Bermuda Charitable Trust," and formerly known as the John DeBlasio Charitable Trust for World Peace and Devlopment.  The trustee of the Bermuda Charitable Trust, JPD Private Trust Company, Ltd., is also a Defendant in this action.)  (Tr. 35 (O'Connor); Ex. C at Schedule 2.4.)

The DC Capital Transaction called for the Bermuda Charitable Trust to receive $60.7 million in cash.  (Ex. C at Schedule 2.4.)  The Florida Business Trust was not paid in cash, but received a 38% equity interest in New Sallyport, the acquiring company.  (Ex. 7 at JD1-00000518.)  The agreement stated that the 38% interest was worth $3.8 million, which would make the total purchase price $64.5 million—half a million dollars shy of the Windfall Provision in the Charron stock purchase agreement.

The agreement required New Sallyport to merge with another DC Capital company, Kaseman Holdings LLC, to form KS International (KSI.)  (Tr. 30–31 (O'Connor); Ex. C at Schedule 2.4.)  The companies merged on July 29, 2011, and the Florida Business Trust's 38% stake in New Sallyport was converted into a 19.38% interest in KSI.  (Tr. 1739–40 (Hitchner); 1818–19 (P. DeBlasio); 1293–94 (Risius); Ex. C ¶ 19.)

## DISCUSSION

I.   Enterprise Value

The parties agree there is no standard definition of "enterprise value."  (Tr. 1299–1300 (Risius); 1669–70 (Hitchner).)  But both define it, somewhat loosely, as the overall value of the entire business, or alternatively, as the value of the anticipated future cash flows.  (Tr. 1299 (Risius); 1670–71 (Hitchner).)  Charron argues that the true value of the rollover equity interest was much greater than the stated $3.8 million, making the total value of the DC Capital

transaction greater than $65 million.  In addition, he argues DeBlasio stripped out certain assets from the company before the sale and kept them for himself, which also must be accounted for in the enterprise value.

### a. Rollover Equity Interest

#### i. Unreliability of $3.8 Million Value in Deal Documents

If one takes the DC Capital agreement at face value, SGH was sold for $64.5 million and there was no windfall sale.  It is Defendants' position that the $64.5 million price "agreed" to with DC Capital establishes the enterprise value of SGH and cannot be challenged. But dissecting this deal is complicated by the fact that the sellers were paid partly in cash and partly in the stock of the acquiring entity.  Because of the two variables being negotiated, one can imagine scenarios in which the $64.5 million price in the deal papers becomes arbitrary.  For example, the parties could agree the company was worth $74.5 million and the 38% equity share worth $13.8 million, but agree to list the equity share as being worth $3.8 million and the total sale price as $64.5 million.  After agreeing to pay $60.7 million in cash and 38% of the acquiring entity, any value "assigned" to the equity stake would not affect the economics of the deal. While the deal as a whole may be the product of an arm's length negotiation, it does not follow that the rollover equity is actually worth the $3.8 million attributed to it.

This is not to say that there was fraud, but only that because of the way the deal is structured, it is necessary to probe behind the $64.5 million figure.  There is no question DeBlasio and DC Capital were aware of the Windfall Provision as they negotiated their deal. The amount in the deal documents, $64.5 million, is startlingly close to the $65 million trigger. One draft of the DC Capital agreement even contained a provision stating "[a]nything to the contrary herein notwithstanding, the parties acknowledge and agree that the enterprise value of

the company is $64.5 million." (Ex. 83 § 2.2(c).)  The only purpose that provision could have served was to negate any claim that the Windfall Provision was triggered.   Aware of Charron's windfall protection clause, DC Capital insisted upon an indemnification against suits by former stockholders of SGH (Tr. 1192–98 (Lake); Ex. 74)—the only former stockholders being Charron and DeBlasio.  (Tr. 31 (O'Connor); Ex. B § 11.1.)

 None of this is damning—DeBlasio and DC Capital were well within their rights to ensure the transaction did not trigger the windfall protection clause and for DC Capital to insist on indemnification.  But it is harder to explain why DeBlasio never informed Charron of the DC Capital transaction.  Instead, Charron's lawyer had to contact DeBlasio's lawyer to ask if SGH had been sold.  (Tr. 230–34 (O'Connor).)  DeBlasio's lawyer sent an opaque two-sentence letter stating that "Sallyport has authorized me to disclose to you that a transaction involving the sale of greater than 20% by voting power of Sallyport's equity was consummated on June 29, 2011 for a price that reflected an enterprise value of Sallyport and related entities of $64.5 million."  (Ex. 8.)  No further information was given.

 This was very different from how SGH's lawyer described the transaction in another letter, just one month earlier.  Sagent Advisors, SGH's former investment bank, sued SGH in New York state court in 2011.  See <u>Sagent Advisors Inc. v. Sallyport Global Holdings Inc.</u>, No. 653644/2011 (N.Y. Sup. Ct.).  In August 2011, SGH's lawyers wrote to Sagent's lawyers, describing the transaction very differently from how it has been represented in this litigation.  They told Sagent's lawyers that

> The transactions resulted in the redemption by SGH of 84.5% of
> the outstanding common stock owned by the John DeBlasio
> Charitable Trust for World Peace and Development, the sole
> stockholder of SGH, and the remaining 15.5% of the outstanding
> common stock of SGH was purchased by the Purchaser.  The sole

stockholder of SGI, the John P. DeBlasio Trust (the "DeBlasio Trust"), rolled over all the outstanding common stock of SGI into units of the Purchaser, resulting in the DeBlasio Trust owning 38% of the issued and outstanding voting membership units of the Purchaser (35.91% of the total number of outstanding membership units of the Purchaser.)  In short, the transaction with the Purchaser resulted in the direct and indirect owners of SGH and SGI prior to the Closing selling 64.09% of the affiliated group's capital stock to purchasers unrelated to the owners of SGH and SGI prior to the Closing.

(Ex. 22 (emphasis added).)  Oddly, the letter warns that "nothing provided or discussed herein or in any subsequent communications or dealings among Sagent and any of the SGH Affiliated Parties is to be shared in any way with Tom Charron, who is no longer affiliated with SGH and has no right to receive directly or indirectly any of such information."  (Ex. 22.)

SGH's lawyers repeated this description of the transaction in a statement of facts opposing a summary judgment motion, arguing to the court that "[l]ooking at this transaction in the aggregate, the direct and indirect owners of Sallyport and SGI retained 35.91% of the ownership interest (on a fully-diluted basis after taking into account management incentive units) in the acquiring entity and, therefore, gave up only 64.09% of their ownership interests."  (Ex. 21 at 30; see also Ex. 21 at 42.)  Obviously, if DeBlasio sold 64.09% of SGH's stock for $60.7 million, the transaction reflected a total enterprise value of well over $65 million.  SGH's insistence in a prior litigation that the DC Capital transaction was not what it seemed—and its insistence on keeping that fact from Charron—confirms the necessity of testing its claim that the transaction reflected an enterprise value of less than $65 million.

The curious role of SGI in the DC Capital transaction further justifies the need to probe the mechanics of the deal.  SGI was formed in January 2011 with the Florida Business Trust as its sole shareholder.  (Tr. 116 (J. DeBlasio).)  It did not have any bank accounts or

-12-

accounting records.  (Tr. 43 (O'Connor); 118 (J. DeBlasio); Ex. 132.)  Unlike SGH and its

subsidiaries, it had no government contracts.  (Tr. 112–13 (J. DeBlasio); Ex. 132.)  None of the

several due diligence reports created in connection with the DC Capital transaction mention SGI.

(Exs. 53; 63; 64; 74.)  SGI appears to have no value whatsoever.  Yet, according to the deal

documents, the Florida Business Trust received its 38% interest in New Sallyport in exchange

for its SGI stock.

        And yet another oddity of the DC Capital Transaction is that it assigned different

values to identical shares of SGH.  SGH redeemed 8,450 of its shares for $54.5 million, valuing

the shares at $6,449 each.  But the remaining 1,550 shares were purchased for $6.2 million,

valuing the shares at $4,000 each.  (Ex. C at Schedule 2.4.)  No one at trial explained this

discrepancy.  (See Tr. 661–63 (Campbell).)

        Finally, $64.5 million appears to be an unrealistically low enterprise value for a

company with SGH's earnings projections, meaning that either SGH was sold for well below its

market value or that the rollover equity was undervalued.  Earnings are measured by "EBITDA,"

an acronym for "earnings before interest, taxes, depreciation, and amortization."  A company's

current and projected EBITDA is an indicator of its overall enterprise value.  Nine different sets

of EBITDA projections for SGH were prepared by various parties at the time of the DC Capital

Transaction, including by DC Capital and by third parties.  Of all these projections, which

extended six years into the future, the lowest projected annual EBITDA was $20.5 million, with

Bank of New York Mellon projecting SGH's annual EBITDA to swell to over $55 million.  (Tr.

1305–07 (Risius); Ex. 405(k.)090.)  For its part, DC Capital made a presentation in June 2011 to

the Kaseman Holdings board of directors, the company which was merging with SGH,

predicting SGH would have an EBITDA of $39.4 million in fiscal year 2011, $35.3 million in

2012, $27.4 million in 2013, and $24.9 million in 2014.  (Tr. 1223–24 (Lake); Ex. 64.)

      Despite all this, Doug Lake of DC Capital Partners testified that his firm believed

"we were buying a business with a truly recurring base of EBITDA of about 10 million" because

of various risks the company faced, such as the threat of peace in the Middle East and a

corresponding troop drawdown.  (Tr. 1192 (Lake).)  But of course, DC Capital and every other

party was aware of these risks as they prepared their projections.  The refrain at trial was that no

one actually believed DC Capital's projections—that they were overly optimistic and everyone

knew it.  (See, e.g. Tr. 1069–70 (Smith) ("[T]he selling company is going to do everything they

can to puff or—I don't want [to] call it put lipstick on a pig, to make it look as good as

possible."); 1279 (Lake) (describing projections as "Optimistic.  Rosy.").); 176–77 (J. DeBlasio)

(Stating the projections represented "[a]n optimistic scenario," but "I believed most of that could

happen."); 1226 (Lake) (describing projections presentation as "an opportunity . . . an investment

thesis memo").)  Essentially, the testimony was that the projections were unrealistically high, but

somehow this did not qualify as intentionally misleading investors because everyone in this

business expects them to do this.  But not even the shrewdest financier could bluff earnings

projections 300–400% higher than what he truly believed.  $10 million was an unrealistically

low prediction of SGH's future EBITDA.

      The parties agree that $64.5 million is too low a price for a company with a future

annual EBITDA as projected.  Plaintiffs' expert, Jeffrey Risius, testified that at a projected

EBITDA of $35 million, a sale of the company for $64.5 million would reflect a value 1.8 times

EBITDA, whereas government contracting companies typically are valued within a range of 5–

10 times EBITDA.  (Tr. 1301–02 (Risius).)  As Charron's counsel walked Tom Campbell

through the various projections and challenged his claim that SGH had an expected annual

EBITDA of $10 million, Campbell testified that "I didn't buy this company for 1.7 times

EBITDA. I'm not that lucky or fortunate. In my view, the real, dependable EBITDA was

somewhere in the $10 million zip code, and we bought the company between five and six times

EBITDA." (Tr. 647 (Campbell).) But as discussed above, the only evidence that SGH's

projected EBITDA was $10 million was trial testimony. All documents contemporaneous with

the transaction indicated SGH's EBITDA was at least twice that amount. And both Risius and

Campbell agree that contractors such as SGH should be valued at about 5 times EBITDA. In

sum, $64.5 million was too good a price to be true.

       The conclusion to be drawn from all of this is that the DC Capital deal documents

do not adequately capture the transaction. As SGH's lawyers told Sagent Advisers, there was

more going on than is apparent.

          ii.  <u>McLean Group Purchase Price Allocation</u>

       In fact, errors in a valuation DC Capital had performed soon after the transaction

call into question the stated $3.8 million value of the rollover equity. DC Capital hired the

McLean Group to perform a purchase price allocation for the acquisition of SGH. (Ex. 27.) As

part of this analysis, the McLean Group was tasked to calculate the fair value of DeBlasio's

interest in KSI, which he received after the merger of New Sallyport and Kaseman. It estimated

the value of KSI's Class A shares as of June 30, 2011 (the day after the DC Capital Transaction

closed) to be $21,569,127. (Ex. 27 at 12.) But the McLean Group incorrectly believed that

DeBlasio was receiving a 17.95% share of KSI, which would be worth $3,871,033. (Ex. 27 at

12.) It is undisputed that DeBlasio's share was actually 19.38% and that McLean's calculation

was incorrect. (Tr. 1322 (Risius); 1101; 1104 (Smith).) The second mistake occurred when the

McLean Group subtracted out the value of a joint venture because the Class A shares did not participate in the profits of that enterprise. As a result, McLean subtracted $2 million from its KSI valuation. (Ex. 33 at 8, Tr. 1108–09 (Smith).) But cash flows from the joint venture had already been subtracted from the projections McLean used to value KSI (Tr. 1322 (Risius).) Because the joint venture was never included in McLean's valuation of KSI, it was improper to subtract out the $2 million. Correcting these two errors makes DeBlasio's rollover equity interest in KSI worth $4.549 million, which makes the total consideration in the DC Capital transaction over $65 million. (Ex. 405(k.)046 at Row 2; Tr. 1322–1323 (Risius); 1776–77 (Hitchner).)

And the projections DC Capital provided to the McLean Group for the purpose of the purchase price allocation varied tremendously from projections it simultaneously provided to Jeffries & Co., an investment bank hired to sell KSI. On November 9, 2011, Jeffries issued a Confidential Information Memorandum (CIM) for potential buyers of KSI. The CIM contained a set of EBITDA projections furnished by Lake from which Jeffries concluded that KSI was worth between $275 and $325 million. (Tr. 1269, 1281-82; Ex. 476.) On November 14, 2011, Lake sent a vastly different set of EBITDA projections to the McLean Group for use with the purchase price allocation. (Ex. 50, 50A.) The two sets of projections are compared below:

|  | Jeffries Confidential Information Memorandum | Purchase Price Allocation to McLean Group |
|---|---|---|
| FY 2012 | $41.6 million | $36.3 million |
| FY 2013 | $47.1 million | $27.4 million |
| FY 2014 | $52.1 million | $24.9 million |
| FY 2015 |  | $23.9 million |

The projected 2014 EBITDA provided to Jeffries is more than double what DC Capital gave to the McLean Group.  The disparities arise because Lake removed several contracts from the projections sent to the McLean Group, including SGH's largest contract.  (Tr. 1267–68 (Lake); 1327 (Risius); Exs. 50, 50A, 51, 51A, 405(k.)030.)  Lake testified that he wanted to modify the earnings projections to account for "contracts that we were seeing were going to go away." (Tr. 1268 (Lake).)  But while he accounted for these risks in performing the purchase price allocation, he was comfortable using much larger projections for presentations to potential buyers. And Lake stripped out not only wholly prospective earnings, which can always be uncertain, but also some the company had in fact already earned that were not at risk.  (Tr. 1327–28 (Risius).)  Lake's testimony was not credible.

Meanwhile, the Jeffries CIM claimed that its higher projections, in fact, represented a "conservative approach to forecasting."  (Ex. 476 at 12.)   It notes that KSI had identified a "pipeline of more than $3 billion worth of opportunities that are **not included in the Company's financial forecast.**"  (Ex. 476 at 11 (emphasis in the original).)  It also noted it had "conservatively assumed in its forecast" that it would win a subcontractor role with regard to a particular contract, but the "high probability" of winning the contract as the prime contractor "would represent nearly **$100 million of upside to the forecast** over the next two years."  (Ex. 476 at 12 (emphasis in original).)

Thus, the $3.8 million value the McLean Group ascribed to DeBlasio's 19.38% interest in KSI was a malleable figure that could be titrated to DeBlasio and DC Capital's needs.

### iii.  Other KSI Investors

Perhaps the best evidence Defendants presented indicating that the value of the rollover equity was in fact $3.8 million was the claim that other investors paid the same per share price for equity in New Sallyport.  KS International Equity LLC, Bank of New York Mellon-Alcentra Mezzanine III, and Nick Gross of DC Capital Partners each nominally invested in New Sallyport, the acquiring entity, at the rate of $100,000 for each percent of its equity.  (Tr. 594–95 (Campbell); Exs. C, 296.)  This would make DeBlasio's 38% share worth $3.8 million.  But money was flowing in and out of the transaction to various parties, making these "investments" unreliable benchmarks.  For example, DC Capital supposedly invested $5.225 million in New Sallyport, but because of various fees it earned, it actually received $827,319 in the deal.  (Tr. 676–78; Ex. 306.)  And Nick Gross was not required to put any money in for his 4.75% stake in New Sallyport.  (Tr. 1669 (Hitchner); Ex. 306 at 11.)  Bank of New York Mellon also earned fees from the deal.  (Ex. 306 at 2, cells 104–109.)  Because these parties were all receiving money from the deal, it is not clear they in fact "invested" the amounts shown for their shares of New Sallyport.

### iv.  Expert Evaluation

It is necessary, then, to assess the value of DeBlasio's equity rollover interest apart from the DC Capital transaction documents.  Charron offered testimony from expert witness Jeffrey Risius on the value of DeBlasio's equity rollover.  Risius is managing director of Stout Risius Ross, where he heads the valuation and financial opinions practices.  (Tr. 1287 (Risius).)  He has 25 years of experience in valuing businesses.  (Tr. 1290 (Risius).)

Risius performed valuations both of the 19.38% interest DeBlasio received in KSI as well as the standalone value of SGH as of the DC Capital Transaction.  However, it is the

interest in KSI that is relevant here. The Windfall Provision anticipated DeBlasio selling SGH in either one transaction "or a series of related transactions." (Ex. A § 2.04.) The DC Capital transaction required New Sallyport to merge with Kaseman to form KSI, which happened the following month. (Tr. 30–31 (O'Connor); Ex. C at Schedule 2.4.) The conversion of DeBlasio's 38% stake in SGH into a 19.38% stake in KSI was the second step in a "series of related transactions."

First, Risius valued KSI using a discounted cash flow analysis, which attempts to quantify the present value of future cash flows. (Tr. 1324 (Risius).) As discussed above, there were nine different sets of earnings projections for KSI. Of these, Risius used the most conservative projections—the ones which stripped out several contracts, including some revenue the company had already earned at the time Lake removed them. (Tr. 1343, 1513 (Risius); 1732–33 (Hitchner).) By using those conservative projections, Risius largely replicated the McLean Group's purchase price allocation analysis.

But a major departure from the McLean Group's analysis is the level of risk assigned to the company. Because a discounted cash flow analysis involves discounting to present value, there will always be a discount rate applied to projected earnings. Businesses and projected cash flows are inherently uncertain. And because of this,

> when the analyst believes that the empirical data is not capturing
> specific company risk or specific risk to the cash flows that are
> being discounted, then the valuation analyst will sometimes make a
> subject company risk adjustment, either positive or negative,
> because he doesn't feel that the empirical data is appropriately
> capturing it all, or is overcapturing it.

(Tr. 1325 (Risius).) The McLean Group applied a discount rate of 22.25%, which included a specific company adjustment of 10% to reflect the risks in KSI's future. (Tr. 1325 (Risius).)

-19-

Risius explained that while SGH (and by extension, KSI) faced certain risks, including its heavy concentration in Iraq and the possibility of troop withdrawals, the McLean Group ignored the fact that the cash flow projections were already "ultraconservative." (Tr. 1326 (Risius).)  In Risius's view, the cash flows had "already been risk adjusted to more than account for the risk associated with the company." (Tr. 1326 (Risius).)  Reading from a valuation treatise, Risius testified that an "analyst must be especially careful to avoid undue double counting such as reflecting a negative factor fully by a reduction in the economic income projection and then magnifying the effect by an increase in the discount rate for the negative factor." (Tr. 1332 (Risius).)

The projections that both Risius and the McLean Group used were "ultraconservative." The original contract waterfalls, prior to the removal of some contracts, included estimates of the probability the contracts would be won.  Lake removed seven contracts with 100% win probabilities—what should have been sure things. (Tr. 1024–35 (Smith); Exs. 50(a), 466.)  He removed another three with 90% win probabilities. (Tr. 1024–35 (Smith); Exs. 50(a), 466.)  All told, Lake eliminated $111.1 million in revenues from the projections for fiscal year 2011, $97.1 million for 2012, and $96.6 million for 2013. (Tr. 1034 (Smith); Ex. 50(a).)

No reasonable explanations were offered for excluding these revenues and also applying a high specific company adjustment.  For both, the explanation was generally that KSI faced risks from its size, its geographic concentration, and the possibility of troop withdrawals. But these risks were adequately accounted for by the removal of hundreds of millions of dollars from KSI's projected cash flows, including from several contracts that were listed as certain or extremely likely to be renewed.

-20-

Moreover, contemporaneous documents show these risks were overstated. Shortly before the closing of the transaction with DeBlasio, DC Capital commissioned a third-party analysis of risks facing SGH in wake of potential troop drawdowns.  (Tr. 1202 (Lake); Ex. 472.)  The report concluded that "nation-building" work by the Department of State would replace work by the Department of Defense in Iraq and eventually in Afghanistan, resulting in a "positive outlook for the future" of SGH.  (Ex. 63 at 4.)  It predicted that "[t]he U.S. Government is likely to favor smaller, more nimble providers like Sallyport going forward."  (Ex. 63 at 5.)  A report by the Bank of New York Mellon similarly found SGH well prepared to face an uncertain future in the Middle East.  (Ex. 53.)

Given this, Risius reasonably applied a specific company adjustment of zero in his analysis in recognition of the fact that KSI's risk was already incorporated into its earnings projections, resulting in a discount rate of 14.5%.  (Tr. 1328–29, Ex. 405(k.)046.)  This, along with certain other calculations in the discount cash flow analysis, results in a value of $18,286,578 for DeBlasio's share of KSI.  (Tr. 1332–34 (Risius); Ex. 405(k.)046.)

Risius then performed a valuation of KSI using the guideline public company method.  In this method, the evaluator identifies similar public companies and compares their market value (easily calculated for public companies) to their EBITDA.  Similar companies should have similar "multiples" when you compare their value to EBITDA.  By comparing KSI to "similar" public companies, Risius concluded KSI was worth $200–240 million.  (Tr. 1340–42 (Risius); Ex. 405(k.)044.)  Comparing the discount cash flow result with the guideline public company result, Risius settled on $210 million as the value of KSI, resulting in DeBlasio's share being worth $20,133,126.  (Tr. 1341–42 (Risius); Ex. 405(k.)046.)

Defendants offered no independent analysis of the value of the rollover equity interest, relying instead on their argument that only the $3.8 million value in the deal documents is probative. Failing that, their most substantive critiques of Risius's analysis relate to figures he relied on in valuing SGH and the guideline public companies to which he compared KSI. But this Court does not rely on that analysis in its determination. The remainder of Defendants' critiques are superficial.

For reasons explained above, Risius's discounted cash flow analysis is persuasive. By correcting the mathematical errors in the McLean Group's analysis and correcting for its double counting of risk, Risius arrived at a reasonable value for DeBlasio's equity interest in KSI. But the guideline public company analysis is significantly more subjective. No public company is truly similar to SGH or KSI, and it is too easy to cherry pick companies to push the result in either direction. To be sure, a discounted cash flow is also subjective, but the dissimilarities with the supposed guideline companies are glaring.

Therefore this Court declines to apply the upward adjustment Risius made to his discount cash flow result on the basis of his guideline public company analysis, and finds that the value of DeBlasio's rollover equity interest was $18,286,578.

b.  "Asset Leakage"

In addition to the cash and equity rollover interest, Charron contends there was a third form of compensation in the DC Capital transaction, which he terms "asset leakage." Charron asserts that shortly before the closing of the transaction, DeBlasio stripped out certain SGH assets to keep for himself, essentially increasing the price he "received" by taking money out of the company instead of receiving it as payment from the purchasers.

The first of these assets are a $2.7 million loan SGS made to Arkel Sallyport Global Ltd. and a $750,000 contracts receivable agreement SGS made to Power Generation Solutions, Ltd (PGS.)  (Tr. 134 (J. DeBlasio); Ex. CG.)  The day before the DC Capital transaction closed, SGH assigned these assets to WD Solutions, Ltd., a Mauritius entity owned by the Bermuda Trust.  (Tr. 134 (J. DeBlasio); Ex. CG.)  The parties' experts agreed that whether these loans are properly included in the "enterprise value" of SGH turns on whether they were operating assets.  (Tr. 1313 (Risius); 1759–60 (Hitchner).)

In February 2008, SGS entered into a joint venture agreement with Arkel International, LLC, forming Arkel Sallyport Global.  (Tr. 138 (J. DeBlasio); Ex. AW.)  The agreement expressly contemplated that the joint venture might be funded by loans from the parties.  (Ex. AW § 5.05.)

Charron explained many government contracts do not come with any "mobilization money."  (Tr. 478 (Charron).)  As a result, small companies find it difficult to take on big government contracts because of the upfront costs.  Through their web of subsidiaries, Charron and DeBlasio kept $49 million in profits in a bank account in Bermuda, out of reach of the Internal Revenue Service.  And that was after they paid all their expenses and themselves handsomely.  Virtually all of that money came from U.S. Government contracts.  A company like SGH, with its "deep pockets," got "invited to a lot of parties."  (Tr. 478 (Charron).)  Thus, SGH could finance a number of joint ventures in trouble spots around the world where construction, power generation, and operational support were needed.

SGS made such a loan to Arkel Sallyport just two days after the joint venture agreement was signed.  (Tr. 481–83; Exs. AW, 411.)  The purpose of the loan was for the joint

venture to begin working in Iraq and South Sudan, and it helped Arkel Sallyport win a contract

in South Sudan.  (Tr. 487–88 (Charron); 155 (J. DeBlasio).)

        In 2011, SGS made another loan to the joint venture, this time to build a hospital

in South Sudan.  (Tr. 139, 155 (J. DeBlasio); Exs. 23, 197.)  SGS and PGS entered into a

factoring agreement in May 2011.  (Tr. 136 (J. DeBlasio); Exs. 91, 45.)  The agreement called

for SGS to provide a $5 million line of credit to fund a PGS project in the United Arab Emirates.

(Tr. 134–35 (J. DeBlasio); Exs. 91, 45.)  PGS agreed to staff at least one SGS employee on its

subcontract, which again would assist SGS in expanding its geographic reach.  (Ex. 45.)  In

return for the $5 million loan, SGS received a $2.5 million fee, which was earned but not paid

when the loan was assigned to WD Solutions.  (Tr. 1317 (Risius); Ex. 45.)

        The benefit to SGH was that "[i]t is very critical that you show [the Government]

experience in the service of product that you are selling as well as the geography that you are

working. . . .  We had to show we had a presence in Africa and were doing work."  (Tr. 488

(Charron).)  Establishing even a minimal presence in Africa was important for SGH, as it

allowed it to trumpet its past performance in an attempt to win more contracts and expand its

geographic reach.  (Tr. 488–89 (Charron); 139, 155 (J. DeBlasio).)  The parties agree that Africa

was the next frontier for SGH and that it needed to demonstrate to Government agencies that it

had full-time equivalent employees on the continent.  Funding these joint ventures helped SGH

"get on some teams" and qualify for contracts with United States Africa Command (AFRICOM)

(Tr. 488 (Charron).)

        Defendants argue these loans are not operating assets because SGH and its

subsidiaries were not in the lending business.  The DC Capital stock purchase agreement

required SGS to list any assets or services outside its ordinary course of business, but these

-24-

contracts were not listed.  (Tr. 1762–63 (Hitchner); Ex. 132 § 6.26(h).)  Instead, they are

identified among SGS's material contracts in the ordinary course of business.  (Tr. 1765

(Hitchner); Ex. 132 § 6.26(h).)  This all makes sense.  Both loans were essential to the success of

their respective ventures, which were intended, in part, to allow SGH to expand its geographic

reach.  By attempting to position SGH in new markets, the loans were advancing its ordinary

business, and hence were operating assets which should be counted as part of SGH's enterprise

value.

        In fact, an attorney emailed Doug Lake and Tom Campbell to make sure it was

correct that these loans be transferred, stating "Sallyport is basically removing loans owing to

SGH and SGS from the balance sheets by transferring them to John's Mauritius entity.  No

consideration is passing."  (Ex. CD.)  After some email exchanges on the subject, Lake wrote to

DeBlasio

> I am still not following why the loan is being transferred to you
> personally and not staying with the company.  As you highlighted
> below the 'loan' is really a working capital investment borne 100%
> by Sallyport since Arkel could not afford its share. . . . In essence
> we are stepping into an incomplete project, finishing the project,
> and then you get paid personally and the JV partners make little to
> no profit?  Am I crazy or is this what you are suggesting?

(Ex. CD.)  At trial, Lake testified that he came around to DeBlasio's point of view that these

were not working capital and that DeBlasio could keep them.  (Tr. 1159–62, 1179–80 (Lake).)

But his reasoning in the emails was more convincing than his trial testimony.

        Risius valued the two loans combined at $2.75 million, which Defendants' expert

did not dispute.  (Tr. 1314 (Risius).)  This amount should be included in calculating the

enterprise value reflected in the DC Capital transaction.

II.     Proceeds Received

    The $60.7 million cash payment, the $18,286,578 value of the equity rollover, and

the $2.75 million value of the PGS and Arkel Sallyport loans are clearly "proceeds" from the

transaction.  But Charron argues there is more.  The Windfall Provision applies if DeBlasio

"sells or agrees to sell" 20% of SGH as measured by "voting power" or "economic value."  (Ex.

A § 2.04.)  DeBlasio "agreed" to sell on May 6, 2011 when he signed the DC Capital agreement.

(Ex. B.)  Before the deal closed, the agreement barred DeBlasio from making certain transfers

out of the company without DC Capital Partners' approval.  (Exs. B, C, 132 §§ 4.2, 4.3, 6.8,

6.10.)  Before the transaction closed, DeBlasio removed large amounts of cash from the

company.  Charron claims these cash disbursements are "proceeds" from the DC Capital

transaction.

    In particular, the day before the closing of the DC Capital transaction, DeBlasio

transferred over $20 million to the Bermuda Charitable Trust (there is some dispute over the

actual amount.)  (Tr. 87 (J. DeBlasio); 1727; 1728; 1828–29 (P. DeBlasio); Exs. 132, 210.)  In

April, May, and June of 2011, SGH transferred a total of $5.7 million to the Florida Business

Trust.  (Tr. 170 (J. DeBlasio); 1604–05 (Selby); Ex. 210.)  In addition, SGH made a $700,000

loan in 2008 to Bernardo Garcia Manzano, a friend of DeBlasio's, in order for Manzano to build

a house in Mexico.  (Ex. 17.)  This loan was assigned to WD Solutions the day before the DC

Capital transaction closed.  Unlike the PGS and Arkel joint ventures, the Manzano loan was not

an operating asset because it did not advance SGH's business interests.

    But the evidence clearly established that the DC Capital transaction, like most

corporate acquisitions, was on a "cash free, debt free" basis.  (Tr. 600 (Campbell); 1147–48

(Lake); Exs. X, Y.)  That is, DC Capital was purchasing the company only with enough working

capital to continue operations, and it was expected that DeBlasio would remove the excess cash from the company. This is the typical practice in private equity deals. (Tr. 1671–72 (Hitchner); 1412–13 (Risius).) It would make little sense for a purchaser to buy cash, so the seller takes the cash out of the company.

Excess cash that is transferred to shareholders is not "proceeds" from the sale, because this is money the company has already earned, it simply has not been invested or disbursed. Previous discussions between Charron and DeBlasio, including the negotiations of DeBlasio's buyout of Charron, show they both understood that excess cash would be removed from a company before a sale and that excess cash does not comprise any of the enterprise value of the company. (Tr. 305–06 (J. DeBlasio); 713–14; 740 (Charron); Exs. F, BG, BK, L, BM.) Charron's attempts to claim he misused the term "enterprise value" in the past and now understands it to include excess cash are unconvincing. (Tr. 729 (Charron) ("I have gotten a lot smarter over the last year.").)

Charron also asserts there was a $14 million transfer from some Sallyport entity to the Florida Charitable Trust after the DC Capital transaction closed. This transfer would stand apart from those above, because after closing, a transfer from Sallyport to DeBlasio would be a payment from a company in which he was no longer the sole shareholder. The Florida Charitable Trust's tax return listed a donation from "Sallyport Global" after the DC Capital transaction closed, with the address as the business address of SGI and SGS. (Tr. 216–17 (J. DeBlasio); Ex. 353.) DeBlasio claims this $14 million was actually a transfer from the Bermuda Charitable Trust and was misidentified on the tax return. (Tr. 215, 218 (J. DeBlasio); 1838–40 (P. DeBlasio).) Defendants produced bank statements consistent with this, showing the Bermuda Charitable Trust wired $14 million to the DeBlasio Group (Ex. 276) followed by a $14 million

deposit from an unlisted source to the Florida Charitable Trust. (Ex. 299.) DeBlasio never

adequately explained why the trust's tax return differed from his own account of where the

money came from. (Tr. 217–18 (J. DeBlasio); 1838–39 (P. DeBlasio).) And there was a

surprising lack of documentation on where exactly the funds came from. But a self-reported tax

return standing alone is not strong evidence in the face of at least some documents pointing to a

different conclusion, and not enough to carry Charron's burden that the $14 million indeed were

proceeds of the sale.

        Defendants raise their own arguments concerning the proceeds received. They

assert that regardless of the enterprise value reflected by the deal, they will never actually receive

more than $65 million. Instead of giving DeBlasio all the cash at once, the deal included a $4

million "holdback" amount which secured any liabilities DeBlasio might ultimately owe DC

Capital Partners. (Exs. B at SGH1-00013898, C at TCHAR0009768.) In February 2012, DC

Capital informed DeBlasio it was keeping the full $4 million. (Ex. 60.) DeBlasio sued DC

Capital, resulting in a May 2013 settlement in which DeBlasio received $4 million and gave up

his rollover equity interest in KSI. (Ex. AD at SGH2-00000473, 479; Tr. 337–40 (J. DeBlasio).)

Another $10 million of the purchase price in the DC Capital transaction is in trust and will be

released to DeBlasio in 2015 if there are no further obligations to the buyers. (Tr. 339 (J.

DeBlasio); Exs. B at SGH1-00013905, C at TCHAR0009756–57.) DeBlasio testified that he

received less than $50 million in cash from the DC Capital transaction, surrendered his rollover

equity interest in KSI, and will not receive more than $60 million even if the full $10 million is

remitted to him in 2015. (Tr. 106, 335; 337–40 (J. DeBlasio); 697 (Campbell).)

        But liabilities arising later between DeBlasio and DC Capital Partners do not

affect the proceeds from the transaction. Those proceeds may have eroded over time as

DeBlasio incurred liabilities leading DC Capital to keep the $4 million holdback, but the fact that DeBlasio incurred liabilities to DC Capital has no more effect on the economics of the transaction than if he incurred them to a third party. What is important is the value of the proceeds DeBlasio received at the time of the transaction, not as altered by after-the-fact events. And the May 2013 settlement was not just a buyout of his rollover equity. It was a settlement of various disputes between DeBlasio and DC Capital. (Tr. 107 (J. DeBlasio).)

Accordingly, DeBlasio's proceeds from the DC Capital transaction are the same as what comprised the calculation of SGH's enterprise value: the $60.7 million in cash, the $18,286,578 rollover equity interest, and the $2.75 million assignment of operating assets, for a total of $78,986,580.75.

### III.   Damages

Nearly as hotly contested as the issue of whether a Windfall Sale occurred is the issue of how to construe the Windfall Provision. Again, a Windfall Sale is defined as a sale of "the Company's capital stock . . . constituting 20% or more by voting power or economic value of the Company's assets or equity to a third party in one or a series of related transactions for a price that reflects an enterprise value of the Company equal to or greater than $65,000,000." (Ex. A § 2.04.) In the event of a Windfall Sale, DeBlasio must pay Charron "an amount equal to 20% of the proceeds received from the Windfall Sale." (Ex. A § 2.04.)

Charron contends this entitles him to 20% of all proceeds received. DeBlasio responds that it is only 20% of the proceeds above the $65 million mark. DeBlasio makes his case with evidence of the parties' negotiations and drafting history. But under New York law, before turning to extrinsic evidence, DeBlasio must first show the provision is ambiguous. See, e.g., Lockheed Martin Corp. v. Retail Holdings, N.V., 639 F.3d 63, 69 (2d Cir. 2011).

-29-

Ambiguity must be determined on the face of the contract; extrinsic evidence may not be introduced in an attempt to create ambiguity. Lockheed Martin, 639 F.3d at 69; W.W.W. Assocs., Inc. v. Giancontieri, 77 N.Y.2d 157, 162 (1990). Whether a contract is ambiguous is an issue of law. Lockheed Martin, 639 F.3d at 69.

      No reading of the Windfall Provision supports DeBlasio's interpretation. Charron is entitled to 20% of "the proceeds received from the Windfall Sale." There is no language introducing the concept of incremental proceeds above the $65 million enterprise value threshold. Nor does the definition of "Windfall Sale" incorporate that idea. A "Windfall Sale" is the entirety of any transaction that meets the criteria, it does not refer to the portion of the sale above the $65 million mark. Instead, the language clearly calls for Charron to receive 20% of "the proceeds received"—that is, all of the proceeds received, without qualification.

      At first blush, DeBlasio's argument has a facial plausibility to it. Why would the parties agree to a provision that creates such a drastic penalty for selling the company for $65 million? For a dollar less, DeBlasio could keep the entire proceeds, but under Charron's interpretation, at $65 million he must pay Charron $13 million, netting $52 million. It creates a huge disincentive to sell the company for a price between $65 and $81.25 million, because DeBlasio would keep more by selling for a dollar less than $65 million. Such a provision is seemingly counterintuitive.

      Charron has suggested a business reason for his interpretation of the provision, which could conceivably have made sense to business partners more accustomed to moving quickly than deliberately and thoughtfully. If DeBlasio sold SGH for $65 million, Charron's interpretation would result in a $13 million payment to Charron. Added to the $40.7 million he redeemed his shares for, he would net $53.7 million, and DeBlasio would net $52 million. If

DeBlasio sold for more than $67.833 million, he would net a little more than Charron.  (Tr. 829–30 (Charron).)  Charron testified that "seemed fair" to him.  (Tr. 830 (Charron).)  Of course, DeBlasio could have sold less than 20% of the company or sold it for $64.9 million, but Charron said he never thought DeBlasio would do that to try to hurt him.  (Tr. 825–26 (Charron).)  In fact, Charron claimed DeBlasio picked the $65 million trigger, and Charron was indifferent to it because he knew the company was worth "way more" than $65 million and he was confident DeBlasio would not sell for less.  (Tr. 824–26 (Charron); 12–13 (O'Connor).)

And DeBlasio's interpretation is completely divorced from the language of the provision when one considers a Windfall Sale of less than 100% of SGH's stock.  At trial, Peter Phelps, SGH's chief financial officer, explained how DeBlasio's interpretation of the Windfall Provision would be applied to a sale of 25% of the company for $25 million.  Because this would reflect an enterprise value of $100 million, there is no doubt the provision is triggered.  Charron's interpretation is simple: 20% of the $25 million proceeds would result in a payment to Charron of $5 million.  But under DeBlasio's theory, several calculations are needed: the $65 million threshold is subtracted from the $100 million enterprise value, resulting in $35 million.  Charron is then entitled to receive 20% of that $35 million difference, or $7 million.  (Tr. 932–33 (Phelps).)  So under DeBlasio's interpretation, some sales would result in Charron receiving more than under Charron's interpretation.

This is too far removed from the language of the Windfall Provision to be a plausible interpretation.  For a sale of less than 100% of the company, DeBlasio would apply the 20% figure to the difference between the enterprise value and $65 million, but the Windfall Provision clearly states that Charron is to receive 20% of "the proceeds received."  In the above

example, the $35 million figure is not "proceeds received." In fact, the $35 million would be $10 million more than the proceeds actually received.

Because there is no ambiguity, DeBlasio must seek reformation of the contract. "Under New York law, a contract can be reformed only when there was a mutual mistake or unilateral mistake combined with fraud." Barbagallo v. Marcum LLP, 820 F. Supp. 2d 429, 440 (E.D.N.Y. 2011). A party seeking reformation for mutual mistake must show "show in no uncertain terms, not only that mistake . . . exists, but exactly what was really agreed upon between the parties." Loewenson v. London Market Companies, 351 F.3d 58, 61 (2d Cir. 2003) (quoting George Backer Mgmt. Corp. v. Acme Quilting Co., 46 N.Y.2d 211, 219 (1978)); see also Restatement (Second) of Contracts, §155. There is a "heavy presumption that a deliberately prepared and executed written instrument manifests the true intention of the parties, and a correspondingly high order of evidence is required to overcome that presumption." Chimart Assocs. v. Paul, 66 N.Y.2d 570, 574 (1986) (internal quotations and citations omitted). The party seeking reformation must present clear and convincing evidence. Barbagallo, 820 F. Supp. 2d at 441 (citing Nash v. Kornblum, 12 N.Y.2d 42, 46 (1962).

There is parol evidence showing DeBlasio wanted a provision that applied only to proceeds above a threshold amount. On November 30, 2010, an attorney for SGH first proposed a windfall provision that applied to the entire purchase price. (Ex. R.) DeBlasio replied, copying Charron, stating what he wanted was that "[i]n the event of a transaction in the next calendar year, [Charron] can share in a reasonable portion of anything above [a set] amount." (Ex. R.) The attorney responded, proposing contract language reflecting DeBlasio's wish that Charron receive only a percentage of the proceeds over a certain amount. (Ex. R.) He later emailed DeBlasio and Charron discussing how various scenarios would payout to Charron, again

-32-

reflecting Charron receipt of a percentage above a threshold amount.  (Ex. R.)  All of these communications were exchanged on November 30.

But while DeBlasio wanted a provision applying to an incremental amount of the proceeds received, Charron wanted a provision that applied to all of the proceeds of a Windfall Sale.  According to Charron, he wanted a provision that would apply to sales in the next three years and provide him with 20% of all proceeds received while DeBlasio wanted a one-year provision applying to 20% of the proceeds over a threshold.  Charron maintains they compromised with a one-year provision applying to 20% of the total proceeds.  (Tr. 440–41 (Charron).)  Charron's credibility on this point is questionable, as it was the first time in the litigation he mentioned it, and it appeared to conflict with deposition testimony that he did not recall discussing the windfall provision after the emails described above.  (Tr. 745–52 (Charron).)

The parol evidence aptly demonstrates DeBlasio <u>wanted</u> a provision that applied only to proceeds over $65 million, but what is at issue is what the parties agreed on.  SGH's attorney proposed language that reflected DeBlasio's wish, but that language was not included in the final agreement.  Defendants argue the November 30 emails discussed above are the best evidence of what the parties wanted in the Windfall Provision, but negotiations over the provision continued after that date.  Indeed, Charron did not retain an attorney until December 1. (Tr. 55 (O'Connor).) Charron's lawyer testified that after receiving WilmerHale's proposed language on December 3, he edited it and made proposals until December 6.  (Tr. 58 (O'Connor).)  A draft version of the agreement from November 30 contained the following:

> In the event that Sallyport commits to sell shares, to a third party, subsequent to this transaction, for a purchase price exceeding an enterprise value of $65 million, in the period ending one year from

the date of closing, the Selling Shareholder will receive 20% of the
sales proceeds, as additional compensation.

(Ex. T at JD1-00011868.)  This provision is quite different from the language in the final

agreement, which substitutes "John DeBlasio or any of his affiliates or any other direct or

indirect equity holder" for "Sallyport," requires that a Windfall Sale be of at least 20% of the

company "by voting power or economic value of the Company's assets or equity," permits a

Windfall Sale to be "one or a series of related transactions," and requires that payment be made

to Charron "within three Business Days following the closing of such Windfall Sale."  (Ex. A §

2.04.)  Negotiations of the Windfall Provision clearly extended beyond the November 30 email,

and the best evidence of what the parties actually agreed to, as in all cases, is the contract itself.

DeBlasio has not shown by clear and convincing evidence that the parties made a mutual mistake

and used language different from their agreement.

In a case of unilateral mistake, a party is only entitled to reformation if the other

party is guilty of fraud.  AMEX Assurance Co. v. Caripedes, 316 F.3d 154, 161 (2d Cir. 2003);

Barbagallo, 820 F. Supp. 2d at 440.  There is no evidence of fraud on Charron's part in the

negotiation and drafting of the Windfall Provision.

Having failed to present clear and convincing evidence of mutual mistake,

DeBlasio is not entitled to reformation of the clear language of the Windfall Provision, which

requires that Charron be paid 20% of all proceeds received from a Windfall Sale.

IV.   Counterclaims

The parties dispute what law applies to the counterclaims against Charron.

Because Charron was in Florida when he wrote the checks to himself, SGH contends Florida law

applies.  Charron argues the New York choice of law provision in the stock purchase agreement

controls.  (Ex. A § 6.05.)

     The scope of the choice of law provision is determined by New York Law.

Finance One Pub. Co. v. Lehman Bros. Special Financing, Inc., 414 F.3d 325, 333 (2d Cir.

2005.)  Broad choice of law provisions can apply to tort claims when they state they apply to

controversies "arising out of" or "relating to" the contract.  Turtur v. Rothschild Registry Int'l,

Inc., 26 F.3d 304, 309 (2d Cir. 1994.)  But the provision here is narrower.  It states

> This Agreement shall be governed by and construed in accordance
> with the laws of the State of New York.  The parties agree that the
> exclusive place of jurisdiction for any action, suit or proceeding
> relating to this agreement shall be in the Court of the United States
> of America sitting in the Borough of Manhattan in the City of New
> York or, if such courts shall not have jurisdiction over the subject
> matter thereof, in the courts of the State of New York sitting
> therein . . .

(Ex. A § 6.05.)  This provision provides only that the contract itself "be governed and construed

in accordance" with New York law.  That language is not broad enough to encompass tort claims

relating to the contract.  See Krock v. Lipsay, 97 F.3d 640, 645 (2d Cir. 1996.)  The "relating to"

language relates only to the forum, not the choice of law.

     "Under New York law, 'the first step in any case presenting a potential choice of

law issue is to determine whether there is an actual conflict between the laws of the jurisdictions

involved.'"  In re Thelen LLP, 736 F.3d 213, 219 (2d Cir. 2013) (quoting GlobalNet

Financial.com, Inc v. Frank Crystal & Co., 449 F.3d 377, 382 (2d Cir. 2006).)  There is a conflict

here because Florida's civil theft statute permits treble damages and attorney's fees.  Fla. Stat. §§

772.11, 55.03(2.)  New York's interest analysis test determines the law applicable to torts.  In re

Thelen, 736 F.3d at 219.  Under that test, "the law of the jurisdiction having the greatest interest

in the litigation will be applied and . . . the [only] facts or contacts which obtain significance in defining State interests are those which relate to the purpose of the particular law in conflict." In re Thelen, 736 F.3d at 219 (omission and alteration in original) (quoting GlobalNet, 449 F.3d at 384.) "[T]he significant contacts are, almost exclusively, the parties' domiciles and the locus of the tort." In re Thelen, 736 F.3d at 219–20 (quoting Schultz v. Boy Scouts of Am., Inc., 65 N.Y.2d 189, 197 (1985).)

"Under the interest-analysis test, torts are divided into two types, conduct-regulating rules, such as 'rules of the road,' and loss-allocation rules, 'such as those limiting damages in wrongful death actions, vicarious liability rules, or immunities from suit.'" In re Thelen, 736 F.3d at 220 (quoting GlobalNet, 449 F.3d at 384.) "If conflicting conduct-regulating laws are at issue, the law of the jurisdiction where the tort occurred will generally apply because that jurisdiction has the greatest interest in regulating behavior within its borders." In reThelen, 736 F.3d at 220 (quoting Cooney v. Osgood Mach., Inc., 81 N.Y.2d 66, 72 (1993).) "If the conflict involves loss-allocation rules, 'the site of the tort is less important, and the parties' domiciles are more important.'" In re Thelen, 736 F.3d at 220 (quoting GlobalNet, 449 F.3d at 384–88.) Here, the substantive conversion and civil theft provisions are conduct-regulating laws, but the most salient conflict between New York and Florida law, the allowance of treble damages, is a loss-allocation rule. Because both the site of the tort and Charron's domicile were in Florida, Florida law applies. (Tr. 523 (Charron).)

SGH brings counterclaims for violations of Florida's civil theft statute, and in the alternative, for conversion and unjust enrichment. Florida law provides a civil remedy allowing for treble damages for violations of its criminal theft statutes. Fla. Stat. § 772.11. A plaintiff must prove "by clear and convincing evidence" injury by criminal theft. Fla Stat. § 772.11;

Almeida v. Amazon.com, Inc., 456 F.3d 1316, 1326–27 (11th Cir. 2006).  The relevant theft statute here is Fla. Stat. § 812.014.  To establish criminal theft, SGH must show Charron "(1) knowingly (2) obtained or used, or endeavored to obtain or use, [SGH's] property with (3) 'felonious intent' (4) either temporarily or permanently to (a) deprive [SGH] of its right to or a benefit from the property or (b) appropriate the property to [Charron's] own use or to the use of any person not entitled to the property."  United Techs. Corp. v. Mazer, 556 F.3d 1260, 1270 (11th Cir. 2009); see also Fla. Stat. § 812.014.

        Under Florida law, "[c]onversion is an 'act of dominion wrongfully asserted over another's property inconsistent with his ownership therein.'"  United Techs. Corp., 556 F.3d at 1270 (quoting Thomas v. Hertz Corp., 890 So. 2d 448, 449 (Fla. Dist. Ct. App. 2004)).  "The tort 'may occur where a person wrongfully refuses to relinquish property to which another has the right of possession,' and it 'may be established despite evidence that the defendant took or retained property based upon the mistaken belief that he had a right to possession, since malice is not an essential element of the action.'"  United Techs. Corp., 556 F.3d at 1270 (quoting Seymour v. Adams, 638 So. 2d 1044, 1047 (Fla. Dist. Ct. App. 1994)).

        To prove unjust enrichment under Florida law, SGH must show (1) "a benefit conferred" upon Charron by SGH, (2) Charron's "appreciation of the benefit," and (3) Charron's "acceptance and retention of the benefit under circumstances that make it inequitable for him to retain it without paying the value thereof."  United Techs., 556 F.3d at 1270 (quoting Rollins, Inc. v. Butland, 951 So. 2d 860, 876 (Fla. Dist. Ct. App. 2006)).

        Charron's first line of defense is that he deposited the checks on December 7, 2010, that the transaction closed on December 8, and that the agreement contained a release of all claims the parties might have against each other which arose before closing.  (Ex. A § 5.03.)

Defendants contend the deal closed on December 7 before Charron's withdrawal of funds.  But exculpatory clauses, no matter how broad their language, cannot absolve liability for intentional torts.  <u>Loewe v. Seagate Homes, Inc.</u>, 987 So.2d 758, 760 (Fla. Dist. Ct. App. 2008); <u>Kellums v. Freight Sales Centers, Inc.</u>, 467 So.2d 816, 817 (Fla. Dist. Ct. App. 1985); <u>see also</u> <u>Lago v. Krollage</u>, 78 N.Y.2d 95, 100 (1991); <u>Great Northern Assocs. v. Cont'l Cas. Co.</u>, 192 A.D.2d 976, 978 (N.Y. App. Div. 1993).)  A general release is not a free pass to take what you want on your way out the door.

By December 2010, Charron had not been paid his monthly salary as SGH's CEO since October 31, 2010.  (Tr. 467 (Charron).)  The $44,400 check Charron wrote himself on December 7 accurately reflected his salary for that period, and it was reported as salary on his W2 form from SGH.  (Tr. 467 (Charron).)  But payroll checks were issued by the DeBlasio Group.  (Tr. 789 (Phelps).)  Employees, including Charron, could not just pay themselves.

Similarly, Charron failed to follow SGH's procedures for reimbursement of expenses.  Charron himself instituted a system whereby Phelps reviewed and approved expenses.  (Tr. 876 (Phelps).)  The largest of these was a $29,695 reimbursement for rental of Charron's Florida home.  (Ex. 402 at TCHAR5-000030.)  Charron claims this was a reimbursable expense because his home doubled as a headquarters for an SGH subsidiary, but there was no agreement as to whether that was a proper reimbursement.  (Tr. 872–74 (Phelps).)  As Phelps testified, DeBlasio's position might be "we don't need a Florida office, you just want to live in Florida."  (Tr. 873 (Phelps).)  And though Charron paid the rent on the Florida home in June, it apparently did not occur to him to submit the reimbursement expense until his buyout was completed.

The "Tom/John account" was a remarkably crude method for a business enterprise with tens of millions of dollars in revenue to track cash withdrawals by its two

shareholders.  In 2010, Charron and DeBlasio had agreed to reconcile the account and ensure

both had taken an equal amount out of the company.  (Tr. 464–65 (Charron); 355 (J. DeBlasio).)

One spreadsheet does show that DeBlasio had received $147,727 more than Charron (Ex. 145.),

but no one statement of the Tom/John account appears to have been definitive.  Instead, there

were several versions floating around, none reconcilable with the others.  (Tr. 869–70 (Phelps).)

At a minimum, Charron owed a duty to SGH to state what the company owed him and to

negotiate a sum when he knew that the stock purchase agreement would include a mutual

exchange of general releases.  He never did that.  Instead, he elected to write himself a check and

then hold it until he got everything he had bargained for in the stock purchase agreement.

   There are even more ways in which Charron failed to follow appropriate

procedures with respect to all three checks.  He resigned on December 7 (Tr. 771 (Charron); Ex.

AI.), and never reported to anyone at SGH that he had caused the company to issue checks to

himself.  And a July 9, 2010 SGH board resolution required written authorization from both

DeBlasio and Charron for withdrawals of over $25,000 (Exs. AG, CP.)

   Charron's unilateral and secret withdrawals were unorthodox even in an

environment lax in recognizing corporate formalities.  Charron wrote two of the checks on

December 3 and the third on December 7, but held them until he was certain SGH had wired

$40.7 million to his account and there was no chance that disputes over the checks could scuttle

his buyout.  And while he was facile with email, he chose not to send the supporting

documentation electronically, and instead dropped it at a FedEx office.  This Court finds that

Charron's choreographed actions were designed for one purpose: to conceal from SGH and

DeBlasio that he was taking an extra $227,364.22 out of the company coffers.

While Charron's self-help at the moment of closing is beyond the pale and constitutes a conversion and unjust enrichment, this Court cannot conclude that Charron had the requisite "felonious intent" to warrant an award of triple damages under Florida's theft statute. As for the Tom/John account, because the different spreadsheets could not be reconciled, Phelps decided to "call it a wash, call it even." (Tr. 869–70 (Phelps).)  But he noted that decision was "maybe just between Pat [DeBlasio] and I, I don't know." (Tr. 869 (Phelps).)  Pat DeBlasio is John DeBlasio's brother and provided accounting services to SGH.  Phelps has no recollection of telling Charron that the Tom/John account was "a wash." (Tr. 886 (Phelps).)  So while Phelps may have decided the account was simply a wash, Charron may have reasonably believed the account could be reconciled based on the spreadsheet he had.  With respect to accrued salary and expense reimbursements, Charron and DeBlasio often ignored the dual-signature requirement. (Tr. 476 (Charron).)  And Charron could have reasonably believed his rent was a reimbursable expense. (Tr. 469–70 (Charron).)  All of the other expenses were unexceptional and routine, such as economy airfares and standard hotel rooms.  (Ex. 402.)

In sum, with this freewheeling approach to accounting and payments, the evidence of criminal intent is not clear and convincing.  Accordingly, Defendant Sallyport Global Holdings, Inc.'s counterclaim under Florida's theft statute for treble damages fails.  But its counterclaims for conversion and unjust enrichment against Charron are granted in the amount of $227,364.22.

CONCLUSION

This lawsuit is a sad denouement to what began as a vibrant and symbiotic partnership between two West Point graduates. After serving their country in the military, they continued to serve by providing logistical support in dangerous overseas theaters. That business earned them tens of millions of dollars. Ultimately, each turned his vast fortune against the other in a litigation bonanza rivaling Warren Adler's "The War of the Roses." This business divorce should never have spilled into a federal courtroom.

For the reasons set forth in this Opinion and Order, Plaintiff Thomas W. Charron, Jr. is entitled to 20% of $78,986,580.75, which is $15,797,316.15 against Defendants Sallyport Global Holdings, Inc.; JPD Private Trust Company, Ltd; and John P. DeBlasio. Defendant Sallyport Global Holdings, Inc. is entitled to $227,364.22 on its counterclaims for conversion and unjust enrichment against Charron. The parties are directed to submit a proposed final judgment by December 22, 2014.

Dated:  December 10, 2014
        New York, New York

SO ORDERED:

_____
WILLIAM H. PAULEY III
U.S.D.J.

*Counsel of Record:*

Brian A. Glasser, Esq.
Bailey & Glasser, LLP
209 Capitol Street
Charleston, WV  25301

-41-

Athanasios Basdekis, Esq.
Bailey & Glasser, LLP
2855 Cranberry Square
Morgantown, WV 26508

James B. Perrine, Esq.
Bailey & Glasser, LLP
201 Monroe Street, Suite 2170
Montgomery, AL 36104
*Counsel for Plaintiff*

Brian P. Waagner, Esq.
Elizabeth G. Leavy, Esq.
Thomas F. Rath, Esq.
Michael Gatje, Esq.
Husch Blackwell LLP
750 17th Street N.W. Suite 900
Washington, DC 20006

Daniel P. Jaffe, Esq.
Omri E. Praiss, Esq.
Husch Blackwell LLP
190 Carondelet Plaza, Suite 600
St. Louis, MO 63105-3441
*Counsel for Defendants*